**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

In re:

                        Case No. 24-21743-gmh

Wisconsin & Milwaukee Hotel LLC,

                        Chapter 11

              Debtor.

**DEBTOR'S SUPPLEMENT TO SECOND AMENDED**
**CHAPTER 11 PLAN OF REORGANIZATION**
**OF WISCONSIN & MILWAUKEE HOTEL LLC**
**DATED JUNE 27, 2025**

Wisconsin & Milwaukee Hotel LLC, ("**Debtor**" or "**WMH**"), by its attorneys Richman & Richman LLC, by Michael P. Richman and Eliza M. Reyes, pursuant to the Order Modifying Schedule for Hearing on Confirmation of Chapter 11 Plan entered by the Court on May 28, 2025 [Doc 562], hereby submits the documents identified in the following Table of Contents as supplements ("**Plan Supplement**") to the Second Amended Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC Dated June 27, 2025 ("**Plan**") [Doc 621].

Dated: July 3, 2025.

                              **RICHMAN & RICHMAN LLC**
                              **Attorneys for Debtor**

By:   */s/ Michael P. Richman*
      Michael P. Richman
      Claire Ann Richman
      Eliza M. Reyes
      122 West Washington Avenue, Suite 850
      Madison, WI 53703
      Tel: (608) 630-8990
      Fax: (608) 630-8991
      mrichman@RandR.law
      crichman@RandR.law
      ereyes@RandR.law

Case 24-21743-gmh    Doc 627    Filed 07/03/25    Page 2 of 69

**Debtor's Note on Plan Supplement**

The Documents comprising this Plan Supplement are in substantially final form. There may be some typographical and other minor (non-material) errors that require correction. The Debtor intends that the documents will be finalized, and where signatures are required, executed, with respect to the various equity offering documents (except the subscription agreement, which must first be distributed to unsecured creditors), such that final executed documents will be offered into evidence during the Plan Confirmation Hearings scheduled to begin on July 21, 2025.

i

# Plan Supplement - Table of Contents

Debtor's Note on Plan Supplement ..................................................................... i

Amended and Restated Operating Agreement
   of Wisconsin & Milwaukee Hotel LLC ....................................................... Exhibit A

Wisconsin & Milwaukee Hotel LLC Subscription Documents
   Instructions ................................................................................... Exhibit B

Offering Procedures ......................................................................... Exhibit C

Backstop Equity Commitment Letter –
   Jackson Street Management LLC ............................................................ Exhibit D

Loan Commitment Letter Agreement –
   Reiman Family Investment Company, LLC ............................................... Exhibit E

Promissory Note ................................................................................ Exhibit F

3

# EXHIBIT A

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## <u>WISCONSIN & MILWAUKEE HOTEL LLC</u>

### A Wisconsin Limited Liability Company

This AMENDED AND RESTATED OPERATING AGREEMENT (this **"Agreement"**) of WISCONSIN & MILWAUKEE HOTEL LLC, a Wisconsin limited liability company (the **"Company"**), dated as of _____, 2025, is agreed to by the undersigned Members of the Company.

## RECITALS

WHEREAS, the Members previously entered into that certain Operating Agreement, dated January 1, 2011, as amended from time to time (the "Prior Agreement");

WHEREAS, the Members desire to amend and restate the Prior Agreement and have agreed to operate a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Members hereto desire to set forth herein their understandings with respect to the governance of the Company and the transfer of ownership interests therein;

NOW, THEREFORE, for good and valuable consideration, the Members, intending to be legally bound, agree as follows:

## ARTICLE 1
## <u>CERTAIN DEFINITIONS</u>

Certain capitalized terms haven the meanings given them on <u>Exhibit A</u>.

## ARTICLE 2
## <u>ORGANIZATION</u>

2.1 <u>Organization</u>. The Company has been organized as a Wisconsin limited liability company under and pursuant to the Act and the issuance of Articles for the Company by the Department of Financial Institutions of the State of Wisconsin. The rights and obligations of the Members are as set forth in the Act except as this Agreement expressly provides otherwise.

2.2 <u>Name</u>. The name of the Company is "Wisconsin & Milwaukee Hotel LLC" and all Company business must be conducted in that name or such other name as the Manager may select from time to time and which is in compliance with all applicable laws.

2.3 <u>Registered Office and Registered Agent and Principal Office</u>. The registered office of the Company required by the Act to be maintained in the State of Wisconsin is the office of the registered agent named in the Articles or such other office as the Manager may designate from

15516721

time to time in the manner provided by law. The registered agent of the Company in the State of Wisconsin is Jon Herreman or such other Person or Persons as the Manager may designate from time to time. The principal office of the Company may be at such place as the Manager may designate from time to time.

2.4     Purposes. The purpose of the Company is to conduct any and all lawful business whatsoever that may be conducted by limited liability companies pursuant to the Act.

2.5     Term. The Company commenced on the date of issuance of its Articles and has a perpetual term and will continue until it is dissolved in accordance with either the provisions of this Agreement or the Act.

2.6     Recapitalization, Acquisitions, Restructuring and Mergers. The Company may participate in or be a party to any recapitalization, acquisition, restructuring or merger in accordance with and as allowed by the Act.

2.7     Entity Declaration. The Company is not a general partnership, a limited partnership or a joint venture, and no Member or Manager should be considered a partner or joint venturer of or with any other Member or Manager, for any purposes other than for federal and state tax purposes, and this Agreement shall not be construed otherwise.

ARTICLE 3
CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

3.1     Capital Contributions. The Class A Members as of the date of this Agreement were holders of membership interests under the Prior Agreement and such membership interests are represented by and converted into Class A Units under this Agreement. Such Class A Members have made such initial Capital Contributions as are set forth on the books and records of the Company. Each Class B Member subscribing for Class B Units in the Offering shall contribute to the Company such Class B Member's required Capital Contribution at the time and in the manner set forth in their Subscription Agreement.

3.2     Subsequent Contributions. The Members will not be obligated to make any additional Capital Contributions to the Company in excess of their initial Capital Contributions as described above in Section 3.1.

3.3     Return of Capital Contributions. Except as expressly provided herein, no Member shall be entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member or Manager.

3.4     Loans by Manager and Members. Any Manager or Member may, but is not obligated to, loan to the Company such sums as the Manager determines to be appropriate for the conduct of the Company's business. Any such loans shall be made upon terms and for such maturities as the Manager determines are commercially reasonable.

2

15516721

3.5     <u>Capital Accounts</u>. A separate capital account ("**Capital Account**") will be maintained for each Member in accordance with Reg. Sec. 1.704-1(b)(2)(iv). Subject to the requirements of Reg. Sec. 1.704-1(b)(2)(iv):

    (a)     the Company will credit each Member's Capital Account with: (i) all cash contributions of such Member to the Company; (ii) the Net Agreed Value of Contributed Property; (iii) such Member's share of the Company's Profits; (iv) the amount of any liabilities of the Company assumed by such Member (other than liabilities included in the netting process of subsection (b)(ii) below or increases in the Member's share of the Company's liabilities determined in accordance with the provisions of Code Sec. 752); and (v) the amount of any basis increase in Company Property attributable to investment credit recapture allocated to such Member; and

    (b)     the Company will debit each Member's Capital Account for: (i) distributions of cash to such Member; (ii) the Net Agreed Value of Company Property distributed to such Member; (iii) such Member's share of the Company's Losses (including expenditures which can neither be capitalized nor deducted for tax purposes, organization and syndication expenses not subject to amortization, and loss on sale or disposition of Company Property, whether or not disallowed under the rules of Code Sec. 267 or Sec. 707, but excluding losses or deductions described in Reg. Sec. 1.704-1(b)(4)(i) or (iii)); (iv) the amount of any liabilities of such Member assumed by the Company (other than liabilities already included in the netting process of subsection (a)(ii) above or decreases in the Member's share of the Company's liabilities determined in accordance with the provisions of Code Sec. 752); and (v) the amount of any basis decrease in Company Property attributable to investment credit recapture allocated to such Member.

3.6     <u>Capital Accounts Upon Sale or Exchange of Units</u>. Upon the sale or exchange of a Unit the Capital Account of the selling or exchanging Member will be transferred to the transferee on a pro rata basis.

3.7     <u>Revaluation of Capital Accounts Upon Occurrence of Certain Events</u>.

    (a)     <u>Contributions</u>. In accordance with the provisions of Reg. Sec. 1.704-1(b)(2)(iv)(f) if, after the initial capital is contributed pursuant to <u>Section 3.1</u>, money or property in other than a de minimis amount is contributed to the Company in exchange for an Interest, the Carrying Values of all the Company's Property (determined immediately prior to such issuance) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each such Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such issuance. In determining the Unrealized Gain or Unrealized Loss, the fair market value of Company Property shall be as determined by the Manager.

    (b)     <u>Distributions</u>. In accordance with the provisions of Reg. Sec. 1.704-1(b)(2)(iv)(f), if money or Company Property in other than a de minimis amount is distributed to a Member in exchange for all or part of an Interest, the Carrying Values of all the Company's Property (determined immediately prior to such distribution) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each item of Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on

15516721

a sale of each such item of Company Property immediately prior to such distribution. In determining the Unrealized Gain or Unrealized Loss, the fair market value of the distributed Property shall be as determined by the Manager.

(c) <u>Liquidation</u>. If the Company is liquidated within the meaning of Treas. Reg. Sec. 1.704-1(b)(2)(ii)(g), the Carrying Values of all of the Company's Property (determined immediately prior to the liquidation) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each Company Property as if the Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such liquidation. In determining the Unrealized Gain or Unrealized Loss, the fair market value of the Company Property shall be determined by the Manager.

(d) <u>Services</u>. In accordance with the provisions of Treas. Reg. Sec. 1.704-1(b)(2)(iv)(f), if the Company grants an Interest (other than a de minimis Interest) as consideration for the performance of services to or for the benefit of the Company, the Carrying Values of all the Company's Property (determined immediately prior to such issuance) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each such Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such issuance. In determining the Unrealized Gain or Unrealized Loss, the fair market value of Company Property shall be as determined by the Manager.

(e) <u>Other Adjustments</u>. The Carrying Values of Company Property shall be increased or decreased to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to (i) Treas. Reg. Sec. 1.704-1(b)(2)(iv)(m); and (ii) subparagraph (g) of the definition of Profits and Losses hereof, provided, however, that Carrying Value shall not be adjusted pursuant to this subparagraph to the extent the Manager determines that an adjustment pursuant to <u>Sections 3.7(a), (b), (c)</u> or <u>(d)</u> is necessary or appropriate in connection with the transaction that would otherwise result an adjustment pursuant to this subparagraph (e).

(f) <u>Manager Discretion</u>. The adjustments pursuant to subparagraphs (a), (b) or (d) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

## ARTICLE 4
## <u>ALLOCATIONS AND DISTRIBUTIONS</u>

4.1 <u>Allocation of Profits</u>. After giving effect to the special allocations set forth in <u>Section 4.3</u>, Profits for each fiscal year shall be allocated among the Members in accordance with their Percentage Ownerships.

4

15516721

4.2     Allocation of Losses.

(a)     After giving effect to the special allocations set forth in Section 4.3, Losses for each fiscal year shall be allocated among the Members in accordance with their Percentage Ownerships.

(b)     The Losses allocated pursuant to Section 4.2(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to this Section 4.2, the limitations set forth in this Section 4.2(b) will be applied on a Member-by-Member basis so as to allocate the maximum permissible loss to each Member under the Treasury Regulations.

4.3     Special Allocations. Items of income, gain, loss and deduction will be allocated in accordance with the provisions of this Section 4.3 without regard to the allocation provisions contained in Sections 4.1 and 4.2, in the following order:

(a)     Minimum Gain Chargeback. Notwithstanding any other provision of this Article 4, if there is a net decrease in Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Minimum Gain, determined in accordance with Reg. Sec. 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. Sec. 1.704-2(f)(6) and (j)(2). This Section 4.3(a) is intended to comply with the minimum gain chargeback requirement in Reg. Sec. 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Notwithstanding any other provision of this Article 4 except Section 4.3(a), if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Reg. Sec. 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Reg. Sec. 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Members pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. Sec. 1.704-2(i)(4) and (j)(2). This Section 4.3(b) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. Sec. 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. If any Member's Capital Account is unexpectedly adjusted for, or such Member is unexpectedly allocated or there is unexpectedly distributed to such Member any item described in Reg. Sec. 1.704-1(b)(2)(ii)(d)(4)-(6), and such treatment creates or increases a Member's Adjusted Capital Account Deficit, then without regard to the allocation provisions provided in Sections 4.1 and 4.2, the Company shall

5

15516721

allocate to such Member items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this Section 4.3(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.3(c) were not in this Agreement.

(d)　　Gross Income Allocation. In the event that a Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) the amount the Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount the Member is deemed to be obligated to restore pursuant to Reg. Secs. 1.704-2(g) and (i)(5), the Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.3(d) shall be made if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.3(d) were not in this Agreement.

(e)　　Nonrecourse Deductions. Nonrecourse Deductions, if any, for any fiscal year shall be allocated to the Members in accordance with their Percentage Ownership.

(f)　　Member Nonrecourse Debt Deductions. Any Member Nonrecourse Debt Deductions for any fiscal year shall be allocated to the Member who bears the risk of loss with respect to the liability to which such Member Nonrecourse Debt Deductions are attributable in accordance with Reg. Sec. 1.704-2(i).

(g)　　Unrecaptured Section 1250 Gain. For purposes of determining the amount of unrecaptured section 1250 gain allocable to each Member, a Member's share of depreciation is determined in accordance with Reg. Sec. 1.1245-1(e), so that the unrecaptured Section 1250 gain is allocated to the Members who received the depreciation deductions.

(h)　　Curative Allocations. The allocations set forth in Section 4.2(b) and Sections 4.3(a) through 4.3(g) ("**Regulatory Allocations**") are intended to comply with certain requirements of Reg. Sec. 1.704-1(b). Notwithstanding any other provision of Article 4 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other profits, losses and other items and the Regulatory Allocations to each Member shall be equal to the amount that would have been allocated if the Regulatory Allocations had not occurred.

(i)　　Code Section 704(c) Allocations. In accordance with Code Sec. 704(c), income, gain, loss and deduction concerning any Contributed Property shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the Net Agreed Value of such property upon contribution. If the value of any Company Property is adjusted under Section 3.7 of this

6

15516721

Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its Carrying Value in the same manner as under Code Sec. 704(c). Allocations under this Section 4.3(i) are solely for purposes of federal income taxes and will not affect or be taken into account in computing any Member's Capital Account.

4.4     Other Allocation Rules.

(a)     In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such fiscal year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such fiscal year in accordance with Code Sec. 706, using any convention permitted by law and selected by the Manager.

(b)     Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Reg. Sec. 1.752-3(a)(3), and solely for such purpose, the Member's Percentage Ownership in the Company is specified to be his applicable interest.

(c)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

4.5     Allocations Concerning Transferred Units. Unless the Code requires otherwise, any Profits or Losses allocable to a Unit which has been transferred during any year shall be allocated among the Persons who were holders of such Unit during such year by taking into account their varying interests during such taxable year in accordance with Code Sec. 706(d) and using any convention selected by the Manager.

4.6     Distribution of Net Cash Receipts. Except as otherwise provided in Section 11.3, Net Cash Receipts, if any, shall be distributed from time to time when determined by the Manager to holders of Membership Interests on a pro rata basis, in proportion to their Percentage Ownerships.

ARTICLE 5
MEMBERSHIP; DISPOSITIONS OF INTERESTS

5.1     Representations and Warranties. Each Member hereby represents and warrants to the Company and to each other Member that:

(a)     Organization and Authority Matters. (i) If that Member is a corporation, limited liability company, partnership, trust, or other entity, it is duly organized, validly existing, and in good standing under the law of the state of its organization and is duly qualified and (if applicable) in good standing as a foreign entity in the jurisdiction of its principal place of business (if not organized therein); (ii) the Member has full corporate, limited liability company, partnership, trust, or other applicable power and authority to execute and agree to this Agreement and to perform its obligations hereunder and all

7

necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by that Member have been duly taken; (iii) the Member has duly executed and delivered this Agreement; and (iv) the Member's authorization, execution, delivery, and performance of this Agreement does not conflict with (A) any law, rule or court order applicable to that Member, (B) that Member's articles of incorporation, bylaws, partnership agreement, agreement or certificate of organization, or (C) any other agreement or arrangement to which that Member is a party or by which it is bound;

(b)     Investment Matters. (i) The Member is acquiring his Interest for his own account for investment and not with a view to the resale, distribution or fractionalization thereof; (ii) the Member is an accredited investors as such term is defined in Regulation D under the Securities Act of 1933; (iii) the Member has, alone or together with his purchaser representatives, such knowledge and experience in financial matters that he is capable of evaluating the relative risks and merits of this investment; (iv) the Member has adequate means of providing for his current needs and personal contingencies and has no need for liquidity in this investment and is able to bear the economic risk of this investment for an indefinite period of time; (v) all documents and records requested by the Member have been delivered or made available to him and the Member's investment decision is based upon his own investigation and analysis and not the representations or inducements of any Manager or Member; (vi) the Member understands that the Interests have not been, and will not be, registered under the Securities Act of 1933 in reliance upon applicable exemptions from registration; and (vii) the Member under that there are substantial restrictions on the transferability of the Interests under the Securities Act of 1933 and state securities laws and under this Agreement and further understands that for the foreseeable future, there will be no public market for the Interests and the Company is under no obligation to register the Interests under the Securities Act of 1933 at some future date.

5.2     Restrictions on Transfer of Units.

(a)     No Transfers. Except as otherwise specifically provided in this Agreement, the parties have agreed that it is not desirable that any of the Units be sold or transferred because the Members desire to provide for continuity of membership and management of the Company. No Member may Transfer any Interest in the Company except as specifically permitted in Sections 5.3 or 5.4. Any attempted Transfer of an Interest, or any part thereof, without compliance with this Agreement shall be, and is hereby declared, null and void ab initio. The Members agree that the foregoing transfer restriction is intended to permit the harmonious operation of the Company's business, is reasonable in view of the Company's purpose and the relationship of the Members, and may be specifically enforced by the Company, the Manager and each Member.

(b)     Effectiveness of Assignment. Any Transfer of Units must be made by a written instrument. No Transfer will be effective unless it is specifically permitted under Section 5.2(a) and:

(i)      neither the Transfer nor any offering in connection therewith violates any provision of any federal or state securities law;

(ii)     the transferee executes a statement that he is acquiring such Interest or such part thereof for his own account for investment and not with a view to distribution, fractionalization or resale thereof;

(iii)    such Transfer would not result in the termination of the Company (within the meaning of Section 708(b) of the Code) or termination of its status as a partnership under the Code; and

(iv)    the Company receives a transfer fee sufficient to cover all expenses in connection with the transfer, including but not limited to legal fees incurred in connection with confirming the matters referred to in subsections (i) and (iii), subject to the Manager's right to waive these fees in its sole discretion.

(c)     <u>Requirements for Admission</u>. No transferee of Units shall have the right to become a Member unless and until the Transfer becomes effective in accordance with <u>Section 5.2(b)</u> and all of the following conditions are satisfied:

(i)     A duly executed and acknowledged written instrument of transfer approved by the Manager has been filed with the Company setting forth (A) the intention of the transferee to be admitted as a Member; (B) the notice address of the transferee; and (C) the number of Units transferred by the transferor to the transferee;

(ii)    The transferor and transferee execute and acknowledge, and cause such other Persons to execute and acknowledge, such other instruments and provide such other evidence as the Manager may reasonably deem necessary or desirable to effect such admission, including without limitation: (A) the written acceptance and adoption by the transferee of the provisions of this Agreement, including a representation and warranty that the representations and warranties in <u>Section 5.1</u> are true and correct with respect to the transferee; (B) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law; and (C) the transferee's completion, if applicable, of an acknowledgment of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(iii)   The admission is approved by the Manager, which will not be unreasonably withheld, conditioned or delayed in the case of a Permitted Transfer; and

(iv)    A fee has been paid to the Company sufficient to cover all expenses in connection with the admission, subject to the Manager's right to waive these fees in their sole discretion.

9

15516721

(d)     Rights of Mere Assignees. If a transferee of an Interest is not admitted as a Member, it shall be entitled to receive the allocations and distributions attributable to the transferred Interest, but it shall not be entitled to inspect the Company's books and records, receive an accounting of Company financial affairs or otherwise take part in the Company's business or exercise the rights of a Member under this Agreement.

5.3     Permitted Transfers. Notwithstanding anything to the contrary contained in this Agreement, Units may be Transferred (a "**Permitted Transfer**") in the case of Transfers by a Member or a Permitted Transferee (as herein defined) to the Representative of such Member, the Company or a Related Party (each such transferee, a "**Permitted Transferee**").

5.4     Approved Sale by a Majority Interest.

(a)     Majority Sale. If Members desire to sell Units held by them constituting a Majority Interest in a bona fide arm's length transaction or series of related transactions with a third-party purchaser which is approved by the Manager (a "**Majority Sale**"), such Members (the "**Selling Members**") shall deliver a written notice (a "**Sale Notice**") to the other Members. The Sale Notice shall disclose in reasonable detail the identity of the proposed transferee(s) (including all parties holding controlling interests in such proposed transferee), the proposed amount of Units to be transferred and the terms and conditions of the proposed sale and shall include a true and correct copy of the written offer to purchase Units received by the Selling Members. Upon delivery of a Sale Notice, subject to compliance with Section 5.4(b), the Selling Members may, within one hundred twenty (120) days after following the delivery of the Sale Notice, sell the Units specified in the Sale Notice to the party or parties named therein at a price no less than the price specified in the Sale Notice and otherwise on terms and conditions no more favorable to the transferee than those offered in the Sale Notice. Any Units not transferred within such one hundred twenty (120)-day period shall be again subject to the provisions of this Section 5.4 with respect to any subsequent Transfer.

(b)     Tag-Along Rights. The delivery by the Selling Members of the Sale Notice shall create an option in favor of the other Members to sell their Units in the Majority Sale transaction described in the Sale Notice as additional selling Members, on identical terms and conditions, by delivering a written notice thereof (a "**Tag-Along Election Notice**") to the Selling Members within thirty (30) days after delivery of the Sale Notice. Each other Member may Transfer up to the Percentage Ownership of Units then owned by such other Member as the Percentage Ownership of Units to be sold by the Selling Members in the transaction bears to the aggregate number of Units then owned by the Selling Member; *provided, however*, that if the transferee refuses to purchase all of such Units, the number of Units to be sold in the transaction shall be reduced pro-rata (in proportion to the total number of Units initially sought to be sold by the Selling Member(s) and the other Members) to the extent necessary to consummate the transaction.

(c)     Drag-Along Rights. The delivery by the Selling Members of the Sale Notice shall also create an option in favor of the Selling Members, exercisable by written notice to the other Members given within thirty (30) days from delivery of the Sale Notice, to require that all of the other Members sell all of their Units in the transaction described in the Sale Notice on identical terms and conditions as set forth in the Sale Notice. The other

15516721

Members must so sell their Units and take all other desirable actions reasonably requested by the Selling Member(s) in connection with the sale described in the Sale Notice.

5.5     Preemptive Rights.

(a)     Each Member shall have a preemptive right to purchase its pro rata share of any Equity Securities (as hereinafter defined) that the Company may, from time to time, propose to issue and sell after the date of this Agreement (an **"Offering"**). A Member's pro rata share is equal to the amount of such Equity Securities so that the Member maintains its Percentage Ownership in the Company. The term **"Equity Securities"** means any Units, any other security convertible into Membership Interests or any warrant, option or other right to purchase any such security.

(b)     The Company shall give the Members written notice of its intention, describing the Equity Securities and the price and the terms and conditions upon which the Company proposes to issue the Equity Securities. Each Member shall have 15 days from the date it has received such notice to agree to purchase up to its pro rata share of the Equity Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company setting forth the quantity of Equity Securities to be purchased.

(c)     After the end of the 15-day period specified in subsection (b) above, the Company shall have 120 days thereafter to sell the Equity Securities in respect of which the Member's rights were not exercised at a price and upon general terms and conditions materially no more favorable to the purchasers thereof than specified in the Company's notice pursuant to subsection (b). If the Company has not sold such Equity Securities within such 120-day period, the Company shall not thereafter issue or sell any Equity Securities without first offering such securities to the Members in the manner provided above.

(d)     Notwithstanding anything herein to the contrary, the preemptive rights established by this Section shall have no application to any of the following Equity Securities: (i) Membership Interests (and/or options, warrants or other Interest purchase rights issued pursuant to such options, warrants or other rights) issued or to be issued to employees, officers or directors of, or consultants or advisors to, the Company or any subsidiary, pursuant to Interest option plans or other arrangements; and (ii) any Equity Securities issued for consideration other than cash pursuant to a merger, consolidation, acquisition or similar business combination.

5.6     Additional Members. Additional Persons may be admitted to the Company as Members and units of Membership Interest may be created and, subject to Section 5.5, issued and/or sold to those Persons and to existing Members upon the approval of and on such terms and conditions as are determined by the Manager. The terms of admission or issuance may provide for the creation of different classes or groups of Members and having different rights, powers and duties. The Manager must reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers and duties, and such an amendment shall require the approval and execution by the Members in accordance with Article 9. The provisions of this Section 5.4 shall not apply to Transfers of Membership Interests.

11

5.7    <u>Interests in Member</u>. A Member that is not a natural person may not cause or permit an ownership interest, direct or indirect, in itself to be disposed of if, after the disposition: (a) the Company would be considered to have terminated within the meaning of Code Sec. 708; or (b) without the written consent of the Manager and a Majority Interest, any Member shall cease to be controlled by substantially the same Persons who controlled it as of the date of the Member's admission to the Company or Permitted Transferees of such Persons.

5.8    <u>Information</u>.

(a)    In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

(b)    The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or Persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or a Manager, except for disclosures: (i) compelled by law (but the Member must notify the Manager promptly of any request for that information, before disclosing it if practicable); (ii) to advisers or representatives of the Member or Persons to which that Member's Unit may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this <u>Section 5.8(b)</u>; or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. The Members acknowledge that breach of the provisions of this <u>Section 5.8(b)</u> may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this <u>Section 5.8(b)</u> may be enforced by specific performance without posting bond.

5.9    <u>Liability to Third Parties</u>. No Member or Manager shall, by virtue of his status as a Member or his ownership of a Unit, be liable for the debts, obligations or liabilities of the Company, including but not limited to a judgment decree or order of a court.

5.10    <u>Withdrawal</u>.

(a)    Each Member agrees not to withdraw as a member of the Company prior to the liquidation of the Company without the approval of the other Member(s). A Member who voluntarily withdraws as a member of the Company without the consent of the other Member(s) shall be liable to the Company for any damages suffered by the Company on account of the breach and the Company shall not be required to purchase his Unit. A Member shall not receive from the Company any part of his or her Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

12

15516721

(b)     A Member, irrespective of the nature of his or her Capital Contribution, has only the right to demand and receive cash in return for his or her Capital Contribution.

(c)     The Company is not obligated to purchase the Unit of any Member who withdraws, retires, resigns, becomes bankrupt or otherwise is dissociated from the Company.

5.11    Lack of Authority. No Member (other than a Manager or an officer appointed by the Manager) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company.

ARTICLE 6
COMPANY MANAGEMENT

6.1     Management of Company. Except as otherwise specifically limited in this Agreement or under applicable law, the Manager shall have the exclusive right and authority to: (a) manage the affairs and business of the Company; (b) exercise the authority and powers granted to the Company; and (c) otherwise act in all other matters on behalf of the Company. No contract, obligation or liability of any kind or type may be entered into on behalf of the Company by any Member other than an existing Manager of the Company unless delegated by the Manager to an executive officer of the Company. The Manager shall take all actions necessary or appropriate to manage the Company's business and accomplish the Company's purposes in accordance with the terms of this Agreement.

6.2     Majority Approval Required for Certain Actions. Notwithstanding anything to the contrary contained in this Agreement, the Company may not take any of the actions set forth below without the prior written approval of a Majority Interest:

(a)     any merger, consolidation, liquidation, dissolution or reorganization of the Company or any sale of all or substantially all of the assets of the Company or any of its subsidiaries;

(b)     sell, issue or redeem any Units or equity securities of the Company or issue any warrants, options or convertible securities granting the holder the right to obtain equity securities;

(c)     make, enter into or modify in any material respect any agreement, arrangement, transaction or payment between the Company, on the one hand, and any Member or Manager or any Person who is an Affiliate or Related Party of a Member or Manager, on the other hand, except as expressly contemplated under this Agreement, which involves aggregate payments or consideration in excess of $25,000 or which is outside the ordinary course of Business of the Company;

(d)     any amendment or modification to the Articles; or

(e)     approve the dissolution of the Company pursuant to Section 11.1(a).

6.3     Number, Tenure and Qualifications.

15516721

(a)     The number of Managers of the Company is one (1). The Initial Manager is Jackson Street Management, LLC.

(b)     The Manager need not be a resident of Wisconsin. The Manager shall hold office until the earlier of his or its removal or resignation pursuant to Section 6.4 or his or its death, adjudication of incompetence or dissolution.

(c)     In the event a Manager is removed, resigns or is otherwise disqualified, the Members will have the right to elect a successor Manager, by the act of a Majority Interest in accordance with Section 7.3.

6.4     Resignation and Removal of Manager. A Manager may resign at any time upon written notice to the other Manager and Members. A Manager may be removed only by the unanimous affirmative vote of all Members.

6.5     Action Without Meeting. Unless specifically prohibited by the Articles, any action to be taken at a meeting of the Manager may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Manager. Any such consent signed by the Manager shall have the same effect as a vote of the Manager and may be stated as such in any document filed with the Secretary of State or with anyone else.

6.6     Fees; Expense Reimbursement. The Manager will not receive any fee for its services as the Manager of the Company. The Manager shall be entitled to be reimbursed for all out-of-pocket costs and expenses incurred in the course of its service hereunder.

6.7     Conflicts of Interest. The Manager need not devote full time to the Company's business, but shall devote such time as it, in its discretion, deems necessary to manage the Company's affairs in an efficient manner. Subject to the other express provisions of this Agreement, any other written agreement with the Company, and any nonwaivable provisions in the Act, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, with no obligation to offer to the Company or any other Manager, Member or officer the right to participate therein. The Company may transact business with any Manager, Member, officer or affiliate thereof provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.

ARTICLE 7
MEETINGS OF MEMBERS

7.1     Meetings. Meetings of the Members may be called by the Manager or by Members holding at least 20% of the Units. The meeting shall be held at the principal place of business of the Company or as designated in the notice or waivers of notice of the meeting.

7.2     Notice. Notice of any meeting of the Members shall be given no fewer than 10 days and no more than 30 days prior to the date of the meeting. Notices shall be delivered in the manner set forth in Section 12.2 and shall specify the purpose or purposes for which the meeting is called. The attendance of a Member at any meeting shall constitute a waiver of notice of such meeting,

14

15516721

except where a Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

7.3 <u>Manner of Acting</u>. Except where otherwise expressly stated otherwise in this Agreement, for purposes of any and all votes, decisions, actions, approvals and other acts to be taken by the Members with respect to the Company, the vote of a Majority Interest shall be required to constitute an act of the Members, subject to <u>Section 7.8</u> of this Agreement.

7.4 <u>Action Without Meeting</u>. Unless specifically prohibited by the Articles, any action required to be taken at a meeting of the Members or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by Members holding Units entitled to not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members were present and voting. Prompt notice of the taking of the action without a meeting by less than unanimous consent shall be given in writing to those Members who were entitled to vote but did not consent in writing.

7.5 <u>Telephonic Meetings</u>. The Members may participate in and act at any meeting of Members through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such meeting shall constitute attendance and presence in person at the meeting of the person or persons so participating.

7.6 <u>Proxies</u>. Each Member entitled to vote at a meeting of Members or to express consent or dissent to action in writing without a meeting may authorize another Person or Persons to act for him by proxy. Such proxy shall be deposited with the Manager not less than 48 hours before a meeting is held or action is taken, but no proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

7.7 <u>Voting of Units</u>. Each outstanding Unit shall be entitled to one vote upon each matter submitted to a vote of the holders thereof. In any elections for Manager, the Members shall not have the right to cumulative voting.

7.8 <u>Deadlock</u>. In the event that (i) three (3) meetings of the Members called for the same stated purpose are adjourned for lack of a Majority Interest being present within a sixty (60)-day period, (b) an equal number of votes of Members are cast in favor of an action or other matter proposed to be taken by the Company as are cast against such action or matter, or (c) there is otherwise a material deadlock among the Members regarding any votes, decisions, consents, or approvals to be taken by the Members with respect to the Company, then such action or matter shall be submitted to a vote of the Class A Members. If the proposed action or matter receives the affirmative vote or written consent of a Class A Members holding at least a majority of the Class A Units, then such vote or consent will constitute authorization for the taking of such action or matter and will be final and binding upon the Members and the Company.

15

## ARTICLE 8
## INDEMNIFICATION

8.1    Right to Indemnification.

(a)    Indemnification. To the fullest extent permitted by the Act, the Company shall indemnify, defend and hold harmless each Person (an "**Indemnified Person**") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (including, without limitation, an action by or in the right of the Company), or any appeal in such a proceeding or any inquiry or investigation that could lead to such a proceeding, by reason of the fact that he, or a Person of whom he is the personal representative, is or was an officer, Manager, Member or tax matters member or partnership representative of the Company, or is or was serving as a director, member, manager, officer, partner, venturer, proprietor, trustee, employee or agent of another limited liability company, corporation, partnership, joint venture, trust, sole proprietorship, employee benefit plan or other enterprise, that is or was a Manager, Member or tax matters member or partnership representative from and against any liabilities, expenses (including, without limitation, attorneys' fees and expenses and any other costs and expenses incurred in connection with defending such action, suit or proceeding), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such Indemnified Person in connection with such proceeding.

(b)    Advance Payment. Expenses (including, without limitation, attorneys' fees and expenses) incurred by an Indemnified Person in defending a civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding; provided, however, that the payment of such expenses incurred in advance of the final disposition of a proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his good faith belief that he has met the standard of conduct necessary for indemnification under this Article 8 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such Person is not entitled to be indemnified under this Article 8 or otherwise.

(c)    Not Exclusive. The indemnification and advancement of expenses provided by this Article 8 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law (common or statutory), provision of the Articles, this Agreement, agreements, vote of the Manager or Members or otherwise.

(d)    Insurance. The Company may purchase and maintain insurance, at its expense, to protect itself and any Person entitled to indemnification under this Article 8 against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 8.

(e)    Indemnification of Employees and Agents. The Company, by adoption of a resolution of the Manager, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may

16

15516721

indemnify and advance expenses to a Manager or Members under this Article 8; and the Company may indemnify and advance expenses to Persons who are not or were not a Manager or Members, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to a Manager, or Member under this Article 8.

8.2     Survival. Indemnification under this Article 8 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 8 shall be deemed contract rights, and no amendment, modification or repeal of this Article 8 shall have the effect of limiting or denying any such rights with respect to actions taken or proceedings arising prior to any such amendment, modification or repeal.

8.3     Savings Clause. If Section 8.1 or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless the Managers, or Members or any other indemnified Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article 8 that shall not have been invalidated and to the fullest extent permitted by applicable law.

ARTICLE 9
AMENDMENTS

This Agreement may be amended or modified from time to time only by a written instrument adopted by the Manager and executed and agreed to by a Majority Interest; *provided*, however, that (a) an amendment or modification reducing a Member's share of distributions (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent, (b) an amendment or modification reducing the required vote required to take any action or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members affected, and (c) an amendment that would modify the limited liability of a Member is effective only with that Member's consent. This Agreement may be amended by the Manager without the consent of the Members: (w) to reflect the issuance of additional Interests or the admission, substitution, termination or withdrawal of Members validly approved and effectuated in accordance with this Agreement, including to amend Exhibit B; (x) to reflect actions duly approved by the Members pursuant to this Agreement; (y) to correct any errors or omissions, or to cure any ambiguity, in this Agreement where the intent of the Members is clear; and (z) to delete or add or modify any provision required to be so deleted, added or modified by the staff of the Securities and Exchange Commission, any other Federal agency or any state securities or "Blue Sky" commissioner or similar official, when the deletion, addition or modification is for the benefit or protection of any of the Members.

15516721

## ARTICLE 10
## BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS

10.1 <u>Maintenance of Books and Records</u>. The Company shall maintain complete and accurate books and records of the Company's business and affairs in accordance with generally accepted accounting principles, consistently applied. The books and records shall be maintained at the principal place of business of the Company and shall be accessible to the Members in accordance with the Act.

10.2 <u>Fiscal Year; Accounting</u>. The Company's fiscal year shall be the calendar year. The accounting methods and principles to be followed by the Company shall be selected from time to time by the Manager.

10.3 <u>Reports</u>. On or before the 90th day following the end of each fiscal year during the term of the Company, the Manager shall use reasonable efforts to cause each Member to be furnished with a federal (and where applicable state) income tax reporting Form K-1 or its equivalent and a financial report for the preceding fiscal year.

10.4 <u>Tax Elections</u>. All elections required or permitted to be made by the Company under the Code shall be made by the Manager.

10.5 <u>Signature Necessary to Bind Company</u>. The signature of any Manager or any other person or persons as the Manager may designate shall be sufficient to bind the Company and any third party dealing with the Company may conclusively rely on such signature as evidence of the Company's ascent.

10.6 <u>Bank Accounts</u>. All funds of the Company are to be deposited in the Company's name in such bank accounts or investment accounts as may be designated by the Manager and shall be withdrawn on the signature of any Manager of the Company or any other Person or Persons as the Manager may designate. The Company's funds may not be commingled with the funds of any Manager or Member.

10.7 <u>Partnership Representative</u>. The Manager shall be designated as the "Partnership Representative" pursuant to Section 6223(a) of the Code for the Company and the "tax matters partner" and/or any analogous position of the Company under state, local, or non-U.S. Law that is not governed by provisions analogous to the Partnership Representative provisions in the Code, and the Manager shall provide all Members with written notice as to that designation. The Partnership Representative will notify all members of the commencement of any Company tax audit or administrative adjustments, and the other Members waive any right to negotiate or enter into a settlement agreement with the Internal Revenue Service in any proceedings. All such negotiations and settlements shall be conducted solely by the Partnership Representative. The Members, other than the Partnership Representative, waive any right to file a petition for readjustment of Company matters pursuant to Section 6226 of the Code unless the Partnership Representative does not file such a petition within ninety (90) days of his receipt of notice of a final Company administrative adjustment and unless such petition is filed in any applicable court chosen by a Majority Interest. The Partnership Representative is authorized to represent the Company in any tax audit proceedings and in any dispute with the Internal Revenue Service, including negotiating and entering into a settlement agreement as provided in Section 6224(c) of

18

15516721

the Code, contesting any proposed adjustment of Company items or petitioning for a readjustment of Company items. If the Company pays, or is required to pay, any imputed adjustment amount under Code Section 6225 and/or any associated interest or penalties, the Partnership Representative in its discretion may require each Person who is or formerly was a Member to reimburse and otherwise indemnify the Company for such Person's allocable share of such amounts as determined by the Partnership Representative.

ARTICLE 11
DISSOLUTION, LIQUIDATION AND TERMINATION

11.1     Events of Dissolution. The Company shall be dissolved and shall commence winding up its affairs upon the first to occur of the following:

(a)     The written agreement of the Manager and a Majority Interest;

(b)     Any event which makes it unlawful or impossible to carry on the Company's business;

(c)     The sale, disposition or abandonment of all or substantially all of the Company Property; or

(d)     The entry of a decree of judicial dissolution under the Act.

The Company shall not be dissolved upon the death, retirement, resignation, expulsion, dissolution or bankruptcy of any Member.

11.2     Winding Up. Upon the dissolution of the Company, the Manager shall wind up the Company's affairs and satisfy the Company's liabilities. The Manager shall liquidate all of the Company Property as quickly as possible consistent with obtaining the full fair market value of said Property. During this period, the Manager shall continue to operate Company Property and all of the provisions of this Agreement shall remain in effect.

11.3     Final Distribution. The proceeds from the liquidation of the Company Property shall be distributed as follows:

(a)     First, to creditors, including Members and Managers who are creditors, until all of the Company's debts and liabilities are paid and discharged (or provision is made for payment thereof);

(b)     Second, to the Members in proportion to the positive balance of their respective Capital Accounts as of the date of such distribution, after giving effect to all prior contributions, distributions and allocations for all periods.

11.4     Distributions in Kind. In connection with the termination and liquidation of the Company, the Manager shall attempt to sell all of the Property. To the extent that Property is not sold, each Member will receive a pro rata share of any distribution in kind. Any Property distributed in kind upon liquidation of the Company shall be valued on the basis of an independent appraisal and treated as though the Property were sold and the cash proceeds distributed.

19

15516721

11.5    <u>No Recourse Against Manager</u>. The Members shall look solely to the assets of the Company for the return of their investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return such investment, they shall have no recourse against the Manager, any affiliate of any Manager, or any other Member.

11.6    <u>Purchase by Member or Manager</u>. A Manager, Member or an affiliate of a Manager or Member may, if he so desires, purchase an item of Property upon liquidation provided that: (a) the purchase price is at fair market value as determined by an independent appraiser selected by the Manager; and (b) at least 15 days' advance notice of the proposed sale has been given to all other Members.

11.7    <u>Deficit Capital Accounts</u>. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member upon dissolution of the Company shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

11.8    <u>Certificate of Cancellation</u>. On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Manager (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State, cancel any other filings made pursuant to <u>Section 2.5</u> and take such other actions as may be necessary to terminate the Company.

ARTICLE 12
<u>GENERAL PROVISIONS</u>

12.1    <u>Entire Agreement</u>. This Agreement embodies the entire understanding among the Members concerning the Company and their relationship as Members and supersedes any and all prior negotiations, understandings or agreements, including, without limitation, the Prior Agreement.

12.2    <u>Notices</u>. All notices and demands required or permitted under this Agreement shall be in writing, as follows: (i) by actual delivery of the notice into the hands of the party entitled to receive it; or (ii) by Federal Express or any other overnight carrier, in which case the notice shall be deemed to be given as of the day following the day it is deposited with such carrier. All notices which concern this Agreement shall be addressed as follows:

If to the Company or Manager:     [_____]
    [_____]
    [_____]
    [_____]

If to the Members: To the address as shown from time to time on the records of the Company. Any Member may specify a different address, which change shall become effective upon receipt of such notice by the Manager.

12.3    <u>Severability</u>. If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement, or the

20

15516721

application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected.

12.4    Parties Bound. This Agreement shall be binding upon the Members and their respective successors, assigns, heirs, devisees, legal representatives, executors and administrators.

12.5    Choice of Law. The laws of the State of Wisconsin (other than those pertaining to conflicts of law) shall govern all aspects of this Agreement, irrespective of the fact that one of the parties now is or may become a resident of a different state or country.

12.6    Partition. Each Member irrevocably waives any right that it may have to maintain any action for partition with respect to Company Property.

12.7    Strict Construction. It is the intent of the Members upon execution hereof that this Agreement shall be deemed to have been prepared by all of the parties to the end that no Member shall be entitled to the benefit of any favorable interpretation or construction of any term or provision hereof under any rule or law. To the extent permitted by applicable law, the provisions of this Agreement shall override the provisions of the Act to the extent of any inconsistency or contradiction between them.

12.8    Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision.

12.9    Counterparts. This Agreement may be executed in multiple counterparts with separate pages, and each such counterpart shall be considered an original, but all of which together shall constitute one and the same instrument.

12.10    Pronouns. All pronouns shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

12.11    Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations hereunder or with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person. Failure on the part of a Person to complain of any act or to declare any Person in default hereunder, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default.

12.12    Further Assurances. Each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated herein.

12.13    Indemnification for Breach. To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold all of them harmless from and against all losses, costs, liabilities, damages and expenses (including, without limitation,

21

15516721

costs of suit and attorneys' fees) they may incur on account of any material breach by that Member of this Agreement.

12.14 <u>Company Set Off</u>. The Company shall be entitled to set off against any and all amount that may from time to time be owing by it to any Member or Manager under or in connection with this Agreement any and all obligations due and owing to the Company from such Member or Manager.

12.15 <u>Disclosure and Waiver of Conflicts</u>. The Members acknowledge and agree that: (i) the attorney who prepared this Agreement ("**Attorney")** acted as legal counsel to the Company and not to the any of the Members; (ii) the Members have been advised by the Attorney that the interests of the Members are opposed to each other and may be opposed to the interests of the Company and, accordingly, the Attorney's representation of the Company may not be in the best interests of the Members; and (iii) each of the Members has been advised by the Attorney to retain separate legal counsel. Notwithstanding the foregoing, the Members: (i) desire the Attorney to prepare this Agreement on behalf of the Company; (ii) acknowledge that they have been advised to retain separate counsel and have either retained separate counsel or waived their right to do so; and (iii) jointly and severally forever waive any claim that the Attorney's representation of the Company or preparation of this Agreement constitutes a conflict of interest.

12.16 <u>Compliance with Anti-Money Laundering Requirements</u>. The Manager shall be authorized without the consent of any Person, including any Member, to take such action as it determines to be necessary or advisable to comply, or to cause the Company to comply, with any anti-money laundering Law ("**AML Law**"). Without limiting the generality of the foregoing, if the Manager reasonably believes that a Member has breached any material representation, warranty or covenant in this Agreement or in its Subscription Agreement regarding such Member's compliance with or status with respect to any AML Law, the Manager may (i) require such Member to withdraw from the Company or (ii) suspend the payment of distributions to such Member, in either case if the Manager reasonably deems it necessary to do so to comply with any AML Law applicable to the Company. No Member shall have any claim against the Company, the Manager or their respective Affiliates for any form of damages or liabilities as a result of any of the aforementioned actions.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Operating Agreement of Wisconsin & Milwaukee Hotel LLC as of the date first set forth above.

Jackson Street Management LLC

By: _____

Name: _____

Title: _____

15516721

# EXHIBIT A
## CERTAIN DEFINED TERMS

"**Act**" means Chapter 183 Uniform Limited Liability Company Law of the Wisconsin Statutes and any successor statute, as amended from time to time.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in the Capital Account maintained for such Member as of the end of each fiscal year of the Company after giving effect to the following adjustments:

(a)     a credit to the Capital Account of any amounts which the Member is obligated to restore under this Agreement and the standards set forth in Treas. Reg. Sec. 1.704-(b)(ii)(c) or is deemed obligated to restore under Treas. Reg. Sec. 1.704-2(g)(1) (relating to partnership gains) and Treas. Reg. Sec. 1.704-2(i)(5) (relating to partnership nonrecourse debt minimum gain); and

(b)     debits to the Capital Account of amounts equal to:

(i)     all losses and deductions that, as of the end of the applicable fiscal year, are reasonably expected to be allocated to the Member in years subsequent to the applicable fiscal year under Code Sects. 704(e)(2) and 706(d) and under Treas. Reg. Sec. 1.751-1(b)(ii); and

(ii)     distributions that are reasonably expected to be made to the applicable Member to the extent that such distributions exceed offsetting increases in the applicable Member's Capital Account that are reasonably expected to occur during (or prior to) the year in which such distributions are reasonably expected to be made.

Notwithstanding anything to the contrary contained herein, an Adjusted Capital Account Deficit shall be determined in accordance with Treas. Reg. Sec. 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with such Reg.

"**Agreed Value**" of any Contributed Property means the fair market value of the property at the time of contribution as determined by the Manager and the contributing Member; provided, however, that the Agreed Value of any Property deemed contributed to the Company for federal income tax purposes upon termination and reconstitution thereof pursuant to Code Sec. 708 shall be determined in accordance with Section 3.5. Subject to Section 3.5, in the event that more than a single item of Property is contributed to the Company in a single or integrated transaction, the Manager shall use such method as they deem reasonable and appropriate to allocate the aggregate Agreed Value of Contributed Properties among each separate property in proportion to the respective fair market value of each such Property.

"**Book-Tax Disparity**" concerning any item of Contributed Property or Revalued Property means, as of the date of any determination, the difference between the Carrying Value of such Contributed Property or Revalued Property and the adjusted basis thereof for federal income tax purposes as of such date. A Member's share of the Company's Book-Tax Disparities in all of the Company's Contributed Property and Revalued Property will be reflected by the difference

15516721

between such Member's Capital Account balance, as maintained pursuant to Article 3, and the balance of such Member's Capital Account computed as if it had been maintained strictly in accordance with federal income tax accounting principles.

"**Capital Contributions**" means the total amount of capital contributed by a Member to the Company, as determined from time to time, which shall include cash contributions and the Net Agreed Value of any Contributed Property.

"**Carrying Value**" means:

(a)    with respect to a Contributed Property, the Agreed Value of such Property reduced (but not below zero) by all depreciation, depletion (computed as a separate item of deduction), amortization and cost recovery deductions charged to the Members' Capital Accounts;

(b)    with respect to a Revalued Property, the fair market value of such Property at the time of revaluation, as determined by the Manager in accordance with Section 3.7 below, reduced (but not below zero) by all depreciation, depletion, amortization and cost recovery deductions charged to the Members' Capital Accounts; and

(c)    with respect to any other Company Property, the adjusted basis of such Property for federal income tax purposes, all as of the time of determination.

The Carrying Value of any Property shall be adjusted from time to time in accordance with Sections 3.7(a) and (b) of this Agreement.

"**Articles of Organization**" or "**Articles**" means the articles of organization filed for the Company in accordance with the Act.

"**Class A Members**" means those Members owning the Class A Units.

"**Class A Units**" means those Units designated as such, issued to Class A Members and having the rights set forth herein.

"**Class B Members**" means those Members owning the Class B Units.

"**Class B Units**" means those Units designated as such, issued to Class B Members and having the rights set forth herein.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Company Property**" or "**Property**" means all properties, assets and rights of any type owned by the Company.

"**Contributed Property**" means any property contributed to the Company at any time or from time to time. Once the Carrying Value of Contributed Property has been adjusted pursuant to Section 3.7 hereof, such property shall be deemed Revalued Property and shall no longer be deemed Contributed Property.

25

15516721

"**Majority Interest**" means the affirmative vote of Members holding at least a majority of the outstanding Units of the Company.

"**Manager**" means any Person elected as a Manager of the Company as provided in this Agreement.

"**Member**" means each Person who acquires a Unit pursuant to this Agreement and each Person hereafter admitted to the Company as a Member as provided in this Agreement. Members include the Class A Members and the Class B Members. The Members and their respective Units are set forth on attached and incorporated Exhibit B.

"**Member Minimum Gain**" means with respect to each Member Nonrecourse Debt, the gain at any given time which would be realized by the Members if the Company disposed of the property encumbered by or otherwise subject to such Member Nonrecourse Debt for no consideration other than the full satisfaction of such Member Nonrecourse Debt. If the applicable property is subject to more than one liability, only that portion of the property's adjusted tax basis which is allocated to the applicable Member Nonrecourse Debt under the immediately succeeding sentence shall be used to compute Member Minimum Gain. The adjusted basis of Company Property subject to two or more liabilities of equal priority shall be allocated among such liabilities in proportion to their outstanding balances, and the adjusted basis of Company Property subject to two or more liabilities of unequal priority shall be allocated to the liabilities of subordinate priority only to the extent of the excess, if any, of the adjusted basis of such Property over the aggregate outstanding balance of all liabilities of superior priority. The priorities of any liability or any group of liabilities shall be determined by reference to all applicable facts and circumstances including, without limitation, all agreements by and between applicable creditors and all applicable corporate, commercial, bankruptcy and other laws. If a Book-Tax Disparity exists with respect to any Company Property, Member Minimum Gain shall be determined by using the Carrying Value instead of the adjusted tax basis of such property.

"**Member Nonrecourse Debt**" means any Nonrecourse Liability to the extent a Member or a Person who is related (as defined in Reg. Sec. 1.752-1(a)(3)) to a Member bears the economic risk of loss, as determined under Reg. Sec. 1.752-2, with respect to such liability. In the event that any Member (or a person related to any Member within the meaning of Reg. Sec. 1.752-1(a)(3)) bears the economic risk of loss for less than all of the outstanding balance of the Nonrecourse Liability, such Nonrecourse Liability shall be bifurcated in accordance with the principles of Reg. Sec. 1.752-2, and shall be treated as a Nonrecourse Liability to the extent that no Member (or related party) bears the economic risk of a loss, and as a Member Nonrecourse Debt to the extent that the applicable Member (or related party) bears the economic risk of loss. Notwithstanding anything to the contrary contained herein, Member Nonrecourse Debt shall be determined in accordance with Reg. Sec. 1.704-2 as the same may be modified or supplemented from time to time.

"**Member Nonrecourse Debt Deduction**" means items of the Company's deductions, losses, and Code Sec. 705(a)(2)(B) expenditures (in each case computed based upon the Carrying Values of all Company assets if a Book-Tax Disparity exists with respect to such property) equal to the net increase, if any, in the amount of the aggregate Member Minimum Gain during any Company tax year ("Available Member Nonrecourse Debt Deductions "). If the net increase in the amount of Member Minimum Gain during any taxable year exceeds the Available Member

15516721

Nonrecourse Debt Deductions, then the excess shall be carried over and treated as Member Minimum Gain of the applicable Member for the immediately succeeding taxable year and all taxable years thereafter until the cumulative Member Nonrecourse Debt Deductions for the applicable Member shall be equal to the sum of all net increases in Member Minimum Gain of the applicable Member for all Company years ending after the date of this Agreement. Generally, Member Nonrecourse Debt Deductions of the Company for a year will consist first of depreciation or cost recovery deductions with respect to property of the Company giving rise to the increase in Member Minimum Gain to the extent of such increase with any excess made up pro rata of all other items of deductions.

"**Membership Interest**" or "**Interest**" means the membership interest or interest of a Member in the Company, including the right to any and all benefits to which such Member may be entitled in accordance with this Agreement, and the obligations as provided in this Agreement and the Act, and are evidenced by the Units.

"**Minimum Gain**" means, with respect to each Nonrecourse Liability of the Company, the gain (regardless of character) that would be realized by the Company if it disposed of the property encumbered by or subject to such Nonrecourse Liability for no consideration other than the full satisfaction of the Nonrecourse Liability. If property is subject to more than one liability, only that portion of the property's adjusted tax basis which is allocated to a Nonrecourse Liability under the immediately succeeding sentence shall be used to compute Minimum Gain. The adjusted basis of Company Property subject to two or more liabilities of equal priority shall be allocated among such liabilities in proportion to their outstanding balances, and the adjusted basis of Company Property subject to liabilities of unequal priority shall be allocated to the liabilities of subordinate priority only to the extent of the excess, if any, of the adjusted basis of such property over the aggregate outstanding balance of all liabilities of superior priority. The relative priorities of any liability or any group of liabilities shall be determined by reference to all applicable facts and circumstances including, without limitation, all agreements by and between applicable creditors and all applicable corporate, commercial, bankruptcy and other laws. If a Book-Tax Disparity exists with respect to any Company Property, the Minimum Gain shall be determined using the Carrying Value instead of the adjusted tax basis of the Property.

"**Offering**" means the offering of $6,000,000 of Class B Units being conducted by the Company on or about the date of this Agreement.

"**Net Agreed Value**" means, as follows:

(a)     for Contributed Property, the Agreed Value of such property net of liabilities either assumed by the Company upon such contribution or to which such property is subject when contributed to the Company, as determined in accordance with Code Sec. 752; and

(b)     for Property distributed to a Member, the Company's Carrying Value of such property at the time such Property is distributed, net of any indebtedness either assumed by such distributee Member upon such distribution or to which such Property is subject at the time of distribution, determined in accordance with Code Sec. 752.

15516721

"**Net Cash Receipts**" means, for any period, the gross cash proceeds from the Company's business, less the portion thereof used to establish reasonable reserves in amounts determined by the Manager or to pay Company expenses, debt payments and capital expenditures. "Net Cash Receipts" shall include the net cash proceeds from the sale of Company Property outside the ordinary course of business or refinancing of indebtedness. Net Cash Receipts shall not be reduced by depreciation, cost recovery, amortization or similar noncash deductions, and shall be increased by any reduction of reserves previously established by the Manager.

"**Nonrecourse Liability**" means a nonrecourse liability as defined in Reg. Sec. 1.704-2(b)(3).

"**Percentage Ownership**" means a fraction, the numerator of which is the number of Units owned by a Member and the denominator of which is the total number of outstanding Units owned by all Members.

"**Person**" means any individual, corporation, trust, partnership, joint venture, limited liability company or other entity.

"**Profits**" and "**Losses**" mean, for each fiscal year, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Sec. 703(a) (including all items required to be stated separately) with the following adjustments:

      (a)     any income exempt from federal income tax shall be included;

      (b)     any expenditures of the Company described in Code Sec. 705(a)(2)(B) (including expenditures treated as such pursuant to Reg. Sec. 1.704-1(b)(2)(iv)(i)) shall be subtracted;

      (c)     if any Company Property is revalued pursuant to Section 3.7, the amount of such adjustment shall be taken into account in determining gain or loss from the disposition of such Property;

      (d)     any items which are specially allocated pursuant to Section 4.3 shall not be taken into account in computing Profits or Losses;

      (e)     gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Carrying Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Carrying Value; and

      (f)     in the case of Property having a Book-Tax Disparity, in lieu of depreciation, amortization or other cost recovery deductions allowable under the Code ("**Tax Depreciation**"), there shall be taken into account for each Property a depreciation allowance which bears the same ratio to its initial Agreed Value (or, with respect to Revalued Property, its initial Carrying Value) as the Tax Depreciation for such year bears to the beginning adjusted tax basis of such Property.

15516721

"**Related Party**" means with respect to any Person (a) any of the spouse, parents and descendants (whether natural or adopted) of the Person (collectively, "**Relatives**"), (ii) any custodian of a custodianship for and on behalf of one or more of such Person or Relatives, (iii) any trustee of a trust or trusts solely for the benefit of the Person and/or one or more such Relatives, and (iv) any corporation, partnership, limited liability company or other entity more than 50% of the voting power of which is owned or controlled by such Person and/or a Related Party of such Person.

"**Representative**" means the legally appointed guardian of a mentally incapacitated Member, the conservator of a mentally incapacitated Member's assets or the legally appointed and qualified executor or personal representative of the estate of a deceased Member. In the event no such guardian, executor or personal representative is appointed, then the Representative shall mean the spouse of such incapacitated or deceased Member, or if such Member does not have a spouse or the spouse is not then living or is unable or unwilling to act, such Member's then living lineal descendants who are willing and capable of acting, one at a time in descending order of age but in no event younger than 21 years of age or, if none, such Member's then-living lineal ancestors who are willing and capable of acting, one at a time and in ascending order of age.

"**Revalued Property**" means any Property which has had its Carrying Value adjusted in accordance with Section 3.7(a) or (b).

"**Subscription Agreement**" means the Subscription Agreement executed by a Class B Member to subscribe for Class B Units in the Offering.

"**Transfer**" means, with respect to a Unit, a sale, assignment, gift or any other disposition, whether voluntary, involuntary or by operation of law.

"**Treasury Regulations**," "**Treas. Reg.**" or "**Reg.**" means the income tax regulations promulgated under the Code as amended from time to time (including corresponding provisions of succeeding regulations).

"**Unit**" means a unit of Membership Interest in the Company having the rights set forth herein. Units include the Class A Units and the Class B Units.

"**Unrealized Gain**" attributable to any item of Company Property means, as of any date of determination, the excess, if any, of (a) the fair market value of such Property (as determined under Section 3.7 hereof) as of such date, over (b) the Carrying Value of such Property as of such date (prior to any adjustment to be made pursuant to Section 3.7 as of such date).

"**Unrealized Loss**" attributable to any item of Company Property means, as of any date of determination, the excess, if any, of (a) the Carrying Value of such Property as of such date (prior to any adjustment to be made pursuant to Section 3.7 as of such date), over (b) the fair market value of such Property (as determined under Section 3.7) as of such date.

15516721

**EXHIBIT B**
**MEMBERS**

| Name and Address of Each Member | Class of Units | Units |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

15516721

# EXHIBIT B

# WISCONSIN & MILWAUKEE HOTEL LLC

## SUBSCRIPTION DOCUMENTS

## INSTRUCTIONS

---

(1) **Subscription Agreement**

(A) **Page 2.** Check the box next to the applicable manner in which the Purchaser qualifies as an Accredited Investor.

(B) **Page S-1.** Indicate the total amount of the Subscription Amount you wish to make to the Company. This will determine the amount of Class B Units you are subscribing for.

(C) **Page S-1.** Sign and print your name as indicated and insert date.

(D) **Page S-2.** Print the name in which the Class B Units are to be registered. Please note that if the Class B Units are to be registered in someone's name other than your name and the purchase price is not being paid directly by you, such other person or entity must complete the Subscription Agreement and Operating Agreement Signature Page. For example, if the Class B Units are to be registered in the name of a trust for your children or grandchildren who are under eighteen years old, the trust is considered the purchaser and the trustee, on behalf of the trust, should complete the documents.

(E) **Page S-2.** Insert social security number or taxpayer identification number of the person who will be registered as the owner of the Class B Units.

(F) **Page S-2.** The address of the person who will be registered as the owner of the Class B Units should be given.

(G) **Page S-2.** Check the box next to the applicable intended legal form of ownership of the Class B Units.

(H) **Page S-3**. A Purchaser who or which is not a United States citizen or resident alien individual, a domestic corporation, a domestic partnership, a domestic trust or a domestic estate (collectively, "United States Persons"), as those terms are defined in the Internal Revenue Code and Income Tax Regulations, should complete the following:

**Foreign Persons**. In order for a Purchaser who is a foreign person (i.e., not a United States Person as defined above) to qualify as exempt from backup withholding, such foreign Purchaser must certify, under penalties of perjury, the statement in Box B attesting to that foreign person's status by checking the box preceding such

15517096

statement. However, such person will be subject to withholding of tax under Section 1445 of the Internal Revenue Code.

(2)    **Operating Agreement**

(A)    **Page O-1.** Date and indicate the city and state in which this document is signed.

(B)    **Page O-1.** Indicate the total amount of the Subscription Amount you wish to make to the Company. This will determine the amount of Class B Units you are subscribing for.

(C)    **Page O-1.** The person who will be the registered owner of the Class B Units should print his or her name and sign as indicated.

(D)    **Page O-2.** Residence and business addresses of person who will be the registered owner of the Class B Units should be given.

(E)    **Page O-2.** Insert social security number or taxpayer identification number of the person who will be the registered owner of the Interests.

15517096

# SUBSCRIPTION AGREEMENT

## WISCONSIN & MILWAUKEE HOTEL LLC

### A WISCONSIN LIMITED LIABILITY COMPANY

This Agreement is made and entered into by and between the undersigned (**"Purchaser"**) and WISCONSIN & MILWAUKEE HOTEL LLC, a Wisconsin limited liability company (**"Company"**).

## RECITALS

The Company has been organized in the State of Wisconsin pursuant to its Articles of Organization and the Amended and Restated Operating Agreement (**"Operating Agreement"**). The relative rights, qualifications, and obligations of the Members are provided for in the Operating Agreement.

## CLAUSES

1.  **Subscription.** Subject to the terms and conditions hereof, the undersigned hereby tenders this irrevocable subscription to purchase the Class B Units stated on the Signature Page hereof, together with its Capital Contribution with respect to such Class B Units as provided by Section 6 below. This subscription may be rejected by the manager of the Company (the "**Manager**") for any reason whatsoever. A Purchaser of Class B Units hereby accepts and adopts each and every provision of the Operating Agreement and agrees to be bound thereby upon acceptance by the Manager of all or any portion of this subscription.

2.  **Subscription Proceeds.** Pending acceptance by the Company, Purchaser's Initial Capital Contribution shall be maintained by the Company separate and apart from all other funds. The Manager will have the right to use Purchaser's Capital Contribution for proper Company purposes immediately following acceptance by the Company of Purchaser's subscription and the closing of the sale of the Class B Units subscribed for hereunder.

3.  **Investment Suitability.** Purchaser acknowledges and agrees that the Class B Units will not to be registered under the Securities Act of 1933, as amended (**"Act"**), or under any applicable state securities laws (collectively, the **"Laws"**) and are being offered and sold in reliance upon exemptions from registration under said Act and Laws. The undersigned hereby represents and warrants to the Company, the Manager and the Members of the Company, that Purchaser is an Accredited Investor as defined in Regulation D of the Securities Act of 1933 for the following reasons:

1

PLEASE INITIAL THE STATEMENTS BELOW WHICH ARE TRUE AS TO YOU IN THE BOX TO THE LEFT THEREOF.

_____ That the Purchaser is a natural person(s) whose individual net worth, or joint net worth with that person's spouse, exclusive of the value of the primary residence, at the time of subscription for the Class B Units exceeds $1,000,000; or

_____ That the Purchaser is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

_____ That the Purchaser is a corporation, partnership, trust or other entity in which one of the two alternative representations contained above is true with respect to each and every equity owner of said entity; or

_____ That the Purchaser is a broker or dealer registered under Section 15 of the Securities Exchange Act of 1934; or

_____ That the Purchaser is a corporation, partnership, limited liability company, an organization described under 501(c)(3) of the Internal Revenue Code of 1986, as amended, or a Massachusetts or similar business trust, not formed for the specific purpose of acquiring the Class B Units and having total assets in excess of $5,000,000;

_____ That the Purchaser is: (a) a trust with total assets in excess of $5,000,000 not formed for the specific purpose of the investment whose purchase is directed by a sophisticated person described in Rule 506(b)(2)(ii) of the Act or (b) a trust which is a grantor trust and the grantor of such trust is an Accredited Investor; or

_____ That the Purchaser is: (a) a "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1): (i) with assets under management in excess of $5,000,000, (ii) that was not formed for the specific purpose of acquiring the Class B Units, and whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment; or (b) a "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1)), of a family office meeting the requirements in paragraph (a) of this section and whose prospective investment in Class B Units is directed by such family office.

**4.** **Representations and Warranties of Purchaser.** Purchaser hereby represents and warrants as follows:

2

15517096

(a)  Purchaser has received and carefully read and understands this Subscription Agreement and the Operating Agreement and is aware of the risks associated with an investment in the Company. In evaluating the suitability of an investment in the Company, the Purchaser has not relied upon any representations or other information (whether oral or written) other than as set forth in any documents furnished to him or her by the Company.

(b)  Purchaser has been provided an opportunity to obtain additional information concerning the Company, the Class B Units, the business of the Company, and any other relevant matters and has been given the opportunity to ask questions of, and receive answers from, the Company and its Manager concerning the terms and conditions upon which the Class B Units are being issued and sold and to obtain such additional information necessary to verify the accuracy of the information provided.

(c)  Purchaser understands that no federal or state agency has made any recommendation or endorsement of the Class B Units, nor has any federal or state agency made any finding or determination as to the adequacy or accuracy of the information provided to Purchaser, or as to the fairness of this offering for investment.

(d)  Purchaser acknowledges that (i) the Class B Units will be issued pursuant to applicable exemptions from registration under the Laws, and (ii) the Class B Units have not been registered under the Act, in reliance on exemptions therefrom. In connection therewith, Purchaser hereby covenants and agrees that Purchaser will not offer, sell, or otherwise transfer the Class B Units unless and until Purchaser obtains the consent of the Manager and such Class B Units are registered pursuant to the Act and the laws of all jurisdictions which in the opinion of the Company may be applicable or unless such Class B Units are, in the opinion of the Company, otherwise exempt from registration thereunder.

(e)  Purchaser acknowledges and is aware that there are substantial restrictions on the transferability of the Class B Units. In the foreseeable future, there will be no public market for the Class B Units and the Company is under no obligation, nor has any representation been made, to register the Class B Units at some future date.

(f)  Purchaser is acquiring the Class B Units for investment, for Purchaser's own account and not with a view to resell or otherwise distribute the Class B Units and has not, and does not, intend to divide Purchaser's participation with others or to resell or otherwise dispose of all, or any part of, said Class B Units.

(g)  If an individual Purchaser is of majority age or over and is a bona fide resident of the State set forth in the resident address which Purchaser has set forth in the Signature Page hereof and has no present intention of becoming a resident of any other state or jurisdiction.

(h)  To the best of Purchaser's knowledge, no action, suit, arbitration, government investigation or legal or administrative proceeding is pending or is threatened against the Purchaser in any court or in any governmental agency or arbitration tribunal which, if determined adversely to Purchaser, would have a material adverse effect upon the Purchaser or which affects or relates in any way to the ability of the Purchaser to fulfill, perform and comply

3

15517096

with the agreements, representations and warranties on the part of Purchaser to be fulfilled, performed or complied with in accordance with the provisions hereof.

(i)     Because the Class B Units have not been registered under the Act or applicable state securities laws, the economic risk of the investment must be borne indefinitely by the Purchaser, and the Class B Units cannot be sold unless subsequently registered under the Act and such state laws or exemptions from otherwise applicable registration requirements are available. Registration under the Act and such state laws is unlikely at any time in the future. Neither the Manager nor the Company is obligated to file an offering statement under Regulation A of the Act or a registration statement under the Act. Rule 144 adopted under the Act and governing the possible disposition of the Class B Units is not currently available or anticipated to be available in the future, and neither the Manager nor the Company has covenanted to take any action necessary to make such Rule available for a resale of the Class B Units. It is not anticipated that there will be any market for resale of the Class B Units.

(j)     No assignment, sale, transfer, exchange or other disposition of the Class B Units can be made except as specifically permitted in the Operating Agreement.

(k)     The Purchaser recognizes that an investment in the Company involves a substantial degree of risk; and the Purchaser has taken full cognizance of and understands all of the risk factors, including risks associated with the Federal tax aspects of an investment in the Company.

(l)     The Purchaser has discussed with Purchaser's professional, legal, tax and financial advisers the suitability of an investment in the Company for his or her particular tax and financial situation. All information that the Purchaser has provided to the Company including Purchaser's financial position is correct and complete as of the date set forth below, and if there should be any material change in such information, Purchaser will immediately provide such information to the Company.

(m)     If this Subscription Agreement is executed and delivered on behalf of a partnership, corporation, trust or other entity, the undersigned has been duly authorized to execute and deliver this Subscription Agreement and all other instruments and documents executed and delivered on behalf of such entity in connection with the purchase of the Class B Units; the signature of the undersigned is binding upon such entity; and the undersigned has delivered herewith the underlying partnership agreement, corporation charter documents, or trust agreement of such entity and such other evidence of the ability of such entity to purchase the Class B Units as may be requested by the Company. Such entity has previously made other investments or engaged in other substantive business activities prior to receiving an opportunity to purchase Class B Units and was not formed with a view to invest in the Class B Units.

(n)     Purchaser has knowledge and experience in financial and business matters and investments; Purchaser's financial condition is such that Purchaser has no need for liquidity with respect to Purchaser's investment in the Class B Units to satisfy any existing or contemplated undertaking or indebtedness; Purchaser is able to bear the economic risk of Purchaser's investment in the Class B Units for an indefinite period of time including the risk of losing Purchaser's entire

4

15517096

investment in the Class B Units, and loss of Purchaser's entire investment in the Class B Units would not materially adversely affect the standard of living of Purchaser and Purchaser's family; Purchaser's overall commitment to investments which are not readily marketable is not (and the acquisition of Class B Units will not cause such overall commitment to become) disproportionate to the Purchaser's net worth; Purchaser has either secured independent tax advice with respect to the investment in the Class B Units, upon which Purchaser is solely relying, or Purchaser is sufficiently familiar with income taxation of partnerships and limited liability companies that Purchaser has deemed such independent advice unnecessary; and Purchaser is acquiring Purchaser's Class B Units for investment, for Purchaser's own account and with no view toward resale or further distribution thereof, in whole or in part.

(o)    Purchaser, if not a U.S. Person or an Affiliate of the Company (as such terms are defined in Regulation S), represents and agrees that: (i) at the time Purchaser executed this Subscription Agreement, Purchaser was outside the United States, its territories and possessions; (ii) Purchaser: (a) will not, during the period commencing on the acceptance of the Subscription Agreement by the Company and ending on the day 40 days after the Offering Termination Date (the "**Restricted Period**"), offer or sell any of the Class B Units in the United States, its territories or possessions, or to a U.S. Person or for the account or benefit of a U.S. Person, other than in accordance with Rules 903 or 904 of Regulation S, and (b) will, after the expiration of the Restricted Period, offer, sell, pledge or otherwise transfer the Class B Units only pursuant to registration under the Act or an available exemption therefrom and, in any case in accordance with ethical state and foreign securities laws; (iii) none of Purchaser, its affiliates or any person acting on behalf of the Purchaser or such affiliates has engaged, or will engage, in any Directed Selling Efforts (as defined in Regulation S) with respect to the Class B Units or any distribution as that term is defined in the definition of Distributor (as defined in Rule 902 in Regulation S) with respect to the Class B Units; (iv) the transactions contemplated with respect to this Offering: (a) have not been pre-arranged with a purchaser located in the United States, its territories or possessions, or who is a U.S. Person, and (b) are not part of a plan or scheme to evade the registration provisions of the Act; and (iv) if Purchaser offers and sells any of the Class B Units during the Restricted Period, then he, she or it will do so only: (a) in accordance with the provisions of Regulation S, (b) pursuant to the registration of the Class B Units under the Act, or (c) pursuant to an available exemption from the registration requirements of the Act.

(p)    Purchaser represents and warrants that Purchasers and, if Purchaser is an entity, any beneficial owner of it is: (i) not a "blocked" person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (as used in this paragraph only, the "**Annex**"); (ii) in full compliance with the requirements of the Patriot Act (defined below) and all other requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**"); (iii) operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available for review and inspection by the Manager or any lender to or for the benefit of the Company during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained

5

15517096

pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; (vii) not owned or controlled by or now acting and or will in the future act for or on behalf of any person named in the Annex or any other list promulgated under the Patriot Act or any other person who has been determined to be subject to the prohibitions contained in the Patriot Act; and (viii) not a Person subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*, and any Executive Orders or regulations promulgated thereunder. Moreover, Purchaser represents and warrants that none of the funds it used or will use to satisfy its capital commitment to the Company have been derived from any unlawful activity. All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this paragraph only as the "**Patriot Act**") and are incorporated into this paragraph.

**5.    Survival of Representations and Warranties.** Purchaser agrees that the statements made by Purchaser herein, including any attachments hereto, and that the representations and warranties made in <u>Section 4</u> above, are true, accurate and complete as of the date hereof and shall be true, accurate and complete as of the date of acceptance hereof. If in any respect such statements, representations and warranties shall not be true, accurate and complete prior to such dates, Purchaser shall give written notice of such fact to the Company specifying such statements, representations and warranties that are not true, accurate and complete and the reasons therefor.

**6.    Payment of Subscription.** The amount of Purchaser's subscription is set forth on the Signature Page hereof (the "**Subscription Amount**"). The Purchaser must pay, concurrently with the submission of this Agreement, by wire transfer pursuant to wire instructions provided by the Company, an amount equal to the Subscription Amount. If the Purchaser's subscription is accepted, its Subscription Amount will constitute the Purchaser's Capital Contribution to the Company. If the Purchaser's subscription is rejected in whole or in part, the portion of the Subscription Amount applicable to the rejected subscription shall be returned to the Purchaser.

**7.    Irrevocable Subscription.** The Purchaser hereby acknowledges and agrees that this subscription is irrevocable and may not be cancelled, revoked or withdrawn by the Purchaser, and that this Subscription Agreement and the documents submitted herewith shall survive (i) changes in the Operating Agreement or other transactions, documents or instruments referenced in this Agreement that are not material, and (ii) death or disability of the Purchaser.

**8.    Termination.** If this Agreement is not accepted by the Manager and the Class B Units subscribed for hereunder are not issued to Purchaser within forty-five (45) days of the date of this Agreement, this Agreement will terminate and the Capital Contribution applicable to the terminated subscription shall be returned to the Purchaser.

15517096

9. **Record Ownership.** The undersigned's Class B Units will be owned and should be shown on the Company's records as indicated on the Signature Page hereof.

10. **Indemnification.** Purchaser understands and acknowledges that the Company is relying upon the representations, warranties and agreements made by Purchaser to the Company herein and, thus, hereby agrees to indemnify the Company and the Manager, and agrees to hold each of them harmless from and against any and all loss, damage, liability, cost or expense, including reasonable attorney's fees, that they or any of them may suffer, sustain or incur by reason of or in connection with any misrepresentation or breach of warranty or agreement made by the Purchaser under this Subscription Agreement or in connection with the sale or distribution by the Purchaser of the Class B Units purchased by Purchaser pursuant hereto in violation of the Operating Agreement, the Act or any other applicable law.

11. **Miscellaneous.**

(a)  All notices required or permitted hereunder shall be in writing, signed by the party giving notice or an officer thereof and shall be deemed to have been given when delivered by personal delivery, by facsimile, telegraph or telex, by Federal Express or similar courier service or by deposit in the United States mail, registered or certified, with postage prepaid, return receipt requested, addressed as follows:

If to the Company, at:

Wisconsin & Milwaukee Hotel LLC
[_____]
[_____]
[_____]

If to Purchaser, at the resident address set forth in the Signature Page hereof.

(b)  This Agreement may be executed in any one or more counterparts, each of which shall constitute an original, no other counterpart needing to be produced and all of which, when taken together, shall constitute but one and the same instrument.

(c)  Capitalized terms used in this Subscription Agreement, if not otherwise defined herein, shall have the meanings attributed to such terms in the Operating Agreement. All pronouns and any variations thereof used herein shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

(d)  The failure of the Company to exercise any right or remedy under this Subscription Agreement or any other agreement between the Company and the Purchaser, or otherwise, or delay by the Company in exercising the same, will not operate as a waiver thereof. No waiver by the Company will be effective unless and until it is in writing and signed by the Company.

7

15517096

(e)        This Subscription Agreement shall be enforced, governed and construed in all respects in accordance with the laws of the State of Wisconsin. This Subscription Agreement and the rights, powers and duties set forth herein shall be binding upon the Purchaser, his or her heirs, estate, legal representatives, successors and assigns and shall inure to the benefit of the Company and its successors and assigns.

(f)        Whenever possible, each provision of this Subscription Agreement shall be construed so as to be interpreted in such manner as to be effective and valid under applicable law. If any provisions of this Subscription Agreement or the application thereof to any party or circumstance shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or any other provision of this Subscription Agreement or the application of such provision to other parties or circumstances.

15517096

**SUBSCRIPTION AGREEMENT**

**Wisconsin & Milwaukee Hotel LLC**
**a Wisconsin Limited Liability Company**

**Signature Page**

PLEASE READ ALL OF THIS AGREEMENT BEFORE SIGNING

The undersigned wishes to subscribe for Class B Units of Wisconsin & Milwaukee Hotel LLC, a Wisconsin limited liability company, as follows:

Total Subscription Amount associated with Class B Units subscribed for:  $_____

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement.

Name(s) of Purchaser(s) (please print): _____

_____

Signature(s) of Purchaser(s): _____

(Title, if appropriate)

_____

(Title, if appropriate)

Date: _____, 2025

S-1

15517096

REGISTRATION:

Please print name(s) in which the Class B Units are to be registered. Include trust name, if applicable:

_____

SOCIAL SECURITY NUMBER or
TAXPAYER IDENTIFICATION NUMBER:    _____

E-MAIL ADDRESS:    _____

PURCHASER ADDRESS:    _____

                                                    Street or P.O. Box

                                     City     State    Zip

             Home Phone    Business Phone   E-mail address

LEGAL FORM OF OWNERSHIP (check one)

| _____ | Individual Ownership | _____ | Corporate/LLC/Partnership |
| _____ | Joint Tenants with Right of Survivorship (both parties must sign) | _____ | Uniform Gift to Minors Act of the State of _____ |
| _____ | Community Property (one signature required) | _____ | Trust |
| _____ | Tenants in Common (all parties must sign) | _____ | Other |

S-2

15517096

---

**SUBSTITUTE FORM W-8**

By checking this box [   ], the person signing this Subscription Agreement hereby certifies under penalties of perjury that the Purchaser is an "exempt foreign person" for purposes of the backup withholding rules under the U.S. federal income tax laws, because the Purchaser:

      (i)     Is a non-resident alien individual or a foreign corporation, partnership, estate or trust;

      (ii)     If an individual, has not been and plans not to be present in the U.S. for a total of 183 days or more during the calendar year; and

      (iii)     Neither engages, nor plans to engage, in a U.S. trade or business that has effectively connected gains from transactions with a broker or barter exchange.

---

ACCEPTED:               Acceptance Date: _____, 2025

                            Wisconsin & Milwaukee Hotel LLC

                            By: _____

                            Name: _____

                            Title: _____

15517096

### Amended and Restated Operating Agreement of
### Wisconsin & Milwaukee Hotel LLC
### Signature Page and Power of Attorney

The undersigned, by executing this Signature Page to the Amended and Restated Operating Agreement (**"Operating Agreement"**) of Wisconsin & Milwaukee Hotel LLC, a Wisconsin limited liability company (the **"Company"**), is hereby admitted as a Member, agrees to all the terms of the Agreement and agrees to be bound by the terms and provisions of the Operating Agreement. The undersigned further constitutes and appoints the Manager or any officer of the Company, with full power of substitution, the undersigned's true and lawful attorney for the undersigned and in the undersigned's name, place and stead to make, execute, sign, acknowledge, swear to, deliver, record and file any documents or instruments which may be determined necessary or desirable by the Manager to carry out the provisions of the Operating Agreement, including, without limitation, any amendment or amendments to the Operating Agreement for the purpose of adding the undersigned and others as Members as contemplated by the Operating Agreement (which amendment(s) the undersigned hereby joins in and executes, hereby authorizing this Signature Page to be attached to any such amendment(s)). The power of attorney hereby granted shall be deemed to be coupled with an interest and shall be irrevocable and survive the death, incapacity, insolvency, dissolution or termination of the undersigned or any delivery by the undersigned of an assignment of the whole or any portion of his or her interest. The place of residence of the undersigned is as shown below.

[Signature page follows]

The undersigned hereby signs and swears to this Signature Page this ____ day of _____, 2025 at _____, _____.

Total Subscription Amount associated with Class B Units subscribed for:  $_____

Name(s) of Member(s) (please print):  _____

_____

Signature(s) of Member(s):  _____
(Title, if appropriate)

_____
(Title, If appropriate)

Member(s) Residence Address:  _____

_____

_____

_____

Member(s) Business Address:  _____

_____

_____

_____

Member(s) E-mail Address:  _____

_____

Member(s) Social Security or
Taxpayer Identification Number:  _____

_____

O-2

15517096

# EXHIBIT C

Jackson Street Management LLC

July \_\_, 2025

Wisconsin & Milwaukee Hotel LLC
_____
_____

Re:     Backstop Equity Commitment Letter

Ladies and Gentlemen:

This backstop equity commitment letter (this "Agreement") sets forth the commitment of Jackson Street Management LLC ("JSM") to purchase Class B Units of Wisconsin & Milwaukee Hotel LLC, a Wisconsin limited liability company (the "Company"), in connection with the Company's offering of $6,000,000 (the "Offering Amount") of Class B Units to its unsecured creditors (the "Offering") being made in connection with the Company's Second Amended and Restated Chapter 11 Plan of Reorganization dated June 27, 2025 (the "Plan").

    1.     <u>Commitment</u>.

       (a)     JSM hereby irrevocably commits, subject to the terms and conditions set forth herein, to purchase an amount (the "Class B") in the Offering (the "Committed Units") in a dollar amount equal to the amount, if any, by which the aggregate dollar amount of all Class B Units purchased by all other subscribers in the Offering is less than the Offering Amount.

       (b)     Prior to the closing of the Offering, the Company shall give JSM written notice of the amount of Committed Units it is required to purchase hereunder. Within five business days after such written notice, JSM shall (i) execute and deliver to the Company a Subscription Agreement for the Committed Units and a signature page to Amended and Restated Operating Agreement of the Company and (ii) pay the subscription amount for the Committed Units in full to the Company in the manner set forth in the Subscription Agreement.

       (c)     Notwithstanding the foregoing, if there are no other subscribers for Class B Units in the Offering, then, with the consent of the Company, which shall not unreasonably be withheld, JSM may, in lieu of purchasing Class B Units in the Offering, fund a capital contribution to the Company in an amount equal to the full Offering Amount in cash on or before the date of the closing of the Offering on account of JSM's existing membership interest in the Company, whereupon JSM will retain its existing membership interest in the Company, the Offering will terminate and the Amended and Restated Operating Agreement of the Company prepared in connection with the Offering will not take effect.

    2.     <u>Miscellaneous</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Wisconsin, without giving effect to any principles of conflict of laws that would result in the application of the law of any other jurisdiction. This Agreement

15517327

contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, writings, commitments and understandings, if any, between the parties with respect thereto. This Agreement may not be terminated, amended, modified, supplemented or waived without the mutual written consent of both parties hereto. Neither party may assign any rights or delegate any obligations created by this Agreement without the prior written consent of the other party. Any written notice required hereunder may be in the form of email or other electronic communication.

3. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Signature page follows.]*

Please confirm that the above correctly reflects our understanding and agreement with respect to the foregoing matters by signing the enclosed copy of this Agreement and returning such copy to the Company.

Very truly yours,

Jackson Street Management LLC

By: _____

Name: _____

Title: _____

AGREED AND ACCEPTED:

Wisconsin & Milwaukee Hotel LLC

By: _____

Name: _____

Title: _____

15517327

# EXHIBIT D

July __, 2025

Jackson Street Management LLC
_____
_____

Re:     Loan Commitment Letter

Ladies and Gentlemen:

This loan commitment letter (this "Agreement") sets forth the commitment of Reiman Family Investment Company, LLC ("Lender") to advance a loan to Jackson Street Management LLC ("JSM") in connection with JSM's Equity Backstop Commitment dated on or about this date (the "Equity Commitment") obligating JSM to purchase Class B Units of Wisconsin & Milwaukee Hotel LLC ("Issuer").

1.     <u>Commitment</u>.

       (a)     Lender hereby irrevocably commits, subject to the terms and conditions set forth herein , and subject to the review and approval in Lender's sole discretion of the court approved final Chapter 11 Plan of Reorganization of Issuer, to advance a loan (the "Loan") to JSM in a principal amount up to $6,000,000.

       (b)     The Loan shall be evidenced by a promissory note in the form of <u>Exhibit A</u> (a "Note") and shall be on the terms and conditions set forth therein.

       (c)     JSM may request the Loan from Lender following JSM's receipt of notice from Issuer of the dollar amount of Class B Units of Issuer that JSM is required to purchase under the Equity Commitment by (i) delivering a written request to Lender setting forth the requested principal amount of the Loan (which may not exceed $6,000,000) and (ii) executing and delivering to Lender a Note in the principal amount of the requested Loan. Upon receiving such a request of the Loan from JSM, Lender shall advance the Loan in the requested amount to or as directed by JSM within five (5) business days.

2.     <u>Miscellaneous</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Wisconsin, without giving effect to any principles of conflict of laws that would result in the application of the law of any other jurisdiction. This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, writings, commitments and understandings, if any, between the parties with respect thereto. This Agreement may not be terminated, amended, modified, supplemented or waived without the mutual written consent of both parties hereto. Neither party may assign any rights or delegate any obligations created by this Agreement without the prior written consent of the other party. Any written notice required hereunder may be in the form of email or other electronic communication.

15537384

3. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Signature page follows.]*

15537384

Please confirm that the above correctly reflects our understanding and agreement with respect to the foregoing matters by signing the enclosed copy of this Agreement and returning such copy to the Company.

Very truly yours,

Reiman Family Investment Company, LLC

By: _____

Name: _____

Title: _____

AGREED AND ACCEPTED:

Jackson Street Management LLC

By: _____

Name: _____

Title: _____

15537384

<u>Exhibit A</u>

<u>Note</u>

See attached.

15537384

# EXHIBIT E

# PROMISSORY NOTE

Milwaukee, Wisconsin

$_____                                    _____, 2025

This Second Amended and Restated Promissory Note (this "**Note**") is made by Jackson Street Management LLC ("**Maker**"), in favor of Reiman Family Investment Company, LLC, with address at [_____] ("**Holder**").

For value received, Maker promises to pay to the order of Holder the amount of [_____ Dollars ($_____)], together with any other amounts due under this Note.

The unpaid principal balance of this Note will bear simple interest at a rate equal to [_____ percent (___%) per annum] (the "**Interest Rate**") from and after the date of this Note. Interest will be computed on the basis of a 365-day year for each day or portion thereof that all or part of the principal balance hereof shall remain outstanding.

Payments under this Note are due and payable as follows: [(a) Maker shall make [monthly/quarterly] payments of all accrued and unpaid interest under this Note, beginning on [_____, 2025] and continuing on the first business day of each calendar [month/quarter] until this Note is repaid in full; and (b)] Maker shall make a final payment of the entire unpaid principal balance of this Note, together with any and all accrued and unpaid interest under this Note, on or before [_____, 20__] (the "**Maturity Date**"). This Note may be prepaid by Maker in whole or in part at any time without penalty or premium.

The occurrence of any one of the following events shall constitute a default by Maker ("**Event of Default**") under this Note:

(a)     Maker fails to make any payment under this Note when due and payable or declared due and payable;

(b)     Maker fails to perform, keep or observe any other term or provision contained in this Note, which is required to be performed, kept or observed by Maker and does not cure such failure to the reasonable satisfaction of Holder within fifteen (15) days after such Holder gives written notice of such failure to Maker;

(d)     (i) Maker commences a voluntary case concerning itself under the Bankruptcy Code or any other law; (ii) an involuntary bankruptcy case is commenced against Maker and the petition is not controverted within ten days, or is not dismissed within 60 days after commencement of such case; (iii) a "custodian" (as defined in the Bankruptcy Code) or similar person is appointed for, or takes charge of, all or substantially all of Maker's property, or Maker commences any other proceedings under any reorganization, arrangement, adjustment of debt, relief of debtors, insolvency, dissolution or liquidation or similar law of any governmental entity, whether now or subsequently in effect, or there is commenced against Maker any such proceeding which remains undismissed for a period of 60 days following commencement; (iv) any order of relief or other order approving any such case or proceeding is entered; (v) Maker is adjudicated bankrupt; (vi) Maker

15542194

suffers any appointment of any custodian or the like for it or any substantial part of its property to continue undischarged for a period of 30 days; (vii) Maker makes a general assignment for the benefit of creditors; (viii) Maker calls a meeting of its creditors with a view to arranging an adjustment of its debts; (ix) Maker by any act or failure to act, consents to, approves of or acquiesces in any of the foregoing; or (x) any action is taken by Maker for the purpose of effecting any of the foregoing; or

(e)        the dissolution or liquidation of Maker.

Upon an Event of Default, without notice or demand by Holder to Maker, all of Maker's liabilities under this Note shall be immediately due and payable, and Maker may exercise any one or more of the rights and remedies it may have pursuant to applicable law. In addition, after an Event of Default, interest will accrue on the unpaid principal balance of this Note at a rate equal to [_____ percent (___%) per annum], calculated daily and payable on demand.

The acceptance by Holder of any partial payment made hereunder after the time any amount under this Note becomes due and payable will not establish a custom or waive any rights of Holder to enforce prompt payment hereof. Maker and every endorser hereof waive presentment, demand and protest and notice of presentment, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of this Note.

If, on an Event of Default, Holder employs counsel for advice or other representation to enforce any rights of Holder against Makers under this Note and/or attempts to or enforces any of Holder's rights or remedies under this Note, all costs and expenses (including reasonable attorney fees and expenses) incurred by Holder in any manner or way with respect to such enforcement will become part of Makers' liabilities hereunder, payable by Makers to Holder on demand.

No delay by the Holder in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Holder of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

If any provision of this Note or the application thereof to any party or circumstance is held invalid or unenforceable, the remainder of this Note and the application of such provision to other parties or circumstances will not be affected thereby and the provisions of this Note shall be severable in any such instance.

This Note shall be binding upon Maker, its successors and assigns, and shall inure to the benefit of the successors and assigns of Holder. This Note shall be governed and controlled by the laws of the State of Wisconsin as to interpretation, enforcement, validity, construction, effect, choice of law and in all other respects. PDF and/or other electronically transmitted copies of signatures shall be deemed originals for all purposes hereof and Holder may produce such copies, without the need to produce original signatures, to prove the existence of this Note and Maker's obligations hereunder.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, Maker has caused this Promissory Note to be duly executed and delivered as of the date first written above.

JACKSON STREET MANAGEMENT LLC

By: _____

Name: _____

Title: _____

15542194

# EXHIBIT F

<u>**OFFERING PROCEDURES**</u>

**WISCONSIN & MILWAUKEE HOTEL LLC**

**OFFERING OF $6,000,000 OF CLASS B UNITS**

July 2025

| TERM | MEANING |
|---|---|
| **Company** | Wisconsin & Milwaukee Hotel LLC, a Wisconsin limited liability company |
| **JSM** | Jackson Street Management LLC |
| **SEC** | U.S. Securities and Exchange Commission |
| **Plan** | Second Amended and Restated Chapter 11 Plan of Reorganization of Company dated June 27, 2025 |

## I.    DOCUMENTATION

| <u>No.</u> | <u>Document/Item</u> | <u>Purpose</u> |
|---|---|---|
| 1. | Amended and Restated Operating Agreement of Company | Amends Company's operating agreement to create Class A and Class B Units, convert outstanding membership interests to Class A Units and establish rights and obligations of all members of Company. |
| 2. | Form of Subscription Agreement | Agreement by which purchasers would subscribe to purchase Class B Units in the offering and join as a party to the Amended and Restated Operating Agreement of Company. |
| 3. | Subscription Agreement Transmittal Materials | Transmittal materials to be used to distribute Subscription Agreements to unsecured creditors, briefly outline the terms and procedures of the offering and identify key risk factors with respect to the offering. |
| 4. | Equity Backstop Commitment Letter | Agreement by which JSM commit to purchase any Class B Units not subscribed for by unsecured creditors in the offering. |
| 5. | Loan Commitment Letter | Agreement by which Reiman Family Investment Company, LLC commits to loan JSM up to $6,000,000 for JSM's use to purchase Class B Units under the Equity Backstop Commitment Letter. |
| 6. | Federal and State Securities Filings | Filings to comply with applicable federal and state securities laws (to be determined based on sales of Class B Units made). |

15533721

## II. OFFERING STEPS AND TIMELINE

| No. | Action | Description | Timing |
|---|---|---|---|
| 1. | Segregated Account | Company will open segregated bank account and establish inbound wire transfer instructions for receipt of subscription amounts. | Prior to Distribution of Subscription Agreements to Unsecured Creditors (#2) |
| 2. | Distribution of Subscription Agreements to Unsecured Creditors | Subscription Agreement and Subscription Agreement Transmittal Materials sent to each unsecured creditor. | |
| 3. | Subscription Period | Period during which unsecured creditors may subscribe for Class B Units.<br><br>Each unsecured creditor will have the right to purchase its pro rata amount of Class B Units as determined under the Plan (the "Allocated Amount"). In addition, each unsecured creditor may indicate its subscription to purchase Class B Units in excess of such amount to the extent other unsecured creditors do not exercise their subscription rights in full.<br><br>To exercise the right to purchase Class B Units, unsecured creditors must complete, execute and deliver their Subscription Agreement and pay by wire transfer to the segregated account, an amount equal to the Subscription Amount for the total amount of Class B Units subscribed for (including any amount subscribed for in excess of their Allocated Amounts). Among other requirements under the Subscription Agreement, unsecured creditors must represent and warrant to Company that they are an Accredited Investor (as defined in Regulation D of the Securities Act of 1933) to purchase Class B Units. | 15 days from distribution of Subscription Agreements (#2) |
| 4. | Acceptance of Subscription Agreements | Company will determine the amount of Class B Units to be purchased by each unsecured creditor that duly completes and submits a Subscription Agreement and will countersign such Subscription Agreements.<br><br>The amount purchasable by each subscribing unsecured creditor will be its Allocated Amount (to the extent subscribed for) plus an amount, if any, equal to a pro rata share (in | Within 5 business days after end of Subscription Period (#3) |

| No. | Action | Description | Timing |
|---|---|---|---|
| | | proportion to the Allocated Amounts desiring to purchase such Class B Units) of any Class B Units not subscribed for by other unsecured creditors. | |
| 5. | Call on Equity Backstop Commitment Letter (if applicable) | If unsecured creditors do not submit subscriptions that are accepted by the Company for all Class B Units offered in the offering, then Company will advise JSM the remaining amount of Class B Units that it must purchase. | Within 5 business days after end of Subscription Period (#3) |
| 6. | Call on Debt Commitment Letter (if applicable) | If JSM must purchase Class B Units under the Equity Backstop Commitment Letter and requires a loan to fund such purchase, it will advise Reiman Family Investment Company, LLC of the amount of loan required. | Following call on Equity Backstop Commitment Letter (#5) |
| 7. | Advance of Loan under Debt Commitment Letter (if applicable) | Reiman Family Investment Company, LLC to advance amount of requested loan and JSM will delivery promissory note(s) to evidence such loans. | By date of Submission of Subscription by JSM (#8) |
| 8. | Submission of Subscription by JSM (if applicable) | If JSM must purchase Class B Units under the Equity Backstop Commitment Letter, it will complete, execute and deliver a Subscription Agreement and pay by wire transfer to the segregated account an amount equal to the Subscription Amount for the total amount of Class B Units subscribed for. | Within 5 business days after call on Equity Backstop Commitment Letter (#5) |
| 9. | Acceptance of JSM Subscription Agreement | Company will accept and countersign the Subscription Agreement of JSM. | Following Submission of Subscription by JSM (#8) and prior to closing of purchase of Class B Units in Offering (#10) |
| 10. | Closing of Purchases of Class B Units in Offering | Purchase of Class B Units is consummated and purchasers become Class B Members. Funds in segregated account are available for Company's general use. | By or before 45 days after distribution of Subscription Agreements to unsecured creditors (#2) |
| 11. | Completion of Exhibit B to Amended and Restated Operating Agreement of Company | Exhibit B to Amended and Restated Operating Agreement of Company is completed by the Manager to reflect the Class B Units purchased at Closing. | Following closing |

15533721

| No. | Action | Description | Timing |
|-----|--------|-------------|--------|
| 12. | Federal and State Securities Filings (if applicable) | Actions to comply with applicable federal and state securities laws (to be determined based on sales of Class B Units made). | Generally, within 15 days after closing |