# LOAN AGREEMENT

### between

## WISCONSIN & MILWAUKEE HOTEL LLC
### as Borrower

### and

## WISCONSIN HOUSING AND ECONOMIC DEVELOPMENT AUTHORITY
### as Lender

### Dated August 31, 2012

### LOAN AGREEMENT

THIS LOAN AGREEMENT (the "**Agreement**") is made and entered into as of August 31, 2012, by and between WISCONSIN & MILWAUKEE HOTEL LLC, a Wisconsin limited liability company (the "**Borrower**"), and WISCONSIN HOUSING AND ECONOMIC DEVELOPMENT AUTHORITY, a Wisconsin public body corporate and politic (the "**Lender**")

### RECITALS:

A.     On the date hereof, Lender shall fully disburse the proceeds of two loans to Borrower in the respective amounts of $2,262,400 ("**Loan B**") and $7,500,000 ("**Loan C**"), together referred to herein as the "**Loans**."

B.     The proceeds of the Loans will be fully utilized or deposited in one or more escrow accounts on the date hereof by Borrower to (i) reimburse Borrower for certain costs previously incurred by Borrower in connection with the acquisition, partial demolition of buildings previously located at the Southwest corner of the intersection of East Wisconsin Avenue and North Milwaukee Street, in Milwaukee, Wisconsin, as legally described in Exhibit A, and to partial construction of the Project, as well as to complete the construction of the Project (ii) to pay costs and expenses related to the Project as and when due and (iii) to pay costs and expenses in connection with the closing and funding of the Loans.

C.     Subject to, and in reliance upon, the terms and conditions of this Agreement and the representations and warranties made herein, all of which terms, conditions, representations and warranties are material and being relied upon by Lender, Lender is willing to make the Loans to Borrower.

### AGREEMENT:

NOW, THEREFORE, in consideration of the above premises and the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

EXHIBIT

**108**

# ARTICLE 1
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.1.     Defined Terms. As used in this Agreement and the recitals hereto, the following terms shall have the following respective meanings:

**"Accountants"** means Reznick Group, P.C. or such other firm of independent certified public accountants as may be engaged by Borrower which is nationally recognized and which has similar new markets tax credit experience.

**"Agreement"** means this Loan Agreement, including all schedules, addenda and exhibits hereto, as the same may be amended, supplemented, modified or restated from time to time.

**"Architect"** means Kahler Slater, Inc.

**"Architect's Agreement"** means that certain Standard Form of Agreement Between Owner and Architect (AIA Document B101-2007) between Borrower and Architect dated February 22, 2011, as amended, restated or replaced from time to time.

**"Assignment of Contracts"** means, collectively, that certain Amended and Restated Assignment of Architect Agreement dated of even date herewith by Borrower and Architect in favor of Lender; that certain Amended and Restated Assignment of Management Agreement, dated of even date herewith by Borrower and White Lodging Services Corporation, an Indiana corporation, in favor of Lender; that certain Amended and Restated Assignment of Construction Contract, dated of even date herewith, by Borrower in favor of Lender and consented to by Contractor; and that certain Amended and Restated Collateral Assignment of Rights of Declarant, dated of even date herewith by Borrower in favor of Lender; each as amended, restated or otherwise modified from time to time.

**"Association"** has the meaning assigned to such term in the Declaration of Condominium for Wisconsin & Milwaukee Hotel Condominium dated as of December 19, 2011 by Borrower.

**"Bond Issuance Date"** means as of the date hereof.

**"Bond Issuer"** means the Wisconsin Housing and Economic Development Authority, a Wisconsin public body corporate and politic ("**WHEDA**").

**"Bonds"** means the tax exempt bonds issued to Lender by Bond Issuer in the aggregate amount of $42,500,000.00, a portion of the proceeds from which will be loaned by Bond Issuer to Borrower.

**"Borrower Operating Agreement"** means that certain Amended and Restated Operating Agreement of Borrower dated January 1, 2011 as amended by that certain First Amendment to Operating Agreement dated November 28, 2011, and as otherwise amended, restated or otherwise modified from time to time.

**"Borrower Operations"** means the construction, ownership and operation of the Project.

2

"**Budget and Construction Schedule**" means the detailed breakdown of costs incurred or to be incurred in connection with the Completion of the Project, including the anticipated schedule for the incurrence of such costs, attached hereto as Exhibit B and made a part hereof.

"**Business Day**" means any day (other than a Saturday, Sunday or legal holiday in the State of Wisconsin) on which banks are permitted to be open for business in Milwaukee, Wisconsin.

"**CDE Lender**" means, collectively, WCDLF Sub CDE XXXIII, LLC and WBD Growth Fund VI, LLC, each of which is a Wisconsin limited liability company.

"**CDE Loan**" means, collectively, the loans in the aggregate principal amount of $40,185,000 loans made by CDE Lender to Borrower as of the date hereof.

"**Closing Date**" means the date on which the conditions set forth in Article 3 have been satisfied and the Loans are closed, which the parties anticipate to be the date hereof.

"**Completion**" means the Project is completed in accordance with the Plans and paid for in full; a certificate of substantial completion for the Project has been signed by Borrower and the Architect and delivered to Lender and no punch-list items remain to be completed or, if punch-list items remain to be completed, funds have been escrowed with the Title Company for their completion in an amount acceptable to Lender; Borrower has delivered to Lender copies of all licenses and permits needed to operate the Project; Borrower is in possession and occupancy of the entire Project; copies of all warranties from suppliers covering materials, equipment and appliances included within the Project have been delivered to Lender; evidence that all insurance required hereby is in full force and effect has been delivered to Lender; and no Event of Default exists hereunder.

"**Completion Date**" means September 30, 2013.

"**Construction Contract**" means that certain Standard Form of Agreement Between Owner and Contractor (AIA Document A101-2007) dated December 30, 2011 between Contractor and Borrower for the construction of the Project and all amendments, modifications, replacements and restatements thereof.

"**Construction Documents**" means, collectively, the Construction Contract, all Subcontracts, the Architect's Agreement and all other documents in connection with construction and development of the Project and all amendments, modifications, replacements and restatements thereof.

"**Contractor**" means C.D. Smith Construction, Inc., a Wisconsin corporation.

"**Contractors**" means the Contractor and each of the subcontractors providing labor and materials to the Project.

"**Control Agreement**" means the Amended and Restated Blocked Account Control Agreement dated as of the date hereof executed by Borrower in favor of Lender and CDE Lender with respect to the Disbursement Account and the Reserve Accounts.

3

"**Disbursing Agreement**" means that certain Amended and Restated Construction Monitoring and Disbursing Agreement dated as of the date hereof by and between Borrower, Lender, Contractor, CDE Lender, Wisconsin & Milwaukee Hotel Funding, LLC, a Wisconsin limited liability company, and Title Company, as amended, restated or otherwise modified from time to time.

"**Disbursement Account**" means, collectively, the bank accounts held at U.S. Bank National Association or such other financial instruction as required or permitted by Lender, and subject to the Pledge Agreement and Control Agreement, and established with Loan Proceeds (not otherwise disbursed pursuant to the Flow of Funds Memorandum in accordance with Section 2.1 hereof) on the date hereof to be disbursed as provided herein and in the Disbursing Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" means any event described in Section 6.1.

"**Financial Projections**" means the financial projections dated as of December 30, 2011, prepared by Reznick Group, P.C. with respect to the Project.

"**Flow of Funds Memorandum**" means the Flow of Funds Memorandum dated on or about the date hereof.

"**Franchise Agreement**" means the Franchise Agreement dated June 17, 2011 between Borrower and Marriott International, Inc.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of any date of determination.

"**Governmental Requirements**" means all laws, statutes, codes, ordinances, and governmental rules, regulations and requirements applicable to Borrower, Lender and the Project.

"**Guarantor**" means, collectively, Jackson Street Management LLC, a Wisconsin limited liability company.

"**Guaranty**" means that certain Guarantee of Completion of even date herewith, executed by the Guarantor in favor of Lender, guarantying completion of the Project.

"**Hazardous Substance Indemnity Agreement**" means the Hazardous Substance Indemnity Agreement dated of even date herewith, executed by Borrower and Guarantor in favor of Lender, CDE Lender and U.S. Bancorp Community Development Corporation.

4

"**Hazardous Substances**" has the meaning assigned to such term in the Hazardous Substance Indemnity Agreement.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement of even date herewith between CDE Lender, Wisconsin & Milwaukee Hotel Funding, LLC, a Wisconsin limited liability company, and Lender.

"**Lien**" means, with respect to any Person, any security interest, mortgage, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device (including the interest of each lessor under any capitalized lease), in, of or on any assets or properties of such Person, now owned or hereafter acquired, whether arising by agreement or operation of law.

"**Loan**" or "**Loans**" means, both individually and collectively, Loan B and Loan C.

"**Loan Documents**" means the Notes, Mortgages, Assignment of Contracts, Guaranty, UCC Financing Statements, Hazardous Substances Indemnity Agreement, Pledge Agreement, Control Agreement, Disbursing Agreement, this Agreement and any other documents evidencing or securing the Loans and any and all renewals, extensions and amendments of any of the Loan Documents.

"**Loan Proceeds**" means the proceeds of the Loans.

"**Management Agreement**" means the Management Agreement dated June 14, 2011, between Borrower and White Lodging Services Corporation, an Indiana corporation.

"**Maturity Date**" means January 1, 2042.

"**Mortgage B**" means that certain Construction Mortgage, Security Agreement, Fixture Filing and Financing Statement B of even date herewith, executed by Borrower in favor of Lender securing Note B, as amended, restated or otherwise modified from time to time.

"**Mortgage C**" means that certain Construction Mortgage, Security Agreement, Fixture Filing and Financing Statement C of even date herewith, executed by Borrower in favor of Lender securing Note C, as amended, restated or otherwise modified from time to time.

"**Mortgages**" means collectively Mortgage B and Mortgage C.

"**Note B**" means that certain Promissory Note of even date herewith made payable to the order of Lender in the original principal amount of up to $2,262,400 together with all amendments, modifications, extensions or renewals thereof or substitutes therefor from time to time.

"**Note C**" means that certain Promissory Note of even date herewith made payable to the order of Lender in the original principal amount of $7,500,000, together with all amendments, modifications, extensions or renewals thereof or substitutes therefor from time to time.

"**Note**" or "**Notes**" means, individually or collectively, Note B and Note C.

5

"**Obligations**" means Borrower's obligations in respect of the due and punctual payment of principal and interest on the Notes when and as due, whether by acceleration or otherwise, and all fees, expenses, indemnities, reimbursements and other obligations of Borrower under this Agreement or any other Loan Document, in all cases whether now existing or hereafter arising or incurred.

"**Performance Bond**" means, collectively, that Performance Bond (AIA Document A312 – 2010) and that Payment Bond (AIA Document A312 – 2010), each issued by Liberty Mutual Insurance Company and dated as of December 30, 2011.

"**Permitted Encumbrances**" means the liens identified in Section 5.14.

"**Person**" means any natural person, corporation, partnership, limited partnership, joint venture, limited liability company, firm, association, trust, unincorporated organization, government, government entity or any other entity, whether acting as an individual, fiduciary or in any other capacity.

"**Plans**" means the final working plans for the construction of the Project, including drawings, specifications, details and manuals, as approved by Lender.

"**Pledge Agreement**" means the Bank Account Pledge Agreement dated as of the date hereof executed by Borrower in favor of Lender and CDE Lender with respect to the Disbursement Account and the Reserve Accounts.

"**Project**" means the development, construction, equipping, furnishing and operation of a nine-story Marriott Hotel located on the Real Estate including 200 guest rooms, 15,000 square feet of banquet space and 60 underground parking stalls.

"**Real Estate**" means all of the estate, right, title and interest of Borrower at law or in equity in and to the real estate described in Exhibit A, attached hereto and made a part hereof.

"**Reserve Accounts**" shall have the meaning set forth in Section 2.5.

"**Subcontracts**" means any contract or contracts entered into with any single subcontractor or materialman employed by Borrower in connection with the construction of the Project, and all amendments, modifications, replacements and restatements thereof.

"**Title Company**" means Chicago Title Insurance Company.

"**UCC Financing Statements**" mean those certain UCC Financing Statements naming Borrower as Debtor and Lender as Secured Party

"**Verified Project Costs**" means costs actually incurred by Borrower for work in place as part of the Project, as certified by Borrower, Architect and such other parties required by Lender from time to time pursuant to the provisions of this Agreement and the Disbursing Agreement.

6

Section 1.2.    Accounting Terms and Calculations.  Except as may be expressly provided to the contrary herein, all accounting terms used herein shall be interpreted, and all accounting determinations hereunder, shall be made in accordance with GAAP.

Section 1.3.    Other Definitional Terms, Terms of Construction.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to Sections, Exhibits, Schedules and like references are to Sections, Exhibits, Schedules and the like of this Agreement unless otherwise expressly provided.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or".  The singular of any word shall include the singular and the plural of such word.  The use of any gender herein shall include all other genders, where the context so requires or permits. All incorporations by reference of covenants, terms, definitions or other provisions from other agreements are incorporated into this Agreement as if such provisions were fully set forth herein and include all necessary definitions and related provisions from such other agreements.  All covenants, terms, definitions and other provisions from other agreements incorporated into this Agreement by reference shall survive any termination of such other agreements until the obligations of Borrower under this Agreement and the Notes are irrevocably paid in full.

## ARTICLE 2
## TERMS OF LENDING

Section 2.1.    Loans.  Upon the terms and subject to the conditions hereof and of the other Loan Documents, Lender agrees to make the Loans to Borrower.  Lender shall advance the proceeds of the Loans to Borrower in full on the date hereof, which proceeds shall be fully disbursed by Borrower in accordance with the Flow of Funds Memorandum on the date hereof and any remaining Loan Proceeds shall be deposited by Lender into the Disbursement Account and shall be disbursed as provided and in accordance with the terms and conditions of the Disbursing Agreement.

Section 2.2.    The Notes; Interest and Repayment.  The Loans shall be evidenced by the Notes.  Lender shall enter in its ledger and record the payments made on each Loan and Lender is authorized by Borrower to enter on a schedule attached to each Note a record of such payments.  Interest shall accrue and interest and principal shall be paid as provided in the Notes. If not sooner paid, each Note, together with all accrued and unpaid interest thereon, shall be due and payable in full on the Maturity Date applicable to such Note.  Except as otherwise provided in the Intercreditor Agreement, all payments made by Borrower to Lender shall be applied first to pay all amounts then due with respect to Note B and then to pay all amounts then due with respect to Note C.

Section 2.3.    Use of Proceeds.  The proceeds of the Loans shall be used as provided in Recital B above.

Section 2.4.    Interest Deferral.  In the event that Borrower is unable to make regularly scheduled interest payments on Loan C after May 30, 2013 based on available cash

7

flows from the Project, and provide that Borrower gives Lender written notice of such inability, such failure shall not constitute an Event of Default hereunder; interest shall accrue on such unpaid interest until paid.

Section 2.5.     Reserve Accounts.  Borrower shall establish and maintain each of the following reserves in separate bank accounts in connection with the Loan (collectively, the "**Reserve Accounts**"), each of which shall be established in Borrower's name at U.S. Bank National Association or such other financial instruction as required or permitted by Lender, and subject to the Pledge Agreement and Control Agreement.

(a)     Interest Reserve.  Upon Completion, Borrower shall deposit $1,000,000 in an interest reserve account or provide a letter of credit in the amount of $1,000,000 to secure payment of interest on the Loans and the CDE Loan from a financial institution and in form and substance reasonably acceptable to Lender.  Funds in such account may, at Lender's discretion, be applied to payment of past due interest on the Loans; provided that such application shall not be deemed to cure any Event of Default with respect to Borrower's failure to pay interest as and when due.

(b)     Working Capital Reserve.  Upon Completion or as otherwise required pursuant to the Management Agreement, Borrower shall deposit funds in a working capital account in such amount(s) as required pursuant to the Management Agreement.  Pursuant to the Management Agreement, the initial deposit required in the working capital account is $200,000. If no Event of Default exists, Lender shall permit Borrower to utilize funds in such working capital account as requested by Borrower to satisfy its obligations pursuant to the Management Agreement.

(c)     Maintenance, Repair and Renovation Reserve.  Borrower shall make deposits and maintain at all times a maintenance, repair and renovation reserve account in conformance with the terms and provisions of the Franchise Agreement and the Management Agreement.  If no Event of Default exists, Lender shall permit Borrower to utilize funds in such maintenance, repair and reserve account as requested by Borrower to satisfy its obligations for repairs and maintenance of the Project pursuant to the Franchise Agreement and the Management Agreement.

(d)     Tax Reserve.  Commencing on May 30, 2013, Borrower shall deposit in a tax escrow account such amounts at such times as required by the Mortgages with respect to payment of taxes on the Project.  Funds in such tax escrow account shall be applied as provided in the Mortgages.

Section 2.6.     Lien Priority.  Except as provided in the Intercreditor Agreement, the relative priority of the liens and security interests created by the Mortgages issued by Borrower to Lender on the date hereof shall be as follows: (a) Mortgage B shall have first lien priority; and (b) Mortgage C shall have second lien priority.

Section 2.7.     Prepayment.  Borrower may not prepay the Notes prior to December 30, 2014.  Borrower may prepay Note B, in whole or in part, during the period from December 30, 2014 through December 30, 2016 only if such prepayment is accompanied by a

8

prepayment fee equal to 0.5% of the amount so prepaid. After December 30, 2016, Borrower may prepay Note B, in whole or in part, without premium or penalty. After December 30, 2014, Borrower may prepay Note C, in whole or in part, without premium or penalty. The Loans have been made with the proceeds of Bonds (as that term is defined in that certain Indenture of Trust, dated as of August 1, 2012, by and between Lender and Wells Fargo Bank, National Association, relating to WHEDA Economic Development Bonds 2012 Series A, B, and C. (the "**Indenture**")). In the event the Bonds are prepaid in accordance with Section 4.3, 4.5, or 4.7 of the Indenture, other than by effecting a prepayment of the Notes, Borrower may be required to prepay of the Loans to the extent required to refund the proceeds of the Bonds to the Bondholders (as that term is defined in the Indenture). Additionally, in the event of a mandatory tender under Section 4.9 of the Indenture with respect to the Series B Bonds and the Series C Bonds (each as defined in the Indenture), if there are insufficient monies in the Bond Purchase Account (as defined in the Indenture) on the Mandatory Tender Date (as defined in the Indenture) to purchase the Series B Bonds and Series C Bonds, the Borrower shall be required to prepay the Fund Loan on the later of the Mandatory Tender Date or December 30, 2018 in an amount equal to such shortfall. Notwithstanding anything else to the contrary herein, permissible prepayments (which exclude mandatory prepayments referenced in the preceding two sentences) (i) may only be made on an Interest Payment Date (as defined in the Indenture) and upon 48 hours prior written notice to Wells Fargo Bank, National Association, whose mailing address is 625 Marquette Avenue, 11th Floor; Minneapolis, Minnesota 55479 and (ii) must include all accrued interest through the day before the Interest Payment Date.

## ARTICLE 3
## CONDITIONS PRECEDENT

The obligation of Lender to make the Loans hereunder shall be subject to the prior or simultaneous fulfillment of each of the following conditions:

Section 3.1. Documents. Lender shall have received fully executed documents and other materials as set forth on Schedule 3.1 attached hereto and hereby made a part hereof.

Section 3.2. Other Matters. All organizational and legal proceedings relating to Borrower and Guarantor and all instruments and agreements in connection with the transactions contemplated by this Agreement shall be reasonably satisfactory in scope, form and substance to Lender and its counsel, and Lender shall have received all information and copies of all documents, which it may reasonably have requested in connection therewith, such documents where appropriate to be certified by Borrower, Guarantor or governmental authorities.

Section 3.3. Closing Costs. Lender shall have received all closing costs and other amounts due and payable by Borrower on or prior to the Closing Date, including the reasonable fees and expenses of counsel to Lender payable pursuant to Section 7.2.

Section 3.4. Perfection. The Mortgages, UCC Financing Statements and any other Loan Document creating or evidencing a lien or security interest which Lender requires to be filed of record shall have been appropriately filed to the satisfaction of Lender or provision shall have been made for their filing and the priority and perfection of the Lien created thereby

9

shall have been established to the satisfaction of Lender or provision shall have been made for the establishment of such priority and perfection to the satisfaction of Lender.

Section 3.5.     No Default.  All representations and warranties of Borrower made in this Agreement shall remain true and correct and no Event of Default shall exist.

Section 3.6.     Other Conditions.  All other conditions set forth in this Agreement shall have been satisfied to Lender's satisfaction.

### ARTICLE 4
### REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as of the date hereof:

Section 4.1.     Organization, Standing, Etc. of Borrower.  Borrower is a limited liability company which is duly formed and validly existing under the laws of the State of Wisconsin and has all requisite power and authority to own its properties and to carry on its business as now conducted, to enter into this Agreement and the other Loan Documents to which it is a party and to issue the Notes and to perform its obligations hereunder and thereunder.  This Agreement, the Notes and the other Loan Documents to which it is a party, and the performance of Borrower's obligations thereunder, have been duly authorized by all necessary action on the part of Borrower and when executed and delivered will be the legal and binding obligations of Borrower.  The execution, delivery and performance of this Agreement, the Notes and the other Loan Documents to which it is a party will not violate Borrower's organizational documents or any law applicable to Borrower and will not violate or cause a default under or permit acceleration of any agreement to which Borrower is a party or by which it or the Real Estate is bound.  Except for consents, approvals and exemptions previously obtained (copies of which have been delivered to Lender), no approval of, or exemption by, any Person is required in connection with Borrower's execution, delivery and performance of this Agreement, the Notes and the other Loan Documents to which it is a party.  To Borrower's knowledge, it is not in default (beyond any applicable grace period) in the performance of any agreement, order, writ, injunction, decree or demand to which it is a party or by which it is bound.

Section 4.2.     Fee Title.  Borrower is the owner of the Real Estate in fee simple and has no knowledge of any unrecorded claims, liens or encumbrances against the Real Estate other than the Permitted Encumbrances.

Section 4.3.     Approval.  The construction and operation of the Project has been approved, to the extent required by any applicable law, statute, ordinance, regulation or effective restrictive covenant, by all federal, state, regional and local authorities, and the use of the Real Estate complies with all applicable zoning and environmental ordinances, regulations and restrictive covenants affecting the Real Estate and all requirements for such use have been satisfied, the failure to comply with which or to satisfy such requirements could reasonably be expected to have a material adverse effect on Borrower.

Section 4.4.     Taxes.  Borrower has filed all federal, state and other income and other tax returns required to be filed, which returns properly reflect taxes owed by Borrower for the period covered thereby and it has paid or made appropriate provisions for the payment of all

10

taxes which may become due pursuant to said returns and for the payment of all present installments of any assessments, fees and other governmental charges upon Borrower or upon any of its property, except for such returns the failure to file and such taxes the failure to pay would not have a material adverse effect on the business, properties, assets, operations or condition (financial or otherwise) of Borrower.

Section 4.5. <u>Financial Statements and No Material Adverse Change</u>. The financial information heretofore furnished to Lender has been prepared in accordance with GAAP. Borrower has no material obligation, liability or asset not disclosed in such financial information, and there has been no material adverse change in the financial condition of Borrower since the date such financial information was submitted. Guarantor has no material obligation, liability or asset not disclosed in such financial statements, and there has been no material adverse change in the financial condition of Guarantor since the date of such financial statements.

Section 4.6. <u>Litigation</u>. There are no actions, suits or proceedings pending or, to the actual knowledge of Borrower, threatened against or affecting Borrower, the Real Estate or the Project that could reasonably be expected to have a material adverse effect on the condition of Borrower or on the ability of Borrower to perform its obligations under the Loan Documents. To Borrower's knowledge, none of Borrower, the Real Estate or the Project is in violation of any Governmental Requirement where such violation could reasonably be expected to impose a material liability on Borrower.

Section 4.7. <u>Use of the Project</u>. Borrower has used (and intends to use) the Project solely to conduct Borrower Operations and has not entered into (and shall not enter into) any Leases with respect to the Project, except such retail leases of a portion of the Project that complement Borrower Operations.

Section 4.8. <u>Employee Benefit Plans</u>. Except as disclosed in writing to Lender: (a) Borrower is not an employee benefit plan as defined in Section 3(1) of ERISA, whether or not subject to ERISA; (b) no assets of Borrower constitute assets of any such plan under ERISA regulations or rulings; (c) with respect to any such plan that Borrower sponsors, participates in or has fiduciary duties with respect to, Borrower has materially complied with all federal and state laws, plan documents and funding requirements; (d) Borrower does not sponsor, participate in or have fiduciary duties with respect to any defined benefit pension plan subject to Title IV of ERISA or any multi-employer pension plan as defined in Section 3(37)(A) of ERISA or any plan providing medical or other welfare benefits to retirees or other former employees (except as required by federal or state law); and (e) Borrower is not (and has not ever been) a member of a group of trades or businesses (whether or not incorporated) that is treated as a single employer under Section 414 of the Internal Revenue Code.

Section 4.9. <u>Federal Reserve Regulations</u>. Borrower is not engaged principally or as one of its important activities in the business of extending credit for the purpose of purchasing or carrying margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System or any successor thereto).

Section 4.10. <u>[Intentionally Left Blank]</u>

11

Section 4.11.　Default of Indebtedness.  Borrower is not in default in the payment of the principal of or interest on any debt or under any instrument or agreement under or subject to which any debt has been issued and no event has occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice or both constitutes or would constitute an event of default thereunder.

Section 4.12.　PUHCA.  Borrower is not a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company," all as defined in the Public Utility Holding Company Act of 1935, as amended.

Section 4.13.　FIRPTA.  Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

Section 4.14.　Existing Agreements.  Each of the Construction Contract, Architect Contract, Performance Bond, Management Agreement and Franchise Agreement are in full force and effect, and Borrower is not in default under any such agreement.

Section 4.15.　Bond Issuance.  Borrower has provided Lender with true and correct copies of all commitment letters and other information pertaining to the closing and funding of the issuance of the Bonds.  Borrower expects the Bond issuance to be closed and funded by Bond Issuance Date.

Section 4.16.　Survival of Representations.  All representations and warranties made in this Agreement or the other Loan Documents shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of the Loan.

## ARTICLE 5
## COVENANTS

Until the Notes and all of Borrower's other Obligations shall have been paid and performed in full, unless Lender shall otherwise consent in writing:

Section 5.1.　Financial Statements and Reports.  Borrower shall provide the following to Lender at Borrower's expense (prepared in accordance with GAAP, as applicable):

(a)　As soon as available and, in any event, within ninety (90) days after the end of each fiscal year of Borrower and Jackson Street Management LLC (commencing with the year ending December 31, 2011), annual financial statements of Borrower and Jackson Street Management LLC prepared in the manner and in accordance with the standards for financial reporting set forth in the Franchise Agreement, consisting of at least (i) statements of income and retained earnings for each party for such year; (ii) balance sheets of each party as at the end of such year and (iii) a statement of contingent liabilities as at the end of such year, setting forth in each case in comparative form corresponding figures from the previous fiscal year, prepared by an independent certified public accountant reasonably acceptable to Lender.

12

(b)     As soon as available and, in any event, within sixty (60) days after the end of each calendar year (commencing with the year ending December 31, 2011), signed personal financial statements of each individual Guarantor.

(c)     As soon as available and in any event within the lesser of (i) one hundred and twenty (120) days after the end of each fiscal year or (ii) fifteen days after filing, a copy of Borrower's and each Guarantor's most recent year's federal and state tax returns (together with all supporting attachments and schedules).

(d)     Within five (5) Business Days after Borrower or Guarantor becomes aware of any Event of Default, a notice describing the nature thereof and what action Borrower or Guarantor proposes to take with respect thereto.

(e)     From time to time and within thirty (30) days of written request therefor, such other information regarding the business, operation and financial condition of Borrower, the Project, any Guarantor and the Real Estate as Lender may reasonably request, including annual verification of insurance coverage and semi-annual verification of property tax and assessment payments, if any.

(f)     [Intentionally Left Blank]

(g)     Upon the occurrence of any natural disaster or incident or widespread property damage or environmental threat or contamination having a material, adverse impact on the Project, a report of the extent of the damage to the Project and the effect such damage might have on the operations of the Project.

(h)     Within five (5) Business Days of Borrower or Guarantor learning of any violation of any health, safety, building code or other statute or regulation which violation has or could reasonably be expected to have a material adverse effect on Borrower or the Project, a detailed statement describing such matters along with any written notices thereof received by Borrower or Guarantor from any federal, state, or local governmental entity.

(i)     Within five (5) Business Days after receipt by Borrower or Guarantor, copies of all default notices, notices of reductions or elimination of benefits under any federal, state or local program previously enjoyed by Borrower; notice of any demand for payment or draw under any construction completion guarantee, performance bond or letter of credit regarding Borrower; and notices regarding the Project's compliance with any regulatory restrictions imposed thereon.

(j)     Within five (5) Business Days after receipt by Borrower or Guarantor, copies of any written or oral notice of any (i) default or failure of compliance with respect to any other financial, contractual or governmental obligation of Borrower; (ii) IRS proceeding regarding the Project or Borrower; (iii) litigation, criminal action or administrative proceeding against Borrower or any affiliate of Borrower; or (iv) communication from any other lender or the Wisconsin Department of Financial Institutions or any other Person or governmental authority which is not in the ordinary course of business;

13

(k) Not later than thirty (30) days after the end of each calendar month:

(i) company prepared statement of operations of Borrower, certified by Borrower; and

(ii) a report of such other information as may be deemed by Borrower to be material to the existence or operation of Borrower or Borrower Operations as it relates to the Project or the Real Estate.

(l) Not later than thirty (30) days after the end of each calendar quarter, company prepared balance sheets of Borrower, certified by Borrower;

(m) Not later than thirty (30) days prior to the start of each fiscal year, the operating budget and capital expenditure budget for the next fiscal year; and

(n) Construction status reports upon request by Lender.

Section 5.2. Books and Records. Borrower will keep adequate and proper records and books of account in which full and correct entries will be made of its dealings, business and affairs, including its use and operation of the Project.

Section 5.3. Inspection. Upon reasonable prior notice and subject to the rights of any tenants, Borrower will permit any Person designated by Lender to visit and inspect the Project, books and financial records of Borrower, to examine and make copies of the books of accounts and other financial records of Borrower and to discuss the affairs, finances and accounts of Borrower with its members at such reasonable times and intervals as Lender may designate.

Section 5.4. Existence. Borrower will maintain its valid existence under the laws of the jurisdiction of its formation and its qualification to transact business in each jurisdiction (including the jurisdiction where the Project is located) where failure to qualify would permanently preclude Borrower from enforcing its rights with respect to any material asset or would expose Borrower to any material liability.

Section 5.5. Notice of Litigation. Borrower will give prompt written notice to Lender of the commencement of any action, suit or proceeding affecting Borrower or the Project in which the amount in dispute which is not covered by insurance exceeds $50,000.

Section 5.6. Employee Benefit Plans. Borrower shall neither take any action, nor omit to take any action, if such action or omission would result in any of the statements set forth in Section 4.8 (including any written disclosures made by Borrower to Lender under Section 4.8) becoming inaccurate or misleading at any time while any portion of the Loans remains outstanding.

Section 5.7. Insurance. Borrower will maintain or cause to be maintained with the Association with financially sound and reputable insurance companies such insurance as may be required by law and such other insurance in such amounts and against such hazards as is

14

customary in the case of reputable companies engaged in the same or similar businesses and similarly situated, including, without limitation, insurance coverage that complies with the requirements of Lender and CDE Lender. Lender shall be named as additional insured and, as applicable, mortgagee and lender's loss payee on such insurance.

Section 5.8. <u>Payment of Taxes</u>. Borrower will file all tax returns and reports which are required by law to be filed by it and will pay before they become delinquent, all other taxes, assessments and governmental charges and levies imposed upon it or its property and all claims or demands of any kind (including those of suppliers, mechanics, carriers, warehousemen, landlords and other like Persons) which, if unpaid, might result in the creation of a Lien upon the Project, except where contested in good faith and by proper proceedings if appropriate reserves are maintained with respect thereto.

Section 5.9. <u>Maintenance of Properties, Compliance</u>. Borrower will maintain its properties in good condition, repair and working order, and supplied with all necessary equipment, and make all necessary repairs and replacements thereto, all as may be necessary in order to operate the business carried on in connection therewith. Borrower will comply in all material respects with all laws, rules and regulations to which it may be subject, including, without limitation, all state and local zoning laws, building codes, health and safety codes and all other Governmental Requirements.

Section 5.10. <u>Merger</u>. Borrower will not merge or consolidate or enter into any analogous reorganization or transaction with any Person or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution).

Section 5.11. <u>Transfer of Assets</u>. Borrower will not sell, transfer, lease or otherwise convey all or any substantial part of its assets except: (a) the sale or disposition of assets which have become obsolete or are no longer used or useful in the conduct of Borrower Operations; and (b) those liens permitted under <u>Section 5.14</u>.

Section 5.12. <u>Investments</u>. Borrower will not make any loans, advances or extensions of credit to any other Person (except for trade and customer accounts receivable for inventory sold or services rendered in the ordinary course of business and payable in accordance with customary trade terms) or purchase or acquire any stock or other debt or equity securities of or any interest in any other Person or any integral part of any business or the assets comprising such business or part thereof, except for the following investments:

(a) Investments in readily marketable direct obligations issued or unconditionally guaranteed by the United States government or any agency thereof and supported by the full faith and credit of the United States.

(b) Certificates of deposit or bankers' acceptances issued by any commercial bank organized under the laws of the United States or any State thereof which is FDIC insured and has (i) combined capital and surplus of at least $100,000,000 and (ii) a credit rating with respect to its unsecured indebtedness from a nationally recognized rating service that is satisfactory to Lender.

15

(c)     Commercial paper given the highest rating by a nationally recognized rating service.

(d)     Repurchase agreements relating to securities of the kind described in clause (a) above; and

(e)     Other readily marketable investments in debt securities which are reasonably acceptable to Lender.

Any investments under clauses (a), (b), (c) or (d) above must mature within eighteen (18) months of the acquisition thereof by Borrower.

Section 5.13.     Indebtedness.  Borrower will not borrow any money or issue any bonds, debentures or other debt securities or otherwise become obligated on any interest-bearing indebtedness, including capitalized leases, except:

(a)     Indebtedness to Lender under this Agreement, the Notes and the other Loan Documents;

(b)     Indebtedness related to the CDE Loan; and

(c)     Indebtedness secured by Liens permitted under Section 5.14.

Section 5.14.     Liens.  Borrower will not create, incur, assume or suffer to exist any Lien, or enter into any arrangement for the acquisition of any property through conditional sale, lease-purchase or other title retention agreements, except:

(a)     Liens granted to Lender.

(b)     Liens related to the CDE Loan.

(c)     Deposits or pledges to secure payment of workers' compensation, unemployment insurance, old age pensions or other social security obligations arising in the ordinary course of business of Borrower.

(d)     Liens for taxes, fees, assessments and governmental charges not delinquent.

(e)     Liens of carriers, warehousemen, mechanics and materialmen and other like Liens arising in the ordinary course of business, for sums not due.

(f)     Liens incurred or deposits or pledges made or given in connection with, or to secure payment of, indemnity, performance or other similar bonds.

(g)     Encumbrances in the nature of zoning restrictions, easements and rights or restrictions of record on the use of real property, which do not materially detract from the value of such property or impair the use thereof in the business of Borrower.

16

(h)     Purchase money security interests created in the ordinary course of Borrower Operations and capitalized leases and operating leases, other than those related to assets purchased in connection with the construction of the Project; provided that such security interests encumber only the assets being so acquired; and provided further that the aggregate amount of such indebtedness, capitalized leases and operating leases does not at any time exceed $750,000.

Section 5.15.     Contingent Obligations.     Neither Borrower nor Guarantor will guarantee or otherwise become liable on the indebtedness of any other Person (other than guarantees of indebtedness permitted under Section 5.14).

Section 5.16.     [Intentionally Left Blank]

Section 5.17.     Contracts.     Borrower shall comply fully with the terms and conditions of the Construction Contract, Architect Agreement, Management Agreement, Franchise Agreement and Performance Bond. Borrower shall promptly notify Lender in writing of any breach of any such documents.

Section 5.18.     Construction of Project.     Project Borrower represents, warrants and covenants as follows with respect to the Contractor, the Construction Contract, and completion of construction of the Project:

(a)     The Budget and Construction Schedule has been prepared, reviewed and approved by Borrower in conjunction with the Contractor and Architect, and constitutes an accurate and complete estimate of the cost and timeline for achieving Completion of the Project. Borrower shall promptly notify Lender in writing of any material change in the Budget and Construction Schedule.

(b)     Borrower has reviewed and approved Contractor's financial statements and the sources and uses of funds presented to Borrower by Contractor that demonstrates Contractor's ability to cause Completion of the Project by the Completion Date, and has provided such information to Lender. Borrower shall promptly notify Lender in writing of any event or circumstance that could reasonably be expected to have an adverse impact on Contractor's ability to cause Completion of the Project by the Completion Date.

(c)     Borrower has furnished to Lender, or shall furnish to Lender when available, all material Subcontracts for the Project. Borrower shall promptly notify Lender in writing of any nonperformance under, or breach or termination of, any material Subcontract.

(d)     Borrower shall provide to Lender the Project and construction-related diligence and materials referenced in the Disbursing Agreement as and when required therein.

(e)     Borrower hereby agrees to provide such additional equity funds for the construction of the Project as may be necessary from time to time to facilitate the construction of the Project without interruption and the Completion of the Project no later than the Completion Date.

17

(f) Borrower shall not amend the Construction Contract without Lender's consent (which consent may be conditioned upon receipt of consent from the Performance Bond surety but which consent will not otherwise be unreasonably withheld) if such amendment has the effect of increasing the amount payable under the Construction Contract and/or extending the date of Completion. If Lender consents to an amendment that increases the amount payable under the Construction Contract, then Borrower shall provide Lender with written evidence that Contractor has agreed to assume all such increased amounts.

Section 5.19.    [Intentionally Left Blank]

Section 5.20.    Notices to Lender. Borrower shall notify Lender, Investment Fund and USBCDC, within ten (10) Business Days, in writing, of any written or oral notice of any (a) default or failure to comply with respect to any other material financial, contractual or governmental obligation of Borrower, (b) IRS proceeding regarding the Project or Borrower, (c) litigation, criminal action or administrative proceeding against Borrower or a member of Borrower, (d) communication to Borrower or Guarantor from any other lender, the State of Wisconsin or other governmental authority that is not in the ordinary course of business of Borrower or (e) any notice given or received pursuant to or under the Construction Contract or Performance Bond.

Section 5.21.    Hazardous Substances. Borrower's representations, warranties and covenants with respect to Hazardous Substances are set forth in the Hazardous Substance Indemnity Agreement and are incorporated herein by this reference.

Section 5.22.    Performance Bond. Borrower shall cause Contractor to keep the Performance Bond remains in place until Completion. To the extent that any amounts are paid to Borrower under the Performance Bond, the same shall, within five (5) Business Days, be forwarded to Lender to be held by Lender as security for payment of the Loans and shall be held and disbursed by Lender in a manner similar to the disbursement procedures for the proceeds of the Loans set forth in the Disbursing Agreement

Section 5.23.    [Intentionally Left Blank]

Section 5.24.    Amendment of Borrower Operating Agreement. Borrower shall not amend any material provision of Borrower Operating Agreement without Lender's consent, except Borrower may amend Borrower Operating Agreement without the consent of Lender to reflect the issuance or transfer of membership interests to (a) a Person not affiliated with Borrower or its current members in an amount not to exceed 25% in the aggregate of the then outstanding membership interests, or (b) to any Person affiliated with Borrower or its current members; provided in either case that the Guarantors maintain the management and control of Borrower.

Section 5.25.    Federal Income Tax Status. Borrower shall at all times maintain its classification as a "partnership" for federal income tax purposes.

Section 5.26.    Dividends. Borrower shall not make any dividends or distributions (a) prior to Completion, (b) unless all debt service payments on the Loans and the CDE Loan have been made and/or (c) if an Event of Default exists.

18

Section 5.27.    Debt Service Coverage Ratio.    Borrower shall use reasonable efforts to maintain as of the last day of each calendar year, commencing December 31, 2013, a Debt Service Coverage Ratio of no less than 1.30:1, as determined by Lender in its commercially reasonable discretion based upon financial statements prepared and submitted by Borrower; provided that Borrower's failure to maintain the required Debt Service Coverage Ratio will not be an Event of Default.  As used in this Section, "Debt Service Coverage Ratio" means the relationship, expressed as a numerical ratio, between:

(i)    The sum of all income derived from operations of the Project in the ordinary course of business less all expenses and proper charges against income for such operations; and

(ii)    The sum of all principal and interest payments to be made in connection with the Loans and the CDE Loan;

calculated for the 12-month period ending on the date of determination; provided that for the calculation as of December 31, 2013, such amount shall be calculated for the period between the Completion Date and December 31, 2013.

## ARTICLE 6
## EVENTS OF DEFAULT AND REMEDIES

Section 6.1.    Events of Default.    The occurrence of any one or more of the following events shall constitute an Event of Default:

(a)    Borrower shall fail to make, within five (5) days of when due, whether by acceleration or otherwise, any payment of principal or interest on any of the Notes or any other financial obligations of Borrower to Lender pursuant to this Agreement or any of the other Loan Documents.

(b)    Any representation or warranty made by or on behalf of Borrower or Guarantor in this Agreement or any of the other Loan Documents or by or on behalf of Borrower or Guarantor in any certificate, statement, report or document herewith or hereafter furnished to Lender pursuant to this Agreement or any of the other Loan Documents shall prove to have been false or misleading in any material respect on the date as of which the facts set forth are stated or certified.

(c)    Borrower shall fail to comply with Section 5.10 or Section 5.11.

(d)    Borrower shall fail to comply with any covenant contained in Article 5 (other than Section 5.10 and Section 5.11) and such failure continues for thirty (30) consecutive days after Lender gives notice to Borrower of such failure.

(e)    Borrower or the Guarantor shall fail to comply with any other Obligations, agreement, covenant, condition, provision or term contained in this Agreement or any of the other Loan Documents (other than those hereinabove set forth in this Section 6.1) and such failure to comply shall continue for thirty (30) consecutive days after the date Lender gives

19

notice of such failure to Borrower or Guarantor, as applicable; or, if such failure cannot be cured within the above mentioned thirty (30) consecutive days, then Borrower or Guarantor, upon proving due diligence to cure, will have an additional sixty (60) consecutive days to cure such failure, but only if (i) such extension does diminish the security given under this Loan Agreement or the other Loan Documents and (ii) no unrelated Event of Default under this Agreement otherwise exists.

(f)     Borrower or Guarantor shall become insolvent or shall generally not pay its debts as they mature or shall apply for, shall consent to or shall acquiesce in the appointment of a custodian, trustee or receiver of itself or for a substantial part of its property, or, in the absence of such application, consent or acquiescence, a custodian, trustee or receiver shall be appointed for Borrower or Guarantor or for a substantial part of the property thereof and shall not be discharged within sixty (60) days or Borrower or Guarantor shall make an assignment for the benefit of creditors.

(g)     Any bankruptcy, reorganization, debt arrangement or other proceedings under any bankruptcy or insolvency law shall be instituted by or against Borrower or Guarantor and, if instituted against Borrower or Guarantor, shall have been consented to or acquiesced in by Borrower or Guarantor, as the case may be, or shall remain undismissed for sixty (60) days or an order for relief shall have been entered against Borrower or Guarantor.

(h)     Any dissolution or liquidation proceeding shall be instituted by or against Borrower or Guarantor and shall be consented to, or acquiesced in, by Borrower or Guarantor, as the case may be or shall remain for sixty (60) days undismissed.

(i)     A judgment or judgments for the payment of money in excess of the sum of $50,000 in the aggregate shall be rendered against Borrower or Guarantor and either (i) the judgment creditor executes on such judgment or (ii) such judgment remains unpaid or undischarged for more than sixty (60) days from the date of entry thereof or such longer period during which execution of such judgment shall be stayed during an appeal from such judgment.

(j)     Any material provision of any Loan Document shall for any reason cease to be valid and binding on Borrower or Guarantor or Borrower or Guarantor shall so state in writing; or, if the Mortgages after delivery thereof to Lender shall for any reason, except to the extent permitted by the terms thereof, cease to create a valid and perfected first or second priority lien and security interest, as applicable under the respective Mortgages, in any of the collateral purported to be covered thereby, subject to any cure rights otherwise provided in this Section 6.1.

(k)     Any challenge, whether by litigation or otherwise, shall be asserted against the validity of this Agreement, the development of the Project or any of the transactions carried out pursuant to any of them, including, without limitation, a claim that Borrower has no authority to enter into them or that such transactions violate any federal, state or municipal constitution, charter, law, ordinance, regulation, resolution or rule, or any court order.

(l)     Guarantor shall default under its Guaranty.

20

(m)     Borrower shall fail to pay any other material debt when due or otherwise fail to perform or to observe the terms of any other material obligations in respect of such debt, subject to the expiration of any notice or cure periods therein.

(n)     There shall be an event of default or default under the Franchise Agreement or the Management Agreement and such default continues beyond any applicable notice and cure periods set forth in each of the Franchise Agreement and the Management Agreement.

Section 6.2.     Remedies.  If (a) any Event of Default described in Section 6.1(f), Section 6.1(g) or Section 6.1(h) shall occur with respect to Borrower, the Notes and all other Obligations shall automatically become immediately due and payable or (b) any other Event of Default shall occur and be continuing after any required notice and cure period, then Lender may declare the Notes and all other Obligations to be forthwith immediately due and payable, whereupon the same shall immediately become due and payable, in each case without presentment, demand, protest or other further notice of any kind, all of which are hereby expressly waived.  Upon the occurrence of any of the events described in clauses (a) or (b) of the preceding sentence, Lender may exercise all rights and remedies under this Agreement, the Notes and any of the other Loan Documents and under any applicable law, including in equity. In addition, in the case of any applicable Event of Default, Lender may cure the Event of Default on behalf of Borrower, and, in doing so, may enter upon the Project and may expend such sums as it may deem reasonably necessary, including reasonable attorneys' fees, all of which shall be deemed to be advances hereunder and under the Notes, even though causing the Loans to exceed the face amount of the Notes, shall bear interest at the interest rate set forth in Note B and shall be payable by Borrower on demand and shall be secured by the Mortgages and all other Loan Documents securing the Loans.

Section 6.3.     Offset.  In addition to the remedies set forth in Section 6.2, upon the occurrence of any Event of Default and thereafter while the same be continuing, Borrower hereby irrevocably authorizes Lender to set off all sums owing by Borrower to Lender against all deposits and credits of Borrower with and any and all claims of Borrower against Lender.

Section 6.4.     [Intentionally Left Blank]

## ARTICLE 7
## MISCELLANEOUS

Section 7.1.     Modifications.  Notwithstanding any provisions to the contrary herein, any term of this Agreement may be amended with the written consent of Borrower; provided that no amendment, modification or waiver of any provision of this Agreement or consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the purpose for which given.

Section 7.2.     Costs and Expenses.  Whether or not the transactions contemplated hereby are consummated, Borrower agrees to reimburse Lender upon demand for all out-of-pocket expenses paid or incurred by Lender (including filing and recording costs and reasonable

21

fees and expenses of counsel to Lender and on-going expenses) in connection with the negotiation, preparation, approval, review, execution, delivery, amendment, modification, interpretation, collection and enforcement of this Agreement, the Notes and the other Loan Documents. The obligations of Borrower under this Section 7.2 shall survive any termination of this Agreement.

Section 7.3.     Waivers, Etc. No failure on the part of Lender or the holder of the Notes to exercise and no delay in exercising any power or right hereunder shall operate as a waiver thereof or hereof; nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or hereof or the exercise of any other power or right. The rights and remedies of Lender hereunder are cumulative and not exclusive of any right or remedy Lender otherwise has.

Section 7.4.     Notices. Except when an alternative form of notice is expressly authorized by this Agreement, any notice or other communication to any party in connection with this Agreement shall be in writing and shall be sent by hand delivery, facsimile transmission (with written confirmation of delivery), overnight courier or United States mail (certified mail, postage prepaid) addressed to such party at the address specified on the signature page hereof or at such other address as such party shall have specified to the other party hereto in writing. All periods of notice shall be measured from the date of delivery thereof if hand delivered, on the date included with the written verification of delivery if sent by facsimile transmission, from the first Business Day after the date of sending if sent by overnight courier or five (5) Business Days after the date of mailing if mailed. Either party may change its address for notices by a notice given not less than five (5) Business Days prior to the effective date of the change.

Section 7.5.     Successors and Assigns; Disposition of Loans. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that Borrower may not assign its rights or delegate its obligations hereunder without the prior written consent of Lender. Lender may at any time sell, assign, transfer, grant participations in or otherwise dispose of any portion of the Loans.

Section 7.6.     Governing Law and Construction. THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF WISCONSIN, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS OR PRINCIPLES THEREOF. WHENEVER POSSIBLE, EACH PROVISION OF THIS AGREEMENT AND ANY OTHER STATEMENT, INSTRUMENT OR TRANSACTION CONTEMPLATED HEREBY OR RELATING HERETO, SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER SUCH APPLICABLE LAW, BUT, IF ANY PROVISION OF THIS AGREEMENT OR ANY OTHER STATEMENT, INSTRUMENT OR TRANSACTION CONTEMPLATED HEREBY OR RELATING HERETO SHALL BE HELD TO BE PROHIBITED OR INVALID UNDER SUCH APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH PROHIBITION OR INVALIDITY, WITHOUT INVALIDATING THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS AGREEMENT OR ANY OTHER STATEMENT, INSTRUMENT OR TRANSACTION CONTEMPLATED HEREBY OR RELATING HERETO.

22

Section 7.7.     Consent to Jurisdiction.  AT THE OPTION OF LENDER, THIS AGREEMENT AND THE NOTES MAY BE ENFORCED IN ANY FEDERAL COURT OR WISCONSIN STATE COURT SITTING IN MILWAUKEE COUNTY, WISCONSIN; AND BORROWER CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVES ANY ARGUMENT THAT VENUE IN SUCH FORUMS IS NOT CONVENIENT.  IN THE EVENT BORROWER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS AGREEMENT, LENDER, AT ITS OPTION, SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE-DESCRIBED, OR, IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, THEN TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.

Section 7.8.     Waiver of Jury Trial.  EACH OF BORROWER AND LENDER IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTES AND ANY OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 7.9.     Captions.  The captions or headings herein and any table of contents hereto are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Agreement.

Section 7.10.     Entire Agreement.  This Agreement and the other Loan Documents embody the entire agreement and understanding between Borrower and Lender with respect to the subject matter hereof and thereof.  This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof.

Section 7.11.     Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and either of the parties hereto may execute this Agreement by signing any such counterpart.  Signature by facsimile or other reproduction sent by electronic mail shall be considered an original signature.

Section 7.12.     [Intentionally Left Blank]

Section 7.13.     Intercreditor Agreement.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE LIENS AND SECURITY INTERESTS GRANTED TO LENDER PURSUANT TO THIS AGREEMENT AND THE EXERCISE OF CERTAIN RIGHTS OR REMEDIES BY LENDER HEREUNDER ARE SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.

Section 7.14.     Photographs and Other Media.  Borrower hereby authorizes Lender to reproduce and display any media (including, without limitation, photographs and illustrations) of the Project submitted to Lender by Borrower.  Borrower represents and warrants to Lender that Borrower has obtained any and all licenses and/or permissions necessary for Borrower's and Lender's use of such media.

23

**[SIGNATURE PAGES FOLLOW]**

24

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be executed as of the date first above written.

*Address:*

c/o Jackson Street Management
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202
Fax: (414) 226-1955

*With copies to:*
Mallery & Zimmerman, S.C.
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202
Fax: (414) 271-8678
Attn: Jon S. Herreman

*BORROWER:*

**WISCONSIN & MILWAUKEE HOTEL LLC,**
a Wisconsin limited liability company

By: Jackson Street Management LLC
Its: Manager

By: _____
    Edward G. Carow, Manager

*Address:*

201 West Washington Avenue, Suite 700
Madison, Wisconsin 53703
Fax: (608) 267-1463
Attn: Brian Nowicki

*LENDER:*

**WISCONSIN HOUSING AND ECONOMIC DEVELOPMENT AUTHORITY,**
a Wisconsin public body corporate and politic

By: _____
    Wyman B. Winston, Executive Director

[Signature Page to Direct Loan Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be executed as of the date first above written.

*Address:*

c/o Jackson Street Management
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202
Fax: (414) 226-1955

*With copies to:*
Mallery & Zimmerman, S.C.
731 North Jackson Street, Suite 900
Milwaukee, Wisconsin 53202
Fax: (414) 271-8678
Attn: Jon S. Herreman

*BORROWER:*

**WISCONSIN & MILWAUKEE HOTEL LLC,**
a Wisconsin limited liability company


By: Jackson Street Management LLC
Its: Manager

    By: _____
        Edward G. Carow, Manager


*Address:*

201 West Washington Avenue, Suite 700
Madison, Wisconsin 53703
Fax: (608) 267-1463
Attn: Brian Nowicki

*LENDER:*

**WISCONSIN HOUSING AND ECONOMIC DEVELOPMENT AUTHORITY,**
a Wisconsin public body corporate and politic


By: _____
    Wyman B. Winston, Executive Director


[Signature Page to Direct Loan Agreement]

**SCHEDULE 3.1**
**DOCUMENTS AND MATERIALS TO BE DELIVERED TO LENDER**

Loan Agreement.

Notes.

Mortgages.

Assignment of Contracts.

Guaranty.

UCC-1 Financing Statement, for filing with the State of Wisconsin and Milwaukee County covering all personal property (including fixtures) related to the Project.

Hazardous Substance Indemnity Agreement.

Pledge Agreement.

Control Agreement.

Environmental Reports as such term is defined in the Hazardous Substance Indemnity Agreement.

A Commitment for Mortgagee's Policy of Title Insurance for Lender in the amount of the Loans made by Lender issued by the Title Company, by which the Title Company commits to issue a mortgagee's policy of title insurance that:

(a)     Specifically insures each Mortgage as a lien upon the Real Estate subject only to Permitted Encumbrances;

(b)     Waives the following standard exceptions and insures over (i) facts which would be disclosed by a comprehensive survey of the land, (ii) rights and claims of parties in possession, and (iii) construction, mechanic's, contractor's or materialmen's liens and lien claims;

(c)     Commits to issue an ALTA Form 9 Comprehensive Endorsement;

(d)     Commits to issue an ALTA 3.1 Zoning Endorsement (with parking);

(e)     Commits to issue an ALTA Subdivision Endorsement (if applicable);

(f)     Commits to issue an ALTA Form 116 Location Endorsement;

(g)     Commits to issue an ALTA General Survey Endorsement;

(h)     Commits to issue an ALTA Tax Parcel Endorsement 3;

      (i)      Commits to issue a Contiguity Endorsement;

      (j)      Commits to issue an Access Endorsement;

      (k)      Commits to issue an Environmental Lien Protection Endorsement (ALTA 8.1);

      (l)      Commits to issue a Condominium Endorsement;

      (m)      Commits to delete any "arbitration provisions."

      (n)      Commits to delete any "pending disbursements provisions."

ALTA Survey of the Real Estate satisfactory to Lender.

A certificate, satisfactory to Lender, evidencing that Borrower has in place a policy or policies of insurance that satisfies Section 5.7.

A policy of flood insurance naming Lender as an additional insured, covering the Project in the maximum amount available, or proof satisfactory to Lender that the Real Estate is not located within a designated flood plain.

Sworn Construction Cost Statement, in form and substance acceptable to Lender, certified by Borrower setting forth all of the hard and soft costs related to the construction of the Project.

Listing of the name, address and telephone numbers of all of the Contractors.

Copy of the executed Construction Contract.

A qualification statement from the Contractor.

Copy of the executed Performance Bond.

Copy of the executed Architect's Agreement.

Evidence satisfactory to Lender that the Contractor is covered by a policy or policies of liability insurance with a company or companies acceptable to Lender, such insurance to cover all insurable aspects of the Contractor's performance in connection with the construction of the Project and to be in an amount not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate along with an umbrella in an amount of at least $2,000,000.00 per occurrence and in the aggregate.

Copies of the most recent Plans which Borrower has had prepared for the Project.

Budget and Construction Schedule.

A copy of all building permits, licenses and other governmental permits, or proof of the immediate availability of same, required to authorize the construction of the Project in accordance with the Plans.

3.1-2

Current UCC Lien, Tax, Judgment, Bankruptcy and Pending Litigation searches against Borrower and each Guarantor in all appropriate jurisdictions (as determined by Lender).

Certified copy of Borrower's Articles of Organization as well as Borrower Operating Agreement and authorizing resolutions.

Legal opinion of Mallery & Zimmerman, S.C.

Compiled Financial Projections and a compilation report from the Accountants, which shall include, without limitation, evidence satisfactory to Lender that there are sufficient sources of funds (loan, equity or otherwise) committed on the Closing Date to pay the costs set forth on the Budget and Construction Schedule.

Payments of closing costs and fees as described in Section 7.2 of this Agreement.

Disbursing Agreement.

Executed Letter of Credit in the amount of $500,000 to secure Borrower's construction contingency obligation in favor of Lender and CDE Lender.

Executed Development Agreement between Borrower and Jackson Street Management LLC.

Comfort Letter executed by Marriott International, Inc., Lender, CDE Lender and Borrower.

Such other documents and instruments as may be required by this Agreement or as Lender may otherwise reasonably require.

3.1-3

## EXHIBIT A
## LEGAL DESCRIPTION

Unit 1, together with said unit's undivided interest in the common elements all in Wisconsin & Milwaukee Condominium, a condominium declared and existing under and by virtue of the Condominium Ownership Act of the State of Wisconsin and recorded by a Declaration as such condominium in the Office of the Register of Deeds for Milwaukee County, Wisconsin, on December 28, 2011, as Document No. 10067047, said condominium being located in the City of Milwaukee, County of Milwaukee, State of Wisconsin on the real estate described in said Declaration and incorporated herein by this reference thereto.

Tax Key Nos. 392-0735-5, 392-0734-X, 392-0736-0, 392-0737-6 and 392-0738-1

Address 319-327 East Wisconsin Avenue and 625-633 North Milwaukee Street

A-1

# EXHIBIT B
## BUDGET AND CONSTRUCTION SCHEDULE



## Marriott Hotel

Marriott Hotel | Milwaukee, WI | 12.02.11
Kahler Slater drawings dated October 14, 2011 & Structural foundation drawings dated October 24, 2011
GSF = 188,000

| | Description | Value 12.02.11 | Notes |
|---|---|---|---|
| 1 | General Conditions | 1,499,750 | |
| 2 | Equipment | 526,850 | Building Shell Contractor Equipment |
| 3 | Selective Demolition | 374,000 | KBS |
| 4 | Structural Demolition | 623,600 | TBD |
| 5 | Asbestos Abatement | 277,626 | Added by owner 11/15 Meeting |
| 6 | Earthwork | 303,051 | |
| 7 | Earth Retention | 45,000 | |
| 8 | Piling with Helical Piers | 497,500 | |
| 9 | Asphalt Paving | 5,000 | |
| 10 | Landscaping | 15,000 | |
| 11 | Concrete | 3,368,929 | C.D. Smith/KBS |
| 12 | Post Tension | 390,070 | C.D. Smith |
| 13 | Reinforcing Steel | 468,029 | C.D. Smith |
| 14 | Reinforcing Mesh | 13,301 | C.D. Smith/KBS |
| 15 | Site Concrete | - | With Concrete |
| 16 | Gypcrete | 67,200 | |
| 17 | Masonry | 1,853,432 | C.D. Smith |
| 18 | Masonry Restoration | 127,586 | |
| 19 | Structural and Misc. Steel | 545,000 | |
| 20 | Steel Erection | 331,113 | C.D. Smith |
| 21 | Carpentry | 573,692 | C.D. Smith/KBS |
| 22 | Millwork | 79,003 | Allowance |
| 23 | Rough Hardware | 10,000 | |
| 24 | Waterproofing | 12,540 | |
| 25 | Air Barrier | 71,340 | |
| 26 | Roofing and Sheetmetal | 392,925 | TBD |
| 27 | Fireproofing | 32,096 | |
| 28 | Firestopping | 3,000 | |
| 29 | Traffic Sealer | 7,500 | |
| 30 | Caulking | 80,000 | |
| 31 | HM/Wood Doors/Frames/Hardware | 685,524 | Electronic Locks with FF&E |
| 32 | Revolving Door | - | With Aluminum Curtainwall/Glazing |
| 33 | Automatic Entrances | 10,090 | |
| 34 | Aluminum Curtainwall/Glazing | 1,009,185 | TBD |
| 35 | Wood Windows | 47,830 | |
| 36 | Insulated/Composite Wall Panels | 434,030 | TBD |
| 37 | Overhead Doors | 16,748 | |
| 38 | Coiling Doors | - | With Overhead doors |
| 39 | Access Doors | 1,500 | |
| 40 | Operable Partitions | 52,000 | |
| 41 | Steel Studs and Drywall | 1,835,386 | TBD |
| 42 | Expansion Control | 11,940 | |
| 43 | Ceramic Tile | 170,000 | Allowance |
| 44 | Resilient Flooring | 49,000 | |
| 45 | Carpeting | 104,000 | Material by others |
| 46 | Acoustical Ceilings | 298,399 | |
| 47 | Painting/Wallcovering | 350,000 | Wall Coverings by Owner |
| 48 | Elevators | 609,800 | Schindler |
| 49 | Swimming Pool and Equipment | 65,225 | |
| 50 | Entrance Mats | 4,000 | |
| 51 | Blinds | - | By Owner |
| 52 | Linen Chutes | 24,182 | |
| 53 | Projection Screens | 11,687 | |
| 54 | Toilet Accessories | 77,520 | |
| 55 | Toilet Partitions | 14,632 | |
| 56 | Mailboxes | 512 | |
| 57 | Shower Doors | 96,664 | |
| 58 | Dock Equipment | 9,000 | |
| 59 | Screen Wall | 9,000 | |
| 60 | Wall Protection | 4,026 | |
| 61 | Fireplaces | 5,000 | |
| 62 | Signage | 10,492 | |
| 63 | Flagpoles | 4,537 | |
| 64 | Fire Extinguishers/Cabinets | 6,218 | |
| 65 | Reinberg Johnson Bank | 175,000 | Allowance |
| 66 | Lobby Finish Allowance | 336,885 | Allowance |
| 67 | Plumbing | 1,542,403 | Alpine |
| 68 | Fire Protection | 390,000 | Design Build Fire Protection |
| 69 | HVAC | 2,782,230 | J.F. Ahern |
| 70 | Electrical | 2,053,547 | Staff Electric |
| 71 | Exterior Signage-Hotel | 90,000 | Added by owner 11/15 Meeting |
| 72 | Awnings-Hotel | 100,000 | Added by owner 11/15 Meeting |
| 73 | Exterior Signage-Restaurant | 35,000 | Added by owner 11/15 Meeting |
| 74 | Electronic Meeting Room Signs | 38,000 | Added by owner 11/15 Meeting |
| 75 | Hotel Sound Systems | 125,000 | Added by owner 11/15 Meeting |
| 76 | Restaurant Sound Systems | 35,000 | Added by owner 11/15 Meeting |
| 77 | Contractor Fee, Insurance & Project Management | 1,200,000 | |
| 78 | Contractor Contingency | 100,000 | |
| 79 | **Total** | **$28,831,244** | |

**Note:**

| | | | |
|---|---|---|---|
| 1 | Project Budget - Owner Source and Use | $ | 27,831,244 |
| 2 | Difference from Owner Budget | $ | 1,000,000 |
| 3 | See "Diff Doc" | | |
| 4 | November 11/15 SOV submitted to owner | $ | 28,193,733 |
| 5 | Kitchen coolers/freezers are not included above | | |

P 920.924.2900 | F 970.924.2910 | 889 E Johnson Street | PO Box 1006 | Fond du Lac, WI 54936-1006 | www.cdsmith.com



**Marriott Milwaukee**

09-Dec-11

CD SMITH CONSTRUCTION SERVICES

Case 24-21743-gmh    Doc 638-8    Filed 07/11/25    Page 33 of 33