UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Case No. 24-21743-gmh |
| Wisconsin & Milwaukee Hotel LLC, | Chapter 11 |
| Debtor. | |

**OBJECTION TO LENDERS' MOTION *IN LIMINE*
TO PROHIBIT EVIDENCE IN SUPPORT OF SECOND AMENDED PLAN
OF JUNE 27, INCLUDING TESTIMONY OF ATTORNEY DAVID T.
BROWN ON EQUITY OFFERING
AND TESTIMONY OF DEBORAH S. FRIEDLAND WITH RESPECT TO
INTEREST RATE APPLICABLE TO SECTION 1111(b) CLAIM**

Wisconsin & Milwaukee Hotel LLC, the debtor herein (the "**Debtor**"), by its attorneys Richman & Richman LLC, by Michael P. Richman, hereby files this objection to the Motion *In Limine*, filed on July 9, 2025 by Computershare Trust Company, N.A. ("**Computershare**") and Wisconsin & Milwaukee Hotel Funding LLC ("**Funding**" and collectively with Computershare, the "**Lenders**") (the "**Motion in Limine**") [Doc 633], expedited for hearing on July 17, 2025 [Doc 637] and purportedly supplemented by correspondence on July 13, 2025 ("**July 13 Letter**") [Doc 649] to expand the scope of the requested prohibitions.

The principal question presented by the Motion in Limine is whether the Debtor should be precluded from presenting testimony and other evidence with respect to the June 27, 2025 amendments set forth in the Second Amended Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC (the "**Second Amended Plan**") [Doc 621], which it filed as authorized pursuant to a June 11

Order of the Court [Doc 593], because the Debtor did not on June 6 have the clairvoyance to identify all the witnesses and evidence it would require to support its June 27 amendments.

The Motion in Limine seeks to prohibit the Debtor from presenting evidence on two of the material amendments that were made in the Second Amended Plan on June 27: (1) the addition of an Equity Offering that the Debtor will make in order to satisfy the absolute priority rule, including the new value exception if applicable, and (2) the interest rate for the Second Amended Plan's substantially revised treatment of Computershare's section 1111(b) claim. The July 13 Letter additionally requests that the Debtor be prohibited from (3) offering any evidence regarding the terms of an amended Franchise Agreement with Marriott, including but not limited to, any new or agreed requirements for a property improvement plan ("**PIP**"), (4) a one-page projection of Debtor's economic performance over 18 years (which included and supplemented prior 5-year projections), and (5) a supplemental report from Debtor's expert, William Pederson on the pro forma equity value of the Debtor in relation to the Equity Offering added to the plan on June 27.

The argument section of the Motion in Limine begins with the declaration that this Court's "April 9 [Scheduling] Order was clear: the failure to disclose a witness by June 6, 2025, would result in exclusion of that witness except upon a showing that such failure was substantially justified or harmless." But the April 9 Scheduling Order was entered long before the Debtor requested (first by letter on June 6, and then at a June 10 status conference) permission, which the Court

2

Case 24-21743-gmh    Doc 651    Filed 07/16/25    Page 2 of 15

granted, Court Minutes and Order dated June 11, 2025 ("**June 11 Order**") [Doc 593], to amend its plan by June 27 to eliminate or mitigate confirmation objections. No one at the June 10 hearing suggested that the Debtor could not supplement its June 6 witness disclosures or provide evidence to take account of the amendments. To do so would have been to eviscerate the very purpose of the amendments.

The supplementation of expert report discovery, witnesses and proposed exhibits in order to prosecute the June 27 Second Amended Plan, where, as here, the supplemental information was provided promptly and well before the scheduled July 21 start of the plan confirmation hearings, was thus substantially justified in the circumstances, and objectively harmless, given that the Lenders have had (and continue to have) sufficient time to review the Second Amended Plan and to have discovery with respect to the applicable evidence. (Discovery has been taking place nearly every day from before and since the Motion in Limine was filed.)

As of June 6, the original date to disclose witnesses according to the April 9 Scheduling Order, the Debtor had not yet determined how it would amend its plan, much less what evidence and witnesses would be needed with respect to amendments. The Debtor and the Lenders in their witness lists filed on June 6, each reserved the right to supplement or amend such disclosures based upon subsequent developments. The Lenders have re-emphasized their reservation to do so on more than one occasion. The Lenders' complaint of prejudice is thus merely conclusory, and not supported by facts.

3

Addition of Attorney Brown to Witness List. The Motion in Limine claims prejudice from the Debtor's "official" identification on July 1, of David T. Brown of the Much Shelist firm, just two business days after the July 27 plan and Equity Offering amendments were filed. But Lenders had much longer unofficial advance notice than that. They knew on June 24 (*i.e.* before the Second Amended Plan was filed) that the Debtors were going to include an Equity Offering in their plan, and that David T. Brown of Much Shelist was the lead lawyer for the team assisting with the drafting of the applicable corporate documents. Notice and Application of the Debtor for Order Authorizing the Retention and Employment of Much Shelist, P.C. as special Counsel for a Specific Purpose ("**Much Shelist App**") [Doc 605].

When the Lenders objected immediately to the Much Shelist App on June 26 [Doc 619], they did not assert prejudice related to the plan confirmation hearings scheduled for the week of July 21, but rather that they felt substantively aggrieved by the Debtor's effort to eliminate the Lenders' objection to plan confirmation on the basis of the absolute priority rule. The only remote reference to "prejudice" referred to in the June 26 objection was a suggestion that Computershare was disadvantaged because it allegedly could not participate in the Equity Offering due to its prior section 1111(b) election (because the election mooted their unsecured deficiency claim). But when Debtor's counsel agreed they should have the right to revoke their election in light of the material amendments to Computershare's claim treatment, Computershare subsequently reaffirmed its election.

4

Further relevant background to the Motion in Limine and this Objection, in relation to Mr. Brown's potential testimony, showing no prejudice to the Lenders' discovery rights, is contained in numerous emails between Debtor's and Computershare's counsel Attorneys Richman and DiCastri, which has been misrepresented in the Motion in Limine. On Sunday, June 29, Attorney DiCastri wrote to Attorney Richman asking questions about the just-filed Second Amended Plan of June 27, including, among other things, the interest rate to be applied to the section 1111(b) claim treatment, and "who will testify about the Rights offering," adding that "we reserve the right to depose this witness." The next business day, June 30, Attorney Richman responded that the interest rate was 5.25% based on a risk premium above the yield on 10-year Treasury securities, and with respect to the "rights offering" question: "It is now a direct equity offering, rather than a rights offering. We believe the documents being filed on July 3 will be self-explanatory and can be admitted as exhibits without a witness as part of the Plan Supplement. If you disagree, or have particular questions about how it will work, or other aspects of it that you believe relevant, we could agree to answer interrogatory questions within a week." (The Lenders subsequently served a limited group of interrogatories on July 8, to which responses were served yesterday, within a week.)

Attorney Richman sent a second email on June 30, shortly after the first, adding that "if you do not consider the documents on Thursday to be self-explanatory, we could try [to] stipulate to certain related facts in order to obviate the need of a witness, or have a corporate lawyer from our team at Much Shelist

5

provide testimony about the structure and terms." In other words, the formal identification of a witness, and the right to depose the witness, were still part of the attorneys' discussion.

Attorney DiCastri responded the next day, July 1, ignoring the offer to have a corporate lawyer provide testimony, and asserting that his understanding from the first of the two June 30 emails from Attorney Richman was that Debtor "would not be calling a witness to testify about the equity offering." (The same statement of Debtor's position is made in the Motion in Limine, p. 6, which simply ignores the related and contemporaneous emails contradicting it). Within minutes, Attorney Richman replied that "if you dispute that the equity offering documents are self-explanatory, and still have questions, we will have a witness explain them and answer your questions if we cannot otherwise stipulate." Attorney DiCastri then declared that he would not agree that Debtor could name a witness to testify about the Equity Offering," notwithstanding that the Equity Offering did not exist until the Second Amended Plan was filed two business days earlier.

Given the apparent and unexpected impasse, the Debtor immediately on July 1 filed Debtor's Supplemental Witness List identifying David T. Brown as one of Debtor's potential witnesses at the hearing on plan confirmation to testify regarding the terms and structure of the Rights Offering [Doc 624]. Two days later, on July 3, 2025, as required, the Debtor filed Debtor's Supplement to Second Amended Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC Dated June 27, 2025, which contained the various documents prepared by the Much firm

6

to facilitate the Rights Offering ("**Plan Supplement**") [Doc 627].

In all the time since the July 3 Plan Supplement was filed, the Lenders have never claimed that they either could not understand the Equity Offering documents, or that they required a witness to explain them. They propounded only four interrogatory questions which have been answered. The Debtor may well conclude that it is not necessary to call Attorney Brown as a witness, but the tenor of the emails with Attorney DiCastri, coupled with the apparent unwillingness to stipulate to any facts concerning such documents, led the Debtor to designate Attorney Brown out of an abundance of caution.

The Motion in Limine complains that '[b]y failing to identify Attorney Brown as a witness until July 1, 2025, shortly before a holiday weekend, Debtor deprived Lenders of the opportunity to depose Attorney Brown." That is not true. The deposition schedule already then agreed (July 7, 9, 11 and 14-16, Motion in Limine, p. 6), left open two full business days -- July 8 and 10 -- on which a Zoom deposition of Mr. Brown could easily have been scheduled.[1]

The Lenders never even requested Mr. Brown's deposition, preferring instead to misrepresent the Debtor's position and to claim prejudice, in order to seek to prohibit his trial testimony.

Lenders make two other arguments about excluding Brown: that the Debtor "made the situation worse" (Motion in Limine, p. 6) by determining to change course from utilizing an investment banker in order to manage an "equity rights" offering,

---

[1] It is obvious that given the compressed timeframes, the parties are working on weekends. Weekend time could have been made available for a Brown deposition as well.

7

to conducting a direct "equity offering" to unsecured creditors, which required only the services of corporate counsel, and that the Debtor is in some way trying to have Attorney Brown be an expert witness without having to submit an expert report. One, the Debtor determined after seeking to engage an investment banker that a direct equity offering would be better and less expensive than a rights offering. Two, Attorney Brown does not have to be qualified as an expert in order to explain the features of the Equity Offering that he and his team prepared and documented.

Expansion of Friedland Testimony to Address Interest Rate in June 27 Plan. Ms. Friedland's deposition was scheduled and conducted over nearly five-and-a-half hours on July 15, which provided the Lenders with nearly two weeks to prepare, after her July 3 rebuttal report, which supplemented her prior expert discovery report in order to provide evidence in rebuttal to one of Debtor's proffered expert witnesses pertaining to the base interest rate for the revised section 1111(b) claim under the Second Amended Plan.

The Lenders' Motion in Limine argument appears to be that even though Ms. Friedland submitted an initial expert report on June 6 as required, she did not then provide a so-called "*Till*" analysis of the interest applicable to the section 1111(b) claim from the now-superseded plan, and therefore should not be permitted to rebut the *Till* analysis of the Lenders' proffered expert as it relates to the June 27 Plan.

At the time of Ms. Friedland's first expert report on June 6, under the now-superseded plan, the Debtor intended legal argument in support of the section 1111(b) claim treatment's implied interest rate, and did not plan to have Ms.

8

Friedland testify about it. That is why it was not a subject of her June 6 report. On the same day, however, the Lenders' proffered expert provided a report which argued that *Till* required as a base rate the current commercial prime rate of 7.5%, plus a risk adjustment in excess of an additional 5%; in other words a rate in excess of 12%.

The Debtor substantially revised the section 1111(b) claim treatment in the Second Amended Plan on June 27, which was about a week before the rebuttal reports were due to be served (by agreement). In the Second Amended Plan, the Debtor determined that the appropriate *Till* interest rate for the section 1111(b) claim was 5.25%, representing the then current yield on 10-year Treasury securities and a risk premium of approximately 1%. Thus, in her July 3 report, Ms. Friedland provided her expert opinion of the propriety of utilizing the 10-year Treasury security yield as the base rate for a hotel refinancing, the impropriety of using the commercial prime rate, and that the risk adjustments made by the Lenders' proffered expert were unsupported. These were all in direct rebuttal to the Lenders' June 6 report, as well as in support of the new Second Amended Plan treatment of the section 1111(b) claim.

Apart from the Debtor's right (and necessity) to supplement with respect to the substantially revised Second Amended Plan, it is appropriate to submit a rebuttal report "intended solely to contradict or rebut evidence on the same subject identified by [opposing party]." *See Zollicoffer v. Gold Standard Baking, Inc.*, 335 F.R.D. 126, 146 (N.D. Ill. 2020) (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)). Here,

regardless of the coverage of the issue in Friedland's initial report of June 6, her rebuttal report directly refuted the report prepared by one of the Lenders' experts, on the applicable base interest rate and risk adjustments. *See Peals v. Terre Haute Police Dep't*, 533 F.3d 621, 630 (7th Cir. 2008) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.") Where, as here, the Lenders' proffered expert repeatedly asserted (in her report and in her deposition) that the commercial prime rate was required to be the base rate for treatment of the section 1111(b) claim, Friedland's rebuttal opinion and testimony that the applicable base rate should be the 10-year Treasury security yield cannot be said to be "wholly new expert opinions." *See Butler v. Sears Roebuck & Co. ("Butler I")*, No. 06 C 7023, 2010 WL 2697601, at *1 (N.D. Ill. July 7, 2010).

The Debtor and Lenders had previously agreed that rebuttal reports could be served by proffered experts who provided expert reports on June 6. There was no agreement, nor is there anything in this Court's scheduling order, that restricted a proffered expert from rebutting an issue or matter that such expert did not first expressly address in its initial report. Friedland's supplemental report therefore is not only substantially justified in the circumstances, and not prejudicial to discovery in the least, but the Court's permission to amend the Plan would be meaningless if the Debtor were restricted from updating its witnesses and evidence to account for the amendments.

*Additional "Prohibitions" on Evidence Proposed by Lenders in July 13 Letter.* In a letter filed on Sunday, July 13, the Lenders purported to "supplement" their Motion in Limine by making additional "prohibition" requests. These relate to (3) the terms of an amended Marriott Franchise Agreement, including any PIP, (4) a one-page exhibit which includes and extends Debtor's prior 5-year projections over the 18-year period of the Second Amended Plan, and (5) a supplemental expert report from Mr. Pederson, which provides opinions on feasibility and the pro forma equity value of the Reorganized Debtor *based on the amendments introduced in the Second Amended Plan of June 27*.

<u>Amended Marriott Franchise Agreement</u>. The Second Amended Plan, section 7.3(d), provides that it is a condition of the Effective Date (but not a condition of plan confirmation) that the Court approve the assumption of the Marriott Franchise Agreement "on the same or an amended basis." Debtor timely filed a Motion to Assume Franchise Agreement with Marriott International, Inc. [Doc 644], on July 11, 2025. Objections, if any (including from Marriott) are due on August 1. The Debtor also represented that there were expected to be amendments that would improve the economics of the agreement and would be in place by agreed stipulation and order prior to the objection date. There is nothing unusual for the effectiveness of a plan, like the Second Amended Plan, to be conditioned on the occurrence of post-confirmation events, such as the conclusion of the Marriott Franchise Agreement and the Equity Offering.

The Lenders object to testimony about Marriott Franchise Agreement

negotiations. The Lenders argue that not knowing the final definitive terms of the Franchise Agreement puts them "in a very difficult position to assess feasibility of the Second Amended Plan and the value of the Hotel." That is not true. The economics of the current franchise agreement are assumed by all the projections of the experts. The amendments being negotiated, if agreed, will only make those economics stronger. Thus, testimony about those negotiations are entirely relevant. Otherwise, because assumption of the Marriott Franchise Agreement is a condition to the Effective Date of the Plan, it is not relevant to feasibility, which is based upon the ability to fulfill plan obligations after a plan is effective.

The Lenders also want to prohibit evidence of the agreed PIP, purportedly because the status of the Marriott Franchise Agreement is not yet final. The PIP -- for renovations the Debtor will be required to make when its plan goes effective -- is highly material to feasibility and is *not* part of the Franchise Agreement amendments being negotiated. The Franchise Agreement requires periodic PIPs be undertaken, but does not prescribe their terms, which is done outside the agreement through independent business negotiations. In this case, as the Lenders were previously advised, Marriott has already agreed to PIP terms for the Debtor which are memorialized in a one-page summary document that was produced to the Lenders weeks ago. The PIP thus has nothing to do with the Motion to Assume the Franchise Agreement (except that its implementation is conditioned on the effectiveness of the franchise agreement assumption and the Second Amended Plan).

<u>New Pederson Expert Report</u>. Mr. Pederson provided in discovery on July 11 an updated report of five pages on feasibility and the pro forma equity value of the Debtor, to take account of the plan amendments of June 27. This report might have been provided earlier, but he was on a long-planned (in summer 2024) vacation in Europe from June 28 until July 8. While the Lenders complain that the production of the report on July 11 provided them with not a single business day before his deposition of July 14 in order to review it or consult their experts about it, they are careful not to say that they were unable to do so. The correspondence filed on July 13 demonstrates that they were working on this case over the weekend.

Nor is any reason provided why the Lenders would be unable to examine Mr. Pederson thoroughly on the short report. They conducted his deposition on July 14 for about three hours, and they still have a full week remaining to review it and discuss it with their experts prior to trial.

<u>New one-page exhibit showing projections for 18 years</u>. Ms. Friedland previously prepared projections (in collaboration with Mr. Pederson) in support of feasibility for a five-year period, which was part of her expert report of June 6. Subsequently, in their expert reports, Lenders took the position that Debtor needed to support feasibility by presenting projections over the 18-year life of the plan. Although the Debtor disagrees with that, and believes that under prevailing law, the words "followed by" in the feasibility section 1129(a)(11) means something akin to "near term," and does not mean "ever" (such that five-year projections are sufficient and well-supported by precedents addressing feasibility for long-term

13

plans), Debtor determined to simply eliminate the issue by providing an 18-year projection. The projection is a single page. Its methodology is easy to follow.

As in the case of the Pederson report of July 11, the Lenders complain that they had but one business day (ignoring the weekend) to figure out how to ask Ms. Friedland at her deposition of July 15 questions about the one-page projections. But during her five-and-a-half hour deposition they did question her about them at length. (They also questioned Mr. Pederson at length about the feasibility projections, in his July 14 deposition). Thus, the conclusory allegation of prejudice is again not supported.

Permitting the Debtor up to June 27 to amend its plan should not result in a bar against the Debtor presenting evidence to support the amendments. Moving with due speed to meet numerous deadlines in the remaining compressed period before the hearings begin, the Debtor provided prompt notice of the additional evidence and witnesses. The Lenders' complaint of prejudice suggests litigation gamesmanship to avoid the substantive implications of the evidence, not a genuine impairment of any right to pretrial discovery.[2]

---

[2] Additional gamesmanship is evident in a snide footnote at the end of the July 13 Letter to the effect that the Debtor has not yet filed or shared its trial exhibits because "*Debtor apparently believes it has no Court-ordered deadline to do so.*" It is a fact that this Court's Scheduling Order of May 29 [Doc 562] imposed a July 11 deadline for the filing and service of trial exhibits "*on each party who is objecting to confirmation of the chapter 11 plan*," not on the Debtor. It is also a fact that this Court's "trial/evidentiary hearing procedures in the absence of a governing order" require the filing and service of exhibits two business days before a trial. The Debtor was still working on determining its trial exhibits in conjunction with the discovery in process and its brief in support of plan confirmation (due today), and is today filing and serving its trial exhibits three business days before the start of trial, and in compliance with this Court's orders and procedures.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Debtor respectfully requests that the Court enter an order denying the Motion in Limine in all respects, and granting such other and further relief as is just and appropriate.

Dated: July 16, 2025　　　　　　　　**RICHMAN & RICHMAN LLC**
　　　　　　　　　　　　　　　　　**Attorneys for Debtor**

By: */s/ Michael P. Richman*
　　Michael P. Richman
　　Claire Ann Richman
　　Eliza M. Reyes
　　122 West Washington Avenue, Suite 850
　　Madison, WI 53703
　　Tel: (608) 630-8990
　　Fax: (608) 630-8991
　　mrichman@RandR.law
　　crichman@RandR.law
　　ereyes@RandR.law