MANAGEMENT AGREEMENT

by and between

WHITE LODGING SERVICES CORPORATION

(as "**MANAGER**")

and

WISCONSIN & MILWAUKEE HOTEL LLC
(as "**OWNER**")


Dated as of June 14, 2011

**EXHIBIT**

05

.

# TABLE OF CONTENTS

ARTICLE I   MANAGEMENT OF THE HOTEL; OWNER OBLIGATIONS   1

1.01   Management of the Hotel   1
1.02   Management Responsibilities   2
1.03   System Services   4
1.04   Employees   4
1.05   Owner's Right to Inspect   5
1.06   The Franchise Agreement   5
1.07   Accounting/Administration Services   5
1.08   Travel and Reimbursement   5

ARTICLE II - TERM   5

2.01   Term   5
2.02   Performance Termination   6

ARTICLE III - COMPENSATION OF MANAGER   7

3.01   Management Fees   7
3.02   Operating Profit   7

ARTICLE IV - ACCOUNTING MATTERS   8

4.01   Accounting, Distributions and Annual Reconciliation   8
4.02   Books and Records   9
4.03   Accounts, Expenditures   9
4.04   Annual Operating Budget   10
4.05   Working Capital   12
4.06   Fixed Asset Supplies   12

ARTICLE V - REPAIRS, MAINTENANCE, AND REPLACEMENTS   12

5.01   Repairs and Maintenance Costs   12
5.02   FF&E Reserve   13
5.03   Capital Expenditures   14
5.04   Ownership of Replacements   16

ARTICLE VI – INSURANCE, DAMAGE, CONDEMNATION, AND FORCE MAJEURE   16

6.01   Insurance   16
6.02   Damage and Repair   19
6.03   Condemnation   20

**ARTICLE VII - TAXES**     20

7.01   Real Estate and Personal Property Taxes     20

**ARTICLE VIII – OWNERSHIP OF THE HOTEL**     21

8.01   Ownership of the Hotel     21
8.02   Subordination of Management Agreement     22
8.03   Non-Disturbance Agreement     22
8.04   No Covenants, Conditions or Restrictions     22
8.05   Liens; Credit     23

**ARTICLE IX - DEFAULTS**     23

9.01   Default     23
9.02   Event of Default     24
9.03   Remedies upon Event of Default     25

**ARTICLE X – ASSIGNMENT AND SALE**     25

10.01   Assignment     25
10.02   Sale of the Hotel     26

**ARTICLE XI - MISCELLANEOUS**     27

11.01   Right to Make Agreement     27
11.02   Consents and Cooperation     27
11.03   Relationship     28
11.04   Applicable Law     28
11.05   Recordation     29
11.06   Headings     29
11.07   Notices     29
11.08   Environmental Matters     29
11.09   Confidentiality     30
11.10   Projections     31
11.11   Actions to be Taken Upon Termination     31
11.12   Trademarks, Trade Names and Service Mark     33
11.13   Competing Facilities     34
11.14   Waiver     34
11.15   Partial Invalidity     34
11.16   Survival     34
11.17   Affiliates     35
11.18   Negotiation of Agreement     35
11.19   Estoppel Certificates     35
11.20   Entire Agreement     36

Case 24-21743-gmh   Doc 652-5   Filed 07/16/25   Page 3 of 79

11.21  Expert Decisions                                              36
11.22  Counterparts                                                  37
11.23  Waiver of Jury Trial and Punitive Damages                     37

ARTICLE XII – Intentionally Deleted                                  38

ARTICLE XIII – DEFINITION OF TERMS                                   38

13.01  Definition of Terms                                           38

Exhibit A - Legal Description of the Site
Exhibit B – Form of Memorandum of Management Agreement
Exhibit C – Form of Non-Disturbance Agreement
Exhibit D – Current Budget of Net Operating Costs

Schedule 1 – Hotel Specific Data

BA3/470422

<u>MANAGEMENT AGREEMENT</u>

This Management Agreement ("**Agreement**") is executed as of June 14, 2011 and effective as of the date identified as the "Effective Date" in Schedule 1 ("**Effective Date**"), by the party identified as the "Owner" in Schedule 1 ("**Owner**"), and the party identified as "Manager" in Schedule 1 attached hereto ("**Manager**").

RECITALS:

A.     Owner is, or will be as on or before December 31, 2011, the holder of title to the parcel of real property described on **Exhibit A** attached to this Agreement and incorporated herein and as further identified and described in the "Description of the Hotel" in Schedule 1 (the "**Site**"). The Site is improved as indicated in the "Description of the Hotel" in Schedule 1 (the "**Improvements**"). The Site and the Improvements, in addition to certain other rights, improvements, and personal property as more particularly described in the definition of "Hotel" in <u>Section 13.01</u> hereof, are collectively referred to as the "Hotel".

B.     Owner desires to engage Manager to manage and operate the Hotel and Manager desires to accept such engagement upon the terms and conditions set forth in this Agreement.

C.     Owner and Manager desire that the Hotel be operated as the type of Hotel identified in the "Franchise Description" in Schedule 1, licensed to Owner by the Franchisor identified in Schedule 1 (the "**Franchisor**") to Owner.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt of which is hereby acknowledged, Owner and Manager agree as follows:

ARTICLE I

MANAGEMENT OF THE HOTEL; OWNER OBLIGATIONS

1.01     <u>Management of the Hotel</u>

Manager shall, and Owner hereby authorizes and engages Manager, as an independent contractor, to, supervise, direct and control the management and operation of the Hotel in accordance with the terms and conditions of this Agreement. During the Term, the Hotel shall be known by the name identified in the "Description of the Hotel" in Schedule 1.

1

1.02    Management Responsibilities

A.      Manager shall manage the Hotel, subject to the terms of this Agreement, and in accordance with the Annual Operating Budget, shall perform each of the following functions (the costs and expenses of which shall be the Deductions) with respect to the Hotel:

1.      Recruit, employ, supervise, direct and discharge the employees at the Hotel.

2.      Establish prices, rates and charges for services provided in the Hotel, including Guest Room rates.

3.      Establish and revise, as necessary, administrative policies and procedures, including policies and procedures for the control of revenue and expenditures, for the purchasing of supplies and services, for the control of credit, and for the scheduling of maintenance, and verify that the foregoing procedures are operating in a sound manner.

4.      Make payments on accounts payable and handle collections of accounts receivable.

5.      Arrange for and supervise public relations and advertising and prepare marketing plans.

6.      Procure all Inventories and replacement of Fixed Asset Supplies.

7.      Prepare and deliver interim accountings, annual accountings, the Proposed Annual Operating Budget, Building Estimate, FF&E Estimate, and such other information as and when required by this Agreement and/or the Franchise Agreement and be available at reasonable times to discuss the above-listed items as well as the operations at the Hotel generally with Owner.

8.      Plan, execute and supervise ordinary and routine repairs, maintenance, and FF&E purchases at the Hotel.

9.      Obtain and keep in full force and effect, either in Manager's name or in Owner's name, as may be required by applicable law, any and all licenses and permits to the extent same is within the control of Manager (or, if same is not within the control of Manager, Manager shall use due diligence and reasonable efforts to cooperate with Owner to obtain and keep same in full force and effect); provided, however, it is understood and agreed that Owner shall be responsible for obtaining at Owner's sole cost and expense, and with the reasonably cooperation of Manager, alcoholic beverage and catering licenses for the sale of alcoholic beverages in, at or from the Hotel.  Manager agrees to assist Owner in connection with Owner's efforts to obtain said alcoholic beverage and catering license and Manager shall use all reasonable efforts to comply with

2

the requirements of said alcoholic beverage and catering licenses, to the extent within Manager's control, and consistent with the approved Annual Operating Budget. Once issued, Owner shall take all actions necessary to keep the alcoholic beverage and catering licenses in full force and effect and shall take no actions in violation of said licenses.

        10.    Retain legal counsel approved by Owner for the Hotel for legal services, as necessary, which legal counsel shall perform legal services under the direction of Manager. Such legal services may include, without limitation, the rendering of legal advice or institution of legal actions on Owner's behalf and at Owner's expense, for the prosecution or defense of actions involving the collection or payment of rent, tenant or guest disputes, damage actions, contract disputes and the like.

      B.    Manager, to the extent sufficient Working Capital and FF&E Reserve funds exist and are available for such purpose, shall comply with all the terms and conditions of the Franchise Agreement and shall advise and assist Owner in the performance and discharge of its covenants and obligations thereunder. Owner shall comply with any capital expenditure, product improvement plan, operating standard changes or other requirements imposed from time to time by the Franchisor under the Franchise Agreement, the cost of which shall be paid in accordance with this Agreement. In the event that there is a conflict with respect to the operation of the Hotel between the terms and conditions of the Franchise Agreement and this Agreement, the terms of the Franchise Agreement shall prevail. Owner specifically agrees that Manager and the Franchisor as "franchisor" under the Franchise Agreement, may deal directly with each other with respect to operational issues pertaining to the Hotel.

      C.    The operation of the Hotel shall be under the exclusive supervision and control of Manager, except as otherwise specifically provided in this Agreement. Manager shall use its good faith efforts to operate the Hotel in accordance with the standards set forth in the Franchise Agreement and this Agreement, and in accordance with the Annual Operating Budget. Subject to the Annual Operating Budget and to such other limitations as are contained in this Agreement, Manager shall have discretion and control, free from interference, interruption or disturbance, in all matters relating to management and operation of the Hotel, including, without limitation, the following: charges for Guest Rooms, commercial space, and services provided by the Hotel; food and beverage services; employment policies; credit policies; receipt, holding and disbursement of funds; maintenance of Manager's bank accounts; procurement of Inventories (including initial Inventories), supplies and services; appearance and maintenance, payment of costs and expenses specifically provided for in this Agreement or otherwise reasonably necessary or desirable for the proper and efficient operation of the Hotel; and generally, all activities necessary or desirable for the operation of the Hotel. Manager shall execute in its name or on behalf of Owner all leases and other agreements relating to equipment and services provided in the Hotel; provided, however, Manager shall not, without the prior consent of Owner, enter into any lease or contract for services with a term in excess of two (2) years with respect to the Hotel, unless such lease or contract is terminable by Owner or Manager at all times thereafter upon not more than 30-days notice (without the payment of any fee or penalty). Manager shall not enter

3

any leases of retail or commercial space within the Hotel without the prior written consent of Owner.

D.     Subject to the Annual Operating Budget, Manager will use reasonable efforts to comply with all applicable Legal Requirements (except for certain Legal Requirements which are Owner's responsibility under Section 1.02, Section 5.03 and Section 11.08 hereof) pertaining to its operation of the Hotel, provided that Manager shall have the right, but not the obligation, with the prior written consent of Owner, which consent shall not be unreasonably withheld, conditioned or delayed to contest or oppose, by appropriate proceedings, any such Legal Requirements. All expenses of any such contest of a Legal Requirement shall be paid from Gross Revenues as Deductions. Owner will comply with all applicable Legal Requirements in connection with Owner's responsibilities under this Agreement and in connection with Owner's actions as Owner of the Hotel. In the event Manager is made aware of a violation of a Legal Requirement of which Manager did not have prior knowledge, Manager, upon becoming aware of such violation shall take appropriate actions to comply with the Legal Requirement in question, subject to the availability of funds for such purpose in accordance with the Annual Operating Budget. Absent the existence of funds for such purpose, as set forth in the Annual Operating Budget, Owner shall advance funds for such purpose within 30 days after receipt of a request therefor from Manager (or such shorter period of time as may be reasonably required, as set forth in Manager's notice to Owner.

1.03     System Services

A.     Manager shall provide to Owner certain computer hardware and software support services ("**System Services**") as may from time to time be necessary or desirable, as reasonably determined by Manager, in connection with the performance by Manager of its duties hereunder.

B.     In consideration for the System Services to be provided by Manager which shall initially include the cost of the services and equipment itemized on Schedule 1 attached hereto (which services may be supplemented or altered by Manager in its sole but reasonable discretion), Owner shall pay to Manager a "System Services Fee" per Accounting Period as indicated in Schedule 1 for the System Services, which System Services Fee shall be a Deduction.

1.04     Employees

All personnel employed at the Hotel shall, at all times, be the employees of Manager. Except as otherwise provided below, Manager shall have absolute discretion with respect to all personnel employed at the Hotel, including, without limitation, decisions regarding hiring, promoting, transferring, compensating, supervising, terminating, directing and training all employees at the Hotel, and, generally, establishing and maintaining all policies relating to employment. Manager shall be permitted to provide free accommodations and amenities to its employees and representatives visiting the Hotel in connection with its management or operation. Manager shall inform Owner

4

as to the name, background and qualifications of the general manager of the Hotel and expressly reserves the right to relocate the general manager of the Hotel to any other hotel managed by Manager. Owner shall have the right to interview any proposed replacement general manager, and Manager shall consider in good faith the opinions of Owner regarding the hiring of any such replacement general manager.

### 1.05    Owner's Right to Inspect

With forty-eight (48) hour advance telephonic notice from Owner to Manager, Owner and its agents shall have access to the Hotel at any and all reasonable times for the purpose of inspection, or showing the Hotel to prospective purchasers or Mortgagees.

### 1.06    The Franchise Agreement

Owner covenants and agrees not to take any actions in violation of, which would result in the violation of, or which would cause Manager to violate the terms of, the Franchise Agreement. Owner further covenants and agrees that it will not amend the Franchise Agreement without the prior written consent of Manager, which shall not be unreasonably withheld or delayed so long as Manager determines that the amendment is not adverse to Manager.

### 1.07    Accounting/Administration Services

In consideration for all of the accounting/administration services to be rendered by Manager pursuant to the provisions of this Agreement, Owner shall pay to Manager the Accounting/Administration Fee indicated in Schedule 1.

### 1.08    Travel and Reimbursement

Manager shall be entitled to be reimbursed for reasonable out-of-pocket costs and expenses (including reasonable travel expenses) for the provision of management and support services by personnel not located at the Property which are related to the efforts of such personnel on behalf of the Property, or the supervision of the management or transition of management for the Property, and the same shall be considered Deductions. In addition, Manager shall be reimbursed for its reasonable out of pocket costs in connection with the relocation of management personnel to the Property and for travel expenses incurred in connection with the initial management and the entering into of this Agreement. Manager shall include such relocation and travel expenses in connection with its initial management as part of its initial Annual Operating Budget. Manager shall provide to Owner, upon request, back-up information relating to any request for reimbursement.

5

## ARTICLE II

## TERM

### 2.01    Term

The "Term" of this Agreement shall consist of an "Initial Term" and the "Renewal Term(s)". The "Initial Term" shall begin on the Effective Date and, unless sooner terminated as provided herein, shall continue until the Expiration Date of the Initial Term identified in Schedule 1. Thereafter, this Agreement shall automatically, and with no further action required by Owner or Manager, be renewed on the same terms and conditions for the successive renewal term(s) identified in Schedule 1 ("**Renewal Terms**"), unless Manager shall have given prior written notice to Owner of Manager's election not to renew at least one hundred eighty (180) days prior to the expiration of the then current Initial Term or Renewal Term, as the case may be; provided, however, either Manager or Owner may terminate this Agreement on or before December 31, 2011 in the event (i) Owner fails to obtain acceptable financing for the Improvements or (ii) the Franchise Agreement is terminated.

### 2.02    Performance Termination

A.    Owner shall have the option to terminate this Agreement if, with respect to each Fiscal Year within the Performance Termination Period in question, as defined in Schedule 1:

1.    Operating Profit per available guest room at the Hotel is not comparable to that realized by well managed hotels of similar size, room count, services, facilities and rate structure, as determined by an Expert in accordance with the provisions of Section 11.21 hereof; and

2.    The Revenue Index of the Hotel is less than the Revenue Index Threshold as set forth on Schedule 1; and

3.    The fact that the Hotel is not meeting the tests set forth in Sections 2.02.A.1 and 2.02.A.2 is not the result of (a) Force Majeure, (b) any major renovation of the Hotel, (c) highway renovations or other construction projects in the vicinity of the Hotel, or (d) a Default by Owner.

B.    Owner shall exercise such option to terminate by serving written notice thereof on Manager no later than sixty (60) days after Owner's receipt of the Accounting Period Statement for the final Accounting Period in the Performance Termination Period. Delivery of such notice shall trigger the Expert Resolution Process set forth in Section 11.21 hereof to establish whether the condition triggering Owner's termination right as set forth in Section 2.02.A.1 exists. In the event Manager challenges Owner's claim that the conditions set forth in Section 2.02.A triggering Owner's termination right have been met, Manager shall give prompt written notice of such challenge to Owner, and in turn,

6

the Expert, and the issue shall be resolved by the Expert. Following the conclusion of the Expert Resolution Process, should the Expert establish that the conditions triggering Owner's termination right as set forth in Section 2.02.A have been met, and provided further that Manager does not elect to avoid Termination pursuant to the provisions of Section 2.02.C hereof, this Agreement shall terminate as of the end of the fourth (4th) full Accounting Period following the date on which the Expert determines and notifies Owner and Manager in writing that the conditions triggering the termination right as set forth in Section 2.02.A have been met. Such termination date may be extended as may reasonably be required to enable Manager to satisfy any Legal Requirements applicable to the termination of employment of any employees at the Hotel.

C.     Notwithstanding anything contained herein to the contrary, but subject nonetheless to the provisions of Section 2.02.E, Manager at its option may elect to avoid the Termination by Owner pursuant to Section 2.02.A for the Performance Termination Period in question by notifying Owner of Manager's election within ten (10) days after Manager's receipt of the Expert's decision; provided, however, that to avoid such Termination, Manager shall either (i) pay to Owner within such 10 day period that amount of money by which Operating Profit fell below the Performance Termination Threshold (the "**Deficit Amount**"), or (ii) offset the Deficit Amount against any Management Fees and/or other amounts or reimbursements payable to Manager under this Agreement, as Owner may elect.

D.     Owner's failure to exercise its right to terminate this Agreement pursuant to this Section 2.02 shall not be deemed an estoppel or waiver of Owner's right to terminate this Agreement with respect to any subsequent event or circumstance that could give Owner the right to terminate pursuant to this Section 2.02.

E.     Manager's exercise of its right to avoid termination of this Agreement pursuant to this Section 2.02 shall not prevent Manager from again exercising such right to avoid termination at a later date, should any subsequent event or circumstance arise that gives Owner the right to terminate under this Section 2.02, provided however, that Manager may exercise such right no more than three (3) times during the Term.

ARTICLE III

COMPENSATION OF MANAGER

3.01    Management Fees

Manager shall be paid the sum of the following as its management fees:

A.     the Base Management Fee, which shall be retained by Manager from Gross Revenues; plus

B.     the Incentive Management Fee, which shall be retained by Manager from Operating Profit in accordance with Sections 3.02 and 4.01 hereof; plus

7

C. the Guaranty Management Fee, which shall be retained by Manager from Operating Profit in accordance with <u>Sections 3.03</u> and <u>4.01</u> hereof; plus

D. the System Services Fee set forth in <u>Section 1.03</u> hereof; plus

E. the Accounting/Administration Fee set forth in <u>Section 1.07</u> hereof; plus

F. the Priority Distribution Fee, if applicable.

3.02 <u>Operating Profit</u>

Operating Profit, if any, shall be distributed to Owner and to Manager in the order of priority listed below.

A. an amount equal to Owner's Priority shall be paid to Owner,

B. the Incentive Management Fee shall be paid to, or credited to and retained by, Manager, and

C. any remaining balance of Operating Profit shall be paid to Owner.

To the extent of available Operating Profit for each Accounting Period and within the time period set forth in <u>Section 4.01.A</u>, Manager shall distribute a prorated portion of the Owner's Priority to Owner each Accounting Period and Manager shall be entitled to be paid, or credited and retain a prorated portion of the Incentive Management Fee each Accounting Period based on its good faith estimate of the Incentive Management Fee for the full Fiscal Year as provided in the Annual Operating Budget.

3.03 <u>Guaranty Management Fee</u> The Guaranty Management Fee due Manager may be retained by Manager out of Net Profit, if and only if, Owner determines to distribute its share of Net Profit to Owner. Manager acknowledges and agrees that Owner has the right, in its sole discretion, to determine if and when to distribute Net Profit. Manager further acknowledges and agrees that Owner, in its sole discretion, may use Net Profit from time to time to (a) reduce the principal balance of Qualified Loans, or (b) fund reasonable reserves with the reasonable consent of Manager relating to the financing of the Hotel. If and to the extent Owner determines to make a distribution of Net Profit in any given Fiscal Year, Owner shall pay Manager a portion of such Net Profit equal to the Guaranty Management Fee.

8

## ARTICLE IV

## ACCOUNTING MATTERS

4.01  <u>Accounting, Distributions and Annual Reconciliation</u>

A.     Within twenty (20) days after the close of each Accounting Period, Manager shall deliver an interim accounting (the "**Accounting Period Statement**") to Owner showing Gross Revenues, Deductions, Operating Profit, and applications and distributions thereof for the preceding Accounting Period.  Subject to Section 3.03 above, Manager shall transfer to Owner, with each Accounting Period Statement, any interim amounts due Owner, subject to Working Capital needs, and shall retain any Base Management Fees, System Services Fees, Accounting/Administration Fees, Incentive Management Fees, Guaranty Management Fee, and any other interim amounts due Manager.

B.     Calculations and payments of the Base Management Fee, the Incentive Management Fee, and the Guaranty Management Fee (and Owner agrees to promptly notify Manager if any Guaranty Management Fee) are due together with an annual certification on or before January 31 of each Fiscal Year for the prior Fiscal Year.  As to Owner distributions, Manager shall have the right to reasonably audit Owner's financial records to determine the accuracy of the certification and whether any Guaranty Management Fee is due Manager., and distributions of Operating Profit made with respect to each Accounting Period within a Fiscal Year shall be accounted for cumulatively within a Fiscal Year, but shall not be cumulative from one Fiscal Year to the next.  Within one hundred twenty (120) days after the end of each Fiscal Year, Manager shall deliver to Owner a statement in reasonable detail summarizing the operations of the Hotel for the immediately preceding Fiscal Year and a certificate of Manager's chief accounting officer certifying that, to the best of his knowledge, such year end statement is true and correct.  The parties shall, within thirty (30) business days after Owner's receipt of such statement, make any adjustments, by cash payment, in the amounts paid or retained for such Fiscal Year as are needed because of the final figures set forth in such statement.  Such final accounting shall be controlling over the Accounting Period Statements.  No adjustment shall be made for any Operating Loss or Operating Profit in a preceding or subsequent Fiscal Year.

C.     To the extent there is an Operating Loss for any Accounting Period, additional funds in the amount of any such Operating Loss shall be provided by Owner within thirty (30) days after Manager has delivered written notice thereof to Owner.  If Owner does not so fund such Operating Loss within the thirty (30) day time period, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount equal to such Operating Loss from future distributions of funds otherwise due to Owner.  Furthermore, if Owner fails to fund an Operating Loss upon request by Manager, Manager may also withdraw interest upon

9

such sum at a rate equal to the Prime Rate plus three (3) percentage points accruing from the date Owner was to have funded such Operating Loss until full repayment is made to Manager by Owner or by withdrawal from Owner's distributions. To the extent the Operating Loss suggests to Manager, in the exercise of its opinion, that there will not be sufficient Working Capital to operate the Hotel in accordance with the terms hereof and the Annual Operating Budget, the provisions of Section 4.05 hereof shall apply.

4.02    Books and Records

Manager shall maintain books of control and account pertaining to operations at the Hotel. Such accounts shall be kept on the accrual basis and in all material respects in accordance with the Uniform System of Accounts, with the exceptions provided in this Agreement. Owner and/or Owner's independent accountants may with prior reasonable notice and at reasonable intervals during Manager's normal business hours examine such records. If Owner desires, at its own expense, to audit, examine, or review, or cause its accountants to audit, examine or review, the annual operating statement described in Section 4.01.B or any Accounting Period Statements(s), Owner shall notify Manager in writing within sixty (60) days after receipt of such statement of its intention to audit and begin such audit no sooner than thirty (30) days and no later than sixty (60) days after Manager's receipt of such notice. Such audit shall be completed within ninety (90) days after commencement thereof. If such an audit does not occur and is not completed within the times herein allotted, then such statement shall be deemed to be conclusively accepted by Owner as being correct, and Owner shall have no right thereafter to question or examine the same. If any audit by Owner discloses an understatement of any amounts due Owner, Manager shall promptly pay Owner such amounts found to be due, plus interest thereon (at the Prime Rate plus one percent (1%) per annum) from the date such amounts should originally have been paid. Any dispute concerning the correctness of an audit shall be settled through the Expert Resolution Process. If any audit discloses that Manager has not received any amounts due it, Owner shall pay Manager such amounts, plus interest thereon (at the Prime Rate plus one percent (1%) per annum) from the date such amounts should originally have been paid. The cost of the audit shall be paid by Owner, provided, however, Manager shall pay for such cost if the audit by Owner discloses an underpayment of the amount due Owner by five percent (5%) of the total amount due to have been paid Owner.

4.03    Accounts, Expenditures

A.      All funds derived from operation of the Hotel and Working Capital shall be deposited by Manager in bank accounts (the "**Operating Accounts**") in the name of Owner doing business as the Hotel (but on which representatives of Manager are the sole signatories) in a bank or similar institution reasonably acceptable to both Manager and Owner. All funds in the Operating Accounts shall be the property of Owner, subject to the terms and conditions of this Agreement. All interest earned on the funds in the Operating Account shall be added to the balance in the Operating Accounts. Manager shall maintain the Operating Accounts as separate and distinct accounts specific to the operation of the Hotel and shall not commingle any other funds from Manager or other

hotels Manager may operate with the funds in the Operating Accounts. Authorized individuals who have signature authority shall be bonded or covered by fidelity insurance in amounts which are customarily obtained for similar hotels. Withdrawals from said Operating Accounts shall be made solely by representatives of Manager whose signatures have been authorized. Reasonable petty cash funds shall be maintained at the Hotel.

B.     All payments made by Manager hereunder shall be made from the Operating Accounts, petty cash funds, or from Working Capital. Manager shall not be required to make any advance or payment with respect to the Hotel except out of such funds, and Manager shall not be obligated to incur any liability or obligation with respect to the Hotel. In any event, if any such liability or obligation (excluding liability pursuant to the Manager Guaranty) is properly incurred by Manager with respect to the Hotel and in accordance with the terms and conditions of this Agreement, Manager shall have the option to deduct such amounts from Owner's share of Operating Profit if Owner has not fully reimbursed Manager for said amounts within thirty (30) days after Owner's receipt of notice from Manager that said amounts are due.

C.     Debts and liabilities (excluding liability pursuant to the Manager Guaranty) incurred by Manager as a result of its operation and management of the Hotel pursuant to the terms hereof, whether asserted before or after Termination, will be paid by Owner to the extent funds are not available for that purpose from Gross Revenues and Manager shall have no responsibility for the payment of such liabilities unless adequate Hotel or Owner funds are available to Manager for such payment. Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability, and damage (including, without limitation, attorneys' fees and expenses) arising from Owner's failure to pay such debts and liabilities. The provisions of this Section 4.03.C shall survive Termination.

4.04     Annual Operating Budget

A.     Manager shall deliver to Owner for its review and approval, at least thirty (30) days prior to the beginning of each Fiscal Year after the Effective Date, a "Proposed Annual Operating Budget" in the form provided to Owner by Manager. Each Proposed Annual Operating Budget shall project the estimated Gross Revenues, departmental profits, Deductions, and Operating Profit for the forthcoming Fiscal Year for the Hotel. Manager shall provide Owner on request additional detail, information and assumptions used in the preparation of the Proposed Annual Operating Budget. Owner shall consider for its approval, subject to the terms and conditions set forth in this Section 4.04, the Proposed Annual Operating Budget on or before the beginning of each Fiscal Year. For purposes hereof, such Proposed Annual Operating Budget, if approved by Owner, is referred to herein as the "**Annual Operating Budget**."

B.     If Owner objects to any portion of the Proposed Annual Operating Budget, Owner shall be specific as to category and any category not specifically disapproved by Owner shall be deemed approved. Owner will provide Manger with the specific reasons for its disapproval with Owner's written objection, and the parties will attempt to resolve

in good faith, any objections within the thirty day period following Owner's objection. Owner shall not have the right to object to any item in the Proposed Annual Operating Budget if such objection would:

1. require modifications to items (such as room rates, menu or banquet prices) affecting the estimate of Hotel revenues or the components thereof;

2. require modifications to any expenditures required to be made under the express provisions of this Agreement, including expenditures for the Management Fee, Incentive Management Fee, Guaranty Management Fee, Accounting/Administration Fee or Special Services Fee, or costs incurred to comply with the terms and conditions of the Franchise Agreement;

3. limit any expenditures reasonably necessary to prevent an imminent threat to life, health, safety or property of the Hotel;

4. materially interfere with Manager's ability to operate the Hotel in a manner consistent and in compliance with the Franchise Agreement or a Legal Requirement;

5. materially impair Manager's ability to pass a Performance Termination Test;

6. materially interfere with Manager's fulfillment of its obligations, duties, agreements, covenants or responsibilities under this Agreement;

7. limit the costs and expenses that are not within the control of Owner and/or Manager, such as Taxes and the costs of utilities; and

8. require modifications to Manager's reasonable projections of increases in projected costs and expenses of operating the Hotel, which increases are primarily caused by projected increases in Gross Revenues.

C. In the event Owner and Manager fail to resolve any of Owner's permitted objections within such thirty (30) day period, all matters shall be referred to the Expert Resolution Process for resolution in accordance with the provisions of Section 11.21 hereof. Pending such Expert determination, Manager shall operate the Hotel with respect to those categories of the Proposed Operating Budget that are in dispute based on the previous Fiscal Year's Annual Operating Budget with respect to such categories, adjusted in accordance with (1) the percentage increase in the CPI from the first day of the Fiscal Year just ended, and the first day of the Fiscal Year for which the Proposed Annual Operating Budget is in dispute and (2) anticipated changes in Gross Revenues to the extent that increases in Gross Revenues would reasonably be expected to impact such category. If Owner fails to provide any objection within the above time periods, the Proposed Operating Budget as submitted by Manager shall be deemed approved.

D. Owner acknowledges that (i) the Annual Operating Budget is intended by Manager to be an estimate of income and expenditure only; (ii) Manager does not give any guarantee, warranty or representation whatsoever in connection with any Annual Operating Budget, other than that Manager prepared the Annual Operating Budget in accordance with the provisions of this Agreement; and (iii) a failure of the Hotel to achieve any Annual Operating Budget shall not in and of itself constitute an Event of Default or breach by Manager hereunder. It is understood, however, that the Annual Operating Budget is an estimate only and that unforeseen circumstances such as, but not limited to, the costs of labor, material, services and supplies, casualty, operation of law, or economic and market conditions, as well as the requirement that the Hotel be operated in accordance with the Franchise Agreement, may make adherence to the Annual Operating Budget impracticable. Manager shall include with each Accounting Period Statement a comparison of the actual results with the budgeted results.

4.05    Working Capital

Contemporaneously with Owner's acquisition of title to the Hotel and execution of this Agreement, Owner shall provide to Manager, Initial Working Capital in the amount set forth on Schedule 1. Owner shall, from time to time during the Term, promptly, but no later than thirty (30) days after written request by Manager, make Additional Advances necessary to maintain Working Capital at levels determined by Manager to be reasonably necessary to satisfy the needs of the Hotel as its operation may from time to time require in accordance with the terms of the Annual Operating Budget for that Fiscal Year and actual operations of the Hotel. If Owner does not so make such Additional Advances within the said thirty (30) day time period, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw an amount equal to the Additional Advance requested by Manager for additional Working Capital from future distributions of funds otherwise due to Owner. Upon Termination, Manager shall, except as otherwise provided in this Agreement, return the outstanding balance of the Working Capital to Owner.

4.06    Fixed Asset Supplies

Owner shall provide at its sole cost and expense, the initial Fixed Asset Supplies for the Hotel. Owner shall, within thirty (30) days after request by Manager, provide funds that are necessary to increase the level of Fixed Asset Supplies to levels determined by Manager, in its good faith judgment, to be necessary to satisfy the needs of the Hotel as its operation may, from time to time, require in accordance with the terms of the approved Annual Operating Budget for that Fiscal Year. Such fundings by Owner shall not be Deductions. The cost of Fixed Asset Supplies consumed in the operation of the Hotel shall constitute a Deduction. Fixed Asset Supplies shall remain the property of Owner throughout the Term of the Agreement and upon Termination.

13

ARTICLE V

REPAIRS, MAINTENANCE, AND REPLACEMENTS

5.01    Repairs and Maintenance Costs

In accordance with and subject to the Annual Operating Budget, and subject to the availability of adequate and required Hotel funds, Manager shall maintain the Hotel in good repair and condition and in conformity with applicable Legal Requirements and in accordance with the Franchise Agreement. Manager shall make or cause to be made such routine maintenance, repairs and minor alterations as it determines are necessary for such purposes. The phrase "routine maintenance, repairs, and minor alterations" as used in this Section 5.01 shall include only those which are normally expensed under generally accepted accounting principles. The cost of such routine maintenance, repairs and alterations shall be paid from Gross Revenues (and not from the FF&E Reserve) and shall be treated as a Deduction in determining Operating Profit.

5.02    FF&E Reserve

A.    Manager shall establish a reserve account (the "**FF&E Reserve**") in the name of Owner doing business as the Hotel (but on which representatives of Manager are the sole signatories) in a bank or similar institution reasonably acceptable to both Manager and Owner, to cover the cost of:

1    replacements, renewals and additions to the FF&E at the Hotel; and

2    Special Capital Expenditures.

B.    Contemporaneously with Owner's acquisition of title to the Hotel and execution of this Agreement, Owner shall deliver to Manager, Owner's initial contribution to fund the FF&E Reserve in the amount set forth on Schedule 1. For each Accounting Period during the term, Manager shall transfer the amounts set forth in Schedule 1 into the FF&E Reserve. Transfers into the FF&E Reserve shall be made at the time of each interim accounting described in Section 4.01 hereof. All amounts transferred into the FF&E Reserve pursuant to this Section 5.02.B shall be paid from Gross Revenues. FF&E Reserve contributions to the extent of the funding obligation set forth in item 17 of Schedule 1 shall be a Deduction.

C.    Manager shall prepare an annual estimate (the "**FF&E Estimate**") of the expenditures necessary for (1) replacements, renewals and additions to the FF&E of the Hotel, and (2) Special Capital Expenditures, during the ensuing Fiscal Year and shall deliver the FF&E Estimate to Owner for its review and approval at the same time as Manager submits the proposed Annual Operating Budget described in Section 4.04. The FF&E Estimate shall also indicate the estimated time schedule for making such replacements, renewals, and additions. Owner's rights to review and approve FF&E

14

Estimate, as well as the resolution of any disputes related thereto, shall be governed by the terms and conditions of Section 4.04, with the FF&E Estimate being treated in the same manner as the Proposed Annual Operating Budget under Section 4.04.

D.     Manager shall from time to time make such (1) replacements, renewals and additions to the FF&E of the Hotel, and (2) Special Capital Expenditures, as Manager deems necessary, or as may be required by the Franchise Agreement, up to the balance in the FF&E Reserve.  No expenditures will be made in excess of said balance without the approval of Owner.  Manager will endeavor to follow the applicable approved FF&E Estimate, but shall be entitled to depart therefrom (but not exceeding the lesser of (i) 10% of the applicable approved FF&E Estimate and (ii) the Reserve balance), in its reasonable discretion, provided that (a) such departures from the approved FF&E Estimate result from circumstances which require prompt repair and/or replacement (in which event Manager shall notify Owner in writing); and (b) Manager submits to Owner a revised FF&E Estimate setting forth and explaining such departures.  At the end of each Fiscal Year, any amounts then remaining in the Reserve shall be carried forward to the next Fiscal Year.  Any Owner interference with the expenditure by Manager of funds from the FF&E Reserve pursuant to this Section 5.02, if such expenditure is in accordance with the terms of this Section 5.02, (including, without limitation, interference resulting from (i) any Litigation involving the Owner or the Hotel, or (ii) a Foreclosure) shall constitute an Event of Default by Owner under Section 9.01.  Proceeds from the sale of FF&E no longer necessary to the operation of the Hotel shall be added to the FF&E Reserve.  The FF&E Reserve will be kept in an interest-bearing account, and any interest which accrues thereon shall be retained in the FF&E Reserve.  Neither (1) proceeds from the disposition of FF&E, nor (2) interest which accrues on amounts held in the FF&E Reserve, shall (a) result in any reduction in the required transfers to the FF&E Reserve set forth in subsection B above, nor (b) be included in Gross Revenues.   All amounts in the FF&E Reserve upon termination or expiration of this Agreement shall be returned to Owner. Notwithstanding anything to the contrary in this Section 5.02, Owner shall have the right to require Manager to use Owner's affiliate to procure and install FF&E and Special Capital Expenditures; provided, however, such Owner's affiliates shall agree to procure and install such FF&E and Special Capital Expenditures items with pricing, fees and performance competitive with those of reputable and qualified parties for similar goods and services.

E.     As the Hotel ages, the percentages of Gross Revenues which are set forth in Section 5.02.B may not be sufficient to keep the FF&E Reserve at the levels necessary to make the replacements, renewals, and additions to the FF&E of the Hotel, or to make the Special Capital Expenditures, which are required to maintain the Hotel in accordance with the requirements of this Agreement and the Franchise Agreement.  If the FF&E Estimate prepared in good faith by Manager exceeds the available funds in the FF&E Reserve, Owner shall elect one or the other of the following two (2) alternatives:

1.     to agree in writing to increase the annual percentage in Section 5.02.B to provide the additional funds required and such increases shall be treated as Deductions, or

2. to make a lump sum contribution to the FF&E Reserve in the necessary amount in which event, such contribution shall be treated as an Owner's Additional Capital Investment.

A failure or refusal by Owner to either agree in writing to Section 5.02.E.1 above or provide the additional funds required in accordance with Section 5.02.E.2 above within sixty (60) days after Manager's request therefor shall be deemed an election by Owner to opt for the funding mechanism in Section 5.02.E.1.

5.03    Capital Expenditures

A.    Manager shall prepare an annual estimate (the "**Building Estimate**") of the expenses necessary for non-routine or major repairs, alterations, improvements, renewals, replacements, and additions to the Hotel including, without limitation, the structure, the exterior facade and all of the mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation elements of the Hotel building (the foregoing expenditures, together with all other expenditures which are classified as "capital expenditures" under generally accepted accounting principles, shall be collectively referred to as "**Capital Expenditures**." Manager shall submit the Building Estimate to Owner for its review and approval at the same time the Proposed Annual Operating Budget is submitted. Manager shall not make any Capital Expenditures (except for Special Capital Expenditures which are governed by the provisions of Section 5.02) without the prior written consent of Owner. Owner shall have thirty (30) days after receipt to review and approve such Building Estimate, it being agreed that Owner shall not withhold its approval with respect to Capital Expenditures as are required, in Manager's reasonable judgment, to keep the Hotel in a first class, competitive, efficient and economical operating condition and/or in accordance with the requirements of the Franchise Agreement, or otherwise required for the continued safe and orderly operation of the Hotel, including the removal of Hazardous Materials in compliance with all Environmental Laws (as more particularly described in Section 11.08) or in compliance with all Legal Requirements. Owner's right to review and approve the Building Estimate, as well as the resolution of any disputes related thereto, shall be governed by the terms and conditions of this Section 5.03 and Section 4.04, with the Building Estimate being treated in the same manner as the Proposed Annual Operating Budget under Section 4.04.

B.    Notwithstanding the provisions of Section 5.03.A, Manager shall be authorized to take appropriate remedial action (including making any necessary Capital Expenditures) without receiving Owner's prior consent in the following circumstances: (i) if there is an emergency threatening the Hotel, its guests, invitees or employees; or (ii) if the continuation of the given condition will subject Manager and/or Owner to civil or criminal liability; or (iii) if necessary to comply with the Franchise Agreement, and, following written notice from Manager, Owner has either failed to immediately remedy the situation or has failed to take appropriate and immediate legal action to stay the effectiveness of any such law, ordinance, regulation or order. In any such case, Owner

16

shall hold harmless, indemnify and defend Manager from any claims, actions, suit, liability or loss resulting from Manager's or Owner's remedial action. Manager shall cooperate with Owner in the pursuit of any such action and shall have the right to participate therein.

      C.      The cost of all Capital Expenditures (except Special Capital Expenditures pursuant to <u>Section 5.02</u>) (including the expenses incurred by either Owner or Manager in connection with any civil or criminal proceeding described above) shall be borne solely by Owner, and shall not be paid from Gross Revenues nor from the FF&E Reserve and shall not constitute a Deduction.

      D.      It shall be a Default by Owner (and Manager shall be entitled to exercise any of the remedies described in <u>Article IX</u> hereof) if Owner fails to provide funding for any Capital Expenditure approved by Owner within sixty (60) days after Owner's approval of the Building Estimate requesting such Capital Expenditures. In addition to any other rights Manager may have under this Agreement, if Owner fails to timely provide the funding, Manager shall have the option of terminating this Agreement upon six (6) months written notice to Owner, whereupon, Owner shall tender to Manager a Termination Fee equal to the termination fee set forth in <u>Section 11.11.G</u> hereof. The provision of this Section shall survive termination of this Agreement.

      E.      It is understood that any proposed "alterations" and "improvements" which would either (a) increase or decrease the number of Guest Rooms in the Hotel, (b) involve changing the architectural footprint of the Hotel or involve other significant changes in the structural design of the Hotel, in any case by more than a de minimis amount, or (c) change significantly or eliminate any Hotel amenities are beyond the scope of this Article V, and would require the approval of both parties and an amendment of this Agreement prior to implementation by either party. In the event any alterations or improvements described in the preceding sentence are proposed, Manager shall have no obligation to supervise such renovations, provided, however, that Owner shall be obligated to notify and provide Manager with the opportunity to bid on and be considered to provide such services for a fee to be negotiated by the parties. In addition, in the event Owner desires to use the purchasing and procurement services of Manager, Manager may charge Owner a reasonable fee for such services, which fee will be paid by Owner from its own funds and shall not be a Deduction. The extent to which the costs associated with such alterations and improvements would increase Owner's Priority as an Owner's Additional Capital Investment shall be negotiated in good faith by the parties as part of the referenced amendment to this Agreement.

      5.04    <u>Ownership of Replacements</u>

      All repairs, alterations, improvements, renewals or replacements made pursuant to Article V, and all amounts kept in the FF&E Reserve, shall, except as otherwise provided in this Agreement, be the property of Owner.

## ARTICLE VI

## INSURANCE, DAMAGE, CONDEMNATION, AND FORCE MAJEURE

6.01    Insurance

If not otherwise required by the Franchise Agreement or Mortgage,

A.    During the Term of this Agreement, Owner shall procure and maintain, as an expense of the Hotel, at terms and rates and providing the types of coverage reasonably acceptable to Owner, a minimum of the following insurance:

1.    Property insurance, including boiler and machinery coverage, on the Hotel building(s) and contents against loss or damage by fire, lightning and all other risks as commonly covered by an "all risk of physical loss" policy of insurance, in an amount not less than the full replacement cost (less excavation and foundation costs) of the Hotel and contents;;

2.    Business interruption insurance covering at least eighteen (18) months' loss of profits and necessary continuing expenses for interruptions at the Hotel caused by any occurrence covered by the insurance referred to in Section 6.01.A.1 above;

B.    During the Term of this Agreement, Manager shall procure and maintain, with insurance companies of recognized responsibility, a minimum of the following insurance:

1.    (a)    Comprehensive or commercial general liability insurance for any claims or losses arising or resulting or pertaining to the Hotel or its operation, with combined single limits of $1,000,000 per each occurrence for bodily injury and property damage. If the general liability coverages contain a general aggregate limit, such limit shall be not less than $2,000,000, and it shall apply in total to the Hotel only. Such insurance shall be on an occurrence policy form and shall include premises and operations, independent contractors, blanket contractual, products and completed operations, advertising injury, employees as additional insureds, broad form property damage, personal injury, incidental medical malpractice, severability of interests, innkeeper's and safe deposit box liability, and explosion, collapse and underground coverage during any construction;

(b)    If applicable, alcoholic beverage liability for combined single limits of bodily injury and property damage of not less than $1,000,000 each occurrence;

(c)    Business auto liability, including owned, non-owned and hired vehicles for combined single limits of bodily injury and property damage of not less than $1,000,000 per each occurrence; and

18

(d)     Umbrella excess liability on an occurrence basis in amounts not less than $49,000,000 excess of the liability insurance required under <u>Section 6.01 B.1</u>, <u>B.4</u> and <u>B.5</u> hereof.

2.     Workers' compensation as may be required under applicable laws covering all of Manager's employees at the Hotel and including employer's liability coverage of not less than $500,000 each occurrence;

3.     Commercial crime insurance including coverage for employee theft, forgery or alteration, and theft of money or securities with reasonable limits as determined by Manager;

4.     Employer's liability insurance, where available, in amounts as Manager in its reasonable judgment deems advisable; and

5.     Such other insurance in amounts as Manager and Owner in their reasonable judgment deems advisable for protection against claims, liabilities and losses arising out of or connected with the operation of the Hotel or as otherwise may be required under the Franchise Agreement, and/or by any Mortgage.

C.     All insurance described in <u>Section 6.01.B</u> may be obtained by Manager by endorsement or equivalent means under its blanket insurance policies, provided that such blanket policies substantially fulfill the requirements specified in this Agreement.

D.     All policies of insurance required under <u>Section 6.01.A</u> shall be carried in the name of the Owner and all policies required under <u>Section 6.01.B</u> shall, as appropriate, have Owner, Manager and any Mortgagee named as additional insureds. Such coverages shall be provided on a primary and non-contributory basis. Any property losses thereunder shall be payable to the respective parties as their interests may appear. Owner shall use its reasonable efforts to require that any Mortgage encumbering the Hotel shall contain provisions to the effect that proceeds of the insurance policies required to be carried under <u>Sections 6.01.A.1</u> and <u>2</u> shall be available for repair and restoration of the Hotel.

E.     Owner and Manager shall deliver to one another certificates of insurance with respect to all policies so procured and, in the case of insurance policies about to expire, shall deliver certificates with respect to the renewal thereof. All certificates of insurance provided for under this <u>Section 6.01</u> shall, to the extent obtainable, state that the insurance shall not be canceled or materially changed without at least thirty (30) days prior written notice to the certificate holder.

F.     Insurance premiums and any other costs or expenses with respect to the insurance required under <u>Section 6.01</u>, including any Insurance Retention (as defined below), shall be paid from Gross Revenues as Deductions. Such premiums and costs shall be allocated on an equitable basis to the hotels participating under Manager's blanket insurance programs. Any reserves, losses, costs or expenses which are uninsured

19

shall be treated as a cost of insurance and shall be Deductions. Upon Termination, a reserve in an amount reasonably acceptable to Owner and Manager shall be established from Gross Revenues to cover the amount of any Insurance Retention and all other costs which will eventually have to be paid by either Owner or Manager with respect to pending or contingent claims, including those which arise after Termination for causes arising during the Term of the Agreement. If Gross Revenues are insufficient to meet the requirements of such reserve, Owner shall deliver into the reserve established hereunder, within thirty (30) days after receipt of Manager's written request therefor, the sums necessary to establish such reserve; and if Owner fails to timely deliver such sums, Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withdraw the amount of such expenses from the Operating Accounts, the FF&E Reserve, the Working Capital funds or any other funds of Owner held by or under the control of Manager and to deposit such funds into the reserve. For purposes of this Section 6.01.F, "Insurance Retention" shall mean the amount of any loss or reserve under Manager's blanket insurance program which is allocated to the Hotel, not to exceed the higher of (A) the maximum per occurrence limit established for similar hotels participating in such programs, or (B) the insurance policy deductible on any loss which may fall within high hazard classifications as mandated by the insurer (e.g., earthquake, flood, windstorm on coastal properties, etc.). If the Hotel is not a participant under Manager's blanket insurance program, "Insurance Retention" shall mean the amount of any loss or reserve allocated to the Hotel, not to exceed the insurance policy deductible.

G.     Notwithstanding anything contained in this Agreement to the contrary, Owner shall have the right to elect to have Manager procure and maintain any or all of the insurance for the Hotel otherwise required to be maintained by Owner under Section 6.01.A by participation in Manager's blanket insurance or self-insurance programs and in lieu of Owner's procuring the same, provided that Owner shall give Manager not less than ninety (90) days written notice of Owner's intent to participate in Manager's blanket insurance or self-insurance programs and such insurance to be procured by Manager shall not become effective until the end of the then-current term of the applicable policy or policies maintained by Owner under Section 6.01.A. Manager shall have no obligation to disclose to Owner the risk history of any other hotels not owned by Owner but which participate in Manager's insurance programs.

6.02     Damage and Repair

A.     Except as provided in Section 6.02.B, if, during the Term, the Hotel is damaged or destroyed by fire, casualty, or other cause, Owner shall, with all reasonable diligence and at its sole cost and expense to the extent of available insurance proceeds, repair or replace the damaged or destroyed portion of the Hotel to substantially the same condition as existed previously. Manager shall have the right to discontinue operating the Hotel to the extent it deems necessary to comply with applicable law, ordinance, regulation or order or as necessary for the safe and orderly operation of the Hotel. To the extent that proceeds from the insurance described in Section 6.01 are available for such purpose, Owner shall utilize such proceeds for the restoration.

B.    In the event damage or destruction to the Hotel from any cause materially and adversely affects the operation of the Hotel and Owner notifies Manager that Owner will not repair or replace such damage or fails to timely (taking into consideration the time taken to adjust the insurance claim with the carriers which participate in Manager's blanket insurance program) commence and/or complete the repairing, rebuilding or replacement of the same so that the Hotel shall be substantially the same as it was prior to such damage or destruction, Manager may, at its option, elect to terminate this Agreement upon sixty (60) days' written notice.    Additionally, if the Franchise Agreement is terminated due to Owner's failure to repair and restore the Hotel, this Agreement shall terminate effective upon the termination of the Franchise Agreement.  In either such event, upon such Termination under this Section 6.02.B, in addition to any of Manager's other rights hereunder, Owner shall pay Manager a termination fee equal to the Termination Fee set forth in Section 11.11.G.  This Section 6.02 shall survive Termination of this Agreement.

6.03    Condemnation

A.    In the event all or substantially all of the Hotel shall be taken in any eminent domain, condemnation, compulsory acquisition, or similar proceeding by any competent authority for any public or quasi-public use or purpose, or in the event a portion of the Hotel shall be so taken, but the result is that it is unreasonable to continue to operate the Hotel in accordance with the standards required by this Agreement, this Agreement shall terminate.  In such event, upon such Termination and to the extent included in Owner's condemnation award, Owner shall pay Manager a Termination Fee as set forth in Section 11.11.G.  Owner and Manager shall each have the right to initiate such proceedings as they deem advisable to recover any damages to which they may be entitled.  The provisions of this Section 6.03 shall survive Termination of this Agreement.

B.    In the event a portion of the Hotel shall be taken by the events described in Section 6.03.A but the result is not to make it unreasonable to continue to operate the Hotel, this Agreement shall not terminate. However, so much of any award for any such partial or temporary taking or condemnation as shall be necessary to render the Hotel equivalent to its condition prior to such event shall be used by Owner for such purpose; and Manager shall have the right to discontinue operating the Hotel to the extent it deems necessary for the safe and orderly operation of the Hotel.

C.    In the event all or a portion of the Hotel shall be taken on a temporary basis, without damage to the physical structure, but damage only to business operations, any award for such taking shall be treated as Gross Revenues and accounted for accordingly.

21

# ARTICLE VII

## TAXES

7.01    Real Estate and Personal Property Taxes

A.      Except as specifically set forth in subsection 7.01.B below, all real estate and personal property taxes, levies, assessments and similar charges on or relating to the Hotel ("**Impositions**") during the Term shall be paid by Manager from Gross Revenues, before any fine, penalty, or interest is added thereto or lien placed upon the Hotel, unless, with the consent of Owner, payment thereof is in good faith being contested and enforcement thereof is stayed.  Any such payments shall be Deductions in determining Operating Profit.  Owner shall, within five (5) days after receipt, furnish Manager with copies of official tax bills and assessments which it may receive with respect to the Hotel.  Either Owner or Manager (in which case Owner agrees to sign the required applications and otherwise cooperate with Manager in expediting the matter) may initiate proceedings to contest any negotiations or proceedings with respect to any Imposition, and all reasonable costs of any such contest shall be paid from Gross Revenues and shall be a Deduction in determining Operating Profit.  Manager shall, as part of its contest or negotiation of any Imposition, and with the prior written consent of Owner, be entitled, on Owner's behalf, to waive any applicable statute of limitations in order to avoid paying the Imposition during the pendency of any proceedings or negotiations with applicable authorities.

B.      The word "Impositions" as used in this Agreement shall not include the following, all of which shall be paid solely by Owner, not from Gross Revenues nor from the FF&E Reserve:

1.      Any franchise, corporate, estate, inheritance, succession, capital levy or transfer tax imposed on Owner, or any income tax imposed on any income of Owner (including distributions to Owner pursuant to Article III hereof);

2.      Special assessments (regardless of when due or whether they are paid as a lump sum or in installments, over time) imposed because of facilities, which are constructed by or on behalf of the assessing jurisdiction (for example, roads, sidewalks, sewers, culverts, etc.) which directly benefit the Hotel (regardless of whether or not they also benefit other buildings), which assessments shall be treated as capital costs of construction and not as Deductions;

3.      "Impact Fees" (regardless of when due or whether they are paid as a lump sum or in installments over time) which are required of Owner as a condition to the issuance of site plan approval, zoning variances or building permits, which impact fees shall be treated as capital costs of construction and not as Deductions.

4.      "Tax increment financing" or similar financing whereby the municipality or other taxing authority has assisted in financing the construction of the

22

Hotel by temporarily reducing or abating normal Impositions in return for substantially higher levels of Impositions at later dates.

## ARTICLE VIII

### OWNERSHIP OF THE HOTEL

8.01    Ownership of the Hotel

A.    Owner hereby covenants that it holds or will hold as of the Effective Date good and marketable fee simple title to the Site and that, upon completion of the Hotel, it will have, keep, and maintain good and marketable fee title to the Hotel free and clear of any and all liens, encumbrances or other charges, except as follows:

1.    easements or other encumbrances (other than those described in subsections 8.01.A.2 and 8.01.A.3 hereof) that do not adversely affect the operation of the Hotel by Manager and that are not prohibited pursuant to Section 8.03 of this Agreement;

2.    Secured Loans with respect to which a Non-Disturbance Agreement in favor of Manager has been executed and delivered;

3.    Mortgages that are given to secure a Qualified Loan

4.    liens for taxes, assessments, levies or other public charges not yet due or due but not yet payable.

B.    Owner shall pay and discharge, on or before the due date, any and all payments due under any Mortgage that Owner has entered into with respect to the Hotel. Owner shall indemnify, defend, and hold Manager harmless from and against all claims, Litigation and damages arising from the failure to make any such payments as and when required; and this obligation of Owner shall survive Termination.  Manager shall have no responsibility for payment of debt service due with respect to the Hotel, from Gross Revenues or otherwise and such responsibility shall be solely that of Owner.

C.    Owner covenants that Manager shall quietly hold, occupy and enjoy the Hotel throughout the Term hereof free from hindrance, ejection or molestation by Owner or other party claiming under, through or by right of Owner.  Owner agrees to pay and discharge any payments and charges and at its expense, to prosecute all appropriate actions, judicial or otherwise, necessary to assure such free and quiet occupation.

23

8.02    Subordination of Management Agreement

Excluding Manager's right to receive payment of the Base Management Fee, Incentive Management Fee, Accounting/Administration Fee, System Services Fee and Termination Fee, this Agreement and all of the rights and benefits of Manager hereunder are, and shall be subject and subordinate to any Qualified Loan(s) which now or hereafter encumber the Hotel. This subordination provision shall be self-operative and no other or further instrument of subordination shall be required; Manager agrees, however, upon request of any Qualified Lender, duly to execute and deliver any subordination agreement requested by such Qualified Lender to evidence and confirm the subordination effected under this Section 8.02. In no event shall this Agreement be subordinated to any mezzanine financing secured by Owner, or other non-Qualified Loan financing.

8.03    Non-Disturbance Agreement

Notwithstanding the provisions of Section 8.02, Owner agrees that, (1) prior to obtaining any Qualified Loan, it will exert all commercially reasonable good faith efforts to obtain from each prospective holder or holders thereof a Non-Disturbance Agreement in favor of Manager and (2) prior to obtaining any Secured Loan, it shall obtain from each prospective holder or holders thereof, a Non-Disturbance Agreement in favor of Manager all upon terms and conditions reasonably acceptable to Manager.

8.04    No Covenants, Conditions or Restrictions

A.    Owner covenants that during the Term of this Agreement, there will not be (unless Manager has given its prior written consent thereto, which shall not be unreasonably withheld or delayed) any covenants, conditions or restrictions, including reciprocal easement agreements or cost-sharing arrangements (collectively referred to as "**CC&R's**"), affecting the Site or the Hotel (i) which would prohibit or limit Manager from operating the Hotel in accordance with the requirements of the Franchise Agreement and this Agreement, including related amenities proposed for the Hotel; (ii) which would allow Hotel facilities (for example, parking spaces) to be used by persons other than guests, invitees or employees of the Hotel which have not been approved by Manager in writing, (iii) which would allow the Hotel facilities to be used for specified charges or rates which have not been approved by Manager in writing; or (iv) which would subject the Hotel to exclusive arrangements regarding food and beverage operation or retail merchandise.

B.    Unless otherwise agreed by both Owner and Manager, all financial obligations imposed on Owner or on the Hotel pursuant to any CC&Rs shall be paid by Owner from its own funds, and not from Gross Revenues or from the FF&E Reserve. Manager's consent to any such CC&R shall be conditioned (among other things) on satisfactory evidence that: (i) the CC&R in question provides a reasonable and cost effective benefit to the operation of the Hotel; (ii) the costs incurred (including administrative expenses) pursuant to such CC&R will be both reasonable and allocated to the Hotel on a reasonable basis; and (iii) no capital expenditures incurred pursuant to said

BA3/470422

CC&R will be paid from Gross Revenues or from the Reserve (but rather, such capital expenditures will be paid separately by Owner).

8.05   Liens; Credit

Manager and Owner shall use commercially reasonable efforts to prevent any liens from being filed against the Hotel which arise from any maintenance, repairs, alterations, improvements, renewals or replacements in or to the Hotel. Manager and Owner shall cooperate fully in obtaining the release of any such liens, and the cost thereof, if the lien was not occasioned by the fault of either party, shall be treated the same as the cost of the matter to which it relates. If the lien arises as a result of the fault of either party, then the party at fault shall bear the cost of obtaining the lien release. In no event shall either party borrow money in the name of or pledge the credit of the other.

ARTICLE IX

DEFAULTS

9.01   Default

Each of the following shall constitute a "Default," under this Agreement:

A.      The appointment of a receiver, trustee, or custodian for all or any substantial part of the property of Manager or Owner, as the case may be, if such appointment is not set aside or vacated within sixty (60) days.

B.      The commencement by Manager or Owner, as the case may be, of any voluntary case or proceeding under present or future federal bankruptcy laws or under any other bankruptcy, insolvency, or other laws respecting debtor's rights.

C.      The making of a general assignment by Manager or Owner, as the case may be, for the benefit of its creditors.

D.      The entry against Manager or Owner, as the case may be, or any "order for relief" or other judgment or decree by any court of competent jurisdiction in any involuntary proceeding against Manager or Owner, as the case may be, under any present or future federal bankruptcy laws or under any other bankruptcy, insolvency, or other laws respecting debtor's rights, if such order, judgment, or decree continues unstayed and in effect for a period of sixty (60) consecutive days.

E.      The failure of Manager or Owner, as the case may be, to make any payment to be made in accordance with the terms hereof, and the defaulting party fails to cure the default within twenty (20) days after receipt of written notice from the non-defaulting party demanding such cure.

F.     The failure of Owner to provide to Manager sufficient Working Capital to operate the Hotel as required by Article VII and Section 9.05 within ten (10) days after written notice from Manager of the need for such Working Capital.

G.     The failure of Manager or Owner, as the case may be, to perform, keep or fulfill any of the other covenants, undertakings, obligations, or conditions set forth in this Agreement, and the continuance of such default for a period of thirty (30) days after notice of said failure, or if such Default cannot be reasonably cured within said 30-day time period, the failure of the defaulting party to commence the cure of such Default within said 30-day period or thereafter the failure to diligently pursue such efforts to completion.

H.     The failure of Owner to complete the construction, furnishing and equipping of the Hotel substantially in accordance with the Plans approved by Franchisor under the Franchise Agreement, or alternatively, complete any and all work required under any property improvement plan under the Franchise Agreement and substantially in compliance with the terms and conditions of the Franchise Agreement and this Agreement.

I.     The failure of Owner to maintain any alcoholic beverage or catering license, if any, in full force and effect provided such failure is not the direct result of action of Manager.

9.02   Event of Default

Upon the occurrence of any Default by either party (referred to as the "defaulting party") under Section 9.01 A, B, C, D, H or I, such Default shall immediately and automatically, without the necessity of any notice to the defaulting party, constitute an "Event of Default" under this Agreement.  Upon the occurrence of any Default by a defaulting party under Section 9.01 E, F, or G, such Default shall constitute an "Event of Default" under this Agreement if the defaulting party fails to cure such Default within the respective cure or payment period (as specified in the applicable Paragraph) after written notice from the non-defaulting party specifying such Default and demanding such cure or payment; provided, however, that if a Default under Section 9.01.G is such that it cannot reasonably be cured within said 30-day period, an "Event of Default" shall then occur if the defaulting party fails to commence the cure of such Default within said thirty (30) day period of time or the Default has not been cured with sixty (60) days from the receipt of said written notice.

9.03   Remedies upon Event of Default

A.     Upon the occurrence of an Event of Default, the non-defaulting party shall have the right to pursue any one or more of the following courses of action:  (i) in the event of a material breach by the defaulting party of its obligations under this Agreement, to terminate this Agreement by written notice to the defaulting party, which Termination shall be effective as of the effective date which is set forth in said notice (provided that

BA3/470422

said effective date shall be at least thirty (30) days after the date of said notice; or, if the defaulting party is Manager, the foregoing thirty (30) days shall be extended to such period of time as may be necessary under applicable law pertaining to termination of employment); and (ii) to institute any and all proceedings permitted by law or equity, including, without limitation, actions for specific performance and/or damages. Upon the occurrence of a Default by either party under Section 9.01.E, the amount owed to the non-defaulting party shall accrue interest, at the Prime Rate plus three percent (3%), from and after the date on which such payment was originally due to the non-defaulting party. The rights granted hereunder shall not be in substitution for, but shall be in addition to, any and all rights and remedies available to the non-defaulting party by reason of applicable provisions of law or equity.

B.      Should there occur a Termination of this Agreement by Manager as a result of an Event of Default by an Initial Owner, and within two (2) years after such Termination Date, there occurs a Sale of the Hotel by such Initial Owner, such Initial Owner shall pay Manager the Priority Distribution Fee which would have been payable to Manager as a result of the Sale of the Hotel, as if such Termination had not occurred. The provisions of this Section 9.03 shall survive Termination.

ARTICLE X

ASSIGNMENT AND SALE

10.01   Assignment

A.      Manager shall not assign this Agreement, or delegate any of its responsibilities hereunder, without the prior written consent of Owner; provided, however, that Manager, shall have the right, without such consent, to  (1) assign its interest in this Agreement to any of its Affiliates; (2) lease shops or grant concessions at the Hotel as approved by Owner and more fully set forth in this Agreement, (3) assign its interest in this Agreement to a successor or purchaser in connection with a merger or consolidation or a sale of all or substantially all of the assets of Manager; provided in all cases that the Manager Guaranty remains in full force and effect and such assignment is permitted under the Franchise Agreement.

B.      Owner shall not assign or transfer its interest in this Agreement, without the prior written consent of Manager; provided, however, that Owner may assign this Agreement upon notice to Manager to any Affiliate of Owner but only if such Affiliate will own one hundred percent (100%) of the Hotel and such Affiliate meets all of the requirements of the Franchise Agreement relative to franchisor owners.

27

C.     Notwithstanding any provision contained in this Agreement, (i) the collateral assignment of this Agreement by Owner as security for any Mortgage securing a Qualified Loan or (ii) the transfer of this Agreement in connection with a merger or consolidation or a sale of all or substantially all of the assets of either party (provided that (x) if such transfer is by Owner in connection with a sale of all or substantially all of its assets, the provisions of Section 10.02.A shall be complied with, and (y) if such transfer is by Manager, such transfer is being done as part of a merger or consolidation or a sale of all or substantially all of the business which consists of Manager's managed hotels and the Manager Guaranty remains in full force and effect and such assignment is otherwise permitted under the Franchise Agreement, is permitted without the consent of the other party.

D.     If either party consents to an assignment of this Agreement by the other, no further assignment shall be made without the express consent in writing of such party, unless such assignment may otherwise be made without such consent pursuant to the terms of this Agreement.

E.     An assignment (either voluntarily or by operation of law) by Owner of its interest in this Agreement shall not relieve Owner from its obligations under this Agreement which accrued prior to the date of such assignment; Owner shall be relieved of such obligations accruing after such date, if the assignment complies with this Article X and if Manager has received an assumption agreement executed by the assignee in form and substance reasonably acceptable to Manager.

10.02   Sale of the Hotel

A.     Owner shall not enter into any Sale of the Hotel to any Person (or any Affiliate of any Person) who is known in the community as being of bad moral character, or has been convicted of a felony in any state or federal court, or is in control of or controlled by persons who have been convicted of felonies in any state or federal court, is ineligible due to misconduct to hold a alcoholic beverage license, or would be in violation of any Franchise Agreement requirements applicable to owners. Furthermore, Owner shall not enter into a Sale of the Hotel if Owner is at the time in Default, or has failed to cure such Default under the terms of this Agreement. Any Sale of the Hotel shall be subject to the continuing operation of this Agreement and upon such Sale of the Hotel, Owner shall require that such purchaser or tenant either take assignment of this Agreement by form of assignment and assumption agreement reasonably acceptable to Manager, or at the option of Manager, enter into a new management agreement with Manager, which new management agreement will be on all of the terms and conditions of this Agreement except that the Initial Term and Renewal Term(s) of any such new agreement shall consist only of the balance of the Initial Term and Renewal Term(s) remaining under this Agreement at the time of execution of any such new agreement. Such new management agreement shall be executed by Manager and such new owner at the time of closing of the Sale of the Hotel, and a memorandum of such new management agreement shall be executed by the parties and recorded immediately following recording

28

of the deed or memorandum of lease or assignment and prior to recordation of any other documents.

B.     It is understood that no Sale of the Hotel (which is otherwise in compliance with the provisions of this Article X) shall reduce or otherwise affect: (i) the current level of Working Capital; (ii) the current amount deposited in the FF&E Reserve; (iii) any of the Operating Accounts maintained by Manager pursuant to this Agreement; or (iv) the amount of Owner's Additional Capital Investment. If, in connection with any Sale of the Hotel, the selling Owner intends to withdraw, for its own use, any of the cash deposits described in the preceding sentence, the selling Owner must obtain the contractual obligation of the buying Owner to replenish those deposits (in the identical amounts) simultaneously with such withdrawal.     The selling Owner is hereby contractually obligated to Manager to ensure that such replenishment in fact occurs. The obligations described in this Section 10.02.B shall survive such Sale of the Hotel and shall survive Termination.

C.     It is further understood that, unless Manager otherwise agrees with the new owner of the Hotel, no Sale of the Hotel by an Initial Owner (which is otherwise in compliance with the provisions of this Article X) shall occur unless in connection with the Closing on such Sale of the Hotel (i) the Manager Guaranty is terminated and Manager's obligations thereunder are released by Franchisor, (ii) to the extent required by Franchisor, a guaranty that fulfills the requirements of the Franchise Agreement is executed by a party other than Manager and delivered to Franchisor, and (iii) Manager is paid its Priority Distribution Fee; following termination of the Manager's Guaranty, Manager's right under this Agreement to receive the Guaranty Management Fee and Priority Distribution Fee shall terminate.

ARTICLE XI

MISCELLANEOUS

11.01   Right to Make Agreement

Each party warrants, with respect to itself, that neither the execution of the Agreement nor the finalization of the transactions contemplated hereby shall violate any provision of law or judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, other commitment or restriction to which it is a party or by which it is bound; or, subject to Section 11.17 of this Agreement, require any consent, vote or approval which has not been taken, or at the time of the transaction involved shall not have been given or taken. Each party covenants that it has and will continue to have throughout the Term of the Agreement and any extensions thereof, the full right to enter into the Agreement and perform its obligations hereunder.

11.02   Consents and Cooperation

29

Wherever in the Agreement the consent or approval of Owner or Manager is required, such consent or approval shall not be unreasonably withheld, delayed or conditioned, except as otherwise provided herein, and shall be in writing and shall be executed by a duly authorized officer or agent of the party granting such consent or approval. If either Owner or Manager fails to respond within thirty (30) days to a request by the other party for a consent or approval, such consent or approval shall be deemed to have been given (except as otherwise provided in this Agreement). Additionally, Owner agrees to cooperate with Manager by considering any leases, subleases, licenses, concessions, equipment leases, service contracts and other agreements negotiated in good faith by Manager and pertaining to the Hotel that, in Manager's reasonable judgment, should be made in the name of the Owner of the Hotel.

11.03   Relationship

A.      In the performance of this Agreement, Manager shall act solely as an independent contractor.   Neither this Agreement nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted deemed or construed as making Manager a partner, joint venturer with, or agent of, Owner; provided, however, that the parties acknowledge that the relationship created by this Agreement shall constitute an agency coupled with an interest except as expressly provided herein.  Owner and Manager agree that neither party will make any contrary assertion, claim or counterclaim in any action, suit, arbitration, or other legal proceedings involving Owner and Manager.

B.      TO THE EXTENT ANY FIDUCIARY DUTIES ARE INCONSISTENT WITH, OR WOULD HAVE THE EFFECT OF MODIFYING, LIMITING OR RESTRICTING, THE EXPRESS PROVISIONS OF THIS AGREEMENT:  (A) THE TERMS OF THIS AGREEMENT SHALL PREVAIL; (B) THIS AGREEMENT SHALL BE INTERPRETED IN ACCORDANCE WITH GENERAL PRINCIPLES OF CONTRACT INTERPRETATION WITHOUT REGARD TO THE COMMON LAW PRINCIPLES OF AGENCY (EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT); AND (C) ANY LIABILITY BETWEEN THE PARTIES SHALL BE BASED SOLELY ON PRINCIPLES OF CONTRACT LAW AND THE EXPRESS FIDUCIARY DUTIES AND OBLIGATIONS UNDER THIS AGREEMENT.   THE PARTIES ACKNOWLEDGE THAT THE TERMS AND PROVISIONS OF THIS AGREEMENT AND THE DUTIES AND OBLIGATIONS SET FORTH HEREIN, ARE INTENDED TO SATISFY THE FIDUCIARY DUTIES WHICH MAY EXIST AS A RESULT OF THE RELATIONSHIP BETWEEN THE PARTIES, INCLUDING WITHOUT LIMITATION ALL DUTIES OF LOYALTY, GOOD FAITH, FAIR DEALING, FULL DISCLOSURE OR ANY OTHER DUTY DEEMED TO EXIST UNDER THE COMMON LAW PRINCIPLES OF AGENCY OR OTHERWISE.

THE     PARTIES     HEREBY     UNCONDITIONALLY     AND IRREVOCABLY WAIVE AND RELEASE ANY RIGHT, POWER OR PRIVILEGE EITHER MAY HAVE TO CLAIM OR RECEIVE FROM THE OTHER PARTY ANY PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES OR ANY

30

INCIDENTAL OR CONSEQUENTIAL DAMAGES WITH RESPECT TO ANY BREACH OF FIDUCIARY DUTIES.

### 11.04   Applicable Law

The Agreement shall be construed under and shall be governed by the laws of the State in which the Hotel is located.

### 11.05   Recordation

The terms and provisions of the Agreement shall run with the parcel of land designated as the Site, and with Owner's interest therein, and shall be binding upon all successors to such interest. Simultaneously with the execution of this Agreement, the parties shall execute a recordable "Memorandum of Management Agreement," in the form which is attached hereto as **Exhibit B**. Such memorandum shall be recorded or registered promptly following the Effective Date in the jurisdiction in which the Hotel is located. Any cost of such recordation shall be reimbursed from Gross Revenues, and treated as a Deduction.

### 11.06   Headings

Headings of articles and sections are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular articles or sections to which they refer.

### 11.07   Notices

Notices, statements and other communications to be given under the terms of the Agreement shall be in writing and delivered by hand against receipt or sent by certified or registered mail or Express Mail service, postage prepaid, return receipt requested or by nationally utilized overnight delivery service, addressed to the parties as set forth on Schedule 1 or at such other address as is from, time to time designated by the party receiving the notice. Any such notice that is mailed in accordance herewith shall be deemed received when delivery is received or refused, as the case may be. Additionally, notices may be given by telephone facsimile transmission, provided that an original copy of said transmission shall be delivered to the addressee by nationally utilized overnight delivery service by no later than the second business day following such transmission. Telephone facsimiles shall be deemed delivered on the date of such transmission

### 11.08   Environmental Matters

A.     Owner hereby represents and warrants to Manager, to the best of its knowledge, that, as of the Effective Date, there are no Hazardous Materials (as defined below) on any portion of the Site or the Hotel, nor have any Hazardous Materials been released or discharged on any portion of the Site or the Hotel. In addition, Owner hereby represents and warrants that it has previously or will prior to the Effective Date deliver to

31

Manager copies of all reports concerning environmental conditions which have been received by Owner or any of its Affiliates. In the event of the discovery of Hazardous Materials on any portion of the Site or in the Hotel during the Term, Owner shall promptly remove such Hazardous Materials, together with all contaminated soil and containers, and shall otherwise remedy the problem in accordance with (1) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as amended; (2) the regulations promulgated thereunder, from time to time; (3) all federal, state and local laws, rules and regulations (now or hereafter in effect) dealing with the use, generation, treatment, storage, disposal or abatement of Hazardous Materials; and (4) the regulations promulgated thereunder, from time to time (collectively referred to as "**Environmental Laws**"). Except to the extent caused directly by Manager's gross mismanagement of its employees or agents, Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including, without limitation, engineers' and attorneys' fees and expenses, and the cost of Litigation) arising from the presence of Hazardous Materials on the Site or in the Hotel; and this obligation of Owner shall survive Termination. "Hazardous Materials" shall mean and include any substance or material containing one or more of any of the following: "hazardous material," "hazardous waste," "hazardous substance," "regulated substance," "petroleum," "pollutant," "contaminant," "polychlorinated biphenyls," "lead or lead based paint" or "asbestos" as such terms are defined in any applicable Environmental Law in such concentration(s) or amount(s) as may impose cleanup, removal, monitoring or other responsibility under the Environmental Laws, as the same may be amended from time to time, or which may present a significant risk of harm to guests, invitees or employees of the Hotel.

B.     All costs and expenses of the aforesaid removal of Hazardous Materials from the Site or the Hotel, and of the aforesaid compliance with all Environmental Laws, and any amounts paid to Manager pursuant to the indemnity set forth in Section 11.08.A., shall be paid by Owner from its own funds, and not from Gross Revenues or from the Reserve.

11.09   Confidentiality

A.     The parties hereto agree that the matters set forth in this Agreement and all statements, reports, projections, and other information relating to the operation of the Hotel are strictly confidential and each party will make every effort to ensure that the information is not disclosed to any outside person or entities (including the press) without the prior written consent of the other party except as may be required by law and as may be reasonably necessary to obtain licenses, permits, and other public approvals necessary for the refurbishment or operation of the Hotel, or except when it may be required by other contracts and agreements entered into by either of the parties hereto in connection with the construction, operation and maintenance of the Hotel, or in connection with Owner's financing of the Hotel, a Sale of the Hotel, or a sale of a controlling interest in Owner or Manager (except any financing or sale involving a private or public offering of securities) or otherwise as is reasonably necessary in the ordinary course of business of the operation of the Hotel.

32

B.     No reference to Manager or to any Affiliate will be made in any prospectus, private placement memorandum, offering circular or offering documentation related thereto (collectively referred to as the "Prospectus"), issued by Owner or by one of Owner's Affiliates, which is designated to interest potential investors in debt or equity securities related to the Hotel, unless Manager has previously received a copy of all such references. However, regardless of whether Manager does or does not so receive a copy of all such references, neither Manager nor any Affiliate will be deemed a sponsor of the offering described in the Prospectus, nor will it have any responsibility for the Prospectus, and the Prospectus will so state. Unless Manager agrees in advance, the Prospectus will not include any trademark, symbols, logos or designs of Manager or any Affiliates. Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability and damage (including attorneys' fees and expenses, and the cost of litigation) arising out of any Prospectus or the offering described therein; and this obligation of Owner shall survive Termination of this Agreement.

11.10   Projections

Owner acknowledges that any written or oral projections, proformas, or other similar information that has been, (prior to execution of this Agreement) or will (during the Term of this Agreement) be provided by Manager to Owner is for information purposes only and that Manager does not guarantee that the Hotel will achieve the results set forth in any such projections, proformas, or other similar information. Any such projections, proformas, or other similar information are based on assumptions and estimates. Unanticipated events may occur subsequent to the date of preparation of such projections, proformas, and other similar information. Therefore, the actual results achieved by the Hotel are likely to vary from the estimates contained in any such projections, proformas, or other similar information and such variations might be material.

11.11   Actions to be Taken Upon Termination

Upon a Termination of this Agreement, the following shall be applicable:

A.     Manager shall, within ninety (90) days after Termination of this Agreement, prepare and deliver to Owner a final accounting statement with respect to the Hotel, as more particularly described in Section 4.01 hereof, along with a statement of any sums due either party to the other pursuant hereto, dated as of the date of Termination. Within thirty (30) days after the receipt by Owner of such final accounting, the parties will make whatever cash adjustments are necessary pursuant to such final statement. The cost of preparing such final accounting statement shall be a Deduction, unless the Termination occurs as a result of an Event of Default by either party, in which case the defaulting party shall pay such cost. Manager and Owner acknowledge that there may be certain adjustments for which the information will not be available at the time of the final accounting and the parties agree to readjust such amounts and make the

33

necessary cash adjustments when such information becomes available; provided, however, that all accounts shall be deemed final as of one hundred eighty (180) days after the date of Termination.

B.     Manager shall immediately release and transfer to Owner any of Owner's funds which are held or controlled by Manager with respect to the Hotel with the exception of funds to be held in escrow pursuant to Sections 6.01.F and 11.11.F and otherwise in accordance herewith.

C.     Manager shall make available to Owner the relevant books and records of Manager relating to the operation and management of the Hotel as will be needed by Owner to prepare the accounting statements, in accordance with the Uniform System of Accounts, for the Hotel for the year in which Termination occurs and for any subsequent year.

D.     Manager shall (to the extent permitted by law) assign to Owner or to the new manager all operating licenses and permits for the Hotel which have been issued in Manager's name (including alcoholic beverage and restaurant licenses, if any); provided that if Manager has expended any of its own funds in the acquisition of any of such licenses or permits, Owner shall reimburse Manager thereof if it has not done so already.

E.     Any computer software (including upgrades and replacements) at the Hotel owned by Manager or an Affiliate of Manager, or the licensor of any of them is proprietary to Manager or such Affiliate, or the licensor of any of them and shall in all events remain the exclusive property of Manager or its Affiliate or the licensor of any of them, as the case may be, and nothing contained in this Agreement shall confer on Owner the right to use any of such software, except for all such computer software which was either purchased by Owner or was purchased by Manager with the cost of such purchase being paid exclusively from Gross Revenues of the Hotel (the "**Owner's Software**"), all of which software shall remain the property of Owner, and shall remain on the site after Termination.     Manager shall have the right to remove from the Hotel without compensation to Owner any computer software (including upgrades and replacements), including, without limitation, the System Services software, owned by Manager or its Affiliate or the licensor of any of them, except for Owner's Software. Furthermore, upon Termination, Manager shall be entitled to remove from the Hotel any computer equipment which is owned by Manager or its Affiliate or the licensor of any of them.

F.     If this Agreement is terminated for any reason, other than a Termination by reason of an Event of Default of Manager hereunder, an escrow fund shall be established from Gross Revenues to reimburse Manager for all reasonable and necessary costs and expenses incurred by Manager in terminating its employees at the Hotel, such as commercially reasonable severance pay, unemployment compensation, employment relocation, and other employee liability costs arising out of the termination of employment of Managers employees at the Hotel. If Gross Revenues are insufficient to meet the requirements of such escrow fund, then Owner shall deliver to Manager, within ten (10) days after receipt of Managers written request therefor, the sums necessary to

establish such escrow fund; and if Owner fails to timely deliver such sums to Manager, Manager shall have the right (without affecting Managers other remedies under this Agreement) to withdraw the amount of such expenses from the FF&E Reserve, the Working Capital funds or any other funds of Owner held by or under the control of Manager.

G.     If this Agreement is terminated in accordance with its terms for any reason other than (1) an Event of Default by Manager or (2) expiration of the Term, then Owner shall, within ten (10) days after Manager's request therefor, pay to Manager the Termination Fee set forth in Schedule 1. If this Agreement is terminated as a result of an Event of Default by an Initial Owner, then such Initial Owner shall, within ten (10) days after Manager's request therefor, pay to Manager, Manager's Guaranty Advances in addition to any other amounts due Manager under this Agreement. If Owner fails to pay the Termination Fee and/or Initial Owner fails to pay Manager's Guaranty Advances within the time period set forth herein, then Manager shall have the right (without affecting Manager's other remedies under this Agreement) to withhold the amount of such Termination Fee and Manager's Guaranty Advances from the Operating Accounts, the FF&E Reserve, the Working Capital funds or any other funds of Owner held by or under the control of Manager. The Termination Fee is agreed to be fair and equitable compensation for Manager's lost revenue and not as a penalty. Notwithstanding any provision of this Agreement to the contrary, in the event Manager elects to terminate this Agreement as a result of an Event of Default by Owner, Manager may, at its option and in its sole and absolute discretion, elect to recover the Termination Fee as liquidated damages for that part of its damage claim constituting lost revenues as a result of such Termination. In no event shall the provisions of this Section 11.11.G be construed as granting Owner the right to terminate this Agreement.

H.     Owner shall use its reasonable efforts to cause the entity which shall succeed Manager as the operator of the Hotel to hire a sufficient number of the employees at the Hotel to avoid the occurrence, in connection with such Termination, of a "closing" under the WARN Act.

I.     Various other actions shall be taken, as described in this Agreement, including, but not limited to, the actions described in Sections 4.05 and 6.01.F.

J.     Manager shall peacefully vacate and surrender the Hotel to Owner and shall cooperate with the Owner and with the new manager to ensure the proper and efficient transition of the Hotel's operation and management.

The provisions of this Section 11.11 shall survive Termination.

BA3/470422

11.12   Trademarks, Trade Names and Service Mark

A.     The name "White Lodging Services Corporation," or "White Lodging" or "WLS" when used alone or in connection with another word or words (collectively, "**Trade Names**"), and the White Lodging trademarks, service marks, other trade names, symbols, logos and designs shall in all events remain the exclusive property of Manager or its Affiliates, and nothing contained in this Agreement shall confer on Owner the right to use any of the Trade Names, or the White Lodging trademarks, service marks, other trade names, symbols, logos or designs otherwise than in strict accordance with the terms of this Agreement.

B.     All Intellectual Property shall at all times be proprietary to Manager or its Affiliates, and shall be the exclusive property of Manager or its Affiliates.  During the Term of this Agreement, Manager shall be entitled to take all reasonable steps to ensure that the Intellectual Property remains confidential and is not disclosed to anyone other than Manager's employees at the Hotel.  Upon Termination, all Intellectual Property shall be removed from the Hotel by Manager, without compensation to Owner, subject to the provisions of Section 11.11.E regarding Software.

C.     Breach of Covenants.  Owner and Manager shall each be entitled, in case of any breach by the other party of any of the covenants of this Section 11.12, to injunctive relief and to any other right or remedy available at law.  The provisions of this Section 11.12 shall survive Termination.

11.13   Competing Facilities

Neither this Agreement nor anything implied by the relationship between Manager and Owner shall prohibit Manager or its Affiliates from constructing, operating, developing, owning, promoting, and/or authorizing others to construct, operate, develop, own or market one or more hotels, lodging concepts, time-share facilities, restaurants, or other business operations of any type, at any location, including a location proximate to the Site.  Owner acknowledges, accepts and agrees further that Manager retains the right, from time to time, to construct, operate, develop and/or own, or promote or acquire, or authorize or otherwise license others to construct, operate, develop and/or own, or promote or acquire any hotels, lodging concepts or products, restaurants or other business operations of any type whatsoever, including, but not by way of limitation, those listed above, at any location including one or more sites which may be adjacent, adjoining or proximate to the Site, which business operations may be in direct competition with the Hotel and that any such exercise may adversely affect the operation of the Hotel.

11.14   Waiver

The failure of either party to insist upon a strict performance of any of the terms or provisions of the Agreement, or to exercise any option, right or remedy contained in this Agreement, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in

36

full force and effect. No waiver by either party of any term or provision hereof shall be deemed to have been made unless expressed in writing and signed by such party.

11.15    Partial Invalidity

If any portion of any term or provision of this Agreement, or the application thereof to any person or circumstance shall be invalid or unenforceable, at any time or to any extent, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

11.16    Survival

Except as otherwise specifically provided in this Agreement, the rights and obligations of the parties herein shall not survive any Termination.

11.17    Affiliates

Subject to the terms and conditions of this Agreement, Manager shall be entitled to contract with one or more of its Affiliates to provide goods and/or services to the Hotel, provided that the prices and/or fees paid to any such Affiliate are competitive with the prices and/or fees which would be charged by reputable and qualified parties which are not Affiliates of Manager for similar goods and/or services (an "**Affiliate Contract**"). The prices and/or fees paid to its Affiliates may include overhead and the allowance of a reasonable return customary for the goods and/or services to be provided. In determining, pursuant to the foregoing, whether such prices and/or fees are competitive, the goods and/or services which are being purchased shall be grouped in reasonable categories, rather than being compared item by item. Affiliates shall pass through to Owner all discounts, rebates and other purchasing benefits it receives in connection with the goods and services furnished to the Hotel. In advance of entering into an Affiliate Contract, Manager shall disclose the proposed Affiliate Contract to Owner for the purpose of obtaining Owner's prior written consent thereto. If Owner fails to respond to the request for consent within fifteen (15) days following delivery of the request, Owner shall be deemed to have consented to the Affiliate Contract.

11.18    Negotiation of Agreement

Owner and Manager are both business entities having substantial experience with the subject matter of this Agreement, and each has fully participated in the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be construed without regard to the rule that ambiguities in a document are to be construed against the draftsman. No inferences shall be drawn from the fact that the final, duly executed Agreement differs in any respect from any previous draft hereof.

11.19    Estoppel Certificates

37

Each party to this Agreement shall at any time and from time to time, upon not less than fifteen (15) days' prior notice from the other party, execute, acknowledge and deliver to such other party, or to any third party specified by such other party, a statement in writing: (a) certifying that this Agreement is unmodified and in full force and effect (or if there have been modifications, that the same, as modified, is in full force and effect and stating the modifications); and (b) stating to the best knowledge of the certifying party (i) whether or not there is a continuing Event of Default by the non-certifying party (or any event that, with the giving of notice, the lapse of time or both would constitute an Event of Default) in the performance or observance of any covenant, agreement or condition contained in this Agreement, (ii) the amount, if any, of any past due fees or other past due amounts owed to Manager or Owner; and (iii) whether or not there are any past due and unpaid obligations with respect to the Hotel, other than in the ordinary course of business. Such statement shall be binding upon the certifying party and may be relied upon by the non-certifying party and/or such third party specified by the non-certifying party as aforesaid. In addition, upon written request after a Termination, each party agrees to execute and deliver to the non-certifying party and to any such third party a statement certifying that this Agreement has been terminated. This provision shall survive Termination.

### 11.20   Entire Agreement

This Agreement including all Schedules and Exhibits, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be amended only by a written instrument that has been duly executed by the signature of an authorized representative of the parties hereto.

### 11.21   Expert Decisions

Where a matter is to be referred to an Expert for determination, the following provisions shall apply to such Expert's determination:

A.       Resolution of the matter or dispute referred to the Expert for resolution (the "**Expert Resolution Process**") shall be the sole and exclusive remedy available to the parties with respect to such matter or dispute. Absent manifest error, the decision of the Expert shall be final and binding on the parties and shall not be capable of challenge, whether by arbitration, in court or otherwise. The failure of either party to adhere to the decision of the Expert shall constitute a Default hereunder.

B.       The parties will observe in all respects, the terms and provisions of this Section 11.21 and any attempt to circumvent the terms shall be null and void. Upon the occurrence of a matter to be referred to the Expert (an "**Expert Resolution Dispute**"), either party may notify the other that a matter or dispute exists and in the event that the parties have been unable to resolve such matter or dispute within thirty (30) days, either party may give notice ("**Expert Notice**") to the other party of submission of such dispute to the Expert Resolution Process set forth herein.

38

C.     For purposes of this Section 11.21, the term "**Expert**" shall mean an individual employed by an independent, nationally recognized hotel consulting firm who is qualified to resolve the issue in question, having at least ten (10) years experience in the subject matters in question. The Expert shall be appointed in each instance by agreement of the parties or, failing agreement, each party shall select one (1) such individual and the two (2) individuals so selected shall select another qualified individual to be the Expert. Each party agrees that it shall not appoint an individual as an Expert hereunder if the individual is, as of the date of appointment or within three (3) years prior to such date, employed by such party, either directly or as a consultant, in connection with any matter.

D.     In the event that either party calls for an Expert determination pursuant to the terms hereof, the parties shall have ten (10) days from the date of delivery of the Expert Notice to agree upon an Expert and, if they fail to agree, each party shall have an additional ten (10) days to make its respective selection of a qualified individual, and within ten (10) days of such respective selections, the two individuals so selected shall select another qualified individual to be the Expert. If either party fails to make its respective selection of a firm or individual within the ten (10) day period provided for above, then the other party's selection shall be the Expert. If the two (2) individuals so selected shall fail to select a third qualified individual to be the Expert, then such Expert shall be appointed by the American Arbitration Association.

E.     Each party shall be entitled to make written submissions to the Expert, and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission provided such submissions are made within thirty (30) days of selection of the Expert(s) (the "**Submissions Period**"). The parties shall make available to the Expert all books and records relating to the issue in dispute and shall render to the Expert any assistance requested of the parties. Unless otherwise provided for herein, the cost of the Expert and the proceedings shall be borne by as directed by the Expert; provided, however, the prevailing party in such proceeding, as determined by the Expert, shall be entitled to recover its costs, including reasonable attorneys' fees, in connection with such proceeding. The Expert may direct that such cost be treated as a Deduction.

F.     The terms of engagement of the Expert shall include an obligation on the part of the Expert to: (i) notify the parties in writing of the Expert's decision within forty-five (45) days after the expiration of the Submissions Period (or such other period as the parties may agree or as set forth herein); (ii) apply the standards applicable to first-class hotels and in all events, consistent with the requirements of the Franchise Agreement; and (iii) establish a timetable within such 45 day period for the making of further submissions and replies, as appropriate or necessary.

G.     No party, or anyone acting on its behalf, shall have *ex parte* communications with any Expert concerning any matter of substance relating to the matter at issue.

H.    All aspects of the Expert Resolution Process shall be treated as confidential.

11.22   Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same instrument.  Such executed counterparts may be delivered by facsimile which, upon transmission to the other party, shall have the same force and effect as delivery of the original signed counterpart.  The submission of an unsigned copy of this Agreement or an electronic instrument with or without electronic signature to either party shall not constitute an offer or acceptance.

11.23   Waiver of Jury Trial and Punitive Damages

Owner and Manager each hereby absolutely, irrevocably and unconditionally waive trial by jury and the right to claim punitive damages in any Litigation, arising out of or pertaining to this Agreement or any other agreement, instrument or document entered into in connection herewith.

ARTICLE XII

[Intentionally Deleted]

ARTICLE XIII

DEFINITION OF TERMS

13.01   Definition of Terms

The following terms when used in the Agreement shall have the meanings indicated:

"**Accounting/Administration Fee**" shall have the meaning ascribed to it in Schedule 1.

"**Accounting Period**" shall mean each of the twelve (12) calendar month accounting periods used by Manager for the Hotel pursuant to generally accepted accounting principles.

"**Accounting Period Statement**" shall have the meaning set forth in Section 4.01.A.

"**Additional Advances**" shall mean either (a) out-of-pocket advances made by Owner from time to time to supplement Working Capital (not otherwise funded from Gross Revenues) in excess of the (i) Initial Working Capital as required pursuant to the

40

terms and conditions of this Agreement, and (ii) any contingency and key money remaining available under Exhibit D, or (b) payments or advances made from time to time by Manager pursuant to the terms and conditions of the Manager Guaranty.

"**Affiliate(s)**" shall mean, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, of the power to vote more than 50% of the voting stock of such Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock, by contract or otherwise.

"**Affiliate Contract**" shall have the meaning ascribed to it in Section 11.17.

"**Agreement**" shall mean this Management Agreement between Owner and Manager, including the exhibits attached hereto.

"**Annual Operating Budget**" shall have the meaning ascribed to it in Section 4.04.

"**Available Cash Flow**" shall mean an amount, with respect to each Fiscal Year or portion thereof during the Term of this Agreement, equal to the excess, if any, of the Operating Profit over the Owner's Priority.

"**Base Management Fees**" shall mean an amount payable to Manager as a Deduction from Gross Revenues equal to the percentage of Gross Revenues shown in Schedule 1 for each Fiscal Year or portion thereof.

"**Building Estimate**" shall have the meaning ascribed to it in Section 5.03.

"**Capital Expenditures**" shall have the meaning set forth in Section 5.03.A.

"**CC&R's**" shall have the meaning ascribed to it in Section 8.04.

"**Competitive Set**" shall mean the group of hotels which are generally within the same hotel market segment as the Hotel. The initial Competitive Set is identified on Schedule 1 attached hereto and made a part hereof. If any such hotels, subsequent to the Effective Date, either changes its chain affiliation or ceases to operate or otherwise ceases to reflect the general criteria set forth in the first sentence of this definition, the Competitive Set shall be changed at the request of either Owner or Manager and approval of both parties so that it continues to satisfy the criteria set forth in the first sentence of this definition. If the parties fail to reach agreement on any proposed change, such matter shall be referred to the Expert.

"**CPI**" shall mean the Consumer Price Index, Urban Workers for Chicago, Illinois [1982-84=100] as published by the Bureau of Labor Statistics of the United States

Department of Labor. If such CPI is discontinued in the future, or ceases (in the reasonable opinion of Owner or Manager) to be a satisfactory source of such data, Manager shall select an alternative source, subject to Owner's approval. If the parties fail to agree on such alternative source within a reasonable period of time, the matter shall be resolved by the Expert Resolution Process. Such alternative source shall thereafter be referred to as the CPI.

"**Deductions**" shall have the meaning ascribed to it in the definition of Operating Profit.

"**Default**" shall have the meaning ascribed to it in Section 9.01.

"**Deficit Amount**" shall have the meaning ascribed to it in Section 2.02.

"**Effective Date**" shall have the meaning ascribed to it in Schedule 1.

"**Environmental Laws**" shall have the meaning ascribed to it in Section 11.08.

"**Event of Default**" shall have the meaning ascribed to it in Section 9.01.

"**Expert**" shall have the meaning ascribed to it in Section 11.21.C.

"**Expert Notice**" shall have the meaning ascribed to it in Section 11.21.

"**Expert Resolution Dispute**" shall have the meaning ascribed to it in Section 11.21.

"**Expert Resolution Process**" shall have the meaning ascribed to it in Section 11.21.

"**Expiration Date of the Initial Term**" shall have the meaning ascribed to it in Schedule 1.

"**Fair Market Value**" shall mean the fair market value of the Hotel as reasonably determined by Owner and Manager. If Owner and Manager cannot agree on the Fair Market Value, Fair Market Value shall be determined through the Expert Resolution Process.

"**FF&E**" shall mean furniture, furnishings, fixtures, kitchen appliances, signage, audio-visual equipment, vehicles, carpeting and equipment, including front desk and back-of-the house computer equipment, but shall not include Fixed Asset Supplies or any computer software of any type (including upgrades and replacements) owned by Manager, an Affiliate of Manager, or the licensor of any of them, except for Owner's Software, as defined in Section 11.11E, which shall be included in FF&E.

"**FE&E Estimate**" shall have the meaning ascribed to it in Section 5.02.C.

42

"**FF&E Reserve**" shall have the meaning ascribed to it in Section 5.02.A.

"**Fiscal Year**" shall mean Manager's Fiscal Year which as of the Effective Date ends at midnight on December 31 in each calendar year; the new Fiscal Year begins on January 1 immediately following. Any partial Fiscal Year between the Effective Date and the commencement of the first full Fiscal Year shall constitute a separate Fiscal Year but shall not be considered to be the "first Fiscal Year". A partial Fiscal Year between the end of the last full Fiscal Year and the Termination of this Agreement shall also constitute a separate Fiscal Year. If Manager's Fiscal Year is changed in the future, appropriate adjustment to this Agreement's reporting and accounting procedures shall be made; provided, however, that no such change or adjustment shall alter the Term of this Agreement or in any way reduce the distributions of Operating Profit or other payments due hereunder.

"**Fixed Asset Supplies**" shall mean items included within "Property and Equipment" under the Uniform System of Accounts including, but not limited to, linen, china, glassware, tableware, uniforms, and similar items, whether used in connection with public space or Guest Rooms.

"**Force Majeure**" shall mean acts of God, acts of war, civil disturbance, governmental action (including the revocation or refusal to grant licenses or permits, where such revocation or refusal is not due to the fault of the party whose performance is to be excused for reasons of Force Majeure), road closures, strikes, lockouts, fire, unavoidable casualties or any other causes beyond the reasonable control of either party (excluding, however, lack of financing).

"**Foreclosure**" shall mean any exercise of the remedies available to a Mortgagee, upon a default under the Mortgage held by such Mortgagee, which results in a transfer of title to or possession of the Hotel. The term "Foreclosure" shall include, without limitation, any one or more of the following events, if they occur in connection with a default under a Mortgage: (i) a transfer by judicial foreclosure; (ii) a transfer by deed in lieu of foreclosure; (iii) the appointment by a court of a receiver to assume possession of the Hotel; (iv) a transfer of either ownership or control of the Owner, by exercise of a stock pledge or otherwise; (v) if title to the Hotel is held by Owner, as tenant under a ground lease, an assignment of the tenant's interest in such ground lease; or (vi) any similar judicial or non-judicial exercise of the remedies held by the Mortgagee.

"**Franchise Agreement**" shall mean the franchise agreement described in Schedule 1 attached hereto and made a part hereof, as the same may be amended or supplemented from time to time subject to the terms of this Agreement.

"**Franchisor**" shall mean the franchisor identified in Schedule 1.

"**Gross Revenues**" shall mean all revenues and receipts of every kind derived from operating the Hotel and all departments and parts thereof, including, but not limited

43

to: income (from both cash and credit transactions) from the rental of Guest Rooms, telephone charges, stores, offices, exhibit or sales space of every kind; license, lease and concession fees and rentals (not including gross receipts of licensees, lessees and concessionaires); income from vending machines; income from parking; health club membership fees; food and beverage sales; wholesale and retail sales of merchandise; service charges; and proceeds, if any, from business interruption or other loss of income insurance; *provided, however, that Gross Revenues shall not include the following:* gratuities to employees of the Hotel; federal, state or municipal excise, sales or use taxes or any other taxes collected directly from patrons or guests or included as part of the sales price of any goods or services; proceeds from the sale of FF&E; interest received or accrued with respect to the funds in the FF&E Reserve or the other operating accounts of the Hotel; any refunds, rebates, discounts and credits of a similar nature, given, paid or returned in the course of obtaining Gross Revenues or components thereof, provided that all such rebates, refunds, discounts and credits shall be credited to the benefit of Owner; insurance proceeds (other than proceeds from business interruption or other loss of income insurance); condemnation proceeds (other than for a temporary taking); or any proceeds from any Sale of the Hotel or from the refinancing of any debt encumbering the Hotel.

"**Guaranty Management Fee**" shall mean an amount payable to Manager, pursuant to Sections 3.03 and 4.01 that is equal to the percentage set forth in **Schedule 1** multiplied by Net Profit. "**Net Profit**" shall mean a dollar amount equal to Operating Profit less (1) the Incentive Management Fee paid to Manager, if applicable, (2) reasonable and necessary administrative costs and expenses of Owner relating to the Hotel, including out of pocket tax preparation, accounting and legal expenses, and if to an Owner's affiliate with fees and performance competitive with those of reputable and qualified parties for similar goods and services, and (3) annual debt service paid under any Qualified Loans for the Fiscal Year in question. Consistent with the provisions of Section 3.02 regarding proration, for purposes of calculating the Guaranty Management Fee payable in any one Accounting Period, the annual debt service will be prorated as well. Notwithstanding anything herein to the contrary, the Guaranty Management Fee shall only be payable with respect to any full or partial Accounting Period during which the Manager Guaranty is in effect and to the extent Owner determines to make a distribution of Net Profit to Owner. Manager acknowledges and agrees that Owner has the right, in its sole discretion, to determine if and when to distribute Net Profit. Manager further acknowledges and agrees that Owner, in its sole discretion, may use Net Profit from time to time to reduce the principal balance of Qualified Loans or fund reasonable reserves relating to the financing, operation and maintenance of the Hotel. If and to the extent Owner determines to make a distribution of Net Profit in any given Fiscal Year, Owner shall pay Manager a portion of such Net Profit equal to the Guaranty Management Fee.

"**Guest Room**" shall mean a lodging unit in the Hotel.

"**Hazardous Materials**" shall have the meaning ascribed to it in Section 11.08.

BA3/470422

"**Hotel**" shall mean the Site together with the following: (i) the Improvements, parking garage and all other Improvements constructed or to be constructed on the Site pursuant to this Agreement; (ii) all FF&E, Fixed Asset Supplies and Inventories installed or located on the Site or in the Improvements; and (iii) all easements or other appurtenant rights thereto.

"**Impositions**" shall have the meaning ascribed to it in Section 7.01.

"**Improvements**" shall have the meaning ascribed to it in Section A of the Recitals.

"**Incentive Management Fee**" shall mean an amount payable to Manager, pursuant to Section 3.02 and Section 4.01 that is equal to the percentage set forth in Schedule 1 of Available Cash Flow in any Fiscal Year (or portion thereof).

"**Initial Owner**" shall mean the Owner identified as "Owner" on **Schedule 1**, any Affiliate thereof, or any other Owner of the Hotel at a time when the Manager Guaranty is in force and effect.

"**Initial Term**" shall have the meaning ascribed to it in Section 2.01 and Schedule 1.

"**Initial Working Capital**" shall mean that amount set forth on Schedule 1.

"**Institutional Lender**" shall mean a foreign or domestic commercial bank, trust company, savings bank, savings and loan association, life insurance company, real estate investment trust, pension trust, pension plan or pension fund, a public or privately held fund engaged in real estate and/or corporate lending, or any other financial institution commonly known as an institutional lender (or any Affiliate thereof) having a minimum paid up capital (or net assets in the case of a pension fund) of $100,000,000.

"**Insurance Retention**" shall have the meaning ascribed to it in Section 6.01.F.

"**Intellectual Property**" shall mean: (i) all Software; and (ii) all manuals, brochures and directives issued by Manager to its employees at the Hotel regarding the procedures and techniques to be used in operating the Hotel.

"**Inventories**" shall mean "Inventories" as defined in the Uniform System of Accounts, such as, but not limited to, provisions in storerooms, refrigerators, pantries and kitchens; beverages in wine cellars and bars; other merchandise intended for sale; fuel; mechanical supplies; stationery; and other expensed supplies and similar items.

"**Legal Requirement**" shall mean any federal, state or local law, code, rule, ordinance, regulation or order of any governmental authority or agency having jurisdiction over the business or operation of the Hotel or the matters which are the

BA3/470422

subject of this Agreement, including, without limitation, the following: (i) any building, zoning or use laws, ordinances, regulations or orders; and (ii) Environmental Laws.

"**Litigation**" shall mean: (i) any cause of action (including, without limitation, bankruptcy or other debtor/creditor proceedings) commenced in a federal, state or local court; or (ii) any claim brought before an administrative agency or body (for example, without limitation, employment discrimination claims).

"**Management Fees**" shall mean collectively, Base Management Fees and Incentive Management Fees.

"**Manager**" shall have the meaning ascribed to it in Schedule 1 or shall mean any successor or permitted assign, as applicable.

"**Manager Guaranty**" shall mean that certain guaranty executed by Manager in favor of Franchisor pursuant to the Franchise Agreement.

"**Manager Guaranty Advances**" shall mean the aggregate amount of all payments made by Manager pursuant to the terms of the Manager Guaranty.

"**Mortgage**" shall mean any mortgage, or security documents encumbering the Hotel and/or Owner's interest in the Site obtained by Owner from time to time to finance the construction or purchase of the Hotel, including, without limitation, mortgages, deeds of trust, security deeds and limited instruments.

"**Mortgagee**" shall mean the holder of any Mortgage.

"**Net Project Costs**" shall mean the total of all costs incurred by Owner to fund predevelopment, development, construction and improvements of the Hotel, including both hard and soft costs. Net Project Costs will include all Fixed Asset, net out-of-pocket contributions to the FF&E Reserve, Capital Expenditures (except Special Capital Expenditures or other costs paid out of FF&E Reserve or out of Gross Revenues), the cost of remediating Hazardous Materials, Working Capital, initial licensing fees and other capital expenditures necessary for compliance with the Franchise Agreements, and other costs paid by Owner with respect to the project that are paid out of the FF&E Reserve or out of Gross Revenues. The current budget of Net Project Costs is attached as **Exhibit D**, which Manager has reviewed and accepted. The actual amount of Net Project Costs incurred through the Opening Date shall be agreed upon by Owner and Manager within six (6) months following the Opening Date; provided Manager shall not unreasonably withhold its agreement if the actual amount of Net Project Costs is consistent in all material respects with the current budget attached as **Exhibit D**.

"**Net Refinancing Proceeds**" shall mean that dollar amount payable to Initial Owner out of the proceeds of a mortgage loan used to refinance an existing mortgage loan encumbering the Hotel after payment of the sum of (i) the dollar amount needed to obtain the release of the mortgage loan being refinanced, (ii) any commitment fees or

costs and expenses payable or reimbursable to the mortgage lender (iii) Owner's reasonable out of pocket expenses, including reasonable attorneys' fees, in connection with obtaining and closing on said replacement mortgage loan, and (iv) the amount of any Unrecovered Additional Advances payable to Owner and/or Manager. If both Owner and Manager have Unrecovered Additional Advances and the proceeds of the mortgage loan are not sufficient to pay in full such Unrecovered Additional Advances, the proceeds shall be paid to Owner and Manager on a pro rata basis in relation to the amount of each party's Unrecovered Additional Advances to the total amount of the Unrecovered Additional Advances.

"**Net Sales Proceeds**" shall mean the dollar amount payable to Initial Owner out of the proceeds of Sale of the Hotel of the contract purchase price, less the sum of (i) the dollar amount needed to obtain the release of any Qualified Loan, (ii) any recordation and transfer taxes, title insurance costs and related fees and expenses paid by Initial Owner pursuant to the terms of the purchase and sale contract for the Hotel, (iii) Owner's reasonable costs and expenses to close transaction including reasonable attorneys' fees, and (iv) the amount of any Unrecovered Additional Advances payable to Owner and/or Manager. If both Owner and Manager have Unrecovered Additional Advances and the proceeds of the Sale of the Hotel are not sufficient to pay in full such Unrecovered Additional Advances, the proceeds shall be paid to Owner and Manager on a pro rata basis in relation to the amount of each party's Unrecovered Additional Advances to the total amount of the Unrecovered Additional Advances.

"**Non-Disturbance Agreement**" shall mean a subordination, non-disturbance and attornment agreement in the form attached hereto as **Exhibit B**.

"**Operating Accounts**" shall have the meaning set forth in Section 4.03.A.

"**Operating Loss**" shall mean a negative Operating Profit.

"**Operating Profit**" shall mean the excess of Gross Revenues over the following deductions ("**Deductions**") incurred by Manager, on behalf of Owner, in operating the Hotel:

        1.    the cost of sales, including, without limitation, compensation, fringe benefits, payroll taxes, ERISA-related liabilities, pension-fund withdrawal liabilities, and other costs related to Hotel employees (the forgoing costs shall include, the allocable portion of the salary and other employee costs of any personnel assigned to a "cluster" of hotels which includes the Hotel);

        2.    departmental expenses incurred at departments within the Hotel administrative and general expenses; the cost of marketing incurred by the Hotel; advertising and business promotion incurred by the Hotel; heat, light, and power; computer line charges; and routine repairs, maintenance and minor alterations treated as Deductions under Section 5.01;

47

3.     the cost of Inventories and Fixed Asset Supplies consumed in the operation of the Hotel;

4.     a reasonable reserve for uncorrectable accounts receivable as reasonably determined by Manager;

5.     all costs and fees of independent professionals or other third parties who are retained by Manager to perform services required or permitted hereunder;

6.     all costs and fees of technical consultants, professionals and operational experts who are retained or employed by Manager, and its Affiliates for specialized services (including, without limitation, quality assurance inspectors, personnel providing architectural, technical or procurement services for the Hotel, tax consultants, and personnel, providing legal services in connection with matters directly involving the Hotel) and the cost of attendance by employees of the Hotel at training and manpower development programs sponsored by Manager or its Affiliates;

7.     the Base Management Fee, Accounting/Administration Fee and System Service Fee;

8.     insurance costs and expenses as provided in <u>Section 6.01</u>;

9.     taxes, if any, payable by or assessed against Manager related to this Agreement or to Manager's operation of the Hotel (exclusive of Manager's income taxes or franchise taxes) and all Impositions;

10.     the amount of any transfers into the FF&E Reserve required pursuant to <u>Section 5.02</u>;

11.     All the costs and expenses paid by Manager pursuant to the Franchise Agreement including, but not limited to, franchise fees, advertising, chain services, insurance, etc.; provided, however, any initial licensing fees or capital expenditures necessary for compliance with the Franchise Agreement shall not be a Deduction from Gross Revenues for purposes of the calculation of Operating Profit but shall be the sole cost and expense of Owner; and

12.     such other costs and expenses incurred by Manager (either at the Hotel or elsewhere) as are specifically provided for elsewhere in this Agreement or are otherwise reasonably necessary for the proper and efficient operation of the Hotel.

The term "Deductions" shall not include: (a) debt service-payments pursuant to any Mortgage on the Hotel; (b) payments pursuant to capital leases of equipment or other forms of capital financing obtained for the FF&E located in or connected with the Hotel, unless Manager has previously given its written consent to such equipment lease and/or financing; (c) rental payments pursuant to any ground lease of the Site; (d) any expenditures by Owners in the acquisition or conversion of the Hotel, if applicable; (e)

48

the cost of external (third party) audits of Hotel operations and/or with respect to the Owner entity itself; nor (f) other recurring and non-recurring ownership costs, such as Owner's entity administration and servicing costs; nor (g) any expenditures included within the definition of Owner's Priority or Owner's Additional Capital Investment; nor (h) any fees, assessments or costs under any reciprocal easements or cost-sharing agreements that do not relate to the operation of the Hotel. All of the foregoing items listed in this paragraph shall be paid by Owner from its own funds.

"**Owner**" shall have the meaning ascribed to it in Schedule 1 or shall mean any successor or permitted assign, as applicable.

"**Owner's Priority**" shall mean an amount equal to Ten Percent (10%) of the Net Project Costs per annum.

"**Owner's Software**" shall have the meaning ascribed to it in Section 11.11.E.

"**Performance Termination Period**" shall have the meaning ascribed to it in Schedule 1.

"**Performance Termination Threshold**" shall mean the average Operating Profit per occupied guestroom realized by well managed hotels of similar size, services, facilities and rate structure, as determined by the Expert employed in accordance with the provisions of Section 2.02A.1 and Section 11.21 hereof.

"**Person**" means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a limited liability company, partnership, a corporation, a government or any department or agency thereof, a trustee, a trust and any unincorporated organization.

"**Plans**" shall mean those certain plans submitted by the Owner to Manager and approved by it in writing for the construction, equipping and furnishing of the Hotel as approved by Franchisor, copies of which have been provided Manager by Owner prior to the date hereof.

"**Prime Rate**" shall mean the "base rate" of interest announced from time to time by Bank of America NA.

"**Priority Distribution Fee**" shall mean an amount payable to Manager by an Initial Owner at closing on a Mortgage refinancing by Initial Owner or a Sale of the Hotel by Initial Owner equal to the percentage set forth on **Schedule 1** of the Net Refinancing Proceeds or Net Sales Proceeds, as the case may be.

"**Proposed Annual Operating Budget**" shall have the meaning described to it in Section 4.04.

"**Qualified Lenders**" shall mean any recognized third party institutional lender such as any federally insured commercial or savings bank, national banking association, savings and loan association, investment banking firm, commercial finance company, and other similar lending institution that is a holder of a Secured Loan that is a Qualified Loan. For purposes of this Agreement, a Qualified Lender shall include an investment entity which may be a government related entity formed to make a loan to Owner using funds from qualified investors who are Non-U.S. Persons who are approved by the United States Citizenship and Immigration Service of an I-526 Immigrant Petition by Alien Entrepreneur to make such investment in the investment entity through the Immigration Pilot Program, commonly known as the EB-5 program.

"**Qualified Loan**" means any Secured Loan that is a lien on the Hotel the proceeds of which are used to acquire or finance the Hotel and for no other purpose, and which meets the following requirements:

      (a)    the maximum principal amount secured, as of the date the Secured Loan is incurred, when added to the current principal balance of all existing Secured Loans does not exceed eighty percent (80%) of the Fair Market Value of the Hotel on such date; and

      (b)    the ratio of Operating Profit forecast for the twelve (12) full Accounting Periods immediately following the second anniversary date the Secured Loan is incurred to the total annual debt service on all Secured Loans is equal to or greater than one and three tenths (1.3) to one (1).

"**Renewal Terms**" shall have the meaning ascribed to it in Section 2.01 and Schedule 1.

"**Revenue Data Publication**" shall mean Smith's STAR Report, a monthly publication distributed by Smith Travel Research, Inc. of Gallatin, Tennessee, or an alternative source, reasonably satisfactory to both parties, of data regarding the Revenue Per Available Room of hotels in the general trade area of the Hotel. If such Smith's STAR Report is discontinued in the future, or ceases (in the reasonable opinion of either Owner or Manager) to be a satisfactory source of data regarding the Revenue Per Available Room of various hotels in the general trade area of the Hotel, Owner and Manager shall select an alternative source for such data, and any failure to reach agreement on such alternative source shall be referred to the Expert.

"**Revenue Index**" shall mean that fraction that is equal to (a) the Revenue Per Available Room for the Hotel divided by (b) the average Revenue Per Available Room for the hotels in the Competitive Set, as set forth in the Revenue Data Publication.

"**Revenue Index Threshold**" shall mean the number shown in Schedule 1 attached hereto and made a part hereof. However, if the entry of a new hotel into the Competitive Set (or the removal of a hotel from the Competitive Set) causes significant variations in the Revenue Index that do not reflect the Hotel's true position in the relevant

market, appropriate adjustments shall be made to the Revenue Index Threshold by mutual consent of Owner and Manager. If the parties fail to reach agreement on the appropriate adjustment, such matter shall be referred to the Expert.

"**Revenue Per Available Room**" shall mean (i) the term "revenue per available room" as defined by the Revenue Data Publication, or (ii) if the Revenue Data Publication is no longer being used (as more particularly set forth in the definition of "Revenue Data Publication"), the aggregate gross room revenues of the hotel in question for a given period of time divided by the total room nights for such period. If clause (ii) of the preceding sentence is being used, a "room" shall be an available hotel guestroom that is keyed as a single unit.

"**Sale of the Hotel**" shall mean any sale, assignment, transfer or other disposition, for value or otherwise, voluntary or involuntary, of the fee simple title to the Site and/or fee simple title to the Hotel. For purposes of this Agreement, a Sale of the Hotel shall also include: (I) a lease (or sublease) or an assignment of Owner's interest in the Site of all or substantially all of the Hotel or Site; or (ii) any sale, assignment, transfer or other disposition, for value or otherwise, voluntary or involuntary, in a single transaction or a series of transactions, of the controlling interest in Owner. The phrase "controlling interest," as used in the preceding sentence, shall mean either: (x) the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the shares of Owner (through ownership of such shares or by contract); or (y) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of Owner.

"**Secured Loan**" means and includes (i) any loan or credit (including New Market Tax Credits) from a Qualified Lender secured by a Mortgage encumbering the Hotel or all or any part of Owner's interest therein; and (ii) all amendments, modifications, supplements and extensions of any such Mortgage.

"**Site**" shall have the meaning ascribed to it in Section A of the Recitals.

"**Software**" shall mean all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is generally commercially available, and the Owner's Software as defined in Section 11.11E, which are used by Manager in connection with the property management system, the reservation system and all future electronic systems developed by Manager for use in the Hotel.

"**Special Capital Expenditures**" shall mean certain expenditures which are within the category of Capital Expenditures, as defined in this Agreement, but which will be funded from the FF&E Reserve (pursuant to Section 5.02), rather than pursuant to the provisions of Section 5.03. Special Capital Expenditures consist of the following types of expenditures: exterior and interior repainting; resurfacing building walls, floors and roofs; resurfacing parking areas; replacing folding walls; and miscellaneous similar expenditures but which are not major repairs, decorations, improvements, renewals or

51

BA3/470422

replacements to the Hotel's building's structure, its mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation systems, the cost of minor ones are Owner's sole responsibility under Section 5.03.

"**Submissions Period**" shall have the meaning ascribed to it in Section 11.21.

"**System Services**" shall have the meaning described to it in Section 1.03.

"**System Services Fee**" shall have the meaning described to it in Schedule 1.

"**Term**" shall have the meaning ascribed to it in Section 2.01.

"**Termination**" shall mean the expiration or sooner cessation of this Agreement.

"**Termination Fee**" shall have the meaning ascribed to it in Schedule 1.

"**Trade Names**" shall have the meaning ascribed to it in Section 11.12.

"**Uniform System of Accounts**" shall mean the Uniform System of Accounts for the Lodging Industry, Tenth Revised Edition, 2006, as published by the Educational Institute of the American Hotel & Motel Association, from time to time, and as modified by appreciable provisions of this Agreement.

"**Unrecovered Additional Advances**" shall mean the amount, from time to time, of unreimbursed Additional Advances payable to Owner and/or Manager.

"**WARN Act**" shall mean the "Worker Adjustment and Retraining Notification Act," 29 U.S.C. 2101 et seq.

"**Working Capital**" shall mean funds that are used in the day-to-day operation of the business of the Hotel, including, without limitation, amounts sufficient for the maintenance of change and petty cash funds, amounts deposited in operating bank accounts, receivables, amounts deposited in payroll accounts, prepaid expenses and funds required to maintain Inventories, less accounts payable and accrued current liabilities.

52

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed under seal as of the day and year first written above.

OWNER:

WISCONSIN & MILWAUKEE HOTEL LLC
a Wisconsin limited liability company

By: JACKSON STREET MANAGEMENT LLC,
    Manager

By: _____
    Edward G. Carow, Manager


MANAGER:

WHITE LODGING SERVICES CORPORATION,
an Indiana corporation

By: _____
    Lawrence E. Burnell
    Chief Operating Officer

53

Legal Description of the Site

Parcel A:

Lots 4 and 5 and the South 15 feet of Lot 3, in Block 13, in the Plat of Milwaukee on the East side of the River, in the Southwest 1/4 of Section 28, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

Tax Key No:  392-0738-1
Address:      625 N. MILWAUKEE STREET


Parcel B:

Lot 1, except the Easterly 34 feet and Lot 2, except the Easterly 34 feet of the North 40 feet and also the Northerly 45 feet of Lot 3, in Block 13 in the original Blocks East of the River, in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

Tax Key No:  392-0735-5
Address:      319-323 E. WISCONSIN AVENUE

Tax Key No:  392-0734-X
Address:      327 E. WISCONSIN AVENUE

Tax Key No:  392-0736-0
Address:      629-631 N. MILWAUKEE STREET

Tax Key No:  392-0737-6
Address:      627 N. MILWAUKEE STREET

Exhibit A

Form of Memorandum of Management Agreement

[NOTE-CHANGES MAY BE NECESSARY TO CONFORM TO ANY LOCAL RECORDING OR DISCLOSURE REQUIREMENTS]

## MEMORANDUM OF MANAGEMENT AGREEMENT

THIS MEMORANDUM OF MANAGEMENT AGREEMENT (this "Memorandum") is made by and between _____ , A_____ with an address as set forth on Schedule 1 attached hereto (herein called "Owner"), and WHITE LODGING SERVICES CORPORATION, an Indiana corporation, with an address as set forth on Schedule 1 attached hereto (herein called "Manager") and is delivered and effective as of the Effective Date set forth on Schedule 1.

## W I T N E S S E T H:

Owner and Manager have entered into that certain Management Agreement of even date herewith (the "Management Agreement") with respect to management and operation of a Hotel on the premises identified on Schedule 1 and as more particularly described on Exhibit A attached hereto (the "Property").

The Management Agreement has an initial term which is as described on Schedule 1, and is subject to renewal terms as described on Schedule 1.

The terms of the Management Agreement include restrictions as to the financing and sale of the Property as well as Owner's ability to sell or transfer interests in itself.

This Memorandum does not in any way alter or modify the terms and conditions of the Management Agreement.

Reference is made to the Management Agreement itself as to the specific terms of any limitations or restrictions.

Upon expiration or other termination of the Management Agreement, Manager agrees promptly to execute and deliver to Owner a termination of this Memorandum in form suitable for recording.

[SIGNATURES FOLLOW ON NEXT PAGE]

Exhibit B

IN WITNESS WHEREOF, the parties have duly executed this Memorandum of Management Agreement under seal as of the date set forth on <u>Schedule I</u>.

**<u>OWNER</u>:**

WITNESS:

By: _____
Print Name: _____

By: _____
Print Name: _____
Title: _____


**<u>MANAGER</u>:**

WHITE LODGING SERVICES
CORPORATION,
an Indiana corporation

WITNESS:

By: _____
Print Name: _____

By: _____
Print Name: _____
Title: _____

2

## NOTARY ACKNOWLEDGMENT

State of _____,
_____ County

       I HEREBY CERTIFY that on _____, 20__, before me, a Notary Public of the
State of _____, personally appeared _____, who acknowledged himself to be the _____ of _____,
a _____
(the " _____ ") and that he, as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the
by
himself as such officer.

       WITNESS my hand and Notarial Seal.

_____
Notary Public
My Commission Expires: _____


State of Indiana,
Lake County

       I HEREBY CERTIFY that on _____, 20__, before me, a Notary Public of the State of Indiana, personally appeared _____who acknowledged himself to be the Chief Operating Officer of WHITE LODGING SERVICES CORPORATION, an Indiana corporation (the "Corporation"), and that he, as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the Corporation by himself as such officer.

       WITNESS my hand and Notarial Seal.

_____
Notary Public
My Commission Expires: _____

3

Legal Description

Parcel A:

Lots 4 and 5 and the South 15 feet of Lot 3, in Block 13, in the Plat of Milwaukee on the East side of the River, in the Southwest 1/4 of Section 28, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

Tax Key No:    392-0738-1
Address:       625 N. MILWAUKEE STREET

Parcel B:

Lot 1, except the Easterly 34 feet and Lot 2, except the Easterly 34 feet of the North 40 feet and also the Northerly 45 feet of Lot 3, in Block 13 in the original Blocks East of the River, in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

Tax Key No:    392-0735-5
Address:       319-323 E. WISCONSIN AVENUE

Tax Key No:    392-0734-X
Address:       327 E. WISCONSIN AVENUE

Tax Key No:    392-0736-0
Address:       629-631 N. MILWAUKEE STREET

Tax Key No:    392-0737-6
Address:       627 N. MILWAUKEE STREET

Exhibit A

SCHEDULE 1

<u>Effective Date</u>: _____, 20___

2.    <u>Address of the Parties</u>:

    a.    <u>Owner</u>:

    b.    <u>Manager</u>:        White Lodging Services Corporation
Attention: Deno Yiankes
701 East 83rd Avenue
Merrillville, Indiana 46410
Fax: (219) 472-2034

3.    <u>Description of Hotel and Premises</u>: That certain fee simple interest in the land
and hotel known as the "Marriott Hotel", located at Southwest corner of the intersection of Milwaukee
Avenue and Wisconsin Street, Milwaukee, Wisconsin.

4.    <u>Term of Management Agreement</u>:

    a.    Initial Term:  20 years

    b.    Renewal Terms:  Two 10 years

2

Form of Non-Disturbance Agreement

PREPARED BY:

Above Space for Recorder's Use Only

## **SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**
### (for Management Agreement)

This Subordination Agreement (this "Agreement") effective as of the Effective Date set forth on Schedule l, is made by and among _____ with an address as set forth on Schedule 1 attached hereto (hereinafter called "Owner"), WHITE LODGING SERVICES CORPORATION, an Indiana corporation with an address as set forth on Schedule 1 attached hereto (hereinafter "Manager"), and the Lender identified on and with an address as set forth on Schedule 1 attached hereto (hereinafter "Lender"),

### **WITNESSETH:**

WHEREAS, Owner and Manager have entered into a Management Agreement as described on Schedule 1 (the "Management Agreement") pursuant to which Manager will manage and operate the Hotel as also described on Schedule 1 (the "Hotel"), located on the Premises, as described on Schedule 1 (the "Premises");

WHEREAS, Lender is the holder of the Mortgage, as described on Schedule 1 which encumbers the fee interest in the Hotel and Premises, as such Mortgage may from time to time be amended or supplemented (the "Mortgage");

WHEREAS Owner, Manager and Lender desire to confirm their understanding with respect to the Management Agreement and the Mortgage and, subject to the provisions hereof, to subordinate the Management Agreement to the Loan Documents as described on Schedule 1 (the "Loan Documents").

Exhibit C

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained Owner, Manager and Lender hereby agree and covenant as follows:

1. **_Subordination._** Manager agrees that, subject to the provisions hereof, the Management Agreement (and its rights created thereunder) as well as all of its rights and options thereunder are and shall be subject and subordinate to the lien of the Mortgage and the lien of any other Loan Documents. Notwithstanding the foregoing, Lender, Owner and Manager agree that the Management Agreement shall not be extinguished by any foreclosure or sale under the Mortgage or any other Loan Documents.

2. **_Owner Consent._** Owner agrees to all matters contained in this Agreement insofar as same the affect its interests, and also agrees to furnish Lender, immediately upon receipt or dispatch of same, with copies of all notices which either Manager or Owner send to each other.

3. **_Assurances._** The Manager hereby represents and warrants that as of the date hereof and except as may be set forth on <u>Schedule 1</u>: (a) it is now the holder of the Manager's interest in the Management Agreement, and that said Manager's interest in the Management Agreement and its execution of this Agreement is not subject to any consents or approvals of any third party; (b) the Management Agreement is now in full force and effect; (c) the Management Agreement has not been modified or amended; (d) Owner is not in default in the observance and/or performance of any of the obligations under the Management Agreement required to be observed and performed by Owner; (e) to Manager's knowledge, no event has occurred, which, with the passing of time or the giving of notice or both would constitute a default under the Management Agreement; (f) all payments due pursuant to the Management Agreement to and including the date hereof, have been paid in full; (g) Manager acknowledges that the Mortgage and other Loan Documents are valid and effective; and (h) as of the date hereof, Manager has entered into no agreements with respect to the "Hotel" (as defined in the Management Agreement) which have a term longer than one (1) year and would be binding upon Lender in the event Lender acquires title to the Premises by foreclosure or deed in lieu thereof.

4. **_Modifications._** Manager agrees to the following modifications to the Management Agreement during the term of the Loan and thereafter if Lender (which shall be deemed to include an "Affiliate" of Lender as defined in the Management Agreement) shall acquire title or control of the Premises through foreclosure or deed in lieu of foreclosure, and Lender shall be a third party beneficiary of the Management Agreement as so amended: (a) no material amendment including, without limitation, any change in economic terms, shall be made to the Management Agreement except in each case upon the express written consent of Lender (not to be unreasonably withheld, conditioned or delayed), (b) the Manager shall not

2

enter into any leases or concession arrangements or other agreements affecting the Hotel which require Owner's approval pursuant to the terms of the Management Agreement, except upon prior written notice to Lender and Manager shall so notify Lender at the same time Manager requests such approval from Owner, and (c) Manager hereby acknowledges and agrees that all funds of Owner held by Manager including, without limitation, FF&E Reserve funds, working capital funds and other operating funds are held by Manager subject to Lender's security interest in such funds and Manager will cooperate with Lender in order for Lender to obtain perfection of its security interest in Owner's interest in such funds and Manager acknowledges it shall not commingle any of Owner's funds with funds of any other party without the express written consent of Lender.

5. **_Nondisturbance._** Subject to amendment and waivers set forth herein, during the term of the Management Agreement or any extensions or renewals thereof, so long as Manager is not in Default (after giving effect to any applicable grace or cure period) in the payment of amounts due Owner under the Management Agreement or in the performance of any of the terms, covenants or conditions of the Management Agreement on Manager's part to be performed, Lender agrees that it will recognize the rights of Manager under the Management Agreement (subject to the terms of this Agreement) and that it will not (i) take any action designed to disturb Manager's possession and occupancy of the Premises, or Manager's operation of the Hotel, pursuant to the provisions of the Management Agreement (but Lender may exercise rights pursuant to this Agreement), or (ii) join Manager as a party defendant in any action or proceeding for the purpose of terminating Manager's interest and estate under the Management Agreement because of any default under the Mortgage.

6. **_Attornment._** In the event any proceedings are brought for the foreclosure of the Mortgage or if the Premises are conveyed to the Lender by deed in lieu of foreclosure, Manager shall attorn to Lender or the purchaser upon any such conveyance or foreclosure sale or trustee's sale and shall recognize Lender or such purchaser as Owner under the Management Agreement, subject to the provisions of the Management Agreement and this Agreement. Such attornment shall be effective and self-operative without the execution of any further instrument on the part of any of the parties hereto. Manager agrees, however, to execute and deliver at any time and from time to time, upon the request of Owner or Lender or any such purchaser (a) any instrument or certificate which may reasonably be necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment, and (b) an instrument or certificate regarding the status of the Management Agreement, consisting of statements, if true, (i) that the Management Agreement is in full force and effect, (ii) the date

3

through which fees have been paid, (iii) amounts, if any, owed by Owner to Manager for working capital or other needs pursuant to the Management Agreement, (iv) the date of the commencement of the term of the Management Agreement, (v) the nature of any amendments or modifications to the Management Agreement, (vi) that no default, or state of facts, which with the passage of time or notice would constitute a default, exists on the part of either party to the Management Agreement, and (vii) such other matters as Lender or prospective purchaser may reasonably request. Notwithstanding the foregoing, the parties acknowledge and agree that nothing in this Agreement shall restrict Manager's ability to terminate the Management Agreement in the event Manager is not paid any fees or other amounts due Manager under the Management Agreement.

7. **_Limited Responsibility._** If Lender shall succeed to the interest of Owner under the Management Agreement in any manner, or if any purchaser acquires the Premises upon any foreclosure of the Mortgage (or similar sale) under the Mortgage, Lender or such purchaser shall have the same remedies for the breach of the Management Agreement by Manager as are available to Owner under the Management Agreement if Lender or such purchaser had not succeeded to the interest of Owner; provided further, however, that Lender or such purchaser shall not be subject to any liability or obligation under the Management Agreement or otherwise until Lender or such purchaser shall have acquired the interest of Owner in the Premises by foreclosure or otherwise, and then only to the extent of liabilities or obligations accruing subsequent to the date that Lender or such purchaser has acquired the interest of Owner; in furtherance of the foregoing, neither Lender or such purchaser shall be:

(a) liable for any action or omission of any prior owner (including Owner); or

(b) subject to any offsets or defenses which Manager might have against any prior owner (including Owner), specifically including without limitation, any set off rights Manager may have pursuant to the Management Agreement as to any revenues or Owner's deposits held by Manager with respect to obligations of the Owner arising prior to the foreclosure or deed in lieu of foreclosure, provided that Manager's rights to offsets for obligations and defenses which arise subsequent to the date that Lender or such purchaser acquires the interest of Owner shall not be affected by this Section 7(b); or

(c) bound by any amendment or modification of the Management Agreement made without its written consent; or

4

(d)    personally liable for any default under the Management Agreement or any covenant on its part to be performed thereunder as Owner, it being acknowledged that Manager's sole remedy in the event of such default shall be to exercise Manager's rights against Lender or such purchaser as Owner, pursuant to the terms of the Management Agreement, provided that recovery of any damages against Lender or such purchaser shall be limited to Lender's or such purchaser's interest in the Premises.

8.    ***Notice of Default; Opportunity to Cure.***  Manager agrees to give Lender notice of any default by Owner under the Management Agreement at the same time as Manager gives notice to the Owner. Lender shall be entitled, but shall not be obligated, upon notice of a default by Owner under the Management Agreement to remedy the default of the Owner within fifteen (15) days or such reasonable additional period as may be necessary after expiration of the applicable cure period available to the Owner as set forth in the Management Agreement, provided Lender proceeds with due diligence and without interruption to complete the action necessary to cure the default including efforts to gain control of the property provided further that Lender notifies Manager of Lender's intent to cure such default. Lender shall in no event be obliged to cure a default which is personal to Owner and, therefore, not reasonably susceptible of cure by Lender. Lender shall provide Manager with a courtesy copy of any notice of default sent to Owner after hotel operations have commenced at the Premises, but failure to do so shall not invalidate any notice as against Owner.

9.    ***Assignment of Revenues; Payment of Owner's Revenues.***

(a)    In the event Manager receives written notice from Lender that there has been a default under the Loan described on <u>Schedule 1</u> and that amounts due under the Management Agreement are to be paid to Lender pursuant to the terms of an Assignment, Manager shall pay to Lender, or in accordance with the directions of Lender, all revenues and other monies due or to become due to Owner under the Management Agreement, and Owner hereby expressly authorizes Manager to make such payments to Lender, or as otherwise directed by Lender, and hereby releases and discharges Manager of and from any liability to Owner on account of any such payments. It is understood that Manager shall comply with the direction set forth in any such notice without any necessity to investigate the reasons for such notice, or to confirm whether Owner is in fact in default under the Loan or the Mortgage.

(b)    From and after the date of this Agreement, Manager shall not deliver funds to Owner relative to the Premises <u>except </u>by transfer

to Owner's account at the Bank identified on <u>Schedule 1</u> and in the amount as designated by Lender unless otherwise expressly directed by Lender in writing.

10. ***No Impairment.*** Nothing herein contained is intended, nor shall it be construed, to abridge or adversely affect any right or remedy of Owner under the Management Agreement in the event of any default by Manager in the performance of any of the terms, covenants or conditions of the Management Agreement.

11. ***Notices.*** Any notice or communication required or permitted hereunder shall be given in writing, sent by hand delivery or by nationally recognized overnight courier, addressed to the recipient party at its address set forth on <u>Schedule 1</u>, or to such other address or in the care of such other person as hereafter shall be designated in writing by the applicable party and shall be deemed to have been given as of the date of receipt.

12. ***Miscellaneous.*** This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns, and any purchaser or purchasers at or subsequent to foreclosure of the Premises or subsequent to acquisition pursuant to deed in lieu thereof, and their respective heirs, personal representatives, successors and assigns. Captions are for convenience in reference only and shall not be used to limit the interpretation of any provision of this Agreement. Capitalized terms not defined in this Agreement shall have the meanings set forth in the Management Agreement.

13. ***Entire Agreement.*** This Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto (including the Management Agreement) and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be changed only by a written non-electronic instrument that has been duly executed by the non-electronic signature of an authorized representative of the parties hereto.

6

IN WITNESS WHEREOF, the parties hereto have hereunto caused this Agreement to be duly executed as of the day and year first above written.

"OWNER"

By:_____
Name:_____
Title:_____

"MANAGER"

WHITE LODGING SERVICES CORPORATION, an Indiana corporation

By:_____
Name: _____
Title:_____

"LENDER"

[NAME]

By:_____
Name: _____
Title:_____

7

STATE OF _____ )
                       )  SS.
COUNTY OF _____  )

      The undersigned, a Notary Public in and for said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, personally know to me to be the _____, of _____ ("Company"), personally appeared before and acknowledged to me that s/he did so sign said instrument in the name of and on behalf of the Company as such, that the same is their free act and deed, and the free act and deed of Company for the uses and purposes therein set forth.

      GIVEN under my hand and Notarial Seal this _____ day of _____, 20__.

                            _____
                                NOTARY PUBLIC

My Commission Expires:

_____

STATE OF INDIANA   )
           ) SS:
COUNTY OF LAKE   )

On this the ___, day of ____, before me personally appeared Lawrence E. Burnell, Chief Operating Officer, known to me (or satisfactorily proven) to be the duly authorized Manager of White Lodging Services Corporation ("Manager") and the person whose name is subscribed to the within instrument and acknowledged that (she)(he) executed the same as (her) (his) free act and deed and the free act and deed of Manager for the purposes therein contained.

   IN WITNESS WHEREOF, I hereunto set my hand.

              _____
              NOTARY PUBLIC
              My Commission Expires: _____

STATE OF _____  )
           ) SS:
COUNTY OF _____ )

   On this the __ day of ____, 20__, before me personally appeared _____, the duly authorized _____ of _____ ("Lender"), known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that (she)(he) executed the same as (her)(his) free act and deed and the free act and deed of Lender, for the purposes therein contained.

   IN WITNESS WHEREOF, I hereunto set my hand.

              _____
              NOTARY PUBLIC
              My Commission Expires: _____

9

## SCHEDULE 1
## To Non-Disturbance Agreement

1.   <u>Effective Date</u>:  June 14, 2011

2.   <u>Address of the Parties</u>:

  a.   <u>Owner</u>:  Wisconsin & Milwaukee Hotel LLC

    <u>Address for Notices</u>:

    Edward G. Carow, Manager
    Wisconsin & Milwaukee Hotel LLC
    731 North Jackson Street, Suite 818
    Milwaukee, Wisconsin 53202
    Telecopy:

    <u>With a copy to</u>:

    Jon S. Herreman
    Mallery & Zimmerman, S.C.
    731 North Jackson Street, Suite 900
    Milwaukee, Wisconsin 53202
    Telecopy:

  b.   <u>Manager</u>:  White Lodging Services Corporation

    <u>Address for Notices</u>:

    Dave Sibley, President and CEO
    Hospitality Management Division
    White Lodging Services Corporation
    701 East 83rd Avenue
    Merrillville, Indiana  46410
    Telecopy: 219-472-2034

    <u>With a copy to</u>:

    Carol Ann Bowman, Esq.
    1000 East 80th Place, Suite 700 North
    Merrillville, Indiana 46410
    Telecopy: 219-680-4226

  c.   <u>Lender</u>:  _____.

Address for Notices:

_____

_____

_____

_____

_____

3.      Management Agreement:  Dated as the Effective Date by and between Owner and Manager.

4.      Description of Hotel:  That certain hotel known as the "Marriott Hotel", located at the Southwest corner of the intersection of Milwaukee Avenue and Wisconsin Street, Milwaukee, Wisconsin, containing approximately 200 guest rooms, a lobby, meeting rooms, administrative offices, parking and certain amenities and related facilities located on the Site, including the following:

5.      The Premises:  As described on Exhibit A attached hereto.

6.      The Mortgage:  That certain mortgage/deed of trust dated as of _____, by _____ in favor of _____ encumbering the Hotel and Premises and recorded among the _____ in Liber _____, folio_____.

7.      The Loan Documents: (as the same may from time to time be amended or supplemented):                    [itemized list]

8.      The Loan:  That certain loan in the original principal amount of $_____ by Lender to _____, and secured by the Mortgage on the Premises.

9.      Paragraph 3 Assurances Carve-outs:
                [itemized list/explanation, if any][None]

10.     Bank Account into which Manager is to deliver Owner distributions or other payments under the Management Agreement:

        Bank Name/Address:

        Account No.:

2

Legal Description of the Premises

Parcel A:

Lots 4 and 5 and the South 15 feet of Lot 3, in Block 13, in the Plat of Milwaukee on the East side of the River, in the Southwest 1/4 of Section 28, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

Tax Key No:   392-0738-1
Address:       625 N. MILWAUKEE STREET


Parcel B:

Lot 1, except the Easterly 34 feet and Lot 2, except the Easterly 34 feet of the North 40 feet and also the Northerly 45 feet of Lot 3, in Block 13 in the original Blocks East of the River, in the City of Milwaukee, County of Milwaukee, State of Wisconsin.

Tax Key No:   392-0735-5
Address:       319-323 E. WISCONSIN AVENUE

Tax Key No:   392-0734-X
Address:       327 E. WISCONSIN AVENUE

Tax Key No:   392-0736-0
Address:       629-631 N. MILWAUKEE STREET

Tax Key No:   392-0737-6
Address:       627 N. MILWAUKEE STREET


Exhibit A

SCHEDULE 1

HOTEL SPECIFIC DATA

1.    <u>Effective Date</u>:  June 14, 2011


2.    <u>Owner</u>:  Wisconsin & Milwaukee Hotel LLC

        <u>Address for Notices</u>:

        Edward G. Carow, Manager
        Wisconsin & Milwaukee Hotel LLC
        731 North Jackson Street, Suite 818
        Milwaukee, Wisconsin 53202
        Telecopy:

        <u>With a copy to</u>:

        Jon S. Herreman
        Mallery & Zimmerman, S.C.
        731 North Jackson Street, Suite 900
        Milwaukee, Wisconsin 53202
        Telecopy:

3.    <u>Manager</u>:  White Lodging Services Corporation, an Indiana corporation.

        <u>Address for Notices</u>:

        Dave Sibley, President and CEO
        Hospitality Management Division
        White Lodging Services Corporation
        701 East 83rd Avenue
        Merrillville, Indiana  46410
        Telephone:  219-472-2900
        Telecopy:  219-472-2034

        <u>With a copy to</u>:

        Carol Ann Bowman, Esq.
        1000 East 80th Place, Suite 700 North
        Merrillville, Indiana 46410
        Telephone:  219-757-3511
        Telecopy: 219-680-4226

4.   Description of Hotel:  That certain fee simple interest in the land and hotel known as the "Marriott Hotel", located at the Southwest quadrant of the intersection of Milwaukee Avenue and Wisconsin Street, Milwaukee, Wisconsin, (the "Site"), containing approximately two hundred (200) guest rooms, a lobby, meeting rooms, administrative offices, parking and certain amenities and related facilities located on the Site, including the following:

5.   Franchise Description:

   a.   Franchise Agreement: Marriott Hotel.

   b.   Franchisor:  Marriott International, Inc, a Delaware corporation.

   c.   Hotel Brand:  Marriott Hotel.

6.   System Services:

   a.   Computer Services covered by the System Services Fee:  Manager's costs related to certain hardware and software support services, which initially shall include by way of example, the following:

- Costs of Licenses for Financial/Payroll/Benefits/Procurement System
- Costs related to Payroll and Benefits for help desk support
- Costs of Manager's modems and trunks for dial-up access
- Costs of Professional Services for Financial/Payroll/Benefits/Procurement System
- Costs of Maintenance for Manager's Network Hardware
- Costs of Maintenance for Manager's Financial/Payroll/Benefits/Procurement System software
- Costs of Hardware to Manager for data storage

   b.   Systems Services Fee:  Two Thousand One Hundred Eighty Nine and No/100 Dollars ($2,189.00) per Accounting Period, adjusted each Fiscal Year, beginning with the second full Fiscal Year of the Term, to reflect any actual cost increases to Manager, which increases shall be applied pro rata to all hotels being offered System Services.

7.   Accounting/Administration Services:

   a.   Accounting/Administration  Services  covered  by  the Accounting/Administration Fee:   Manager's costs related to certain accounting and administration and administration services, which include by way of example, the following:

2

- Accounting
- Internal Audit
- Accounts Payable
- Payroll
- Credit
- Bank Reconciliation
- Reporting
- Cash administration
- Human Resource administration

b.      Accounting/Administration Fee: Three Thousand Seventeen and No/100 Dollars ($3,017.00) per Accounting Period, adjusted each Fiscal Year to account for positive increases, if any in CPI occurring after the Effective Date. Such adjustment shall be made by multiplying the Accounting/Administration Fee by a fraction, the numerator of which is the CPI published for the period that includes the month immediately preceding the Fiscal Year for which such adjustment is being made, and the denominator of which is the CPI published for the period that includes the month immediately preceding the month in which the first full Fiscal Year occurs.

8.      <u>Expiration Date of the Initial Term</u>:  The expiration of the twentieth (20th) full Fiscal Year following the Opening Date.

9.      <u>Renewal Term(s)</u>:  Two (2) Renewal Terms; ten (10) years each.

10.     <u>Performance Termination Period</u>.  Any two (2) consecutive Fiscal Years, not including any period of time within the first two (2) full Fiscal Years elapsing after the Opening Date.

11.     <u>Base Management Fee</u>:  Three and One Half Percent (3.5%) of Gross Revenues as further defined in <u>Section 13.01</u>.

12.     <u>Incentive Management Fee</u>:  Twenty percent (20%) of Available Cash Flow as further defined in <u>Section 13.01</u>.

13.     <u>Guaranty Management Fee</u>:  Seventeen and one-half percent (17.5%) of Net Profit, as further defined in <u>Section 13.01</u>.

14.     <u>Priority Distribution Fee</u>:  Seventeen and one-half percent (17.5%) of any Net Refinancing Proceeds or Net Sales Proceeds as further set forth in <u>Section 13.01</u>.

15.     <u>Revenue Index Threshold</u>: Ninety Five Percent (95%).

16.     <u>Competitive Set</u>:

3

Intercontinental Milwaukee Downtown
Doubletree Hotel Milwaukee Downtown
Hyatt Hotel Milwaukee Downtown
Hilton Hotel Milwaukee Downtown
Preferred Pfister Hotel Milwaukee Downtown

17.     Initial Working Capital:  One Thousand and No/100 Dollars ($1000.00) per guest room at the Hotel.

18.     Funding Obligation applicable to the FF&E Reserve:  During the period from the Opening Date through the end of the first Fiscal Year (the first "full" Fiscal Year), Manager shall transfer into the FF&E Reserve an amount equal to one percent (1%) of Gross Revenues for each Accounting Period within such Fiscal Year; during the second Fiscal Year Manager shall transfer into the FF&E Reserve an amount equal to two percent (2%) of Gross Revenues for each Accounting Period within such Fiscal Year; during the third Fiscal Year through the end of the fifth Fiscal Year, Manager shall transfer into the FF&E Reserve an amount equal to three percent (3%) of Gross Revenues for each Accounting Period within such Fiscal Year; during the sixth Fiscal Year through the tenth Fiscal Year, Manger shall transfer into the FF&E Reserve an amount equal to four percent (4%) of Gross Revenues, and during the eleventh Fiscal Year and for the balance of the Term of this Agreement, Manager shall transfer into the FF&E Reserve an amount equal to five percent (5%) of Gross Revenues for each Accounting Period within such Fiscal Year, or such greater amount as may be required under the Franchise Agreement or under a Qualified Loan.

19.     Net Project Costs:  To be finally calculated by Owner and Manager not later than six (6) months following the Opening Date.

20.     Termination Fee:  An amount equal to (i) the greater of (y) One Million and No/100 Dollars ($1,000,000) or (z) two (2) times the actual Base Management Fees, Incentive Management Fees and Guaranty Management Fees earned by Manager in the Fiscal Year preceding the Fiscal Year in which the Termination occurred, to the extent such Termination occurs at any time prior to the expiration of the tenth (10th) full Fiscal Year of the Term; or (ii) the actual Base Management Fee and Incentive Management Fees earned by the Manger in the Fiscal Year preceding the Fiscal Tear in which the Termination occurred.

4