**HOTEL MANAGEMENT AGREEMENT**

**WISCONSIN & MILWAUKEE HOTEL LLC,**
**a Wisconsin limited liability company, as Owner**

**and**

**AVION HOSPITALITY, LLC,**
**a Delaware limited liability company, as Manager**

**FOR**

**MILWAUKEE MARRIOTT DOWNTOWN**

**EXHIBIT**

**06**

1

TABLE OF CONTENTS

ARTICLE I.  THE HOTEL ........................................................................................1

ARTICLE II.  TERM ...............................................................................................6

Section 2.1  Commencement Date .......................................................................6
Section 2.2  Term ................................................................................................6

ARTICLE III.  MANAGER'S OBLIGATIONS ........................................................7

Section 3.1  Direct Operation ...............................................................................7
Section 3.2  Compliance with License Agreement ...............................................7
Section 3.3  Manner of Operations .......................................................................7
Section 3.4  Adherence to Budgets .......................................................................7
Section 3.5  Affiliate Transactions .......................................................................8
Section 3.6  Payment of Manager's Costs .............................................................8
Section 3.7  Payment of Hotel Costs ....................................................................8
Section 3.8  Personnel ..........................................................................................8
Section 3.9  Hotel Policies ...................................................................................10
Section 3.10  Bank Accounts ...............................................................................10
Section 3.11  Operating Budgets ..........................................................................11
Section 3.12  Operating Statement .......................................................................12
Section 3.13  Capital Budgets ..............................................................................13
Section 3.14  General Maintenance Non-Capital Replacements ...........................14
Section 3.15  Operating Equipment ......................................................................14
Section 3.16  Operating Supplies .........................................................................14
Section 3.17  Contracts ........................................................................................14
Section 3.18  Accounting Standards .....................................................................16
Section 3.19  Marketing and Advertising .............................................................16
Section 3.20  Permits and Licenses ......................................................................16
Section 3.21  Owner Meetings .............................................................................17
Section 3.22  Insurance ........................................................................................17
Section 3.23  Manager Representatives .................................................................17
Section 3.24  Compliance with Requirements .......................................................18
Section 3.25  Services by Manager .......................................................................18
Section 3.26  Reserved .........................................................................................19
Section 3.27  Liens ...............................................................................................19

ARTICLE IV.  OWNER'S OBLIGATIONS DURING THE TERM ...........................19

Section 4.1  Compliance with License Agreement ...............................................19
Section 4.2  Licenses and Permits ........................................................................19
Section 4.3  Insurance ..........................................................................................19
Section 4.4  Operating Funds ...............................................................................20
Section 4.5  Capital Funds ...................................................................................20
Section 4.6  Payments to Manager .......................................................................20
Section 4.7  Owner Representatives ......................................................................20
Section 4.8  Owner's Audits .................................................................................20

-i-

Section 4.9      Exhibits ....................................................................................................21

Section 4.10      Right of First Offer……………………………………………………19


ARTICLE V.      MANAGEMENT FEE ........................................................................21

Section 5.1      Base Management Fee ......................................................................21
Section 5.2      Incentive Management Fee ..............................................................21
Section 5.3      Annual Reconciliation ....................................................................22
Section 5.4      Revenues and Expenses re: Liquor Service ....................................22
Section 5.5      Business Interruption Insurance Proceeds ......................................22

ARTICLE VI.      CLAIMS AND LIABILITY ..............................................................23

Section 6.1      Indemnification; Notice of Claims...................................................23
Section 6.2      Manager's Grossly Negligent or Willful Acts .................................24
Section 6.3      Exceptions for Industry Practices and Employer Liability ..............24
Section 6.4      Survival ...........................................................................................25

ARTICLE VII.      CLOSURE, EMERGENCIES AND DELAYS ..................................25

Section 7.1      Events of Force Majeure .................................................................25
Section 7.2      Emergencies ....................................................................................25

ARTICLE VIII.      CONDEMNATION AND CASUALTY ..............................................26

Section 8.1      Condemnation ..................................................................................26
Section 8.2      Casualty...........................................................................................26

ARTICLE IX.      TERMINATION RIGHTS ................................................................27

Section 9.1      Bankruptcy and Dissolution............................................................27
Section 9.2      Breach .............................................................................................27
Section 9.3      Additional Remedies .......................................................................28
Section 9.4      Performance Termination ................................................................28
Section 9.5      Post Expiration/Termination Procedures ........................................28
Section 9.6      Employment Solicitation Restriction ..............................................30
Section 9.7      Termination on Sale ........................................................................30

ARTICLE X.      APPLICABLE LAW AND ARBITRATION .........................................30

Section 10.1      Applicable Law................................................................................30
Section 10.2      Arbitration of Financial Matters .....................................................31
Section 10.3      Arbitration of Non-Financial Matters ........**Error! Bookmark not defined.**

ARTICLE XI.      GENERAL PROVISIONS ................................................................33

Section 11.1      Representations ................................................................................33
Section 11.2      Relationship ....................................................................................33
Section 11.3      Manager's Contractual Authority in the Performance of this Agreement .34
Section 11.4      Further Actions ...............................................................................34
Section 11.5      Successors and Assigns....................................................................34
Section 11.6      Notices ............................................................................................35

07.10.2025 v.1

| Section 11.7 | Documents | 35 |
| Section 11.8 | Defense | 35 |
| Section 11.9 | Waivers | 36 |
| Section 11.10 | Changes | 36 |
| Section 11.11 | Captions | 36 |
| Section 11.12 | Severability | 36 |
| Section 11.13 | Confidentiality | **Error! Bookmark not defined.** |
| Section 11.14 | Reimbursement | 36 |
| Section 11.15 | Travel and Out-of-Pocket Expenses | 37 |
| Section 11.16 | Reserved | 37 |
| Section 11.17 | Third Party Beneficiary | 37 |
| Section 11.18 | Brokerage | 37 |
| Section 11.19 | Survival of Covenants | 37 |
| Section 11.20 | Estoppel Certificate | 37 |
| Section 11.21 | Extension of Date of Termination | 37 |
| Section 11.22 | No Representations | 38 |
| Section 11.23 | Post-Termination Matters; Reimbursements to Manager | 38 |
| Section 11.24 | Entire Agreement | 39 |
| Section 11.25 | Periods of Time | 39 |
| Section 11.26 | Preparation of Agreement | 39 |
| Section 11.27 | Exhibits | 39 |
| Section 11.28 | Attorneys' Fees and Other Costs | 39 |
| Section 11.29 | Counterparts | 39 |
| Section 11.30 | Subordination and Non-Disturbance | 39 |
| ARTICLE XII. | PROVISIONS RELATING TO A HOTEL WHICH IS OPEN | 40 |
| Section 12.1 | Employment | 40 |
| Section 12.2 | Operating Costs | 40 |
| Section 12.3 | Indemnity | 40 |
| Section 12.4 | Previous Franchise and Management Agreements | 40 |
| Section 12.5 | Confidentiality | 41 |

| EXHIBIT A | LICENSE AGREEMENT |
| EXHIBIT B | INSURANCE PROCURED BY MANAGER |
| EXHIBIT C | INSURANCE PROCURED BY OWNER |
| EXHIBIT D | EXISTING MORTGAGES AND MEZZANINE FINANCING |
| EXHIBIT E | REVPAR TEST |
| EXHIBIT F | TENTATIVE OPERATING BUDGET FOR YEAR 2025 |
| EXHIBIT G | TENTATIVE CAPITAL BUDGET FOR YEAR 2025 |

07.10.2025 v.1

MANAGEMENT AGREEMENT

This Management Agreement ("**Agreement**") is made and entered into as of July \_\_\_, 2025 (the "**Effective Date**") between Wisconsin & Milwaukee Hotel LLC, a Wisconsin limited liability company ("**Owner**") and Avion Hospitality LLC, a Delaware limited liability company ("**Manager**").

**RECITALS**

A.  Owner owns the Hotel (as defined below) which is the subject matter of this Agreement.
B.  Owner desires to engage Manager to manage the Hotel in accordance with the terms of this Agreement.
C.  Manager has agreed to manage the Hotel in accordance with the terms of this Agreement.

**NOW THEREFORE**, in consideration of the premises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto agree as follows:

ARTICLE I.
DEFINITIONS

Unless the context otherwise specifies or requires, for purposes of this Agreement, the following terms shall have the meanings set forth below:

"**Adjusted Gross Revenue**" shall mean Gross Revenue less the following revenues of the Hotel to the extent included in Gross Revenue: (i) any gratuities or service charges added to a customer's bill to the extent the same are actually paid to employees; (ii) any credits or refunds made to customers, guests or patrons; (iii) any sums and credits received by Owner for lost or damaged merchandise; (iv) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges or similar taxes or charges as well as taxes and charges in replacement thereof; (v) any proceeds from the sale or other disposition of the Hotel, furnishings and equipment or other capital assets; (vi) proceeds from payments received on account of insurance policies; (vii) any condemnation awards; (viii) any proceeds of financing or refinancing of the Hotel; and (ix) interest earned on any reserve or Bank Account.

"**Bank Account(s)**" shall have the meaning ascribed thereto in Section 3.10 hereof.

"**Base Management Fee**" shall have the meaning ascribed thereto in Section 5.1 hereof.

"**Best's**" shall have the meaning ascribed thereto in Exhibit B hereof.

"**Budget**" shall mean collectively or individually, as the context shall require, the Operating Budget and Capital Budget, in each case, as approved by Owner (or as established pursuant to

07.10.2025 v.1

Section 3.11(C)**)**, as well as, if applicable, the Tentative Operating Budget and Tentative Capital Budget.

"**Capital Budget**" shall have the meaning ascribed thereto in Section 3.13 hereof.

"**Capital Replacements**" shall have the meaning ascribed thereto in Section 3.13 hereof.

"**Capital Reserve Fund**" shall have the meaning ascribed thereto in Section 3.13 hereof.

"**Centralized Services Reimbursement**" shall have the meaning ascribed thereto in Section 3.18 hereof.

"**Claims**" shall have the meaning ascribed thereto in Section 6.1(C) hereof.

"**COBRA**" shall have the meaning ascribed thereto in Section 9.5(A) hereof.

"**Commencement Date**" shall have the meaning ascribed thereto in Section 2.1 hereof.

"**Confirmation Date**" shall have the meaning ascribed thereto in Section 12.7 hereof.

"**Consumer Price Index**" means the "Consumer Price Index for all urban consumers (CPI-U)," specified for "All Items" (1982-84 = 100) for United States – All Urban Areas and issued by the Bureau of Labor Statistics of the United States Department of Labor. In the event that the Consumer Price Index shall hereafter be converted to a different standard reference base or otherwise revised, the determination of the Inflation Increase shall be made with the use of such conversion factor, formula, or table for converting the Consumer Price Index as may be published by the Bureau of Labor Statistics or, if said Bureau shall not publish the same, then the use of such conversion factor, formula, or table as may be published by any nationally recognized publisher of statistical information. In the event the Consumer Price Index shall cease to be published, there shall be substituted for the Consumer Price Index such other index as Owner and Manager shall agree upon.

"**ERISA**" shall have the meaning ascribed thereto in Section 6.3 hereof.

"**Extension Term**" shall have the meaning ascribed thereto in Section 2.2 hereof.

"**Financial Arbitrator**" shall have the meaning ascribed thereto in Section 10.2.

"**Fiscal Year**" means a fiscal year that ends on December 31. The first Fiscal Year shall be the period commencing on the Commencement Date and ending on December 31 of the same calendar year. The words "**full Fiscal Year**" mean any Fiscal Year containing not fewer than three hundred sixty-five (365) days. A partial Fiscal Year after the end of the last full Fiscal Year and ending with the expiration or earlier termination of the Term shall constitute a separate Fiscal Year.

"**Force Majeure**" shall have the meaning ascribed thereto in Section 7.1 hereof.

"**GAAP**" shall mean generally accepted accounting principles, consistently applied.

"**Gross Operating Profit**" shall mean the excess of Adjusted Gross Revenue over Operating Costs, calculated for the relevant period.

"**Gross Revenue**" shall mean all revenues and income of any nature derived directly or indirectly from the Hotel or from the use or operation thereof (including any revenue attributable to the sale and service of alcoholic beverages at the Hotel pursuant to any license, management or other agreement between Manager and any liquor permit holder for any sales of alcoholic beverages at the Hotel, subject to Section 5.4 hereof), including total room sales, food and beverage sales (unless excluded as provided in Section 12.6 below), if any, laundry, telephone, telegraph and telex revenues, and other income, rental or other payments from lessees, sublessees, licensees and concessionaires (but not (i) security deposits unless and until applied and (ii) the gross receipts of any lessees, sublessees, licensees or concessionaires).

"**Hotel**" means that certain hotel currently known by its Trade Name, located at 625 N Milwaukee St, Milwaukee, WI 53202, which is comprised of 205 keyed rooms.

"**Hotel Personnel**" shall have the meaning ascribed thereto in Section 3.8(A) hereof.

"**Incentive Management Fee**" shall have the meaning ascribed thereto in Section 5.2 hereof.

"**Inflation Increase**" means the increase, expressed as a percentage, in the Consumer Price Index issued for the date closest to November 1st of the Fiscal Year prior to the Fiscal Year for which the Budget is applicable (i.e., the Fiscal Year in which the Budget is initially prepared) over the Consumer Price Index issued for the comparable date for the Fiscal Year immediately prior to the Fiscal Year in which the Budget is initially prepared (i.e., if the Budget is for the year 2026, the Consumer Price Indexes to be used will be those issued closest to November 1st in the years 2024 and 2025).

"**Initial Term**" shall have the meaning ascribed thereto in Section 2.2 hereof.

"**Institutional Lender**" means any state-chartered bank, national banking association, insurance company or other licensed commercial lender.

"**Lender**" shall have the meaning ascribed thereto in Section 11.30 hereof.

"**License Agreement**" means the license agreement or franchise agreement, if any, described on Exhibit A attached hereto and/or any license agreement or franchise agreement hereafter entered into by Owner with respect to the Hotel.

"**Licensor**" means the licensor or franchisor under the License Agreement.

"**Management Fee**" shall have the meaning ascribed thereto in Section 5.2 hereof.

"**Manager Indemnified Parties**" shall have the meaning ascribed thereto in Section 6.1(A) hereof.

"**Manager Representative**" shall have the meaning ascribed thereto in Section 3.23 hereof.

"**Manager's Grossly Negligent or Willful Acts**" shall have the meaning ascribed thereto in Section 6.2 hereof.

"**Necessary Expenses**" shall mean expenses to fund (a) completion of construction of improvements to the Hotel in accordance with plans and specifications approved by Owner (but subject to the limitations of the Capital Budget), (b) debt service payments on Owner's financing, including mortgage and mezzanine financing (including expenses of curing any defaults thereunder), (c) real estate taxes, assessments and utility charges, (d) insurance premiums, or (e) an expense which is reasonably necessary to prevent an immediate threat to the health, safety or welfare of any individual in the immediate vicinity of the Hotel or prevent immediate structural damage or material loss to the Hotel, or avoid the suspension of any necessary service in or to the Hotel or avoid criminal or civil liability on the part of Owner, Manager or any of their respective owners or affiliates with respect to activities at the Hotel or pursuant to this Agreement.

"**Net Operating Income**" shall mean the excess of Gross Operating Profit over Project Ownership Costs, calculated for the relevant period.

"**Off-Site Personnel**" shall have the meaning ascribed thereto in Section 3.8(A) hereof.

"**Operating Budget**" shall have the meaning ascribed thereto in Section 3.11(A) hereof.

"**Operating Costs**" shall mean all Hotel operating costs, as such costs and expenses are determined in accordance with GAAP, specifically including, but not limited to, (i) all fees, assessments and charges due and payable under any License Agreement; (ii) the Base Management Fee; (iii) the Centralized Services Reimbursement and all reimbursable expenses due Manager; (iv) the cost of Operating Equipment and Operating Supplies, wages, salaries, bonuses and employee benefits, advertising and promotional expenses, the cost of personnel training programs, utility and energy costs, operating licenses and permits, grounds and landscaping maintenance costs, and equipment rentals classified as an operating cost under the Uniform System of Accounts as in effect from time to time; (v) all expenditures made for maintenance and repairs to keep the Hotel in good condition and repair, specifically excluding expenditures for Capital Replacements; and (vi) premiums and charges on the insurance coverages specified in Part II of Exhibit B incurred after the Commencement Date.

"**Operating Equipment**" shall have the meaning ascribed thereto in Section 3.15 hereof.

"**Operating Supplies**" shall have the meaning ascribed thereto in Section 3.16 hereof.

"**Operating Term**" shall mean the portion of the Term commencing on the Commencement Date and expiring upon the expiration of the Term or earlier termination of the Agreement.

"**Owner Indemnified Parties**" shall have the meaning ascribed thereto in Section 6.1(B) hereof.

"**Owner Representative**" shall have the meaning ascribed thereto in Section 4.7 hereof.

"**Ownership Costs**" shall mean the following costs which shall be excluded from Operating Costs: (i) depreciation of the Hotel, furnishings, fixtures and equipment; (ii) rental pursuant to a ground lease, if any, or any other lease payments; (iii) debt service (interest and principal) on any

mortgage(s) encumbering the Hotel and with respect to any mezzanine financing for the Hotel; (iv) the Incentive Management Fee; (v) property taxes and assessments; (vi) deposits into the Capital Reserve Fund and expenditures for Capital Replacements; (vii) audit, legal and other professional or special fees of Owner not relating to or arising from the operations of the Hotel; (viii) premiums for insurance coverages specified in Part I of <u>Exhibit B</u> and in <u>Exhibit C</u>; (ix) equipment rentals classified as ownership costs under the Uniform System of Accounts as in effect from time to time, but excluding any equipment used in the operation of the Hotel; (x) administrative and general expenses and disbursements of Owner (other than the Base Management Fee), including compensation of employees of Owner, but excluding Operating Costs and the administrative and general overhead of Manager; (xi) costs and expenses incurred in connection with entertainment and/or rooms procured by Owner; (xii) Federal, State and local franchise and income taxes; (xiii) amortization of bond discounts and mortgage expenses; and (xiv) such other costs or expenses which are normally treated as ownership costs under GAAP and the Uniform System of Accounts as in effect from time to time.

"**Permitted Variations**" means unapproved variations up to five percent (5%) per line item, but in any event not more than five percent (5%) in the aggregate per annum, of all costs and expenses in the approved Budget for the period such approved Budget is effective.

"**Project Ownership Costs**" shall mean and include the following Ownership Costs:  (i) an amount (annualized) to satisfy land, building and personal property taxes and assessments; (ii) an amount (annualized) to satisfy the premiums for the insurance required to be obtained in accordance with Part I of <u>Exhibit B</u> and <u>Exhibit C</u>; (iii) deposits into the Capital Reserve Fund; and (iv) equipment rentals characterized as ownership costs under the Uniform System of Accounts as in effect from time to time.

"**Project Services**" shall have the meaning ascribed thereto in Section 3.25(A) hereof.

"**Requirements**" shall have the meaning ascribed thereto in Section 3.24 hereof.

"**Tentative Capital Budget**" shall have the meaning ascribed thereto in Section 3.13 hereof.

"**Tentative Operating Budget**" shall have the meaning ascribed thereto in Section 3.11(A) hereof.

"**Term**" shall have the meaning ascribed thereto in Section 2.2 hereof.

"**Terminated Contracts**" shall have the meaning ascribed thereto in Section 9.5(B)(iii) hereof.

"**Termination Fee**" shall mean an amount payable by Owner to Manager if this Agreement is terminated by Owner upon sale of the Hotel as set forth in Section 9.7.  Such Termination Fee to be determined and payable as follows:

> (a)    If such termination occurs prior to or within the first (1st) month through the twelfth (12th) month following the Commencement Date, the Termination Fee shall be an amount equal to the product of (i) the average monthly Base Fee during this period multiplied by (ii) twelve (12);

07.10.2025 v.1

(b)　　　If such termination occurs within the thirteenth (13th) month through the eighteenth (18th) month following the Commencement Date, the Termination Fee shall be an amount equal to the product of (i) the average monthly Base Fee during this period multiplied by (ii) six (6);

(c)　　　If such termination occurs within the nineteenth (19th) month through the twenty-fourth (24th) month following the Commencement Date, the Termination Fee shall be an amount equal to the product of (i) the average monthly Base Fee during this period multiplied by (ii) three (3) and

(d)　　　If such termination occurs at any time following the expiration of the twenty-fourth (24th) month following the Commencement Date, Manager shall not be entitled to a Termination Fee.

"**Trade Name**" means Milwaukee Marriott Downtown or such other name as may be determined pursuant to the License Agreement.

"**Uniform System of Accounts**" shall mean the latest edition (currently, the 11th Revised Edition, 2014) of the Uniform System of Accounts for the Lodging Industry that is copyrighted by the Hotel Association of New York City, Inc. and published by the American Hotel & Lodging Educational Institute.

"**WARN Act**" shall have the meaning ascribed thereto in Section 11.21 hereof.

"**Working Capital Balance**" shall have the meaning ascribed thereto in Section 4.4 hereof.

ARTICLE II.
TERM

Section 2.1　　<u>Commencement Date</u>.  Manager shall commence operating the Hotel under the Trade Name on a date mutually determined by Owner and Manager and confirmed in writing, but in no event later than sixty (60) days after the Confirmation Date (the "**Commencement Date**").

Section 2.2　　<u>Term</u>.  The initial term shall commence on the Effective Date and expire three (3) full Fiscal Years after the Commencement Date (the "**Initial Term**"), unless sooner terminated as herein provided.  The first "full Fiscal Year" after the Commencement Date shall be the twelve-(12)-month period commencing on the January 1 next following the Commencement Date.  The parties may elect to extend the term of this Agreement for one or more extension term(s), each such extension term commencing at the expiration of the Initial Term or the preceding extension term, as applicable, and expiring one (1) full Fiscal Year thereafter.  Each such right to extend the term shall be deemed to have been exercised unless either party shall have given written notice to the other of its intention not to exercise such right, which notice shall be given at least ninety (90) days prior to the expiration of the Initial Term or the expiring extension term, as applicable.  Each such extension term, an "**Extension Term**;" the Initial Term and any Extension Term(s), together, the "**Term**."

Case 24-21743-gmh    Doc 652-6    Filed 07/16/25    Page 10 of 57

ARTICLE III.
MANAGER'S OBLIGATIONS

Subject to the terms and conditions of this Agreement, Manager shall undertake the following activities during the Operating Term, except that Section 3.26 shall also be applicable prior to the commencement of the Operating Term:

Section 3.1    Direct Operation.  Manager shall, on behalf of Owner and at Owner's expense, direct the operation of the Hotel pursuant to the terms of (i) this Agreement, (ii) the License Agreement, and (iii) all applicable Requirements, free from unreasonable interference, interruption or disturbance by Owner (or anyone claiming by, through or under Owner) subject, however, to Owner's express rights under this Agreement.

Section 3.2    Compliance with License Agreement.  Manager shall use commercially reasonable good faith efforts to comply in all material respects with the provisions of any License Agreement applicable to the operation of the Hotel, provided that Owner (i) materially performs its obligations under this Agreement, (ii) approves Operating Budgets and Capital Budgets which are sufficient to operate and maintain the Hotel in accordance with the standards set forth in the License Agreement, and (iii) provides sufficient funds to operate and maintain the Hotel in accordance with said standards.  Manager shall be responsible for directing the day-to-day activities of the Hotel.  In connection with carrying out its duties and obligations under the terms of this Agreement, Manager shall take no action that could reasonably be expected to constitute a material default under this Agreement or the License Agreement and will take such actions as are necessary to comply therewith.

Section 3.3    Manner of Operations.  Manager shall operate the Hotel and all of its facilities and activities on a 7-day-a-week, 24-hour-a-day basis, in a first-class and professional manner (i) as is customary and usual in the operation of full-service hotels in the vicinity of the Hotel to the extent consistent with the Hotel's facilities, (ii) consistent with the requirements under the License Agreement and this Agreement, and (iii) consistent with optimizing the financial performance of the Hotel.  Manager shall not close reservations for the Hotel without the prior written consent of Owner.  Manager shall perform all of its services in a diligent, professional and first-class manner in accordance with recognized standards of the hotel management industry for full-service hotels.  If Owner wishes to have Manager observe and comply with the provisions of the Loan Documents for any loan secured by the Hotel, Owner shall so notify Manager in writing and shall provide Manager with true and accurate copies of those Loan Documents with which Owner requires that Manager comply, together with a list of those provisions with which Manager shall comply, whereupon Manager shall use commercially reasonable efforts to so comply, provided that such compliance does not materially increase Manager's obligations nor materially decrease Manager's rights under this Agreement.

Section 3.4    Adherence to Budgets.  In discharging its duties and responsibilities under this Agreement, except as otherwise specifically provided herein to the contrary, Manager shall at all times act in accordance with the approved Operating Budget and Capital Budget for the Hotel. Except for Permitted Variations, Necessary Expenses, and other provisions hereof specifically providing that Manager may depart or vary from the applicable Budget or a specified amount of money is permitted hereunder to be spent by Manager (e.g. Section 3.24), Manager shall not take

-7-

any action, make any expenditure or incur any obligation by or on behalf of Owner, the Hotel or the operations of either that would exceed a Permitted Variation from any applicable Budget. Manager shall be authorized to make expenditures in excess of budgeted amounts within the limits of the Permitted Variations and Manager shall also be authorized to make expenditures for Necessary Expenses, whether or not budgeted and whether or not the same exceed the Permitted Variations, but only to the extent such expenses are Necessary Expenses. Manager shall also be authorized to make expenditures in excess of the Permitted Variations for costs and expenses that both (i) vary with occupancy to the extent that occupancy exceeds the projections contained in the applicable Budget and (ii) in Manager's good faith and professional judgment, will be offset by unbudgeted revenue directly correlated to such unbudgeted costs and expenses. References in this Agreement to the limitations imposed by the Operating Budget (and phrases of similar import) shall be deemed to incorporate Manager's authority to expend funds in excess of the Operating Budget as set forth or referenced in this Section 3.4. Regardless of the foregoing provisions relating to certain expenditures beyond the applicable Budget, Manager will promptly provide to Owner explanations for all significant variances and put programs in place to correct or improve budget deviations.

Section 3.5    Affiliate Transactions.    Notwithstanding any other provision of this Agreement to the contrary other than as to liquor permits and licenses as specifically provided in this Agreement, and except for transactions permitted under Section 3.25(B) hereof, Manager shall not enter into or consummate any transaction or arrangement with respect to the operation of the Hotel with any affiliate of Manager without the express written approval of Owner.

Section 3.6    Payment of Manager's Costs.    Owner agrees to reimburse Manger for reasonable and necessary due diligence and transition expenses incurred in connection with the assumption of management of the Hotel including, but not limited to, travel expenses, all as set forth in the approved Tentative Operating Budget; provided, however, Manager shall not exceed the amount allocated for such transition expenses in the Tentative Operating Budget without the prior written consent of Owner. In addition, all cost(s) and expense(s) of the Hotel incurred by Manager in accordance with and as permitted pursuant to this Agreement shall be paid from the Bank Account(s), except for costs and expenses which Manager is responsible for pursuant to the terms hereof.

Section 3.7    Payment of Hotel Costs.    Manager shall be obligated to timely pay all Operating Costs (including any sales taxes associated with Hotel operations) and such Ownership Costs as agreed by Owner and Manager, subject to availability of funds in the Bank Account(s).

Section 3.8    Personnel.

A.    Manager shall take all necessary and proper actions during the Operating Term to properly staff and Operate the Hotel in a first-class and professional manner in accordance with the terms and conditions of this Agreement. Subject to Section 3.8(B) below, Manager shall be the sole judge of the fitness and qualification of all personnel working at the Hotel ("**Hotel Personnel**") and shall have the sole and absolute right to hire, supervise, order, instruct, discharge and (subject to compliance with the Operating Budget) determine the compensation, benefits and terms of employment of all Hotel Personnel. The selection, terms of employment (including rates of compensation), which shall be consistent with the terms that are customary and usual in the

operation of other full-service hotels, and termination thereof, and the supervision, training and assignment of duties of all employees of Manager engaged in the operation of the Hotel, shall be the sole duty and responsibility of Manager. Notwithstanding the foregoing, the criteria (which must be clearly stated) for earning and the payment of bonuses to Hotel Personnel must be approved in advance by Owner. All Hotel Personnel shall be employees or independent contractors of Manager or an affiliate of Manager and/or vendors to Manager or an affiliate of Manager (and not employees of Owner). Manager shall use commercially reasonable efforts to limit the use of "temporary employees" in the operation of the Hotel. Subject to compliance with the Operating Budget, Manager shall also have the right to use employees of Manager, as well as Manager's parent and subsidiary and affiliated companies, not located at the Hotel ("**Off-Site Personnel**") to provide services to the Hotel, including without limitation information systems support, legal, accounting, tax, purchasing, marketing, human resources and revenue management services; provided the costs for such Off-Site Personnel shall be clearly disclosed to Owner and set forth in the Operating Budget. All Claims and employment costs (including, without limitation, those pertaining to any collective bargaining agreement or union activities, and any multiemployer plan withdrawal liability or the like) that are related to Hotel Personnel and Off-Site Personnel shall be Operating Costs. If and to the extent that any employee of Manager or Off-Site Personnel performs services for any other Manager-managed hotel in addition to the Hotel, a portion of such employee's compensation and related costs shall be allocated to the Hotel as an Operating Cost, with such allocation to be made in good faith and on a fair and proportionate basis among the Hotel and the other Manager-managed hotels benefiting from such shared services and clearly stated and disclosed to Owner. Any shared services as described above shall be identified as part of the approved Operating Budget or otherwise agreed to in writing by the Owner.

B.     Manager shall not hire any general manager, director of sales or other executive management level employees for the Hotel without the prior written consent of Owner (which consent may be via email), which consent shall not be unreasonably withheld, conditioned or delayed.   Manager shall provide Owner with prior written notice of a proposed hire of any general manager, director of sale or other executive management employee for the Hotel, including the offered salary, moving expense allowance, benefits and bonuses, all of which shall be subject to Owner's prior approval. In addition, as a condition of Owner's approval of any such candidate, Owner shall be entitled to meet and interview any such proposed candidate within five (5) business days of receipt of written notice of such proposed hire.

C.     Subject to compliance with the Operating Budget, or otherwise agreed to in writing by Owner, Manager, in its reasonable discretion, may (i) provide lodging for Manager's (or its affiliate's) executive employees visiting the Hotel in connection with the performance of Manager's services at the Hotel and allow them the use of Hotel facilities and (ii) provide the general manager of the Hotel temporary living quarters within the Hotel (not to exceed ten (10) days in the aggregate without Owner's approval) and other Hotel employees (including the general manager) the use of all Hotel facilities, in either case at a discounted price or without charge as the case may be; provided, however, that any such use or discount shall not exceed that which is customary and usual in the operation of other similarly situated hotels, unless otherwise required by any applicable union contract or previously approved by Owner or set forth in the Operating Budget. Manager shall, on an as-available basis and provided such use is not excessive in the reasonable judgment of Manager, provide lodging at the Hotel for Owner's executive employees, directors or members visiting the Hotel and allow them the use of all Hotel facilities, in either case

-9-

at a discounted price or without charge as the case may be, on the same basis as afforded Manager's executive employees under clause (i) above.

D. Manager shall not enter into any collective bargaining agreement concerning any employees of the Hotel without the prior written approval of Owner, which may be granted or withheld in Owner's sole discretion. Upon Owner's approval of any such agreement, Manager shall be responsible to perform such agreements. Owner's granting or withholding of approval to enter into a collective bargaining agreement shall not interfere with Manager's bargaining obligations under the National Labor Relations Act. Manager will use good faith reasonable efforts and take all such actions which are consistent with the generally prevailing industry practices in the management of full-service commercial hotels, to comply with all applicable laws, regulations, and ordinances regarding the employment of Hotel Personnel, including, but not limited to, the "Equal Employment Opportunity" laws and regulations.

Section 3.9    Hotel Policies. Manager shall be responsible for establishing all policies and procedures relating to the management and operation of the Hotel, all subject to the limitations and provisions relating thereto set forth in this Agreement and the License Agreement. Manager shall determine the terms of guest admittance to the Hotel, establish room rates, use of rooms for commercial purposes, establish rates and policies for use of the conference facilities, and direct and manage the food and beverage operations of the Hotel, all subject to the limitations and provisions relating thereto set forth in the Operating Budget and the License Agreement, if any. Manager will be available to consult with and advise Owner, at Owner's reasonable request, concerning all policies and procedures affecting all phases of the conduct of business at the Hotel.

Section 3.10    Bank Accounts/Distributions.

A. Manager shall open and operate the Hotel's bank accounts. All sums received from the operation of the Hotel and all items paid by Manager arising by virtue of Manager's operation of the Hotel shall pass through bank account(s) established by Manager as agent for Owner or its Lender (if required by applicable Loan Documents) at such banks as Owner shall designate ("**Bank Account(s)**"). Only Manager's designees, which have been approved by Owner, shall be authorized to operate and draw from the Bank Account(s). Each calendar month Manager, on behalf of Owner, shall disburse funds from the Bank Account(s) (to the extent available) on account of Operating Costs. If after such disbursements for Operating Costs, there are funds in the Bank Account(s) in excess of the Working Capital Balance, Manager shall promptly disburse such excess funds to Owner, but in no event later than the fifteenth (15th) day of each such calendar month. If, at any time during the Operating Term, Manager reasonably determines in good faith that there will be a deficiency in the funds in the Bank Account(s), including any Working Capital Balance, to fund Operating Costs for the next thirty (30) day period taking into account projected Operating Costs and Gross Revenue for such period and the ability to delay payables in the ordinary course of business, Owner shall, within two (2) days of receipt of written notice with supporting documents and verifying the request, provide such funds as may be immediately necessary to fund any such deficiency. Manager shall not change the bank or open or close any Bank Account without Owner's prior written approval; provided, however, Manager may maintain a separate account into which it maintains no more than $7,500 as petty cash so that Hotel Personnel may make small expenditures, with the authorization of the general manager or assistant general manager, for Operating Costs (for example, payments on delivery).

-10-

B.     Manager shall not commingle funds of Owner or the Hotel (including those on deposit in the Bank Account(s)) with other funds of Manager or with funds of any other property owned, leased or managed by Manager or any of its affiliates.

C.     Notwithstanding anything to the contrary set forth in this Agreement, Manager agrees that it will comply with any reasonable requirement or request of Lender or the provider of any mezzanine financing with respect to the Hotel to change the manner in which bank and other accounts are held and in which the cash management system for the Hotel operates; provided that Owner shall provide Manager with copies of the relevant provisions of any Loan Documents which shall apply to any such cash management system.

Section 3.11   Operating Budgets.

A.     Attached hereto and made a part hereof as Exhibit F is an interim operating budget (the **"Tentative Operating Budget"**) for the balance of the current Fiscal Year.  Within seventy-five (75) days after the Commencement Date (provided Owner has furnished accurate electronic financial data to Manager), Manager shall submit to Owner for its approval a proposed operating budget for first Fiscal Year (as approved by Owner, the **"Operating Budget"**).  Any reference herein to the **"Operating Budget"** shall include the Tentative Operating Budget.  Further**,** Manager shall, no later than December 1st of each Fiscal Year hereafter, submit to Owner for its approval a proposed Operating Budget for the ensuing full or partial Fiscal Year, as the case may be.

B.     Owner's approval of the Operating Budget shall not be unreasonably withheld or conditioned and shall be deemed given unless specific written objections thereto are delivered by Owner to Manager within thirty (30) days after submission.

C.     If Owner disapproves or raises objections to a proposed Operating Budget, the parties shall attempt to resolve in good faith any reasonable objections raised by Owner within twenty-five (25) days after Manager's receipt of such objections. If Owner and Manager are unable to resolve the disputed or objectionable matters prior to the commencement of the applicable Fiscal Year, then the disputed or objectionable items in the Operating Budget (or the entire Operating Budget if wholly disputed) for such Fiscal Year shall remain the same as the Operating Budget for the prior Fiscal Year (whether the same was approved or deemed approved but in all instances excluding any non-recurring items) increased by the Inflation Increase; provided, however, in any event such increase shall not exceed an increase of five (5%) percent for any particular line item, or five (5%) percent in the aggregate, above the Operating Budget for the prior Fiscal Year, unless otherwise mutually agreed upon by the parties.

D.     Manager may propose for Owner's reasonable approval revisions to the Operating Budget from time to time, as necessary, to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of income or expense. Owner acknowledges that the Operating Budget is intended only to be a reasonable estimate of the Hotel's income and expenses for the ensuing Fiscal Year.  Manager shall not be deemed to have made any guaranty, warranty or representation whatsoever in connection with the Operating Budget.

07.10.2025 v.1

E.    Each annual Operating Budget shall be prepared in accordance with the Uniform System of Accounts.  The proposed annual Operating Budget shall incorporate Manager's good faith reasonable estimates of the items of revenue and expense contained therein and shall contain the proposed budget for operations for the succeeding fiscal year and shall include: estimated profit and loss statement for the Hotel for each month of the upcoming fiscal year in reasonable detail, including schedules of projected: (i) hotel room rates; (ii) occupancy levels, (iii) general sources of business; (iv) sources and amounts of other income; (v) Operating Costs to be incurred in operating the Hotel, including as separate line items amounts budgeted for repairs and maintenance expenditures, expenditures for advertising and business promotions and salaries, bonuses and benefits for Hotel Personnel (with such items specifically delineated for the general manager, director of sales and other executive management of the Hotel, including any proposed formula for bonuses); (vi) other fixed costs and expenses to be incurred in operating the Hotel, including all items included in taxes, rent, insurance and additions to the reserve accounts (determined as a percentage, not to exceed the Reserve Percentage of Gross Revenue); (vii) the methodology for determining and allocating shared and centralized services; (viii) net cash flow; (ix) reimbursable expenses to Manager; (x) a narrative description of Manager's plans and goals for marketing and operating the Hotel for the upcoming fiscal year; and (xi) any other schedules relating to the operation of the Hotel reasonably requested by Owner.  Any revisions, substitutions or additions to the Operating Budget must be approved by the Owner in writing.

F.    As part of the budgeting process, Manager shall provide to Owner, together with each proposed annual Operating Budget, a complete list of all service and other contracts anticipated for the Fiscal Year which is the subject of the Operating Budget having a liability to the Hotel in excess of $20,000 for such Fiscal Year.  So long as any service or other contracts fall within the guidelines set forth below, Owner's approval thereof shall not be required:

(i)    The term of such contract shall be no longer than one (1) year; and

(ii)    Each contract must be terminable by Owner or Manager without payment or penalty upon not more than thirty (30) days' notice;

Notwithstanding anything herein to the contrary, Manager shall nevertheless promptly report to Owner the execution of (and provide Owner with a true and complete copy of) each such contract having a liability to the Hotel of in excess of $20,000.

Section 3.12    Operating Statement.  Manager shall prepare and furnish to Owner the following statements, which shall include such additional statements, information or reports as Owner is required to provide under the License Agreement or by Lender, from time to time:

A.    within thirty (30) calendar days after the close of each Fiscal Year, a preliminary and unaudited balance sheet for the Hotel dated as of the end of such Fiscal Year, a preliminary and unaudited statement of income and expenses and a preliminary and unaudited statement of cash flow (in each case, with explanations of material Budget variances);

B.    within ninety (90) calendar days after the close of each Fiscal Year, a balance sheet for the Hotel dated as of the end of the Fiscal Year, a related statement of income and expense (with explanations of material Budget variances), a statement of cash flow (with

-12-

explanations of material Budget variances), and all other information reasonably required by Owner, all of which shall be unaudited but certified to Owner by Manager as being, to the best of its knowledge, true and correct;

C. within sixty (60) days after the end of each Fiscal Year, a profit and loss statement with explanations of material Budget variances including, without limitation, a breakdown of the salaries, benefits and bonuses paid to Hotel Personnel (specifically delineating such compensation paid to the general manager, director of sales and any other executive management of the Hotel and the basis of such payments), and statement of cash flow (with explanations of material Budget variances) for the Hotel, and a report of capital expenditures, each for the previous Fiscal Year, and an accounts receivable aging report, each dated as of the end of the previous Fiscal Year;

D. within fifteen (15) days after the end of each calendar month, a profit and loss statement (with explanations of material Budget variances), and statement of cash flow (with explanations of material Budget variances) for the Hotel, and a report of capital expenditures, each for the previous calendar month, and an accounts receivable aging report, each dated as of the end of the previous calendar month;

E. Within twenty (20) days after the end of each calendar quarter, a summary report of all fees, costs and pass through expenses due and paid or payable to Manager or its affiliates pursuant to this Agreement; and

F. Each day, a daily revenue report for the Hotel for the prior day.

Section 3.13    Capital Budgets.  Manager shall, not less than December 1st of each Fiscal Year, submit to Owner a recommended capital budget, prepared in accordance with the Uniform System of Accounts, for the ensuing full or partial Fiscal Year, as the case may be, for furnishings, fixtures and equipment, and ordinary Hotel capital replacement items (collectively, "**Capital Replacements**") as shall be required to operate the Hotel in accordance with the standards set forth in this Agreement and those referred to in the License Agreement (as approved by Owner, the "**Capital Budget**").  Attached hereto and made a part hereof as Exhibit G is an interim Capital Budget for the balance of the current Fiscal Year (the "**Tentative Capital Budget").**  Within seventy-five (75) days after the Commencement Date, Manager shall submit to Owner for its approval (provided Owner has furnished accurate electronic financial data to Manager) a proposed capital budget for the ensuing Fiscal Year.  Until such proposed replacement capital budget has been approved, any reference herein to the **"Capital Budget"** shall include the Tentative Capital Budget**.**  Owner's approval of the Capital Budget shall not be unreasonably withheld or conditioned and shall be deemed given unless Owner provides specific written objections thereto to Manager within thirty (30) days after submission.  If Owner does not approve the Capital Budget, then subject to any limitations in the Loan Documents, Manager shall be entitled to spend on Capital Budget items only those amounts necessary to comply with the License Agreement or applicable law or to maintain safety standards at the Hotel as set forth in Section 7.2 hereof. Manager may propose, for Owner's reasonable approval, revisions to any Capital Budget from time to time, as necessary to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of capital expenditures.

A.     Owner shall create a separate reserve account from which to fund expenditures for Capital Replacements by depositing the percentage of Adjusted Gross Revenue as may be required, from time to time, under the License Agreement, on a monthly basis into an interest-bearing account (the "**Capital Reserve Fund**") established by Owner or, if applicable, Owner's first mortgage lender, with the only authorized signatories on said account being Owner's designees, and, if applicable, Owner's first mortgage lender, in each case as approved by Owner. Any amounts remaining in the Capital Reserve Fund at the close of each Fiscal Year (including, without limitation, all interest earned thereon) shall be carried forward and retained in the Capital Reserve Fund until fully used as herein provided, unless otherwise required or permitted by Licensor and Lender.  All proceeds from the sale or other disposition of furniture, fixtures and equipment no longer needed for the operation of the Hotel shall be deposited in the Capital Reserve Fund.

Section 3.14   General Maintenance Non-Capital Replacements.  Manager or its designee shall supervise the routine maintenance, repair and replacement of non-Capital Replacements as necessary to maintain the Hotel in good operating condition in compliance with the License Agreement and otherwise in the condition required by this Agreement, which projects may include the routine repairs and maintenance of HVAC, mechanical and electrical systems, exterior and interior repainting, resurfacing building walls and parking areas, waterproofing of exterior surfaces of floors, roofs, and replacement of plate glass; provided that, such routine repair and maintenance projects are limited in the scope of work and the required time commitment to complete and are capable of being performed by Hotel employees without supervision or specialized training.  It is Owner's intent that the sums allocated for such routine repairs and maintenance projects shall be set forth in the then current annual Operating Budget and that the parties shall use commercially reasonable efforts to expend such sums during the current fiscal year exclusively for the purposes identified in such annual Operating Budget.  If Owner has received a guaranty or warranty of the builder of the Hotel or of any supplier of labor or materials for the Hotel or of any supplier of labor or materials for the construction of the Hotel related to such repair or maintenance project and such guaranty or warranty remain in effect, then the parties shall cooperate using commercially reasonable efforts to enforce the rights of Owner under such guaranty or warranty.

Section 3.15   Operating Equipment.  Manager or its designee shall select and purchase all operating equipment for the Hotel, such as linens, utensils, uniforms and other similar items ("**Operating Equipment**"), all in accordance with the Operating Budget or otherwise approved by Owner in writing.

Section 3.16   Operating Supplies.  Manager shall select and purchase all operating supplies for the Hotel, such as food, beverages, fuel, soap, cleansing items, stationery and other consumable items ("**Operating Supplies**"), all in accordance with the Operating Budget, or otherwise approved by Owner in writing.

Section 3.17   Contracts.

A.     Manager shall negotiate, enter into and enforce contracts for the provision of services to the Hotel in accordance with the Operating Budget or otherwise approved by Owner in writing; provided however, that without Owner's prior written approval, Manager shall not enter into any such contract or amend any such contract if:

-14-

(i)     the contract is a "barter" arrangement in whole or in part unless it relates only to the Hotel and no other property;

(ii)    the contract is with an affiliate of Manager;

(iii)   the contract is for a period of more than one (1) year, unless (i) such contract is terminable by Owner after said one (1) year period upon not more than thirty (30) days' notice without the payment of any fee or premium or (ii) such contract (or amendment thereto) is contemplated by a Budget approved (or deemed approved) by Owner;

(iv)    the contract is not terminable by Owner or Manager upon at least thirty (30) days prior notice without payment of any fee or premium; or

(v)     the contract is for the lease of real or personal property.

Furthermore, Manager shall not: (1) (i) exercise any remedies or make any other material decision with respect to third parties who default on obligations of $25,000 or more relating to the Hotel, or (ii) take any action on behalf of Owner with respect to any claim, dispute, or litigation involving the Hotel which could reasonably be expected to result in a claim for damages by or against Owner or the Hotel of $25,000 or more, unless the action set forth in (i) or (ii) above, as applicable, is (a) with respect to the collection of accounts receivable incurred in the ordinary course of business, (b) contemplated by a Budget approved (or deemed approved) by Owner, or (c) otherwise specifically approved by Owner, (2) request or permit the changing of any zoning Requirements at the Hotel without written approval by Owner, or (3) encumber or permit the encumbrance of the Hotel or any assets of Owner.

B.      All contracts for repairs, Capital Replacements, and food and beverage services exceeding $15,000 per annum shall be awarded on the basis of competitive bidding (provided, however, that Manager will not be required to obtain competitive bids for any service for which a single provider exists), solicited in the following manner:

(i)     A minimum of two (2) written bids shall be obtained for each purchase or contract that exceeds $15,000 per annum, up to $30,000 per annum. Purchases over $30,000 per annum will require a minimum of three (3) bids.

(ii)    Each bid will be solicited in a uniform format.

(iii)   Manager may accept a low bid without prior approval from Owner if the expenditure is for an item in the approved Budget and will not exceed the annual budgeted amount for such account category of the applicable Capital Budget or Operating Budget.

(iv)    If Manager desires to accept a bid other than the lowest bid, then Manager shall so advise Owner in writing and recommend that such bid be accepted, with support for such recommendation as Owner may reasonably require.

(v)     Owner shall have the right to accept or reject any and all bids for repairs, Capital Replacements, or food and beverage services that are not the lowest bid; provided, however, that acceptance of such bid shall not be unreasonably withheld or delayed.

-15-

(vi)     Manager may request Owner to waive in writing competitive bidding rules for a specific item or service.

Section 3.18     Accounting Standards.     Manager shall maintain the books and records reflecting the operations of the Hotel in accordance with GAAP as well as the Uniform System of Accounts as in effect from time to time and shall adopt and follow a calendar year accounting period. All such books and records, no matter where located or maintained, including, without limitation, all books of accounts, guest records, front office records and financial, tax and other reports and statements prepared in accordance with this Agreement, shall be the property of Owner. Manager shall provide centralized and routine accounting services, revenue management services and at Owner's request, routine purchasing services, in either case as required in the ordinary course of business.  Upon the expiration or earlier termination of this Agreement, all such books and records shall thereafter be provided to Owner or its designee, although Manager may retain copies thereof.   The Hotel-level generated accounting records, reflecting detailed day to day transactions of the Hotel's operations, shall be kept by Manager at the Hotel, at Manager's corporate headquarters, or at such other location as Manager shall reasonably determine.  Manager shall be paid a monthly charge (the "**Centralized Services Reimbursement**") for accounting, internal audit and data processing services provided to the Hotel, which may include regional or third party oversight over property-level accounting, as set forth from time to time in the annual Operating Budget.  As of the date hereof, the Centralized Services Reimbursement shall include (but shall not limited to) the following reimbursable services; provided, however, any changes to the Centralized Services Reimbursement shall be included in the annual approved Operating Budget or otherwise approved in writing by Owner:

| Support Services | Total Per Year | Total Per Month |
|---|---|---|
| Centralized Accounting | $45,000 | $3,750 |
| Revenue Management | $36,000 | $3,000 |

Section 3.19     Marketing and Advertising.     Subject to the License Agreement and the Operating Budget, Manager shall advertise and promote the Hotel in coordination with the sales and marketing programs of Manager and other hotels operating under the Trade Name.  Subject to the License Agreement and Operating Budget, Manager may participate in sales and promotional campaigns and activities involving complimentary rooms.  Subject to the License Agreement and the Operating Budget, Manager, in marketing and advertising the Hotel, shall have the right to use marketing and advertising services of employees of Manager and its parent and affiliated companies not located at the Hotel and to participate in group or cluster marketing activities where services may be shared and the costs equitably allocated among the participants without a mark-up of such costs to Manager or its affiliates.

Section 3.20     Permits and Licenses.     Manager shall, on behalf of Owner, use commercially reasonable efforts to obtain and maintain in good standing in Owner's name (to the extent permitted under applicable law) all licenses and occupancy and operating permits required for the legal operation and occupancy of the Hotel.  Manager shall send to Owner a copy of all initial or renewal license applications.  All such licenses, permits and other instruments shall be

-16-

obtained in Owner's name whenever possible, except that the Hotel's liquor license may be held by Manager or by Owner and Manager, or a subsidiary of the forgoing as permitted below. All such licenses, permits or other instruments held in the name of Manager shall be held by Manager on behalf of Owner and upon the termination or expiration of this Agreement, Manager shall (to the extent permitted under applicable law) transfer or assign any such licenses, permits or other instruments to Owner or to such person as Owner may direct. Manager or an affiliate of Manager (and the use of an affiliate of Manager for such purposes is hereby approved) will use commercially reasonable efforts to obtain and maintain the appropriate licenses and permits (to include a mixed beverage permit, mini-bar permit, a mixed beverage late hours permit and food and beverage certificates, as applicable) for the service of alcoholic beverages at the Hotel and will use commercially reasonable efforts to comply with all laws, regulations, and requirements applicable in the Hotel's jurisdiction to the sale and service of alcoholic beverages and applicable to the maintenance of such licenses and permits at the Hotel. Upon termination of this Agreement, Manager agrees, at no cost, expense or liability to Manager to cooperate reasonably with Owner or any subsequent owner of the Hotel in the transition of the alcoholic beverage operations at the Hotel. With respect to the serving of liquor at the Hotel, Manager agrees, at Owner's sole cost and expense, to the extent required by law, rule or regulation, to form one or more subsidiary entities of Manager to hold any liquor license permits, and to enter into any necessary management or license agreements by and between Manager and such subsidiary liquor permit holders, provided the same are reasonably acceptable to Manager. All rights and benefits arising under this Agreement shall likewise apply to any such subsidiary of Manager with respect to all of its activities at or for the benefit of the Hotel (including, without limitation, the provisions of Article VI hereof). Likewise, the limitations on Manager's authority as well as the obligations hereunder shall apply to such subsidiary with respect to all of its activities at or for the benefit of the Hotel. The provisions of this <u>Section 3.20</u> shall survive the expiration or earlier termination of this Agreement.

Section 3.21   <u>Owner Meetings</u>.   The Hotel's general manager shall meet with Owner Representatives from time to time as Owner may reasonably request, but not less than monthly, to review and discuss previous and future operating statements, cash flow, budgets, capital expenditures, important personnel matters, marketing, sales, revenue management and the general concerns of Owner and Manager. Except to the extent otherwise mutually agreed upon by Owner and Manager (acting reasonably), all such meetings shall be held at the Hotel.

Section 3.22   <u>Insurance</u>.   Manager, at Owner's request, shall procure and maintain throughout the Operating Term the insurance coverages set forth on <u>Exhibit B</u>. In the event Owner desires to procure the coverages set forth on Exhibit B, it shall then be the Owner's obligation to procure and maintain such coverages throughout the Operating Term.

Section 3.23   <u>Manager Representatives</u>.   Manager shall appoint representative(s) to represent Manager in all matters relating to this Agreement and/or the Hotel (each a "**Manager Representative**"). Robert Burg shall be the Manager's initial Manager Representative. Owner shall have the right to deal with any of the Manager Representatives on all such matters. Owner may rely upon statements and representations of any Manager Representative as being from and binding upon Manager. Manager may change its Manager Representative(s) from time to time by providing written notice to Owner in the manner provided for herein.

07.10.2025 v.1

Section 3.24   Compliance with Requirements.  Manager shall cause compliance, in all material respects, by the Hotel (A) with all federal, state and municipal laws, rules, regulations, requirements, orders, notices, determinations, and ordinances, including all environmental laws, relative to the leasing, use, operation, repair and maintenance of the Hotel, (B) with the rules, regulations or orders of the local Board of Fire Underwriters or other similar body of any federal, state or municipal authority to the extent applicable from time to time during the Term hereof with respect to the Hotel or the performance of Manager's obligations under this Agreement, and (C) with all terms, conditions, requirements and provisions of (i) all governmental or quasi-governmental licenses and permits, including but not limited to any certificate of occupancy, business licenses and liquor licenses; (ii) all leases; and (iii) all liens, restrictive covenants and encumbrances affecting the Hotel or any part thereof (collectively, the "**Requirements**").  In connection with the foregoing, Owner may provide Manager with asbestos or similar O&M program requirements and Manager shall use commercially reasonable efforts to comply with such programs.  Manager shall promptly use commercially reasonable efforts to remedy any violation of any such Requirement which comes to its attention, including any tenant violation, all at Owner's expense in accordance with this Agreement.  If the cost of compliance exceeds $10,000 in any instance, Manager shall notify Owner promptly and obtain Owner's prior written approval (acting reasonably) prior to making the expenditure.

Section 3.25   Services by Manager.

A.   Direction and administration of Hotel renovation projects, other planning, design and implementation, management information systems and accounting services for specific renovation projects or other significant projects, and related project management and technical services which the Hotel may require (collectively, "**Project Services**"), are not provided for under the scope of this Agreement. Accordingly, Manager will not furnish, and Owner will not be charged for, Project Services, unless the same are provided for in an Operating Budget or Capital Budget approved by Owner or unless otherwise approved by Owner.  In such event, Manager may use the services of its affiliates to perform Project Services, in which case, Project Services shall be furnished to Owner on terms and conditions that are comparable to those available from a competitive outside source.  In any event, Owner shall not itself (or engage any third party to) make any alterations or renovations to the Hotel without first consulting and coordinating with Manager so as to minimize interference with Hotel operations; provided, however, the foregoing shall in no way limit Owner's right to determine, in its sole discretion, the provider of any Project Services.

B.   In purchasing goods, supplies, equipment and services for the Hotel, including, without limitation, Operating Supplies, Operating Equipment, insurance and long-distance telephone services, Manager may utilize purchasing procurement services of affiliates of Manager and/or other group buying techniques involving other hotels that which would be charged by third party vendors in an arms-length transaction.  If such expenses are shared by other Manager-managed hotels, the Hotel's portion of the costs described above will be specifically set forth in the approved Operating Budget (including any mark-up or fee in favor of Manager or its affiliates), or otherwise approved in Owner in writing, and allocated in good faith in a fair and proportionate basis among the Hotel and such other Manager-managed hotels.  In such event, such affiliates and/or Manager (as the case may be) may mark up their costs or receive and retain a fee or other compensation from vendors and service providers for their services in making the benefit

-18-

of volume purchases available to the Hotel or negotiating and implementing the arrangements with such vendors or providers; provided such mark-up or fees are disclosed to Owner in advance of incurring any such costs.

Section 3.26    Reserved.

Section 3.27    Liens.  Owner and Manager shall cooperate and use all commercially reasonable efforts to prevent any liens from being filed against the Hotel that arise from any maintenance, changes, repairs, alterations, improvements, renewals or replacements in or to the Hotel. If any such liens are filed, Manager shall use commercially reasonable efforts, subject to the availability of funds therefor in the Bank Account(s) or as otherwise supplied by Owner, to obtain the release thereof prior to the institution of legal proceedings in connection therewith.  The cost of obtaining such release shall be included in Operating Costs.

ARTICLE IV.
OWNER'S OBLIGATIONS DURING THE TERM

Section 4.1    Compliance with License Agreement.  The following provisions of this Section 4.1 shall be applicable only if, as, and when Owner enters into a License Agreement: Owner shall comply in all material respects with all the terms and conditions of the License Agreement (specifically including, but not limited to, Owner's obligation to pay the fees, charges and contributions set forth in the License Agreement) and keep the License Agreement in full force and effect from the Commencement Date through the remainder of the Term.   The preceding sentence shall not be construed to derogate from Manager's obligations under this Agreement, including, without limitation, Section 3.2 hereof.  Owner acknowledges that Licensor and Manager shall have the right to communicate directly with each other regarding day-to-day operation of the Hotel; provided, however, (a) Manager shall promptly provide Owner with copies of all communications received by Manager from Licensor regarding the Hotel, and (b) Manager shall include Owner in all negotiations and discussions with Licensor regarding any property improvement plan, Capital Reserve Fund or FFE reserve requirements, closing of the executive lounge, key money repayment or other material issues relating to the Hotel.

Section 4.2    Licenses and Permits.  Owner shall assist Manager in obtaining and maintaining all governmental permissions, licenses and permits necessary to enable Manager to operate the Hotel in accordance with the terms of this Agreement and the License Agreement.

Section 4.3    Insurance.  Owner shall procure and maintain throughout the Term the insurance coverages set forth on Exhibit C.  Notwithstanding the foregoing, Manager may, at its option (but shall not be obligated to) make available to Owner during the Operating Term the opportunity to participate in blanket insurance policies carried by Manager and its affiliates for other properties, and which cover all or any portion of the insurance coverage specified in Exhibit C.  Owner agrees to participate in such blanket policies if (a) Manager determines to make such coverage available to Owner, (b) the premiums for such coverage allocable to the Hotel shall be less expensive than the premiums Owner would pay to a carrier other than Manager's carrier, and (c) the coverage afforded by and the creditworthiness of such blanket insurers is at least equal to that of Owner's insurer(s) and satisfies the requirements contained in the Loan Documents.  In such event, notwithstanding the provisions of Exhibit C, Manager shall be responsible for

procuring and maintaining, at the expense of Owner, all insurance coverage represented by such blanket policies. Upon the Effective Date, and thereafter until commencement of the Operating Term, Owner shall name Manager as an additional insured on the Hotel's liability insurance certificate of insurance evidencing such liability insurance coverage.

Section 4.4    Operating Funds.    Subject to the other terms and conditions of this Agreement, Owner shall provide all funds necessary to enable Manager to manage and operate the Hotel in accordance with the terms of this Agreement and the License Agreement. Prior to Manager commencing its duties under this Agreement, Owner agrees to deliver to Manager for deposit into the Bank Account(s) on the Commencement Date the sum of Two Hundred Five Thousand Dollars ($205,000.00), which amount shall be the "**Working Capital Balance**". The Working Capital Balance shall serve as the working capital for the Hotel's operations. If there are insufficient funds in the Bank Accounts, including any Working Capital Balance, to fund Operating Costs for the next thirty (30) day period taking into account projected Operating Costs and Gross Revenue for such period and the ability to delay payables in the ordinary course of business, Owner agrees from time to time, within five (5) days of Manager's written request in accordance with Section 3.10A above, to furnish Manager with sufficient funds to operate the Hotel for the following thirty (30) day period (provided such request is made in accordance with Section 3.10A, is accompanied by an explanation including the use of the required funds and the reason the requirement was not anticipated).

Section 4.5    Capital Funds.    Owner shall expend such amounts for renovation programs, furnishings, fixtures and equipment and ordinary Hotel capital replacement items as are provided for in the Capital Budget or available in the Capital Reserve Fund and required from time to time to (a) maintain the Hotel in good order and repair; (b) comply with the standards referred to in the License Agreement; and (c) comply with governmental regulations and orders. Owner shall cooperate fully with Manager in establishing appropriate procedures and timetables for Owner to undertake capital replacement projects.

Section 4.6    Payments to Manager.    Owner shall promptly pay to Manager all amounts due Manager under this Agreement.

Section 4.7    Owner Representatives.    Owner shall appoint representative(s) to represent Owner in all matters relating to this Agreement and/or the Hotel (each an "**Owner Representative**"). Owner's initial Owner Representative(s) shall be Randall G. Erkert and Mark Flaherty. Manager shall have the right to deal with any one of the Owner Representatives on all such matters. Manager may rely upon statements and representations of any Owner Representative as being from and binding upon Owner. Owner may change its Owner Representatives from time to time by providing written notice to Manager in the manner provided for herein. Owner shall cause at least one of the Owner Representatives to attend all meetings with Manager pursuant to Section 3.21.

Section 4.8    Owner's Audits.    On no less than forty-eight (48) hours' prior written notice, Owner shall have the absolute right to conduct an audit of the Hotel's operations and its books and records by using its own internal auditors or by employing independent auditors. Except as set forth below, costs associated with conducting any such audit shall be borne by Owner. Should Owner's employees or agents discover either weaknesses in internal controls or errors in

-20-

record keeping, these shall be communicated to Manager in writing. Manager shall correct such discrepancies either upon discovery or within a reasonable period of time after notification by Owner. The books of accounts and all other records relating to or reflecting operations of the Hotel shall at all times be available to Owner and its auditors at all reasonable times for examination, audit, inspection, transcription and reproduction, with no less than forty-eight (48) hours' prior written notice. If any audit conducted by or on behalf of Owner reveals a discrepancy in the calculation of annual Gross Operating Profit before deduction of Project Ownership Costs in excess of the greater of (A) two percent (2%) thereof and (B) Two Hundred Thousand Dollars ($200,000.00), Manager shall be responsible for the reasonable costs and expenses of such audit. The provisions of this <u>Section 4.8</u> shall survive the expiration or earlier termination of this Agreement.

Section 4.9 <u>Exhibits</u>. Owner represents and warrants to Manager that the only mortgage(s) and mezzanine financing presently encumbering the Hotel or the beneficial interests of Owner in the Hotel are documented by the mortgage(s) and mezzanine financing documents, if any, are listed on <u>Exhibit D</u> (as such exhibit and corresponding documents may be modified, amended, or supplemented, the "**Loan Documents**"); provided, however, that Owner may encumber the Hotel or the beneficial interests of Owner in the Hotel with mortgage and mezzanine financing at any time after the Effective Date and Owner shall promptly provide Manager with written notice of such Lender and Loan Documents.

Section 4.10 [Reserved].

ARTICLE V.
MANAGEMENT FEE

Section 5.1 <u>Management Fee</u>. Commencing on the Commencement Date and on or after the first (1st) day of each calendar month during the Operating Term, Manager is authorized by Owner to pay itself monthly from the Bank Account(s) three percent (3%) during the Operating Term, of Adjusted Gross Revenues for the prior calendar month (the "**Base Management Fee**"). The Management Fee shall be paid in arrears based upon the previous calendar month's Adjusted Gross Revenue.

Section 5.2 <u>Incentive Management Fee</u>. Manager shall receive an Incentive Management Fee equal to ten percent (10%) of the Gross Operating Profit for the second full Fiscal Year and each Fiscal Year thereafter, or portion thereof, in excess of the Gross Operating Profit for the prior Fiscal Year (the "**Incentive Management Fee**"). Manager shall provide to Owner, within sixty (60) days after January 1st of each Fiscal Year, a detailed calculations (the "**IMF Calculation**") of the Incentive Management Fee, if applicable, allocable to the preceding Fiscal Year based on the annual results of operations (the Base Management Fee and Incentive Management Fee, collectively, the "**Management Fee**"). Within fifteen (15) days of Owner's receipt of the IMF Calculation, Owner shall provide Manager with written notice of either: (a) Owner's agreement with the IMF Calculation, whereby Manager shall be authorized to pay itself from the Bank Account(s) the Incentive Management Fee, subject to available cash after payment of real estate taxes, personal property taxes, insurance and debt service and in the event such payment is deferred, payable from next available cash; or (b) Owner's dispute of the Incentive

-21-

Management Fee, whereby Owner shall submit the dispute to the Financial Arbitrator and follow the procedures as set forth in Section 10.2.

Section 5.3    Annual Reconciliation.  Promptly after the end of each Fiscal Year during the Operating Term, Manager shall calculate the Management Fee that is due and payable to Manager from Owner for the preceding Fiscal Year after giving effect to the provisions of Sections 5.1 and 5.2 hereof.  To the extent that Manager has not been paid the full Management Fee for the preceding year, then Manager is authorized by Owner to pay itself the balance of the Management Fee from the Bank Account(s) or to the extent funds therein are not sufficient (taking into account reasonably anticipated needs for funds), Owner shall, within thirty (30) days, pay such accrued balance to Manager.  To the extent that Manager has been paid on account of the Management Fee an amount in excess of the Management Fee actually due and payable to Manager for the preceding year, then the amount thereafter due to Manager on account of the Management Fee for succeeding periods shall be reduced by such excess payment.

Section 5.4    Revenues and Expenses re: Liquor Service.  To the maximum extent permitted by applicable law, all income and expenses relating to the provision of alcoholic beverages at the Hotel (in whatever manner the same is accomplished and irrespective of whether Manager (or an affiliate thereof) holds the applicable liquor permits and licenses) are to be treated in the same manner as Gross Revenue and Operating Costs, respectively.  In the event that applicable law does not permit such income and expenses to be treated as provided in the preceding sentence, then Manager and Owner (acting reasonably) shall cooperate with each other such that, to the maximum extent permitted by applicable law, the net result of the provision of alcoholic beverages at the Hotel is as provided in the preceding sentence, including, if applicable, a reduction in the Management Fee due hereunder equal to any net profit from liquor operations at the Hotel (after all expenses related thereto including taxes (but not income taxes of Manager)) retained by Manager or its applicable affiliate that may not under applicable law be paid to Owner.

Section 5.5    Business Interruption Insurance Proceeds.  At any time when business interruption insurance proceeds are paid to Owner with respect to the Hotel and the Management Fee is included in the calculation of the amount of such proceeds paid by the insurer to Owner, Owner shall pay to Manager a Management Fee equal to the budgeted Management Fee for such period the proceeds are intended to cover (based upon the Budget in effect at the time of the casualty, even if the business interruption insurance claim extends beyond the period of time covered by such Budget).

The provisions of this Article V shall survive the expiration or earlier termination of this Agreement.

07.10.2025 v.1

## ARTICLE VI.
## CLAIMS AND LIABILITY

Section 6.1     <u>Indemnification; Notice of Claims</u>.

A.     Subject to Sections 6.1(B) and 6.1(D), Owner shall indemnify, defend and hold harmless Manager and its affiliates and their respective partners, members, managers, directors, trustees, officers, employees and agents (collectively, the "**Manager Indemnified Parties**") for, from and against any and all Claims. Notwithstanding the foregoing, in no event shall Owner's indemnification obligations under this Section 6.1(A) extend to Claims to the extent caused by Manager's Grossly Negligent or Willful Acts.

B.     Subject to Section 6.1(D), Manager shall indemnify, defend and hold harmless Owner and its affiliates and their respective partners, members, managers, directors, trustees, officers, employees and agents (collectively, the "**Owner Indemnified Parties**") for, from and against any and all Claims to the extent caused by Manager's Grossly Negligent or Willful Acts. In addition, with respect to Claims covered by general and/or excess liability insurance ("Covered Claims"), Manager shall indemnify Owner Indemnified Parties for the deductible attributable to such Covered Claims, provided Owner was participating in Avion's insurance program responding to such Covered Claims and regardless of Manager's or Owner's actions that may have contributed to such Covered Claim.

C.     "**Claims**" shall mean any and all claims, demands, civil or criminal actions (including enforcement proceedings initiated by any government agency), penalties, suits, proceedings and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and disbursements and any other amounts that any Owner Indemnified Party or Manager Indemnified Party, as the case may be, is required to pay to third parties in connection with such matters) that any indemnified party(ies) may have alleged against them, incur, become responsible for, or pay out to third parties for any reason related to the ownership, management or operation of the Hotel.

D.     Notwithstanding anything to the contrary set forth in this Article VI, Owner and Manager mutually agree for the benefit of each other to look first to the appropriate insurance coverages in effect pursuant to this Agreement in the event of any Claim regardless of the cause of such Claim. So long as each party is named as an insured or additional insured under the other party's policies of casualty insurance, or the policies otherwise permit where a party is not so named, each party hereby releases the other party, and its affiliates and agents, and its and their officers and employees, from any and all liability for damage or destruction to its property (including, in the case of Owner, the Hotel and the personal property related thereto), whether or not due to the negligent or other acts or omissions of the other party, its affiliates or agents, or its or their officers or employees, to the extent the damage or destruction is covered by insurance proceeds available to the releasing party. Nothing contained in this Article VI shall in any way affect the releases set forth in the previous sentence.

E.     Any indemnified party shall be entitled, upon written notice to the indemnifying party, to the timely appointment of counsel by the indemnifying party for the defense of any Claim, which counsel shall be subject to the approval of the indemnified party. If, in the

07.10.2025 v.1

indemnified party's judgment, a conflict of interest exists between the indemnified party and the indemnifying party at any time during the defense of the indemnified party, the indemnified party may appoint independent counsel of its choice for the defense of the indemnified party as to such Claim. Additionally, regardless of whether the indemnified party is appointed counsel or selects independent counsel, (i) the indemnified party shall have the right to participate in the defense of any Claims and approve any proposed settlement of such Claims, and (ii) all reasonable, actual out-of-pocket costs, expenses and attorneys' fees of the indemnified party shall be borne by the indemnifying party. If the indemnifying party fails to timely pay such reasonable, actual out-of-pocket costs, expenses and attorneys' fees, the indemnified party may, but shall not be obligated to, pay such amounts and be reimbursed by the indemnifying party for the same. The parties hereby acknowledge that it shall not be a defense to a demand for indemnity that less than all Claims asserted against the indemnified party are subject to indemnification. If a Claim is covered by the indemnifying party's liability insurance, the indemnified party shall not take or omit to take any action that would cause the insurer not to defend such Claim or to disclaim liability in respect thereof.

Section 6.2    Manager's Grossly Negligent or Willful Acts. "**Manager's Grossly Negligent or Willful Acts**" shall mean any gross negligence, recklessness, willful misconduct, or fraud committed by Manager, its affiliates, or Manager's home office or regional staff in the performance of Manager's duties under this Agreement. The acts or omissions (including those which are grossly negligent or fraudulent and those which constitute willful misconduct) of any Hotel employee shall not be imputed to Manager or its affiliates or to Manager's home office or regional staff, or deemed to constitute Manager's Grossly Negligent or Willful Acts, unless such acts or omissions resulted directly from the gross negligence, willful misconduct or fraudulent acts of Manager's home office or regional staff in hiring, training or supervising such Hotel employee or its policies and procedures. In no event shall the settlement by either party in good faith of any Claim brought by a third party (including Hotel employees) in connection with the ownership or operation of the Hotel be deemed to create any presumption of the validity of the Claim, nor shall any such settlement be deemed to create any presumption that the acts or omissions giving rise to such claim constituted Manager's Grossly Negligent or Willful Acts.

Section 6.3    Exceptions for Industry Practices and Employer Liability. Notwithstanding anything in this Agreement to the contrary, in the event Manager unintentionally fails to comply with Requirements with respect to immigration and/or wages and hours of labor, such failure shall not be a considered a breach of this Agreement and shall not be deemed to constitute a Manager's Grossly Negligent or Willful Act unless such action is inconsistent with generally prevailing industry practices in the management of full-service commercial hotels and provided that Manager shall cease such practice if Owner requests Manager to do so or Manager discovers that such practice is not in compliance with Requirements. In addition, notwithstanding anything in this Agreement to the contrary, unless caused by Manager's Grossly Negligent or Willful Acts, (i) the cost of non-compliance with Requirements relating to employer liability to employees shall in all events be an Operating Cost of the Hotel, and (ii) Owner shall indemnify, defend and hold harmless Manager and the other Management Indemnified Parties for, from and against any and all Claims at any time arising as a result of or in connection with a complete or partial withdrawal, as defined in Sections 4203 and 4205 of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), from any multiemployer plan as defined in Section 3(37) of ERISA proximately caused by or resulting from the cessation of or change in ownership or operation of the Hotel,

-24-

including without limitation in connection with the entering into or any termination, expiration, permitted assignment, or transfer of this Agreement.

Section 6.4    Survival.  The provisions of this Article VI shall survive any cancellation, termination or expiration of this Agreement and shall remain in full force and effect until such time as the applicable statute of limitations shall cut off all demands, claims, actions, damages, losses, liabilities or expenses which are the subject of the provisions of this Article VI.

ARTICLE VII.
CLOSURE, EMERGENCIES AND DELAYS

Section 7.1    Events of Force Majeure.  If at any time during the Operating Term it becomes necessary, in Manager's or Owner's opinion, to cease operation of the Hotel in order to protect the Hotel and/or the health, safety and welfare of the guests and/or employees of the Hotel for reasons beyond the reasonable control of Manager, such as, but not limited to, acts of war, terrorism, insurrection, civil strife and commotion, labor unrest, governmental regulations and orders, shortage or lack of adequate supplies or lack of skilled or unskilled employees, contagious illness (including but not limited to COVID-19 and similar diseases), catastrophic events or acts of God ("**Force Majeure**"), then in such event or similar events Manager shall, if so directed by Owner or mandated by governmental order or regulation, close and cease operation of all or any part of the Hotel, reopening and commencing operation when Manager and Owner agree that such may be done without jeopardy to the Hotel, its guests and employees.  In the event that the Hotel is temporarily closed due to Force Majeure then, during the period of such closure, the parties' obligations hereunder shall be temporarily suspended (other than (i) those accruing prior to the closure, (ii) financial obligations of the parties, and (iii) those which, if not performed, would cause a material adverse effect on the Hotel or its operations (e.g., the requirement to maintain the permits or insurance obligations hereunder)).

Manager and Owner agree, except as otherwise provided herein, that if such temporary closure due to an event of Force Majeure exceeds thirty (30) days, then the time within which a party is required to perform an obligation which is incapable of being performed due to an event of Force Majeure and (if the Hotel is closed) Manager's right to manage the Hotel under this Agreement shall be extended for a period of time equivalent to the period of delay (or the period the Hotel is closed) caused by an event of Force Majeure.

Section 7.2    Emergencies.  If a condition of an emergency nature should exist during the Operating Term which requires that immediate repairs be made for the preservation and protection of the physical integrity of the Hotel, the protection of the health, welfare and safety of the Hotel's guests or employees, or to assure compliance with law or the continued operation of the Hotel, Manager is authorized to take all actions and to make expenditures necessary to repair and correct such condition whether or not provisions have been made in an approved Budget; provided that Manager may expend only up to $10,000 in any instance without Owner's approval when involving life-safety or other extraordinary emergency circumstances.  To the extent reasonably appropriate, any emergency actions taken by Manager in accordance with this Section 7.2 without prior notice to Owner shall be limited to temporary actions as will not permanently modify any portion of the Hotel, its operations or its policies and procedures.  Expenditures made by Manager in connection with such an emergency shall be paid, in Manager's sole discretion, out of the Bank

Account(s). To the extent reasonably practical, prior to taking any action or expending any funds pursuant to the provisions of this Section 7.2, Manager must provide Owner with notice of its intention to act in accordance with the provisions of this Section 7.2 hereof (which approval may be given by telephone) except (together with Manager's best estimate of the costs to be incurred or the funds to be expended) prior to taking such action or expending such funds, and in the event such prior notice is not practical, Manager shall thereafter give Owner prompt written notice of any such action or expenditure pursuant to the authorizations and provisions of this Section 7.2.

ARTICLE VIII.
CONDEMNATION AND CASUALTY

Section 8.1    Condemnation.  If the Hotel is taken in any eminent domain, expropriation, condemnation, compulsory acquisition or similar proceeding by a competent authority, this Agreement shall automatically terminate as of the date of taking or condemnation with no obligation on the part of Owner to pay any termination fee or penalty to Manager.  Any compensation for the taking or condemnation of the physical facility comprising the Hotel shall be paid to Owner.  Manager, however, with the full cooperation of Owner, shall have the right to file a claim with the appropriate authorities for the loss of Management Fee income for the remainder of the Term and any extension thereof because of the condemnation or taking, provided that the same shall not reduce Owner's recovery under any condemnation claim.  If only a portion of the Hotel is so taken and the taking does not make it unreasonable or imprudent, in Manager's and Owner's opinion, to operate the remainder as a hotel of the type in operation immediately preceding such taking, this Agreement shall not terminate. Any compensation received by Owner shall be used to restore the Hotel by Owner or applied in the manner required by Owner's Lender; provided, however, if in the reasonable opinion of Manager, the Hotel, after the use of any such condemnation compensation, has not been returned to, or is no longer a hotel of, the same type and class as it was immediately preceding such taking or condemnation, then in such circumstances, Manager shall have the option to terminate this Agreement at any time upon sixty-five (65) days' prior written notice, and in such circumstances, Owner will have no obligation to pay any termination fee or penalty to Manager.

Section 8.2    Casualty.  In the event of a fire or other casualty, Manager shall promptly notify Owner and Manager shall reasonably cooperate with and reasonably assist Owner in evaluating the extent of the damage, filing and pursuing insurance claims, developing plans for the restoration of the Hotel and modifying the applicable Operating Budget to reflect the effect of the casualty on operations.  Any decision to restore the Hotel and the use of any insurance or other casualty proceeds shall be in the sole and absolute discretion of Owner provided that if Owner has not commenced restoration of the Hotel within three (3) months and substantially completed restoration within nine (9) months after the casualty, Manager may terminate this Agreement by notice to Owner given prior to the commencement of restoration of the Hotel or substantial completion thereof, as applicable.  Except as otherwise provided herein, this Agreement shall remain in full force and effect subsequent to such casualty, provided that, (a) Owner may, subject to Section 11.21 hereof, terminate this Agreement upon thirty (30) days prior notice to Manager if Owner elects to permanently close the Hotel as a result of such casualty, with no obligation on the part of Owner to pay any termination fee or penalty to Manager, and (b) Manager may terminate this Agreement at any time upon sixty-five (65) days' prior written notice to Owner if in the reasonable judgment of Manager the Hotel cannot, after giving effect to any restoration as

determined by Owner in its sole discretion, be profitably operated as a hotel of the same type and class as it was immediately preceding such casualty.

ARTICLE IX.
TERMINATION RIGHTS

Section 9.1    Bankruptcy and Dissolution.  If either party is voluntarily or involuntarily dissolved or declared bankrupt or insolvent, or commits an act of bankruptcy; or if either party becomes the subject of voluntary or involuntary reorganization proceedings and, in the case of involuntary proceedings, the same are not dismissed within sixty (60) days after the filing thereof; or if either party enters into liquidation whether compulsory or voluntary (other than in connection with a merger, consolidation, or other similar event pursuant to which there is a surviving entity as Manager in compliance with the provisions of Section 11.5 hereof), or makes a composition of its debts with or a general assignment for the benefit of its creditors, or has a receiver appointed over all or any part of its assets, or passes title by foreclosure or a transfer in lieu of foreclosure; then and in any of such events, the other party may terminate this Agreement immediately upon serving notice to the other party, without liability on the part of the terminating party to pay any termination fee or penalty and without prejudice to its right to seek damages or other remedies available to it at law or in equity, subject to the limitations set forth in Section 9.3 hereof.

Section 9.2    Breach.  If either party, during the Term of this Agreement, commits a breach of this Agreement by failing to keep, perform or observe any covenant, obligation or agreement required to be kept, performed or observed by such party under the terms of this Agreement, or breaches in any material respect a material representation or warranty hereunder, and the defaulting party fails to remedy or correct such breach within a period of thirty (30) days (ten (10) days in the case of a monetary default or breach) after such defaulting or breaching party receives written notice of its default or breach from the non-defaulting party, then the non-defaulting party may terminate this Agreement with no obligation to pay any termination fee or penalty and without prejudice to its right to seek damages or other remedies available to it at law or in equity, subject to the limitations set forth in Section 9.3 hereof; provided, however, that if such non-monetary default or breach can be cured but cannot reasonably be cured within such thirty (30) day period, the cure period shall continue, if such defaulting or breaching party commences to cure the default or breach within such thirty (30) day period, for so long as such defaulting party diligently prosecutes the cure to completion.  For the avoidance of doubt, each of the following (in addition to the foregoing) shall constitute a breach of this Agreement by Manager (subject to applicable notice and cure periods, as provided herein):

A.    The operation of the Hotel by Manager in such a manner as to cause the Franchisor to require the removal of Manager as the Manager of the Hotel or to give a final notice to the Owner of intent to terminate the License Agreement unless such termination of the License Agreement is due to Owner's breach or default under this Agreement.

B.    Any act or omission by Manager that causes the suspension for a period in excess of ten (10) business days, or any withdrawal or revocation that is not re-issued within thirty (30) days, of any required license for the sale of alcoholic beverages, unless such act or omission is due to Owner's breach or default under this Agreement.

07.10.2025 v.1

C. Failure of Manager (but excluding such a failure which results from Owner's breach or default under this Agreement) to maintain at all times throughout the term hereof all of the insurance required to be maintained by Manager.

D. The commission of fraud, gross negligence, willful misconduct or criminal activity by any principal of Manager in connection with the management, operation or maintenance of the Hotel.

E. Failure of Manager (but excluding such a failure which results from Owner's breach or default under this Agreement) to materially comply with Section 3.4 hereunder more than two (2) times in any Fiscal Year.

Section 9.3    Additional Remedies.  The rights granted under Sections 9.1 and 9.2 above shall not be in substitution for, but shall be in addition to, any and all rights and remedies available to the non-defaulting party (including, without limitation, injunctive relief and damages) by reason of applicable provisions of law or equity; provided, however, that Owner and Manager hereby agree that neither shall be liable to the other for punitive, incidental or consequential damages as a result of any breach of this Agreement.

Section 9.4    Performance Termination.  Subject to the provisions of this Section 9.4 and Exhibit E attached hereto and hereby made a part hereof, Owner shall have the option to terminate this Agreement without payment of any fee or penalty to Manager if during each of the two (2) Fiscal Years of any Test Period (as defined in Exhibit E):

A. the RevPar (as defined in Exhibit E) of the Hotel is less than the Threshold Amount (as defined in Exhibit E) for each such Fiscal Year (the "**RevPar Test**"); and

B. the actual Gross Operating Profit is less than ninety percent (90%) of the budgeted amount for Gross Operating Profit (such deficiency, the "**GOP Shortfall**") projected in the Operating Budget for each of such Fiscal Years (the "**GOP Test**"; the RevPar Test and GOP Test, collectively, the "**Performance Termination Test**").

Such option to terminate shall be exercised by serving written notice thereof (the "**Performance Termination Notice**") on Manager no later than sixty (60) days after the receipt by Owner of the Test Period Calculation Notice (as defined in Exhibit E) for the second Fiscal Year in the subject Test Period during which the Hotel failed the Performance Termination Test. In such event, this Agreement shall terminate, subject to Section 11.21 hereof, on the date set forth in the Performance Termination Notice unless Manager elects to negate such termination as provided in Exhibit E.  Owner's failure to exercise its right to terminate this Agreement pursuant to this Section 9.4 with respect to any given Test Period shall not be deemed an estoppel or waiver of Owner's right to terminate this Agreement with respect to subsequent Test Periods to which the Performance Termination Test applies.  Further, any Fiscal Year which is included in a Test Period with respect to which a Cure Payment (as defined in Exhibit E) is made shall not be included in any other Test Period.

Section 9.5    Post Expiration/Termination Procedures.

07.10.2025 v.1

A.     Upon the expiration or earlier termination of this Agreement, Manager shall establish a reserve (to be funded out of Gross Revenue and from the Bank Accounts) (the "**Termination Reserve**"), in an amount to be determined by Manager in its reasonable judgment, to cover costs and expenses that may need to be paid post expiration or termination and relating to causes or events arising during the Term or otherwise pursuant to this Agreement, including without limitation (i) the amount of any insurance retention and other costs and expenses that may need to be paid with respect to workers' compensation and other pending or contingent claims, including those that are made after termination, and (ii) expenses anticipated to be incurred by Manager on account of Hotel Personnel incident to the termination or expiration of this Agreement, including without limitation amounts which may become due under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**") or any state analog thereto or otherwise pursuant to applicable legal requirements, but excluding any severance or similar payments to Hotel Personnel (unless approved  by Owner); provided, however, that if the balance in the Bank Accounts is insufficient to cover such amounts, then Owner shall pay such amounts to Manager promptly upon Manager's request therefor.  No later than ten (10) business days prior to the expiration or earlier termination of this Agreement, Manager shall provide Owner with a detailed listing of all funds which Manager intends to hold in such Termination Reserve, setting forth the anticipated use of such funds, the amount of funds being reserved for each such use, and the length of time such funds will be withheld.  Should any dispute arise regarding the Termination Reserve, the parties shall submit such dispute to arbitration as set forth in <u>Section 10.2</u> hereof.

B.     Upon the expiration or earlier termination of this Agreement other than due to Section 9.1 or 9.2 arising due to Owner's insolvency or default, Manager shall cooperate with Owner in all reasonable respects at no cost to Manager in transferring management of the Hotel (including all books, records and assignable licenses but excluding software or proprietary information that is the property of Manager) to Owner or another management company with as little hindrance to the operations of the Hotel as reasonably practicable; Owner shall reimburse Manager for all costs and expenses incurred by Manager in connection therewith, including, without limitation, payroll for, and other out-of-pocket expenses incurred by, Off-Site Personnel assigned to the Hotel on a temporary basis to effect the transition.  Without limiting the generality of the foregoing, Manager shall:

(i)     at Owner's request continue to manage the Hotel under this Agreement for such period (not to exceed ninety (90) days) as Owner may request after the date of such expiration or termination upon all of the terms and conditions of this Agreement;

(ii)     use its commercially reasonable efforts (1) to transfer to Owner or Owner's nominee all licenses relating to the Hotel or (2) if such transfer is prohibited by law or Owner otherwise elects, to reasonably cooperate with Owner or Owner's nominee in connection with the processing by Owner or Owner's nominee of any applications for all such licenses, including, to the extent allowed by law, Manager continuing to operate, while such applications are pending, the liquor operations under its licenses for the Hotel (in which case Owner or, if this Agreement is being terminated incident to a sale of the Hotel, the purchaser of the Hotel, shall indemnify and hold harmless Manager against any liability arising as a result of Manager's continuation of such operation); provided, in either case, that the costs and expenses of any such transfer or the processing of any such application shall be paid by Owner or Owner's nominee;

07.10.2025 v.1

(iii) assign to Owner or Owner's nominee or at Owner's request, terminate such any such contracts or agreements specified by Owner, simultaneously with the termination of this Agreement, and except for those contracts or agreements specified by Owner to be terminated (the "Terminated Contracts"), assignee shall assume, all space leases, contracts, concessions agreements and agreements in effect with respect to the Hotel then in Manager's name; provided, however, that Owner need not assume any space leases, contracts, concessions agreements and agreements entered into in violation of this Agreement. Owner shall indemnify Manager against all costs and expenses incurred as a result of terminating the Terminated Contracts, excluding any Terminated Contracts entered into in violation of this Agreement;

(iv) except for funds held in the Termination Reserve, deliver to Owner the balance of any and all funds of Owner held by Manager immediately upon the expiration or termination of this Agreement;

(v) deliver to Owner all materials, supplies, keys, leases, contracts, other documents, insurance policies, plans, specifications, permits, licenses, promotional materials and such other papers and records (including general correspondence) as pertain to this Agreement, the operations of the Hotel or the performance of Manager's duties hereunder (excluding confidential or proprietary material of Manager); and

(vi) deliver to Owner a final accounting (including the reports, statements and other matters described in Section 3.12 of this Agreement) of the Hotel up to and including the effective date of the termination or expiration. Within ninety (90) days of the receipt by Owner of such final accounting statement, the parties will make whatever cash adjustments are necessary pursuant to such final statement. The cost of preparing such final accounting statement shall be an Operating Cost.

Section 9.6    Reserved.

Section 9.7    Termination on Sale.  In connection with a bona fide sale of the Hotel to an unrelated third party ("**Purchaser**"), Owner may elect to terminate this Agreement, effective as of the date of such sale, provided that Owner (i) gives at least thirty (30) days prior notice of the contemplated termination of this Agreement to Manager, subject to Section 11.21 hereof; (ii) pays to Manager upon (and as a condition of) the termination of this Agreement the Termination Fee. Notwithstanding the forgoing, in the event Purchaser enters into a management agreement with Manager in connection with the sale of the Hotel, either prior to or within three (3) months after the termination of this Agreement, Owner shall have no obligation to pay Manager the Termination Fee and Manager shall refund any such Termination Fee paid to Manager by Owner in connection with such sale.

ARTICLE X.
APPLICABLE LAW AND DISPUTE RESOLUTION

Section 10.1    Applicable Law.  The parties desire to resolve disputes arising out of this Agreement without litigation and except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or suit to compel compliance with this dispute resolution process, the parties agree to use the dispute resolution procedures set forth in this Article

-30-

X as their sole remedy with respect to any controversy or claim arising out of or relating to this Agreement or its breach. The interpretation, validity and performance of this Agreement shall be governed by the procedural and substantive laws of the State of Illinois (without regard to conflict of laws principles).

Section 10.2    <u>Arbitration of Financial Matters</u>.

A.    In the case of a dispute with respect to any of the following financial matters, this Section 10.2 shall control and either party may submit such matter to arbitration, which shall be conducted by the Financial Arbitrator pursuant to the terms of this Section 10.2:

(i)    computation of the Management Fee;

(ii)    any dispute in adjusting or calculating RevPar, Gross Operating Profit, the Threshold Amount and/or the GOP Shortfall pursuant to <u>Exhibit E</u> attached hereto; or

(iii)    any dispute regarding the Termination Reserve.

B.    The "**Financial Arbitrator**" shall have not less than five (5) years' experience in the hotel field or as a consultant to the hotel industry, and such experience must include familiarity with hotel operating and financial statement.  The party desiring to submit any matter to arbitration under Subsection 10.2(A) shall do so by written notice to the other party, which notice shall set forth the items to be arbitrated and such party's choice of a Financial Arbitrator.  The party receiving such notice shall within fifteen (15) days after receipt of such notice either approve such choice or designate another Financial Arbitrator by written notice back to the first party, and the first party shall within fifteen (15) days after receipt of such notice either approve such choice or disapprove the same.  If the parties are unable to agree on the Financial Arbitrator, then either the Owner or the Manager may request the local office of the American Arbitration Association to appoint a Financial Arbitrator.  If either party fails to respond within the applicable 15-day period, then the firm selected by the other party shall be the Financial Arbitrator for the purposes of arbitrating the dispute. The Financial Arbitrator shall be required to render a decision in accordance with the procedures described in Subsection 10.2 within ten (10) business days after being notified of their selection.

C.    In all arbitration proceedings submitted to the Financial Arbitrator, the Financial Arbitrator shall be required to select either the substantive position advocated by Owner, or the substantive position advocated by Manager with respect to each disputed item.  Any decision rendered by the Financial Arbitrator that does not reflect either the position advocated by Owner or Manager shall be beyond the scope of authority granted to the Financial Arbitrator and will have no force or effect and will not be binding on either party hereto.  All proceedings by the Financial Arbitrator shall be conducted in accordance with the Uniform Arbitration Act, except to the extent the provisions of such act are modified by this Agreement or the mutual agreement of the parties. Unless otherwise agreed, all arbitration proceedings shall be conducted at the Hotel.

Section 10.3    <u>Arbitration of Non-Financial Matters</u>.

A. In the case of a dispute with respect to a non-financial matter, this Section 10.3 shall control.

B. At the written request of either party, the parties to the non-financial dispute shall appoint knowledgeable, responsible representatives to meet and negotiate in good faith to resolve any dispute arising under this Agreement. The parties intend that these negotiations be conducted by non-lawyer, business representatives, including at least one senior executive of each party to the dispute. The location, format, frequency, duration and conclusion of these discussions shall be left to the discretion of the representatives. Discussion and correspondence among the representatives for purposes of these negotiations shall be treated as confidential information developed for purposes of settlement, exempt from discovery and production, which shall not be admissible in the arbitration described below. Documents identified in or provided with such communications, which are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted in evidence in the arbitration or lawsuit.

C. If the negotiation conducted pursuant to Section 10.3 does not resolve the non-financial dispute within thirty (30) days of the commencement of such negotiation, or if prior to the expiration of such thirty (30) day period any one of the parties determine that continuation of the negotiation process is not warranted by notice to such effect to the other party, the dispute shall be submitted to binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. The party initiating the arbitration shall name an arbitrator within twenty (20) days of the date of transmission of notice of the arbitration to the respondent; the respondent shall name an arbitrator within twenty (20) days of receipt of notice of arbitration from the claimant. Each of the arbitrators named by the respondent and the claimant must have not less than ten (10) years' experience each in the hospitality field or as a consultant to the hotel industry. The two named arbitrators shall, within thirty (30) days of the appointment of the respondent's arbitrator, appoint a third arbitrator who must be a reputable attorney with not less than five (5) years' experience as a civil business litigator. In the event that a party fails to name its respective arbitrator within the twenty (20) day period allotted, or if the two named arbitrators fail to appoint a third arbitrator within thirty (30) days of their appointment, then upon written application by either party, the arbitrator to be appointed shall be appointed by the American Arbitration Association. Each party shall have the right to take the deposition of up to five (5) individuals (or a larger number of individuals with the consent of two of the three arbitrators), and any expert witness designated by the other party. Each party shall also have the right to request production of relevant documents, the scope and enforcement of which shall be governed by the arbitrators. Additional discovery may be only by order of the arbitrators, and only upon a showing of substantial need. The arbitrators shall be authorized to issue subpoenas for the purpose of requiring attendance of witnesses at depositions. The arbitration shall be held in the location of the Hotel. The arbitrators shall control the scheduling so as to process the matter expeditiously. The parties may submit written briefs. The arbitrators shall rule on the dispute by issuing a written opinion within thirty (30) days after the close of hearings. The times specified in this Section may be extended upon mutual agreement of the parties or by the arbitrators upon a showing of good cause.

Section 10.4    Award. An award rendered pursuant to this Article X shall be final, binding and non-appealable judgment and the award may be entered in any court of competent jurisdiction

in the United States. Special, consequential or punitive damages shall not be awarded by the Financial Arbitrator or the arbitrators.

Section 10.5 <u>Confidentiality</u>. The parties agree that all communications and negotiations between the parties during the dispute resolution process, any settlements agreed upon during the dispute resolution process and any information regarding the other party obtained during the dispute resolution process (that are not already public knowledge) are confidential and may be disclosed only to employees and agents of the parties who shall have a "need to know" the information and who shall have been made aware of the confidentiality obligations set forth in this Section, unless the party is required by law to disclose such information.

Section 10.6 <u>Fees and Expenses</u>. The parties shall equally split the fees of any arbitrators. Any party found by the arbitrators to have breached this Agreement shall pay all other out-of-pocket expenses, including reasonable attorney's fees and expenses, of the other party incurred in connection with the dispute resolution process. If the arbitrators do not find that any party has breached this Agreement, then each party shall bear its own costs and expenses, including attorney's fees and expenses.

ARTICLE XI.
GENERAL PROVISIONS

Section 11.1 <u>Representations</u>. Owner and Manager each represents and warrants to the other that it has full power and authority to execute this Agreement and to be bound by and perform the terms hereof. On request, each party shall furnish the other evidence of such authority. Manager and Owner each represents and warrants that (a) it is an entity duly authorized, validly existing and in good standing under the laws of the state in which it is formed and is qualified to do business in the state in which the Hotel is located and all other states where it is required to be qualified to do business, and (b) the execution, delivery and performance of all or any portion of its obligations under this Agreement does not require any consent or approval of any governmental authority that has not been obtained (other than required liquor license transfer approvals), does not violate any provisions of law or any governmental order, and does not conflict with, result in a breach of, or constitute a default under any operating agreements or other instrument to which it is a party or by which it is bound. Owner and Manager each further represents and warrants to the other that neither it nor any of its direct or indirect subsidiaries, members, partners, investors or shareholders, or, to the best of its knowledge, any of their respective affiliates, is (i) listed on the Specially Designated Nationals and Blocked Persons List or any other similar list maintained by the Office of Foreign Assets Control, US Department of the Treasury, pursuant to any authorizing statute, executive order or regulation; (ii) a "specially designated global terrorist" or other person listed on Appendix A to Chapter V of 31 C.F.R., as the same has been from time to time updated and amended; or (iii) a person or entity either (1) included within the term "designated national" as defined in the United States Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (2) designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or a person or entity similarly designated under any related enabling legislation or any other similar Executive Orders.

Section 11.2 <u>Relationship</u>. Manager and Owner shall not be construed as joint venturers or partners of each other by reason of this Agreement and neither shall have the power to bind or

-33-

obligate the other except as set forth in this Agreement. Subject to the terms and conditions set forth in this Agreement, Manager shall act as Owner's agent with respect to the operation of the Hotel. In such capacity as Owner's agent, Manager shall act in the best interest of the Owner in all such matters.

Section 11.3   Manager's Contractual Authority in the Performance of this Agreement. Subject to the provisions of this Agreement, Manager is authorized to make, enter into and perform in the name of and for the account of Owner any contracts deemed necessary by Manager to perform its obligations under this Agreement, but only to the extent such authority is granted by Manager pursuant to this Agreement.

Section 11.4   Further Actions.   Owner and Manager agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

Section 11.5   Successors and Assigns.

A.   Provided that the assignee is directly or indirectly controlled by or under common control with Manager, Manager may, without the consent of Owner, freely assign this Agreement to any such assignee; provided, however, Manager shall remain liable for all of its obligations under this Agreement. Manager may also, with Owner's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, assign this Agreement to any successor or assignee of Manager incident to a public offering or that may result from any merger, consolidation or reorganization with, or any sale or assignment to, any corporation, individual, partnership, limited liability company or other entity which shall acquire (directly or indirectly) all or substantially all of Manager's hotel management business, or any affiliate or successor thereof, provided that any such assignee agrees to be bound by the terms and conditions of this Agreement, assumes all of Manager's obligations under this Agreement and the assignee (or its senior management) is experienced in the hotel management business. Manager shall also have the right to pledge or collaterally assign as security its interest in this Agreement to an institutional lender to secure financing to Manager or any of its affiliates, without the prior written consent of Owner. In all other events, Owner's consent to an assignment of this Agreement shall be required, which consent shall not be unreasonably withheld, conditioned or delayed.

B.   Owner may not assign this Agreement without the prior consent of Manager, provided that Owner may assign this Agreement without Manager's consent to, and in any event this Agreement shall be binding upon, any person or entity acquiring the Hotel (by arm's-length purchase, foreclosure, deed-in-lieu of foreclosure or otherwise) or to an affiliate of Owner, subject to the terms of this Section 11.5.B. Any such assignee or transferee shall agree in writing to be bound by this Agreement and to assume all of Owner's obligations under this Agreement from and after the effective date of the assignment, provided, however, if such assignee is not acceptable to Manager in its sole and absolute discretion, then Manager may terminate this Agreement effective upon the transfer of the Hotel, which effective date shall be extended if applicable for the period contemplated under Section 11.21 hereof (provided, Owner shall have no obligation to pay a termination fee or penalty in connection with such termination by Manager).

-34-

C.     Upon any permitted assignment of this Agreement and the assumption of this Agreement by the assignee, except as specifically provided otherwise, the assignor shall be relieved of any obligation or liability under this Agreement arising from and after the effective date of the assignment.  Any attempted transfer or assignment in violation of this Section 11.5 shall be null and void.

Section 11.6   Notices.   All notices or other communications provided for in this Agreement shall be in writing and shall be either hand delivered, delivered by certified mail, postage prepaid, return receipt requested, delivered by an overnight delivery service, or delivered by email (with an executed original sent the same day by an overnight delivery service), addressed to Owner or Manager (as the case may be) at their respective addresses set forth below.  Notices shall be deemed delivered on the date that is three (3) business days after the notice is deposited in the U.S. mail (not counting the mailing date) if sent by certified mail, or, if hand delivered, on the date the hand delivery is made or refused, or if delivered by email, on the date the transmission is made provided the email is transmitted during normal business hours of the recipient, otherwise on the next business day.  If given by an overnight delivery service, the notice shall be deemed delivered on the next business day following the date that the notice is deposited with the overnight delivery service.  The addresses provided below may be changed by either party by notice given in the manner provided herein.

As to Manager: Avion Hospitality
     8580 Belleview Dr, Suite 125
     Plano, TX 75024
     Attention: Lynne Roberts

     Tel. No.:  469-365-2215
     E-mail:  lynne@avionh.com


As to Owner:  Wisconsin & Milwaukee Hotel LLC
     731 North Jackson Street, Suite 420
     Milwaukee, Wisconsin 53202

     Tel. No.:  414-226-1950
     E-mail:  Randy@JacksonStreetHoldings.com
        Jennifer@JacksonStreetHoldings.com

Section 11.7   Documents.   Owner shall furnish to Manager copies of all leases, title documents, property tax receipts and bills, insurance statements, and all financing documents (including notes and mortgages) relating to the Hotel and such other documents pertaining to the Hotel as Manager shall reasonably request.

Section 11.8   Defense.   Manager shall defend and/or settle any claim or legal action brought against Manager or Owner, individually, jointly or severally in connection with the operation of the Hotel provided that absent Owner's prior approval, which shall not be unreasonably withheld, conditioned or delayed, Manager shall not defend and/or settle any such claim or action if the amount in contention is in excess of $25,000.  Manager shall retain and

-35-

supervise legal counsel, accountants and such other professionals, consultants and specialists as Manager deems appropriate to defend and/or settle any such claim or cause of action provided the same are reasonably acceptable to Owner. All liabilities, costs and expenses, including reasonable attorneys' fees and disbursements, incurred in defending and/or settling any such claim or legal action which are not covered by insurance shall be paid as an Operating Cost of the Hotel.

Section 11.9 <u>Waivers</u>. No failure or delay by Manager or Owner to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Section 11.10 <u>Changes</u>. Any change to or modification of this Agreement including, without limitation, any change in the application of this Agreement to the Hotel, must be evidenced by a written document signed by both parties hereto.

Section 11.11 <u>Captions</u>. The captions for each Article and Section are intended for convenience only.

Section 11.12 <u>Severability</u>. If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof.

Section 11.13 <u>Confidentiality</u>. Except as disclosure may be required to obtain the advice of professionals or consultants, for financing purposes, or in furtherance of a permitted assignment of this Agreement or other permitted transfer, or as may be required by law or by the order of any government, regulatory authority, or tribunal or otherwise to comply with law (including reporting requirements applicable to public companies), each party shall make every effort to ensure that the terms of this Agreement and any documents prepared by either party pursuant to this Agreement are not disclosed to any third person without the prior consent of the other party. The obligations set forth in this Section shall survive any termination or expiration of this Agreement. The parties shall cooperate with one another on all public statements, whether written or oral and no matter how disseminated, regarding their contractual relationship as set forth in this Agreement or the performance of their respective obligations hereunder.

Section 11.14 <u>Reimbursement</u>. The performance by Manager of its responsibilities under this Agreement is conditioned upon Owner providing reasonable, necessary and sufficient funds to Manager on a timely basis to enable Manager to perform its obligations hereunder. Nevertheless, Manager shall be entitled, at its option, to advance funds or contribute property, on behalf of Owner, to satisfy obligations of Owner in connection with the Hotel and this Agreement, all subject to compliance with applicable Budgets. Manager shall keep appropriate records to document all reimbursable expenses paid by Manager, which records shall be made available for inspection by Owner or its agents upon request. Owner agrees to reimburse Manager with interest

upon demand for money paid or property contributed by Manager to satisfy obligations of Owner in connection with the Hotel and this Agreement, subject to compliance with applicable Budgets. Except as set forth in an Operating Budget, reimbursable expenses shall not include any of the expenses of the central or branch offices maintained by Manager, other than offices maintained at the Hotel for the management of the Hotel, or any allocation of any general and administrative costs or overhead costs of Manager.

Section 11.15 <u>Travel and Out-of-Pocket Expenses</u>. Subject to compliance with applicable Budgets or otherwise approved by Owner in writing, Manager shall be reimbursed for all travel and out of pocket expenses of Manager's employees reasonably incurred in the performance of this Agreement. Subject to compliance with applicable Budgets or otherwise approved by Owner in writing, Manager shall have sole discretion, which shall not be unreasonably exercised, to determine the necessity for such travel or other expenses.

Section 11.16 [Reserved]

Section 11.17 <u>Third Party Beneficiary</u>. This Agreement is exclusively for the benefit of the parties hereto and it may not be enforced by any party other than the parties to this Agreement and shall not give rise to liability to any third party other than the authorized successors and assigns of the parties hereto.

Section 11.18 <u>Brokerage</u>. Manager and Owner represent and warrant to each other that neither has sought the services of a broker, finder or agent in connection with this Management Agreement, and neither has employed, nor authorized, any other person to act in such capacity. Manager and Owner each hereby agrees to indemnify and hold the other harmless from and against any and all claims, loss, liability, damage or expenses (including reasonable attorneys' fees and costs) suffered or incurred by the other party as a result of a claim brought by a person or entity engaged or claiming to be engaged as a finder, broker or agent by the indemnifying party in connection with this Agreement. The provisions of this <u>Section 11.18</u> shall survive the expiration or earlier termination of this Agreement.

Section 11.19 <u>Survival of Covenants</u>. Any covenant, term or provision of this Agreement which, to be effective, must survive the termination of this Agreement, shall survive any such termination.

Section 11.20 <u>Estoppel Certificate</u>. Manager and Owner agree to furnish to the other party, from time to time, as requested by the other party, upon not less than ten (10) days' prior written notice, an executed estoppel certificate in such reasonable form as the requesting party may request stating whether there are any outstanding defaults under this Agreement known to the party furnishing the estoppel certificate and such other information relating to the Hotel as may be reasonably requested.

Section 11.21 <u>Extension of Date of Termination</u>. Notwithstanding any contrary provision of this Agreement, the date of termination or expiration of the Term of this Agreement shall be extended so that the date of termination after notice of termination is given to or by Manager, or following expiration or any automatic termination of the Term pursuant to the provisions of this Agreement, shall be on a date which is not earlier than fifteen (15) days plus the number of days,

-37-

if any, Manager is required to give its employees advance notice of termination of employment as required by the Worker Adjustment and Retraining Act, 29 U.S.C., §2101 et. seq., as hereafter amended, or any similar federal or state statute (collectively, the "**WARN Act**"), unless Manager is given assurances reasonably satisfactory to Manager (a) that the Hotel will remain open after termination of this Agreement, (b) that the new operator of the Hotel will offer employment to a sufficient number of Hotel employees upon such terms and in a manner such that the termination of this Agreement will not trigger the applicability of the WARN Act (i.e., the terms of employment offered to such Hotel Personnel shall comply with all governmental regulations relating to such employees and shall be sufficient to prevent Manager from incurring any loss or liability under the WARN Act), and (c) that Manager will be indemnified by a credit-worthy entity for any liability under the WARN Act incident to termination of this Agreement.

    Section 11.22 <u>No Representations</u>.

    A.    Owner and Manager acknowledge that there have been no representations, inducements, promises or agreements made by Manager or Owner other than those specifically set forth herein.

    B.    Financial projections, budgets or similar forecasts as may have been prepared or in the future are prepared by Manager or its affiliates do not take into account, nor make provision for, any unforeseeable rise or decline in local or general economic conditions or other factors beyond the control of Manager. Manager and its affiliates cannot and do not warrant or guaranty in any way said financial projections, budgets or other forecasts. Any financial projections, budgets or forecasts provided have been prepared in good faith on the basis of information available at the time of such preparation and Manager's and its affiliate's professional experience in the hotel industry. Said financial projections, budgets and forecasts have been prepared for information only and not as an inducement for action. Owner hereby acknowledges that in entering into this Agreement, Owner has not relied on any projection of earnings, statements as to the possibility of future success, or other similar information which may have been prepared by Manager or its affiliates. Owner further understands and acknowledges that no guaranty is made or implied by Manager or its affiliates as to the cost, or the future financial success or profitability, of the Hotel.

    Section 11.23 <u>Post-Termination Matters; Reimbursements to Manager</u>. Upon any termination or expiration of this Agreement for any reason whatsoever, Owner expressly agrees that Manager may remove any documents which are proprietary to Manager or its affiliates (e.g., without limitation, manuals, software programs, internal correspondence of a proprietary nature, etc.). Owner further agrees that within ten (10) days of billing therefor, Owner shall pay to Manager in addition to any other amounts due pursuant to this Agreement, (i) Manager's reasonable out-of-pocket costs incurred by reason of requests by Owner for assistance after termination of this Agreement not otherwise expected of Manager in the orderly termination of its operations at the Hotel; (ii) any unpaid fees and other charges and reimbursements properly due Manager hereunder; (iii) any payments to or expenses with respect to Hotel Personnel mandated by applicable law [e.g., COBRA]; (iv) to the extent reasonable and consistent with standard industry practices and standards or as reflected or contemplated in the Operating Budget, termination-related expenses including accrued sick pay, and vacation and regular monthly contributions under a defined benefit plan to employees, as well as (but only to the extent

-38-

consistent with the Operating Budget or otherwise approved by Owner in writing) bonus, severance and termination payments; and (v) without limiting the generality of the last sentence of Section 6.3, any liability or obligation arising as a result of or in connection with a complete or partial withdrawal as defined in Sections 4203 or 4205 of ERISA from any multiemployer plan as defined in Section 3(37) of ERISA in connection with or relating to the termination or expiration of this Agreement.  This Section 11.23 shall survive the expiration or sooner termination of this Agreement.

Section 11.24  Entire Agreement.  This Agreement, together with any other writings signed by the parties contemporaneously herewith and together with any other instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior oral and written understandings. Amendments to this Agreement shall not be effective unless in writing and signed by the parties hereto.  Facsimile or pdf signatures shall be effective for all purposes.

Section 11.25  Periods of Time.  Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or legal holiday under the laws of the state in which the Hotel is located, then and in such event, said date shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

Section 11.26  Preparation of Agreement.  This Agreement shall not be construed more strongly against either party regardless of who is responsible for its preparation.

Section 11.27  Exhibits.  All exhibits attached hereto are incorporated herein by reference and made a part hereof as if fully rewritten or reproduced herein.

Section 11.28  Attorneys' Fees and Other Costs.  Should Owner or Manager engage in litigation to enforce their respective rights pursuant to this Agreement, the prevailing party shall have the right to recover from the non-prevailing party the prevailing party's reasonable attorneys' fees, court costs and expenses arising therefrom.  The provisions of this Section 11.28 shall survive the expiration or earlier termination of this Agreement.

Section 11.29  Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original.

Section 11.30  Subordination and Non-Disturbance.  Manager acknowledges and agrees that its rights under this Agreement shall be subject and subordinate to the lien of any bona fide third party first mortgage encumbering the Hotel, whether now or hereafter existing, provided that (a) the holder of any such first mortgage (a "**Lender**") is an Institutional Lender; (b) such financing encumbers only the Hotel; (c) in the event that the Lender exercises any of its remedies thereunder, the Lender shall have the right to terminate (or to require Owner to terminate) this Agreement only after the occurrence and during the continuance of an event of default by Owner, as borrower, under the loan documents, and any termination of this Agreement shall be subject to extension in accordance with Section 11.21 hereof; and (d) any subordination agreement entered into by Manager with the Lender shall provide that, notwithstanding anything to the contrary contained in the loan documents, whether or not a default or an event of default exists under such loan, for so long as Manager continues to manage the Hotel pursuant to the terms of this Agreement, Manager

-39-

shall be paid from Gross Revenue before debt service, and shall be entitled to retain all fees earned and all reimbursable expenses actually incurred by Manager with respect to which Manager is entitled to payment or reimbursement pursuant to the terms of this Agreement, including without limitation payroll and other employee-related expenses. Owner shall use commercially reasonable efforts to obtain a non-disturbance agreement in favor of Manager from any such Lender in a form customarily and reasonably utilized by such Lender. The provisions of this Section 11.30 shall be self-operative, but at Owner's request, Manager agrees to execute and deliver promptly an agreement confirming such subordination in accordance with the provisions hereof and containing such other terms as may be customary and reasonable as the Lender and Manager, each acting reasonably, may agree upon.

ARTICLE XII.
PROVISIONS RELATING TO A HOTEL WHICH IS OPEN

Section 12.1    Employment.  Owner and Manager hereby acknowledge and agree that the employment of all individuals presently employed at the Hotel shall be terminated by the current manager of the Hotel as of the Commencement Date; that Manager or its affiliate will be a new employer; that Manager or its affiliate will offer employment to all or substantially all of such employees (with the exception, in Manager's discretion, of the senior hotel personnel and with such other exceptions as Owner may approve) on a 90-day probationary basis; and that Manager will have complete discretion as to those employees it may elect to retain once the probation period is over in accordance with applicable federal, state and local law.  Manager and Owner hereby acknowledge that Manager or its affiliate will require employees currently employed at the Hotel who are interested in remaining as employees of Manager beyond the 90-day probation period to proceed through Manager's or its affiliate's normal application and hiring process to attempt to secure such employment with Manager or its affiliate.

Section 12.2    Operating Costs.  In no event shall Operating Costs include any write-offs of accounts receivable based upon goods sold or services rendered prior to the Commencement Date, nor shall any other item of income, cost or expense attributable to termination of any previous management agreement, or to any period prior to the Commencement Date as determined by GAAP, be included in the calculation of Gross Revenue, Operating Costs or Ownership Costs.

Section 12.3    Indemnity.  Owner shall, at its expense, defend, indemnify and hold Manager and the other Manager Indemnified Parties harmless against and from any and all Claims arising out of any event or circumstance that occurs prior to the Commencement Date, including without limitation, any and all employment-related Claims accruing prior to the Commencement Date, provided such event or circumstance was not caused by Manager's Grossly Negligent or Willful Acts.

Section 12.4    Previous Franchise and Management Agreements.  Owner shall, or shall cause the previous owner of the Hotel to, terminate the existing management agreement for the Hotel prior to the Commencement Date at Owner's sole cost and expense; Owner acknowledges, however, that it has not been induced by Manager to do so.  Owner shall, at its expense, defend, indemnify and hold harmless Manager and the other Manager Indemnified Parties against and from any and all Claims arising out of or incident to the termination of the existing management

07.10.2025 v.1

agreement or any prior franchise or license agreement for the Hotel, whether such Claims are asserted by the previous manager, the franchisor or licensor, or any other party.

Section 12.5    Confidentiality.  Owner and Manager agree to keep the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any), together with all information and data obtained, possessed, or generated in connection with the Hotel (collectively, "Privileged Information"), strictly confidential and not to make any public announcements or any disclosures to any third parties (other than Smith Travel Research (STAR Report) or a comparable hospitality industry reporting service), either orally or in writing, with respect to any Privileged Information without the express written consent of the other party hereunder; provided, however, the restrictions imposed hereby shall not apply to any Privileged Information (1) which is required to be disclosed in order to comply with any law, ordinance, governmental decree or any rule, regulation or decree of any interested governmental body; (2) which must otherwise be disclosed to relevant third parties, including accountants, attorneys and lenders, in the course of reasonable and diligent management and operation of the Hotel or the business of Owner, or any subsidiary or Affiliate of Owner or Manager; or (3) which is (i) publicly available through no fault of or disclosure by or through the disclosing party; or (ii) is made known to disclosing party apart from the performance of its duties hereunder from a source that is not otherwise bound by any confidentiality obligation with respect to such Privileged Information.  If the disclosing party makes such disclosure in accordance with the previous sentence, it shall notify such third party of this provision and of the requirement of confidentiality.  The provisions of this Section 12.5 shall survive the expiration or earlier termination of this Agreement.

Section 12.6    Owner's Rights to License Food and Beverage.  Owner reserves the right, upon the provision of no less than sixty (60) days' prior written notice to Manager, to license the food and beverage service within the Hotel and its facilities to a third-party contractor.  In such event, Owner and Manager shall, in good faith, amend this Agreement to modify Manager's obligations accordingly and exclude revenue and expense of food and beverage from Gross Revenue and Operating Supplies.

Section 12.7    Contingency.    Manager acknowledges that Owner is the Debtor in Possession of the Hotel pursuant to Case No. 24-2173-gmh (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Eastern District of Wisconsin (the "**Court**").  This Agreement shall be contingent upon entry of a Court order confirming the Second Amended Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC Dated June 27, 2025 ("**Plan**") [Doc 621], and occurrence of the Effective Date (as defined in the Plan), which shall occur only if, among other events, the Equity Offering (as defined and contemplated in the Plan) is successfully concluded, such date to be promptly confirmed in writing from Owner to Manager upon completion of the Equity Offering ("**Confirmation Date**").  Additionally, if the Plan is materially modified by Court order, or as may be necessary or desirable to settle or compromise claims within the Bankruptcy Case, Owner may terminate this Agreement prior to the Confirmation Date with no further liability to Manager.

[Signatures Begin on Next Page]

07.10.2025 v.1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

OWNER:

WISCONSIN & MILWAUKEE HOTEL LLC,
a Wisconsin limited liability company

By: _____
      Name:
      Title:

MANAGER:

AVION HOSPITALITY, LLC,
a Delaware limited liability company

By: _____
      Name: Lynne Roberts
      Title: Managing Member

[Signature page to Hotel Management Agreement]

EXHIBIT A

<u>LICENSE AGREEMENT</u>

[see attached]

07.10.2025 v.1

EXHIBIT B

<u>INSURANCE PROCURED BY MANAGER</u>

In accordance with Section 3.22, Manager shall, if requested by Owner and on behalf of Owner and at Owner's expense, procure the insurance coverages hereinafter set forth and ensure that they are in full force and effect on the Commencement Date and that they remain in full force and effect thereafter throughout the remainder of the Term of this Agreement.  In such event, all cost(s) and expense(s) incurred by Manager in procuring the following insurance coverages shall be Operating Costs or Project Ownership Costs (as applicable), and shall be paid from the Bank Account(s):

<u>Coverages</u>:                                                    <u>Amounts of Insurance</u>:

<u>PART I</u>

| <u>Commercial General Liability</u><br><br>Including -<br>Premises – Operations<br>Products/Completed Operations<br>Contractual<br>Personal Injury<br>Liquor Liability/Dram Shop (if applicable)<br>Elevators and Escalators | In an amount not less than generally provided at other hotels managed by Manager and its affiliates, but in no event less than $1,000,000 per occurrence, $2,000,000 aggregate |
|---|---|
| <u>Automobile Liability</u><br><br>Owned Vehicles<br>Non-Owned Vehicles<br>Uninsured Motorist where Required by Statute | In an amount not less than generally provided at other hotels managed by Manager and its affiliates, but in no event less than $1,000,000 per location. |
| <u>Umbrella Liability Policy</u> | In an amount not less than generally provided at other hotels managed by Manager and its affiliates, but in no event less than $25,000,000 per occurrence and in the aggregate. |
| <u>Automobile Physical Damage</u>  (Optional)<br>Comprehensive<br>Collision | (To Value if insured) |

07.10.2025 v.1

| | |
|---|---|
| Crime<br>(including fidelity, forgery, alteration, counterfeiting and computer crime) | In an amount not less than generally provided at other hotels managed by Manager and its affiliates, but in no event less than $1,000,000 per occurrence |
| Privacy and Network Liability | $2,000,000 in the aggregate |

PART II

| | |
|---|---|
| Workers' Compensation | Statutory |
| Employer's Liability | $1,000,000 bodily injury each accident<br>$1,000,000 bodily injury by disease |
| Employment Practices Liability | In an amount not less than generally provided at other hotels managed by Manager and its affiliates, but in no event less than $1,000,000. |

All insurance coverages provided for under this Exhibit B shall be effected by policies issued by insurance companies that are of good reputation and of sound and adequate financial responsibility, having a rating in the current Best's Insurance Reports ("**Best's**") of A-VII, or better, or a comparable rating if Best's ceases to publish its ratings or materially changes its rating standards or procedures.

In the event Manager procures the coverages set forth on this Exhibit B, Manager deliver to Owner duly executed certificates of insurance with respect to all of the policies of insurance procured, including existing, additional and renewal policies. In the event Owner procures the coverages set forth on this Exhibit B, Owner shall deliver to Manager duly executed certificates of insurance with respect to all of the policies of insurance procured, including existing, additional and renewal policies.

Each policy of insurance maintained in accordance with this Exhibit B, to the extent obtainable, shall specify that such policies shall not be cancelled or materially changed without at least thirty (30) days prior written notice to Owner and Manager.

Each policy of insurance maintained in accordance with this Exhibit B shall contain a specific waiver of subrogation reflecting the provisions of Section 6.1 of this Agreement.

All policies of insurance provided for under this Exhibit B shall be carried in the name of Manager. All liability policies under Part I of this Exhibit B shall name Owner and each mortgagee, and in each case any of their affiliated or subsidiary companies which they may specify, and their respective managers, directors, officers, agents, employees, members and partners, as additional insureds.

07.10.2025 v.1

All such policies of insurance shall be written on an "occurrence" basis with the exception of Employment Practices Liability insurance, Privacy and Network Liability insurance, and Crime Insurance, each of which may be written on a "claims made" basis. If multiple locations are insured under Part I of this <u>Exhibit B</u> on policies containing an aggregate limit, then the aggregate limit must apply on a per location aggregate basis except with respect to Privacy and Network Liability insurance and Crime Insurance.

Either Manager or Owner, by notice to the other, shall have the right to require that the minimum amount of insurance to be maintained with respect to the Hotel under this <u>Exhibit B</u> be increased to make such insurance comparable with prudent industry standards and to reflect increases in liability exposures, taking into account the size and location of the Hotel; provided that the approval of the other party (acting reasonably) shall be required if such increases result in increased premiums that exceed the budget line item for insurance in the Operating Budget.

In the event Owner requests Manager to procure the coverages set forth in this Exhibit B, Manager may place all or any of the foregoing insurance coverages under blanket insurance policies carried by Manager and/or its affiliates for other properties, in which event the premiums for such coverage shall be allocated by Manager and its affiliates on a fair and equitable basis, consistently applied, among all hotels participating in such blanket insurance coverage.

07.10.2025 v.1

# EXHIBIT C

## INSURANCE PROCURED BY OWNER

In accordance with Section 4.3, Owner agrees, at its expense and as a Project Ownership Cost, to procure and maintain the following insurance coverages, as reasonably adjusted from time to time, throughout the Operating Term of this Agreement:

| Coverages: | Amounts of Insurance: |
|---|---|

### Builders Risk

All risk for term of the initial
and any subsequent Hotel
construction and renovation.

Completed value of the Hotel

### Real and Personal Property

Blanket Coverage
Replacement Cost - all risk
Boiler Machinery - written on a
comprehensive form

100% replacement value of building
and contents

### Business Interruption

Blanket Coverage for the perils
insured against under Real and
Personal Property in this Exhibit C.
This coverage shall specifically cover
Manager's loss of Management
Fees. The business interruption
insurance shall be for a minimum
eighteen (18) month indemnity period.

Calculated yearly based on estimated
Hotel revenues

07.10.2025 v.1

All insurance coverages provided for under this Exhibit C shall be effected by policies issued by insurance companies that are of good reputation and of sound and adequate financial responsibility, having a Best's rating of A-VII, or better, or a comparable rating if Best's ceases to publish its ratings or materially changes its rating standards or procedures.

Owner shall deliver to Manager duplicate copies of either insurance policies or certificates of insurance (at Manager's option) with respect to all of the policies of insurance procured, including existing, additional and renewal policies, and in the case of insurance nearing expiration, shall deliver duplicate copies of the insurance policies or certificates of insurance with respect to the renewal policies to Manager not less than thirty (30) days prior to the respective dates of expiration.

Each policy of insurance maintained in accordance with this Exhibit C, to the extent obtainable, shall specify that such policies shall not be cancelled or materially changed without at least thirty (30) days prior written notice to Owner, Manager and each mortgagee.

Each policy of insurance maintained in accordance with this Exhibit C shall contain a specific waiver of subrogation reflecting the provisions of Section 6.1 of this Agreement.

All policies of insurance provided for under this Exhibit C shall be carried in the name of Owner, Manager and each mortgagee, and losses thereunder shall be payable to the parties as their respective interests may appear; provided, however, the mortgagee which holds the first mortgage on the Hotel (in terms of lien priority) shall be designated as the loss payee (under a standard mortgagee's endorsement) under all casualty policies carried with respect to the Hotel.

All such policies of insurance shall be written on an "occurrence" basis.

Either Manager or Owner, by notice to the other, shall have the right to require the minimum amount of insurance to be maintained with respect to the Hotel under this Exhibit C be increased to comply with the requirements of any mortgage or to make such insurance comparable with prudent industry standards and to reflect increases in risk exposures, taking into account the size and location of the Hotel (provided that the prior approval of the other (acting reasonably) shall be required if such increases result in increased premiums that cause the budget line items for insurance in the Operating Budget to be exceeded).

C-2

EXHIBIT D

<u>EXISTING MORTGAGES AND MEZZANINE FINANCING</u>

<u>EXHBIT E</u>

<u>REVPAR TEST</u>

(a)     For purposes of determining the RevPar and Gross Operating Profit (with respect to the provisions of <u>Section 9.4</u>) for the Hotel and whether there is (and if so, the amount of) any RevPar Deficiency and GOP Shortfall, for any Fiscal Year of any Test Period in which a material capital improvement or major renovation plan is being implemented with respect to the Hotel, or in which there occurs a material event of Force Majeure or (in the case of a GOP Shortfall) a Market Adjustment Event (as defined below), or a default by Owner under this Agreement has occurred, or for any Fiscal Year in which the effects of any of the foregoing may continue, the RevPar and Gross Operating Profit of the Hotel for any such Fiscal Year shall be equitably adjusted by mutual agreement of Manager and Owner (or, in the absence of such agreement, either party shall have the right to submit such dispute to the Financial Arbitrator for resolution in accordance with <u>Section 10.2</u>) to reflect the RevPar and Gross Operating Profit that would have been produced with respect to such Fiscal Year absent such event, circumstance or occurrence.

(b)     Each Fiscal Year beginning on and after the commencement of the first Test Period, Manager shall give written notice (the "**Test Period Calculation Notice**") of its calculation of the RevPar of the Hotel, the GOP Shortfall (if any) and the Threshold Amount (as defined below) for such Fiscal Year to Owner within ninety (90) days after the end of such Fiscal Year, and such calculation shall be deemed accepted if no objection is received from Owner within sixty (60) days after such notice. If such an objection is received within such sixty (60) days, the RevPar of the Hotel, the GOP Shortfall and the Threshold Amount for such Fiscal Year shall be determined by mutual agreement of Manager and Owner, each acting reasonably and in good faith (or, in the absence of such agreement, either party shall have the right to submit such dispute to the Financial Arbitrator in accordance with <u>Section 10.2</u>).

(c)     As used herein, the following terms shall have the meanings set forth below:

"**<u>Average Competitive Set RevPar</u>**" shall mean for any Fiscal Year, the average, weighted by number of rooms, of the RevPar for all of the hotels in the Competitive Set for such Fiscal Year, as calculated by Smith Travel Research, Inc. and published monthly in the STAR Report (or, if the STAR Report is no longer published, such other hotel industry statistical service on which Manager and Owner may mutually agree (the STAR Report or such other service, the "**Revenue Data Publication**")).

"**<u>Competitive Set</u>**" shall mean the hotels listed below, or as otherwise agreed upon in writing by Manager and Owner, or as established by the Financial Arbitrator, from time to time. Initially, the Competitive Set shall be the following hotels:

(i)     Saint Kate the Arts Hotel – 219 rooms;

(ii)    Hilton Garden Inn Milwaukee Downtown – 127 rooms;                          ];

(iii)   Hyatt Regency Milwaukee – 481 rooms;

(iv)    Double Tree by Hilton Hotel Milwaukee Downtown – 243 rooms; and

E-1

(v)     The Pfister Hotel – 307 rooms.

If any of such hotels, subsequent to the date hereof, either changes its chain affiliation or ceases to operate or ceases to report data, Owner and Manager agree to mutually, reasonably and in good faith, discuss whether changes to the foregoing list of the hotels in the Competitive Set are appropriate and, if so, what those changes ought to be.

"**Market Adjustment Event**" shall mean any event or circumstance that was not reasonably foreseeable at the time the applicable Operating Budget was prepared that (i) has a material, adverse effect on the United States travel industry generally (such as, by way of example, (x) an act or acts of terrorism of a nature analogous to the events of September 11, 2001, (y) the price of aviation fuel or gasoline increasing substantially, or (z) a general and sudden economic downturn such as occurred in the fourth quarter of 2008 and the first quarter of 2009), (ii) causes the Average Competitive Set RevPar, calculated monthly, to fall by more than ten percent (10%) for a period of at least three (3) consecutive months compared to the Average Competitive Set RevPar, calculated monthly, for the same period during the previous Fiscal Year, and (iii) has a material, adverse effect on the Gross Operating Profit attained at the Hotel during the same three (3) consecutive month period.

"**RevPar**" shall mean, with respect to any hotel for any Fiscal Year, the quotient arrived at by dividing Room Revenues by Room Night Availability.

"**RevPar Deficiency**" shall mean the excess, if any, of (i) the Room Revenues in respect of the Hotel which would have been required in order to achieve a RevPar for the Hotel equal to the Threshold Amount for the Fiscal Year in question, over (ii) the actual Room Revenues of the Hotel for such Fiscal year.

"**Room Night Availability**" shall have the meaning given to that term in the STR Guidelines.

"**Room Revenues**" shall mean, for any period, that portion of Gross Revenue which is derived from the sale or rental of guest rooms and suites, as defined in the STR Guidelines.

"**STR Guidelines**" shall mean the Smith Travel Research Program Data Reporting Guidelines (or such successor thereto on which Manager and Owner may mutually agree).

"**Test Period**" shall mean any two (2) consecutive Fiscal Years during the Term of this Agreement; provided, however, that the first Test Period shall begin on January 1, 2026; provided further, however, that a Test Period shall not include any Fiscal Year in which any portion of the Hotel is undergoing alterations, renovations or other improvements that have a material adverse impact on the availability or usage of guest rooms, food and beverage services, or meeting space for an extended period of time during such Fiscal Year, unless Owner and Manager agree upon an equitable adjustment as provided above.

"**Threshold Amount**" shall mean, for any Fiscal Year within a Test Period, ninety percent (90%) of the budgeted RevPar for such Fiscal Year.

EXHIBIT F

<u>TENTATIVE OPERATING BUDGET FOR YEAR 2025</u>

[see attached]

07.10.2025 v.1

EXHIBIT G

<u>TENTATIVE CAPITAL BUDGET FOR YEAR 2025</u>

[see attached]

H-1