# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## <u>WISCONSIN & MILWAUKEE HOTEL LLC</u>

### A Wisconsin Limited Liability Company

This AMENDED AND RESTATED OPERATING AGREEMENT (this **"Agreement"**) of WISCONSIN & MILWAUKEE HOTEL LLC, a Wisconsin limited liability company (the **"Company"**), dated as of _____, 2025, is agreed to by the undersigned Members of the Company.

## RECITALS

WHEREAS, the Members previously entered into that certain Operating Agreement, dated January 1, 2011, as amended from time to time (the "Prior Agreement");

WHEREAS, the Members desire to amend and restate the Prior Agreement and have agreed to operate a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Members hereto desire to set forth herein their understandings with respect to the governance of the Company and the transfer of ownership interests therein;

NOW, THEREFORE, for good and valuable consideration, the Members, intending to be legally bound, agree as follows:

## ARTICLE 1
## <u>CERTAIN DEFINITIONS</u>

Certain capitalized terms haven the meanings given them on <u>Exhibit A</u>.

## ARTICLE 2
## <u>ORGANIZATION</u>

2.1     <u>Organization</u>. The Company has been organized as a Wisconsin limited liability company under and pursuant to the Act and the issuance of Articles for the Company by the Department of Financial Institutions of the State of Wisconsin. The rights and obligations of the Members are as set forth in the Act except as this Agreement expressly provides otherwise.

2.2     <u>Name</u>. The name of the Company is "Wisconsin & Milwaukee Hotel LLC" and all Company business must be conducted in that name or such other name as the Manager may select from time to time and which is in compliance with all applicable laws.

2.3     <u>Registered Office and Registered Agent and Principal Office</u>. The registered office of the Company required by the Act to be maintained in the State of Wisconsin is the office of the registered agent named in the Articles or such other office as the Manager may designate from

EXHIBIT

09

time to time in the manner provided by law. The registered agent of the Company in the State of Wisconsin is Jon Herreman or such other Person or Persons as the Manager may designate from time to time. The principal office of the Company may be at such place as the Manager may designate from time to time.

2.4     Purposes. The purpose of the Company is to conduct any and all lawful business whatsoever that may be conducted by limited liability companies pursuant to the Act.

2.5     Term. The Company commenced on the date of issuance of its Articles and has a perpetual term and will continue until it is dissolved in accordance with either the provisions of this Agreement or the Act.

2.6     Recapitalization, Acquisitions, Restructuring and Mergers. The Company may participate in or be a party to any recapitalization, acquisition, restructuring or merger in accordance with and as allowed by the Act.

2.7     Entity Declaration. The Company is not a general partnership, a limited partnership or a joint venture, and no Member or Manager should be considered a partner or joint venturer of or with any other Member or Manager, for any purposes other than for federal and state tax purposes, and this Agreement shall not be construed otherwise.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

3.1     Capital Contributions. The Class A Members as of the date of this Agreement were holders of membership interests under the Prior Agreement and such membership interests are represented by and converted into Class A Units under this Agreement. Such Class A Members have made such initial Capital Contributions as are set forth on the books and records of the Company. Each Class B Member subscribing for Class B Units in the Offering shall contribute to the Company such Class B Member's required Capital Contribution at the time and in the manner set forth in their Subscription Agreement.

3.2     Subsequent Contributions. The Members will not be obligated to make any additional Capital Contributions to the Company in excess of their initial Capital Contributions as described above in Section 3.1.

3.3     Return of Capital Contributions. Except as expressly provided herein, no Member shall be entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member or Manager.

3.4     Loans by Manager and Members. Any Manager or Member may, but is not obligated to, loan to the Company such sums as the Manager determines to be appropriate for the conduct of the Company's business. Any such loans shall be made upon terms and for such maturities as the Manager determines are commercially reasonable.

2

15516721

3.5 <u>Capital Accounts</u>. A separate capital account ("**Capital Account**") will be maintained for each Member in accordance with Reg. Sec. 1.704-1(b)(2)(iv). Subject to the requirements of Reg. Sec. 1.704-1(b)(2)(iv):

(a) the Company will credit each Member's Capital Account with: (i) all cash contributions of such Member to the Company; (ii) the Net Agreed Value of Contributed Property; (iii) such Member's share of the Company's Profits; (iv) the amount of any liabilities of the Company assumed by such Member (other than liabilities included in the netting process of subsection (b)(ii) below or increases in the Member's share of the Company's liabilities determined in accordance with the provisions of Code Sec. 752); and (v) the amount of any basis increase in Company Property attributable to investment credit recapture allocated to such Member; and

(b) the Company will debit each Member's Capital Account for: (i) distributions of cash to such Member; (ii) the Net Agreed Value of Company Property distributed to such Member; (iii) such Member's share of the Company's Losses (including expenditures which can neither be capitalized nor deducted for tax purposes, organization and syndication expenses not subject to amortization, and loss on sale or disposition of Company Property, whether or not disallowed under the rules of Code Sec. 267 or Sec. 707, but excluding losses or deductions described in Reg. Sec. 1.704-1(b)(4)(i) or (iii)); (iv) the amount of any liabilities of such Member assumed by the Company (other than liabilities already included in the netting process of subsection (a)(ii) above or decreases in the Member's share of the Company's liabilities determined in accordance with the provisions of Code Sec. 752); and (v) the amount of any basis decrease in Company Property attributable to investment credit recapture allocated to such Member.

3.6 <u>Capital Accounts Upon Sale or Exchange of Units</u>. Upon the sale or exchange of a Unit the Capital Account of the selling or exchanging Member will be transferred to the transferee on a pro rata basis.

3.7 <u>Revaluation of Capital Accounts Upon Occurrence of Certain Events</u>.

(a) <u>Contributions</u>. In accordance with the provisions of Reg. Sec. 1.704-1(b)(2)(iv)(f) if, after the initial capital is contributed pursuant to <u>Section 3.1</u>, money or property in other than a de minimis amount is contributed to the Company in exchange for an Interest, the Carrying Values of all the Company's Property (determined immediately prior to such issuance) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each such Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such issuance. In determining the Unrealized Gain or Unrealized Loss, the fair market value of Company Property shall be as determined by the Manager.

(b) <u>Distributions</u>. In accordance with the provisions of Reg. Sec. 1.704-1(b)(2)(iv)(f), if money or Company Property in other than a de minimis amount is distributed to a Member in exchange for all or part of an Interest, the Carrying Values of all the Company's Property (determined immediately prior to such distribution) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each item of Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on

15516721

Case 24-21743-gmh    Doc 652-9    Filed 07/16/25    Page 3 of 30

a sale of each such item of Company Property immediately prior to such distribution. In determining the Unrealized Gain or Unrealized Loss, the fair market value of the distributed Property shall be as determined by the Manager.

(c)     Liquidation. If the Company is liquidated within the meaning of Treas. Reg. Sec. 1.704-1(b)(2)(ii)(g), the Carrying Values of all of the Company's Property (determined immediately prior to the liquidation) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each Company Property as if the Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such liquidation. In determining the Unrealized Gain or Unrealized Loss, the fair market value of the Company Property shall be determined by the Manager.

(d)     Services. In accordance with the provisions of Treas. Reg. Sec. 1.704-1(b)(2)(iv)(f), if the Company grants an Interest (other than a de minimis Interest) as consideration for the performance of services to or for the benefit of the Company, the Carrying Values of all the Company's Property (determined immediately prior to such issuance) shall be adjusted to reflect the Unrealized Gain or Unrealized Loss attributable to each such Company Property as if such Unrealized Gain or Unrealized Loss had been recognized on a sale of each such item of Company Property immediately prior to such issuance. In determining the Unrealized Gain or Unrealized Loss, the fair market value of Company Property shall be as determined by the Manager.

(e)     Other Adjustments. The Carrying Values of Company Property shall be increased or decreased to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to (i) Treas. Reg. Sec. 1.704-1(b)(2)(iv)(m); and (ii) subparagraph (g) of the definition of Profits and Losses hereof, provided, however, that Carrying Value shall not be adjusted pursuant to this subparagraph to the extent the Manager determines that an adjustment pursuant to Sections 3.7(a), (b), (c) or (d) is necessary or appropriate in connection with the transaction that would otherwise result an adjustment pursuant to this subparagraph (e).

(f)     Manager Discretion. The adjustments pursuant to subparagraphs (a), (b) or (d) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

ARTICLE 4
ALLOCATIONS AND DISTRIBUTIONS

4.1     Allocation of Profits. After giving effect to the special allocations set forth in Section 4.3, Profits for each fiscal year shall be allocated among the Members in accordance with their Percentage Ownerships.

4

4.2     Allocation of Losses.

(a)     After giving effect to the special allocations set forth in Section 4.3, Losses for each fiscal year shall be allocated among the Members in accordance with their Percentage Ownerships.

(b)     The Losses allocated pursuant to Section 4.2(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to this Section 4.2, the limitations set forth in this Section 4.2(b) will be applied on a Member-by-Member basis so as to allocate the maximum permissible loss to each Member under the Treasury Regulations.

4.3     Special Allocations. Items of income, gain, loss and deduction will be allocated in accordance with the provisions of this Section 4.3 without regard to the allocation provisions contained in Sections 4.1 and 4.2, in the following order:

(a)     Minimum Gain Chargeback. Notwithstanding any other provision of this Article 4, if there is a net decrease in Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Minimum Gain, determined in accordance with Reg. Sec. 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. Sec. 1.704-2(f)(6) and (j)(2). This Section 4.3(a) is intended to comply with the minimum gain chargeback requirement in Reg. Sec. 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Notwithstanding any other provision of this Article 4 except Section 4.3(a), if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Reg. Sec. 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Reg. Sec. 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Members pursuant thereto. The items to be so allocated shall be determined in accordance with Reg. Sec. 1.704-2(i)(4) and (j)(2). This Section 4.3(b) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. Sec. 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. If any Member's Capital Account is unexpectedly adjusted for, or such Member is unexpectedly allocated or there is unexpectedly distributed to such Member any item described in Reg. Sec. 1.704-1(b)(2)(ii)(d)(4)-(6), and such treatment creates or increases a Member's Adjusted Capital Account Deficit, then without regard to the allocation provisions provided in Sections 4.1 and 4.2, the Company shall

5

15516721

allocate to such Member items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this Section 4.3(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.3(c) were not in this Agreement.

(d) _Gross Income Allocation_. In the event that a Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) the amount the Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount the Member is deemed to be obligated to restore pursuant to Reg. Secs. 1.704-2(g) and (i)(5), the Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.3(d) shall be made if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article 4 have been tentatively made as if this Section 4.3(d) were not in this Agreement.

(e) _Nonrecourse Deductions_. Nonrecourse Deductions, if any, for any fiscal year shall be allocated to the Members in accordance with their Percentage Ownership.

(f) _Member Nonrecourse Debt Deductions_. Any Member Nonrecourse Debt Deductions for any fiscal year shall be allocated to the Member who bears the risk of loss with respect to the liability to which such Member Nonrecourse Debt Deductions are attributable in accordance with Reg. Sec. 1.704-2(i).

(g) _Unrecaptured Section 1250 Gain_. For purposes of determining the amount of unrecaptured section 1250 gain allocable to each Member, a Member's share of depreciation is determined in accordance with Reg. Sec. 1.1245-1(e), so that the unrecaptured Section 1250 gain is allocated to the Members who received the depreciation deductions.

(h) _Curative Allocations_. The allocations set forth in Section 4.2(b) and Sections 4.3(a) through 4.3(g) ("**Regulatory Allocations**") are intended to comply with certain requirements of Reg. Sec. 1.704-1(b). Notwithstanding any other provision of Article 4 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other profits, losses and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other profits, losses and other items and the Regulatory Allocations to each Member shall be equal to the amount that would have been allocated if the Regulatory Allocations had not occurred.

(i) _Code Section 704(c) Allocations_. In accordance with Code Sec. 704(c), income, gain, loss and deduction concerning any Contributed Property shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the Net Agreed Value of such property upon contribution. If the value of any Company Property is adjusted under Section 3.7 of this

15516721

Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its Carrying Value in the same manner as under Code Sec. 704(c). Allocations under this Section 4.3(i) are solely for purposes of federal income taxes and will not affect or be taken into account in computing any Member's Capital Account.

4.4     Other Allocation Rules.

(a)     In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such fiscal year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such fiscal year in accordance with Code Sec. 706, using any convention permitted by law and selected by the Manager.

(b)     Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Reg. Sec. 1.752-3(a)(3), and solely for such purpose, the Member's Percentage Ownership in the Company is specified to be his applicable interest.

(c)     Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

4.5     Allocations Concerning Transferred Units. Unless the Code requires otherwise, any Profits or Losses allocable to a Unit which has been transferred during any year shall be allocated among the Persons who were holders of such Unit during such year by taking into account their varying interests during such taxable year in accordance with Code Sec. 706(d) and using any convention selected by the Manager.

4.6     Distribution of Net Cash Receipts. Except as otherwise provided in Section 11.3, Net Cash Receipts, if any, shall be distributed from time to time when determined by the Manager to holders of Membership Interests on a pro rata basis, in proportion to their Percentage Ownerships.

ARTICLE 5
MEMBERSHIP; DISPOSITIONS OF INTERESTS

5.1     Representations and Warranties. Each Member hereby represents and warrants to the Company and to each other Member that:

(a)     Organization and Authority Matters. (i) If that Member is a corporation, limited liability company, partnership, trust, or other entity, it is duly organized, validly existing, and in good standing under the law of the state of its organization and is duly qualified and (if applicable) in good standing as a foreign entity in the jurisdiction of its principal place of business (if not organized therein); (ii) the Member has full corporate, limited liability company, partnership, trust, or other applicable power and authority to execute and agree to this Agreement and to perform its obligations hereunder and all

7

15516721

necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries, or other Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by that Member have been duly taken; (iii) the Member has duly executed and delivered this Agreement; and (iv) the Member's authorization, execution, delivery, and performance of this Agreement does not conflict with (A) any law, rule or court order applicable to that Member, (B) that Member's articles of incorporation, bylaws, partnership agreement, agreement or certificate of organization, or (C) any other agreement or arrangement to which that Member is a party or by which it is bound;

(b)    <u>Investment Matters</u>. (i) The Member is acquiring his Interest for his own account for investment and not with a view to the resale, distribution or fractionalization thereof; (ii) the Member is an accredited investors as such term is defined in Regulation D under the Securities Act of 1933; (iii) the Member has, alone or together with his purchaser representatives, such knowledge and experience in financial matters that he is capable of evaluating the relative risks and merits of this investment; (iv) the Member has adequate means of providing for his current needs and personal contingencies and has no need for liquidity in this investment and is able to bear the economic risk of this investment for an indefinite period of time; (v) all documents and records requested by the Member have been delivered or made available to him and the Member's investment decision is based upon his own investigation and analysis and not the representations or inducements of any Manager or Member; (vi) the Member understands that the Interests have not been, and will not be, registered under the Securities Act of 1933 in reliance upon applicable exemptions from registration; and (vii) the Member under that there are substantial restrictions on the transferability of the Interests under the Securities Act of 1933 and state securities laws and under this Agreement and further understands that for the foreseeable future, there will be no public market for the Interests and the Company is under no obligation to register the Interests under the Securities Act of 1933 at some future date.

5.2    <u>Restrictions on Transfer of Units</u>.

(a)    <u>No Transfers</u>. Except as otherwise specifically provided in this Agreement, the parties have agreed that it is not desirable that any of the Units be sold or transferred because the Members desire to provide for continuity of membership and management of the Company. No Member may Transfer any Interest in the Company except as specifically permitted in <u>Sections 5.3</u> or <u>5.4</u>. Any attempted Transfer of an Interest, or any part thereof, without compliance with this Agreement shall be, and is hereby declared, null and void <u>ab initio</u>. The Members agree that the foregoing transfer restriction is intended to permit the harmonious operation of the Company's business, is reasonable in view of the Company's purpose and the relationship of the Members, and may be specifically enforced by the Company, the Manager and each Member.

(b)    <u>Effectiveness of Assignment</u>. Any Transfer of Units must be made by a written instrument. No Transfer will be effective unless it is specifically permitted under <u>Section 5.2(a)</u> and:

    (i)    neither the Transfer nor any offering in connection therewith violates any provision of any federal or state securities law;

15516721

(ii)     the transferee executes a statement that he is acquiring such Interest or such part thereof for his own account for investment and not with a view to distribution, fractionalization or resale thereof;

(iii)    such Transfer would not result in the termination of the Company (within the meaning of Section 708(b) of the Code) or termination of its status as a partnership under the Code; and

(iv)    the Company receives a transfer fee sufficient to cover all expenses in connection with the transfer, including but not limited to legal fees incurred in connection with confirming the matters referred to in subsections (i) and (iii), subject to the Manager's right to waive these fees in its sole discretion.

(c)     <u>Requirements for Admission</u>. No transferee of Units shall have the right to become a Member unless and until the Transfer becomes effective in accordance with <u>Section 5.2(b)</u> and all of the following conditions are satisfied:

(i)     A duly executed and acknowledged written instrument of transfer approved by the Manager has been filed with the Company setting forth (A) the intention of the transferee to be admitted as a Member; (B) the notice address of the transferee; and (C) the number of Units transferred by the transferor to the transferee;

(ii)    The transferor and transferee execute and acknowledge, and cause such other Persons to execute and acknowledge, such other instruments and provide such other evidence as the Manager may reasonably deem necessary or desirable to effect such admission, including without limitation: (A) the written acceptance and adoption by the transferee of the provisions of this Agreement, including a representation and warranty that the representations and warranties in <u>Section 5.1</u> are true and correct with respect to the transferee; (B) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law; and (C) the transferee's completion, if applicable, of an acknowledgment of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(iii)   The admission is approved by the Manager, which will not be unreasonably withheld, conditioned or delayed in the case of a Permitted Transfer; and

(iv)    A fee has been paid to the Company sufficient to cover all expenses in connection with the admission, subject to the Manager's right to waive these fees in their sole discretion.

9

15516721

(d)     Rights of Mere Assignees. If a transferee of an Interest is not admitted as a Member, it shall be entitled to receive the allocations and distributions attributable to the transferred Interest, but it shall not be entitled to inspect the Company's books and records, receive an accounting of Company financial affairs or otherwise take part in the Company's business or exercise the rights of a Member under this Agreement.

5.3     Permitted Transfers. Notwithstanding anything to the contrary contained in this Agreement, Units may be Transferred (a "**Permitted Transfer**") in the case of Transfers by a Member or a Permitted Transferee (as herein defined) to the Representative of such Member, the Company or a Related Party (each such transferee, a "**Permitted Transferee**").

5.4     Approved Sale by a Majority Interest.

(a)     Majority Sale. If Members desire to sell Units held by them constituting a Majority Interest in a bona fide arm's length transaction or series of related transactions with a third-party purchaser which is approved by the Manager (a "**Majority Sale**"), such Members (the "**Selling Members**") shall deliver a written notice (a "**Sale Notice**") to the other Members. The Sale Notice shall disclose in reasonable detail the identity of the proposed transferee(s) (including all parties holding controlling interests in such proposed transferee), the proposed amount of Units to be transferred and the terms and conditions of the proposed sale and shall include a true and correct copy of the written offer to purchase Units received by the Selling Members. Upon delivery of a Sale Notice, subject to compliance with Section 5.4(b), the Selling Members may, within one hundred twenty (120) days after following the delivery of the Sale Notice, sell the Units specified in the Sale Notice to the party or parties named therein at a price no less than the price specified in the Sale Notice and otherwise on terms and conditions no more favorable to the transferee than those offered in the Sale Notice. Any Units not transferred within such one hundred twenty (120)-day period shall be again subject to the provisions of this Section 5.4 with respect to any subsequent Transfer.

(b)     Tag-Along Rights. The delivery by the Selling Members of the Sale Notice shall create an option in favor of the other Members to sell their Units in the Majority Sale transaction described in the Sale Notice as additional selling Members, on identical terms and conditions, by delivering a written notice thereof (a "**Tag-Along Election Notice**") to the Selling Members within thirty (30) days after delivery of the Sale Notice. Each other Member may Transfer up to the Percentage Ownership of Units then owned by such other Member as the Percentage Ownership of Units to be sold by the Selling Members in the transaction bears to the aggregate number of Units then owned by the Selling Member; *provided, however*, that if the transferee refuses to purchase all of such Units, the number of Units to be sold in the transaction shall be reduced pro-rata (in proportion to the total number of Units initially sought to be sold by the Selling Member(s) and the other Members) to the extent necessary to consummate the transaction.

(c)     Drag-Along Rights. The delivery by the Selling Members of the Sale Notice shall also create an option in favor of the Selling Members, exercisable by written notice to the other Members given within thirty (30) days from delivery of the Sale Notice, to require that all of the other Members sell all of their Units in the transaction described in the Sale Notice on identical terms and conditions as set forth in the Sale Notice. The other

10

Members must so sell their Units and take all other desirable actions reasonably requested by the Selling Member(s) in connection with the sale described in the Sale Notice.

5.5     Preemptive Rights.

(a)     Each Member shall have a preemptive right to purchase its pro rata share of any Equity Securities (as hereinafter defined) that the Company may, from time to time, propose to issue and sell after the date of this Agreement (an **"Offering"**). A Member's pro rata share is equal to the amount of such Equity Securities so that the Member maintains its Percentage Ownership in the Company. The term **"Equity Securities"** means any Units, any other security convertible into Membership Interests or any warrant, option or other right to purchase any such security.

(b)     The Company shall give the Members written notice of its intention, describing the Equity Securities and the price and the terms and conditions upon which the Company proposes to issue the Equity Securities. Each Member shall have 15 days from the date it has received such notice to agree to purchase up to its pro rata share of the Equity Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company setting forth the quantity of Equity Securities to be purchased.

(c)     After the end of the 15-day period specified in subsection (b) above, the Company shall have 120 days thereafter to sell the Equity Securities in respect of which the Member's rights were not exercised at a price and upon general terms and conditions materially no more favorable to the purchasers thereof than specified in the Company's notice pursuant to subsection (b). If the Company has not sold such Equity Securities within such 120-day period, the Company shall not thereafter issue or sell any Equity Securities without first offering such securities to the Members in the manner provided above.

(d)     Notwithstanding anything herein to the contrary, the preemptive rights established by this Section shall have no application to any of the following Equity Securities: (i) Membership Interests (and/or options, warrants or other Interest purchase rights issued pursuant to such options, warrants or other rights) issued or to be issued to employees, officers or directors of, or consultants or advisors to, the Company or any subsidiary, pursuant to Interest option plans or other arrangements; and (ii) any Equity Securities issued for consideration other than cash pursuant to a merger, consolidation, acquisition or similar business combination.

5.6     Additional Members. Additional Persons may be admitted to the Company as Members and units of Membership Interest may be created and, subject to Section 5.5, issued and/or sold to those Persons and to existing Members upon the approval of and on such terms and conditions as are determined by the Manager. The terms of admission or issuance may provide for the creation of different classes or groups of Members and having different rights, powers and duties. The Manager must reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers and duties, and such an amendment shall require the approval and execution by the Members in accordance with Article 9. The provisions of this Section 5.4 shall not apply to Transfers of Membership Interests.

11

15516721

5.7     Interests in Member. A Member that is not a natural person may not cause or permit an ownership interest, direct or indirect, in itself to be disposed of if, after the disposition: (a) the Company would be considered to have terminated within the meaning of Code Sec. 708; or (b) without the written consent of the Manager and a Majority Interest, any Member shall cease to be controlled by substantially the same Persons who controlled it as of the date of the Member's admission to the Company or Permitted Transferees of such Persons.

5.8     Information.

(a)     In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

(b)     The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or Persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or a Manager, except for disclosures: (i) compelled by law (but the Member must notify the Manager promptly of any request for that information, before disclosing it if practicable); (ii) to advisers or representatives of the Member or Persons to which that Member's Unit may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Section 5.8(b); or (iii) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. The Members acknowledge that breach of the provisions of this Section 5.8(b) may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Section 5.8(b) may be enforced by specific performance without posting bond.

5.9     Liability to Third Parties. No Member or Manager shall, by virtue of his status as a Member or his ownership of a Unit, be liable for the debts, obligations or liabilities of the Company, including but not limited to a judgment decree or order of a court.

5.10    Withdrawal.

(a)     Each Member agrees not to withdraw as a member of the Company prior to the liquidation of the Company without the approval of the other Member(s). A Member who voluntarily withdraws as a member of the Company without the consent of the other Member(s) shall be liable to the Company for any damages suffered by the Company on account of the breach and the Company shall not be required to purchase his Unit. A Member shall not receive from the Company any part of his or her Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

15516721

(b) A Member, irrespective of the nature of his or her Capital Contribution, has only the right to demand and receive cash in return for his or her Capital Contribution.

(c) The Company is not obligated to purchase the Unit of any Member who withdraws, retires, resigns, becomes bankrupt or otherwise is dissociated from the Company.

5.11 <u>Lack of Authority</u>. No Member (other than a Manager or an officer appointed by the Manager) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company.

ARTICLE 6
COMPANY MANAGEMENT

6.1 <u>Management of Company</u>. Except as otherwise specifically limited in this Agreement or under applicable law, the Manager shall have the exclusive right and authority to: (a) manage the affairs and business of the Company; (b) exercise the authority and powers granted to the Company; and (c) otherwise act in all other matters on behalf of the Company. No contract, obligation or liability of any kind or type may be entered into on behalf of the Company by any Member other than an existing Manager of the Company unless delegated by the Manager to an executive officer of the Company. The Manager shall take all actions necessary or appropriate to manage the Company's business and accomplish the Company's purposes in accordance with the terms of this Agreement.

6.2 <u>Majority Approval Required for Certain Actions</u>. Notwithstanding anything to the contrary contained in this Agreement, the Company may not take any of the actions set forth below without the prior written approval of a Majority Interest:

(a) any merger, consolidation, liquidation, dissolution or reorganization of the Company or any sale of all or substantially all of the assets of the Company or any of its subsidiaries;

(b) sell, issue or redeem any Units or equity securities of the Company or issue any warrants, options or convertible securities granting the holder the right to obtain equity securities;

(c) make, enter into or modify in any material respect any agreement, arrangement, transaction or payment between the Company, on the one hand, and any Member or Manager or any Person who is an Affiliate or Related Party of a Member or Manager, on the other hand, except as expressly contemplated under this Agreement, which involves aggregate payments or consideration in excess of $25,000 or which is outside the ordinary course of Business of the Company;

(d) any amendment or modification to the Articles; or

(e) approve the dissolution of the Company pursuant to Section 11.1(a).

6.3 <u>Number, Tenure and Qualifications</u>.

13

15516721

(a)     The number of Managers of the Company is one (1). The Initial Manager is Jackson Street Management, LLC.

(b)     The Manager need not be a resident of Wisconsin. The Manager shall hold office until the earlier of his or its removal or resignation pursuant to <u>Section 6.4</u> or his or its death, adjudication of incompetence or dissolution.

(c)     In the event a Manager is removed, resigns or is otherwise disqualified, the Members will have the right to elect a successor Manager, by the act of a Majority Interest in accordance with <u>Section 7.3</u>.

6.4     <u>Resignation and Removal of Manager</u>. A Manager may resign at any time upon written notice to the other Manager and Members. A Manager may be removed only by the unanimous affirmative vote of all Members.

6.5     <u>Action Without Meeting</u>. Unless specifically prohibited by the Articles, any action to be taken at a meeting of the Manager may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Manager. Any such consent signed by the Manager shall have the same effect as a vote of the Manager and may be stated as such in any document filed with the Secretary of State or with anyone else.

6.6     <u>Fees; Expense Reimbursement</u>. The Manager will not receive any fee for its services as the Manager of the Company. The Manager shall be entitled to be reimbursed for all out-of-pocket costs and expenses incurred in the course of its service hereunder.

6.7     <u>Conflicts of Interest</u>. The Manager need not devote full time to the Company's business, but shall devote such time as it, in its discretion, deems necessary to manage the Company's affairs in an efficient manner. Subject to the other express provisions of this Agreement, any other written agreement with the Company, and any nonwaivable provisions in the Act, each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, with no obligation to offer to the Company or any other Manager, Member or officer the right to participate therein. The Company may transact business with any Manager, Member, officer or affiliate thereof provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.

ARTICLE 7
MEETINGS OF MEMBERS

7.1     <u>Meetings</u>. Meetings of the Members may be called by the Manager or by Members holding at least 20% of the Units. The meeting shall be held at the principal place of business of the Company or as designated in the notice or waivers of notice of the meeting.

7.2     <u>Notice</u>. Notice of any meeting of the Members shall be given no fewer than 10 days and no more than 30 days prior to the date of the meeting. Notices shall be delivered in the manner set forth in <u>Section 12.2</u> and shall specify the purpose or purposes for which the meeting is called. The attendance of a Member at any meeting shall constitute a waiver of notice of such meeting,

14

except where a Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

7.3 <u>Manner of Acting</u>. Except where otherwise expressly stated otherwise in this Agreement, for purposes of any and all votes, decisions, actions, approvals and other acts to be taken by the Members with respect to the Company, the vote of a Majority Interest shall be required to constitute an act of the Members, subject to <u>Section 7.8</u> of this Agreement.

7.4 <u>Action Without Meeting</u>. Unless specifically prohibited by the Articles, any action required to be taken at a meeting of the Members or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by Members holding Units entitled to not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members were present and voting. Prompt notice of the taking of the action without a meeting by less than unanimous consent shall be given in writing to those Members who were entitled to vote but did not consent in writing.

7.5 <u>Telephonic Meetings</u>. The Members may participate in and act at any meeting of Members through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such meeting shall constitute attendance and presence in person at the meeting of the person or persons so participating.

7.6 <u>Proxies</u>. Each Member entitled to vote at a meeting of Members or to express consent or dissent to action in writing without a meeting may authorize another Person or Persons to act for him by proxy. Such proxy shall be deposited with the Manager not less than 48 hours before a meeting is held or action is taken, but no proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

7.7 <u>Voting of Units</u>. Each outstanding Unit shall be entitled to one vote upon each matter submitted to a vote of the holders thereof. In any elections for Manager, the Members shall not have the right to cumulative voting.

7.8 <u>Deadlock</u>. In the event that (i) three (3) meetings of the Members called for the same stated purpose are adjourned for lack of a Majority Interest being present within a sixty (60)-day period, (b) an equal number of votes of Members are cast in favor of an action or other matter proposed to be taken by the Company as are cast against such action or matter, or (c) there is otherwise a material deadlock among the Members regarding any votes, decisions, consents, or approvals to be taken by the Members with respect to the Company, then such action or matter shall be submitted to a vote of the Class A Members. If the proposed action or matter receives the affirmative vote or written consent of a Class A Members holding at least a majority of the Class A Units, then such vote or consent will constitute authorization for the taking of such action or matter and will be final and binding upon the Members and the Company.

15

15516721

## ARTICLE 8
## INDEMNIFICATION

8.1     Right to Indemnification.

(a)     Indemnification. To the fullest extent permitted by the Act, the Company shall indemnify, defend and hold harmless each Person (an "**Indemnified Person**") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (including, without limitation, an action by or in the right of the Company), or any appeal in such a proceeding or any inquiry or investigation that could lead to such a proceeding, by reason of the fact that he, or a Person of whom he is the personal representative, is or was an officer, Manager, Member or tax matters member or partnership representative of the Company, or is or was serving as a director, member, manager, officer, partner, venturer, proprietor, trustee, employee or agent of another limited liability company, corporation, partnership, joint venture, trust, sole proprietorship, employee benefit plan or other enterprise, that is or was a Manager, Member or tax matters member or partnership representative from and against any liabilities, expenses (including, without limitation, attorneys' fees and expenses and any other costs and expenses incurred in connection with defending such action, suit or proceeding), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such Indemnified Person in connection with such proceeding.

(b)     Advance Payment. Expenses (including, without limitation, attorneys' fees and expenses) incurred by an Indemnified Person in defending a civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding; provided, however, that the payment of such expenses incurred in advance of the final disposition of a proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his good faith belief that he has met the standard of conduct necessary for indemnification under this Article 8 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such Person is not entitled to be indemnified under this Article 8 or otherwise.

(c)     Not Exclusive. The indemnification and advancement of expenses provided by this Article 8 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any law (common or statutory), provision of the Articles, this Agreement, agreements, vote of the Manager or Members or otherwise.

(d)     Insurance. The Company may purchase and maintain insurance, at its expense, to protect itself and any Person entitled to indemnification under this Article 8 against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 8.

(e)     Indemnification of Employees and Agents. The Company, by adoption of a resolution of the Manager, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may

16

15516721

indemnify and advance expenses to a Manager or Members under this <u>Article 8;</u> and the Company may indemnify and advance expenses to Persons who are not or were not a Manager or Members, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to a Manager, or Member under this <u>Article 8.</u>

8.2     <u>Survival</u>. Indemnification under this <u>Article 8</u> shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this <u>Article 8</u> shall be deemed contract rights, and no amendment, modification or repeal of this <u>Article 8</u> shall have the effect of limiting or denying any such rights with respect to actions taken or proceedings arising prior to any such amendment, modification or repeal.

8.3     <u>Savings Clause</u>. If <u>Section 8.1</u> or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless the Managers, or Members or any other indemnified Person as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this <u>Article 8</u> that shall not have been invalidated and to the fullest extent permitted by applicable law.

ARTICLE 9
AMENDMENTS

This Agreement may be amended or modified from time to time only by a written instrument adopted by the Manager and executed and agreed to by a Majority Interest; *provided*, however, that (a) an amendment or modification reducing a Member's share of distributions (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent, (b) an amendment or modification reducing the required vote required to take any action or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members affected, and (c) an amendment that would modify the limited liability of a Member is effective only with that Member's consent. This Agreement may be amended by the Manager without the consent of the Members: (w) to reflect the issuance of additional Interests or the admission, substitution, termination or withdrawal of Members validly approved and effectuated in accordance with this Agreement, including to amend <u>Exhibit B;</u> (x) to reflect actions duly approved by the Members pursuant to this Agreement; (y) to correct any errors or omissions, or to cure any ambiguity, in this Agreement where the intent of the Members is clear; and (z) to delete or add or modify any provision required to be so deleted, added or modified by the staff of the Securities and Exchange Commission, any other Federal agency or any state securities or "Blue Sky" commissioner or similar official, when the deletion, addition or modification is for the benefit or protection of any of the Members.

17

15516721

## ARTICLE 10
## BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS

10.1  Maintenance of Books and Records. The Company shall maintain complete and accurate books and records of the Company's business and affairs in accordance with generally accepted accounting principles, consistently applied. The books and records shall be maintained at the principal place of business of the Company and shall be accessible to the Members in accordance with the Act.

10.2  Fiscal Year; Accounting. The Company's fiscal year shall be the calendar year. The accounting methods and principles to be followed by the Company shall be selected from time to time by the Manager.

10.3  Reports. On or before the 90th day following the end of each fiscal year during the term of the Company, the Manager shall use reasonable efforts to cause each Member to be furnished with a federal (and where applicable state) income tax reporting Form K-1 or its equivalent and a financial report for the preceding fiscal year.

10.4  Tax Elections. All elections required or permitted to be made by the Company under the Code shall be made by the Manager.

10.5  Signature Necessary to Bind Company. The signature of any Manager or any other person or persons as the Manager may designate shall be sufficient to bind the Company and any third party dealing with the Company may conclusively rely on such signature as evidence of the Company's ascent.

10.6  Bank Accounts. All funds of the Company are to be deposited in the Company's name in such bank accounts or investment accounts as may be designated by the Manager and shall be withdrawn on the signature of any Manager of the Company or any other Person or Persons as the Manager may designate. The Company's funds may not be commingled with the funds of any Manager or Member.

10.7  Partnership Representative. The Manager shall be designated as the "Partnership Representative" pursuant to Section 6223(a) of the Code for the Company and the "tax matters partner" and/or any analogous position of the Company under state, local, or non-U.S. Law that is not governed by provisions analogous to the Partnership Representative provisions in the Code, and the Manager shall provide all Members with written notice as to that designation. The Partnership Representative will notify all members of the commencement of any Company tax audit or administrative adjustments, and the other Members waive any right to negotiate or enter into a settlement agreement with the Internal Revenue Service in any proceedings. All such negotiations and settlements shall be conducted solely by the Partnership Representative. The Members, other than the Partnership Representative, waive any right to file a petition for readjustment of Company matters pursuant to Section 6226 of the Code unless the Partnership Representative does not file such a petition within ninety (90) days of his receipt of notice of a final Company administrative adjustment and unless such petition is filed in any applicable court chosen by a Majority Interest. The Partnership Representative is authorized to represent the Company in any tax audit proceedings and in any dispute with the Internal Revenue Service, including negotiating and entering into a settlement agreement as provided in Section 6224(c) of

18

15516721

the Code, contesting any proposed adjustment of Company items or petitioning for a readjustment of Company items. If the Company pays, or is required to pay, any imputed adjustment amount under Code Section 6225 and/or any associated interest or penalties, the Partnership Representative in its discretion may require each Person who is or formerly was a Member to reimburse and otherwise indemnify the Company for such Person's allocable share of such amounts as determined by the Partnership Representative.

ARTICLE 11
DISSOLUTION, LIQUIDATION AND TERMINATION

11.1    Events of Dissolution. The Company shall be dissolved and shall commence winding up its affairs upon the first to occur of the following:

(a)    The written agreement of the Manager and a Majority Interest;

(b)    Any event which makes it unlawful or impossible to carry on the Company's business;

(c)    The sale, disposition or abandonment of all or substantially all of the Company Property; or

(d)    The entry of a decree of judicial dissolution under the Act.

The Company shall not be dissolved upon the death, retirement, resignation, expulsion, dissolution or bankruptcy of any Member.

11.2    Winding Up. Upon the dissolution of the Company, the Manager shall wind up the Company's affairs and satisfy the Company's liabilities. The Manager shall liquidate all of the Company Property as quickly as possible consistent with obtaining the full fair market value of said Property. During this period, the Manager shall continue to operate Company Property and all of the provisions of this Agreement shall remain in effect.

11.3    Final Distribution. The proceeds from the liquidation of the Company Property shall be distributed as follows:

(a)    First, to creditors, including Members and Managers who are creditors, until all of the Company's debts and liabilities are paid and discharged (or provision is made for payment thereof);

(b)    Second, to the Members in proportion to the positive balance of their respective Capital Accounts as of the date of such distribution, after giving effect to all prior contributions, distributions and allocations for all periods.

11.4    Distributions in Kind. In connection with the termination and liquidation of the Company, the Manager shall attempt to sell all of the Property. To the extent that Property is not sold, each Member will receive a pro rata share of any distribution in kind. Any Property distributed in kind upon liquidation of the Company shall be valued on the basis of an independent appraisal and treated as though the Property were sold and the cash proceeds distributed.

19

15516721

11.5    No Recourse Against Manager. The Members shall look solely to the assets of the Company for the return of their investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return such investment, they shall have no recourse against the Manager, any affiliate of any Manager, or any other Member.

11.6    Purchase by Member or Manager. A Manager, Member or an affiliate of a Manager or Member may, if he so desires, purchase an item of Property upon liquidation provided that: (a) the purchase price is at fair market value as determined by an independent appraiser selected by the Manager; and (b) at least 15 days' advance notice of the proposed sale has been given to all other Members.

11.7    Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member upon dissolution of the Company shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

11.8    Certificate of Cancellation. On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Manager (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State, cancel any other filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the Company.

ARTICLE 12
GENERAL PROVISIONS

12.1    Entire Agreement. This Agreement embodies the entire understanding among the Members concerning the Company and their relationship as Members and supersedes any and all prior negotiations, understandings or agreements, including, without limitation, the Prior Agreement.

12.2    Notices. All notices and demands required or permitted under this Agreement shall be in writing, as follows: (i) by actual delivery of the notice into the hands of the party entitled to receive it; or (ii) by Federal Express or any other overnight carrier, in which case the notice shall be deemed to be given as of the day following the day it is deposited with such carrier. All notices which concern this Agreement shall be addressed as follows:

If to the Company or Manager:    [               ]
                                     [               ]
                                     [               ]
                                     [               ]

If to the Members: To the address as shown from time to time on the records of the Company. Any Member may specify a different address, which change shall become effective upon receipt of such notice by the Manager.

12.3    Severability. If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement, or the

20

15516721

application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected.

12.4 <u>Parties Bound</u>. This Agreement shall be binding upon the Members and their respective successors, assigns, heirs, devisees, legal representatives, executors and administrators.

12.5 <u>Choice of Law</u>. The laws of the State of Wisconsin (other than those pertaining to conflicts of law) shall govern all aspects of this Agreement, irrespective of the fact that one of the parties now is or may become a resident of a different state or country.

12.6 <u>Partition</u>. Each Member irrevocably waives any right that it may have to maintain any action for partition with respect to Company Property.

12.7 <u>Strict Construction</u>. It is the intent of the Members upon execution hereof that this Agreement shall be deemed to have been prepared by all of the parties to the end that no Member shall be entitled to the benefit of any favorable interpretation or construction of any term or provision hereof under any rule or law. To the extent permitted by applicable law, the provisions of this Agreement shall override the provisions of the Act to the extent of any inconsistency or contradiction between them.

12.8 <u>Headings</u>. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision.

12.9 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts with separate pages, and each such counterpart shall be considered an original, but all of which together shall constitute one and the same instrument.

12.10 <u>Pronouns</u>. All pronouns shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

12.11 <u>Effect of Waiver or Consent</u>. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations hereunder or with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person. Failure on the part of a Person to complain of any act or to declare any Person in default hereunder, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default.

12.12 <u>Further Assurances</u>. Each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated herein.

12.13 <u>Indemnification for Breach</u>. To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold all of them harmless from and against all losses, costs, liabilities, damages and expenses (including, without limitation,

15516721

costs of suit and attorneys' fees) they may incur on account of any material breach by that Member of this Agreement.

12.14   Company Set Off. The Company shall be entitled to set off against any and all amount that may from time to time be owing by it to any Member or Manager under or in connection with this Agreement any and all obligations due and owing to the Company from such Member or Manager.

12.15   Disclosure and Waiver of Conflicts. The Members acknowledge and agree that: (i) the attorney who prepared this Agreement ("**Attorney")** acted as legal counsel to the Company and not to the any of the Members; (ii) the Members have been advised by the Attorney that the interests of the Members are opposed to each other and may be opposed to the interests of the Company and, accordingly, the Attorney's representation of the Company may not be in the best interests of the Members; and (iii) each of the Members has been advised by the Attorney to retain separate legal counsel. Notwithstanding the foregoing, the Members: (i) desire the Attorney to prepare this Agreement on behalf of the Company; (ii) acknowledge that they have been advised to retain separate counsel and have either retained separate counsel or waived their right to do so; and (iii) jointly and severally forever waive any claim that the Attorney's representation of the Company or preparation of this Agreement constitutes a conflict of interest.

12.16   Compliance with Anti-Money Laundering Requirements. The Manager shall be authorized without the consent of any Person, including any Member, to take such action as it determines to be necessary or advisable to comply, or to cause the Company to comply, with any anti-money laundering Law ("**AML Law**"). Without limiting the generality of the foregoing, if the Manager reasonably believes that a Member has breached any material representation, warranty or covenant in this Agreement or in its Subscription Agreement regarding such Member's compliance with or status with respect to any AML Law, the Manager may (i) require such Member to withdraw from the Company or (ii) suspend the payment of distributions to such Member, in either case if the Manager reasonably deems it necessary to do so to comply with any AML Law applicable to the Company. No Member shall have any claim against the Company, the Manager or their respective Affiliates for any form of damages or liabilities as a result of any of the aforementioned actions.

*[Signature Pages Follow]*

15516721

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Operating Agreement of Wisconsin & Milwaukee Hotel LLC as of the date first set forth above.

Jackson Street Management LLC

By: _____

Name: _____

Title: _____

15516721

# EXHIBIT A
## CERTAIN DEFINED TERMS

"**Act**" means Chapter 183 Uniform Limited Liability Company Law of the Wisconsin Statutes and any successor statute, as amended from time to time.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in the Capital Account maintained for such Member as of the end of each fiscal year of the Company after giving effect to the following adjustments:

(a) a credit to the Capital Account of any amounts which the Member is obligated to restore under this Agreement and the standards set forth in Treas. Reg. Sec. 1.704-(b)(ii)(c) or is deemed obligated to restore under Treas. Reg. Sec. 1.704-2(g)(1) (relating to partnership gains) and Treas. Reg. Sec. 1.704-2(i)(5) (relating to partnership nonrecourse debt minimum gain); and

(b) debits to the Capital Account of amounts equal to:

(i) all losses and deductions that, as of the end of the applicable fiscal year, are reasonably expected to be allocated to the Member in years subsequent to the applicable fiscal year under Code Sects. 704(e)(2) and 706(d) and under Treas. Reg. Sec. 1.751-1(b)(ii); and

(ii) distributions that are reasonably expected to be made to the applicable Member to the extent that such distributions exceed offsetting increases in the applicable Member's Capital Account that are reasonably expected to occur during (or prior to) the year in which such distributions are reasonably expected to be made.

Notwithstanding anything to the contrary contained herein, an Adjusted Capital Account Deficit shall be determined in accordance with Treas. Reg. Sec. 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with such Reg.

"**Agreed Value**" of any Contributed Property means the fair market value of the property at the time of contribution as determined by the Manager and the contributing Member; provided, however, that the Agreed Value of any Property deemed contributed to the Company for federal income tax purposes upon termination and reconstitution thereof pursuant to Code Sec. 708 shall be determined in accordance with Section 3.5. Subject to Section 3.5, in the event that more than a single item of Property is contributed to the Company in a single or integrated transaction, the Manager shall use such method as they deem reasonable and appropriate to allocate the aggregate Agreed Value of Contributed Properties among each separate property in proportion to the respective fair market value of each such Property.

"**Book-Tax Disparity**" concerning any item of Contributed Property or Revalued Property means, as of the date of any determination, the difference between the Carrying Value of such Contributed Property or Revalued Property and the adjusted basis thereof for federal income tax purposes as of such date. A Member's share of the Company's Book-Tax Disparities in all of the Company's Contributed Property and Revalued Property will be reflected by the difference

15516721

between such Member's Capital Account balance, as maintained pursuant to Article 3, and the balance of such Member's Capital Account computed as if it had been maintained strictly in accordance with federal income tax accounting principles.

"**Capital Contributions**" means the total amount of capital contributed by a Member to the Company, as determined from time to time, which shall include cash contributions and the Net Agreed Value of any Contributed Property.

"**Carrying Value**" means:

    (a)    with respect to a Contributed Property, the Agreed Value of such Property reduced (but not below zero) by all depreciation, depletion (computed as a separate item of deduction), amortization and cost recovery deductions charged to the Members' Capital Accounts;

    (b)    with respect to a Revalued Property, the fair market value of such Property at the time of revaluation, as determined by the Manager in accordance with Section 3.7 below, reduced (but not below zero) by all depreciation, depletion, amortization and cost recovery deductions charged to the Members' Capital Accounts; and

    (c)    with respect to any other Company Property, the adjusted basis of such Property for federal income tax purposes, all as of the time of determination.

The Carrying Value of any Property shall be adjusted from time to time in accordance with Sections 3.7(a) and (b) of this Agreement.

"**Articles of Organization**" or "**Articles**" means the articles of organization filed for the Company in accordance with the Act.

"**Class A Members**" means those Members owning the Class A Units.

"**Class A Units**" means those Units designated as such, issued to Class A Members and having the rights set forth herein.

"**Class B Members**" means those Members owning the Class B Units.

"**Class B Units**" means those Units designated as such, issued to Class B Members and having the rights set forth herein.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Company Property**" or "**Property**" means all properties, assets and rights of any type owned by the Company.

"**Contributed Property**" means any property contributed to the Company at any time or from time to time. Once the Carrying Value of Contributed Property has been adjusted pursuant to Section 3.7 hereof, such property shall be deemed Revalued Property and shall no longer be deemed Contributed Property.

"**Majority Interest**" means the affirmative vote of Members holding at least a majority of the outstanding Units of the Company.

"**Manager**" means any Person elected as a Manager of the Company as provided in this Agreement.

"**Member**" means each Person who acquires a Unit pursuant to this Agreement and each Person hereafter admitted to the Company as a Member as provided in this Agreement. Members include the Class A Members and the Class B Members. The Members and their respective Units are set forth on attached and incorporated Exhibit B.

"**Member Minimum Gain**" means with respect to each Member Nonrecourse Debt, the gain at any given time which would be realized by the Members if the Company disposed of the property encumbered by or otherwise subject to such Member Nonrecourse Debt for no consideration other than the full satisfaction of such Member Nonrecourse Debt. If the applicable property is subject to more than one liability, only that portion of the property's adjusted tax basis which is allocated to the applicable Member Nonrecourse Debt under the immediately succeeding sentence shall be used to compute Member Minimum Gain. The adjusted basis of Company Property subject to two or more liabilities of equal priority shall be allocated among such liabilities in proportion to their outstanding balances, and the adjusted basis of Company Property subject to two or more liabilities of unequal priority shall be allocated to the liabilities of subordinate priority only to the extent of the excess, if any, of the adjusted basis of such Property over the aggregate outstanding balance of all liabilities of superior priority. The priorities of any liability or any group of liabilities shall be determined by reference to all applicable facts and circumstances including, without limitation, all agreements by and between applicable creditors and all applicable corporate, commercial, bankruptcy and other laws. If a Book-Tax Disparity exists with respect to any Company Property, Member Minimum Gain shall be determined by using the Carrying Value instead of the adjusted tax basis of such property.

"**Member Nonrecourse Debt**" means any Nonrecourse Liability to the extent a Member or a Person who is related (as defined in Reg. Sec. 1.752-1(a)(3)) to a Member bears the economic risk of loss, as determined under Reg. Sec. 1.752-2, with respect to such liability. In the event that any Member (or a person related to any Member within the meaning of Reg. Sec. 1.752-1(a)(3)) bears the economic risk of loss for less than all of the outstanding balance of the Nonrecourse Liability, such Nonrecourse Liability shall be bifurcated in accordance with the principles of Reg. Sec. 1.752-2, and shall be treated as a Nonrecourse Liability to the extent that no Member (or related party) bears the economic risk of a loss, and as a Member Nonrecourse Debt to the extent that the applicable Member (or related party) bears the economic risk of loss. Notwithstanding anything to the contrary contained herein, Member Nonrecourse Debt shall be determined in accordance with Reg. Sec. 1.704-2 as the same may be modified or supplemented from time to time.

"**Member Nonrecourse Debt Deduction**" means items of the Company's deductions, losses, and Code Sec. 705(a)(2)(B) expenditures (in each case computed based upon the Carrying Values of all Company assets if a Book-Tax Disparity exists with respect to such property) equal to the net increase, if any, in the amount of the aggregate Member Minimum Gain during any Company tax year ("Available Member Nonrecourse Debt Deductions "). If the net increase in the amount of Member Minimum Gain during any taxable year exceeds the Available Member

15516721

Nonrecourse Debt Deductions, then the excess shall be carried over and treated as Member Minimum Gain of the applicable Member for the immediately succeeding taxable year and all taxable years thereafter until the cumulative Member Nonrecourse Debt Deductions for the applicable Member shall be equal to the sum of all net increases in Member Minimum Gain of the applicable Member for all Company years ending after the date of this Agreement. Generally, Member Nonrecourse Debt Deductions of the Company for a year will consist first of depreciation or cost recovery deductions with respect to property of the Company giving rise to the increase in Member Minimum Gain to the extent of such increase with any excess made up pro rata of all other items of deductions.

"**Membership Interest**" or "**Interest**" means the membership interest or interest of a Member in the Company, including the right to any and all benefits to which such Member may be entitled in accordance with this Agreement, and the obligations as provided in this Agreement and the Act, and are evidenced by the Units.

"**Minimum Gain**" means, with respect to each Nonrecourse Liability of the Company, the gain (regardless of character) that would be realized by the Company if it disposed of the property encumbered by or subject to such Nonrecourse Liability for no consideration other than the full satisfaction of the Nonrecourse Liability. If property is subject to more than one liability, only that portion of the property's adjusted tax basis which is allocated to a Nonrecourse Liability under the immediately succeeding sentence shall be used to compute Minimum Gain. The adjusted basis of Company Property subject to two or more liabilities of equal priority shall be allocated among such liabilities in proportion to their outstanding balances, and the adjusted basis of Company Property subject to liabilities of unequal priority shall be allocated to the liabilities of subordinate priority only to the extent of the excess, if any, of the adjusted basis of such property over the aggregate outstanding balance of all liabilities of superior priority. The relative priorities of any liability or any group of liabilities shall be determined by reference to all applicable facts and circumstances including, without limitation, all agreements by and between applicable creditors and all applicable corporate, commercial, bankruptcy and other laws. If a Book-Tax Disparity exists with respect to any Company Property, the Minimum Gain shall be determined using the Carrying Value instead of the adjusted tax basis of the Property.

"**Offering**" means the offering of $6,000,000 of Class B Units being conducted by the Company on or about the date of this Agreement.

"**Net Agreed Value**" means, as follows:

(a)     for Contributed Property, the Agreed Value of such property net of liabilities either assumed by the Company upon such contribution or to which such property is subject when contributed to the Company, as determined in accordance with Code Sec. 752; and

(b)     for Property distributed to a Member, the Company's Carrying Value of such property at the time such Property is distributed, net of any indebtedness either assumed by such distributee Member upon such distribution or to which such Property is subject at the time of distribution, determined in accordance with Code Sec. 752.

15516721

"**Net Cash Receipts**" means, for any period, the gross cash proceeds from the Company's business, less the portion thereof used to establish reasonable reserves in amounts determined by the Manager or to pay Company expenses, debt payments and capital expenditures. "Net Cash Receipts" shall include the net cash proceeds from the sale of Company Property outside the ordinary course of business or refinancing of indebtedness. Net Cash Receipts shall not be reduced by depreciation, cost recovery, amortization or similar noncash deductions, and shall be increased by any reduction of reserves previously established by the Manager.

"**Nonrecourse Liability**" means a nonrecourse liability as defined in Reg. Sec. 1.704-2(b)(3).

"**Percentage Ownership**" means a fraction, the numerator of which is the number of Units owned by a Member and the denominator of which is the total number of outstanding Units owned by all Members.

"**Person**" means any individual, corporation, trust, partnership, joint venture, limited liability company or other entity.

"**Profits**" and "**Losses**" mean, for each fiscal year, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Sec. 703(a) (including all items required to be stated separately) with the following adjustments:

        (a)      any income exempt from federal income tax shall be included;

        (b)      any expenditures of the Company described in Code Sec. 705(a)(2)(B) (including expenditures treated as such pursuant to Reg. Sec. 1.704-1(b)(2)(iv)(i)) shall be subtracted;

        (c)      if any Company Property is revalued pursuant to Section 3.7, the amount of such adjustment shall be taken into account in determining gain or loss from the disposition of such Property;

        (d)      any items which are specially allocated pursuant to Section 4.3 shall not be taken into account in computing Profits or Losses;

        (e)      gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Carrying Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Carrying Value; and

        (f)      in the case of Property having a Book-Tax Disparity, in lieu of depreciation, amortization or other cost recovery deductions allowable under the Code ("**Tax Depreciation**"), there shall be taken into account for each Property a depreciation allowance which bears the same ratio to its initial Agreed Value (or, with respect to Revalued Property, its initial Carrying Value) as the Tax Depreciation for such year bears to the beginning adjusted tax basis of such Property.

15516721

"**Related Party**" means with respect to any Person (a) any of the spouse, parents and descendants (whether natural or adopted) of the Person (collectively, "**Relatives**"), (ii) any custodian of a custodianship for and on behalf of one or more of such Person or Relatives, (iii) any trustee of a trust or trusts solely for the benefit of the Person and/or one or more such Relatives, and (iv) any corporation, partnership, limited liability company or other entity more than 50% of the voting power of which is owned or controlled by such Person and/or a Related Party of such Person.

"**Representative**" means the legally appointed guardian of a mentally incapacitated Member, the conservator of a mentally incapacitated Member's assets or the legally appointed and qualified executor or personal representative of the estate of a deceased Member. In the event no such guardian, executor or personal representative is appointed, then the Representative shall mean the spouse of such incapacitated or deceased Member, or if such Member does not have a spouse or the spouse is not then living or is unable or unwilling to act, such Member's then living lineal descendants who are willing and capable of acting, one at a time in descending order of age but in no event younger than 21 years of age or, if none, such Member's then-living lineal ancestors who are willing and capable of acting, one at a time and in ascending order of age.

"**Revalued Property**" means any Property which has had its Carrying Value adjusted in accordance with Section 3.7(a) or (b).

"**Subscription Agreement**" means the Subscription Agreement executed by a Class B Member to subscribe for Class B Units in the Offering.

"**Transfer**" means, with respect to a Unit, a sale, assignment, gift or any other disposition, whether voluntary, involuntary or by operation of law.

"**Treasury Regulations**," "**Treas. Reg.**" or "**Reg.**" means the income tax regulations promulgated under the Code as amended from time to time (including corresponding provisions of succeeding regulations).

"**Unit**" means a unit of Membership Interest in the Company having the rights set forth herein. Units include the Class A Units and the Class B Units.

"**Unrealized Gain**" attributable to any item of Company Property means, as of any date of determination, the excess, if any, of (a) the fair market value of such Property (as determined under Section 3.7 hereof) as of such date, over (b) the Carrying Value of such Property as of such date (prior to any adjustment to be made pursuant to Section 3.7 as of such date).

"**Unrealized Loss**" attributable to any item of Company Property means, as of any date of determination, the excess, if any, of (a) the Carrying Value of such Property as of such date (prior to any adjustment to be made pursuant to Section 3.7 as of such date), over (b) the fair market value of such Property (as determined under Section 3.7) as of such date.

29

15516721

**EXHIBIT B**
<u>**MEMBERS**</u>

| Name and Address of Each Member | Class of Units | Units |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

15516721