# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Wisconsin & Milwaukee Hotel LLC,

Debtor.

Case No. 24-21743-gmh
Chapter 11

---

## BRIEF IN SUPPORT OF CONFIRMATION OF
## DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION, AND IN
## RESPONSE TO OBJECTIONS TO CONFIRMATION

**RICHMAN & RICHMAN LLC**
**Attorneys for Debtor**

Michael P. Richman
Claire Ann Richman
Eliza M. Reyes
122 West Washington Avenue, Suite 850
Madison, WI 53703
Tel: (608) 630-8990
Fax: (608) 630-8991
mrichman@RandR.law
crichman@RandR.law
ereyes@RandR.law

# Table of Contents

**BACKGROUND** 1

**PLAN OVERVIEW** 3

**PLAN SOLICITATION, NOTIFICATION AND VOTING PROCESS** 5

**ARGUMENT** 6

**THE PLAN SATISFIES THE APPLICABLE PROVISIONS OF SECTION 1129(a)** 7

THE PLAN SATISFIES THE CLASSIFICATION REQUIREMENTS OF SECTION 1122 8

THE PLAN COMPLIES WITH SECTION 1123 12

THE PLAN SATISFIES THE APPLICABLE PROVISIONS OF SECTION 1129(a)(2) OF THE BANKRUPTCY CODE 16

THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW – SECTION 1129(a)(3) 18

THE PLAN PROVIDES FOR COURT APPROVAL OF PAYMENTS FOR SERVICES AND EXPENSES – SECTION 1129(a)(4) 20

THE PLAN DISCLOSES ALL NECESSARY INFORMATION REGARDING DIRECTORS AND OFFICERS OF THE DEBTOR UNDER THE PLAN – SECTION 1129(a)(5) 20

THE PLAN DOES NOT CONTAIN RATE CHANGES SUBJECT TO THE JURISDICTION OF ANY GOVERNMENTAL REGULATORY COMMISSION – SECTION 1129(a)(6) 21

THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND EQUITY INTEREST HOLDERS – SECTION 1129(a)(7) 21

SECTION 1129(a)(8) IS INAPPLICABLE – SECTION 1129(a)(8) 23

THE PLAN PROVIDES FOR PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS – SECTION 1129(a)(9) 23

AT LEAST ONE IMPAIRED CLASS HAS ACCEPTED THE PLAN – SECTION 1129(a)(10) 24

THE PLAN IS FEASIBLE – SECTION 1129(a)(11) 24

ALL STATUTORY FEES HAVE BEEN OR WILL BE PAID – SECTION 1129(a)(12) 33

SECTIONS 1129(a)(13), (14), (15) AND (16) ARE INAPPLICABLE 33

**THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129(b)** 34

THE PLAN DOES NOT DISCRIMINATE UNFAIRLY 35

THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO SECURED CLASS 1B: VALUATION AND *TILL* INTEREST RATE 38

THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO CLASS 5 AND CLASS 7: THE ABSOLUTE PRIORITY RULE 48

**CONCLUSION** 52

i

## Cases

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct (In re Chateaugay Corp.)*, 89 F.3d 942 (2d Cir. 1996) ............................................................................... 9, 35

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) ............................................................................................................ 48, 49

*In re 20 Bayard Views, LLC*, 45 B.R. 83 (Bankr. E.D.N.Y. 2011) .............................. 6

*In re Adelphia Bus. Sols, Inc.*, 341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...................... 25

*In re Am. Homepatient, Inc.*, 420 F.3d 559 (6th Cir. 2005) ................................... 47

*In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006) ............................ 6

*In re Aurora Memory Care, LLC*, 589 B.R. 631 (Bankr. N.D. Ill. 2018) ................... 24

*In re Barnes*, 689 F.2d 193 (D.C. Cir. 1982) ........................................................... 9

*In re Bastankhah*, 2012 Bankr. LEXIS 256 (Bankr. S.D. Tex. Jan. 18, 2012) .......... 44

*In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109 (Bankr. N.D. Tex. 2002) 9, 35

*In re Castle Arch Real Estate Inv. Co., LLC*, 2013 Bankr. LEXIS 2335 (Bankr. D. Utah June 7, 2013) ................................................................................................ 8

*In re Crawford*, 324 F.3d 539 (7th Cir. 2003) ...................................................... 10

*In re Deep River Warehouse, Inc.*, 2005 Bankr. LEXIS 1793 (Bankr. M.D.N.C. Sept. 22, 2005) ............................................................................................................ 44

*In re Draiman*, 450 B.R. 777 (Bankr. N.D. Ill. 2011) .................................. 7, 19, 20

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723 (Bankr. S.D.N.Y. 1992) .. 7, 16, 25

*In re Fortin*, 482 B.R. 35 (Bankr. D. Mass. 2012) ................................................. 26

*In re GAC Storage Lansing, LLC*, 485 B.R. 174 (N.D. Ill. 2013) ............................... 6

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001) .................. 8

*In re Granite Broad. Corp.*, 369 B.R. 120 (Bankr. S.D.N.Y. 2007) .......................... 19

*In re Greenwood Point, LP*, 445 B.R. 885 (Bankr. S.D. Ind. 2011) ...................... 9, 35

*In re Haas*, 162 F.3d 1087 (11th Cir. 1998) ......................................................... 25

*In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298 (B.A.P. 10th Cir. 2006) ................ 26, 31

*In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3d Cir. 1987) ...................................... 8

*In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .................................. 8, 25

*In re K&K Holdings, LLC*, 2014 Bankr. LEXIS 626 (Bankr. N.D. Ill. Feb. 13, 2014) ............................................................................................................................ 41

*In re KMC Real Estate Invs, LLC*, 531 B.R. 758 (S.D. Ind. 2015) ........................... 24

*In re La Guardia Assocs., L.P.*, 2006 Bankr. LEXIS 4735 (Bankr. E.D. Pa. Sept. 13, 2006) .................................................................................................................. 46

*In re Landing Assocs., Ltd.*, 157 B.R. 791 (Bankr. W.D. Tex. 1993) ....................... 36

*In re Lightsquared Inc.*, 513 B.R. 56 (Bankr. S.D.N.Y. 2014) .................................. 9

*In re Linda Vista Cinemas, LLC*, 442 B.R. 724 (Bankr. D. Ariz. 2010) ................... 41

*In re Lupton Consulting LLC*, 633 B.R. 844 (Bankr. E.D. Wis. 2021) ..................... 32

*In re Mace*, 2011 Bankr. LEXIS 280 (Bankr. M.D. Tenn. Jan. 25, 2011) ................ 27

*In re Machne Menachem, Inc.*, 233 F. App'x 119 (3d Cir. 2007) .............................. 6

*In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1984) ................................... 19

*In re MPM Silicones, LLC*, 2014 Bankr. LEXIS 3926 (Bankr. S.D.N.Y. Sept. 9, 2014) ............................................................................................................................ 42

ii

*In re MPM Silicones, LLC*, 531 B.R. 321 (S.D.N.Y. 2015) .......................................... 44

*In re Multiut Corp.*, 449 B.R. 323 (Bankr. N.D. Ill. 2011) ............................................ 51

*In re Najar Trucking Inc.*, 2025 Bankr. LEXIS 108 (Bankr. D. Nev. Jan. 8, 2025).. 31

*In re Oneida Ltd.*, 351 B.R. 79 (Bankr. S.D.N.Y. 2006) ............................................ 19

*In re Padda Hotels, LLC*, 2014 Bankr. LEXIS 525 (Bankr. D.N.M. Feb. 7, 2014) .. 26, 28

*In re Peabody Energy Corporation*, 933 F.3d 918 (8th Cir. 2019)...................... 49, 50

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) ...................................... 16, 19

*In re Quay Corp.*, 372 B.R. 378 (Bankr. N.D. Ill. 2007) ............................................ 10

*In re Sentinel Mgmt. Grp., Inc.*, 389 B.R. 281 (Bankr. N.D. Ill. 2008) ............. 6, 8, 16

*In re Settlers' Hous. Serv.*, 505 B.R. 483 (Bankr. N.D. Ill. 2014) .............................. 39

*In re SJT Ventures, LLC*, 441 B.R. 248 (Bankr. N.D. Tex. 2010) ............................. 44

*In re Smith*, 178 B.R. 946 (Bankr. D. Vt. 1995)............................................. 42, 43, 44

*In re Snyders Drug Stores, Inc.*, 307 B.R. 889 (Bankr. N.D. Ohio 2004).............. 9, 35

*In re Source Enters., Inc.*, 392 B.R. 541 (S.D.N.Y. 2008) ............................................ 9

*In re Spin City EC, L.L.C.*, 578 B.R. 635 (Bankr. W.D. Wis. 2017)...................... 8, 35

*In re STC, Inc.*, 2016 Bankr. LEXIS 1110 (Bankr. S.D. Ill. Apr. 7, 2016)......... passim

*In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010) ................................ 28

*In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988)...................................... 16, 25

*In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790 (5th Cir. 1997) ............................ 25

*In re Topp*, 75 F.4th 959 (8th Cir. 2023) ................................................................ 41, 44

*In re Trenton Ridge Investors, LLC*, 461 B.R. 440 (Bankr. S.D. Ohio 2011)............. 26

*In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10 (Bankr. D. Kan. 2001)... 26, 27, 28

*In re VDG Chicken, LLC*, 2011 Bankr. LEXIS 1795 (9th Cir. Apr. 11, 2011).......... 44

*In re Vill at Camp Bowie I, L.P.*, 454 B.R. 702 (Bankr. N.D. Tex. 2011) ................. 44

*In re W.R. Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) ........................................... 25, 31

*In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567 (Bankr. D. D.C. 2011) ...................................................................................................... 42, 44

*In re WorldCom*, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) ........... 20

*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) ..................................... 39, 40, 43, 47

*United States v. Energy Res. Co., Inc.*, 495 U.S. 545 (1990) ..................................... 25

*United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213 (1996) ............. 22

**Statutes**

11 U.S.C. § 1122(a) .......................................................................................................... 8

11 U.S.C. § 1123.............................................................................................................. 12

11 U.S.C. § 1123(a)(1) .................................................................................................... 12

11 U.S.C. § 1123(a)(2) .................................................................................................... 12

11 U.S.C. § 1123(a)(3) .................................................................................................... 13

11 U.S.C. § 1123(a)(4) .................................................................................................... 13

11 U.S.C. § 1123(a)(5) .................................................................................................... 14

11 U.S.C. § 1123(a)(6) .................................................................................................... 14

11 U.S.C. § 1123(a)(7) .................................................................................................... 15

11 U.S.C. § 1123(b) ........................................................................................................ 16

iii

11 U.S.C. § 1125(b) ..................................................................................... 17

11 U.S.C. § 1129 ............................................................................................ 6

11 U.S.C. § 1129(a)(1) ................................................................................... 7

11 U.S.C. § 1129(a)(10) ......................................................................... 24, 38

11 U.S.C. § 1129(a)(11) ............................................................................... 24

11 U.S.C. § 1129(a)(12) ............................................................................... 33

11 U.S.C. § 1129(a)(13) ............................................................................... 33

11 U.S.C. § 1129(a)(14) ............................................................................... 34

11 U.S.C. § 1129(a)(15) ............................................................................... 34

11 U.S.C. § 1129(a)(16) ............................................................................... 34

11 U.S.C. § 1129(a)(2) ................................................................................. 16

11 U.S.C. § 1129(a)(3) ................................................................................. 18

11 U.S.C. § 1129(a)(4) ................................................................................. 20

11 U.S.C. § 1129(a)(5) ................................................................................. 21

11 U.S.C. § 1129(a)(6) ................................................................................. 21

11 U.S.C. § 1129(a)(7) ..................................................................... 21, 38, 39

11 U.S.C. § 1129(a)(8) ................................................................................. 23

11 U.S.C. § 1129(a)(9) ................................................................................. 23

11 U.S.C. § 1129(b) ..................................................................... 7, 34, 35, 38

11 U.S.C. § 1129(b)(2) ................................................................................. 48

11 U.S.C. §§ 1126(c) and (d) ...................................................................... 18

11 U.S.C. §§ 1126(f) and (g) ....................................................................... 18

## Other Authorities

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) .......................................... 7

## Treatises

1 COLLIER REAL ESTATE TRANSACTIONS & BANKR. CODE ¶ 2.07 (2025) .................... 42

12B PURCHASE AND SALE OF REAL PROP. § 36.02 (2025) .............................. 43

4 POWELL ON REAL PROPERTY § P3.11 (2025) ............................................. 43

iv

Wisconsin & Milwaukee Hotel LLC (the "**Debtor**," the "**Hotel**," or "**WMH**"), the debtor in the above-referenced chapter 11 case, by and through its attorneys, Richman & Richman LLC, by Michael P. Richman, hereby submits this brief (the "**Confirmation Brief**") in support of confirmation of Debtor's Second Amended Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC Dated June 27, 2025 [Doc 621] (the "**Plan**"), pursuant to section 1129(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), and in response to objections to confirmation.[1]

In further support of confirmation of the Plan, the Debtor will provide evidence at the Plan confirmation hearings. The Debtor also respectfully refers the Court to the Tabulation and Summary of Ballots filed on May 20, 2025 [Doc 545] ("**Ballot Report**").

## BACKGROUND

1.      On April 9, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Case**").

2.      The Debtor commenced this Case primarily due to its inability to refinance loan prepayment obligations (the "**Loans**") to Computershare Trust Company N.A. ("**Computershare**"). The Loans were originally funded by Wisconsin Housing and Economic Development Corporation ("**WHEDA**") through the sale of the tax-exempt bonds pursuant to an Indenture of Trust dated as of August 1, 2012,

---

[1] Unless otherwise indicated, all section references in this Confirmation Brief are meant to refer to provisions of the Bankruptcy Code, U.S.C. title 11. Capitalized terms not otherwise defined in this Confirmation Brief, have the meanings ascribed to them in the Plan.

1

between WHEDA and Computershare (as successor to Wells Fargo Bank, National Association ("**Wells Fargo**"), as trustee. Stipulation by Computershare Trust Company, N.A. and Wisconsin & Milwaukee Hotel Funding LLC and Debtor regarding Statement of Facts [Doc 632, ¶ 8] ("**Fact Stip**"). The interest rate on the Loans corresponded to the interest rate applicable to the tax-exempt bonds. Fact Stip, ¶ 11.

3.     The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to sections 1106 and 1107 of the Bankruptcy Code and has complied with its duties and requirements under the Bankruptcy Code.

4.     No unsecured creditors committee, trustee, or examiner has ever been appointed in this Case.

5.     The Court has scheduled hearings on confirmation of the Plan for July 21, 2025 - July 25, 2025. Order Approving Amended Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan [Doc 495]. The Debtor believes there will be four principal issues to be addressed at the confirmation hearing: (i) valuation of the Hotel collateral, (ii) feasibility of the Plan (including the appropriate cramdown interest rate), as to (a) the stream of payments to Computershare over 18 years, and (b) the balloon payment to be made at the end, (iii) the use of an equity offering to all unsecured creditors (backed by a commitment of the Debtor's owner to subscribe for the full offering on the Plan Effective Date to the extent not subscribed by unsecured creditors) in order to satisfy the absolute priority rule, and the new value exception thereto, if applicable (and provide the Debtor with essential exit financing to support

improvements, renovations and operations as may be needed), and (iv) the separate classification and treatment of the Debtor's vendors, owner and an affiliate on the one hand, from the classification and treatment of White Lodging Services Corporation ("**White Lodging**" or "**WL**"), and Wisconsin & Milwaukee Hotel Funding LLC ("**WMH Funding**," together with Computershare, the "**Lenders**") on the other.

6. Other relevant background about the Debtor and this chapter 11 Case is set forth in the Plan and Disclosure Statement.

## PLAN OVERVIEW

7. Under the Plan, the Administrative Expense Claims and Priority Unsecured Claims will be paid in full, unless a holder of any such claim agrees to different treatment, as required by the Bankruptcy Code. Computershare has elected treatment under section 1111(b), which is contained within Class 1B under the Plan. Under Class 1B, Computershare is to have a claim of $50 million, which was calculated in order to provide it with a present value of $26 million (the Debtor's appraised valuation of the Hotel collateral) at a cramdown interest rate of 5.25% (based upon a premium to the yield on 10-year Treasury securities), and will be paid $117,760 per month for 18 years, followed by a final balloon payment of $24.5 million in approximately October 2043. In accordance with section 1111(b), Computershare will retain all its liens until paid in full.

8. Because Computershare is substantially undersecured (an undisputed fact based on the appraisals of the Debtor and Computershare), there is no collateral

3

value available to provide for secured claim treatment of WMH Funding (Class 2) or J.M. Brennan, Inc. (Class 3). In accordance with section 506, those claims are treated as unsecured in Class 7 and Class 8, respectively.

9.     There is one priority unsecured claim, US Foods, which is by itself in Class 4 and will be paid in full on the Effective Date.

10.     The section 1111(b) election of Computershare eliminates its unsecured deficiency claim and thereby moots Class 6. Unsecured Claims in Class 5 (White Lodging) and Class 7 (WMH Funding) will be paid pro rata at a dividend rate of 10% over 18 years.

11.     General Unsecured Claims are treated in Class 8 and will be paid pro rata at a dividend rate of 50% over 2-1/2 years. Class 8 consists of the Debtor's vendors and other parties with whom it deals in the ordinary course of business, and the unsecured loan claims of Jackson Street Management ("**JSM**") and Wave Renovations ("**Wave**") (together, the "Affiliated Lenders").[2]

12.     Class 9 treats Existing Equity Interests by providing them with their pro rata share of 100% of the new Class A Common Units which will be issued under the Plan, on account of their Backstop Commitment to purchase any Class B Equity Offering Units not subscribed for by Eligible Creditors.

---

[2] Class 8 also included Jackson Street Asset Management ("**JSAM**"), an affiliate of the Debtor's owner JSM. However, its claim was based upon prepetition amounts due under a contract which the Debtor is assuming. It is therefore appropriately considered removed from Class 8. Although upon contract assumption it is entitled to receive 100% of its unpaid prepetition amounts, it has agreed to payment of 50% of such amount, which brings it in substantial alignment with the treatment of Class 8 claims.

4

## PLAN SOLICITATION, NOTIFICATION AND VOTING PROCESS

13. On April 9, 2025, this Court entered the Order Approving Amended Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan [Doc 495] (the "**Solicitation Procedures Order**"), which set the voting deadline to accept or reject the Plan for May 16, 2025, the Plan objection deadline for May 21, 2025, and the hearings on confirmation of the Plan for July 21 - 25, 2025.

14. On April 10, 2025, the Debtor served on the Debtor's creditors and parties requesting notice: (i) the Solicitation Procedures Order; (ii) Amended Disclosure Statement for Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC Dated April 4, 2025 ("**Disclosure Statement**"); (iii) Amended Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC Dated April 4, 2025; and (iv) Ballot for Accepting or Rejecting a Plan for Reorganization. Declaration of Mailing Certificate of Service [Doc 508] ("**Service Declaration**") regarding the service of the above items in accordance with the terms of the Solicitation Procedures Order.

15. The Plan was accepted by Class 8 (100% of that impaired class of unsecured creditors who submitted ballots), but not by other classes. Consequently, the Debtor seeks confirmation of its Plan pursuant to section 1129(b), colloquially referred to as cramdown. *See* Ballot Report.

16. On May 21, 2025, the Lenders (as further defined below) filed Lenders' Objection to Amended Chapter 11 Plan of Reorganization Dated April 4, 2025 [Doc 551] ("**Lenders' Objection**"). White Lodging filed Objection to the Confirmation of

5

the Debtor's Amended Plan of Reorganization and Disclosure Statement [Doc 550] ("**White Lodging Objection")**, and Marriott International, Inc. ("**Marriott**") filed Reservation of Rights and Limited Objection of Marriott International, Inc. to the Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC [Doc 547] ("**Marriott Reservation**"). No other objections were received.

## ARGUMENT

17.     Section 1129 sets forth the requirements that the Debtor must meet for the Court to confirm Debtor's proposed chapter 11 plan. The Debtor bears the burden of proving that it has satisfied each of the requirements of section 1129 by a preponderance of the evidence. *See In re GAC Storage Lansing,* LLC, 485 B.R. 174, 182 (Bankr. N.D. Ill. 2013); In *re Sentinel Mgmt. Grp., Inc.*, 389 B.R. 281, 292 (Bankr. N.D. Ill. 2008); *In re Machne Menachem, Inc.*, 233 F. App'x 119, 120 (3d Cir. 2007); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 129 (D. Del. 2006) ("[T]he debtors' standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence."); *see also In re 20 Bayard Views, LLC*, 45 B.R. 83, 93 (Bankr. E.D.N.Y. 2011).

18.     This Confirmation Brief (and the additional evidence to be provided at the Plan confirmation hearings) demonstrates that, by a preponderance of the evidence, the Plan complies with the requirements of sections 1129(a) and (b). Accordingly, the Plan should be confirmed.

6

## THE PLAN SATISFIES THE APPLICABLE
## PROVISIONS OF SECTION 1129(a)

19. A nonconsensual plan can be confirmed under section 1129(b) if all requirements of section 1129(a), other than section 1129(a)(8), are met and the plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired class of claims or interests that did not accept the plan. Section 1129(b). As demonstrated below, the Plan should be confirmed by the Court as it meets all applicable requirements of section 1129(a), other than section 1129(a)(8), and also meets all the requirements of section 1129(b) that are applicable when section 1129(a)(8) is not satisfied.

20. Section 1129(a)(1) requires that a plan comply "with the applicable provisions of this title." Section 1129(a)(1) has been interpreted by the courts to mean that the form and content of the plan must meet all of the statutory requirements, including (as discussed more fully below) the proper classification of claims under section 1122 and the inclusion of mandatory provisions in the plan under section 1123. *See In re Draiman*, 450 B.R. 777, 790 (Bankr. N.D. Ill. 2011); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan"); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977) ("Paragraph (1) [of 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as section[s] 1122 and 1123, governing classification and contents of [a] plan"); *see also In re Johns-Manville Corp.*, 843 F.2d 636, 648-49

7

(2d Cir. 1988); *In re Castle Arch Real Estate Inv. Co., LLC*, 2013 Bankr. LEXIS 2335 (Bankr. D. Utah June 7, 2013); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

21.     In sum, the Plan divides the creditor claims and equity interests into classes, where similar claims are either classified together, or placed in separate classes in a rational manner, and dissimilar claims are not classified together. Additionally, the Plan contains all of the necessary elements required by section 1123 of the Bankruptcy Code.

### THE PLAN SATISFIES THE CLASSIFICATION REQUIREMENTS OF SECTION 1122

22.     Section 1122 of the Bankruptcy Code governs the classification of claims under a plan. Section 1122(a) requires that a plan place a claim or an interest in a particular class only if such claim or interest is *"substantially similar"* to the other claims or interests in such class (emphasis supplied). If claims are not substantially similar, they may not be in the same class, and the inquiry under section 1122 ends. *In re Spin City EC, L.L.C.*, 578 B.R. 635, 639 (Bankr. W.D. Wis. 2017).

23.     Classification does not, however, require that all substantially similar claims or interests be placed in the same class. Instead, the debtor has flexibility in creating classes under the plan, provided that there is a reasonable justification for the structure. *See In re Sentinel Mgmt. Grp. Inc.*, 398 B.R. 281, 297 (Bankr. N.D. Ill. 2008) ("Claims may also be separately classified if there are 'good business reasons' to do so or if the claimants have sufficiently different interests in the plan); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general

8

view which permits the grouping of similar claims in different classes"); *In re Barnes*, 689 F.2d 193, 201 (D.C. Cir. 1982) (finding Section 1122 "does not require that similar claims must be grouped together, but merely that any group created must be homogenous"); *In re Lightsquared Inc.*, 513 B.R. 56, 82–83 (Bankr. S.D.N.Y. 2014) (separate classifications of otherwise substantially similar claims and interests can be appropriate provided that there is an articulated reasonable or rational justification for separate classifications); *In re Source Enters., Inc.*, 392 B.R. 541, 556 (S.D.N.Y. 2008) (court held significant flexibility in classifying claims under section 1122(a) provided that there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar).

24. "Good business reasons" for classifying substantially similar creditors differently may be broad and varied. *See In re Snyders Drug Stores, Inc.*, 307 B.R. 889 (Bankr. N.D. Ohio 2004) (maintaining goodwill for future debtor operations); *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109 (Bankr. N.D. Tex. 2002) (continuing relationships with essential creditors); *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct (In re Chateaugay Corp.)*, 89 F.3d 942 (2d Cir. 1996) (maintaining labor relations); *In re Greenwood Point, LP*, 445 B.R. 885 (Bankr. S.D. Ind. 2011) (avoiding the accrual of interest).

25. This broad flexibility is the general standard in the Seventh Circuit. In declining to adopt a strict test, the Court noted that "this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the

9

purposes of the relevant law." *In re Crawford*, 324 F.3d 539, 542 (7th Cir. 2003); *see also In re Quay Corp.*, 372 B.R. 378, 385 (Bankr. N.D. Ill. 2007) (noting that cases dealing with creditor classification in chapter 13 "may be seen to provide guidance in cases under § 1122(a) of Chapter 11").

26.     As set forth in Article 2 of the Plan, the Plan designates 9 classes of claims and interests as follows: Class 1 (and Options 1A, 1B and 1C) Secured Claim of Computershare; Class 2 Secured Claim of WMH Funding LLC; Class 3 Secured Claim of J.M. Brennan, Inc.; Class 4 Priority Unsecured Claim of US Foods, Inc.; Class 5 Unsecured Claims of White Lodging; Class 6 Unsecured Claim of Computershare; Class 7 Unsecured Claim of WMH Funding; Class 8 all other general unsecured claims; and Class 9 equity interests of the Debtor (collectively, "**Classes**").

27.     Lenders and White Lodging have objected to the Debtor's classification of the WMH Funding and White Lodging claims separate from the Class 8 unsecured creditors. White Lodging Objection, p. 6; Lenders' Objection, p. 14. Their classification objections are intertwined with their arguments that the more favorable treatment of the Debtor's Class 8 unsecured creditors, comprised of the Debtor's vendors and Affiliated Lenders is a form of unfair discrimination prohibited by section 1129(b). However, the differential classification, and the treatment thereof (discussed more fully in the section 1129(b) discussion below) is fair and well supported by good business reasons. From a pure classification standpoint, the White Lodging and WMH Funding claims are dissimilar from each other and from the Class 8 unsecured claims in significant ways that (apart from business reasons) justify being classified

10

separately from the Class 8 creditors. White Lodging's claims (filed as Claim 15 and Claim 16) arise from the impending rejection of its long-term Management Agreement with the Debtor and are the subject of ongoing litigation. The Debtor will have no continuing relationship with White Lodging that might justify the kind of treatment that it believes is appropriately accorded to vendors and other ordinary course parties whose continued support of the reorganized Debtor will be essential to the success of the business.

28.     WMH Funding's claim arises from a loan to the Debtor's owner JSM, to benefit the Debtor, and for which the Debtor pledged collateral (on a basis subordinate to Computershare) as security. WMH Funding is also one of the "Lenders" acting in concert and proposed to be treated over the remaining 18-year term of the original Loans. While the Debtor will also be required to make payments to WMH Funding as an unsecured creditor, it will have no other continuing relationship with it.

29.     The Debtor's business judgment in providing enhanced dividend recoveries to the Class 8 creditors over a shorter period of time than the Class 5 and Class 7 creditors is that such treatment is appropriately accorded to vendors and other ordinary course parties whose continued support of the reorganized Debtor will be essential to the success of the business. The Debtor included the unsecured loan claims of its Affiliated Lenders in this class because they are substantially alike legally and are also continuing long-term relationship parties with the Debtor.

11

30. Each of the nine Classes of claims and interests are thus sufficiently dissimilar from each other to be classified separately, and each class contains entities with claims or interests with legal rights that are substantially similar to the others within such class.

31. There thus exist valid business, factual, and legal reasons for the Plan's classification. Accordingly, the Plan complies with section 1122 of the Bankruptcy Code.

## THE PLAN COMPLIES WITH SECTION 1123

32. The Plan complies with the applicable provisions of section 1123 of the Bankruptcy Code which sets forth the mandatory and permissive contents required for a plan.

### SECTION 1123(A)(1) – DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

33. Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims, other than claims of a kind specified in sections 507(a)(2), (3) or (8) of the Bankruptcy Code. As described above, the Plan in Article 2 designates 8 classes of claims and one class of interests. The Plan does not classify administrative claims (section 507(a)(2)) or priority tax (section 508(a)(8)) claims. Accordingly, the Plan complies with the applicable provisions of section 1123(a)(1).

### SECTION 1123(A)(2) – THE PLAN SPECIFIES UNIMPAIRED CLASSES

34. Section 1123(a)(2) requires that a plan specify any class of claims or interests that is unimpaired under the Plan. Article 3 of the Plan identifies Class 4 as unimpaired, and Class 1, Class 2, Class 3, Class 5, Class 6, Class 7, Class 8, and

12

Class 9 as impaired.[3] Accordingly, the Plan complies with the applicable provisions of section 1123(a)(2).

### SECTION 1123(A)(3) – THE PLAN SPECIFIES THE TREATMENT OF IMPAIRED CLASSES

35.     Section 1123(a)(3) requires that a plan specify the treatment of any class of claims or interests that is impaired under the Plan. Under the Plan, the treatment of impaired Class 1, Class 2, Class 3, Class 5, Class 6, Class 7, Class 8 and Class 9 is specified. Article 3 of the Plan sets forth the Plan's proposed treatment of such classes. Accordingly, the Plan complies with the applicable provisions of section 1123(a)(3).

### SECTION 1123(A)(4) – THE PLAN PROVIDES FOR THE SAME TREATMENT FOR CLAIMS OR INTERESTS WITHIN THE SAME CLASS

36.     Section 1123(a)(4) requires that a plan provide that each claim or interest in a particular class receive the same treatment as other claims or interests in the class (unless the holder of a particular claim or interest agrees to a less favorable treatment).

37.     Article 3 of the Plan satisfies this requirement by providing that each claim or interest that is classified in a particular class under the Plan will receive the same treatment as the other claims and interests included in such class. Accordingly, the Plan complies with section 1123(a)(4).

---

[3] The Plan does not use the word "impaired" in the Class 9 description, but in making clear that the Class 9 interest holders are to receive new Class A Unit Interests, the economic attributes of which will be diluted by the Equity Offering, the Class is clearly impaired.

13

## SECTION 1123(A)(5) – THE PLAN PROVIDES ADEQUATE MEANS FOR ITS IMPLEMENTATION

38.     Section 1123(a)(5) requires that a plan contain adequate means for its implementation, which can include the retention by the debtor of property of the estate, the sale of property, merger with another entity, and/or the issuance of securities of the debtor in exchange for claims or interests.

39.     The Plan contains adequate means for its implementation. As set forth in Article 5 of the Plan, the Plan will be implemented by specified actions occurring on or after the Effective Date.

40.     The distributions to creditors will be funded by Debtor's income from its operation of the Hotel, its cash on hand, and the proceeds from the Equity Offering. Additionally, the Debtor will utilize the proceeds of the Equity Offering to fund any necessary renovations and improvements of the Hotel. Accordingly, the Plan complies with section 1123(a)(5).

## SECTION 1123(A)(6) – THE DEBTOR'S OPERATIONAL AGREEMENT WILL PROVIDE THAT THE REORGANIZED DEBTORS WILL PROHIBIT THE ISSUANCE OF NONVOTING EQUITY SECURITIES

41.      Section 1123(a)(6) requires that a plan provide for the inclusion of a provision in the reorganized debtor's operational agreement prohibiting the issuance of non-voting equity securities and providing the appropriate distribution of voting power among the classes of securities.

42.     Under the Plan, the Class B Units that are to be issued to unsecured creditors who subscribe for them pursuant to the Equity Offering, are voting shares. The draft Reorganized Debtor's operational agreement does not provide for the

14

issuance of non-voting units, *see* [Doc 627, ex. A, p. 8] ("**Plan Supplement**"), but the Plan will be modified (as permitted by the Plan provisions) to require that such a prohibition be added to the operational agreement, and the operational agreement will be amended in conformity. Accordingly, the Plan will be in compliance with section 1123(a)(6).

### SECTION 1123(A)(7) – THE SELECTION OF POST-CONFIRMATION DIRECTORS AND OFFICERS IS APPRORIATE

43.     Section 1123(a)(7) requires that the selection of any officer or director of the debtor of any trustee, and of any successor thereto, be consistent with the interests of creditors and interest holders and with public policy.

44.     The Plan provides that JSM will continue to serve as Debtor's manager. Plan, p. 23. Additionally, the Debtor's day-to-day management has been committed for many years to a professional hotel management company, White Lodging, as is typical in the hotel business. The Debtor oversees that business through its managing member JSM. The Debtor has moved for the approval of a contract with a new Hotel manager, Avion Hospitality, LLC, on economic terms that are materially better than the terms of the prior long-term contract with White Lodging, and will continue to oversee that business through JSM. Disclosure Statement, p. 14. The Debtor submits therefore that its post-petition management does not violate any public policy and is in the best interest of creditors and interest holders. Accordingly, the Plan complies with section 1123(a)(7).

15

## SECTION 1123(B) – THE PLAN CONTAINS APPROPRIATE DISCRETIONARY PROVISIONS NOT INCONSISTENT WITH THE BANKRUPTCY CODE

45. Section 1123(b) enumerates certain discretionary provisions that are permissible in a plan, including any "provision not inconsistent with the applicable provisions" of the Bankruptcy Code. All the provisions of the Plan are consistent with section 1123(b) and the provisions of the Bankruptcy Code.

46. The Plan provides, inter alia, in Articles 2, 3 and 4 for: (a) impairment of certain claims; and (b) the assumption, assignment and rejection of executory contracts and leases. Each of these provisions of the Plan is consistent with any applicable provisions of the Bankruptcy Code. Accordingly, the Plan complies with section 1123(b).

## THE PLAN SATISFIES THE APPLICABLE PROVISIONS OF SECTION 1129(a)(2) OF THE BANKRUPTCY CODE

47. Section 1129(a)(2) requires that the plan proponent comply "with the applicable provisions of this title."

48. The legislative history with respect to this section, as well as applicable case law, interprets the focus of section 1129(a)(2) to be whether the plan proponent has complied with the disclosure and solicitation requirements of sections 1125 and 1126. *See In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 303 (Bankr. N.D. Ill. 2008); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re Texaco Inc.*, 84 B.R. 893, 906–07 (Bankr. S.D.N.Y. 1988); *see also In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 769 (Bankr. S.D.N.Y. 1992) (section 1129(a)(2) satisfied where debtors complied with all provisions of Bankruptcy Code and Bankruptcy Rules

16

governing notice, disclosure and solicitation relating to the plan). Pursuant to section 1125(b), a plan proponent cannot solicit votes on a proposed plan of reorganization without a court approved disclosure statement. The purpose is to ensure that an entity voting on a plan of reorganization has sufficient information about the debtor and the plan to make an informed decision with regards to voting.

49. The Debtor has complied with section 1125. Before the Debtor solicited votes on the Plan, the Court entered the Solicitation Procedures Order which determined after notice and hearing that Debtor's Disclosure Statement contained adequate information within the meaning of section 1125(a) and authorized the solicitation of votes on the Plan.

50. As described above and as detailed in the Service Declaration, the Disclosure Statement (along with other solicitation materials) was served on all parties entitled to vote on the Plan. This was done in accordance with the Court-approved Solicitation Procedures Order. Thus, voting parties had sufficient information to make an informed decision when voting on the Plan. Accordingly, the Debtor has complied with section 1125.

51. As described above and as detailed in the Service Declaration, the Debtor caused to be served on the holders of claims and interests eligible to vote in Classes 1B, 5, 7 and 8, copies of the Disclosure Statement, class appropriate ballots and the Solicitation Procedures Order in accordance with the Court-approved Solicitation Procedures Order. The Disclosure Statement and the ballots informed voting parties of the procedures for completing the ballots, the deadline for returning

17

completed ballots, and the method and address for returning completed ballots. The Solicitation Procedures Order also informed parties of the deadline for returning ballots and for filing objections to confirmation of the Plan.

52. The Debtor has not solicited votes on the Plan from the holders of claims and interests in Class 4 (unimpaired under the Plan) and Class 9 (impaired, but insiders whose votes do not count), and in Class 2 and Class 3 (impaired but deemed to reject the Plan). Sections 1126(f) and (g).

53. As described above and as detailed in the Ballot Report, holders of claims in Class 8 voted to accept the Plan and holders of claims in Class 1B, Class 5 and Class 7 voted to reject the Plan. The Ballot Report describes the methods for collecting the ballots and tabulating the votes and demonstrates that the determination of whether a class of claims or interests accepted or rejected the Plan was done in conformity with sections 1126(c) and (d).

54. Accordingly, the Debtor has complied with section 1126. As the Debtor has complied with the provisions of sections 1125 and 1126, the Debtor has complied with section 1129(a)(2).

## THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW – SECTION 1129(a)(3)

55. Section 1129(a)(3) requires a plan proponent to propose a plan "in good faith and not by any means forbidden by law." Section 1129(a)(3).

56. In determining good faith under section 1129(a)(3), courts address whether the plan was proposed with good intentions and will achieve a result that is consistent with the objectives of the Bankruptcy Code. *See In re Draiman*, 450 B.R.

18

at 803; *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("for purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."); *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *In re Granite Broad. Corp.*, 369 B.R. 120, 128 (Bankr. S.D.N.Y. 2007).

57.  Good faith is to be determined "in light of the totality of the circumstances surrounding" formulation of the plan. *In re Draiman*, 450 B.R. at 804; *In re Pub. Fin. Corp.*, 712 F.2d 219, 221 (5th Cir. 1983); *In re Oneida Ltd.*, 351 B.R. 79, 85 (Bankr. S.D.N.Y. 2006).

58.  As provided in the Plan and additional evidence to be presented at the Plan confirmation hearings, this Case was commenced in order to avoid a foreclosure by the Lenders, which would likely have provided no recovery for any creditors or stakeholders other than the Lenders, and for the purpose of restructuring its financial liabilities and ensuring the long-term success of the Hotel for the benefit of all of its creditors and stakeholders. All these results are consistent with the purposes and objectives of chapter 11.

59.  Accordingly, the Plan was proposed in good faith and achieves a result that is consistent with the provisions of the Bankruptcy Code. Section 1129(a)(3) is therefore satisfied.

19

## THE PLAN PROVIDES FOR COURT APPROVAL OF PAYMENTS FOR SERVICES AND EXPENSES – SECTION 1129(a)(4)

60.     Section 1129(a)(4) requires that payments "for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case," be approved by the Court as reasonable.

61.     Section 1129(a)(4) has been construed by courts to require that all professional fees and expenses be subject to review and approval by the Bankruptcy Court. *See In re Draiman*, 450 B.R. at 807; *In re WorldCom*, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003).

62.     All professional fees or expenses that have been paid by the Debtor have been based upon processes and orders approved by the Bankruptcy Court and will continue to be so paid through the Effective Date. Accordingly, the Plan satisfies section 1129(a)(4).

## THE PLAN DISCLOSES ALL NECESSARY INFORMATION REGARDING DIRECTORS AND OFFICERS OF THE DEBTOR UNDER THE PLAN – SECTION 1129(a)(5)

63.     Sections 1129(a)(5)(A)(i) and (ii) of the Bankruptcy Code require that a plan proponent disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor," and requires a finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy." Sections 1129(a)(5)(A)(i) and (ii). Section 1129(a)(5)(B) further requires that a plan proponent disclose the "identity of any

20

insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." Section 1129(a)(5)(B).

64. The current management of the Debtor through JSM will continue to manage the reorganized Debtor. Plan, at 23. The continuation of its employment is consistent with the interest of the creditors, the interest of equity interest holders and public policy. Accordingly, the Plan satisfies section 1129(a)(5).

## THE PLAN DOES NOT CONTAIN RATE CHANGES SUBJECT TO THE JURISDICTION OF ANY GOVERNMENTAL REGULATORY COMMISSION – SECTION 1129(a)(6)

65. Section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in the plan.

66. Section 1129(a)(6) is inapplicable to this Case because the Debtor is not subject to the jurisdiction of any regulatory commission, nor does the Plan provide any changes in any rates subject to such regulatory approval.

## THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND EQUITY INTEREST HOLDERS – SECTION 1129(a)(7)

67. Section 1129(a)(7) codifies what is generally referred to as the "best interests of creditors test."

68. Section 1129(a)(7) requires that, with respect to each class of impaired claims or interests under a plan, every holder of a claim or interest in such impaired class either (i) accept the plan, or (ii) receive or retain property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy

Code. *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996). The liquidation analysis provided with Debtor's Disclosure Statement and to be presented as evidence at the confirmation hearing confirms that all classes which have not accepted the Plan are receiving property of a value, as of the effective date of the Plan, that is greater than the amount that such holder would receive or retain if the Debtor were liquidated under chapter 7.

69.     According to the Debtor's Expert Report of Jonathan Jaeger Pursuant to Confirmation Hearing on Amended Chapter 11 Plan of Reorganization of Wisconsin & Milwaukee Hotel LLC Submitted June 6, 2025 (the "**Jaeger Report**"), which will be submitted into evidence during the Plan confirmation hearings, the chapter 7 liquidation value of the Debtor is approximately $19.5 million. Subtracting for trustee's fee and other chapter 7 expenses, the amount available for distribution under chapter 7 is approximately $19.2 million [Doc 486, ex. F, p. 76] ("**Disclosure Statement**"). Lenders' appraiser has not refuted this, nor has any other evidence or argument, and it is clearly substantially less than the distributions proposed to be made hereunder to every Class entitled to receive distributions.

70.     Stated simply, in a chapter 7 liquidation Computershare would likely receive all the net value, which would be substantially less than the distributions proposed to be made to it under the Plan, and no other creditor or interest holder would receive anything. Accordingly, the Plan satisfies the best interests of creditors test of section 1129(a)(7).

## SECTION 1129(a)(8) IS INAPPLICABLE – SECTION 1129(a)(8)

71.     Section 1129(a)(8) requires that each class of claims and interests established under a plan either accept the plan or not be impaired under the plan. But under section 1129(a)(10), section 1129(a)(8) is inapplicable if there are rejecting classes and (a) at least one class of claims impaired by the Plan (Class 8 here) has voted to accept the Plan, and (b) as here, Plan confirmation is sought under section 1129(b).

## THE PLAN PROVIDES FOR PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS – SECTION 1129(a)(9)

72.     Section 1129(a)(9) provides that (unless the holder of a claim has agreed to a different treatment): (i) the holder of a claim entitled to priority under section 507(a)(2) or (3) must receive cash equal to the allowed amount of its claim on the effective date of the plan, (ii) the holder of a claim entitled to priority under sections 507(a)(1), (4), (5), (6) or (7) must receive either cash in the allowed amount of such claim on the effective date of the plan or deferred cash payment of a value, as of the effective date, equal to the allowed amounts of such claim, and (iii) the holder of a tax claim entitled to priority under section 507(a)(8) must receive on account of such claim regular installment payments in cash (a) of the total value, as of the effective date of the plan, equal to the allowed amount of such claim, (b) over a period ending not later than 5 years after the date of the order for relief, and (c) in a manner not less favorable than the most favored nonpriority unsecured claim.

73.     As provided in Article 3 of the Plan, each holder of an Allowed Administrative Expense Claim and Priority Unsecured Claim will be paid in full on

the Effective Date, unless the holders of such claims agree to different treatment. Accordingly, the Plan satisfies section 1129(a)(9).

### AT LEAST ONE IMPAIRED CLASS HAS ACCEPTED THE PLAN – SECTION 1129(a)(10)

74.     Section 1129(a)(10) requires that at least one class of claims that is impaired under the plan has voted to accept the plan, determined without including any acceptance of the plan by any insider. As set forth above, impaired Class 8 voted to accept the Plan. Accordingly, the Plan satisfies section 1129(a)(10).

### THE PLAN IS FEASIBLE – SECTION 1129(a)(11)

75.     Section 1129(a)(11) provides that a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." Section 1129(a)(11) is referred to as the feasibility standard or feasibility test.

76.     In the Seventh Circuit, "to determine that a plan is feasible, 'the bankruptcy court need not find that it is guaranteed to succeed; *only a reasonable assurance of commercial viability is required.*'" *In re KMC Real Estate Inv., LLC*, 531 B.R. 758, 768 (S.D. Ind. 2015) (emphasis in original) (citing *In re 203 N. La Salle St. P'ship*, 126 F.3d 955, 961–62 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434, 119 S. Ct. 1411 (1999)); *In re Aurora Memory Care, LLC*, 589 B.R. 631, 640 (Bankr. N.D. Ill. 2018). Accordingly, the feasibility test standard is met if the plan is workable and offers a reasonable likelihood of success. *See United States v. Energy Res. Co.,*

24

*Inc.*, 495 U.S. 545, 549 (1990); *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be reasonable assurance of commercial viability."). Success need not be guaranteed. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *see also In re W.R. Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013) ("Success need not be guaranteed, but must be reasonably likely."); *In re Haas*, 162 F.3d 1087, 1090 (11th Cir. 1998) (Chapter 11 Plan meets feasibility standard if the plan offers a reasonable prospect of success and is workable); *In re Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success."); *In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) ("In making determinations as to feasibility . . . a bankruptcy court does not need to know to a certainty or even a substantial probability, that the plan will succeed. All it needs to know is that the plan has a reasonable likelihood of success.").

77.     The existence of some uncertainty with respect to the future or future results is insufficient by itself to find a plan not feasible. *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ("Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.").

78.     Additionally, the Bankruptcy Code does not limit the length of a repayment period under a debtor's plan, nor does it require projections for the entire duration of a long-term plan. *In re Trenton Ridge Invs., LLC*, 461 B.R. 440, 504

25

(Bankr. S.D. Ohio 2011). "A chapter 11 debtor may propose a reorganization plan that takes as many years to consummate as he can convince his creditors and the court to accept." *In re Fortin*, 482 B.R. 35, 41 (Bankr. D. Mass. 2012). While a debtor should "sustain its burden to somehow prove that it will be able to perform all obligations it is assuming under the plan" by providing its cash flow projection, courts "do not require projections for the same period over which a long-term plan spans." *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006).

79.     Courts have typically required any repayment period under the plan to be reasonable in accordance with section 1129(b)(2) because "[s]ection 1129(b)(2) represents the minimum standard of what is 'fair and equitable.'" *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 37–38 (Bankr. D. Kan. 2001). Long-term plans are reasonable in appropriate circumstances, as here. Courts have approved plans as long as thirty years—so long as the plan is fair and equitable to creditors and fulfills all requirements under section 1129. *In re Padda Hotels, LLC*, 2014 Bankr. LEXIS 525, at *4, *17 (Bankr. D.N.M. Feb. 7, 2014).

80.     In *In re Padda Hotels*, the debtor proposed a chapter 11 plan to repay a secured creditor over a 30-year period with interest. *Id.* at *9. The court held that this repayment period complied with section 1129(b)(2)(A)(i)(II) because the period was reasonably consistent with the original loan term of 24 years. *Id.* Furthermore, the repayment period did not unfairly discriminate against the creditor because (as here) the creditor would be paid in full with interest. *Id.* Similarly, in *In re Valley View*, the court approved a 30-year repayment period because such a period is comparable to

26

what the market typically offers. *In re Valley View*, 260 B.R. at 38 ("For example, 30 year amortization is available for residential and some commercial property; thus, extending a mortgage for another 30 years is often viewed as fair and equitable. If the mortgagee had been able to foreclose, it is likely that it would have financed a new loan for the typical 30 year amortization."); *see also In re Mace*, 2011 Bankr. LEXIS 280, at *6 (Bankr. M.D. Tenn. Jan. 25, 2011) (allowing a 20-year repayment period on a real property loan because four similarly situated creditors agreed to the same term).

81.    For the same reasons, a repayment period of 18 years for Computershare's section 1111(b) loan is appropriate because it is reasonably consistent with the Loan terms when they were originated, consistent with the market for real estate financings, and the Plan otherwise complies with all requirements under section 1129.

82.    The repayment period to Computershare was based in part upon the original loan period between Computershare and the Debtor, and the underlying tax-exempt Bonds, which were issued in 2012 and had a 30-year amortization schedule. At the time the Debtor filed its petition, the amortization schedule had 18 years remaining. What the Debtor has proposed is a type of reinstatement: picking up the Loans where it left off, using chapter 11 tools to restructure the payments and interest in order to have a feasible plan and success, and still paying the Loans in full over the roughly eighteen remaining years from the original term. This both conforms to the original loan terms and does not go beyond the length a consistent market

27

would offer. Based on applicable precedent, the Debtor could well be justified in proposing a 30-year repayment period to Computershare. *See In re Valley View*, 260 B.R. at 38; *In re Padda Hotels*, 2014 Bankr. LEXIS 525, at *9.

83.     The Lenders and White Lodging argued that the Debtor's Plan is not feasible because Debtor has not entered into a new management agreement with equal or better terms than its existing management agreement with White Lodging. White Lodging Objection, at 8; Lenders' Objection, at 8. Additionally, the Lenders and White Lodging argued that the Plan is not feasible because the Debtor has not disclosed any potential changes to the Marriott Hotel Franchise Agreement Between Marriott International, Inc. and Wisconsin & Milwaukee Hotel LLC (the "**Franchise Agreement**") White Lodging Objection, p. 9; Lenders' Objection, pp. 8–9.

84.     Those are not proper feasibility objections. Feasibility measures the reasonableness of success when and after a plan is implemented on its effective date. It considers performance under the plan. A plan can be confirmed even if certain conditions must be met between plan confirmation and the effective date. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 153 (Bankr. D.N.J. 2010) (finding plan confirmable even though the short term liquidity of the debtor would require court approval of a proposed DIP facility, and the motion to approve such DIP facility would not be heard before plan confirmation). If the conditions to the effective date are not met, the plan never goes into effect and the projections and feasibility become irrelevant. The Effective Date of this Plan is contingent upon the Debtor's rejection

of the White Lodging Management Agreement, its entry into a new management agreement, and its assumption of the Franchise Agreement (as it may be amended).

85. To satisfy the conditions to the Effective Date, the Debtor filed Motion for an Order Authorizing Debtor to Reject Management Agreement with White Lodging Services Corporation, Effective as of the Rejection Effective Date (as Defined Herein) [Doc 640] ("**Rejection Motion**") and a Motion for an Order Authorizing Debtor to Enter into Hotel Management Agreement with Avion Hospitality, LLC, Effective as of Avion Contract Effective Date (as Defined Herein) [Doc 642] ("**Avion Motion**") to replace the White Lodging contract with an economically superior management contract with Avion Hospitality, LLC ("**Avion**"). Rejection Motion, pp. 4–5. The new management contract (attached as Exhibit A to the Avion Motion) is economically superior in at least the following ways: the base management fee will be 3% of gross revenues, as opposed to 3.5% of gross revenues in the White Lodging contract; and the incentive management fee will be 10% of any increase in gross operating profit, as opposed to 20% of available cash flow in the White Lodging contract. Avion Motion, ex. A, p. 21. Therefore, with the new management contract, the Debtor will likely reduce the costs of managing the Hotel and increase its net operating income.

86. The Debtor has also filed a Motion to Assume Franchise Agreement with Marriott International, Inc., Effective as of the Plan Effective Date (As Defined Herein) [Doc 644] ("**Marriott Motion**") to assume the Franchise Agreement. While the details of amendments to that agreement have not yet been finalized, at a

29

minimum the Court and parties in interest know definitively that the Hotel will continue under the Marriott brand (an assumption made by the Debtor and Lenders' appraisals and proffered expert opinions). In addition, any amendments that are reached (and expected to be reached) by agreement can be reasonably expected to improve the economics for the Debtor.

87. The Lenders also argued that the Debtor's Plan is not feasible because they believed the Debtor would not be able to refinance or otherwise make the balloon payment (which at the time of their objection under the now-superseded amended plan was approximately $45 million) at the end of the Plan term. Lenders' Objection, p. 9. However, in the Plan (subsequently filed on June 27), the Debtor substantially increased the stream of payments to Computershare over 18 years, and significantly reduced the balloon payment to $24.5 million, which is less than the Hotel value *today* under the valuations provided by the Debtor and the Lenders.

88. The Lenders also contended that a balloon payment could not likely be financed unless the loan to value was 80% or less. Lenders' Objection. With a value today that is already higher than the Plan's balloon payment, and assuming ordinary appreciation in value over 18 years, the loan to value at maturity in 2043 is likely to be approximately 50% or less. This conclusion is supported by the projections of the Debtor's and Lender's appraisers, and one of the Debtor's expert witnesses, as will be shown during the Plan confirmation hearings. In the Jaeger Report, the projected value of the hotel is already over $48 million by 2035 [Jaeger Report, p. 122] (approximately twice the balloon payment, suggesting a loan to value of 50%, with

30

another 8 years of appreciation likely before maturity). Therefore, under the current Plan, there is a preponderance of evidence that the Debtor will be able to secure refinancing to cover the balloon payment in 2043.

89.     In the Disclosure Statement, the Debtor initially provided a 5-year cash flow projection in support of feasibility based on the historical financial record since its reopening after the pandemic in the belief that under prevailing case law, the meaning of the phrase "not likely to be followed by the liquidation, or the need for further financial reorganization" in section 1129(a)(11), suggests the need to show avoidance of a near-term failure. "Followed" means "coming soon after," and not "ever." *See In re Najar Trucking Inc.*, 2025 Bankr. LEXIS 108, at *20 (Bankr. D. Nev. Jan. 8, 2025) ("[T]he inevitability of success need not be proven."); *In re W.R. Grace & Co.*, 729 F.3d 332, 348 (3d Cir. 2013) ("Success need not be guaranteed, but must be reasonably likely."). Indeed, a long-term projection covering the same period over which the long-term plan spans is not required if the debtor can prove that it can perform the obligations under the plan, including the significant balloon payment at the end of the plan that is not covered in the projection. *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006). However, in order to avoid argument whether 18-year projections should be required for feasibility in this case or not, the Debtor subsequently prepared, and will introduce as evidence at the Plan confirmation hearings, an 18-year projection that, like the prior 5-year projection, demonstrates in conjunction with the projections of both the Debtor's and Lenders' appraisers, that the Debtor can be reasonably expected to generate sufficient net

31

operating income to comply with all its Plan obligations. Furthermore, those projections do not account for the material improvement in economic performance that is expected from the engagement of Avion in place of White Lodging.

90.     When assessing feasibility, courts consider "the company's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company." *In re Lupton Consulting* LLC, 633 B.R. 844, 866 (Bankr. E.D. Wis. 2021) (citing *In re Am. Consol. Transp. Cos, Inc.*, 470 B.R. 478, 490 (Bankr. N.D. Ill. 2012)). Indeed, as can be seen from the Debtor's monthly operating reports, the Debtor has been consistently earning substantial income after making $50,000 in monthly adequate protection payments, and other ordinary operating expenses and administrative expenses during this chapter 11 Case. Additionally, because the Plan provides a $6 million equity infusion as of the Effective Date, the Debtor will have a cushion to be able to fund improvements and renovations and have resources available if any projections are missed. Accordingly, the Debtor will have a sufficient capital structure post-confirmation to sustain feasibility.

91.     Significantly, while the Debtor's owner and "supervising" manager JSM is not being changed, the day-to-day management of the Hotel is being placed under the control of Avion, with economics that are materially superior for the Debtor than those that were in effect under White Lodging's regime. Just as importantly, the maintenance of JSM in supervisory control, including as equity owner after the Equity Offering of the Plan is consummated, is required by Marriott in order to

32

permit assumption of the Franchise Agreement, which is central to the long-term success of the Hotel.

92.     The Lenders further argued that the Plan is not feasible because it would be "highly unusual" for Marriott to allow a property improvement plan ("**PIP**") to extend remodeling over five years. Lenders' Objection, p. 10. However, under the Plan the Debtor now proposes to undertake a PIP within three years, and the evidence will show that Marriott has approved a PIP estimate with such terms.

93.     Accordingly, as all the feasibility factors that courts consider weigh in favor of the Debtor, the Plan satisfies the feasibility standard set forth in section 1129(a)(11).

**ALL STATUTORY FEES HAVE BEEN OR
WILL BE PAID – SECTION 1129(a)(12)**

94.     Section 1129(a)(12) requires that a plan provide that all fees payable under 28 U.S.C. § 1930 be paid on or before the effective date of the plan. Article 3 of the Plan provides that all fees due and payable under 28 U.S.C. § 1930 shall be paid in full in cash on or before the Effective Date, and that the Debtor shall remain obligated to pay such fees until the chapter 11 Case is closed. Accordingly, the Plan satisfies section 1129(a)(12).

**SECTIONS 1129(a)(13), (14), (15) AND (16) ARE INAPPLICABLE**

95.     Section 1129(a)(13) requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with section 1114. The Debtor does not have any present obligation to pay retiree benefits within the

meaning of section 1129(a)(13). Thus, section 1129(a)(13) is not applicable for confirmation.

96.     Section 1129(a)(14) requires that a debtor pay all domestic support obligations. The Debtor is an entity and is not required by any judicial or administrative order, or by statute, to pay any domestic support obligations. Thus, section 1129(a)(14) is not applicable for confirmation.

97.     Section 1129(a)(15) applies only to individual debtors. Because the Debtor is an entity, section 1129(a)(15) is inapplicable.

98.     Section 1129(a)(16) applies only to transfers of property under a plan by a corporation or trust that is not for profit entity. Thus, section 1129(a)(16) is not applicable for confirmation.

## THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129(b)

99.     Under section 1129(b), a chapter 11 plan can be confirmed notwithstanding the nonacceptance of the plan by an impaired class of creditors provided: (a) all of the applicable requirements of section 1129(a), other than subsection 1129(a)(8), have been satisfied, and (b) the plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired class of claims or interests that did not accept the plan.

100.    As shown above, the Plan satisfies all the applicable provisions of section 1129(a). As discussed in further detail below, the Plan does not discriminate unfairly and is fair and equitable with respect to the impaired classes or interests that did not accept the plan.

34

## THE PLAN DOES NOT DISCRIMINATE UNFAIRLY

101.  Section 1129(b) requires that a Plan not discriminate unfairly.

102.  As discussed with respect to classification above, the Debtor may separate similar claims into separate classes and treat them differently where "separate classification is permitted for 'good business reasons.'" *In re Bernard Steiner Pianos USA, Inc.*, 292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) (citations omitted). "Good business reasons" are broad and varied. Courts have found that maintaining good will for future debtor operations, continuing relationships with creditors who are essential to the continued operations of the debtor, maintaining labor relations, and avoiding accrual of interest all to be valid business reasons to classify similar claims and treat them differently. *See In re Spin City EC, L.L.C.*, 578 B.R. 635, 640 (Bankr. W.D. Wis. 2017) (maintaining goodwill); *In re STC, Inc.*, 2016 Bankr. LEXIS 1110, at *15 (Bankr. S.D. Ill. Apr. 7, 2016) (continuing relationships with essential creditors); *In re Greenwood Point, LP*, 445 B.R. 885, 909 (Bankr. S.D. Ind. 2011) (avoiding accrual of interest); *In re Snyders Drug Stores, Inc.*, 307 B.R. 889 (Bankr. N.D. Ohio 2004) (goodwill for future operations); *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109 (Bankr. N.D. Tex. 2002) (continuing relationship with essential creditors); *Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct (In re Chateaugay Corp.)*, 89 F.3d 942 (2d Cir. 1996) (maintaining labor relations); *In re Greenwood Point, LP*, 445 B.R. 885 (Bankr. S.D. Ind. 2011) (avoiding the accrual of interest). Additionally, providing long-term payout to long-term obligations and short-term

35

payout to short-term obligations under a plan cannot be "unfair discrimination." *In re Landing Assocs., Ltd.*, 157 B.R. 791, 823 (Bankr. W.D. Tex. 1993).

103. The impaired classes entitled to distributions are Class 5, Class 7 and Class 1B. The Plan treats Class 1B in accordance with the requirements of section 1111(b). Classes 5 (White Lodging) and 7 (WMH Funding) are alike in that they are nonpriority unsecured claims, as is Class 8 (vendors and Affiliated Lenders). Class 5 and Class 7 are treated similarly to each other (10% dividends payable over 18 years), but not in the same manner as the Class 8 unsecured creditors, who are to be paid dividends of 50% over 2-1/2 years.

104. The Lenders argue that the Plan unfairly discriminates against WMH Funding because insiders will receive "significantly more" than other creditors, Lenders' Objection, p. 14, and Lenders and White Lodging argue that they were "arbitrarily" placed into their own classes; and that the Plan unfairly discriminates against them by paying them a 10% dividend over 18 years while paying other unsecured creditors a 50% dividend over 2 ½ years. White Lodging Objection, p. 8; Lenders' Objection, pp. 14-15.

105. This differential treatment does not constitute unfair discrimination. As stated above, the Debtor's business judgment in providing enhanced dividend recoveries to the Class 8 creditors over a shorter period of time than the Class 5 and Class 7 creditors is that such treatment is appropriately accorded to vendors and other ordinary course parties whose continued support of the Reorganized Debtor will be essential to the success of the business. The Debtor included the unsecured loan

36

claims of its Affiliated Lenders in this class because they are substantially similar to other claims in Class 8 and are also continuing long-term relationship parties with the Debtor.

106. The Debtor has good business reasons for classifying White Lodging and WMH Funding into their own classes, separate from Class 8, and treating them differently. White Lodging's claim arises mostly from its claim for long-term damages arising from the expected rejection of its Management Agreement. WMH Funding's claim is dissimilar from White Lodging's, and arises from a loan to a non-debtor party (JSM). In the case of White Lodging and WMH Funding, there is no justification for providing to them the enhanced recovery over a shorter time that is accorded the Class 8 claims, because unlike the creditors in Class 8, there is no continuing business relationship with either of them that is important to the operations of the Reorganized Debtor.

107. The Debtor also has good business reasons for paying White Lodging and WMH Funding over a term of 18 years. In the case of White Lodging, the rejection damages they seek cover a period at least as long as 18 years. Providing for payment of any such claim on the same basis as vendors and ordinary course parties who will have continued relationships with the Debtor that will be essential to the Debtor's success could conceivably threaten the feasibility of the Plan to the detriment of all the Debtor's stakeholders. The 18-year repayment period for WMH Funding is based on its status as holder of the bonds underlying the Loans, the maturity of which is in approximately 18 years, as well as by the fact that it is acting in concert with

37

Computershare, and its post-confirmation support of the Debtor is not expected to be provided, nor are they expected to do anything to contribute to the success of the reorganization.

108. The Lenders also argue that the Debtor has unfairly discriminated against them by including the Affiliated Lenders (insiders) in Class 8. Lenders' Objection, p. 16. The Debtor classified the Affiliated Lender claims in Class 8 because those claims were ordinary course loans, not tied to long-term contracts or original 30-year loan terms, and relatively small and consistent with the administrative convenience of the entire class.

109. The Lenders and White Lodging also argue that they have been separated from Class 8 by "gerrymandering" to secure the affirmative vote of an accepting impaired class, and they suggest that including the insiders in Class 8 furthered that design. That is not the case, as demonstrated by the business reasons for class treatment set forth above. In any event, insider votes do not count for Plan acceptance purposes, and Class 8 accepted the Plan without counting the votes from insiders. 11 U.S.C. § 1129(a)(10); *see* Ballot Report.

110. Accordingly, the Plan does not discriminate unfairly and section 1129(b) of the Bankruptcy Code is satisfied.

### THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO SECURED CLASS 1B: VALUATION AND *TILL* INTEREST RATE

111. The fair and equitable treatment of secured Class 1B requires evaluation under sections 1129(a)(7)(B) and 1129(b)(2)(A)(i). In brief, under the facts of this Case, and with additional evidence to be presented at the Plan confirmation

hearings, this requires that Computershare "receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims" (satisfied by the Debtor's provision of a $50 million claim, which, assuming a 5.25% interest rate consistent with *Till* and applicable precedents applying *Till*, has a present value equal to the value of the Hotel collateral today, of $26 million), and "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property" (satisfied by the Plan's stream of monthly payments to Computershare at the same "*Till* rate" of 5.25% per year interest over 18 years, and the balloon, which together equals the full amount of the $50 million claim, and also has a present value of $26 million).

112. Section 1129(a)(7)(B) requires that a creditor that makes an election pursuant to section 1111(b)(2) of the Bankruptcy Code receive payment of at least the value of the creditor's collateral. *In re Settlers' Hous. Serv.*, 505 B.R. 483, 491 (Bankr. N.D. Ill. 2014). *Till* holds that if the payments are to be distributed over the life of the plan, the plan must provide for an appropriate rate of interest so that the creditor may realize the present value of its claim. The rate of interest is treated as a surrogate for a discount rate. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 469 (2004).

113. The Debtor's Second Amended Plan proposes payment to Computershare of a $50 million claim (in excess of its Claim 11 amount of approximately $45 million), pursuant to an 18-year stream of monthly payments with

39

interest at 5.25% per year, followed by a balloon payment of approximately $24.5 million. Plan, at 10. Evidence at the Plan confirmation hearings will demonstrate that these payments together have a present value of $26 million (the Debtor's determination of the collateral value), based upon the appropriate *Till* interest rate of 5.25%. The Debtor believes, and will present evidence, that the base or starting rate under *Till* for a hotel refinancing is the current prevailing rate for 10-year United States Treasury Securities, which has recently ranged between 3.9% and 4.48%. The Debtor's Plan provides that it will adjust the interest rate ten years from the Effective Date to reflect a comparable premium to the then-prevailing 10-year Treasury yield. *Id.*

114.    Lenders' Objection asserts that *Till* requires that the cramdown interest rate be "above and beyond the prime rate." Lenders' Objection, at 7. That is a misreading or misconstruction of *Till*, which famously involved a used truck refinancing under chapter 13. *Till*, 541 U.S. at 470. The Supreme Court provided in that case that the cramdown interest rate should ordinarily start with a base rate of the prime rate, because that was how vehicle loans were priced outside bankruptcy. *Id.* at 479–80. The Court did not address expressly how this "prime plus" formula should be applied in chapter 11 cases or in cases where the comparable non-bankruptcy loans were not priced off the prime rate, but rather, as here, another base rate such as the rate on 10-year Treasury securities. *Id.*

115.    While prime-plus may be appropriate where the comparable non-bankruptcy loan would use the prime rate as a base, the Seventh Circuit has made

clear that this is not the only or even the optimal rate to be used. In *In re K&K Holdings, LLC*, 2014 Bankr. LEXIS 626, at *37 (Bankr. N.D. Ill. Feb. 13, 2014), the Court wrote: "the prime-plus formula is not 'the only—or even the optimal—method for calculating the Chapter 11 cramdown rate" (quoting *In re Texas Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 336 (5th Cir. 2013)); *see also In re STC, Inc.*, 2016 Bankr. LEXIS 1110, at *49 (Bankr. S.D. Ill. Apr. 7, 2016) ("The Court agrees that *Till* does not require use of the prime-rate formula approach in chapter 11 cramdown cases."). Indeed, many courts have emphasized that determining a cramdown interest rate is a factual determination to be made on a case-by-case basis. *E.g.*, *In re Topp*, 75 F.4th 959, 963 (8th Cir. 2023) ("[R]eliance on *Till* is simply a red herring—an attempt to pitch the starting-rate choice as a purely legal question…rather than what it is: a factual finding about the appropriate discount rate in this particular case."); *In re STC*, 2016 Bankr. LEXIS at *48–49; *In re Linda Vista Cinemas,* LLC, 442 B.R. 724, 729–50 (Bankr. D. Ariz. 2010).

116. *Till* made clear that the Bankruptcy Court should use discretion in determining the cramdown interest rate, and to be mindful of its effect on feasibility. *Till* also made clear that the determination of the appropriate cramdown interest rate was to be a surrogate for the applicable discount rate to be used in calculating present value, in order to simplify the manner in which the rate would be determined. This rationale would appear to be true whether the Plan proposes to cramdown on a bifurcated claim or a claim under section 1111(b).

117.    Plan length is another factor that weighs decidedly against using the prime rate. Chapter 13 plans, like the plan in *Till*, cannot last longer than five years as a matter of law. Section 1322(d). In that context (and as applied to a vehicle loan) the prime rate represents "[t]he interest rate that a commercial bank holds out as its lowest rate for a *short-term* loan to its most creditworthy borrowers." *In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567, 574 (Bankr. D. D.C. 2011) (emphasis supplied) (quoting *Prime Lending Rate*, BLACK'S LAW DICTIONARY (12th ed. 2024)).

118.    But here, the Debtor's Plan proposes an interest rate that is consistent with long-term hotel financings and an 18-year term. The cramdown loan here pertains to a hotel construction loan that was originally financed with over $45 million of EB-5 visa investments, quite different from the $4,900 used car loan in *Till*. A disbursement period of this length requires a base rate that is designed to cover the time period while properly "reflect[ing] maturity and inflation premiums." *In re Smith*, 178 B.R. 946, 956 (Bankr. D. Vt. 1995).

119.    Courts have recognized that the Treasury rate is an "appropriate base rate for longer-term debt, finding that the prime rate correlates more closely to the rate banks charge one another on overnight loans." *In re MPM Silicones, LLC*, 2014 Bankr. LEXIS 3926, at *98 (Bankr. S.D.N.Y. Sept. 9, 2014) *rev'd on other grounds* 874 F.3d 787, 801 (2d Cir. 2017). Accordingly, the Treasury rate is a better base rate to use for a long-term cramdown loan than the prime rate. *See also* 1 COLLIER REAL ESTATE TRANSACTIONS & BANKR. CODE ¶ 2.07 (2025) ("The current trend is the

adoption of the so-called formula approach to the interest rate analysis. This approach takes a riskless interest rate of interest for an obligation of even maturity (*for example, U.S. Treasury Bills*)."); 4 POWELL ON REAL PROPERTY § P3.11 (2025) ("[T]he typical commercial loan contains an adjustable [interest] rate that is usually tied to the prime rate *or treasury bills*."); 12B PURCHASE AND SALE OF REAL PROP. § 36.02 (2025) ("[C]ommonly used is the yield rate of United States Treasury securities because the Bond yield rate has neither large nor infrequent changes.").

120.    Furthermore, the Treasury rate is an ideal base rate because section 1129(a)(7)(B) only requires that the creditor receive the *present value* of its claim. *In re Smith*, 178 B.R. 946, 956 (Bankr. D. Vt. 1995); *Till*, 541 U.S. at 474. The Treasury rate more accurately reflects a claim's present value because it simply represents "pure interest, inflation, and liquidity premiums." *In re Smith*, 178 B.R. at 956.

121.    The Treasury rate allows courts to more accurately determine a risk adjustment based on a debtor's individualized situation because the risk adjustment is entirely separate from the base rate. *See id*; *In re STC, Inc.*, 2016 Bankr. LEXIS at *52–55. Moreover, *Till* acknowledges that "starting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing." *Till*, 541 U.S. at 479 (emphasis in original).

122.    When adopting the formula approach, *Till* endorsed the prime-plus rate in part because it was easy to compute. *Till*, 541 U.S. at 478, 498–99 (describing the prime lending rate as "objective and easily ascertainable," as it is reported daily in

the press). However, the Treasury rate is just as easily objective and ascertainable. It, too, is updated daily and discoverable after a quick online search. In sum, the Treasury rate:

> [P]rovides a discount or interest rate that reflects maturity and inflation premiums. It is simple to compute. It is efficient. It reduces complexity. It will provide a threshold test that will require debtors and creditors to focus on feasibility and claim valuation. It is predictable.

*In re Smith*, 178 B.R. 946, 956 (Bankr. D. Vt. 1995).

123.    In numerous cases, Courts across the country have used the Treasury rate as a base rate for cramdown purposes under *Till. E.g.*, *In re Bastankhah*, 2012 Bankr. LEXIS 256, at *8–9 (Bankr. S.D. Tex. Jan. 18, 2012) (using the Treasury rate as a base cramdown rate in a chapter 11 case); *In re SJT Ventures, LLC*, 441 B.R. 248, 256 (Bankr. N.D. Tex. 2010) (same); *In re Vill at Camp Bowie I, L.P.*, 454 B.R. 702, 713 (Bankr. N.D. Tex. 2011) (same); *In re VDG Chicken, LLC*, 2011 Bankr. LEXIS 1795, at *21 (9th Cir. Apr. 11, 2011) (same); *In re Deep River Warehouse, Inc.*, 2005 Bankr. LEXIS 1793, at *31–32 (Bankr. M.D.N.C. Sept. 22, 2005) (same); *In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567, 574 (Bankr. D. D.C. 2011) (same); *In re Topp*, 75 F.4th 959, 962–63 (Bankr. N.D. Ill. 2024) (same, in a chapter 12 case); *In re MPM Silicones, LLC*, 531 B.R. 321, 334–35 (S.D.N.Y. 2015), *rev'd on other grounds* 874 F.3d 787, 801 (2d Cir. 2017) (finding that the bankruptcy court did not err in using the Treasury rate instead of the prime rate).

124.    In the Seventh Circuit, the Treasury rate was used in a chapter 11 context in *In re STC, Inc.*, 2016 Bankr. LEXIS 1110 (Bankr. S.D. Ill. Apr. 7, 2016). That case involved a creditor who had an unsecured claim against the debtor arising

from a lawsuit judgment to be paid with 10% interest. *Id.* at *3–4. The debtor's plan proposed paying the creditor back in full at an interest rate of 3%, which was calculated by taking the then-prevailing 1.87% Treasury rate and adding a 1.13% risk adjustment. *Id.* at *52. The court considered the risk adjustment factors outlined in *Till*: (1) circumstances of the estate; (2) nature of security; (3) duration of the plan; and (4) feasibility of the plan. The *STC* court held that the 3% interest rate was appropriate for several reasons, including:

    a.    The creditor would only receive 25% of its claim under a chapter 7 liquidation, but if the chapter 11 plan is successful, the creditor would be paid in full;

    b.    The creditor's claim was effectively secured by 99% of the equity interests of the reorganized debtor; and

    c.    The drastic improvement of the debtor's management, customer loyalty, and the "quality of the collateral" indicated that the risk of nonpayment was very low.

*In re STC*, at *54–56.

125.    The Debtor's Treasury-plus interest rate of 5.25% accurately reflects the low-risk nature of the cramdown loan. Computershare is being paid in full, and would receive less than half of that if this case were liquidated under chapter 7. It is retaining its liens securing the entirety of its $50 million under section 1111(b). The Debtor has moved to enter into a new management agreement with Avion Hospitality LLC ("**Avion**"), which is significantly better for the Debtor economically that the long-term White Lodging Management Agreement, and will therefore further enhance the Debtor's chances of success.

45

126. Indeed, the Debtor's new management company, new capitalization, and renewed relationship with Marriott, are significant enhancements to the Debtor's projections which already showed, on the basis of its 5- and 18-year projections that assumed a continuing relationship with White Lodging, that there is relatively little risk it would not earn sufficient net operating income to perform its Plan payment obligations.

127. Further justification for a low risk adjustment, as distinct from the exaggerated adjustment of nearly _5% above the prime rate_ asserted by the Lenders, is attributable to the fact that the bonds which underly the Loans in this case are federal tax-exempt. Cases dealing with tax-exempt bonds have made _downward_ adjustments to the cramdown interest rate based upon the bonds' tax-exempt status. _In re La Guardia Assocs., L.P._, 2006 Bankr. LEXIS 4735, at *128 (Bankr. E.D. Pa. Sept. 13, 2006). Because the Loans that gave rise to Computershare's secured claim were based upon the tax-exempt bonds, the tax-exempt status of the bonds should also be considered. Accordingly, the bonds' tax-exempt status amplifies the reasonableness of the Plan's 5.25% cramdown interest rate under _Till_, whose tax equivalent yield is 8.76%[4], assuming the bondholder is in the highest tax bracket.[5]

---

[4] Using Fidelity's Tax Equivalent Yield calculator, for an In-State Municipal Bond (exempt from regular federal income tax) with a yield of 5.25%, assuming that the bondholder is in the highest tax bracket, the tax equivalent yield would be 8.76% if the bond were otherwise a non-tax-exempt corporate bond. https://digital.fidelity.com/prgw/digital/taxyieldcalc/.

[5] Recent communications with Lenders' counsel suggest an intention by the Lenders to argue that the bonds will lose their tax-exempt status if the Loans are restructured under the Plan. The Debtor's reference to the tax-free attributes of the underlying bonds is meant to amplify the justification for using the 10-year Treasury yield as a base rate, but is independent of it. That is to say, even if the tax-exempt status is changed, the justification for using the 10-year Treasury yield as the _Till_ base rate is still powerfully supported by the real estate financing market, the duration of the cramdown loan, and the many applicable precedents, as discussed in the text.

46

128. Another factor weighing heavily against the Lenders' assertion of a prime-plus rate of 12% is that it would be a complete windfall given the history of the Loans and the low risk of repayment under the Plan. Although a lender is entitled to a fair and equitable cramdown rate, courts should be reluctant to implement a cramdown rate that may result in a "windfall" to the creditor. *In re Am. Homepatient, Inc.*, 420 F.3d 559, 562 (6th Cir. 2005).

129. Lastly, the Debtor's proposed interest rate ensures Plan feasibility. This is an important factor under *Till*. When selecting a cramdown interest rate, feasibility is of utmost importance: "[t]ogether with the cram down provision, this requirement obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Till*, 541 U.S. at 480. The higher the interest rate, the greater the risk to feasibility. The minimum interest rate of 12% that Computershare proposes is an "eye popping" rate likely cannot be supported by the Debtor's projections. Under such a high interest rate, the Debtor will either be unable to demonstrate feasibility, or if confirmed, feasibility will be imperiled.

130. Given the individualized facts of the Debtor's case, the proposed rate of 5.25% is the most suitable cramdown rate. It is fair, related directly to the base rate used for hotel and real estate financings and refinancings, includes a risk premium reflecting the low risk associated with the Plan payments, and will allow Computershare to realize the present value of its Claim.

131. Accordingly, the treatment of Class 1B is fair and equitable under section 1129(b).

47

## THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO CLASS 5 AND CLASS 7: THE ABSOLUTE PRIORITY RULE

132.    A plan is fair and equitable with respect to a class of impaired unsecured claims that rejects a plan (or is deemed to reject a plan) if it follows the absolute priority rule. The absolute priority rule provides that either the impaired class must be paid in full or no class of claims or interests junior to the impaired class can receive or retain property under the plan on account of its claims or interests. Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii); *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999).

133.    The Plan satisfies the absolute priority rule with respect to all impaired classes that did not vote to accept the Plan, or which were deemed to reject the Plan. As to each such rejecting class, there is no class that is junior to such rejecting classes that will receive or retain any property under the Plan on account of the Claims or Interests in such Class. That is because existing equity interest holders will receive new equity interests in the reorganized Debtor only on account of their Backstop Commitment, not on account of their interests. The Backstop Commitment is valuable consideration for the Debtor, necessary to its need for exit financing and to its success.

134.    In *LaSalle*, the Supreme Court held that a junior interest holder cannot have the exclusive opportunity free from competition to acquire the equity interest in the reorganized debtor. 526 U.S. at 458. The Supreme Court found that the exclusive opportunity to obtain new equity interests in the reorganized debtor is a species of property, and a junior claim holder should not have the exclusive opportunity to

48

obtain such interests on account of its junior claim. *Id.* at 455. However, a junior interest holder may receive the reorganized equity if such distribution is not "on account of" prepetition equity interests. *Id.* at 451.

135.    In a recent case addressing the issue whether preferential treatment of certain claimants was treatment for or on account of their claims, in the context of an equity rights offering, *In re Peabody Energy Corporation*, 933 F.3d 918 (8th Cir. 2019), the Court found where, as here, such preferential treatment is on account of such creditors' agreement to provide valuable consideration to support the plan and exit financing, it did not offend the principles of *LaSalle*, which it considered applicable by analogy (as *Peabody* did not directly implicate the absolute priority rule). The plan in *Peabody* provided, among other things, that a creditor could participate in the equity rights offering if it agreed to backstop the equity rights offering and support the reorganization plan throughout the confirmation process. *Id.* at 922. Creditors could choose to participate in a private placement and acquire an 8% discount in consideration of their backstop commitment. *Id.*

136.    An ad hoc committee argued that the participating creditors were receiving preferential treatment on account of their claims through the opportunity to participate in the private placement, citing *LaSalle*. *Id.* at 925. The Eighth Circuit disagreed and held that the participating creditors' commitment to backstop the equity rights offering was valuable consideration in exchange for the preferential treatment, and so was not on account of their claims. *Id.* Additionally, the court found

49

that participating creditors did not have the exclusive opportunity to acquire the new equity interest. *Id.* at 926.

137.    The same reasoning applies here. The existing equity interest holders are obtaining the new equity interest not on account of their pre-petition equity interest, but on account of their commitment to backstop the equity offering. The existing equity interest holders under the Plan are not getting the exclusive opportunity to acquire new equity interests in the reorganized Debtor. All unsecured creditors are also invited to participate in the equity offering, and the opportunity to acquire the new equity interests is not exclusive. The existing equity will have a tie-break right, but that is in exchange for the consideration of the Backstop Commitment, which ensures that the Debtor obtains necessary exit financing, and no fees or any other consideration are being paid to the existing equity on account of its commitment.

138.    Further, even if the Court determines that the new equity interests are "on account of" existing interests, the Backstop Commitment meets the requirements of the new value exception to the absolute priority rule, because the existing interest holders will not have the exclusive opportunity to receive the new Class B equity interests on account of their current equity interest. Although the Equity Offering documents (in the Plan Supplement) provide that the new Class A Units to be issued to existing equity holders will carry with them the right to determine the outcome of any tie vote involving the new Class B Units (which necessarily includes any vote to change the Debtor's managing member), that tie-break right is not provided to

50

existing equity on account of their current equity interests, but rather on account of their valuable and essential $6 million backstop commitment to provide exit financing for the Debtor. In the Seventh Circuit, for the new value exception to apply, the new capital must be "new, substantial, necessary for success of the plan, reasonably equivalent to the value retained, and in the form of money or money's worth." *In re Multiut Corp.*, 449 B.R. 323, 354 (Bankr. N.D. Ill. 2011). The $6 million Backstop Commitment meets this test. Further, evidence at the Plan confirmation hearings will demonstrate that $6 million is a reasonable estimation of the actual pro forma equity value of the Debtor coming out of bankruptcy.

139.    Another important reason for the maintenance of the tie-break right with the new Class A Units to be issued to existing equity holders is to assure the continuation of the Franchise Agreement with Marriott, an essential foundation of the Debtor's success, past and future. Section 17 of the Franchise Agreement explicitly prohibits the transfer of controlling ownership in the Debtor. Accordingly, if the existing equity interest holders do not obtain the right to cast the tie-breaking vote, the Debtor will be in material breach of the Franchise Agreement. This is one of the reasons that existing equity was willing to provide the Backstop Commitment. This commitment makes clear by purpose and magnitude that it is not merely on account of the existing equity ownership. As such, the Equity Offering which would allow existing equity interest holders to obtain a tie-break right in the reorganized Debtor does not violate the absolute priority rule under *LaSalle*.

51

140.    Accordingly, the Plan is fair and equitable with respect to Class 5 and Class 7.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Plan satisfies the applicable requirements of sections 1129(a) and 1129(b) for confirmation of the Plan. The Debtor therefore respectfully requests that the Court confirm the Plan and enter such other and further relief as is just and appropriate.

Dated: July 16, 2025

**RICHMAN & RICHMAN LLC**
**Attorneys for Debtor**

By:    /s/ Michael P. Richman
Michael P. Richman
Claire Ann Richman
Eliza M. Reyes
122 West Washington Avenue, Suite 850
Madison, WI 53703
Tel: (608) 630-8990
Fax: (608) 630-8991
mrichman@RandR.law
crichman@RandR.law
ereyes@RandR.law