UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| WISCONSIN & MILWAUKEE HOTEL, LLC, | Case No. 24-21743 |
| Debtor. | Honorable G. Michael Halfenger |

**LENDERS' SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Computershare Trust Company, N.A. (solely in its capacity as indenture trustee, taking direction from the bondholder, "Computershare") and Wisconsin & Milwaukee Hotel Funding LLC ("Funding," and together with Computershare, "Lenders"), at the request of the Court submit this supplemental brief in support of their *Motion for Relief from the Automatic Stay*, filed with the Court on June 5, 2025 (ECF #577), and tried to the Court during the weeks of July 21 and August 11, 2025 (the "Motion").

## SUPPLEMENT

Lenders submit this Supplement at the request of the Court in its October 29, 2025 docket order (the "October 29 Order"). Lenders interpret the October 29 Order to request that Lenders supplement their briefing solely on the questions specifically addressed to Lenders, and not questions addressed to Debtor. Oct. 29 Order at 1 ("Lenders' submission must address the following . . ."), 3 ("Both parties must address the following . . ."). Should the Court have additional questions, Lenders would be pleased to submit further briefing.

I. **THE EVIDENCE SHOWS THAT THE APPROPRIATE RATE OF CRAMDOWN INTEREST IS THE SAME REGARDLESS OF BASE RATE.**

Ms. Nelson testified that changing the base rate would not alter her *Till* analysis.

54798648v3

1

Case 24-21743-gmh    Doc 786    Filed 11/13/25    Page 1 of 7

> I could have started with a treasury rate, but because the treasury rate is a risk-free rate, I would have had to make larger adjustments to account for the inherent risk associated with the prime rate, which already has some risk built into it. So my adjustments with respect to the factors, each of the factors would have been greater because I'm looking at the overall risk that needs to be compensated—for which the lender needs to be compensated. So it just would have been larger adjustments on top of a treasury rate.

Nelson, Aug. 14, at 46.

> But again, it's a red herring. It doesn't matter what the base rate is. What matters is the amount of the adjustment to figure out what the risks are that are imposed by the plan of reorganization on the lender.

Nelson, Aug. 14, at 89.

Changing the base rate should not alter the Court's conclusion of an appropriate rate of cramdown interest either. Ms. Nelson's testimony that "it doesn't matter" what the base rate is, and that her adjustments would have to "account for the inherent risk associated with the prime rate," is evidence that her adjustments to a Treasury rate would not only be "larger," but specifically, would have increased the interest rate *to the level of prime* before applying the *Till*-based risk factors. If it "mattered" what the base rate were, it would mean that Ms. Nelson's conclusion could have been different by starting from a Treasury rate. She clearly testified that it did not matter because the resulting, pre-*Till* adjustments would have to "account for the inherent risk associated with the prime rate" even if Treasury were used. To "account for" that risk, the pre-*Till* adjustment would have to arrive at prime.

Perhaps anticipating this answer, the Court stated in the October 29 Order: "That, however, would seem no different than starting at the prime rate in the first place . . . ." Oct. 29 Order at 2. Indeed, this was Ms. Nelson's expert testimony—and the only testimony the Court received on this subject—and there is nothing at all problematic with Ms. Nelson's conclusion.

The Court of Appeals for the Seventh Circuit endorsed this conclusion in *Koopmans v. Farm Credit Services of Mid-America, ACA*, 102 F.3d 874, 875 (7th Cir. 1996) (Easterbrook, J.), a pre-*Till* chapter 12 case (also cited by Debtor) that considered whether a secured creditor was receiving the "indubitable equivalence" of its property interest. The Court of Appeals applied the "coerced loan" approach, and affirmed the bankruptcy court's order that applied a "prime-plus" rate of interest to the plan.

*Koopmans* obviously involved a different set of facts, and the *Till* plurality clearly rejected the coerced loan approach, but the Court of Appeals had occasion to address the broader question—still relevant after *Till*—whether the bankruptcy court should have started from the Treasury rate in a "prime-plus" analysis:

> What the standing Chapter 12 Trustee, representing the interests of unsecured creditors, favors is the rate the federal government pays to borrow money (the "T-Bill rate for short). At times the Trustee appears to concede that this rate may be adjusted for risk; *if so, that comes to the same thing as prime-plus, although the adjustment may be larger*. The prime rate of interest is the benchmark rate for the banks' most credit-worthy customers, but even blue-chip debtors are more likely to default than is the United States government, so the prime rate exceeds the T-Bill rate. Because the prime rate includes some compensation for the risk of non-repayment, the add-on for less creditworthy customers is less than it would be if the court started with the risk-free T-Bill rate. . . . *Because adjustments would make the final interest rate the same whether the bankruptcy court starts with the prime rate or the T-Bill rate, the choice of nomenclature is irrelevant—although it is best to stick with the market's approach to estimating the risk premium.* On this record, the market's approach is prime-plus.

*Id.* (emphasis added).[1]

---

[1] The Court of Appeals' treasury-vs.-prime rationale is equally applicable to cases arising under other chapters of the Bankruptcy Code. *See, e.g., In re Carson*, 227 B.R. 719, 723 (Bankr. S.D. Ind. 1998) (applying *Koopmans* rationale in chapter 13 case).

Like the Court of Appeals for the Eighth Circuit in *Topp*, then, the Court of Appeals for the Seventh Circuit recognizes that the choice of a base rate is irrelevant because the adjustment necessary for an analysis that begins with the lower Treasury rate must "account for" (to borrow Ms. Nelson's words) the risk inherent in prime. *See also In re Topp*, 75 F.4th 959, 962-63 (8th Cir. 2023) (noting that "the appropriate risk adjustment depends on the risk already accounted for in the starting rate."). Even so, the Seventh Circuit thought it "best to stick with the market's approach to estimating the risk premium." *Koopmans*, 102 F.3d at 875. In this case, that "market" approach is the prime rate, which "tak[es] its cue from ordinary lending practices." *Till v. SCS Credit Corp.*, 541 U.S. 465, 478-79 (2004).

At trial, Debtor offered *no evidence* that use of a Treasury rate is appropriate for a loan of the type proposed here. Debtor championed the broad commonality of "real estate loans" to justify use of a Treasury base rate, but then admitted that all of the real estate loans it considered were fundamentally different from the loan proposed here in terms of duration, loan-to-value ratios, and so on. Friedland, Aug. 11, at 54-56, 58-64. At best, Debtor offered evidence of what lending rates might be for credit-worthy borrowers holding assets that conform with customary underwriting criteria for upscale hotels. In other words, not this situation—not this Hotel.[2]

When a debtor offers no evidence to show that a Treasury base rate is appropriate for the loan proposed in a plan, the proper approach is to reject that base rate and stick with what eight justices of the Supreme Court concluded was already—"concededly" and "indisputably"—too low of a base rate for bankrupt borrowers: the prime rate. *Till*, 541 U.S. at 479 (plurality

---

[2] The Court asked Debtor to identify "the maximum rate for which the plan could 'conceivably still be modified and be confirmable'? . . . And how can the court reach such a conclusion on the existing record?" Oct. 29 Order at 3. Consistent with the Court's latter inquiry, Lenders object to any attempt by Debtor to introduce evidence not presented at trial.

opinion), 498 (Scalia, J., dissenting).[3] *See also In re McCoy*, 657 B.R. 260, 263 (Bankr. N.D. Ill. 2024) (rejecting use of Treasury base rate because "McCoy offers no evidence that this low rate is appropriate for a car loan.").

The Court also asks Lenders to address why it would be "appropriate to include the total amount by which the prime rate exceeds the treasury rate in determining what discount (cramdown) rate is fair and equitable, given that the lender here will incur no such costs [of making loans]?" Oct. 29 Order at 2. To begin, recall that the parties have agreed it is Debtor's burden, not Lenders', to show that a base rate other than prime is appropriate. Resp. at 6. Debtor has never argued that prime is inappropriate because it includes an adjustment for lenders' costs of making loans, perhaps because these are "necessary components of *any* commercial lending rate, since creditors will not lend money if they cannot recover their costs and return a level of profit sufficient to prevent their investors from going elsewhere." *Till*, 541 U.S. at 497 (Scalia, J., dissenting and citing *Koopmans*). *See also* Friedland, Aug. 11, at 30-34 (testifying that even non-bankruptcy real estate loans with different durations and LTVs include "spreads" over Treasury rates).

But more to the point, Lenders dispute that they "will incur no such costs" here. Lenders have endured a lengthy, contested chapter 11 process, and will face the uncertainties of an 18-year loan term if Debtor's plan is confirmed. Lenders' costs of ordinary loan origination and monitoring procedures are replaced in this bankruptcy case by the far larger costs of attorneys and other professionals needed to ensure the secured creditor's rights are protected. To argue that "costs" should be subtracted from the prime rate is to ignore these significant bankruptcy

---

[3] Indeed, all nine Justices believed that the starting point for a cramdown interest rate analysis should be the prime rate. *See Till*, 541 U.S. at 491 (concluding that cramdown rate must be equal to or greater than the "risk-free" rate) (Thomas, J., concurring), 488 n.2 (stating that the prime rate most closely approximates the riskless or pure rate for money) (Thomas, J., concurring).

expenses. *See In re Walkabout Creek Ltd. Dividend Housing Assn. L.P.*, 460 B.R. 567, 577-78 (Bankr. D.D.C. 2011) ("In any event, the transaction costs a secured lender incurs in monitoring a bankruptcy confirmation process in a chapter 11 case are probably at least as significant, or more so, as would occur in making a loan.").

No amount of evidence would tell the Court exactly how the Treasury rate should be adjusted for these costs. *See, e.g., Walkabout Creek*, 460 B.R. at 578 ("[M]arket rates of interest are not nicely broken down in the *Wall Street Journal* as to their various components for such things as risk, transaction costs, costs of administration, and profit."). This is one of the reasons why starting from a Treasury rate would be inappropriate: it would negate the benefits of having a presumptive rate in the first place. The Court of Appeals for the Seventh Circuit cautioned against the "intellectual exercise" of prime rate "reconstructions." *Koopmans*, 102 F.3d at 875-77 ("Far better to read this cost of capital from newspaper tables based on actual transactions in competitive markets than to reconstruct it in a factual vacuum as an intellectual exercise. Tables may err, but reconstructions are bound to do worse."). *See also Till*, 541 U.S. at 478-79 (relying on prime, the "financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default."). This Court, too, should start from the prime rate, rather than trying to parse the various components of the Treasury-prime spread.

## II. THE LWHA REPORT MISSTATES THE AVERAGE DISCOUNT RATE FOR UPPER-UPSCALE HOTELS.

The Court cites the LW Hospitality Advisors Report at page 120 for the proposition that "discount rates for luxury/upper-upscale hotels ranged from 7.5 [percent] to 11.0 [percent] with an average of 6.63 [percent]." Oct. 29 Order at 2. For the record, this is an accurate quote from the LWHA report, but the source data from the PwC Hotel Investor Survey, shown on page 119

of the LWHA report, indicate that the correct average was 9.63%, not 6.63%. (ECF #652-1 at 119).

## III. THE PARTIES DISAGREE ON SEVERAL MATTERS OF SCHEDULING.

Although the parties have agreed on most of the hypothetical confirmation schedule (their joint scheduling proposal will be submitted on November 14), there is disagreement on several important points, each of which will be highlighted in the November 14 submission. Lenders' brief statements of position on these contested points are to be incorporated herein.

### CONCLUSION

For all of the reasons set forth herein and in Lenders' briefs in support of the Motion, the Court should grant the Motion and lift the automatic stay immediately.

DATE: November 13, 2025     COMPUTERSHARE TRUST COMPANY, N.A.
                            WISCONSIN & MILWAUKEE HOTEL FUNDING LLC

                            BY: */s/ Frank W. DiCastri*

                            Frank W. DiCastri
                            Sara C. McNamara
                            REINHART BOERNER VAN DEUREN s.c.
                            1000 North Water Street, Suite 1700
                            Milwaukee, WI 53202-3186
                            414-298-1000
                            fdicastri@reinhartlaw.com
                            smcnamara@reinhartlaw.com