**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

In re:

Wisconsin & Milwaukee Hotel LLC,

Case No. 24-21743-gmh
Chapter 11

Debtor.

**DEBTOR'S SUPPLEMENTAL SUBMISSION IN RESPONSE TO
COURT'S DOCKET TEXT ORDER OF OCTOBER 29, 2025 [DOC 774],
IN FURTHER OPPOSITION TO LENDERS' MOTION FOR
RELIEF FROM THE AUTOMATIC STAY**

Wisconsin & Milwaukee Hotel LLC (the "**Debtor**" or "**WMH**"), the debtor in this chapter 11 case, by and through its attorneys, Richman & Richman LLC, by Michael P. Richman, hereby makes this supplemental submission in compliance with the Court's Docket Text Order [Doc 774] of October 29, 2025 ("**DTO**"), and in further opposition to the June 5, 2025 Motion for Relief from the Automatic Stay filed by Computershare Trust Company, N.A. ("**Computershare**") and Wisconsin & Milwaukee Hotel Funding LLC ("**WMH Funding**," and collectively with Computershare, the "**Lenders**") [Doc 577] ("**Lift Stay Motion**"), and the Lenders' July 18, 2025 Supplement to Motion for Relief from the Automatic Stay [Doc 659] ("**LS Supp**").

## I.    Application of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004)

The questions posed by the Court in the DTO are subsets of the question whether and how the *Till* decision is applicable to the determination of a cramdown interest rate in chapter 11. The Debtor's Post-Hearing Brief in Opposition to Lenders'

1

Motion for Relief from the Automatic Stay ("**Debtor's Post-Hearing Brief**") [Doc 752] surveyed *Till* and numerous cases applying *Till* and concluded that in a chapter 11 case (particularly where, as here, there is a $26 million hotel property and a secured cramdown loan, not an $8,000 used truck financing), the plurality opinion in *Till* did not require literal application of "prime plus 1-3%," but instead should be read as guidance about how to further its articulated goals of simplicity, and avoidance of theories (which the Supreme Court expressly rejected) that require expensive litigation for determining the cramdown rate based on rates that might be charged if a loan with the same economic characteristics as the cramdown loan were made outside bankruptcy.

The only reference to chapter 11 in the *Till* plurality opinion is the *dicta* of footnote 14, which suggested that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." The Court was thinking of debtor-in-possession financing, which is inapplicable here. There is no market (as both the Debtor and Lenders agreed) for a loan with the economic characteristics of the cramdown loan proposed in this case. *There is likely no non-bankruptcy market for any cramdown loan in any chapter 11 case.* Apart from that footnote musing, and relevant to the questions raised by the DTO, the Court appeared to reason that extensive competing evidence of how a cramdown loan might be priced outside of bankruptcy, using similar economic characteristics, was not an appropriate process.

"[We] reject the coerced loan, the presumptive contract rate, and the cost of funds approaches. Each of these approaches is complicated, imposes significant

2

evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value. For example, the coerced loan approach requires bankruptcy courts to consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors – an inquiry far removed from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans."[1]

The Court also said that "the debtor and any creditors may present evidence about the appropriate risk adjustment, *Till* at 479, and that the burden of adjusting the interest rate higher than the debtor's rate would be on the creditor. "[S]tarting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing." *Id*. (emphasis in original).[2]

Other parts of the plurality opinion make clear that the risk adjustment was meant to be tied to the *risk of default under the proposed plan. See, e.g., id*. at 480-81, and 484. If the risk adjustment were meant to be tied to evidence of interest rates that might be charged for hypothetical non-bankruptcy loans with similar economic characteristics, that would defeat the Court's purpose of rejecting the coerced and forced loan approaches.

Subsequent cases demonstrated that bankruptcy and other courts have been

---

[1] The plurality opinion (Stevens, J.) rejected the "coerced" or "forced loan" approach that had been employed by the Seventh Circuit, which focused on "the interest rate 'that the creditor in question would obtain in making a new loan in the same industry to a debtor who is similarly situated, although not in bankruptcy.'" *Till* at 472 (quoting from *In re Till*, 301 F.3d 583,591 (7th Cir. 2002). "[W]e think Congress would favor an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary hearings." *Till* at 474-75.

[2] "[T]he formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate." *Till* at 484-85.

3

willing to permit and accept evidence from debtors of a starting base rate different from the commercial prime rate. In such cases the debtor has the burden of showing the propriety of a different base rate, and in this case the Debtor met that burden by presenting extensive evidence supporting the use of a Treasury security yield (here, the 5-year Treasury security, currently at about 3.7%) for a loan secured by real estate, instead of the commercial prime rate (currently at 7%).[3] The Debtor also proposed a risk adjustment of nearly 3% (2.7%). In doing so, the Debtor acknowledged risk at the high end of the suggested range, and supported its rate with extensive projections of performance (including the required $8 million equity infusion from the pre-Effective Date auction) over the life of the Plan. Although the Lenders' only witness testified that there was inherent risk in any projections over 18 years, she did not otherwise refute the Debtor's feasibility evidence which showed a low risk of default where there is ample ability to make all the loan payments under the cramdown loan (including the likelihood that the Hotel value would exceed substantially the balloon amount in 2043, thereby facilitating refinancing and payment of it).

## II. DTO Request for Submission to Address Evidence for Risk Adjustment: 270 basis points vs. 389 basis points

The Lenders' proffered risk adjustment of 389 basis points was not supported with evidence of the risk of default in the payment of the cramdown loan from and

---

[3] Lenders expert witness Cynthia Nelson also testified that the five-year Treasury yield is commonly used for commercial real estate loans, and that in fact she used it as the cramdown base rate prior to *Till*. See August 14 Hearing Transcript ("**HT**") at pp. 45, 87.

after the Plan Effective Date, which is the only relevant risk that could support an upward interest rate risk adjustment under *Till*. They also failed to offer evidence of the risk adjustment they would proffer if the base rate were the Treasury security yield, despite knowing since the June 27, 2025 filing of Debtor's Second Amended Plan [Doc 621] that the Debtor was seeking Court approval of a Treasury yield base rate.

The Lenders' only witness, Cynthia Nelson of FTI, claimed she was assessing the feasibility and default risk of the Debtor's Plan, but she made a major material error. Her testimony was based almost entirely (and repeatedly) on the same pre-Effective Date risks (obtaining the amended Marriott franchise agreement, and Marriott's agreement to renovation costs and a guarantor, identity of the "borrower" (*i.e.*, the prevailing party in the equity auction, who would own the Debtor borrower) and assurance of funding (from the equity auction)). All those risks are inextricably tied to required conditions to the Effective Date, and therefore must all be resolved before any cramdown loan (and default risk) take effect. The cramdown loan is a creature exclusively of a confirmed and effective plan.

From the Nelson Hearing Transcript of August 14, 2025 ("**HT**"), pp. 21-23:

Q: To the best of your knowledge, were the materials that you reviewed, were they complete and accurate?
A: Yes.
Q: Okay. Are there any materials that you wanted to review as part of your task but not have or were not provided to you.
A: Well, I keep hoping to see an agreed franchise agreement with Marriott or at least an agreed term sheet. And as far as I know, that doesn't exist and if it does, I haven't seen it. I would have liked to have seen an agreed scope and timing and an associated budget for the renovation or the property improvement program for the hotel and my understanding is that doesn't exist.

5

There are assumptions in the projections [with respect to the property improvement], but I haven't seen an actual agreement with respect to those renovations, nor have I seen an agreed guarantor or information about a guarantor that Marriott will require for its franchise agreement.

Q: Okay. And why are those documents ordinarily important in the type of analysis that you do?

A: *I am assessing what the risks are associated with the plan of reorganization, as well as its feasibility. And those – the agreement for the hotel under a franchise agreement with a brand like Marriott is a very important determinant of that hotel's performance and if there's uncertainty about that, it adds risk associated with feasibility, as well as the appropriate interest rate*." (emphasis supplied).[4]

This significant error was amplified, when near the end of Ms. Nelson's testimony Lenders' counsel asked her to give a summation of "some of the uncertainties or unknowns about the plan that have given you concern in your [overall] risk adjustments and your interest rate analysis."

A: So I've discussed several of those. A principal one is whether the fact that there's not an agreed Marriott franchise agreement, that we don't have an agreed scope, cost or timing for the renovations, that it's not absolutely clear

---

[4] A few minutes later, after testifying about the loan-to-value ratio, Nelson reiterated that she "looked at the – considered the uncertainty regarding who the – if there's a franchise agreement in place, what the terms of that franchise agreement would be and whether or not there is an agreed scope and cost and timeline for renovations, and that is uncertain as well. I also looked at if there's a definitive source of funding that, you know, that's not at all questionable in terms of being able to finance the improvements. I also considered that the plan is over 18 years. That's not – I know you can, in certain cases, you can get financing, but that's not customarily the term for a real estate loan in the market generally. And then I also considered, as a result of the third amended plan, that when the court is going to be setting the interest rate, the identity of the borrower will not even be known because the auction will not have occurred." HT, pp. 41-42. In all this she erred in failing to take into account that (a) the identity of the borrower does not change in an equity auction, and the prevailing auction party will be known before there is an Effective Date, (b) like the franchise agreement, the conduct of the auction has to occur before and as a condition of the Effective Date, so it has no relationship to a cramdown interest rate adjustment, (c) the auction will result in at least $8 million to fund renovations (as other testimony demonstrated), and (d) the unrefuted evidence of Debtor's feasibility projections showed abundant cash availability to pay all Plan obligations including renovations, even without the $8 million infusions, all of which contradicted her testimony that there would be uncertainty about the "definitive source of funding" that will be available for renovations. Lenders' counsel followed up that testimony by asking about the loan that is proposed to be made to back the equity auction bid of the Debtor's managing member, which led her to suggest that uncertainty there also justified a higher post-Effective Date risk adjustment. But again, those uncertainties if any are required in the Plan to be eliminated as conditions to Plan effectiveness, so they have nothing to do with the risk of default of the post-Effective Date cramdown loan.

to me what the funding source is and that there is a definitive commitment for the $8 million to be funded by the Debtor for those renovations if it's the successful bidder. There are concerns about the identity of the borrower, given the structure of the auction that will be occurring after the plan is confirmed and an interest rate is set and, in fact, we won't even have the bid procedures known at the time of plan confirmation. And there are, you know, just inherent uncertainties related to just an 18-year plan and 18 years' worth of operations, more so than if you have a two- or three-year set of projections. HT, pp. 67-68.

At this point, after colloquy with the Court, Lenders' counsel must have realized that this testimony related nearly exclusively to conditions of Plan effectiveness that would have to be resolved before the cramdown loan goes into effect, and therefore irrelevant to default risk in the post-Effective Date cramdown loan. He thus asked:

> Q: So which of the uncertainties that you've identified do you believe the Debtor could address or remedy?
> A: My understanding is the Debtor may be able to get an agreed franchise agreement with Marriott with very specific terms that could, you know, agree with Marriott what the renovation is, the scope, what the timing of that, what the dollar amount is in a manner that's consistent with the projections. It could be more definitive in terms of its funding source. I think it could provide documentation or testimony with respect to that and agreements. So those – if, in fact, those were addressed, *I believe the risk is lowered and the interest rate should be lower* because I think some of the adjustments wouldn't be as great. There remain fundamental issues that I think are inherent in the plan that I don't believe will be addressed. The loan-to-value ratio is still going to be 100 percent, we've still got an 18-year plan, and the way the plan is structured right now, we will not know the identity of the borrower. . ..
> Q: Okay. *And how much do you think the interest rate could be lowered if these correctable deficiencies or uncertainties that you've identified are, in fact, addressed?*
> A: . . . If what we're left with is the loan-to-value, the 18-year plan, and no identity of the – not knowing the identity of the borrower, although that's mitigated to some extent just because Marriott has to agree to everything under what has been described as requirements of the auction, *it's still a loan-to-value of 100 percent* and I'm looking at what investors require for that type of investment. . .. So in my view, given the market indications of required interest rates based on leverage required investor yields, *I think it's a minimum of 11 percent just on that factor alone.* (emphasis supplied.)

Ms. Nelson appeared to be saying in this summary that if the only elements of risk were those inherent in a high loan-to-value ratio ("**LTV**") and a long projection period (inherent because she did not provide testimony about specific risk with this Plan, with this ownership, or with these projections), she would have reduced her concluded cramdown interest rate by only 39 basis points (11.39% to 11%). That means that in her summation she implied she would attribute 350 basis points of risk on the basis of the LTV, in complete contradiction of her earlier testimony (discussed below) in which she several times ascribed 200 basis points of risk adjustment to the LTV.[5]

It is a material error and inconsistent with *Till* for the witness to have based her opinion on the risk adjustment with reference to the way a loan with the economic characteristics of a cramdown loan would be treated outside bankruptcy. This was especially the case with her testimony about the LTV of 100% (which is nearly always the case with a cramdown loan, given the requirements for secured claim treatment under sections 506, 1129, and 1111(b)). She said "customarily, financing is not available equal to the value of the property; it's some portion of that to provide a lender some cushion in the event of non-payment or deferred payment. So that was a very significant factor." HT, p. 41. Furthermore, she adjusted the interest rate upward on the basis only of the LTV on the Effective Date, and took no account of the Effective Date infusion of $8 million or the projected improvement in LTV over time as the loan amounts are paid and the property increases in value.

---

[5] At one point she said "at least" 200 basis points.

Case 24-21743-gmh    Doc 787    Filed 11/13/25    Page 8 of 23

The determination of a risk adjustment on the basis of assumptions about how a non-bankruptcy loan with similar economic characteristics would be priced is a methodology that was rejected by the Court in *Till*. This error infused her entire opinion. Her reasoning was that such an LTV creates a *per se* high risk of default because the owners have no "skin in the game." She opined on this basis that the risk adjustment should be *at least* 200 basis points. *But she was not able, when asked, to identify any way that there was such a risk of default in the Debtor's particular Plan.* Nor did she take account of the significant "skin in the game" that, as a condition of the Effective Date, is the requirement of an equity infusion of at least $8 million.

Nelson's core testimony (prior to the summation above in which Lenders' counsel tried to lead her away from the pre-Effective Date conditions (uncertainties) that had to be resolved), tethered her proposed risk adjustments more specifically to the four factors that the *Till* plurality believed were relevant to determining the risk adjustment in a cramdown loan. She testified about the factors this way: "my initial adjustment was 50 basis points for circumstances of the estate, 200 basis points for loan-to-value, 200 basis points for feasibility, and 59 basis points for the 18-year duration." HT, p. 62. Then, in consideration of the Second Amended Plan's adjustment of interest rates every ten years, which she believed reduced the Lenders' risks under the "duration" factor, she reduced the cramdown rate by 59 basis points to 12%. When the Third Plan proposed to adjust rates every five years, she reduced the cramdown rate further under the "duration" factor another 61 basis points to 11.39%. *Id.*, p. 63. Thus, prior to her summation, her risk adjustment of 389 basis

9

points was comprised of (1) 50 basis points for circumstances of the estate, (2) 200 basis points for LTV, (3) 200 basis points for feasibility, less (4) 61 basis points for duration.

In discussing "the circumstances of the estate," HT, p. 47, Ms. Nelson ignored the $8 million equity infusion on the Effective Date, even though she said that the only thing she looked at was whether the borrower or sponsor would "have skin in the game. . .. [L]enders are going to very much look at who actually is the borrower, who's the sponsor and are they incented to continue to be involved with and maintain the value of the collateral." *Id*. This reinforced her methodology errors. The identity of the equity auction winner (which she variously referred to as the borrower or the sponsor) has to be known before the Plan is effective. And the equity auction will (as an Effective Date condition) produce an investment of at least $8 million, which is substantial "skin in the game" by any measure. She later conceded that an $8 million infusion would be "a lot of skin in the game," HT, p. 107. The "circumstances of the estate" factor refers to the circumstances underlying the cramdown loan *after* the Effective Date, not the uncertainty today of getting to the Effective Date. She concluded that these risks should result in an interest rate increase of 50 basis points. HT, pp. 53-54.

The second factor on which she based her opinion was the "nature of the security." Here she relied on the LTV. She said, referring to non-bankruptcy loans, that "[i]f the loan-to-value ratio is low, there's lower risk; if the loan-to-value ratio is high, there's greater risk and that is something for which there needs to be an

adjustment." *Id.* This testimony was strictly limited to assumptions about non-bankruptcy 100% LTV loans which she said are *ordinarily not even made.* Id., pp. 55-57. She did not provide testimony about any manner in which a high LTV would relate in any way to a default risk *in this case.* For this factor she opined that the interest rate should be increased by another 200 basis points. HT, p. 54.

The third factor was "feasibility." Although she said she asks "what are the operations, what are the risks to the cashflow, where are the uncertainties and risks in just operating and receiving a stream of payments over time," she answered those by relying once more on the exact same pre-Effective Date conditions that led her to a 50 basis point increase under the "circumstances of the estate" factor. If those "circumstances of the estate" already accounted for 50 basis points, it makes no sense to say that they should support another 200 basis point increase under a factor with a different name. The risks do not happen (nor should they be counted) twice. In either case, whether under "circumstances of the estate" or "feasibility," these "risks" are not germane to default risk of a post-Effective Date cramdown loan because they must be resolved before the cramdown loan is effective. She said "uncertainty related to the Marriott franchise agreement. We don't have an agreed franchise agreement; we don't know what the terms will be. And hand-in-hand with that goes what the renovations will be that are required." *Id.*, p. 48.[6] Confusing "feasibility" risk

---

[6] A few minutes later she added to this, saying that "[w]e don't know who the guarantor ultimately will be,' or the financial wherewithal of the equity auction winner, at the time the interest rate must be set. *Id.*, p. 49. But those will be known and resolved before the loan goes into effect and it is erroneous and illogical to suggest that the uncertainty of those items today should be manifested in a higher cramdown interest rate.

11

adjustment further with respect to pre-feasibility factors:

> "There are uncertainties, as I've discussed, with respect to the Marriott franchise agreement, which is really absolutely critical for this hotel and what is proposed under the plan. We still don't have an agreement that at least I've seen, an agreed franchise agreement, nor do we have an agreed scope for the renovations and costs and timing for the renovations over time. So those continue to be risks that I see. And then again, just real clarity about the funding that's going to be available to finance those improvements over time all contribute, in my mind, to feasibility risks." HT, p. 58.

On cross-examination with respect to the feasibility risk factor, she further confirmed that substantially the entirety of the basis for her feasibility risk adjustment of 200 basis points was attributable to "risks" that must be eliminated before the Plan is effective and before the cramdown loan takes effect:

> Q: Would I summarize . . . [your plan feasibility] opinion correctly if I said that you concluded that the Debtor's plan was not feasible because you haven't seen an agreed Marriott franchise agreement, you haven't seen an agreed guarantor for that franchise agreement, you believe that the $8 million equity infusion is uncertain, that the projected renovation costs may change, and that the plan is not able to support the stream of payments that would be required based on your concluded rate of interest?
> A: I think there may be some other factors, but that covers most of it. HT, p. 90.

A few minutes later, Ms. Nelson conceded that the Debtor's Plan would be feasible "[i]f the Court adopts the Debtor's interest rate, and if prior to the time that the plan becomes effective, the Marriott Franchise Agreement is assumed, there is a new agreed and approved guarantor, and the equity auction is successfully completed, resulting in an infusion of $8 million to the estate." HT, pp. 97-98 (initially answering "no" on the basis of the Lenders' proffered interest rate, but changing answer to "it likely is" feasible when asked to assume the Debtor's interest rate is adopted). Conceding that the Plan is feasible (which is possible only if all those pre-

Effective Date conditions are met) means that the Lenders failed to present any basis for any risk adjustment for the "feasibility" factor. This concession also removes any basis for the 50 basis point risk adjustment opined for the "circumstances of the estate" factor, because that adjustment relied on all the same pre-Effective Date conditions.

Ms. Nelson did testify elsewhere with respect to feasibility that cash flow projections over 18 years create an inherent uncertainty, and greater risk, but she did not refer to any part of the Debtor's projections nor did she specify a particular part of her 200 basis point feasibility risk adjustment that would be applicable to such long-term cash flow projection risk. In fact, in her summation (discussed above), when the pre-Effective Date uncertainties were filtered out, leaving only the inherent 18-year projection risk, she made no downward adjustment to this feasibility factor (and 200 basis point increase) at all. There was no testimony apportioning any part of the feasibility adjustment to long-term projection risk.

The fourth factor was "duration." Here she credited the Debtor's proposal to modify the interest rates periodically as protecting the Lenders and requiring a relatively small risk adjustment downward of 61 basis points. HT, p. 60.

Nelson testified several times that her "nature of the security" risk adjustment for a 100% LTV should be 200 basis points because in non-bankruptcy contexts a high LTV is a marker of default risk. As she seemed to explain it, in a non-bankruptcy context, when a borrower has no equity or "skin in the game," there is an increased likelihood they will default and abandon the property. But she did not apply that to

chapter 11 or to this Plan. The LTV should be irrelevant to a chapter 11 cramdown loan, because definitionally the LTV will always be at least 100% (unless, as here, the Debtor has a mechanism to assure an infusion of at least $8 million in capital, and a projected $2 million in cash on hand, as well as renovation reserves of $500,000, which would be additional value/security above the fair market value of the Hotel). The cramdown loan amount must be at least equal to the collateral value (whether under sections 506, 1129 or 1111(b)). Regular application of risk adjustments applicable to non-bankruptcy high LTV loans would penalize chapter 11 debtors and make it substantially more difficult to confirm plans, because such higher interest rates would necessarily imperil feasibility (by requiring substantially higher payments). The plurality in *Till* noted that in setting the cramdown rate the Court should be mindful of its effect on feasibility: "[t]ogether with the cram down provision, this requirement obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Till*, 541 U.S. at 480.

If there is risk of default, it should be based upon the actual Plan and projections. Ms. Nelson failed to do that (beyond the vague and indisputable assertion that projections have uncertainty over long time periods). She conceded that an $8 million infusion would be "a lot of skin in the game," HT, p. 107, but did not credit that investment in her LTV analysis. There is no evidence, nor inference, nor reason to believe that the owners would be prone to default where they will have so much new money at risk. To protect such a large investment the owners would be incentivized to assure continued loan compliance. In addition, the Debtor's

14

projections showed that the property and business would likely enjoy normal and regular value appreciations over time, as the cramdown loan is paid down, such that the LTV will steadily improve. Indeed, from a present value perspective, on the Effective Date the Lenders will have a $26 million loan secured by $34 million in value: a Hotel valued at $26 million, plus (excluding cash and reserves of $2.5 million) $8 million in fresh capital, which is an LTV of 76.5%.

In the first part of the DTO, the Court requests that the Lenders explain what evidence, if any, supports the argument that the risk adjustments they advocated to the commercial prime rate should be "larger" if the Court adopts the five-year Treasury security yield as the base rate. The Lenders' witness Nelson said that the commercial prime rate already had an "inherent risk" but did not quantify it in any way. "[B]ecause the treasury rate is a risk-free rate, I would have had to make larger adjustments to account for the inherent risk associated with the prime rate, which already has some risk built into it. So my adjustments with respect to the factors, each of the factors would have been greater because I'm looking at the overall risk that needs to be compensated – for which the lender needs to be compensated. So it just would have been larger adjustments on top of a treasury rate." Aug. 14 HT, p. 46.

This nonspecific "adjustment" testimony also suffered from another material methodological error. Nelson failed to account for the fact that the risk component of the commercial prime rate is mitigated where a loan is secured by real estate (and is a reason why secured real estate loans are most often priced from lower base rates

like the Treasury yield).

Although she was aware for a long time (from the Second Amended Plan of June 27, 2025 [Doc 621]) that the Debtor was advocating a Treasury yield base rate, Ms. Nelson failed to testify to the risk adjustment she would consider appropriate if that base rate were adopted by the Court. At one point she called the base rate a "red herring," suggesting that the risk adjustment would be the same for either base rate. "It doesn't matter what the base rate is. What matters is the amount of the adjustment to figure out *what the risks are that are imposed by the plan of reorganization*." Aug. 14 HT, p. 89 (emphasis supplied). "I looked at the bond market, the high yield financing market… Looked at—this would not be an investment-grade investment. I looked at CCC rated investments and what rating agencies' criteria are." Aug. 14 HT, p. 65. She also testified that she "look[ed] at market indicators wherever [she] can" in developing risk adjustments. *Id.*, p. 64. Ms. Nelson confirmed upon cross-examination that she would "describe [her] methodology as being based on a market for comparable non-bankruptcy loans." *Id.*, p. 105. Ms. Nelson testified that she looked at various materials which "provided indications of what the market rates were for financing based on various loan-to-value ratios for hospitality properties." *Id.*, p. 57.

There is nothing in the record that would support a different (higher) risk adjustment if the Court determines to a lower Treasury security base rate. Ms. Nelson was invited to provide specification and declined. In fact, as the Court's research disclosed (C.B. Reehl & Stephen P. Milner, *Chapter 11 Real Estate Cram-*

*Down Plans: The Legacy of Till*, 30 Cal. Bankr. J. 405, 407 (2010)), the prime rate is *not* priced with respect to the risk of a particular loan, and bears no relationship whatsoever to the Treasury rate. It is priced as a spread to the Federal Funds rate (today, 3.75% - 4%), which is the money that commercial banks borrow from the Federal Reserve in order to make commercial loans, and is meant to "cover banks' cost of making loans and approximates the banks' break-even interest rate." DTO, para. 4. Those "costs" are irrelevant here. This is not a banking system issue, but rather a bankruptcy cramdown loan. No Federal Funds are being borrowed by the Lenders (and none need to be repaid) to make a loan, and there are no lending costs involved.[7]

### III.   Debtor Justification for 6.5% Cramdown Interest Rate

The second section of the DTO asks that the Debtor address the evidence that supports its proposed 270 basis point risk adjustment, and justify how its proposed 6.5% cramdown rate is fair and equitable where the cramdown loan obligation will have 100% LTV, economic characteristics that carry rates as high as 13% in non-bankruptcy financial markets. The Court also asks the Debtor to justify the reasonableness of the 6.5% cramdown rate as a discount rate, where the appraisal testimony previously was that an appropriate discount rate was 11%.

Debtor believes that the risk adjustment called for by *Till* is meant to reflect

---

[7] The Lenders are not commercial lending institutions, and Federal Funds were not part of the loans to the Debtor when those loans were originally made. The funds came from bondholders, who purchased bonds in order to qualify for U.S. visas. Additionally, the commercial prime rate was never utilized in this case. The original loans were priced as (according to the evidence) most real estate/hotel financings, utilizing the low base rate of LIBOR (similar to SOFR, which replaced it as a base rate recently), and both of which are quite close to the Treasury security yield.

17

the risk of feasibility of the Debtor's Plan, and not the risk or pricing for risk of non-bankruptcy loans that might have similar economic characteristics. Thus, the Debtor's support for its 270 basis point adjustment (which is at the high end of the 1-3% adjustment guidance from *Till*) was its unrefuted projections, and the testimony of William Pederson, that demonstrated that the risks of default were relatively low.[8] The Debtor submits that non-bankruptcy loan pricing for 100% LTV loans is irrelevant and inconsistent with *Till's* guidance.

The non-bankruptcy loan pricing of high LTV loans should also be rejected, because it would impose non-bankruptcy considerations (lack of "skin in the game" in a 100% LTV) and the high LTV relationship to default, on a bankruptcy plan which has substantial skin in the game, and projections of substantial income that negate the default risk. As stated above, it would also penalize chapter 11 debtors in a cramdown context because every cramdown loan starts with a 100% LTV (unless a debtor provides, as here, for a substantial equity infusion on the Effective Date, and approximately $2.5 million in additional cash and reserves).

**Comment on the Fair and Equitable Treatment of the Lenders' Claim**. In this case, the cramdown loan and risks are not just based on the property value but on the viability and value of the future cash streams that will be used to pay the loan. There is "skin in the game" because of the substantial $8 million equity infusion on the Effective Date, and the potential future dividends to owners. In addition, the projections show a regular and steady improvement in the LTV as the cramdown loan

---

[8] The Lenders' witness testified that long-term (18-year) projections have inherent risk, but she did not attempt to quantify in or otherwise equate it to a particular proffered risk adjustment.

18

is repaid and the property appreciates in value.

The Debtor's treatment of the Lenders' claim is also fair and equitable because it is consistent with, and significantly better than the treatment for which the Lenders bargained when the underlying loans were originally made in 2013. *See* Joint Stipulation of Facts [Doc 632] at ¶¶ 6-11. At that time the Hotel was a startup business with no operations history. The blended interest rate (based on the average of Notes A, B and C) was 4.88%. Based on an appraisal showing the value of the Hotel project to be $56 million in 2013, the LTV of the $44 million loan was 80%.

On a present value basis, and had the Lenders not elected treatment under section 1111(b), the cramdown loan would be $26 million secured by a $26 million Hotel and an $8 million capital infusion, for an LTV of 76.5%. As the testimony showed, that is a fairly conventional low-risk loan characteristic with "skin in the game." Because the Lenders voluntarily elected to relinquish their deficiency claim and have their entire $45 million claim secured by the Hotel, they created the circumstances for a high LTV but that election did not increase the funds they put at risk. As a consequence of the Lenders' election, it is the present value calculation requirements of section 1111(b) that require that the Lenders receive $59 million over 18 years. Even if one assumes that the higher payments required over time represent an increase in default risk, the return for the Lenders in such Plan treatment is significantly better than would have been the case without the election. The Lenders never loaned more than $45 million, even though the Debtor will pay them more in order to comply with the elected section 1111(b) treatment.

19

**Comment on Impropriety of Using Appraisal Discount Rate**. The DTO asks how the Debtor's proposed cramdown interest rate (which is also required to serve as the discount rate under *Till*) can be justified where the appraisers testified to an 11% discount rate for determining the present value of the Hotel in a fair market sale context. The short answer is that an appraiser's determination of a discount rate in a fair market value real property valuation is meant to reflect investor (potential purchaser) yield expectations. Investment returns (necessarily junior to lenders) are inherently riskier than lender returns, and hence have higher yield expectations, which leads to higher discount rates. For fair market value appraisal purposes, as described in various places in both appraisers' reports in this case (Doc 652-001 LWHA Appraisal) and (Doc 674-001 HVS Appraisal), the discount rate reflects investor expectations of equity returns, after accounting for the payment of debt. For this purpose, both appraisers consulted other sales transactions and investor surveys, and interviewed market participants, among other things.

By contrast, the discount rate to be used in accordance with *Till*, is required to be equivalent of the determined cramdown interest rate. It is necessarily lower than an appraiser's discount rate in a fair market value appraisal, because rather than reflect a fair market value sale to a purchaser with investor expectations, it is a pure mathematical calculation of the present value based on the time value of money over the period of repayment. Lenders, especially those with secured interests and foreclosure rights in the event of default, have more predictable payment streams and default remedies, and therefore take less risk, than investors.

20

There is therefore no relationship or relevancy between the appraiser's investor-oriented discount rate, and the discount rate that is the mathematical equivalent of the cramdown interest rate derived under *Till*. Under *Till*, evidence and adjudication should begin with the base rate and the risk adjustment, based on the factor of the particular case previously discussed, and in particular the risks of default of the cramdown loan. That rate then serves as the discount rate to be used mathematically for present value purposes (and in the case of the section 1111(b) election, to determine the total claim amount that will derive the required present value at that particular interest rate. "Backing into" a cramdown interest rate by starting with a calculated discount rate based on fair market value sale appraisal methodology reflecting purchaser/investor expectations in a sale context, would not only distort the interest determination for *Till* purposes, but would introduce complex and expensive litigation which the *Till* Court sought to eliminate. Engrafting such a methodology on the determination of a cramdown interest rate would be the reverse of (and contradict) the guidance from *Till*.

## IV. Debtor Position with Respect to Potential Cramdown Interest Rate Higher than 6.5%

The second section of the DTO also asked the Debtor to elaborate on the comment it made in its Post-Hearing Brief that if the Debtor's proposed cramdown rate of 6.5% is not approved, the Debtor could conceivably modify its Plan to be confirmable at a higher interest rate. The Debtor's ownership previously decided that to assure feasibility of its Plan, it should limit payments on the cramdown loan to $1.5 million a year.

21

Based upon analyses conducted by Debtor's financial advisors, from 6.4% up to 7.0%, with interest payments at $1.5 million annually, the balloon payment would rise from about $32 million to about $37 million. The Debtor reiterates its belief that its proffered adjustable rate of 270 basis points over the five-year Treasury security yield has been amply supported, and should be approved. But in response to the Court's question, the Debtor also believes it can make a strong case for Plan feasibility with higher than a 270 basis point increase to the Treasury yield, so long as the concluded rate does not exceed 7%. Above that (and the corresponding balloon payment of approximately $37 million in 2043), while feasibility may still be provable, there would be greater risk to feasibility from increased balloon payment amounts.

## CONCLUSION

For the foregoing reasons, the Court should approve the Debtor's Plan cramdown interest rate of 270 basis points above the prevailing yield on 5-year Treasury securities, the Lenders' Lift Stay Motion should be denied, and the Court should grant such other and further relief as is just and appropriate.

*[Signature appears on following page.]*

Dated: November 13, 2025       **RICHMAN & RICHMAN LLC**
                                           **Attorneys for Debtor**

By: *_/s/ Michael P. Richman_*
Michael P. Richman
Claire Ann Richman
Eliza M. Reyes
122 West Washington Avenue, Suite 850
Madison, WI 53703
Tel: (608) 630-8990
Fax: (608) 630-8991
mrichman@RandR.law
crichman@RandR.law
ereyes@RandR.law

23