So Ordered.

Dated: December 5, 2025



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

    Wisconsin & Milwaukee Hotel LLC,       Case No. 24-21743-gmh

                              Chapter 11

       Debtor.

## OPINION AND ORDER*

Computershare Trust Company, N.A., and Wisconsin & Milwaukee Hotel Funding LLC (the Lenders) have moved under 11 U.S.C. §362(d)(2) for relief from the §362(a) stay so that they can pursue their liens on the hotel that is the centerpiece of the debtor's business. They are dissatisfied with the debtor's progress toward reorganization—they would say, "lack of progress"—and they boisterously contend that the debtor's plan—amended several times—remains unconfirmable with no reasonable prospect of confirmation in view. "*Enough is enough*", they say. ECF No. 760, at 10. They feel that it is high time to sound this case's death knell by freeing them to foreclose. But, while the end may be near, it is not quite the final curtain.

# I

Section 362(d)(2) provides that "the court shall grant relief from the stay provided under subsection (a) of this section . . . (2) with respect to a stay of an act against property . . . , if—(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization". Whether the Lenders are entitled to relief under §362(d)(2) depends solely on whether the hotel is "necessary to an effective reorganization", since the debtor does not dispute that it lacks equity in the property. To show that the property is necessary to an effective reorganization, the debtor must demonstrate "that the property is essential for an effective reorganization *that is in prospect*[,] . . . mean[ing] . . . that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 370 (5th Cir. 1987), aff'd, 484 U.S. 365) (citing *id*. at 370–71 & nn.12–13).

The court held a two-part, multiple-day evidentiary hearing on the motion. In the first part, the parties presented evidence of the property's value, after which the court found that the hotel has a value of $26 million. In the second part, the parties presented feasibility evidence, principally evidence as to the appropriate discount rate that the plan must apply to deferred payments ("cramdown interest") to comply with 11 U.S.C. §1129(b)(2)(A)(i)(II) and achieve confirmation over Computershare's objection.

The Lenders' post-hearing brief contends that the debtor has no effective reorganization *in prospect*, because the debtor has dithered away the reasonable time to confirm a plan with a series of legally unsupportable amendments. They argue that the plan as currently amended cannot be confirmed: among other failings, it (still!) offends §1129(b)'s absolute priority rule by positioning the debtor's current owner as the stalking horse bidder and not allowing the Lenders to credit bid; the plan cannot meet §1129(a)(11)'s "feasibility" requirement because the debtor (still!) has not shown that

Marriott will enter an extended franchise agreement; and the plan does not comply with §1129(b)(2)'s requirement that it pay Computershare cramdown interest at a fair and equitable rate determined using the formula approach mandated by *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). The Lenders also note that the debtor reports that it will amend the plan (yet again!), even though the court has set several deadlines in this case ordering the debtor to file a final amended plan, and the debtor has repeatedly requested leave to further amend those "final" plans. ECF No. 760, at 9–10.

There is force to much of this, and the Lenders' proposed course is not untested. See, e.g., *In re River E. Plaza, LLC*, 669 F.3d 826, 833 (7th Cir. 2012) (first citing *Colon v. Option One Mortg. Corp.*, 2012) 319 F.3d 912, 916 (7th Cir. 2003); and then citing *In re Williams*, 144 F.3d 544, 546 (7th Cir. 1998)) ("But [ ] [B]ankruptcy [J]udge [Wedoff] had lost patience. He refused to consider the third proposed plan, lifted the automatic stay, and dismissed the Chapter 11 proceeding. In doing these things he did not abuse his discretion—the applicable standard of appellate review."). Still, the court must decide whether the existing record, including the evidence presented on plan feasibility, establishes that the debtor's proposed plan faces insurmountable obstacles to confirmation in the near future such that the hotel is not "necessary to an effective reorganization" for purposes of §362(d)(2) because the debtor has no reasonable possibility of a successful reorganization within a reasonable time.

## II

The Lenders' principal arguments that the debtor has no reasonable possibility of reorganization center on their contention that the proposed plan of reorganization does not satisfy the absolute priority rule.

## A

The absolute priority rule, codified in §1129(b), requires a debtor to propose a plan that "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a

reorganization] plan." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (alteration in original) (quoting *Ahlers v. Norwest Bank Worthington (In re Ahlers)*, 794 F.2d 388, 401 (8th Cir. 1986)). The absolute priority rule requires "that every cent of each class comes ahead of the first dollar of any junior class", and "[a]n objection to the plan [on absolute priority grounds] may be overridden only if every class lower in priority is wiped out." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990) (citing Walter J. Blum & Stanley A. Kaplan, *The Absolute Priority Doctrine in Corporate Reorganizations*, 41 U. Chi. L. Rev. 651 (1974)).

The debtor's proposed plan does <u>not</u> provide for the debtor's owner, Jackson Street Management LLC (JSM), to retain its existing equity interests in the reorganized debtor. See ECF No. 710, at 13.[1] Instead, the debtor's proposed plan provides that the reorganized debtor will "conduct an auction sale of equity to be newly issued on the Effective Date" and that "all Existing Equity Interests shall be extinguished upon issuance of New Common Units of the Reorganized Debtor", though JSM retains its right (based on its prepetition equity interests) to payment of any excess funds from the auction that are available after the debtor pays all allowed claims. ECF No. 710, at 4, 13 & 20. "Because no . . . distribution would be made [to JSM] unless all unsecured creditors were paid in full, plus interest," the debtor contends "that the distribution provided [to JSM] does not implicate or violate the Absolute Priority Rule under Bankruptcy Code § 1129(b)(2)(B)(ii)." *Id.* at 13.

Under the plan, JSM's existing ownership interest is "wiped out", unless all senior classes have been paid in full. That outcome does not raise an absolute priority rule problem, even if JSM wins the auction to buy the new equity interests. The plan proposes to sell new equity interests (possibly reflecting, one supposes, perceived undervaluation of its real estate, benefit in its debt restructuring, or some control value

---

[1] JSM owns a 99.99% membership interest in the debtor. ECF No. 710, at 4. For ease of explication and because it has no bearing on the issues at hand, this opinion ignores the remaining 0.01%.

premium). The auctioning of the new equity interests maximizes the benefit of whatever perceived value remains for the estate's creditors, either by distributing the auction proceeds to them pro rata or by using those proceeds to continue hotel operations to fund the plan's debt-repayment obligations. The plan provides distributions to JSM based on its prepetition equity interest only after all unsecured creditors are paid in full. *Id*. at 10–11. None of this offends the absolute priority rule if the auction is fair and the plan fairly distributes its proceeds. The Lenders think the plan doesn't hew to those principles. They argue that the debtor's plan is incurably flawed because it proposes an equity auction that benefits the debtor's owner, JSM, and either underpays or, perhaps, overpays Computershare.

1

The Lenders find fault in the plan's proposed method of conducting the auction. They contend that, although the plan as amended provides for an 11 U.S.C. §363 sale of new equity interests and the extinguishing of JSM's old equity interests, the plan still allows JSM to retain and acquire property in violation of §1129(b)(2)(B). They argue that the plan's auction provisions bestow "at a minimum" the following "intangible property" on JSM:

- the exclusive right to serve as stalking horse bidder;
- the exclusive and automatic status of "qualified bidder[]"[;]
- the exclusive right to a "breakup" fee of 3.5%;
- the lower burden of demonstrating financial wherewithal on bid price and renovations;
- the lower burden of demonstrating compliance with the Marriott Franchise Agreement;
- the absence of a cash deposit that is subject to forfeiture; and
- the right to obtain excess sale proceeds before Computershare is paid in full.

ECF No. 760, at 11.

First, even if the Lenders were correct that inclusion of these provisions offends the absolute priority rule, that conclusion does <u>not</u> mean that the debtor is unable to confirm a plan in a reasonable time. While the plan as drafted contemplates inclusion of these provisions, none of them seem essential to the plan's proposal of an equity auction. An equity auction could presumably proceed even if the court approved it on terms that are not identical to those proposed in the third amended plan. In short, sorting out which of the disputed terms, if any, are inconsistent with §363 or §1129, or both, is not necessary to conclude, under §362(d)(2), that the debtor has a reasonable chance of confirming a plan reasonably promptly.

Second, many of the Lenders' other complaints about JSM's participation in the auction do <u>not</u> seem to amount to JSM receiving or retaining property "on account of" its existing ownership interest. See *id.* at 10 ("[T]he existing owners still stand to receive property on account of their interests . . . ."); see also §1129(b)(2)(B)(ii) (providing, in relevant part, that a junior claim holder cannot "receive or retain under the plan on account of such junior claim . . . any property", unless each senior claim holder will "receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim"). "Property," as used in §1129(b)(2)(B), includes intangible property, but not pledges immeasurable in money's worth. See *Norwest Bank Worthington*, 485 U.S. at 203–04 (discounting the supposed "value" of the "respondents' pledge of future labor and management skills"). The Lenders contend that JSM's participation in the auction gives rise to rights that must be market tested. ECF No. 760, at 12–14. But the Lenders do not satisfactorily explain how the plan's contemplated auction procedures can be transformed into substantive rights—that is, rights measurable in money's worth on a balance sheet. And, unless the plan's auction procedures entitle JSM to "receive or retain" an economic benefit measurable in money's worth, those procedures do not run afoul of §1129(b)(2)(B).

The record doesn't establish that the plan's auction procedures tilt the table in JSM's favor. The plan proposing JSM as the stalking horse, for example, is not inherently competition-limiting. The record establishes no more than that JSM, as the current owner, is interested in acquiring the new equity and, as the debtor's charter member, it is presumed qualified, if it has the necessary funds, to acquire that new equity. The Lenders' reply brief proclaims, "Computershare would welcome the opportunity to be a stalking horse bidder in this case (assuming a fair auction process), and would gladly bid more than the current owners, but they are not being given the opportunity." *Id.* at 12. As far as the record reveals, nothing is preventing Computershare from offering the debtor better terms. And like the plan's positioning of JSM as the stalking horse, the other auction procedures identified above that the Lenders contend bestow "intangible property" on JSM for purposes of the absolute priority rule incorporated into §1129(b)(2)(B), have not been proven to be measurable in money's worth, so they are not "property" for purposes of §1129(b)(2)(B)(ii). ECF No. 760, at 11–12.

That said, the debtor's contemplated course—to file a proposed sale motion within 14 days *after* the entry of the confirmation order—is problematic. See ECF No. 710, at 20. The plan proposes an auction in which JSM is (1) the stalking horse bidder, (2) afforded a $280 thousand breakup fee and other ancillary benefits, and (3) unburdened of the need to demonstrate its ability to pay up to $12.6 million at the auction, a contemplated requirement of any other bidders for the reorganized debtor's equity. ECF No. 760, at 20–21. As a result, the plan's proposed auction is certainly susceptible to a charge that it, and the plan itself, is rigged in JSM's favor, and if it is so rigged, then the plan unquestionably runs afoul of §1129(b)'s fair and equitable requirement. Only a fair and competitive auction can expose the equity to the market and thereby protect "against the dilution of creditors' rights by inadequate contributions by [the current owners]". *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510,

526–30 & n.27 (1941) (discussing *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 121–22 (1939), and considering whether "the requirements of 'fair and equitable' [we]re satisfied" with respect to a plan of corporate reorganization under § 77B of the Bankruptcy Act,); see also Bruce A. Markell, *Fair Equivalents and Market Prices: Bankruptcy Cramdown Interest Rates*, 33 Emory Bankr. Dev. J. 91, 101–02 (2016).

At least some of the auction terms seem difficult to justify as a means of maximizing competition to buy the new equity. While slotting the current owner as the stalking horse bidder is plausibly justifiable as avoiding the costs of seeking out another candidate, the plan offers no insight into how the debtor justifies a $280 thousand breakup fee under these circumstances. While breakup fees are a common feature of corporate mergers, those fees are typically justified as a means of compensating the stalking horse for its due-diligence costs on which later participants may free ride, mitigating the disincentive to incur costs in what might be an unsuccessful undertaking and deterring opportunistic bidding. See *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999).[2] Why JSM would require

---

2.    As the Third Circuit explained in the context of deciding whether a breakup fee is a reasonable administrative expense under 11 U.S.C. §503:

> All parties recognize that break-up fees and expenses are accepted in corporate merger and acquisitions transactions. In summarizing the corporate use of break-up fees, Calpine has explained that such provisions are designed to provide a prospective acquirer with some assurance that it will be compensated for the time and expense it has spent in putting together its offer if the transaction is not completed for some reason, usually because another buyer appears with a higher offer. Such provisions may also encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful.

> Not all of the purposes that break-up fees serve in corporate transactions are permissible in bankruptcy.

> Although the assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other

additional compensation to serve as the stalking horse is not obvious, leading to a reasonable question about whether the breakup fee is instead serving to deter competition for the acquisition of the new equity interests rather than serving to maximize the net auction proceeds. See *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) ("[B]ankruptcy courts should carefully scrutinize breakup fees to be sure that, following the underlying policy guiding § 363, revenues will be maximized."); see also *In re JW Res., Inc.*, 536 B.R. 193, 196 (Bankr. E.D. Ky. 2015) (approving a breakup fee but observing that "a break-up fee is not warranted if a signed asset purchase agreement will not benefit a proposed auction of a debtor's assets"); Markell, *Breakup Fees*, *supra*, at 386 ("Breakup fees in bankruptcy cases are an unwelcome importation from the non-bankruptcy world. A simple economic analysis illustrates that, except in rare circumstances, they do not cause otherwise unwilling bidders to make a firm bid. . . . The effect of [the procedural, substantive and policy differences between transactions outside of bankruptcy and §363 sales] is that breakup fees, except in rare circumstances, waste estate assets.").

2

The Lenders next argue that distributing sale proceeds to existing equity interests after unsecured claims are paid in full offends §1129(b)(2). The Lenders make two

---

bidders by increasing the cost of the acquisition to the other bidders (an impermissible purpose).

Moreover, even if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser will bid whether or not break-up fees are offered. This can be expected to occur whenever a potential purchaser determines that the cost of acquiring the debtor, including the cost of making the bid, is less than the estimated value the purchaser expects to gain from acquiring the company. In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

*Calpine Corp.*, 181 F.3d at 535 (citing Bruce A. Markell, *The Case Against Breakup Fees in Bankruptcy*, 66 Am. Bankr. L.J. 349, 359 (1992) (hereinafter Markell, *Breakup Fees*).

versions of this argument. First, they argue that existing owners will "receive property" in the form of "the right to obtain excess sale proceeds before Computershare is paid in full" in violation of §1129(b)(2)(B). ECF No. 760, at 10–11. But this amounts to a contention that although the plan provides for Computershare's *secured* claim—treated as *fully* secured because of Computershare's §1111(b) election—in the manner expressly authorized by §1129(b)(2)(A)(i)(II), JSM's right to any distribution after all unsecured claims are paid in full is a "right" treated as "property" that JSM cannot "retain" without the plan offending §1129(b)(2)(B). Computershare thus tries to have it both ways: It elected to have its entire claim treated as secured, rather than partially unsecured under 11 U.S.C. §506(a), thus requiring the debtor's plan to pay it in full, but now Computershare also contends that the debtor's proposed auction procedures have created an "intangible property" right "to obtain excess sale proceeds before Computershare is paid in full", as if Computershare held an unsecured claim. ECF No. 760, at 11. If the plan pays Computershare's claim as provided by §1129(b)(2)(A)(i), the (likely remote) possibility that auction proceeds will be distributed to JSM, in accordance with the proposed plan terms, after paying all unsecured creditors does not make the plan unfair or inequitable to Computershare, which *elected* to have its claim treated as fully secured.[3] That the plan's allowance for making distributions to existing equity interests only *after* satisfying all unsecured claims is fair and equitable follows from §1129(b)'s text and the historic meaning of "fair and equitable," which informs application of that subsection. See *In re Woodbrook Assocs.*, No. 90-7323, 1996 WL 33406697, at *2 (Bankr. S.D. Ind. Mar. 14, 1996) ("[T]he full satisfaction of a claim

---

3.        *Travelers Insurance Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496 (4th Cir. 1992), is not to the contrary. *Bryson Properties* concludes that a plan providing the debtor's equity holders with an exclusive right to purchase equity in the reorganized debtor was not fair and equitable to Travelers, which had its claim bifurcated under §506(a), resulting in it holding an unsecured claim. As the holder of an unsecured claim, Travelers was entitled by §1129(b)(2)(B) to be paid in full before old equity could be afforded an option to acquire new equity.

avoids an absolute priority rule problem."); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 113 B.R. 392, 397 (Bankr. S.D. Ohio 1990) ("If Lincoln should elect treatment under . . . [§]1111(b), the absolute priority rule of . . . § 1129(b)(2)(B) would not apply on its account."). The plan's distribution provision, which distributes funds to old equity only after all unsecured claims are paid in full and with interest, cannot properly be recast as a retention of property by holders of equity interests that offends §1129(b)(2)(A)(i)(II).

The Lenders' second version of this argument is that the plan is not "fair and equitable" as required by §1129(b)(2) because "[i]t is neither fair nor equitable to permit payments to existing equity holders when the secured creditor must wait 18 years for payment with a speculative, $32 million balloon on a $26 million hotel." ECF No. 760, at 15–16. This contention is spurious because it juxtaposes the *future* balloon payment with the hotel's *current* valuation to suggest that the balloon payment will far exceed the property value when the balloon comes due. Notably, both valuation experts projected that the hotel's market value in 10 years will exceed $48 million. See ECF No. 652-1, at 122 (debtor's expert appraisal anticipated terminal sale value of about $48.6 million); ECF No. 674-1, at 145 (Lenders' expert appraisal anticipated terminal sale value of about $58.5 million). And, again, the plan's proposed full payment of Computershare's claim is not rendered unfair or inequitable by the possibility that the equity auction will yield funds sufficient to pay off all unsecured creditors (a possible distribution that Computershare opted out of in favor of having its claim paid in full as a secured claim) and then make a distribution to JSM based on its existing equity interest. See *Case*, 308 U.S. at 115–22 ("Fair and equitable" requires senior interests to be paid in full before junior interest are paid.). Having elected full payment of its claim as secured, Computershare cannot complain that the plan treats it unfairly or inequitably—in whatever sense that term might plausibly be used in §1129(b) but especially in the absolute priority terms that §1129(b)(2) actually specifies. See *Kham & Nate's Shoes No. 2,*

*Inc.*, 908 F.2d at 1361 ("The definition of 'fair and equitable' is no longer a matter of common law; § 1129(b)(2) defines it expressly.").

In all events, the existing record does not establish that the plan's treatment of Computershare's claim offends §1129(b)(2)'s fair and equitable requirement simply because all other creditor classes and equity interests *might* receive a distribution before Computershare receives the balloon payment in year 18 that completes full payment of its claim. Because the court finds that there is no evidence that the plan's proposed equity sale will yield sufficient proceeds to allow any distribution to JSM, the court is unpersuaded that the bankruptcy court opinions the Lenders cite (with little elaboration) support their request for stay relief. ECF No. 760, at 15–16. Those opinions—which the Lenders cite for the proposition that the plan is not "fair and equitable" as required by §1129(b)(2) because "it permit[s] payments to existing equity holders when the secured creditor must wait 18 years for payment with a speculative, $32 million balloon on a $26 million Hotel", ECF No. 760, at 16—all appear to have issued after the completion of confirmation hearings, or otherwise on a fully developed confirmation record that is absent here. See *In re Griswold Bldg., LLC*, 420 B.R. 666, 705 (Bankr. E.D. Mich. 2009); *In re Dwellco I Ltd. P'ship*, 219 B.R. 5, 9–13 (Bankr. D. Conn. 1998); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992); *In re One Times Square Assocs., Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993), aff'd, 165 B.R. 773 (S.D.N.Y. 1994), aff'd sub nom., *In re One Times Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994). Whatever persuasive value these opinions might have after a full evidentiary hearing on plan confirmation, they do not compel a conclusion that the court should terminate the debtor's reorganization effort without further proceedings.[4]

---

[4]     The Lenders also suggest that the plan's proposed use of equity auction proceeds to pay renovation costs is not fair and equitable. See ECF No. 760, at 14–15. This suggestion also seems, at a minimum, insufficiently supported by the current evidentiary record. Additionally, at least some courts have found that a reorganization plan may devote new value contributions or post-petition revenue to

The Lenders next contend that the plan's "preferential treatment" of JSM in the equity auction offends "the traditional requirement that a 'new value' investment from existing equity be 'necessary.'" ECF No. 760, at 12 (first citing *In re Multiut Corp.*, 449 B.R. 323, 354 (Bankr. N.D. Ill. 2011); and then citing *Case*, 308 U.S. at 121). To meet this "traditional requirement," the Lenders argue, the debtor must demonstrate that it "undertook a diligent search for alternative sources of funding", which it cannot do "because its owners are the self-appointed stalking horse bidder; there was no search for alternative sources of funding." *Id.* (quoting *BT/SAP Pool C Assocs., L.P. v. Coltex Loop Cent. Three Partners, L.P.*, 203 B.R. 527, 535 (S.D.N.Y. 1996)).

This argument is ill-suited to the present context: the Lenders make this argument in support of their effort to show that the debtor's plan is unconfirmable, but the specific issue—whether the plan's auction of new equity is necessary because the debtor lacks alternative sources of funding—is not one that the court can fault the debtor for failing to present evidence on at hearings to adjudicate the Lenders' request for stay relief under §362(d)(2). Even if the Lenders' argument has merit, the debtor has not had an adequate opportunity to contest it.

And, ultimately, the debtor may be able to show that the equity sale is necessary, presuming that this "requirement" applies. The current record hardly forecloses the debtor from showing in support of plan confirmation that it cannot in fact obtain funding elsewhere and thus has proposed a plan that devotes part of the auction proceeds, set minimally at the $8 million stalking-horse bid amount, to fund renovations necessary to allow the hotel to continue as Marriott's franchisee and

---

maintain operations without being unfair to a secured creditor or unfairly favorable to equity owners. See, e.g., *In re Baseline-Dobson Ctr. Real Est. Ltd. P'ship*, 193 B.R. 284, 290 (Bankr. D. Ariz. 1994) ("Contributing necessary improvements to a secured property enhances or retains value equally to owners and the secured creditor. No risk is shifted thereby—the status quo is favorably retained to the mutual benefit of owner and lienholder.") (emphasis omitted).

generate the forecasted income that will enable the reorganized debtor to make the payments required by the plan. See ECF No. 710, at 16 ("To effectuate the proposed Plan, [the debtor] shall continue its Hotel operations. [The debtor] will utilize income from its operations, and cash on hand on the Effective Date (including the proceeds of the Equity Auction) to fund the proposed Plan, and will also use funds from the Equity Auction in order to pay for necessary renovations and improvements, as well as comply with Plan obligations.").

What is more, *In re Castleton Plaza LP*, 707 F.3d 821 (7th Cir. 2013), suggests no continuing need to demonstrate the "necessity" of new investments in a case like this. *Castleton Plaza* reasons that a debtor's owners can acquire or maintain a property interest in the reorganized debtor only to the extent that they contribute market-tested "new value." See *id.* at 821–23 (discussing *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999)). That reasoning means that whether the absolute priority rule is satisfied (and a plan's relevant provisions are fair and equitable), with respect to whether a debtor's owners have contributed new value sufficient to continue as owners of the reorganized debtor turns on whether the new-value contribution is adequately exposed to competition. See, e.g., *id.* at 821–22 & 824 ("Competition is essential whenever a plan of reorganization leaves an objecting creditor unpaid yet distributes an equity interest to an insider. . . . Competition helps prevent the funneling of value from lenders to insiders, no matter who proposes the plan or when. An impaired lender who objects to *any* plan that leaves insiders holding equity is entitled to the benefit of competition."). Understood in this way, asking whether the plan's proposal to sell equity interests in the reorganized debtor is "necessary" is no more an absolute priority issue than asking whether the plan's sale of real estate or some other asset is "necessary," regardless of whether JSM wins the auction or someone else does. The equity interests are property of the estate that have whatever value they will yield at a fair auction. If JSM is the winning bidder at a fair auction, the *necessity* of the sale

makes no conceivable difference to whether the plan is fair and equitable.[5] See Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 Stan. L. Rev. 69, 112–14 (1991) (concluding that "the necessity rule. . . . should be discarded").

4

The auction procedures that the plan contemplates are also not improper as a matter of course simply because they allow only cash bids, eschewing credit bids, contrary to the Lenders' contention. ECF No. 760, at 14–15. The Lenders argue that *Castleton Plaza* ensures Computershare the right to credit bid. *Id.* at 14 (contending that accepting "only cash bids . . . in [the] equity auction. . . . violates the express requirements of *Castleton Plaza*"). *Castleton Plaza* holds that a plan's sale of an equity interest that benefits the debtor's original owner must be market tested, as discussed above, but it does not mandate credit bidding in all circumstances. 707 F.3d at 822 (comparing the debtor's plan to sell equity to its owner's spouse for $75 thousand and pay 15% on unsecured claims with the principal secured creditor's offer to pay $600 thousand for the equity with a promise to pay all other creditors in full).

*Castleton Plaza*'s opening paragraph notes both that "[a] plan of reorganization that includes a new investment must allow other potential investors to bid" and that "[i]n this competition, creditors *can* bid the value of their loans." 707 F.3d at 821 (emphasis added) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)). But a closer look at the cited Supreme Court case, *RadLAX Gateway Hotel*, reveals that *Castleton Plaza*'s use of "can" is not a mandate that any proposal for selling new equity *must* allow for credit bids, but simply a recognition that credit *may* be bid,

---

5. Whether the auction the plan proposes can be approved under §363 is a matter that has been neither fully litigated nor adequately presented for adjudication, given that the debtor has not yet filed its motion to approve the auction procedures under §363. As noted above, however, the auction the plan proposes is susceptible to a charge that the sale terms, and thus the plan that proposes them, rigs the equity auction in JSM's favor, which would unquestionably run afoul of §1129(b)'s fair and equitable requirement, and that issue will need to be determined at or before any future confirmation hearing.

rather than cash, when such a proposal allows for such bids or such bids are required by §363(k), i.e., in the more limited circumstances discussed in *RadLAX Gateway Hotel*, where "the plan provides for the sale of collateral free and clear of the creditor's lien". 566 U.S. at 641. Here, the debtor does not propose to sell Computershare's collateral—mainly, the hotel itself—so neither *RadLAX Gateway Hotel* nor *Castleton Plaza*'s off-hand mention of credit bidding is germane to the matter at hand.

The Lenders cite no other authority in support of their contention that Computershare must be afforded the right to credit bid at an auction of new equity interests. That is unsurprising. Section 363(k) generally affords secured creditors the right to credit bid on "property that is subject to" the creditor's lien. §363(k) ("At a sale under [§363](b) . . . of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."). Section 1129(b)(2)(A)(ii) offers plan proponents the option, with respect to nonconsenting classes of secured claims, to provide "for the sale . . . of any property that is subject to the liens securing such claims, free and clear of such liens," subject to certain requirements, including those specified in §363(k). See *RadLAX Gateway Hotel*, 566 U.S. at 649 (holding that a debtor "may not obtain confirmation of a Chapter 11 cramdown plan that provides for the sale of collateral free and clear of [a] lien, but does not permit the [lien-holder] to credit-bid at the sale"). But none of this affords Computershare the right to credit bid its claim at an auction of equity interests in the reorganized debtor, as opposed to a sale of its collateral. Computershare holds a lien on the hotel and related personal property—it does not hold a lien on equity interests in the existing debtor or the reorganized debtor. See ECF No. 632, at 5–8; Claim No. 11-1, at 5–6. So, neither §363(k) nor any other provision of the Bankruptcy Code affords it a right to credit bid at the auction of those equity interests.

The Lenders also argue that the plan *overpays* Computershare in violation of the absolute priority rule. They correctly observe that bankruptcy courts have ruled that a reorganization plan that overpays a secured creditor cannot be confirmed because the overpayment constitutes funds that the absolute priority rule requires be paid to unsecured creditors. ECF No. 760, at 17–18; see Markell, *Fair Equivalents & Market Prices*, *supra*, at 103 (quoting *In re Genco Shipping & Trading Ltd*, 513 B.R. 233, 242–43 (Bankr. S.D.N.Y. 2014)) ("'It's undisputed that the 'fair and equitable' requirement encompasses a rule that a senior class cannot receive more than full compensation for its claims."). The Lenders say that the plan plainly violates this principle because Computershare has an allowed claim in the amount of about $45 million, and the plan provides, in relevant part, "Computershare shall have a secured claim in the amount of $59,465,380 with a present value of $26,000,000, based upon the payment of interest at a rate of 6.5%, which shall be paid in full over a term of 18 years." ECF No. 710, at 9.[6]

While the plan says that Computershare "shall have a secured claim" in an amount exceeding $59 million, the plan does not pay Computershare more than it is fairly and equitably entitled to by operation of §1129(b)(2)(A)(i)(II) as payment on its allowed $45 million claim secured by $26 million of estate property (at least if the plan's discount rate is correct, a matter discussed at length below). Section 1129(b)(2)(A)(i)(II) states that a chapter 11 plan treats a class of secured claims fairly and equitably if it provides "that the holders of such claims retain the[ir] liens", as and to the extent specified, and "that each holder of a claim of [the] class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value,

---

6.     While one might question Computershare's standing to contend that the plan flunks §1129(b)'s fair and equitable test (which, again, is the source of the Code's applicable absolute priority rule) because the plan pays it *too much*, Wisconsin & Milwaukee Hotel Funding LLC holds an allowed unsecured claim, which, if the Lenders' argument were correct, would be unfairly treated by the plan. See ECF No. 710, at 10 & 12.

as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property". More simply, the latter requirements mean that if the plan makes deferred payments to the holder of a secured claim, then (i) the present value of those payments as of the effective date must equal at least the collateral value on that date (i.e., the estate's interest in the property) and (ii) the total value of the deferred payments must at least equal the allowed amount of the claim.

As will also be discussed further below, payment in the future is worth less than payment today—a future payment cannot be used (or invested) today, inflation may lessen its relative value, and there is a risk that a future payment will never be made. To ensure that the plan's deferred payments equal the present value of the collateral, therefore, those payments must be sufficiently great that when discounted by the appropriate rate (again, discussed further below) their value on the plan's effective date equals the amount of the allowed secured claim. The plan proposes a 6.5% discount rate to ensure that the payments have a present value as of the effective date of $26 million. The plan's proposed total payment of about $59 million is equal to 18 years of annual payments of $1.5 million (paid in equal monthly installments of $125 thousand), plus an additional balloon payment of about $32 million in year eighteen. ECF No. 710, at 9. The plan projects that when one discounts those payments at an annual rate of 6.5%, they have a total value as of the plan's effective date that is at least equal to $26 million and will pay Computershare the remainder of its §1111(b) claim (the portion of the allowed claim that exceeds the value of the collateral). Because the Bankruptcy Code provides that paying holders of secured claims the present value of their lien—that is, providing "payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property"—is fair and equitable, the plan cannot be said to violate the absolute priority rule as to unsecured creditors by making those payments. See *Kham & Nate's Shoes No. 2, Inc.*, 908 F.2d at 1361. Payment of interest on deferred payments to

meet §1129(b)(2)(A)(i)(II)'s present-value requirement is neither unfair or inequitable to unsecured creditors for purposes of §1129(b). *Id.*

The court has valued the hotel at $26 million; so only if the court were to determine that the plan's proposed 6.5% interest rate is too *high*—which, as discussed below, is *not* what the Lenders argue—would the plan's payment to Computershare suffer from an absolute priority problem because of overpayment.[7] And inclusion of an overly high cramdown rate would not doom the debtor's efforts to confirm a plan. If the rate were found to be too high, the debtor could readily amend the plan to lower that rate (paying Computershare less) and distribute the additional available funds to unsecured creditors.

B

The Lenders also argue that the plan is not confirmable—and the debtor cannot timely reorganize—because the plan pays Computershare *less* than the amount required by §1129(b)(2). The plan pays Computershare too little, the Lenders' assert, because the deferred payments the plan pays Computershare do not have a present value on the

---

7.    The decisions on which the Lenders rely (ECF No. 760, at 18) simply observe that "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)). Consistent with the discussion above, these decisions conclude that a plan that pays a secured creditor *more than* the present value of the collateral—either by overvaluing the property or applying interest at a rate that exceeds an appropriate cramdown rate—is not fair and equitable to unsecured creditors who are not paid in full. See *In re Victory Constr. Co., Inc.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984) (plan's use of overstated interest rate resulted in overpayment to secured creditor); see also *In re P.J. Keating Co.*, 168 B.R. 464, 469–70 (Bankr. D. Mass. 1994) (concluding present value of payments to creditor was not greater than amount of secured claim); *In re Brewery Park Assocs., L.P.*, No. 10-11555, 2011 WL 1980289, at *11–14 (Bankr. E.D. Pa. Apr. 29, 2011) (debtor argued, and the bankruptcy court agreed, that the secured creditor–proposed plan that would result in the creditor receiving "real estate worth at least $8 million simply by making a credit bid of only $2 million" without paying unsecured creditors in full was not fair and equitable). But, as also discussed above, the Lenders are not now contesting the court's determination that the value of their secured claim is $26 million, and they argue the plan's proposed 6.5% interest rate is too *low*, not too high. The plan on its face does not provide for overpayment of Computershare's claim.

effective date that is at least equal of the amount of Computershare's allowed secured claim, as required by §1129(b)(2)(A)(i)(II).

The plan offers Computershare three payment choices. But only one of those choices applies because Computershare has elected to have its lien continue to secure its entire claim, which has an allowed value of about $45 million, under §1111(b), rather than have its claim treated as secured only up to the $26 million value of its collateral, the debtor's hotel and related personal property. ECF No. 710, at 9–10 ("Option 1B"); Claim 11-1; ECF No. 489. In that case, the plan provides, as discussed above, that Computershare retains its lien on the collateral until the reorganized debtor pays the claim in full, which the reorganized debtor must do by paying Computershare $1.5 million a year for 18 years and a balloon payment of more than $32 million at the end of that period. ECF No. 710, at 9–10. Again, the total payments of about $59 million, discounted at a rate of 6.5%, are projected to have a value of at least $26 million on the plan's effective date.[8]

Because the plan provides for paying Computershare's allowed secured claim over an eighteen-year period, the plan must account for the time value of money—the

---

8. The plan provides:

Computershare shall have a secured claim in the amount of $59,465,380 with a present value of $26,000,000, based upon the payment of interest at the rate of 6.5%, which shall be paid in full over a term of 18 years. Payments of $1,500,000 per annum, shall be made in equal monthly payments of $125,000, with the first payment due on the first day of the month that begins after 30 days from the Effective Date, with each subsequent monthly payment due on the first day of each subsequent month, and followed by a final balloon payment of $32,465,380 which shall be paid on the first day of the 216th month, estimated to be October 2043. The interest and discount rate is based upon a 2.7% premium over the current prevailing rates for 5-year United States Treasury Securities (3.8% as of the market close on August 1, 2025), and will be adjusted every five (5) years from the Effective Date to reflect a 2.7% premium to the then-prevailing rates.

. . . Computershare shall retain liens securing its claim until such time as its secured claim has been paid in full pursuant to the terms of the Plan . . . .

ECF No. 710, at 9–10.

notion that a dollar today is worth more than a dollar tomorrow—to comply with §1129(b)(2)(A)(i)(II)'s confirmation requirement that the present value on the plan's effective date of $59 million in total deferred payments is at least equal to the $26 million value of the collateral.[9] Determining the present value of the plan's future payments requires discounting those payments by an appropriate rate. See *In re Hammond*, 667 B.R. 42, 46 (Bankr. E.D. Wis. 2025); see also 4 Norton, *supra*, §113:15 ("In calculating present values, the deferred payments are discounted by the rate of return or interest factor to reflect the opportunity cost of capital. It is the rate of interest which equates the deferred cash payment with the present value of the payment."). The discount (or cramdown) rate must reflect "the non-eliminable risk of default, inflation, and the opportunity costs associated with the inability of the creditor to use the money right away, whether for investment or any other profitable purpose." Wiener, *supra*, at 231; cf. *In re Oil Spill by Amoco Cadiz off The Coast of France on March 16, 1978*, 954 F.2d 1279, 1332–35 (7th Cir. 1992) ("Any market interest rate reflects three things: the social return on investment (that is, the amount necessary to bid money away from other productive uses), the expected change in the value of money during the term of the loan (i.e., anticipated inflation), and the risk of nonpayment.").

The Lenders contend that the plan's discount rate is too low, and thus that the deferred payments to Computershare will not satisfy §1129(b)(2)(A)(i)(II)'s requirement that the plan pay it $26 million—the value of its interest in the estate's interest in the

_____

9. See *Farm Credit Servs. of Am., FLCA v. Topp (In re Topp)*, 75 F.4th 959, 961 (8th Cir. 2023) (citing Charles J. Woelfel, *Encyclopedia of Banking & Finance* 1131 (10th ed. 1994)) ("Generally, money now is worth more than money later."); see also 4 William L. Norton III, *Norton Bankruptcy Law & Practice* §113:15 (3d ed., Oct. 2025 update), Westlaw NRTN-BLP (quoting Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance* 11 (2d ed. 1984)) ("The concept of the present value of money is explained by the maxim: 'A dollar today is worth more than a dollar tomorrow, because the dollar today can be invested to start earning interest immediately.'"); Matthew Wiener, *Cramdown Interest Rates in the Commercial Credit Context: Arguments for the Two-Step Approach in Chapter 11*, 74 N.Y.U. Ann. Surv. Am. L. 223, 231 (2018) ("Present value captures the worth of future money in terms of its value now, taking into account time value.").

collateral—as of the plan's effective date. The plan discounts future payments on Computershare's allowed secured claim using a total rate of 6.5%, calculated by adding a risk adjustment of 2.7 percentage points to the prevailing five-year Treasury note rate, though the plan provides that the rate is adjusted at the end of each five-year period to account for any change in the Treasury note rate during the plan term. ECF No. 710, at 9. The parties agree that there is no competitive market for financing of this type. They further agree that the court should apply the "formula approach" explicated in *Till*'s plurality opinion, 541 U.S. at 478–81 (opinion of Stevens, J.), to determine whether the plan's deferred payments discounted by 6.5% have a present value that is at least equal to Computershare's $26 million collateral interest.

The formula approach has two steps. Step one: Select an appropriate base or reference interest rate. *Till*, 541 U.S. at 478–79. Step two: adjust that rate to account for the risk that the debtor will default on its obligation to make the required deferred payments. *Id.* On the first step the parties disagree about methodology. The debtor asks the court to use a five-year Treasury note rate as the base rate (3.8% as of August 1, 2025, per the debtor's plan but currently about 3.62%). See ECF No. 710, at 9; ECF No. 752, at 8–17. Computershare argues that one must start with the prime rate (7.5 at the time of the August 14, 2025 hearing but currently 7.0%). See ECF No. 760, at 21–24. On the second step the debtor contends that Computershare has not met its burden to prove that the risk of default requires a rate exceeding 6.5%. See ECF No. 752, at 17.

1

*Step One: Base Rate.* The parties' debate over the extent to which the plurality opinion in *Till* governs application of the formula method under §1129(b)(2)(A)(i)(II) raises several issues. First, the lack of a majority opinion in *Till* creates a preliminary question about the extent to which the plurality opinion has precedential effect. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position

taken by those Members who concurred in the judgments on the narrowest grounds. . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (omission in original) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

The Court in *Till* reversed the Seventh Circuit's decision to vacate the district court's ruling that the cramdown rate applied by the bankruptcy court in confirming a chapter 13 plan—the prime rate plus 1.5 percentage points—was too low to satisfy §1325(a)(5)(B)(ii), which provides that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of [an allowed secured] claim" cannot be "less than the allowed amount of such claim". The *Till* plurality opinion (joined by four Justices) explains that the district court "understood Seventh Circuit precedent to require that bankruptcy courts set cramdown interest rates at the level the creditor could have obtained if it had foreclosed on the loan, sold the collateral, and reinvested the proceeds in loans of equivalent duration and risk", and notes that, while the Seventh Circuit vacated that ruling and endorsed "a slightly modified version" of this "'coerced' or 'forced loan' approach", "the majority agreed with the District Court that, in a cramdown proceeding, the inquiry should focus on the interest rate 'that the creditor in question would obtain in making a new loan in the same industry to a debtor who is similarly situated, although not in bankruptcy." *Id.* at 472 (quoting *In re Till*, 301 F.3d 583, at 591 & 592 (7th Cir. 2002)). The plurality opinion "reject[s] the coerced loan . . . approach", describing the required inquiry as "far removed from [bankruptcy] courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans"—because it "requires [such] courts to consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors"—and "the approach overcompensates creditors because the market lending rate must be high enough to cover factors, like lenders' transaction costs

and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans." *Id.* at 477.

*Till*'s plurality opinion also rejects two other then-common approaches to determining an appropriate interest rate on deferred payments for purposes of §1325(a)(5)(B)—"the . . . presumptive contract rate[] and cost of funds approaches." *Id.* The presumptive contract rate approach uses "the parties' prebankruptcy contract rate" as "a presumptive [cramdown] rate" but allows "either the creditor or the debtor [to] challenge with evidence that a higher or lower rate should apply." *Id.* at 472–73 (quoting *Till*, 301 F.3d at 592). The plurality opinion states, however:

> Like the coerced loan approach, the presumptive contract rate approach improperly focuses on the creditor's potential use of the proceeds of a foreclosure sale. In addition, although the approach permits a debtor to introduce some evidence about each creditor, thereby enabling the court to tailor the interest rate more closely to the creditor's financial circumstances and reducing the likelihood that the creditor will be substantially overcompensated, that right comes at a cost: The debtor must obtain information about the creditor's costs of overhead, financial circumstances, and lending practices to rebut the presumptive contract rate. Also, the approach produces absurd results, entitling "inefficient, poorly managed lenders" with lower profit margins to obtain higher cramdown rates than "well managed, better capitalized lenders." 2 K. Lundin, Chapter 13 Bankruptcy § 112.1, p. 112–8 (3d ed. 2000). Finally, because the approach relies heavily on a creditor's prior dealings with the debtor, similarly situated creditors may end up with vastly different cramdown rates.

*Id.* at 477–78.

Under the cost of funds approach, "the relevant interest rate is the actual cost to the secured creditor of being temporarily deprived of payment of its claim, and therefore having to borrow the sum elsewhere." Todd J. Zywicki, *Cramdown and the Code: Calculating Cramdown Interest Rates Under the Bankruptcy Code*, 19 T. Marshall L. Rev. 241, 255 (1994) (first citing *In re Wilkinson*, 33 B.R. 933, 936 (Bankr. S.D.N.Y. 1983); then citing *Campbell v. Ford Motor Credit Co. (In re Campbell)*, 16 B.R. 496, 497 (Bankr.

N.D. Ill. 1982); and then citing *In re Jordan*, 130 B.R. 185, 191 (Bankr. D.N.J. 1991)).

Rejecting this approach, *Till*'s plurality opinion calls it "improperly aimed":

> Although [the cost-of-funds approach] rightly disregards the now-irrelevant terms of the parties' original contract, it mistakenly focuses on the creditworthiness of the *creditor* rather than the debtor. In addition, the approach has many of the other flaws of the coerced loan and presumptive contract rate approaches. For example, like the presumptive contract rate approach, the cost of funds approach imposes a significant evidentiary burden, as a debtor seeking to rebut a creditor's asserted cost of borrowing must introduce expert testimony about the creditor's financial condition. Also, under this approach, a creditworthy lender with a low cost of borrowing may obtain a lower cramdown rate than a financially unsound, fly-by-night lender.

541 U.S. at 478.

*Till*'s plurality endorses the two-step "formula approach", asserting that it "has none of these defects." *Id.*

> Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the [formula] approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Id.* at 478–79 (footnote omitted). This approach requires the court to "hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment", but by "starting from a concededly *low* estimate and adjusting *upward*", it "places the evidentiary burden squarely on the creditors, who are likely to have readier

access to any information absent from the debtor's filing (such as evidence about the 'liquidity of the collateral market')." *Id.* at 479 (quoting *id.* at 499 (Scalia, J., dissenting)).

Justice Thomas concurred in the judgment, providing the deciding vote for the Court's decision to reverse the Seventh Circuit. He criticized both "the plurality and the dissent" for "ignor[ing] the clear text of the statute . . . . that Congress enacted", which "does not require a debtor-specific risk adjustment", writing:

> I agree that a "*promise* of future payments is worth less than an immediate payment" of the same amount, in part because of the risk of nonpayment. But this fact is irrelevant. The statute does not require that the value of the *promise* to distribute property under the plan be no less than the allowed amount of the secured creditor's claim. It requires only that "the value . . . of *property* to be distributed under the plan," at the time of the effective date of the plan, be no less than the amount of the secured creditor's claim.

*Id.* at 485–86 (Thomas, J., concurring in judgment) (omission in original) (first quoting *id.* at 474 (plurality opinion); and then quoting §1325(a)(5)(B)(ii)) (citing *id.* at 491 (Scalia, J., dissenting)). In Justice Thomas's view:

> in order for a plan to satisfy § 1325(a)(5)(B)(ii), the plan need only propose an interest rate that will compensate a creditor for the fact that if he had received the property immediately rather than at a future date, he could have immediately made use of the property. In most, if not all, cases, where the plan proposes simply a stream of cash payments, the appropriate risk-free rate should suffice.

*Id.* at 487. Because the chapter 13 plan's interest rate was "higher than the risk-free rate," Justice Thomas agreed with the plurality that the Seventh Circuit's decision rejecting plan confirmation should be reversed. *Id.* at 491. The remaining four Justices dissented.[10]

---

10. The dissent agrees with the plurality that, to satisfy §1325(a)(5)(B)(ii), "any deferred payments to a secured creditor must fully compensate it for the risk that" the chapter 13 plan will fail. *Id.*

*Till*'s plurality opinion is controlling precedent, at least when a lower court must decide whether a chapter 13 plan's periodic payments comply with §1325(a)(5)(B)(ii). See *Marks*, 430 U.S. at 193. The plurality's rationale offers the narrowest grounds for the Court's reversal of the judgment below: any interest rate that satisfies the plurality's prime-rate-plus rationale will, at least as a practical matter, satisfy Justice Thomas's risk-free-rate rationale, but not *vice versa*. See *In re Jones*, 534 B.R. 149, 156–58 (Bankr. E.D. Ky. 2015).

The applicability of the *Till* plurality's prime-rate-plus formula in this chapter 11 case, however, is a distinct issue. The plurality opinion provides some guidance. It observes that "the Bankruptcy Code includes numerous provisions" other than §1325(a)(5)(B)(ii), the chapter 13 plan-confirmation provision at issue in *Till*—including §1129(b)(2)(A)(i)(II), the chapter 11 plan-confirmation provision at issue here—that similarly "require a court to 'discoun[t] . . . [a] stream of deferred payments back to the[ir] present dollar value', to ensure that a creditor receives at least the value of its claim." 541 U.S. at 474 & n.10 (alterations and omission in original) (citation omitted) (quoting *Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993)). The plurality continues:

> **We think it likely that Congress intended bankruptcy judges and trustees to follow *essentially* the same approach when choosing an appropriate interest rate under any of these provisions.** Moreover, we think Congress would favor an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary proceedings.

*Id.* at 474–75 (emphasis added). As the opinion acknowledges, though, "the Chapter 13 context" differs from "the Chapter 11 context" in ways that may be material to determining an appropriate cramdown rate, including that "there is no free market of

---

at 491. The dissent disagrees, however, on the methodology for determining the rate necessary to compensate for that risk, favoring "the contract rate—*i. e.*, the rate at which the creditor actually loaned funds to the debtor—as a presumption that the bankruptcy judge could revise on motion of either party", noting that the contract rate "is generally a good indicator of actual risk," so "disputes should be infrequent, and it will provide a quick and reasonably accurate standard." *Id.* at 492.

willing cramdown lenders" in chapter 13—"[b]ecause every cramdown . . . is imposed by a court over the objection of the secured creditor"—but "the same is *not* true" in chapter 11. *Id.* at 476 n.14 ("[N]umerous lenders advertise financing for Chapter 11 debtors in possession."). As a result, the plurality concludes, "when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce", even if, "[i]n the Chapter 13 context, . . . the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure." *Id.*

As mentioned above, the parties agree that no market—efficient or otherwise—is available to the debtor to finance repayment of Computershare's allowed secured claim. Consequently, the *Till* plurality opinion directs this court "to follow *essentially* the same approach when choosing an appropriate interest rate under" §1129(b)(2)(A)(i)(II) as it would under §1325(a)(5)(B)(ii). *Id.* at 474 (emphasis added). At a minimum that requires using the formula approach, which the plurality approved and to which both parties here subscribe, rather than any of the other approaches that the plurality and Justice Thomas rejected. 541 U.S. at 477. Whether "follow[ing] *essentially* the same approach" requires starting with the prime rate is unclear—and this, as mentioned above, is the point on which the parties disagree. *Id.* at 474 (emphasis added).

The *Till* plurality opinion does not expressly foreclose use of the Treasury note rate as the reference rate in circumstances unlike those presented in that chapter 13 case. The opinion's emphasis on the prime rate as the reference rate perhaps results from the case's circumstances: the chapter 13 debtor justified the plan's cramdown rate using adjustments from the prime rate, which the court accepted as a rate that is "reported daily in the press" and "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." 541 U.S. at 479. None of that necessarily forecloses a conclusion that

employing the formula approach using a Treasury note rate as the reference rate is "follow[ing] essentially the same approach when choosing an appropriate interest rate under" §1129(b)(2)(A)(i)(II). *Id.* at 474.

The prime rate and the Treasury note rate are set through different mechanisms and are affected by different factors. The prime rate is an average of what commercial banks charge credit-worthy customers. Generally, the prime rate is three percentage points more than the federal funds rate—the rate set by the Federal Reserve as a means of effectuating federal monetary policy by altering short-term interest that banks pay for overnight borrowing. See *The Fed Explained: How We Conduct Monetary Policy*, Fed. Rsrv., https://www.federalreserve.gov/aboutthefed/fedexplained/monetary-policy.htm (last visited Dec. 4, 2025). The Federal Reserve Board "reports the prime rate posted by the majority of the largest twenty-five banks." *Most Frequently Asked Questions*, Fed. Rsrv., https://www.federalreserve.gov/faqs.htm (last visited Dec. 4, 2025). The reported "[b]ank prime loan" rate, as of December 3, 2025, is 7%. *Selected Interest Rates (Daily) - H.15*, Fed. Rsrv., https://www.federalreserve.gov/releases/h15/ (last visited Dec. 4, 2025). The five-year Treasury note rate, on the other hand, is set by the market, reporting auction prices for those notes, and reflects investor expectations about inflation, as well as about the Government's borrowing needs and monetary policy. See *Understanding Pricing and Interest Rates*, TreasuryDirect, https://www.treasurydirect.gov/marketable-securities/understanding-pricing/ (last visited Dec. 3, 2025); see also *What Makes Treasury Bill Rates Rise and Fall? What Effect Does the Economy Have on T-Bill Rates?*, Fed. Rsrv. Bank of S.F., https://www.frbsf.org/research-and-insights/publications/doctor-econ/2000/12/treasury-bill-rates/ (last visited Dec. 3, 2025). The current five-year Treasury note rate is about 3.62 percent. *Selected Interest Rates (Daily) - H.15, supra*. Unlike the prime rate, the five-year Treasury note rate is understood to contain no risk premium.

The *Till* plurality opinion persistently refers to the prime rate as the starting point for the formula approach. But, in stating that "courts have generally approved [risk] adjustments of 1% to 3%," 541 U.S. at 480, the plurality cites a case, as "collecting cases"; however, the cited case is one in which the Second Circuit started not with the prime rate, but with "the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan", to which the court then added "a premium to reflect the risk to the creditor in receiving deferred payments under the reorganization plan" to account for the fact that "the rate on a treasury bond is virtually risk-free". *Gen. Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55, 64 (2d Cir. 1997).[11] And, even after *Till*, bankruptcy courts applying the formula approach to determine cramdown rates in chapter 11 cases have used Treasury note rates as the base rate when lenders in related financing markets use that rate as the

---

11.     Unsurprisingly, many of the opinions in the cases that *Valenti* collects also take some version of this more nuanced approach, using or considering Treasury note rates—usually, but not always, with an upward risk adjustment—to assess cramdown rates in bankruptcy plans. See *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., LTD., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1169 (5th Cir. 1993) (concluding that the 10.25% contract rate adopted by the bankruptcy court sufficiently exceeded the 6.4% "riskless rate"—the rate for "Treasury bonds with 15 years to maturity (the term of this [chapter 11] reorganization)"—to provide the relevant creditor with present value for purposes of §1129(b)(2)(A)(i)); *United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir. 1989) ("The [bankruptcy] court rationally analyzed its preference for using the yield on treasury bonds as the preferable riskless rate and the court's discussion of the risk rate properly emphasized the nature of the agricultural economy as Chapter 12 is geared toward farmers."); *In re Dingley*, 189 B.R. 264, 271 (Bankr. N.D.N.Y. 1995) ("[T]he rate on a United States Treasury instrument (with a maturity that best matches the proposed payout term on the allowed secured claim) with up to a three percent risk premium both provides present value and facilitates the expedient administration of cases."); *In re Smith*, 178 B.R. 946, 953 (Bankr. D. Vt. 1995) ("[W]e believe that the Treasury rate for an instrument of similar term, although it slightly overcompensates the creditor, comes as close as we can get in an imperfect economic world to an interest rate that is 'just right.'"); *In re Wynnefield Manor Assocs., L.P.*, 163 B.R. 53, 60 (Bankr. E.D. Pa. 1993) (approving "an interest rate of nine (9%) percent" as "provid[ing] sufficient present value of the deferred payments to Freddie Mac" because it exceeded the selected 5.1% "risk-free rate"—i.e., "the six year treasury bill rate, applicable for the duration of the Plan"— plus "a risk premium of three (3%) percent"); see also 4 Norton, *supra*, §113:16 ("In utilizing the formula approach, the interest rate is adjusted for the term of the plan's repayment period by utilizing as the base rate the yield quoted for treasury bills or bonds on equivalent terms."); 8 *Collier on Bankruptcy* ¶1225.03[4][c] n.29 (Richard Levin and Henry J. Sommer eds., 16th ed. 2025) (collecting opinions, including the Second Circuit's in *Valenti*, "that used a treasury bond rate as a basis from which to choose an upward adjustment").

initial reference point. See *In re MPM Silicones, LLC*, No. 14-22503, 2014 WL 4436335, at *31–32 (Bankr. S.D.N.Y. Sept. 9, 2014), aff'd sub nom., *U.S. Bank Nat'l Ass'n v. Wilmington Sav. Fund Soc'y, FSB (In re MPM Silicones, LLC)*, 531 B.R. 321 (S.D.N.Y. 2015) aff'd in part and rev'd in part on other grounds sub nom., *Momentive Performance Materials, Inc. v. BOKF, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787 (2d Cir. 2017); see also *In re Walkabout Creek Ltd. Dividend Hous. Ass'n Ltd. P'ship*, 460 B.R. 567, 574–78 (Bankr. D.D.C. 2011) (sustaining confirmation objection under §1129(b)(2)(A)(i)(II) because plan's cramdown rate was less than the rate determined by making upward adjustments to "the 30-year treasury yield"). As the district court observed in *MPM Silicones*, the bankruptcy judge

> chose the Treasury rate because it is "often used as a base rate for longer-term corporate debt such as the [R]eplacement [N]otes." In contrast, the prime rate may be "a more appropriate base rate for consumers, although [the Second Circuit in] *Valenti* chose the Treasury rate." The Court agrees . . . that *Till* does not obligate a bankruptcy court to choose the national prime rate as the risk-free base rate.

531 B.R. at 334 (alterations in original) (citations omitted) (quoting 2014 WL 4436335, at *31). But see *Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 12 & n.3 (D. Conn. 2006) ("If the Bankruptcy Court elects to apply the *Till* formula, or the 'prime-plus' rate, it must at least consider that rate before deviating from it": "The Prime rate is the interest rate at which a creditworthy commercial borrower can borrow money. As such, it is an appropriate starting point from which to construct the rate at which a bankrupt debtor could borrow. . . . [I]t is not obvious that the treasury note rate provides an appropriate starting point for the *Till* analysis.").

In the only appellate opinion to consider whether *Till* requires starting from the prime rate, *Farm Credit Services of America v. Topp (In re Topp)*, a case under chapter 12, the Eighth Circuit rejected the contention that *Till* requires, as a matter of law, starting with the prime rate in determining the cramdown rate: "We see no legal significance to

whether a court starts with a risk-free rate and adds *full* risk or starts with a *some*-risk rate and adds some more. If the court properly follows the formula approach, the ultimate discount rate, not the starting point, is what matters." 75 F.4th at 962–63 (citing April E. Kight, *Balancing the Till: Finding the Appropriate Cram Down Rate in Bankruptcy Reorganizations After* Till v. SCS Credit Corporation, 83 N.C. L. Rev. 1015, 1028 (2005)).[12] Simply put, *Topp* says, "*Till* did not make the treasury rate obsolete as a matter of law." *Id.* at 963 (collecting opinions). Nor did *Till* make "the starting-rate choice . . . a purely legal question". *Id.* "[W]hat it is", *Topp* concludes, is "a factual finding about the appropriate discount rate in th[e] particular case". *Id.* (citing *Doud*, 869 F.2d at 1146). The Eighth Circuit "[r]eview[ed] the bankruptcy court's factual finding [that the twenty-year Treasury bond rate was the appropriate starting rate] for clear error" and "s[aw] none", noting the bankruptcy court's consideration of "the length of the

---

12.     *Topp* notes that the parties "disagree[d] over the proper *risk-free* starting point": "Topp propose[d] starting with the twenty-year treasury bond rate (1.87% at the relevant time) . . . . Farm Credit opt[ed] for the national prime rate (3.25% at the time) . . . ." 75 F.4th at 961 (emphasis added). The opinion then refers to the treasury rate as "a risk-free rate" and the prime rate as "a *some*-risk rate". *Id.* at 962. This is consistent with *Till*'s plurality opinion, which, as noted above, describes "the national prime rate" as reflecting at least a "relatively slight risk of default." 541 U.S. at 479. Justice Thomas's concurrence seems to endorse the prime rate as a "risk-free rate". *Id.* at 488 n.2 & 491 (quoting Glenn G. Munn, F. L. Garcia & Charles J. Woelfel, *Encyclopedia of Banking & Finance* 830 (rev. 9th ed. 1991)) (alteration in original) ("The prime rate is '[t]he interest rate most closely approximating the riskless or pure rate for money.'"). But the source that Justice Thomas quotes goes on to clarify that the prime rate is not strictly "riskless", but is instead the rate "most devoid of *financial* risk (highest-quality credit with *least* or *negligible* premium for *credit* risk)." Munn, Garcia & Woelfel, *supra*, at 830 (emphasis added). That source continues, "Among security yields, the yields on U.S. government securities are conventionally considered to be the most closely approximating riskless rate." *Id.* All of which is to say, labels like "risk-free" and "some-risk" may be useful shorthand, but they do not strictly or uniquely correspond with particular rates. And which specific rate is most appropriately applied in any given situation depends, at least in part, on the circumstances presented. For example, if "the prime rate is the interest rate charged for the very best credits of *short-term* maturity", *id.* (emphasis added), then it may well be the best starting point for purposes of chapter 13, in which cramdown rates are applied to payments made over terms that cannot exceed 5 years. See 11 U.S.C. §1322(d). "[T]he same is *not* true in the Chapter 11 context", *Till*, 541 U.S. at 476, in which claims are often paid over much longer periods, as the debtor proposes to pay Computershare's claim here and as are hotel financing terms available outside of bankruptcy. See ECF No. 746, at 128 (Nelson testimony that hotel financing terms are commonly as long as 10 years); see also ECF No. 750, at 33–37 (Friedland testimony that Treasury note rates are commonly used benchmark rates by suppliers of luxury/upscale hotels).

proposed maturity period, the fact that [the] claim was substantially over-secured, and the overall risk of nonpayment" and its observation that the "claim was secured by real estate and . . . those 'types of transactions are generally financed over a longer period of time which justifies use of the treasury bond as the base rate.'" *Id.* (quoting *In re Topp*, No. 20-01191, 2021 WL 4237321, at *3 (Bankr. S.D. Iowa Sept. 16, 2021)).

*Topp* thus stands for the proposition, consistent with many past opinions applying the formula approach, that *Till* does not, as a matter of law, require a court to start with the prime rate when using the formula approach. Consequently, at least where a chapter 11 reorganization plan pays a claim secured by real estate over a longer period than five years, and where participants in analogous lending markets use Treasury note rates, rather than the prime rate, as their reference rates, a court may employ the formula approach starting with a comparable Treasury note rate to determine a fair and equitable discount rate for purposes of §1129(b)(2)(A)(i)(II) and still be taking "essentially" the same approach as that approved by the *Till* plurality. 541 U.S. at 474.

As a factual matter, participants in the hotel financing market do not use the prime rate as the reference rate when negotiating interest rates. Deborah Friedland, the leader of EisnerAmper's hospitality advisory services practice, testified that participants in the market for hospitality loans use the five- and ten-year Treasury note rates and the Secured Overnight Financing Rate (SOFR) as baselines. ECF No. 750, at 28–30.[13] She credibly opined that those rates, not the prime rate, are consistently used as the lending benchmark for hotel financing. *Id.* Based on her review of available industry data, she

---

13. "The Secured Overnight Financing Rate (SOFR) is a broad measure of the cost of borrowing cash overnight collateralized by Treasury securities." *Secured Overnight Financing Rate Data*, Fed. Rsrv. Bank of N.Y., https://www.newyorkfed.org/markets/reference-rates/sofr (last visited Dec. 4, 2025); see also *Additional Information about Reference Rates Administered by the New York Fed*, Fed. Rsrv. Bank of N.Y., https://www.newyorkfed.org/markets/reference-rates/additional-information-about-reference -rates (last visited Dec. 4, 2025) ("Calculation Methodology for the TGCR, BGCR, and SOFR").

also opined that the current overall industry interest rate ranged from 250 to 425 basis points above the five-year Treasury note rate (which the plan reports as 3.8%), making the debtor's proposed rate of 6.5% reasonable. *Id.* at 60. She emphasized that she personally surveyed potential lenders who told her that they had the ability to price below the interest rates reported in the hospitality lending survey data on which she relied and that they would do so in appropriate circumstances. *Id.* at 38–39 & 63–64.

Ms. Friedland's testimony about hospitality lenders' use of Treasury note rates or SOFR as their benchmark rates was supported by Randall Erkert. Mr. Erkert, the manager of JSM, testified that in his experience in obtaining real estate loans, "[t]he reference rates are always pegged to more secure types of financing" than the prime rate, "like treasuries or SOFR." ECF No. 745, at 55–59. He further testified that he was recently involved in refinancing two other hotels in the Milwaukee area, the Westin and the Fairfield, and reported that in both instances the lender used either the Treasury rate or SOFR as the reference rate. ECF No. 745, at 51, 56–57.

What is more, Cynthia Nelson, Computershare's expert on "cramdown interest rate analysis," who has substantial experience in workouts of troubled hotels and other real estate properties, acknowledged that "prime . . . is by no means customary for long-term loans or secured loans for certain asset classes such as non-construction real estate lending" and that "[m]any commercial lenders have moved away from prime as a base rate to those that are more directly driven by the market."[14] ECF No. 746, at 15, 45–46

---

14. As discussed above, the prime rate is not set by the market in the sense that the Treasury note rates are:

> The "Prime Rate" is generally defined as the rate at which commercial banks lend money to their best customers. Not all banks apply the same prime rate at exactly the same time. The Wall Street Journal publishes the average of the prime rates set by the 30 largest banks in the country. Although it may be understood that the Prime Rate is a rate established by market conditions—that is not entirely true. The Prime Rate is a rate that is *targeted* to roughly equal to 300 basis points over the Federal Funds Rate. The Federal Funds Rate ("Fed Funds Rate") is the interest rate on *overnight* interbank loans and is set

& 134–35. She also acknowledged that before the *Till* opinion issued in 2004, she had used Treasury note rates as benchmarks. *Id.* at 45–46. And Ms. Nelson explained that in opining on an appropriate cramdown rate for the debtor's plan, she had no factual reason for using the prime rate rather than the Treasury note rate as her benchmark. *Id.* at 87–89. She testified:

> [The prime rate] was suggested by the Supreme Court [in *Till*], and I followed the guidance provided by the Supreme Court, but it's ultimately a red herring. . . .
>
> . . . .
>
> . . . What the base rate is, is irrelevant. What is appropriate is figuring out what type of risk adjustments over whatever base rate you use are appropriate to compensate the lender for the risks imposed on it by a cram-down plan.

*Id.* at 88; see also *id.* at 45 & 102–03. She emphasized that she "could have started with a treasury rate", but she "would have had to make larger adjustments to account for the inherent risk associated with the prime rate, which already has some risk built into it", but she never explicated this "inherent risk" or opined on the extent to which accounting for it would have warranted such "larger adjustments" in this case. *Id.* at 46. Nor did she offer testimony reconciling—either on factual or finance-theory terms—her use of the prime rate as a baseline when suppliers of hotel financing use other reference

---

by the Federal Reserve Open Market Committee as a means for implementing its monetary policy. Therefore, the Prime Rate is a very short term interest rate that is derived from a targeted overnight rate.

The 300 basis point spread over the Fed Funds Rate is intended to cover banks' cost of making loans and approximates the banks' break-even interest rate.

C.B. Reehl & Stephen P. Milner, *Chapter 11 Real Estate Cram-Down Plans: The Legacy of* Till, 30 Cal. Bankr. J. 405, 407 (2010) (footnotes omitted).

rates and loan funds to their most creditworthy borrowers at rates significantly below the current prime rate.

The evidence thus persuasively supports use of the five-year Treasury note rate as the reference rate. Again, lenders in an analogous market for luxury hotel financing commonly use Treasury note rates and SOFR as their reference rates and, the evidence showed, lend to their most creditworthy customers at a lower rate than the prime rate, even at its current rate of 7%. Like market-originated hotel financing, but unlike short-term business and consumer loans that banks offer at the prime rate, the plan preserves Computershare's lien on an income-producing hotel. Under these circumstances, using the Treasury note rate rather than the prime rate as the base rate for the formula approach eliminates the default risk built into the prime rate. The built-in default risk in the prime rate has less application to the plan's payment of Computershare's claim, which is secured by the debtor's main asset, the hotel, than to determining the rate for loans with shorter terms that are unsecured or secured by collateral that is not income producing or has a greater depreciation risk, or loans generated in a market where lenders employ prime as a reference rate.

The debtor's plan proposes to reset the cramdown rate every five years based on the then-current five-year Treasury note rate. And, as explained above, *Till* does not foreclose that approach, at least not when determining an appropriate cramdown rate for purposes of §1129(b)(2)(A)(i)(II). Under these circumstances, use of the Treasury note rate as the reference rate is appropriate. The Treasury note rate, like the prime rate, is an easily determined published rate, but it has the advantage in the current context of reflecting the market's prediction of the inflation risk over the next five years—at the end of which the plan provides for an adjustment to the cramdown rate based on the then-current five-year Treasury note rate—and does not reflect lender compensation components that the *Till* plurality reasoned are inapplicable in the cramdown context. Based on the evidence, I find and conclude that the five-year Treasury note rate is an

appropriate base rate for determining the cramdown rate—that is, the rate that fairly and equitably compensates Computershare for not being paid an amount equal to the value of its collateral on the plan's effective date.

2

*Step Two: Risk Adjustment.* As discussed earlier, Computershare bears the evidentiary burden with respect to any upward adjustments from the base rate. *Till*, 541 U.S. at 479. The debtor presented no direct evidence about risk adjustment. As mentioned above, Ms. Friedland opined that the debtor's proposed 6.5% interest rate (calculated by adding 2.7 percentage points to the then-prevailing five-year Treasury note rate) is reasonable based on available information about recent hotel financing trends, including her discussions with brokers, a life insurance company lender, a commercial bank lender, and a private equity fund, all of whom provide financing to firms in the hospitality industry. ECF No. 750, at 32–39. She based this opinion in part on industry loan data showing that interest rates for loans secured by similar luxury/upper upscale hotels range from 5%–13%, though those loans enjoy loan-to-value ratios of 80% or less. Ex. 38, ECF No. 719-4, at 2; ECF No. 750, at 36. While Ms. Friedland opined that 6.5% is a "reasonable" cramdown rate, she did not give an opinion on the extent to which an increase from the Treasury note rate is necessary to compensate Computershare for the default risk presented by the circumstances facing the reorganized debtor. But her credible testimony that the most creditworthy borrowers in the hospitality industry in the luxury/upper upscale market are paying 5% interest supports an initial upward adjustment from the Treasury note base rate (here listed as 3.8% as of August 1, 2025, in the debtor's chapter 11 plan) of 120 basis points. Computershare offered no credible contradictory evidence on that score.[15]

---

15. The Lenders' supplemental brief argues that *Koopmans v. Farm Credit Services of Mid-America, ACA*, 102 F.3d 874 (7th Cir. 1996), requires recognizing an equivalence between the prime rate

and a Treasury note rate adjusted for the risk of non-payment by even creditworthy borrowers. ECF No. 786, at 3–4. *Koopmans*, an opinion issued several years before *Till*, arose from a senior secured creditor's appeal of confirmation of a chapter 12 plan entitling it to cramdown interest. The court applied the coerced-loan approach, under which "the creditor must get the market rate of interest, at the time of the hypothetical foreclosure, for loans of equivalent duration and risk." 102 F.3d at 874–75. "The bankruptcy [court]", in *Koopmans*, "approximated this [market rate of interest] by **starting with the prime rate of interest, which it found prevalent for new 20–year well-secured agricultural loans at the time**, and adding 1.5 percent because it deemed this extension of credit more risky than the norm in light of the [debtors'] sorry repayment record." *Id.* at 875 (emphasis added). The Seventh Circuit, "hold[ing] that the creditor [wa]s entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk", ruled that the bankruptcy court's rate was not erroneous "**[w]ithout implying that 'prime-plus' is the only way to approximate the market rate of interest—for participants in the market may use other methods**". *Id.* (emphasis added). *Koopmans*, which expressly left the door open for courts to employ a different base rate than the prime rate if "participants in the market . . . use other methods", when applying the coerced-loan approach rejected by the plurality in *Till*, cannot be reasonably read to require courts to use the prime rate as the base rate in applying the formula approach, especially where, as here, "participants in the market . . . use [an]other method[]". *Id.*

In contending that *Koopmans* forecloses use of a Treasury note base rate, the Lenders quote the following passage:

> What the standing Chapter 12 Trustee, representing the interests of unsecured creditors, favors is the rate the federal government pays to borrow money (the "T–Bill rate" for short). At times the Trustee appears to concede that this rate may be adjusted for risk; *if so, that comes to the same thing as prime-plus, although the adjustment may be larger.* The prime rate of interest is the benchmark rate for the banks' most credit-worthy customers, but even blue-chip debtors are more likely to default than is the United States government, so the prime rate exceeds the T–Bill rate. Because the prime rate includes some compensation for the risk of non-repayment, the add-on for less credit-worthy customers is less than it would be if the court started with the risk-free T–Bill rate. . . . *Because adjustments would make the final interest rate the same whether the bankruptcy court starts with the prime rate or the T–Bill rate, the choice of nomenclature is irrelevant—although it is best to stick with the market's approach to estimating the risk premium.* On this record, the market's approach is prime-plus.

ECF No. 786, at 3 (omission in original) (quoting 102 F.3d at 875 with added emphasis). The point that warrants emphasis, however, is the one to which the Lenders did not add emphasis: "**On this record, the market's approach is prime-plus.**" 102 F.3d at 875 (emphasis added). No doubt: if market participants price loans starting at the prime rate, then a court "[t]aking its cue from ordinary lending practices," *Till*, 541 U.S. at 478, should also start with the prime rate—starting at a lower Treasury note rate would, under those circumstances, require a senseless upward adjustment equal to the spread between the two rates because the market rate includes the default risk incorporated into the prime rate. But where the evidence shows that market participants start at a Treasury note (or similar) rate and make loans to blue-chip borrowers at rates up to hundreds of basis points *below* the prime rate, there is no compelling justification for using prime as the base rate or, what is the same, adjusting the Treasury note rate by the current spread between that rate and the prime rate.

Computershare presented the testimony of Ms. Nelson in support of its upward adjustments. Her opinion was that circumstances warrant a 3.8 percentage point upward adjustment from her base rate—the prime rate at the time—yielding a cramdown rate of at least 11.39%. ECF No. 746, at 23. She testified about each of the risk factors specifically identified in the *Till* plurality opinion: "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." 541 U.S. at 479; see ECF No. 746, at 46.

i

*Circumstances of the estate.* Ms. Nelson opined that the circumstances of the estate, principally the uncertainty about the debtor's ability to fund property improvements required by Marriott to continue the franchise agreement, warrant an upward adjustment of least 50 basis points from the base rate. ECF No. 746, at 52–54. In explaining her adjustment for the "circumstances of the estate", Ms. Nelson testified about her concerns with respect to "the Debtor's ability to fund the plan improvements over time", as well as "some concerns about the availability of financing to the Debtor." *Id.* at 52. Focusing a forced-loan analogy on the winning bidder at the plan's new-equity auction, rather than on the debtor itself, she testified:

> I also have concerns about the structure of the plan which means that the identity of the borrower is not going to be known until after the plan is confirmed and the interest rate is determined. I'm not even aware – I can't even think of a situation where a lender would be making a loan – be bound by the terms of a loan if it did not know the identity of the borrower.

*Id.* at 52–53.

Ms. Nelson thus premised her opinion in part on the uncertainty over whether JSM (the debtor's current owner) can obtain necessary financing to serve as the stalking horse at the equity auction, since, if no suitable alternative stalking horse is put forward, the debtor may not be able to pay for needed property improvements. The risk Ms.

Nelson attributes to the "identity of the borrower"—apparently equating the debtor with its owner—purportedly arises from the equity auction and the possibility that an entity other than the debtor's current owner may succeed in acquiring the new equity interests at the auction. *Id.* Perhaps Ms. Nelson is correct that a hypothetical lender would find that a change in ownership creates additional default risk, but, even if that is the case, Ms. Nelson does not explain why, under the circumstances here—where the plan is funded by hotel revenues and the hotel's operations are managed by a third-party entity—a change in who holds the reorganized debtor's equity interests would materially increase the reorganized debtor's default risk. Nor does she explain why the willingness of an investor to pay more than $8 million for equity in the debtor—in essence to make a capital contribution of more than $8 million—to outbid JSM at a court-approved auction should be viewed as increasing rather than decreasing the reorganized debtor's risk of default.

The existing record leaves no doubt that if the debtor cannot secure a continuation of its Marriott franchise agreement (or a suitable alternative, which no one suggests is in the works) or cannot fund necessary renovations, then the court will not confirm the plan. In the absence of those developments, the debtor will be unable to demonstrate that plan "confirmation . . . is not likely to be followed by . . . liquidation[] or the need for further financial reorganization", as required by §1129(a)(11). If the plan is confirmed, therefore, the specters Ms. Nelson sees in the current fog of uncertainty will have been dispersed. That's also true of concerns about JSM's ability to fund the proposed stalking-horse bid, which, in all events, were allayed by Mr. Erkert's testimony that JSM *has* obtained the necessary financing to make the $8 million equity acquisition. ECF No. 745, at 58–61. And William Pederson, a director with EisnerAmper, testified that the debtor's forecasts show it will have sufficient funding to make at least the renovations that were anticipated at the time the forecasts were created. See *id.* at 29–30. Considering all of this and weighing the evidence accordingly, I find Ms.

Nelson's upward adjustment of 50 basis points based on the "circumstances of the estate" to be insufficiently supported and unpersuasive.

ii

*Nature of the security.* Ms. Nelson next opined that the nature of the security requires an adjustment upward of 200 basis points from the base rate. ECF No. 746, at 54. In support of this adjustment Ms. Nelson testified that she "look[ed] at what the value of the collateral is relative to the loan amount", describing "the loan-to-value ratio [a]s the gold standard in terms of . . . evaluating that risk". *Id.* at 54–55.

> The market currently prices real estate loans very much based on loan-to-value ratios. . . .

> So I looked at what interest rates were being charged for loans with customary loan-to-value ratios. And you can get financing in the market from 50 to 70 percent, maybe up [to] 75 [percent], for a senior loan and that's anywhere you know, in the mid-6[ percent]s to maybe, you know, high 9[ percent]s, not inconsistent with what the Debtor[ has] provided in terms of their evidence for a loan with a customary, albeit at the lower end of that range, but that's a loan with customary loan-to-value ratios.

> If you . . . look at mezzanine financing, which is . . . the amount above the 60 to 70 percent [loan-to-value ratios], usually up to 80 percent of the value of the collateral, that's anywhere from 12 to 18 percent [interest], so obviously much higher than for senior financing. And then I looked at what [the] overall requirements would be for an investor who had the 100 percent interest in the property without any debt, but just had the 100 percent interest, what type of yield that investor would require.

> . . . In this case, . . . . I very conservatively made an adjustment of 200 basis points, which . . . is a minimum adjustment. And it could be higher given just where all in rates are if you consider investor requirements, including the senior loan and mezzanine loan, that would be on a blended rate. If you look at senior loan financing and mezzanine loan financing, that's probably an overall rate of 10 percent up to that 80 percent financing.

> And if you look at what's required for the 100 percent interest, I looked at discount rates, unleveraged discount rates for hospitality properties of

this type; they're anywhere from 8 to 12 percent. But in particular, I wanted to look at this loan and I considered that both the Debtor's appraiser and the lender's appraiser used the discount rate of 11 percent. That is, they concluded that that's the yield investors would require on an unleveraged basis for the 100 percent interest in the property.

So my conservative 200 basis point adjustment to the prime is a minimum adjustment in my mind and that was how I approached the adjustment for nature of the security.

*Id.* at 54–57.

In this direct testimony, Ms. Nelson characterizes the default risk arising from the relationship between the value of the debt and the value of the collateral as relevant to the risk factor the *Till* plurality opinion calls, "nature of the security." 541 U.S. at 479. But, as discussed further below, Ms. Nelson's testimony only in passing addressed the fact that Computershare's security is real estate improved with an upscale hotel having a substantial history of meeting its regular debt-service obligations. ECF No. 746, at 114–115. And, as also discussed further below, on cross examination, Ms. Nelson seemed to combine her opinions about adjustments for the risk resulting from the relationship between the debt and the collateral value—what she first discussed in the "nature of the security" context—with her concern about the plan's duration and feasibility. ECF No. 746, at 130–132.

In all events, there is no doubt that the plan's obligation to pay Computershare the full value of its collateral carries more default risk than would be the case if the plan were paying Computershare less than the value of the collateral. And, unquestionably, lenders financing hotels similarly charge more interest as the equity cushion decreases. An upward risk adjustment, therefore, is warranted. The amount of that adjustment is addressed below, since Ms. Nelson's testimony returned to that relationship when discussing the need for an upward risk adjustment based on the plan's feasibility.

iii

*Feasibility of the plan and duration.* Ms. Nelson opined that an upward adjustment from her base rate is necessary to account for the default risk created by the third amended plan's feasibility, and a downward adjustment to account for duration. She considered the plan's duration and its feasibility separately, starting with feasibility.

a

*Feasibility of the plan.* In opining on the need for an upward risk adjustment based on plan feasibility, Ms. Nelson began by focusing on the length of the projections and repeating her opinion—first offered to justify an upward risk adjustment based on the circumstances of the estate—that uncertainty surrounding the franchise agreement and the funding of renovations creates above-par default risk, testifying:

> On feasibility, I made a 200 basis point adjustment . . . . The feasibility risks are several. There[ are] questions about . . . the length of time over which the projections occur, . . . separate and apart from interest rate risk; that . . . the longer your forecast is, there's greater risk associated just with fluctuations in those cash flows.
>
> There are uncertainties . . . with respect to the Marriott franchise agreement, which is really absolutely critical for the hotel and what is proposed under the plan. We still don't have . . . an agreed franchise agreement, nor do we have an agreed scope for the renovations and costs and timing for the renovations over time. So those continue to be risks that I see. And then again, just real clarity about the funding that's going to be available to finance those improvements over time all contribute, in my mind, to feasibility risks.

*Id*. at 58. Ms. Nelson acknowledged, however, that the debtor's recent plan amendments had somewhat reduced the feasibility risk by lowering the plan's balloon payment to an amount that Ms. Nelson believed could plausibly be paid; she stated:

> The Debtor [now] has a significantly lower number for the balloon payment at the end of the 18-year term. And when you compare it, it's higher than

the current value of $26 million, but it's, in my view, not an unreasonable amount for the property to increase in value over that period of time.

So I believe the Debtor has mitigated some of the feasibility risk on account of its repayment risk, . . . which I believe brings the 200 basis point adjustment down somewhat from what I had initially concluded based on the [debtor's] first plan.

*Id.* at 59. But Ms. Nelson then testified that, while the plan amendments made payment of the balloon more likely, they did <u>not</u> warrant a reduction of her proposed feasibility adjustment from 200 basis points, stating that any decrease would be offset by a need to increase the adjustment based on the circumstances of the estate: "I've considered the upward adjustment I needed on account of the circumstances of the estate. And considering the relative increase in risk and downward adjustment in risk, my opinion is they offset one another conservatively, so I didn't make further adjustments on account of those." *Id*. Given that Ms. Nelson relied on the same conditions—lack of renewed franchise agreement and uncertainty in funding necessary renovations—in justifying a risk increase for both "circumstances of the estate" and "feasibility," her total upward adjustment of 4 percentage points seems susceptible to a charge of double counting. That can be ignored, however, because whatever the franchise agreement and renovation risks are labeled, they are not a convincing basis for an upward risk adjustment from the base rate because, as explained above, if the debtor is unable to eliminate those risks, the court will not confirm the plan.

On cross-examination, Ms. Nelson opined that she would reach the same cramdown rate even if the debtor eliminated *all* uncertainties concerning the franchise agreement and funding for renovations, because she equates Computershare's payment risk with the return rate demanded of a "100 percent unleveraged owner" based solely on the relationship of the repayment amount to the collateral value and the eighteen-year payment period:

> [M]y testimony was that even if all of the uncertainty was addressed by the Debtor that you've just outlined, that there are still risks associated with this plan because of the fact that it's 100 percent loan-to-value loan and it's an 18-year projection. Every indication I have of loans and investments for hotels with 100 percent ownership interest is that the required rate, the required yield is much, much higher than what the Debtors are proposing to pay the secured lenders.
>
> **But the secured lender is going to be in the position of the 100 percent equity owner.** And both the Debtor's appraiser and the lender's appraiser concluded **that that yield that's required is 11 percent.** So, my testimony right before lunch was, I believe, . . . 11 percent, right? **Even if some of the current uncertainties are addressed, you're still left with the fact that you've got an asset alone in which they're effectively in the shoes of the 100 percent unleveraged equity owner.**

*Id.* at 130–31 (emphasis added). That conclusion is difficult to accept. The plan provides that Computershare will retain its lien on the hotel, a lien that secures Computershare's allowed claim up to the full value of the hotel, previously determined to be $26 million, and secures its claim should the hotel prove to be worth as much as $46 million (as a result of Computershare's exercise of its rights under §1111(b)). Twenty-six million is the amount that the present value of the plan's deferred payments must equal or exceed. One might suppose that the risk adjustment needs to account for the likelihood that the creditor will receive less than $26 million in a foreclosure (even if the court's valuation is spot-on), should the plan fail. But Ms. Nelson didn't comment on that, and, regardless, the repayment risk of a creditor secured by a hotel cannot correctly be equated with the financial risk of an investor in the entity that owns the hotel, at least not in the absence of some compelling explanation, which Ms. Nelson did not provide. This testimony on cross-examination, moreover, is strikingly inconsistent with the blended rate testimony that Ms. Nelson gave to justify her 200-basis-point adjustment for the nature of the security. Her effort on cross-examination to hang fast to her ultimate conclusion that the cramdown rate must exceed 11% even when asked to

presume away many of the principal factors she originally gave in support of that conclusion—uncertainties about the franchise agreement, the ability to fund renovations, and the prevailing party at the equity auction—substantially undermines the weight that her opinion deserves in determining an appropriate risk adjustment.

In all events, to the extent Ms. Nelson's proposed upward risk adjustment for feasibility is premised on uncertainties about the franchise agreement, the renovations, or the equity sale, that increase is unwarranted for the reason discussed previously— that the persistence of those uncertainties will doom confirmation of the plan. Additionally, the debtor's history of being able to service the debt on the hotel and the lack of any challenge to the debtor's financial projections that show the debtor able to fund the payments required by the plan (other than a challenge based on the uncertainty any eighteen-year projection carries) to some extent mitigate the need for an upward risk adjustment to account for feasibility uncertainty.

b

*Duration risk.* About the risk of default based on the plan's length, Ms. Nelson testified that after the debtor amended the plan to base the cramdown rate on the five-year Treasury note rate, to be reset every five years, she concluded that an adjustment of 61 basis points *downward* was warranted. *Id.* at 61. Because her downward adjustment is premised on the prime rate's current overstatement of anticipated inflation risk in comparison to the five-year Treasury note rate, the adjustment is inapplicable to the Treasury note base rate.

3

Computershare, as discussed above, bears the burden of proving the extent to which upward adjustments from the base rate are necessary to calculate a fair and equitable cramdown rate of interest to be paid on its claim. And, for the reasons given previously, Ms. Nelson's testimony about the magnitude of upward risk adjustments was not wholly persuasive. Still, the evidence shows that there at least needs to be an

upward adjustment to the Treasury note rate to account for risk that even the most creditworthy hospitality borrowers present. The evidence showed that the best of those borrowers pay 5% percent interest, so 120 basis points above the Treasury note rate at the time the plan was filed in August 2025 (3.8%). An upward adjustment of 120 basis points is needed to account for that risk.

Moreover, this debtor—because, no matter the reason and no matter how strong its payment history before or following the pandemic, it *is* seeking reorganization in chapter 11—cannot be found among the most creditworthy borrows in the hospitality sector. So additional upward risk adjustments are warranted, even if the plan is determined to be feasible, as required for confirmation. The vexing issue is how should the court determine the magnitude of the risk adjustment based on the evidence presented?

The *Till* plurality, having rejected the market-referencing coerced and presumptive loan approaches, does not give clear guidance on how the court should calculate the risk adjustment. To the contrary, the plurality declined to decide the issue. 541 U.S. at 480 ("We do not decide the proper scale for the risk adjustment, as the issue is not before us."). Instead, it provided some not entirely helpful observations: (a) "courts have generally approved adjustments of 1% to 3%," 541 U.S. at 480 (citing *Valenti,* 105 F.3d at 64); (b) "the court [must] select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan", *id.*; and (c) "a presumption that bankruptcy plans will succeed"—thus supporting a modest cramdown risk adjustment—"is more consistent with Congress' statutory scheme than the dissent's more cynical focus on bankruptcy debtors' 'financial instability and . . . proclivity to seek legal protection,'" *id.* at 483 (quoting *id.* at 493 (Scalia, J., dissenting)). These observations seem to suggest that the cramdown risk adjustment should be limited to a few percentage points because if the plan's default risk is greater, the court should deny confirmation. See *id.* at 482–83 ("Perhaps bankruptcy judges currently confirm too many

risky plans, but the solution is to confirm fewer such plans, not to set default cramdown rates at absurdly high levels, thereby increasing the risk of default."); see also *id.* at 485 ("If the rather sketchy data uncovered by the dissent support an argument that Chapter 13 of the Bankruptcy Code should mandate application of the presumptive contract rate approach (rather than merely an argument that bankruptcy judges should exercise greater caution before approving debt adjustment plans), those data should be forwarded to Congress."). But the opinion throws a last bone to market adherents, stating:

> [I]f all relevant information about the debtor's circumstances, the creditor's circumstances, the nature of the collateral, and the market for comparable loans were equally available to both debtor and creditor, then in theory the formula and presumptive contract approaches would yield the same final interest rate. Thus, we principally differ with the dissent not over what final rate courts should adopt but over which party (creditor or debtor) should bear the burden of rebutting the presumptive rate (prime or contract, respectively).

*Id.* at 484. Amalgamating all this, this court concludes that in determining the magnitude of the cramdown risk, the court should consider all of the evidence relating to at least the debtor's (or the bankruptcy estate's) circumstances, the nature of the collateral, and the market for loans in the relevant industry to determine the extent to which the creditor has demonstrated that the risk of plan default requires an upward cramdown rate adjustment, even though the plan of reorganization, if confirmed, is presumed to succeed (because to confirm the plan the court must conclude that the reorganized debtor is not likely to need to reorganize again (or liquidate)). In a more general sense, the creditor must demonstrate how much additional interest is necessary to compensate it for the risk of default by a debtor that proves it is more likely than not that there will be no default.

As discussed above, the evidence requires a 120-basis-point increase from the five-year Treasury note rate to account for the default risk typical of a creditworthy upscale hotel borrower. Beyond that any additional upward default risk adjustments depend principally on the testimony of Ms. Nelson, who not only failed to opine concretely on the payment risk that the debtor—as reorganized by a confirmed plan—would present but seemed to purposely evade that undertaking. Ms. Nelson based much of her upward risk adjustments on perceived risks—such as uncertainty involving the Marriott franchise agreement (including whether Marriott will require a guarantor), the costs of franchise-agreement-related renovations, and uncertainties about JSM's ability to finance its equity bid—that will either be substantially or entirely eliminated before a decision on plan confirmation *or* will result in the court denying confirmation. Those risks, as they currently exist, therefore, do not warrant a further upward adjustment of the cramdown rate.

Apart from adjusting for these factors, Ms. Nelson testified that a 200-basis-point upward adjustment is needed because the debtor is paying Computershare the full value of its collateral. ECF No. 746, at 54. In reaching her opinion on this adjustment, Ms. Nelson considered available market ranges for loans with high loan-to-value ratios and for unsecured capital contributions. But, as discussed above, her opinion in this regard is not wholly persuasive: she cast Computershare's risk status as being the same as an "unleveraged equity owner", even though the plan provides that Computershare will continue to hold a lien that fully secures its interest in the $26 million value of its collateral. *Id.* at 131 ("[T]he secured lender is going to be in the position of the 100 percent equity owner . . . they're effectively in the shoes of the 100 percent unleveraged equity owner."). Additionally, Ms. Nelson gave short shrift to the debtor's substantial history of making monthly debt service payments prior to it suffering pandemic-related business losses and its inability to meet a mandatory repayment obligation that eventually led the debtor to file a bankruptcy petition. *Id.* at 114–17; ECF No. 632, at 5.

The debtor's pre-pandemic financial viability is supported by the fact that in March 2020, immediately before the pandemic, the debtor was positioned to secure refinancing of its secured debt.[16] And the evidence at the valuation portion of the hearings showed that the hotel is well positioned to operate profitably going forward. Computershare has not presented convincing evidence to doubt that the reorganized debtor will be able to perform as stated in its financial projections, with one caveat: Ms. Nelson did persuasively suggest on cross-examination that even if all the plan-feasibility risks she identified are eliminated before confirmation, the plan's eighteen-year term justifies some upward increase because forecasts become less reliable the further into the future they predict. ECF No. 746, at 129–30. She did not, however, opine on the cramdown rate adjustment amount she would attribute solely to this forecast-uncertainty risk of the (presumably) reorganized debtor.

Ms. Nelson also sought to align her opinion as to the appropriate cramdown rate adjustments with what she concluded a similarly situated debtor might be able to achieve outside of bankruptcy. And, while that undertaking is similar to the coerced or presumptive loan approaches rejected by the *Till*, marketplace evidence, as discussed above, remains potentially relevant to determining the magnitude of risk adjustments to the base rate. But her testimony that upward adjustments sufficient to reach a cramdown rate in excess of 11% are justified (even if one presumes the plan is confirmable)—because, in substantial part, that is the rate a capital contributor would demand—seems outcome-driven, which, again, significantly undercuts the weight of her overall opinion on the appropriate cramdown rate. Still, Ms. Nelson's testimony relating to the need to adjust the cramdown rate upward to account for the risk

---

16.     Randall Erkert testified that immediately before the COVID-19 pandemic he had arranged a refinancing of the debtor's loans that was scheduled to be finalized in March 2020. ECF No. 745, at 51. The refinancing deal did not close because once COVID-19-related closings started, lenders stopped making loans. *Id*.

resulting from the plan's eighteen-year duration injecting uncertainty into the financial projections and its payment provision being akin to financing at a 100% loan-to-value justify some upward adjustments to the base rate. All things considered, a 200-basis-point upward default-risk adjustment is necessary to account for these risks even presuming confirmation of the plan.

In sum, based on the evidence presented and considering that the burden of demonstrating upward adjustments is on Computershare, the court finds that the plan's future payments on Computershare's allowed secured claim must be discounted at a rate equal to the prevailing rate for five-year Treasury notes, as referenced in the plan, plus 320 basis points.[17] The plan currently provides for a similar rate (270 basis points above a reported five-year Treasury note rate of 3.8 percent (ECF No. 710, at 9)), and because the base rate has decreased since the debtor last amended the plan (to a current rate of about 3.6%), the court's determination that a 320-basis-point adjustment is needed does not mean that any shortfall in the plan's proposed cramdown rate justifies a conclusion that the debtor lacks "any realistic prospect of effective reorganization." See *Timbers*, 484 U.S. at 376.

---

17. Though, if the base rate were the prime rate, based on the evidence as discussed in the text above, the court would adjust the prime rate downward to account for the fact that the most creditworthy borrowers in the hotel financing market pay 5%, so 250 basis points less than the 7.5% prime rate utilized by Ms. Nelson. That downward adjustment would be only partially offset by the 200-basis-point upward default-risk adjustment found necessary to account for the duration and feasibility risks. The net result, applied to a base rate of 7.5%, is 7% (750 − 250 + 200). Ms. Nelson acknowledged the need for at least some downward adjustment from the prime rate to account for the fact that market-based interest rates, i.e., Treasury notes, reveal an expectation that inflation is expected to decrease in the next five years. See ECF No. 746, at 61–62 (Nelson testified as follows, "The prime rate . . . incorporates what . . . . inflationary risks are expected to be right now. Those risks – the interest rate is expected to go down in five years. So, if I'm using the prime rate, it's overcompensating for interest rate risk because the current interest rates are higher than what the expectation is in five years, so I have to adjust downward" by 61 basis points.).

C

Even putting aside the cramdown rate issue, the Lenders contend that the debtor
has no reasonable possibility of successfully reorganizing soon because it is doubtful
that the plan is "feasible"—i.e., that the plan will not result in a subsequent liquidation
or financial reorganization—because, they argue, the debtor's projections are too
uncertain, "leaving feasibility . . . in doubt". ECF No. 760, at 31. This contention is
unpersuasive.

Like Ms. Nelson's testimony about the circumstances of the estate and feasibility
of the plan, the Lenders argue that the debtor's projections are too speculative because
the debtor has not finalized a franchise agreement with Marriott, has not obtained the
necessary guaranty for the franchise agreement, and does not know the scope and costs
of the expected property improvement plan that Marriott will require for the hotel. ECF
No. 760, at 31–32. On top of this, the Lenders complain that JSM, the proposed stalking
horse, has not confirmed to their satisfaction that it has access to sufficient funds to
make the contemplated $8 million bid for the new equity offering. *Id*. at 32–33.
Consequently, they argue, the projections that Ms. Friedland prepared—for "the first
time in her career"—are unreliable. *Id*. at 32. And, they say, if nothing else, testimony
showed that the estimate of renovation costs contained in those projections may be
understated, because Mr. Erkert testified that "Marriott may require a substantially
more expensive . . . renovation at the Hotel within the first five years." *Id*. at 32.

This is no confirmation showstopper. Mr. Erkert, the managing member of
JSM—the debtor's managing member and principal owner since hotel operations began
in 2011—testified about the debtor's chances of successfully reorganizing. ECF No. 745,
at 48–61. As discussed above, he credibly explained that the debtor was on track to
refinance its debt in March 2020, immediately before the COVID 19 pandemic made
financing unavailable and altered the demand for hotel services. *Id*. at 51. He further
testified that, based on his experience, review of the financial projections, and personal

knowledge, (1) the debtor will be able to meet its obligations under the plan and (2) JSM (through financing it has secured) will have the means to bid $8 million to acquire a new equity position in the debtor. *Id.* at 55, 58 & 76–78. He also testified that those funds and the debtor's existing reserves are expected to be sufficient to complete any improvements that Marriott might require as a condition of continuing the hotel's franchise agreement—a matter that the debtor is currently negotiating with Marriott. *Id.* Mr. Erkert's testimony was credible, and the Lenders' evidence does not contradict it.

Ms. Friedland, who has substantial experience in modeling hotel acquisitions, including evaluating the reasonableness of performance projections, prepared budgets, a five-year forecast, and an eighteen-year forecast for the hotel's post-confirmation operations. Based on these forecasts and projections, Mr. Pederson, one of Ms. Friedland's colleagues, testified that the debtor is expected to be able to meet the commitments required by the proposed plan. Mr. Pederson further opined that the debtor will not need to reorganize further and that at the end of plan's term, the hotel's value will likely be 60–65% of the amount needed to make the balloon payment as provided in the plan. Ms. Friedland's testimony supports the inference that the debtor will then be able to secure the necessary financing to complete the plan.

The Lenders attack Ms. Friedland's credibility, labeling her a novice for never previously having prepared projections for a debtor in bankruptcy and for lacking objectivity as to the reasonableness of her projections, arguing that, of course she "belie[ves] that the projections are reasonable, *she is the one who prepared them*", and that her "testimony carries little weight because it is not an independent evaluation of Debtor's projections and is inherently biased." ECF No. 760, at 32. None of this is compelling. And, while the Lenders bemoan the debtor's failure to present testimony from the hotel's current manager, White Lodging, it is more notable that the Lenders, who say that Ms. Friedland's projections are suspect, themselves called no one from White Lodging. If White Lodging's knowledge about the hotel's historical financial

statements, current budgets, or anything else materially undermines Ms. Friedland's work, one would expect the Lenders to have presented evidence from White Lodging, especially since White Lodging is no longer aligned with the debtor and White Lodging's counsel attended several days of the evidentiary hearing. The Lenders presented neither lay nor expert testimony undermining the opinions of Ms. Friedland and Mr. Pederson about the reasonableness of the debtor's projections. At least for now, those projections are adequate to show a reasonable likelihood of successful reorganization in the near term.

That said, the Lenders rightfully emphasize that the projections are made inherently uncertain by the debtor's continuing negotiations with Marriott about extending the hotel's franchise agreement. The court presumes that the debtor's effort at reorganization will fail if it cannot reach terms with Marriott before or in connection with the hearing on plan confirmation. But weighing the evidence presented in the context of whether to now grant the Lenders' request for relief from the §362(a) stay, the court finds that the evidence demonstrates that the debtor continues to have a reasonable probability of successfully reorganizing.

D

Although the court concludes that the Lenders have not demonstrated that the clock has expired on the debtor's time to successfully reorganize, the debtor should recognize that "reasonable time" requires a judgment call—one that a court might justifiably have answered differently under the circumstances presented, including the debtor's continued lack of an extension of the franchise agreement and that at least some of the auction procedures proposed in the amended plan are problematic, if not outright unacceptable. There should be no confusion: if this case is not confirmed "when the flowers start to bloom next spring," *United States v. Warneke*, 199 F.3d 906, 909 (7th Cir. 1999), the court anticipates that the Lenders will have by then been relieved of the §362(a) stay, either by order or by operation of law.

## III

For these reasons, IT IS ORDERED as follows:

1.  The stay imposed by §362(a) is modified to terminate upon entry of an order by the court denying confirmation of all plans of reorganization filed or last amended no later than December 31, 2025, *and* the Lenders' subsequent filing of a request that the court enter an order terminating the stay pursuant to this order, accompanied by a proposed order so providing.

2.  The Lenders' motion under §362(d)(2) for relief from the §362(a) stay is otherwise denied without prejudice.

# # # # #

---

\*      This redocketed Opinion and Order corrects two non-substantive errors on page six of the original, changing "debtors" to "debtor" and "have" to "has."