So Ordered.

Dated: April 2, 2026



G. Michael Halfenger
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Wisconsin & Milwaukee Hotel LLC,  Case No. 24-21743-gmh
Chapter 11

Debtor.

**OPINION AND ORDER
DENYING MOTION UNDER RULE 8007 TO SUSPEND PROCEEDINGS AND
CONTINUING PROCEEDINGS THROUGH CONFIRMATION**

Creditors Computershare Trust Company, N.A., and Wisconsin & Milwaukee

Hotel Funding LLC (collectively, Lenders) appealed this court's December 5, 2025 order

denying them immediate relief from the automatic stay to enforce liens on the debtor's

property to collect pre-bankruptcy debts, see §362(a) of the Bankruptcy Code, but

entitling them to that relief if the debtor fails to confirm its fourth amended plan of

reorganization.[1] On January 29, 2026, Lenders requested that this court suspend all

proceedings in this chapter 11 bankruptcy case until their appeal is concluded. ECF No.

885, at 20–21. This opinion and order denies that request.

---

1.  Unless otherwise specified, all references to statutory sections are to the Bankruptcy
Code, title 11 of the United States Code.

*Overview*: After a review of relevant proceedings (Part I), this opinion:

- Concludes that Lenders' appeal of the December 5 order (Order) does not divest the bankruptcy court of jurisdiction to continue proceedings relating to confirmation of the debtor's pending fourth amended plan of reorganization and related request for approval of procedures for the sale of equity interests in the reorganized debtor. (Part II.A.)

- Concludes that suspension of the bankruptcy proceedings pending the resolution of Lenders' appeal is unwarranted for several reasons (Part II.B), including:

  - Lenders have not shown that their appeal is likely to succeed on the merits (Part II.B.1) because:

    - As the District Court has previously ruled, a bankruptcy court is within its discretion to deny stay relief requested on the grounds that the debtor's property is not necessary for an effective reorganization, if the property is logically required for a plan of reorganization that has a reasonable possibility of succeeding within a reasonable time, the test for which is "feasibility, meaning that the bankruptcy judge need not find a plan *per se* confirmable; rather, it should be enough that a plan has a realistic chance of being confirmed." *Wells Fargo Bank NA v. Dilworth (In re Dilworth)*, No. 14-CV-375, 2014 WL 5305904, at *4 (E.D. Wis. Oct. 15, 2014) (quotation omitted). (Part II.B.1.a.)

    - The Order is reviewed for abuse of discretion, with its findings of fact reviewed only for clear error and while its conclusions of law are reviewed de novo, an error of law may give rise to an abuse of discretion only if the discretionary ruling is premised on that error. (Part II.B.1.a.)

    - The court concluded that the debtor's reorganization plan had a reasonable chance of being confirmed in a reasonable time, if further amended, based on findings about the debtor's ability to pay required claims, including paying Computershare's secured claim in full with interest at a rate equal to the five-year Treasury note plus 2.7%. (Part II.B.1.b.)

- Lenders do not show that the Order is premised on an erroneous legal conclusion or that any legal error is reversable, rather than harmless:

  - ➢ The Order is based on a correct application of the burden of proof and, even if it were not, any such error would be harmless. (Part II.B.1.c.)

  - ➢ Under the circumstances of this case, the decision to afford the debtor a final opportunity to confirm a fourth amended plan is a reasonable exercise of discretion. (Part II.B.1.c.)

  - ➢ Lenders' contention that proposed plan terms and auction procedures are grounds for reversal misconstrues the stay-relief test as one requiring the debtor to show that a pending plan satisfies all confirmation requirements, and the plan provisions and proposed auction procedures the Lenders dispute are either not necessary for the debtor to successfully reorganize, not inconsistent with chapter 11's confirmation requirements, or both. (Part II.B.1.c.)

  - ➢ Lenders' effort to show that the Order is based on a clearly erroneous finding of an appropriate interest rate is unsupported by the record. (Part II.B.1.c.)

- o The Lenders have not shown that continuation of the proceedings though plan confirmation will cause them irreparable harm and continuing the proceedings best promotes efficient judicial administration. (Part II.B.2.)

- o The public interest aligns with chapter 11's preference for reorganization over liquidation and disfavors allowing an appeal that is final as to a discrete relief-from-stay proceeding but otherwise interlocutory to bring the entire case to a halt. (Part II.B.3.)

I

*The debtor, its principal creditors, and initial case proceedings.* Debtor Wisconsin & Milwaukee Hotel LLC owns the Milwaukee Marriott Downtown, a full-service hotel in Milwaukee, Wisconsin, that is operated under a franchise agreement with Marriott International, Inc. (Marriott) and managed by White Lodging Services Corporation (White Lodging). ECF No. 547, at 2; see also ECF No. 632, at 1–2. The Lenders (i.e., Computershare Trust Company, N.A., (Computershare) and Wisconsin & Milwaukee Hotel Funding LLC) hold debt secured by the debtor's assets, including the hotel. ECF No. 632, at 1–5. The debtor was unable to pay its obligations to the Lenders when they demanded full payment on April 1, 2024, resulting in the debtor commencing this bankruptcy case by filing a chapter 11 petition on April 9, 2024. ECF No. 632, at 5.

After commencing the case, the debtor in possession—statutorily charged with operating the debtor's business and maximizing the value of its bankruptcy estate through a plan of reorganization or liquidation, see §§1107(a) & 1108—litigated several disputes with the Lenders and White Lodging, with whom it was then at odds. In July 2024 the debtor requested an extension of the time in which it alone could file a chapter 11 plan. ECF No. 195. On July 31, 2024, after no one objected, the court granted that request, extending the debtor's exclusivity periods to file a plan to December 9, 2024, and to obtain acceptance of the plan to February 7, 2025. ECF Nos. 198 & 217.

On November 18, 2024, the debtor requested a further extension of the exclusivity periods, explaining that continuing litigation with the Lenders relating to the amount of Computershare's claim and the value of its secured claim, as well as with White Lodging about its claims and management agreement, constituted sufficient cause to afford the debtor more time to propose a plan of reorganization. ECF No. 318. The court agreed and, over the Lenders' and White Lodging's objections, extended the debtor's exclusive right to file a plan to February 7, 2025, and to obtain acceptance of the plan to April 8, 2025. ECF No. 331, 335–36, 346, 350 & 357.

*Debtor files a plan of reorganization.* On February 7, 2025, the debtor filed its plan of reorganization and proposed disclosure statement for use in soliciting acceptance of the plan, as required by §1125(b). ECF Nos. 392–93. The Lenders objected to approval of the disclosure statement, and in response, the debtor filed an amended disclosure statement and amended plan that it contended adequately addressed the Lenders' objection. ECF Nos. 479 & 486–87. At an April 7, 2025 hearing, the court approved the amended disclosure statement, extended the deadline for the debtor to obtain acceptances of its plan to May 16, 2025, set a deadline for objecting to the plan, and scheduled an evidentiary hearing on plan confirmation to begin on July 21, 2025.[2] ECF Nos. 494–95. The class of general unsecured creditors all voted to accept the plan, thus making the plan potentially confirmable. ECF No. 545, at 4–5; see also §1129(a)(10) (requiring at least one class of impaired claims to accept the plan) & §1129(b)(1).

On May 21, 2025, the Lenders and White Lodging filed objections to confirmation. ECF Nos. 550–51. Marriott filed a limited objection and reservation of rights, explaining that the debtor and Marriott were "discussing a potential consensual resolution to Marriott's concerns about the Debtor's assumption of the [Marriott] Franchise Agreement . . . in connection with its Plan, as well as the Debtor's ongoing operation of the Hotel . . . under the Marriott flag." ECF No. 547, at 1. Because Marriott had not yet finalized an agreement with the debtor, it stated that it was not then consenting to the assumption of its franchise agreement under the debtor's plan of reorganization but, "[i]f the negotiations are successful, the expectation is that Marriott and the Debtor will enter into a stipulation governing the terms of the Debtor's assumption of the Franchise Agreement, in either its current form or an agreed upon

---

2. On April 9, 2025, the debtor filed a letter requesting leave to file further revisions to the amended disclosure statement and plan that were negotiated between the debtor and the United States trustee. ECF No. 501. The court granted that request, and the debtor filed an amended disclosure statement and amended chapter 11 plan on April 10, 2025, which it then used to solicit votes in April and May of 2025. ECF Nos. 502–04 & 508.

amended form." *Id*. On May 29, 2025, the court entered an order requiring the debtor, among other things, to file and serve, by no later than July 11, 2025, "any new or revised management agreement and franchise agreement, with appropriate motions to authorize, assume, or reject agreements". ECF No. 562, at 2.

*The Lenders move for relief from stay.* On June 5, the Lenders filed a motion seeking relief from the §362(a) stay, asserting that they were entitled to relief under §362(d)(2) because the debtor has no equity in the hotel and the hotel is not necessary for an effective reorganization. ECF No. 577. The court held a preliminary hearing on Lenders' motion on June 10, 2025, and, based on the Lenders' agreement "that there [wa]s a reasonable likelihood that the debtor will prevail on the motion at the final hearing", see §362(e)(1), the court continued the automatic stay to the final hearing, which the parties agreed would be held "at the end of the confirmation hearing, scheduled for July 21, 2025, through July 25, 2025." ECF No. 593, at 2; see also ECF No. 587. The court further ordered the debtor "to file a final amended plan by no later than June 27, 2025" and stated that the June 27 deadline was "a final plan amendment deadline, and the debtor [wa]s not authorized to file any additional amended plans without further leave of the court." ECF No. 593, at 2. The court's order setting a "final plan amendment deadline" made it clear that the debtor could not file an additional amended plan *without further court approval.* Notably, this provision, which the court routinely includes in orders scheduling evidentiary confirmation hearings, is designed to guard against the otherwise common bankruptcy practice of filing plan amendments on the eve (or day) of a confirmation hearing, which can derail the parties' and the court's ability to prepare for and conduct the confirmation hearing; the provision is not intended to limit the court's discretion to allow further plan amendments when the plan's proponent demonstrates that there is a good reason to do so. See, *e.g., In re Settlers' Housing Svc., Inc.*, 505 B.R. 483, 489–90 (Bankr. N.D. Ill. 2014) ("Debtor was ordered to file a Plan to sharpen the issues for this hearing, not to bind Debtor to terms of its initial Plan.").

The debtor filed a second amended chapter 11 plan on June 27, 2025, which, among other things, increased payments on Computershare's secured claim and providing for a sale of new equity interests. ECF No. 621. The court ordered the debtor to be prepared to address two issues at the pretrial conference for the July 21 confirmation hearing: first, how the plan's proposed equity offering could be approved without the benefit of market valuation and, second, whether creditors can bid the value of their loans if the debtor elects to solicit new investment. ECF No. 654. As the order indicated, in the absence of satisfactory answers to these inquiries, which the court had not found in its preliminary review of the debtor's brief in support of plan confirmation, the debtor's plan appeared not to comply with §1129(b)(2)(B)(ii) (known in bankruptcy parlance as the "absolute priority rule"), which would render it unconfirmable over the Lenders' objection. ECF No. 654. After a discussion at the final pretrial conference, the debtor stated that it would further amend its chapter 11 plan "to address the absolute priority rule issues identified by the court in its July 17, 2025 docket order." ECF No. 660, at 2. As a result, instead of proceeding with the planned July 21 chapter 11 confirmation hearing, the court, after receiving input from the parties at the pretrial conference, convened "an evidentiary hearing on the valuation of Computershare['s] collateral, and on [the Lenders'] motion for relief from the automatic stay" beginning on July 22, 2025.[3] *Id.* The court made clear, however, that its findings on valuation and the rate of interest a reorganization plan would have to pay

---

3.    On July 18, 2025, the Lenders filed a supplement to their motion for relief, and, as the court's subsequent July 18 order observed, "the Supplement [wa]s intended to emphasize Lenders' oft-repeated point (including at the July 17 hearing) that, in their view, the debtor has taken too long to confirm a plan and appears again to be seeking more time to cure fatal defects in its plan of reorganization." ECF No. 665; see also ECF No. 659. The court observed, "[t]his point is not without force," but reiterated what it had ruled at the July 17 hearing, "that a sequential presentation of evidence best serves the just and efficient administration of this case, including the adjudication of the Lenders' motion" and found "based on the record in this case and the court's familiarity with other proceedings before it that there are compelling circumstances for extending the time to decide the motion such that the time is extended by this order until 28 days after the conclusion of all evidentiary proceedings on the motion and the final ordered submission made in connection with the motion." ECF No. 665.

Computershare would presumptively apply to debtor's effort to confirm its further amended plan. ECF No. 660, at 2.

*Evidentiary hearing on the Lenders' stay-relief motion: hotel valuation.* The court proceeded to conduct a two-part evidentiary hearing to adjudicate the Lenders' motion for relief from stay under §362(d)(2). The court held part one on July 22, 23, and 24 to determine the value of the debtor's hotel, with the debtor and the Lenders both offering appraisal testimony from competing experts. ECF No. 697. The court announced an oral ruling on valuation on July 25, 2025, concluding from the evidence presented that "the hotel has a fair market value of $26 million." *Id*. at 2. The court ordered the debtor to file "a final version of its chapter 11 plan by no later than August 4, 2025." *Id*. (emphasis omitted).

*Debtor files its third amended plan.* The debtor timely filed a third amended chapter 11 plan. ECF Nos. 710–11. The third amended plan changed the interest rate to be paid on Computershare's secured claim to an initial 6.5 percent, paying a 2.7% risk premium over the five-year Treasury note rate, adjusted every five years in accordance with then-prevailing market rates. See ECF No. 710, §3.3. The third amended plan also provided that to raise at least $8 million of additional funds (principally for renovations expected to be required by Marriott to continue franchising the hotel), the debtor would move under §363 for approval of an auction of equity interests in the reorganized debtor. ECF No. 710, at §5.10. The third amended plan contemplated proposing for court approval auction procedures under which the debtor's principal owner would make an $8 million stalking-horse bid, subject to a breakup fee of $280 thousand, and other bidders had to pay in cash and show the ability both to bid up to $12.6 million and step in as the guarantor of the debtor's obligations to Marriott. ECF No. 710, at §5.10. The third amended plan further provided that sale proceeds exceeding $8 million (less any breakup fee) would first be distributed pro rata to unsecured creditors and, if those

creditors were paid in full, to the debtor's former owners, whose prior equity interests would otherwise be terminated. ECF No. 710, §§3.7, 3.13 & 5.10.

*Marriott's limited objection to debtor's motion to assume franchise agreement.* On August 1 Marriott, whose franchise agreement the third amended plan assumes as amended, filed a "reservation of rights and limited objection" to the debtor's motion to assume the franchise agreement, stating that although "negotiations are not yet finalized, and the terms have not yet been memorialized in a definitive agreement, Marriott [wa]s hopeful that the Parties will be able to reach an agreement in the near term that would permit the Debtor to assume the Francise Agreement without objection from Marriott." ECF No. 706, at 2. Marriott further reported that it was "committed to continuing its discussions with the Debtor in an attempt to consensually resolve the[] open issues" and requested that the court "delay ruling on the [assumption] Motion until either the Parties submit an agreed-upon written stipulation governing assumption of the Franchise Agreement or Marriott notifies the Court that no such agreement can be reached." *Id.*

*Continued evidentiary hearing on Lenders' motion: Determination of the debtor's ability to finance a plan of reorganization that includes paying Computershare's secured claim with interest as required by §1129(b).* The court held part two of the motion-for-relief evidentiary hearing on August 6, 11, and 14, 2025, as scheduled. The debtor offered testimony from Randall Erkert, a managing member of Jackson Street Management LLC (JSM), the debtor's managing member, and from financial experts, Deborah Friedland and William Pederson, to show principally that the debtor's financial projections establish that it will be able to fund the plan through hotel operating revenue plus the equity sale proceeds. ECF Nos. 734, 736 & 745. The Lenders offered expert testimony from Cynthia Nelson on the rate of interest necessary to satisfy §1129(b)(2)(A)(i)(II)'s confirmation requirement that the plan's stream of deferred payments to Computershare at least equal the present value of its secured claim at the plan's

effective date. ECF Nos. 734 & 736. At the conclusion of the hearing the court set a briefing schedule that ran through September 29, 2025. ECF No. 734.

*Post-hearing proceedings.* After the court reviewed the parties' post-hearing briefs, it requested supplemental submissions concerning the selection of an appropriate interest (discount) rate under §1129(b)(2)(A)(i)(II). An October 29, 2025 order required the parties to file further submissions addressing that order's specific inquiries by no later than November 13, 2025. ECF No. 774 (discussing the application of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), to the evidence presented in this case). The court also directed both parties to submit proposals for a course of proceedings to finally adjudicate the debtor's plan of reorganization if the court denied the Lenders' request for immediate relief from the stay. ECF Nos. 774, 784–85 (extending deadline at parties' request). The parties timely complied with both orders.

*The Order denying immediate stay relief.* The court entered an opinion and order on December 5, 2025. ECF No. 803 (redocketed on January 5, 2026, as ECF No. 845, after correcting two nonsubstantive clerical errors) (all subsequent references to this opinion and order are in the form "Order, at __"). Based on a finding that the debtor likely has the means to finance a feasible plan of reorganization that may timely be confirmed, the Order denied the Lenders' request for immediate termination of the stay and granted the debtor leave to file a fourth amended plan. But, taking account of the case's duration, the court also modified the stay to entitle the Lenders to stay relief if the debtor's final effort to confirm an amended plan failed.[4]

In addition to finding that the debtor has the means to fund a feasible plan of reorganization, the Order addresses two other sets of issues: First, it addresses the

---

4. The Order modifies the §362(a) stay "to terminate upon entry of an order by the court denying confirmation of all plans of reorganization filed or last amended no later than December 31, 2025, *and* the Lenders' subsequent filing of a request that the court enter an order terminating the stay pursuant to this order, accompanied by a proposed order so providing." Order, at 55. The deadline for the debtor to file a fourth amended plan was subsequently modified to January 12, 2026. ECF No. 817, at 2.

Lenders' principal post-evidentiary hearing arguments that, as they stated, the debtor could not meet its burden to show it had a reasonable prospect of timely confirming a plan because debtor's plan as then proposed was "patently unconfirmable". ECF No. 760, at 7–8 (citing authorities for proposition that "'effective reorganization' standard is not met when proposed plan is patently unconfirmable"); *id.* at 13 ("Lenders' Motion should be granted because the August 4 Plan is patently unconfirmable: it violates the absolute priority rule like the plan that preceded it."); *id.* at 20 ("The August 4 Plan is patently unconfirmable: overpaying Computershare violates the absolute priority rule." (capitalization altered) (emphasis omitted)). Second, the Order addresses the Lenders' contention that the debtor's plan was not confirmable because it pays interest on Computershare's secured claim at a rate less than 11%. *Id.* at 34 ("At an interest rate of 11.39% (or even 11.14%), the August 4 plan is neither feasible nor satisfies the requirements of §1129(b)(2)(A)(i)(II)." (capitalization altered) (emphasis omitted)); see also *id.* at 21–33 (arguing evidence at trial showed that the required interest rate for determining the value of the deferred payments on the plan's effective date exceeds 11%, and thus the August 4 plan is not confirmable).

The first of these sets of issues—whether the debtor's plan was "patently unconfirmable"—involves the Lenders' contentions that the plan offended §1129(b)'s absolute priority rule in how it provided for payment of Computershare's secured claim and in its proposal to raise at least $8 million by selling equity interests in the reorganized debtor at a cash auction in which the debtor's owner, JSM would be the stalking horse that opens the bidding. The Order concludes that the Lenders' absolute-priority-rule arguments did not make "patently unconfirmable" an amended plan funded in part by proceeds from a competitive sale of equity interests in the reorganized debtor. See, e.g., Order, at 4–21. In addition, as the Order reasons, many of Lenders' arguments challenged proposed auction procedures that had not yet been presented for adjudication. See, e.g., Order at 15 n.5. Given that future court approval of

any auction procedure was necessary, the court reasoned that a potential failure of some of the debtor's proposed procedures did not entail that the debtor had failed to show a reasonable likelihood of promptly confirming a plan. Order, at 6.

As to the second set of issues—those relating to the debtor's ability to timely confirm a reorganization plan that pays adequate interest—the court found that a plan paying interest on Computershare's secured claim at a rate equal to the five-year Treasury note rate (readjusted every five years) plus 320 basis points will satisfy §1129(b)(2)(A)(i)(II)'s interest requirement. Order, at 19–51. Based on that finding, the court concluded that the debtor's financial projections demonstrated that income from the hotel will be adequate to fund the plan, since those projections were based on the third amended plan's materially similar interest rate of 270 basis points over the five-year Treasury note benchmark rate. Order, at 51–54.

*Further proceedings to determine plan confirmation or grant stay relief to pursue foreclosure.* On the same day the court entered the Order, it also entered a supplemental case management order scheduling a December 11, 2025 case management conference. ECF No. 804. Based on the parties' input at the December 11 conference, the court further ordered that the Lenders could request termination of the stay if (1) the debtor failed to file, by January 12, 2026, a fourth amended plan, an amended disclosure statement, a motion for the sale of debtor's equity, and a signed stipulation with Marriott agreeing to all amendments to the franchise agreement or (2) the court entered an order denying confirmation of any timely filed plan. ECF No. 817, at 2 & Order, at 54–55. Unlike the court's previous orders setting final plan amendment deadlines, these orders modify the automatic stay to entitle the Lenders to relief from that stay if the debtor fails timely to file or confirm a fourth amended chapter 11 plan.

After considering the parties' proposals on continued proceedings at the December 11 conference, the court set a comprehensive schedule culminating in a final evidentiary hearing on confirmation of the debtor's chapter 11 plan to commence on

May 26, 2026. ECF No. 817. *Id.* The Lenders filed a notice of the appeal of the Order on December 17, 2025. ECF No. 824.

On January 12, 2026, the debtor timely filed its fourth amended plan of reorganization, a second amended disclosure statement, a motion to approve bidding procedures for the sale of equity, and a stipulation with Marriott authorizing the assumption of the Marriott franchise agreement. ECF Nos. 849–856. No objections were filed to the disclosure statement, and the court entered an order approving the second amended disclosure statement on February 3, 2026. ECF No. 892.

On January 26, 2026, the Lenders filed a "Statement of Jurisdiction in Light of Pending Appeal", which concludes that this court "has been divested of its jurisdiction to proceed with plan confirmation and the proposed sale of new equity." ECF No. 871 at 8. On January 29, 2026, the Lenders moved under Federal Rule of Bankruptcy Procedure 8007 to suspend all proceedings in this court until "the resolution of Lenders' appeal." ECF No. 885, at 21. The debtor objects, contending that (1) this court retains jurisdiction to adjudicate plan confirmation and its motion to approve auction procedures and (2) the court should not suspend these proceedings because the appeal lacks merit and further proceedings will not irreparably harm Lenders. ECF No. 913.

II

A

*Divestiture.* As between federal district courts and the courts of appeals, an appeal of a judgment divests the trial court of jurisdiction over the case and vests it in the appellate court. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 731 (7th Cir. 2001) ("[O]nce a notice of appeal is filed with the district court it is divested of jurisdiction over the case, and the appellate court assumes jurisdiction." (citing *Kusay v. United States*, 62 F.3d 192, 193 (7th Cir. 1995))). Similarly, "[t]he filing of a notice of appeal to a district court divests a bankruptcy court of jurisdiction to proceed with matters raised by such appeal." *In re Stat. Tabulating Corp., Inc.*, 60 F.3d 1286, 1289 (7th Cir. 1995) (quoting *In re*

*de Kleinman*, 150 B.R. 524, 526 (Bankr. S.D.N.Y. 1992)).

But because "[a] bankruptcy case involves 'an aggregation of individual controversies,' many of which would exist as stand-alone lawsuits but for the bankrupt status of the debtor", *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501 (2015) (quoting 1 *Collier on Bankruptcy* ¶5.08[1][b], pp. 5–42 (16th ed. 2014)), divestiture in the bankruptcy context is limited to the bankruptcy court's authority to annul or vacate the appealed order. See *Belda v. Marshall*, 416 F.3d 618, 620 (7th Cir. 2005) ("A bankruptcy court retains jurisdiction over cases before it throughout the term of the plan. This is true because regardless of the status of any appeals, the court must be able to protect the rights of the various interested parties by enforcing the debtor's performance under the reorganization plan and ensuring that the trustee properly administers the plan throughout its term."). An appeal from the bankruptcy court thus "does not prevent the [bankruptcy] court from taking action 'in furtherance of the appeal.' Nor does it prevent the court from entertaining motions on matters collateral to those at issue on appeal." *Mahone v. Ray*, 326 F.3d 1176, 1179 (11th Cir. 2003) (citations & footnote omitted) (first quoting *Lairsey v. Advance Abrasives Co.*, 542 F.2d 928, 930 (5th Cir. 1976); and then citing *Doe v. Bush*, 261 F.3d 1037, 1064 (11th Cir. 2001)).

The Lenders' appeal of the Order denying their request for immediate relief from the §362(a) stay does not render useless further bankruptcy proceedings on other matters, including confirmation of debtor's fourth amended plan and its request for approval of auction procedures. On the contrary, the Order provides that the Lenders will be entitled to relief from the stay if the debtor is unable to confirm an amended plan by the deadlines ordered on December 11, 2025. Further proceedings—filing an amended plan, an amended disclosure statement, and motion to approve auction procedures; the court's approval of the disclosure statement; solicitation of plan acceptances; adjudication of the request to approve the action procedures; and plan confirmation—are all either already accomplished or being currently undertaken to

determine finally whether the debtor may reorganize in a manner authorized by the Bankruptcy Code. Even if the District Court on appeal were to order that the Lenders are entitled to stay relief immediately, this court would still have jurisdiction to adjudicate all of the contemplated proceedings, since an order granting relief from the stay does not end the chapter 11 case—it is neither a dismissal nor a conversion to chapter 7. See, e.g., *In re Saguaro Ranch Dev. Corp.*, No. 4:09-BK-02484, 2011 WL 2182416, at \*1–3 (Bankr. D. Ariz. June 1, 2011) ("[C]onfirmation of the 3rd Plan will not have the effect of interfering or circumventing the Lift Stay Order because if the 3rd Plan is confirmed, the Property will revest in the Debtors . . . and, as a result, there is no longer an automatic stay in effect." (citing *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n*, 997 F.2d 581, 589 (9th Cir.1993))).

Lenders "argue . . . that the Court's decisions on [bid-procedure] issues were wrong, and the District Court will be deciding whether those decisions were correct, in some cases as a matter of law"; based on that premise, they conclude that the bankruptcy court "**no longer has jurisdiction over those <u>issues</u>** because they are being properly presented on appeal." ECF No. 923, at 22 (emphasis added). That conclusion is based on an incorrect understanding of the nature of appellate jurisdiction: "courts of appeals 'review[ ] judgments, not statements in opinions.'" *E.E.O.C. v. Chi. Club*, 86 F.3d 1423, 1431 (7th Cir. 1996) (quoting *Black v. Cutter Lab.*, 351 U.S. 292, 297 (1956)). "A judgment is the resolution of the case or controversy, not a statement or intermediate finding to which the prevailing party might take exception." *Id.*; see also *Foreign Car Ctr., Inc. v. Salem Suede, Inc. (In re Salem Suede, Inc.)*, 221 B.R. 586, 594 (D. Mass. 1998) ("An appellate tribunal (including a United States district court when sitting on appeal in bankruptcy matters) ordinarily reviews judgments or orders, not opinions or reasoning.").

Lenders also argue that if the court approves auction procedures "there is a significant chance the Court will modify or alter its December 5 Order, particularly with

respect to arguments the Court did not address, but which Lenders intend to press both in this Court and in the District Court." ECF No. 923, at 20–21. That is incorrect too: The debtor's motion to approve auction procedures is a distinct proceeding arising out of a distinct request for relief. Future adjudication of the debtor's motion to approve auction procedures will not modify or have any other effect on the appealed Order's denial of immediate stay relief. The Order denied the Lenders' request for immediate stay relief because the court found that the debtor had in prospect a plan of reorganization that, although the debtor conceded it needed to be modified, showed that the debtor had a reasonable chance of confirming a plan of reorganization in a reasonable time. Any overlap of *issues* in the adjudication of those distinct requests for relief does not entail an overlap of *effects*.

And, as the Order explains, in determining that the debtor had a plan in prospect that was reasonably likely to result in a timely reorganization, the court rejected the Lenders' arguments that the debtor would be unable to generate funds through an equity auction because the auction was foreclosed as a matter of fact or law. As discussed further below, the equity auction proposed by the third amended plan was expressly subject to court approval under §363. The Order explains that the propriety of any such auction was "neither fully litigated nor adequately presented for adjudication" because "the debtor ha[d] not yet filed its motion to approve th[ose] . . . procedures . . . ." Order at 15 n.5.

The debtor did not need to prove that specific auction procedures would be approved under §363 in order to demonstrate that it had a reasonable chance of confirming a plan within a reasonable time under §362(d)(2). As the Order states, the court found that the debtor likely could raise the needed funds through an auction that withdrew all of the provisions the Lenders contested, and "sorting out which of the disputed [auction] terms, if any, are inconsistent with §363 or §1129, or both, is not necessary to conclude, under §362(d)(2), that the debtor has a reasonable chance of

confirming a plan reasonably promptly." *Id.* at 6. The Order's rejection of the Lenders' auction-related arguments informs the ruling but does not necessarily govern the adjudication of the distinct contested matters ("proceedings" for purposes of 28 U.S.C. §157(b)(1)) involving plan confirmation under §1129 or auction procedure approval under §363. In fact, the auction procedures for which the debtor now seeks approval lack many of the provisions to which the Lenders objected. Regardless, any order approving those procedures in whole or in part or disapproving them will have absolutely no effect on the appealed order: absent reversal of the Order on appeal, the Lenders still will not be afforded stay relief as of December 5, 2025, or, presumably, at any point before a final ruling on plan confirmation, since the debtor has now complied with the other conditions set by the December 11, 2025 order. The ongoing proceedings in the bankruptcy court are "different from . . . those involved in the appeal", and for that reason, this court is not "divest[ed] . . . of its jurisdiction" to decide them. *In re VII Holdings Co.*, 362 B.R. 663, 666 n.3 (Bankr. D. Del. 2007) (quoting *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 583 (Bankr. S.D.N.Y. 2001)).

The Order from which the Lenders appeal is a jurisdictionally distinct matter from the pending proceedings related to confirmation of the debtor's amended plan—a conclusion that follows from the presumption that the Order is final and appealable. It can only have that status if the motion for stay relief is understood to "initiate[] a discrete procedural sequence . . . ." *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 43 (2020) (citations omitted). To be appealable as a final order, the Order must be deemed to have finally resolved "a discrete dispute of [a] kind [that] constitutes an independent 'proceeding' within the meaning of 28 U.S.C. §158(a)." *Id.* at 43–44 (citing *Bullard*, 575 U.S. at 502–05). Plan confirmation and auction-procedure approval involve separate proceedings within the meaning of 28 U.S.C. §158(a), adjudicated under §1129 (plan confirmation) and §363 (sale of estate property). See also 28 U.S.C. §157(b)(2)(L) (proceedings involving "confirmation of plans") & §157(b)(2)(N) (proceedings for

"orders approving the sale of property"); see also §157(b)(2)(G) (proceedings on "motions to terminate, annul, or modify the automatic stay"). For purposes of allocating jurisdiction between the bankruptcy court and the District Court exercising appellate jurisdiction, these proceedings are distinct from the Order adjudicating whether the Lenders were entitled to relief from the stay under §362(d)(2). They must be distinct, otherwise the Lenders' appeal of the Order, which plainly contemplates future proceedings on plan confirmation and auction-procedure approval, would be improper under 28 U.S.C. §158(a)(1)'s grant of district court jurisdiction to "hear appeals . . . from final judgments, orders, and decrees" "of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of [ ] title [28]."

Therefore, the Lenders' notice of appeal from the Order did not divest this court of jurisdiction to adjudicate the separate proceedings involving confirmation of debtor's amended plan and its approval of proposed auction procedures. And any overlap of issues between those proceedings and the stay-relief proceeding on appeal does not invalidate that conclusion. As *Sabine Oil* observes:

> If the divestiture doctrine were to be applied in a way that divests bankruptcy courts of jurisdiction over all issues relevant to confirmation on which the court has previously ruled and are the subject of a pending appeal, this would lead to an absurd result—courts would likely decline to rule on any issues that could be implicated at confirmation for fear of interfering with a debtor's ability to emerge from chapter 11.

*In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016). As explained below, the Order addressed issues relating to auction procedures and plan terms— matters that the Order could have eschewed given the court's finding that the debtor had the financial ability to fund a feasible plan and its determination that affording the debtor a brief additional period to confirm such an amended plan was reasonable. The court addressed those additional issues in the hope of promoting the efficient administration of the bankruptcy case and to explain why the debtor had in prospect—

but concededly in need of further modification—a plan of reorganization that had a reasonable possibility of success in a reasonable time. For that effort to bring the entire case to a halt because the Lenders have elected to appeal the court's discretionary decision not to immediately lift the stay would be "an absurd result". *Id.*

What is more, because divestiture "'does not refer to statutory jurisdiction . . . . [but] is a judge-made doctrine", *Loc. P-171, Amalgamated Meat Cutters and Butcher Workmen of N. Am. v. Thompson Farms Co.*, 642 F.2d 1065, 1074 (7th Cir. 1981) (quoting 9 Moore's Federal Practice ¶203.11, at 3–44 n.1 (2d ed. 1980)), Rule 8007(e)'s delegation of authority to the bankruptcy court to "suspend or order the continuation of other proceedings in the case" supersedes that doctrine except for proceedings that are the *same* as those on appeal; that is, proceedings that would reconsider, modify, or vacate the appealed order. See, e.g., *In re Breland*, No. 16-2272, 2017 WL 4857420, at *1 (Bankr. S.D. Ala. Oct. 25, 2017) ("'The filing of a proper notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the appellate court and divests the trial court of its control over those aspects of the case involved in the appeal.' 'Nevertheless, Rule 8007(e) of the Federal Rules of Bankruptcy Procedure permits a bankruptcy court, in its discretion, to suspend or order the continuation of other proceedings in the case or issue any other appropriate orders during the pendency of an appeal to protect the rights of all parties in interest.'" (citations omitted) (first quoting *Walden v. Walker (In re Walker)*, 515 F.3d 1204, 1211 (11th Cir. 2008); and then quoting *Ogier v. Daniels (In re Patterson)*, Adv. No. 16-5059, 2016 WL 4919947, at *1 (Bankr. N.D. Ga. Sept. 2, 2016))). Because the proceedings the Lenders ask the court to suspend are distinct from the stay relief proceeding that is on appeal, Rule 8007(e) authorizes this court to decide whether to suspend or continue those proceedings based on the principles discussed below, regardless of the scope the divesture doctrine might have in Rule 8007(e)'s absence.

*Rule 8007(e): suspension of proceedings pending appeal.* "Bankruptcy Rule 8007(e) . . . 'permits a bankruptcy court, in its discretion, to suspend or order the continuation of other proceedings in the case or issue any other appropriate orders during the pendency of an appeal to protect the rights of all parties in interest.'" *Ga. United Credit Union v. Moore (In re Moore)*, No. 20-40309, 2020 WL 5633081, at *4 (Bankr. S.D. Ga. Aug. 27, 2020) (quoting *Breland*, 2017 WL 4857420, at *1); see Fed. R. Bankr. P. 8007(e) ("[W]hile [an] appeal is pending, the bankruptcy court may: (1) suspend or order the continuation of other proceedings in the case, or (2) issue any appropriate order to protect the rights of all parties in interest."). Invoking this rule, the Lenders request that the court suspend the scheduled proceedings on plan confirmation and auction-procedure approval—indeed, apparently all proceedings—until "the resolution of [their] appeal." ECF No. 885, at 22.

A request to suspend proceedings under Rule 8007(e) is determined by applying the well-established standard for granting a stay pending appeal. See *In re Rios*, No. 22-21161, 2023 WL 4055909, at *1 (Bankr. E.D. Wis. June 16, 2023). "The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction." *A & F Enters., Inc. II v. IHOP Franchising LLC (In re A & F Enters., Inc. II)*, 742 F.3d 763, 766 (7th Cir. 2014) (citing *In re Forty–Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir. 1997)); see also 10A *Collier on Bankruptcy* ¶8007.07 ("In determining whether a discretionary stay under Rule 8007 should be granted, most courts have adopted the standard used in determining whether to grant a preliminary injunction . . . .").

The court must "consider the moving party's likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other." *A & F Enters.*, 742 F.3d at 766 (first citing *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547–48 (7th Cir. 2007); then citing *Sofinet v. INS*, 188 F.3d 703, 706 (7th Cir. 1999); and then citing *Forty–Eight*

*Insulations*, 115 F.3d at 1300). "Applicants for preliminary relief have threshold burdens to demonstrate the first two factors: they must show that they have some likelihood of success on the merits and that they will suffer irreparable harm if the requested relief is denied. . . . [I]f the movant does not make the requisite showings on either of these two factors, the court's inquiry into the balance of harms is unnecessary, and the stay should be denied without further analysis." *Forty-Eight Insulations*, 115 F.3d at 1300–01 (citations and footnote omitted). "As with a motion for a preliminary injunction, a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *A & F Enters.*, 742 F.3d at 766 (first citing *Cavel*, 500 F.3d at 547–48; and then citing *Sofinet*, 188 F.3d at 707).

1

*The Lenders' likelihood of success on appeal.* The first issue to be considered is the Lenders' likelihood of success on appeal. For the Lenders to succeed on appeal, they must persuade the district court to reverse this court's order denying immediate relief under §362(d)(2) from the automatic stay imposed by §362(a).

a

*Standard of review.* Evaluating the likelihood that the Lenders will succeed on appeal begins with the standard of review. "In this circuit, the standard of review is clear: the Court will review the bankruptcy court's order denying the Appellant's motion for [relief from the] automatic stay under §362(d)(2) for abuse of discretion." *Fink v. Tower Bank & Tr. Co.*, No. 1:05-CV-17, 2005 WL 2756731, at *3 (N.D. Ind. Oct. 25, 2005); see also *In re Boomgarden*, 780 F.2d 657, 660 (7th Cir. 1985) ("Because 11 U.S.C. § 362(d) commits the decision of whether to lift the stay to the discretion of the bankruptcy judge, his decision may be overturned only upon a showing of abuse of discretion." (citing *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 507 (7th Cir.

1982))). "In general terms, a court abuses its discretion when its decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied." *In re KMart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004) (citing *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004)); see also *Dilworth*, 2014 WL 5305904, at *2 (stating that the bankruptcy court's findings of fact are reviewable only "for clear error", and stating, "as the Seventh Circuit has made clear, 'a court necessarily abuses its discretion when its decision is based *solely* on an erroneous conclusion of law,' meaning that '[w]hen reviewing the bankruptcy judge's conclusions of law,' the Court should apply a *de novo* standard." (emphasis added) (first citing *In re Alexander*, 435 F. App'x 563, 564 (7th Cir. 2011); and then quoting *Colon v. Option One Mortg. Corp.*, 319 F.3d 912, 916 (7th Cir. 2003))).

*Standard for relief from stay under §362(d)(2)(B)—the debtor has a reasonable possibility of timely reorganization.* Section 362(d)(2) provides that the court shall grant relief from the stay if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization". The parties agreed that the debtor lacks equity in the hotel because the hotel is only worth $26 million but it secures Computershare's claim for almost $45 million. The only issue in dispute was whether the hotel is necessary to an effective reorganization, on which the debtor bore the burden. §362(g).

The hotel is the debtor's principal income-generating asset. It is obviously a necessary part of any plan to reorganize the debtor, but precedent requires the debtor to show "that the property is essential for an effective reorganization *that is in prospect*[,] . . . mean[ing] . . . that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" Order, at 2 (alterations and omissions in original) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988)). As the District Court has stated, "this means that the property 'must be logically required for a reorganization which has a reasonable possibility of

succeeding within a reasonable time.'" *Dilworth,* 2014 WL 5305904, at *4 (quoting

*AgSouth Farm Cr., ACA v. Del-A-Rae, Inc. (In re Del–A–Rae, Inc.),* 447 B.R. 915, 919 (Bankr.

S.D. Ga. 2011)) (citing *Wells Fargo, N.A. v. Benton (In re Benton),* No. 09–41429, 2010 WL

9473073, at *2 (Bankr. S.D. Ga. Dec. 20, 2010)). As Judge Stadtmueller stated in *Dilworth*

when affirming then–Chief Bankruptcy Judge Pepper's denial of stay relief under

§362(d)(2)(B), "'[T]he test **is one of feasibility**,' meaning that the **bankruptcy judge

need not find a plan *per se* confirmable**; rather, it should be enough that **a plan has a

realistic chance of being confirmed**." *Id.* (bold added) (citations omitted).

b

*Plan feasibility.* Whether a plan has a realistic chance of being confirmed depends

principally on whether the debtor has the financial wherewithal to generate sufficient

funds to pay claims in a manner consistent with §1129's confirmation requirements. *In

re Settlers' Hous. Serv.,* 505 B.R. at 489–90. The plan must provide, in a realistic way, for

the payment of priority claims, Computershare's secured claim in full (presuming

Computershare will not accept the plan), and allowed unsecured claims enough to

persuade at least one class of unsecured creditors to accept the plan. §1129(a)(10) &

(b)(1).

The debtor has proposed a plan, subsequently amended, that pays creditors,

including the Lenders, over a period of years, using projected income from the

operation of the hotel. The plan terms at the time of the Order provided for full

payment of Computershare's claim (with interest paid on the value of Computershare's

collateral (the hotel) over eighteen years), full payment of all priority claims, and

payment of nearly $1.5 million to the holders of allowed nonpriority unsecured claims.

ECF No. 710, at 11–13; see also *id.* at 8–10. The plan also provided that the debtor would

use cash on hand (the debtor has accumulated substantial funds during the bankruptcy)

and proceeds from the sale of equity interests in the reorganized debtor to fund the

proposed plan payments as well as necessary renovations to maintain its Marriott

franchise (with any excess sale proceeds going first to increase payments to unsecured creditors until they are paid in full with interest). ECF No. 710, at 4, 10–11 & 16; see ECF No. 951, at 2 (reporting a cumulative profit from hotel operations during the bankruptcy case of more than $4.6 million as of February 28, 2026).

Whether confirmation of a plan along those lines is a reasonable possibility depends first on whether the debtor can adequately fund it: put differently, are the hotel's ongoing operations and the proposed sale of equity interests likely to generate enough income for the reorganized debtor to make the payments required by the plan, including the contemplated payments to Computershare? In addition, Computershare must be paid interest at a sufficient rate to ensure that the present value of those payments equals at least the value of its secured claim (here, the $26 million value of the hotel) as of the plan's effective date. §1129(b)(2)(A)(i)(II). For that reason, plan feasibility depends in part on a determination of the appropriate discount or "cramdown" interest rate that must be added to the deferred payments on Computershare's $26 million secured claim: the greater the interest rate, the greater the total amount the plan must pay to Computershare over the 18-year plan term.

As mentioned above, the debtor presented testimony from three witnesses to show that its plan of reorganization is feasible. As the Order explains, the court found these witnesses credible, and the Lenders presented no witnesses or other evidence to rebut the debtor's financial projections:

> **Mr. Erkert, the managing member of JSM—the debtor's managing member and principal owner since hotel operations began in 2011— testified about the debtor's chances of successfully reorganizing.** ECF No. 745, at 48–61. . . . He further testified that, based on his experience, review of the financial projections, and personal knowledge, **(1) the debtor will be able to meet its obligations under the plan and (2) JSM (through financing it has secured) will have the means to bid $8 million to acquire a new equity position in the debtor.** *Id.* at 55, 58 & 76–78. He also testified that **those funds and the debtor's existing reserves are expected to be**

**sufficient to complete any improvements that Marriott might require as a condition of continuing the hotel's franchise** agreement—a matter that the debtor is currently negotiating with Marriott. *Id.* **Mr. Erkert's testimony was <u>credible</u>, and <u>the Lenders' evidence does not contradict it</u>.**

**Ms. Friedland**, who has substantial experience in modeling hotel acquisitions, including evaluating the reasonableness of performance projections, **prepared budgets, a five-year forecast, and an eighteen-year forecast** for the hotel's post-confirmation operations. **Based on these forecasts and projections, Mr. Pederson, one of Ms. Friedland's colleagues, testified that the debtor is <u>expected to be able to meet the commitments required by the proposed plan</u>**. Mr. Pederson further opined that **the debtor will not need to reorganize further and that at the end of plan's term, the hotel's value will likely be 60–65% of the amount <u>needed to make the balloon payment</u> as provided in the plan**. **Ms. Friedland's testimony supports the inference that the debtor will then be able to secure the necessary financing to complete the plan.**

. . . **The Lenders presented neither lay nor expert testimony undermining the opinions** of Ms. Friedland and Mr. Pederson about the reasonableness of the debtor's projections. **At least for now, those projections are adequate to show a reasonable likelihood of successful reorganization in the near term.**

That said, the Lenders rightfully emphasize that the projections are made inherently uncertain by the debtor's continuing negotiations with Marriott about extending the hotel's franchise agreement. The court presumes that the debtor's effort at reorganization will fail if it cannot reach terms with Marriott before or in connection with the hearing on plan confirmation. **But weighing the evidence presented in the context of <u>whether to now grant the Lenders' request for relief from the §362(a) stay, the court finds that the evidence demonstrates that the debtor continues to have a reasonable probability of successfully reorganizing</u>.**

Order, at 52–54 (emphasis added).

This finding, that the debtor has a reasonable possibility of successfully reorganizing in a reasonable time, is premised in part on the court's determination of an appropriate cramdown-interest rate. The parties' proposed cramdown interest rates

differed significantly, with the debtor proposing to pay interest at the then-prevailing five-year Treasury note rates plus 2.7% (which then totaled 6.5%) and the Lenders contending that the rate must be at least 11.39% (which their expert calculated by adjusting the 7.5% prime rate upward by 3.8%). See *id.* at 37 & 39 (first citing ECF No. 750, at 32–39; and then citing ECF No. 746, at 23).

The court determined the appropriate interest rate in two steps. The first step, as the parties agreed, is to select an appropriate base or reference rate. *Id.* at 22 (citing *Till*, 541 U.S. at 478–79). The second step is to "adjust that rate to account for the risk that the debtor will default on its obligation to make the required deferred payments." *Id.* (citing *Till*, 541 U.S. at 478–79).

Based on the evidence presented, the court found that an appropriate market-based reference rate to use in this case is the five-year Treasury note rate because the testimony *of both parties' experts*, and that of Mr. Erkert, was that "participants in the hotel financing market do not use the prime rate as the reference rate when negotiating interest rates" but do use Treasury note rates. *Id.* at 33–37. The Order emphasized that the *Lenders'* expert conceded that "prime . . . is by no means customary for long-term loans or secured loans for certain asset classes such as non-construction real estate lending", *id.* at 34 (quoting ECF No. 746, at 134–35) and that "[m]any commercial lenders have moved away from prime as a base rate", *id.* (quoting ECF No. 746, at 135); yet she offered no factual reason for selecting the prime rate as her benchmark, insisting instead that "[w]hat the base rate is, is irrelevant." *Id.* at 35 (citing ECF No. 746, at 87–89).

The second step in determining an appropriate cramdown interest rate—adjusting the benchmark rate based on the reorganized debtor's risk of default—is a question of fact for which the Supreme Court has assigned the burden of proof to the creditor. *Till*, 541 U.S. at 479. Again, based on the evidence, the court found an appropriate adjustment to the base rate, given the factors identified in *Till*—"the

circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan", Order, at 39 (quoting *Till*, 541 U.S. at 479)—based principally on testimony by the *Lenders'* expert. *Id.* at 37–51. The court accepted some aspects of that expert's testimony and rejected others, ultimately finding that the Lenders had shown a need to adjust the benchmark rate by 3.2% (320 basis points). Order, at 51. Because the financial projections showed that the five-year Treasury note rate plus 320 basis points did not differ materially, for feasibility purposes, from the debtor's proposal to pay that rate plus 270 basis points, the court found that the debtor had a reasonable prospect of effective reorganization.

*Reorganize in a reasonable time.* The court recognized that successful reorganization would require the debtor to (a) amend the plan to account for the discount rate found by the court, (b) obtain Marriott's agreement to extend its franchise, and (c) request and obtain court approval of bid procedures to conduct the plan's proposed equity auction (procedures that presumably would take into consideration objections made by the Lenders that the Order suggests have merit). See Order, at 54. Mindful that the case had been pending for about sixteen months when the Lenders' motion was tried, the Order concludes that the reasonable time that the debtor had to successfully reorganize before the Lenders would be entitled to stay relief was coming to an end. *Id.* For that reason, the Order provides that the court will terminate the automatic stay as to the Lenders unless the debtor confirms the fourth amended plan. *Id.* at 55; ECF No. 817, at 2.

c

*Lenders' arguments on appeal.* The Lenders suggest that they will likely succeed in showing that this court abused its discretion because it committed legal error, which the District Court will review de novo. ECF No. 885, at 8. The Lenders' motion states that they "will advance numerous arguments on appeal, including some arguments that are premised on this Court's conclusions of law". *Id.* The Lenders' claims of legal error

appear to be: (1) the Order misapplied the standard of review; (2) the equity sale described in the third amended plan proposed that (a) the debtor's owner, JSM, would serve as the stalking horse bidder enjoying procedural benefits that constitute "property" for purposes of §1129(b)(2)(B)(ii), which the plan cannot allow JSM to retain, unless it pays holders of allowed unsecured claims in full, and (b) bids must be made in cash, which Lenders state is contrary to "the requirements of *In re Castleton Plaza*[, *LP*, 707 F.3d 821 (7th Cir. 2013)]" (ECF No. 885, at 10), and (3) the third amended plan is not fair and equitable for purposes of §1129(b)(2)(B)(ii)'s absolute priority rule because, if the equity auction generates net proceeds sufficient to pay for the hotel renovations *and* all holders of allowed unsecured claims in full with interest, then the plan directs distribution of any additional net proceeds to JSM based on its pre-reorganization ownership of the debtor, rather than to Computershare, whose secured claim (per §1111(b)(2)) is not paid in full until the end of the 18-year plan term. ECF No. 885, at 8–12; ECF No. 923, at 11. The appeal's merit depends on whether any of these contentions establish a legal error that affected a substantial right (i.e., is not harmless error) in the context of the Order's conclusion that the debtor's hotel is necessary for an effective reorganization for purposes of §362(d)(2)(B). Importantly, the Order's conclusion was *not to confirm a plan of reorganization*, as that proceeding has yet to occur.

Considered against the §362(d)(2)(B) standard, only one of the Lenders' contentions of legal error—that the court misapplied the burden of proof—could plausibly be cast as "a premise" of the Order. The rest of Lenders' contentions involve incidental issues, addressing plan terms or auction procedures that, while informative of the debtor's ability to confirm a plan of the type debtor has proposed, were not necessary to the Order's conclusion that the debtor had a reasonable possibility of successfully reorganizing in a reasonable time. Again, that conclusion is principally based on (a) the adjudicated value of the hotel, which set the value of Computershare's secured claim, (b) the court's determination of the appropriate interest rate that the plan

must pay Computershare, and (c) the debtor's likely future financial performance, which along with a proposed equity auction, is sufficient to fund a plan that has a reasonable chance of being shown to comply with §1129's confirmation requirements.

*Lenders' argument on appeal: the court misapplied the standard of review.* The Order, read in total, plainly looked to see if the debtor had shown "a reasonable possibility of a successful reorganization within a reasonable time." Order, at 2 (quoting *Timbers*, 484 U.S. at 375–76). But because the debtor's unrebutted evidence showed that the hotel's operation is likely to generate sufficient income to pay necessary claims over time, and the Lenders offered no meaningful refutation of the debtor's financial projections, the court devoted much of the Order to addressing the Lenders' contentions that the plan the debtor had proposed (but had conceded required further modification) was "patently unconfirmable". ECF No. 760, at 13; *id.* at 13–21. The court recognized that if, as the Lenders argued, the proposed plan suffered from *incurable* defects, i.e., ones that made the proposed plan and any future amended plan unconfirmable, then the debtor would have failed in its effort to show that it could confirm a plan in a reasonable time. Against this backdrop the Order states:

> [T]he court must decide whether the existing record, including the evidence presented on plan feasibility, establishes that the debtor's proposed plan faces insurmountable obstacles to confirmation in the near future such that the hotel is not "necessary to an effective reorganization" for purposes of §362(d)(2) because the debtor has no reasonable possibility of a successful reorganization within a reasonable time.

Order, at 3. In context, this passage should not be read to suggest a shifting of the ultimate burden of proof on §362(d)(2)(B)'s "necessary to an effective reorganization" requirement, which the Order makes clear is on the debtor, stating earlier:

> To show that the property is necessary to an effective reorganization, **the debtor must demonstrate** "that the property is essential for an effective reorganization *that is in prospect*[,] . . . mean[ing] . . . that there must be a

'reasonable possibility of a successful reorganization within a reasonable time.'"

Order, at 2 (quoting *Timbers*, 484 U.S. at 375–76) (first emphasis added).

Even if the Order were read to erroneously shift the burden, however, that error would be harmless, not reversable. See *Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 688 (7th Cir. 1985) ("The judge's error about who had the burden of proof was harmless." (citing *E.S.I. Meats, Inc. v. Gulf Fla. Terminal Co.*, 639 F.2d 1348, 1352–53 (5th Cir. 1981))); *St. Farm Fla. Ins. Co. v. Carapella (In re Gaime)*, 17 F.4th 1349, 1355 (11th Cir. 2021) ("We hold . . . that any error here was harmless because the trustee demonstrated that there was no cause to lift the stay."); *Fink*, 2005 WL 2756731, *10 ("The Appellant is correct in arguing that the bankruptcy court erred by misapplying § 362(g)'s instructions regarding her burden of proof. However[,] the error was harmless, as the Appellant cannot show that the debtor . . . lacks equity in the . . . property."); see also Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); Fed. R. Bankr. P. 9005 ("Fed. R. Civ. P. 61 applies in a bankruptcy case."). As *Fink* observes, Rule 61 requires a district court reviewing a denial of stay relief based on a misapplication of the burden of proof to "determine whether refusing to disturb the bankruptcy court's order is inconsistent with substantial justice," which in turn requires the court to "consider whether the bankruptcy court's order declining to alter the stay was justified despite the court's error." *Fink*, 2005 WL 2756731, at *6.

What is more, as the Seventh Circuit has observed, "Burdens of persuasion affect the outcomes only of cases in which the trier of fact thinks the plaintiff's and the defendant's positions equiprobable. Burdens of persuasion are, in other words, tie-breakers. If the trier of fact, having heard all the evidence, comes to a definite conclusion, he has no occasion to invoke a burden of persuasion." *Bristow v. Drake St. Inc.*, 41 F.3d 345, 353 (7th Cir. 1994); see also *Wilmington Tr. Co. v. AMR Corp (In re AMR*

*Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) ("[I]t is well-established that, where both parties have offered evidence, and where there is no evidentiary tie, any improper assignment of the burden of proof is harmless since the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof, or preponderance." (quoting *TransCanada Pipelines Ltd. v. USGen New England, Inc.*, 458 B.R. 195, 215 (D. Md. 2011))). Here, no tiebreaker was needed: The debtor's financial projections were unrebutted; the court found credible testimony that at least $8 million would be bid at the planned equity sale and that the debtor would have sufficient funds to accommodate any improvements Marriott might require to continue franchising the hotel in addition to funding the obligations under the plan. While the court recognized that plan confirmation would ultimately depend on Marriott agreeing to renew its franchise, thus interjecting some uncertainty (which has been subsequently dispelled by Marriott's agreement to renew the franchise), the Order clearly declares that, "in the context of whether to . . . grant the Lenders' request for relief from the §362(a) stay, the court finds that the evidence demonstrates that the debtor continues to have a reasonable probability of successfully reorganizing."[5] Order, at 54.

The Lenders argue that the claimed error was not harmless, however, because in their view the debtor was required to show either that its plan was confirmable (see Brief of Computershare Trust Company, N.A. and Wisconsin & Milwaukee Hotel Funding LLC, *Computershare Tr. Co. NA v. Wis. & Milwaukee Hotel LLC*, 25-cv-01984 (E.D. Wis.), ECF No. 6, at 34 ("Appeal Brief")) or that "its unconfirmable plans could be salvaged." ECF No. 953, at 2. As these arguments demonstrate, the Lenders do not take

---

5. If this court were asked, by a party seeking clarification under Rules 8008(b) or 9005 or on remand, this court would declare that the burden of proof made no difference to its ruling and that the evidence before it showed that the debtor proved by a preponderance of the evidence that it was reasonably likely to confirm a feasible plan in a reasonable time—a period of time that was set by the Order, as modified by the subsequent December 11 order, to commence a confirmation hearing on the fourth amended plan.

seriously their own suggestion that the debtor should be found to lack a reasonable possibility of successfully reorganizing because it didn't prove that its third amended plan was confirmable. True allegiance to that standard would demand entitlement to relief from the stay based solely on the debtor's concession that the plan needed to be further modified. The Lenders, for good reason, are not so bold: even when a court denies confirmation, the court may, "[p]ursuant to § 362(d)(2), . . . find[] that there is a reasonable possibility of success *within a reasonable amount of time*, because the Debtor could file a modified plan that would address th[e] Court's concerns." *In re Northbelt, LLC*, 630 B.R. 228, 286 (Bankr. S.D. Tex. 2020) (citing *In re Couture Hotel Corp.*, 536 B.R. 712, 755 (Bankr. N.D. Tex. 2015)); see also *Couture Hotel Corp.*, 536 B.R. at 755 (denying relief from stay under §362(d)(2) because, although "the Plan, as drafted, may not be confirmed . . . . with a few modifications, the Debtor could file a new plan that would address th[e] Court's concerns . . . , and the current Plan's projections clearly show that the Dallas Hotel would be necessary for an effective reorganization.").

As Judges Stadtmueller and Pepper reasoned in *Dilworth*, "the standard [under §362(d)(2) is] **not** the same as would be necessary for confirmation"—"[t]hat is, assuming that the burden on the debtor increases over time, presumably it still would not reach the level of what is required for confirmation until the point of the confirmation hearing." 2014 WL 5305904, at *5 & n.3 (emphasis added). The §362(d)(2) "'**test is one of feasibility**,' meaning that the bankruptcy judge need **not** find a **plan** *per se* **confirmable**; rather, it should be enough that **a plan has a realistic chance of being confirmed**." *Id.* at *4 (bold and underline added). Put differently, the "difference between a section 362(d)(2) analysis and a section 1129 [plan-confirmation] analysis is in the *level of scrutiny* to which Debtor's feasibility evidence is subjected, *not* in the factors to be considered in assessing feasibility." *In re 11447 Second St. I, LLC*, No. 12-B-84690, 2013 WL 4051039, at *5 (Bankr. N.D. Ill. Aug. 8, 2013) (quoting *Edgewater Walk Apartments v. MONY Life Ins. Co.*, 162 B.R. 490, 499 (N.D. Ill. 1993)). The level of scrutiny

to apply, however, is a matter left to the bankruptcy court's discretion. *Edgewater,* 162 B.R. at 502 ("The Court cannot say that the bankruptcy court abused its discretion in applying what is concededly a fairly high level of scrutiny to Debtor's plans.").

*Lenders' argument on appeal: Under the circumstances of this case, the court's decision to afford the debtor a final opportunity to confirm an amended plan was not a reasonable exercise of discretion.* The Lenders argue that in allowing the debtor a final opportunity to confirm a plan of reorganization, the court afforded the debtor an unreasonable amount of time and misapplied the "sliding scale" approach to deciding whether the debtor has a plan of reorganization in prospect that is likely confirmable in a reasonable time. Under the sliding-scale analysis, the debtor's burden to show a reasonable possibility of successful reorganization within a reasonable time increases at later stages in the case. See *Sumitomo Tr. & Banking Co., Ltd v. Holly's, Inc. (In re Holly's, Inc.),* 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992) (citing *Timbers*, 484 U.S. at 376); see also *Edgewater*, 162 B.R. at 500. The Lenders contend that the "length of time Debtor has required to reorganize is not reasonable" (Appeal Brief, at 28), asserting that almost twenty months had elapsed from filing of the bankruptcy petition to the court's ruling on their stay-relief motion in which the debtor "demonstrated an unwillingness to propose a confirmable plan" (*id.,* at 31) and instead "proposed and then withdrew *four* plans". *Id.* at 32.

But, as *Holly's* observes, application of the sliding-scale approach—that is, deciding how much time is reasonable to allow the debtor to pursue confirmation before granting stay relief under §362(d)(2)—"is fact intensive and should be determined on a case by case basis":

> When considering the debtor's burden of proof target under § 362(d)(2)(B), one consideration is [that] a secured creditor may be expected to bear some reasonable delay while the debtor is moving meaningfully to propose a plan. Conversely, a secured creditor should not bear inordinate delay if the debtor is not progressing to plan confirmation.

*Holly's*, 140 B.R. at 700. The facts in this case sufficiently support the exercise of discretion to afford the debtor an additional six months to confirm a plan (originally, six, now down to two). While the debtor might have proposed the specific terms of the fourth amended plan more quickly, the principal components of the debtor's plan of reorganization—including paying Computershare's secured claim in a manner purportedly authorized by §1129(b)(2) and its primary funding through income from hotel operations—were included in the amended plan of reorganization filed in June 2025.[6] See ECF No. 621, at 9–10. Based on the record, including the evidence presented over several days of hearings, the court concluded that the debtor's plan to restructure its obligations and continue operating a hotel is founded on a solid financial track record (pandemic shutdown aside), including during the bankruptcy case.[7] The court

---

6. The circumstances of this case are materially different from those in cases like *In re River East Plaza, LLC*, 669 F.3d 826 (7th Cir. 2012), and *Edgewater*, 162 B.R. 490*.* In *River East Plaza* the debtor, which had filed for bankruptcy after a secured creditor had prevailed in state court foreclosure proceedings and scheduled a foreclosure sale of the debtor's property, first proposed a plan that would have invoked §1129(b)(2)(A)(iii)'s option of giving the secured creditor substitute collateral as an "indubitable equivalent" and only after the bankruptcy court rejected the substitute collateral's equivalency did the debtor seek to amend the plan to pay the secured creditor's claim in full, allowing retention of its lien, as authorized by §1129(b)(2)(A)(i). 669 F.3d at 833.

The difference between *Edgewater* and this case is even more striking. The debtor in *Edgewater* had filed for bankruptcy after its sole asset, an apartment building on which it had three mortgages, had been subject to a state court foreclosure and it had failed to pay real estate taxes for several years. The bankruptcy court found that two proposed plan alternatives, which the debtor did not file until submitting its pretrial report before an evidentiary hearing on the first-mortgage holder's §362(d)(2) motion, were hopelessly speculative. 162 B.R. at 495. One plan, which proposed that the debtor's building would be maintained as rental apartments, the court found to be "little more than conjecture", and as to the other, which assumed conversion to condominiums, the court found that "none of the 'substantial work [that] must be done prior to securing financing for any such conversion' had been done, despite the fact that Debtor had contemplated the possibility of such conversion" for more than a year. *Id.* at 495 & 496 (quoting the bankruptcy court's order). The court's conclusion that the debtor had failed to show it had a reasonable possibility of successfully reorganizing is hardly surprising given those findings and that the court also found that the debtor had "yet to invest the resources necessary to transform [its] proposal into a concrete attempt at reorganization", had "failed to include any significant cash infusion to cover administrative expenses or fund capital improvements", and had "unrealistic" "income and expense projections". *Id.* at 495 & 504.

7. The debtor's monthly operating reports show that hotel revenue during the bankruptcy case has been sufficient to pay Computershare $50 thousand per month (totaling almost $960 thousand as of December 2025) of "adequate protection" under the agreed terms of a cash collateral order, pay about

found that future hotel operations were reasonably projected to yield sufficient cash flows to fund payments required under the plan, including paying Computershare's secured claim in full with interest in a manner authorized by §1129(b)(2)(A)(i)(II), and that an equity auction will plausibly yield at least $8 million to fund renovations needed to maintain the debtor's Marriott franchise, given JSM's commitment to pay that much for equity in the reorganized debtor (a commitment the court found to be sufficiently reliable based on the testimony of JSM's principal).[8] The court further reasoned that §1129 imposed no confirmation requirement that the debtor might not satisfy through an amended plan and a presentation of evidence on a full confirmation record. Under these circumstances, the court's conclusion that it was reasonable to afford the debtor a few more months to again amend the plan and present proof that it is confirmable, and only then to apply a level of scrutiny under which a failure to confirm the plan will lead necessarily to stay relief, seems unlikely to be ruled an abuse of discretion.[9]

In fact, the duration of this case's pendency is not so remarkable as to suggest an abuse of discretion. A study of chapter 11 cases conducted some years ago found that the median time to confirmation was roughly 14 to16 months, but only about 87 percent

---

$1.9 million of administrative expenses of the bankruptcy estate, and increase its cash reserves from less than $370 thousand to over $2 million. See ECF No. 830, at 1–2; see also ECF No. 868, at 3.

8.      Before the court adjudicated the Lenders' stay relief motion, Marriott had reported that it and the debtor "ha[d] made substantial progress in their negotiations regarding the Debtor's potential assumption of the Franchise Agreement and other unresolved business and operational issues at the Hotel", that "Marriott [wa]s hopeful that the Parties will be able to reach an agreement in the near term that would permit the Debtor to assume the Franchise Agreement without objection from Marriott", and that "Marriott [wa]s committed to continuing its discussions with the Debtor in an attempt to consensually resolve these open issues". ECF No. 706, at 1–2. The debtor and Marriott subsequently reached a deal allowing the hotel to continue operating under Marriott's flag. ECF No. 908.

9.      The Lenders point to decisions in which bankruptcy courts have granted stay relief in cases that had a shorter run length. But given the circumstance-specific nature of the "reasonable time" inquiry, those decisions have little bearing here. Specific factual contexts aside, moreover, none of those decisions reverse a bankruptcy court decision finding that a debtor had a reasonable possibility of successfully reorganizing in a reasonable time. See, e.g., *River East Plaza,* 669 F.3d 826 (appeal from case dismissal); *In re Castleton Plaza, LP,* 561 F. App'x 561 (7th Cir. 2014) (appeal from case dismissal); *Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers, Inc.),* 171 B.R. 71 (B.A.P. 9th Cir. 1994) (appeal from grant of stay relief).

of those cases reached confirmation within 24 months. See Elizabeth Warren & Jay Lawrence Westbrook, *The Success of Chapter 11: A Challenge to the Critics*, 107 Mich. L. Rev. 603, 632–33 (February 2009). Although chapter 11 filings vary—some are filed with creditors' agreement on plan confirmation, while others are filed with little chance of achieving reorganization—it typically takes time to accomplish "negotiations, notice, voting confirmation hearings, and the like" and thus results in "the time to confirmation [in the study's cases being] about a third longer than the time to dismissal." *Id.* at 632. As the authors observe: "Success carries its own costs, and taking the time to succeed is obviously one of those costs. Cases can fail quickly, but the data suggest that the negotiations, proposals, and strategies employed to resuscitate a failing business takes time." *Id.* at 633.

More recent local data tell a similar story anecdotally. Chapter 11 cases in the Eastern District of Wisconsin are a diverse lot. Even excluding small business cases, including those filed under subchapter V (which are subject to different processes designed to expedite confirmation), the time from case commencement to plan confirmation has in recent times ranged from four to thirty-three months, with an average time of around 16 months.[10] In many instances, confirmation is facilitated by agreement or the withdrawing of objections following plan amendments. And while the Lenders unquestionably have the right to contest reorganization and insist on an adjudicated resolution of this case, the time the court has afforded the debtor to complete the chapter 11 process seems within the ballpark, or at least not so far outside it as to amount to an abuse of its discretion.

---

10.    Compare *NLC Energy Denmark LLC*, Case No. 25-24634 (petition filed August 16, 2025, plan confirmed December 8, 2025), with *In re C2R Global Manufacturing, Inc.*, Case No. 18-30182 (petition filed October 29, 2018, plan confirmed August 12, 2021). See also, e.g., *In re Ganske*, Case No. 20-21042 (petition filed February 11, 2020, plan confirmed June 17, 2022).

*Lenders' arguments on appeal: error in ruling on objections to plan terms and equity-interest auction procedures.* The rest of the Lenders' claims of legal error relate to confirmation issues or auction procedures. See ECF No. 885 at 6–13. Given that (a) the debtor acknowledged a need to modify the plan and (b) the auction terms are subject to later court approval (or rejection), none of the Order's rulings on those matters can properly be found to have affected a substantial right, since none of them change the fact that the debtor showed the financial wherewithal necessary to support the conclusion that the debtor is reasonably likely to confirm *a* plan in a reasonable time.

As for the auction procedures specifically, the Order is clear that the Lenders' §362(d)(2) motion did not require the court to adjudicate auction procedures for the proposed equity sale:

> First, **even if the Lenders were correct that inclusion of these provisions offends the absolute priority rule, that conclusion does <u>not</u> mean that the debtor is unable to confirm a plan in a reasonable time.** While the plan as drafted contemplates inclusion of these provisions, none of them seem essential to the plan's proposal of an equity auction. An equity auction could presumably proceed even if the court approved it on terms that are not identical to those proposed in the third amended plan. **In short, sorting out which of the disputed terms, if any, are inconsistent with §363 or §1129, or both, is not necessary to conclude, under §362(d)(2), that the debtor has a reasonable chance of confirming a plan reasonably promptly**.

Order, at 6 (bold added); see also *id*. at 15 n.5 ("Whether the auction the plan proposes can be approved under §363 is a matter that has been neither fully litigated nor adequately presented for adjudication, given that the debtor has not yet filed its motion to approve the auction procedures under §363.").

The same is true of Lenders' argument that any role JSM is assigned in the auction process (such as serving as the stalking horse) means that the plan entitles JSM to "receive or retain" "property" "on account of [its ownership] interest" contrary to

§1129(b)(2)(B)(ii). While the Order explains the court's skepticism about construing any roll JSM may have in an auction as "property" for purposes of §1129(b)(2)(B)(ii), the fact that the court may approve an auction in which JSM has little or potentially no favored roll shows that the issue is not one that substantially affects the Order's denial of immediate stay relief. Instead, it is an issue to be resolved in the proceedings on approval of auction procedures and plan confirmation.

*Lenders' arguments on appeal: the debtor's third amended plan failed to comply with §1129(b)(2)'s absolute priority rule.* The remainder of the issues the Lenders raise relate to the absolute priority rule codified in §1129(b)(2). Again, plan confirmation is not at issue on appeal—the feasibility of a successful reorganization is. *Dilworth, supra,* at \*4–5. And, although §1129's provisions inform the court's scrutiny of whether the debtor has a plan in process that has a reasonable chance of being confirmed, the issues Lenders raise do not defeat the court's conclusion that the debtor has a realistic chance of confirming an amended plan shortly.

The Lenders' argument that the proposed plan is not "fair and equitable" within the meaning of §1129(b)(2), even if it pays interest and entitles Computershare to retain its lien until fully paid, as provided in §1129(b)(2)(A)(i)(I) & (II), is a matter that must await an evidentiary confirmation hearing because determining whether the treatment is otherwise "fair and equitable" requires a factual determination based on evidence of the relevant circumstances. See *Legal Serv. Bureau, Inc. v. Orange Cnty. Bail Bonds, Inc. (In re Orange Cnty. Bail Bonds, Inc.),* 638 B.R. 137, 145 (B.A.P. 9th Cir. 2022) ("Whether a chapter 11 plan is 'fair and equitable' is a factual determination that we review for clear error.").

The Lenders contend in part that the plan is not fair and equitable because it pays Computershare total deferred payments that nominally total almost $60 million, more than its $45 million claim. That contention is spurious, however: It compares the claim's $45 million value (established as of the petition date as required by §502(a) &

(b)) with the total amount (about $60 million) the plan disburses to Computershare over 18 years to pay Computershare's entire claim (pursuant to its §1111(b) election) in a manner permitted by §1129(b)(2)(A)(i)(II). When a secured creditor asserts its §1111(b) election, "payments under a [chapter 11] plan must satisfy two requirements: (1) payment of the simple, arithmetic total of the stream of payments totaling at least equal the total claim [here, approximately $45 million], and (2) a stream of payments **with a present value equal to the value of the collateral [here, $26 million]**." *In re Settlers' Hous.*, 505 B.R. at 491 (emphasis added) (citing *In re Bloomingdale Partners*, 155 B.R. 961, 974 (Bankr. N.D. Ill. 1993)); see also Paul W. Bonapfel, *To 1111(B) or Not to 1111(B): Whether 'Tis Nobler to Elect in Subchapter V Cases*, 34 No. 2 J. Bankr. L. & Prac. NL Art. 2 (May 2025); Joel L. Tabas, *The § 1111(b) Election: A Decision-Making Framework*, 22-JAN Am. Bankr. Inst. J. 48 (Dec./Jan. 2004). Paying the full present value of Computershare's secured claim requires paying interest, and, as any commonly available loan calculator will show, while paying $26 million over eighteen years at 6.5% interest could be done with payments totaling slightly less than $44 million (paid in equal monthly payments of more than $200 thousand), the third amended plan's proposed monthly payments of $125 thousand with a final balloon payment of more than $32 million results in total payments greater than $45 million. This doesn't offend §1129(b)(2)(A)(i)(II), which requires total payments that are "*at least* the allowed amount of such claim" (emphasis added). Computershare's true gripe is that the plan's periodic payments are too little and its proposed 18-year repayment term is too long to be fair and equitable within the meaning of §1129(b)(1), even if the plan pays its claim in a manner consistent with §1129(b)(2)(A)(i)(II) and §1111(b). But, again, if that issue is to be decided, the May 2026 evidentiary confirmation hearing is the proper forum. See *In re White*, 36 B.R. 199, 203 (Bankr. D. Kan. 1983) ("The Court believes that § 1129 does not per se prohibit long term payouts. If the mathematical requirements of § 1129(b)(2)(A)(i)(II) are satisfied, if the creditor is adequately protected under the plan,

pursuant to the general fair and equitable requirement of § 1129(b)(2), and if the debtors can prove they can make payments over the life of the plan pursuant to § 1129(a)(11), then the plan is confirmable and can be crammed down on a rejecting class of secured claim holders, regardless of normal lending practices or policies."); see also *In re Bryant*, 439 B.R. 724, 743–44 (Bankr. E.D. Ark. 2010) ("Section 1129 does not specifically prohibit a debtor from altering the original repayment period on a loan." (citing *In re Mulberry Agric. Enters., Inc.*, 113 B.R. 30, 32–33 (D. Kan. 1990))).

*Lenders' arguments on appeal: the court's interest rate finding is clearly erroneous.* The Lenders also argue on appeal that the Order clearly erred in finding that the five-year Treasury note rate plus 320 basis points is an appropriate rate of interest under §1129(b)(2)(A)(i)(II). The Lenders do not dispute the Order's use of the Treasury note base rate.[11] Appeal Brief, at 50 ("Ultimately, it is not the selection of the five-year Treasury rate that constitutes reversible error, at least not standing alone; it is the finding that 6.8% cramdown rate sufficiently accounted for the risk of default."). Instead, the Lenders argue that the interest rate finding should be found to be clearly erroneous for three reasons:

> [The court (1)] failed to account for the risk-free nature of the Treasury rate it chose as a starting point; [2] it improperly downplayed the high interest rates associated with 100% LTV loans; and [3] it disregarded risk factors that, in its own words, were serious enough to "result in the court denying confirmation" (Decision 49 [App. 894]), without carrying that finding to its logical conclusion and finding Debtor's plan patently unconfirmable.

*Id.* at 54. None of these reasons has merit. First, the contention that the Order did not "account for the risk-free nature of the Treasury [note] rate it chose as a starting point"

---

11.      As noted above, the Order explains that selection of the five-year Treasury note base rate was premised on evidence that hotel financiers use Treasury note rates or the Secured Overnight Financing Rate (SOFR) as their reference rates. Order, at 36. Beyond that, however, the Order explains that the court would have found an interest rate that is materially the same had it used the prime rate as the reference rate and adjusted from that rate based on the evidence. *Id.* at 51 n.17.

is demonstrably false. *Id.* The Order explains that it first adjusted upward from the Treasury note rate to account for the risk inherent in lending to creditworthy hospitality borrowers: "[Ms. Friedland's] credible testimony that the most creditworthy borrowers in the hospitality industry in the luxury/upper upscale market are paying 5% interest supports an initial upward adjustment from the Treasury note base rate (here listed as 3.8% as of August 1, 2025, in the debtor's chapter 11 plan) of 120 basis points. Computershare offered no credible contradictory evidence on that score." Order, at 37; see also *id.* at 46–47 ("Still, the evidence shows that there at least needs to be an upward adjustment to the Treasury note rate to account for the risk that even the most creditworthy hospitality borrowers present. The evidence showed that the best of those borrowers pay 5[ ] percent interest, so 120 basis points above the Treasury note rate at the time the plan was filed in August 2025 (3.8%). An upward adjustment of 120 basis points is needed to account for that risk."); *id.* at 49 ("As discussed above, the evidence requires a 120-basis-point increase from the five-year Treasury note rate to account for the default risk typical of a creditworthy upscale hotel borrower.").

Second, the court considered at length the credibility of Lenders' expert on the magnitude of the adjustment necessary to account for any confirmable reorganization plan having to pay 100% of the value of the collateral, thus, that the Lender's loan-to-(collateral)-value ratio would embody more risk than loans made with customary loan-to-value ratios in the 50-70% range. See Order at 41–42, & 49–52. The Order found that "there is no doubt that the plan's obligation to pay Computershare the full value of its collateral carries more default risk than would be the case if the plan were paying Computershare less than the value of the collateral. And, unquestionably, lenders financing hotels similarly charge more interest as the equity cushion decreases. An upward risk adjustment, therefore, is warranted." *Id.* at 42. But the burden of proof on the amount of that adjustment was borne by Computershare. *Id.* at 37 ("Computershare bears the evidentiary burden with respect to any upward adjustments from the base

rate." (Citing *Till*, 541 U.S. at 479.)). And, as the Order explains, inconsistencies in the testimony given by Computershare's expert on the adjustment amounts necessary to account for any plan risk as well as aspects of her testimony that the court found incredible—such as equating the risk of Computershare's claim secured by a lien on the hotel with that of an equity investor—"substantially undermine[d] the weight her opinion deserve[d] in determining an appropriate risk adjustment." *Id*. at 46, see also *id*. at 44–45. Still, the court considered Computershare's expert's "not wholly persuasive" testimony about "the upward adjustment [ ] needed because the debtor is paying Computershare the full value of its collateral" (*id.* at 49) in finding that an additional 200-basis-point increase was required. *Id*. at 51; see also *id*. at 50–51 ("Still, Ms. Nelson's testimony relating to the need to adjust the cramdown rate upward to account for the risk resulting from the plan's eighteen-year duration injecting uncertainty into the financial projections and its payment provision being akin to financing at a 100% loan-to-value justify some upward adjustments to the base rate. All things considered, a 200-basis-point upward default-risk adjustment is necessary to account for these risks even presuming confirmation of the plan."). While the Lenders suggest that the court's weighing of their expert's testimony "improperly downplayed the high interest rates associated with 100% LTV loans", they do not attempt to rehabilitate their expert's testimony or contest the court's discretion to find it of dubious weight. Appeal Brief, at 54. In short, the court's weighing of the evidence of risk resulting from the 100% loan-to-value ratio in light of Computershare's burden to prove risk adjustments is unlikely to support a ruling that the court's finding was clearly erroneous.

Third, the Lenders' contention that the Order's risk adjustment finding is clearly erroneous because "it disregarded risk factors that, in its own words, were serious enough to 'result in the court denying confirmation' . . . without carrying that finding to its logical conclusion and finding Debtor's plan patently unconfirmable" once again conflates §362(d)(2)(B)'s feasibility of reorganization standard with plan confirmation.

Appeal Brief, at 54. As the Order explains, in determining the repayment risk of a reorganized debtor for purposes of the *Till* interest analysis, one may presume that the plan of reorganization meets the confirmation requirements of §1129, including §1129(a)(11)'s requirement that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan". Order, at 40–41. Only if the debtor proves by a preponderance of the evidence that the plan meets this "feasibility" standard will the plan be confirmed, and only then will the reorganized debtor be obliged to pay Computershare's secured claim. It is the risk that such a reorganized debtor will default (one that has already proved the plan feasible by a preponderance of the evidence) that is the touchstone for risk adjustments from the base rate in determining what interest rate is fair and equitable for purposes of §1129(b)(2)(A)(i)(II). In determining the rate of interest a confirmable plan must pay, the Order thus disregards possible outcomes that would make the plan infeasible, i.e., that would defeat any showing that plan confirmation would not be followed by liquidation or further reorganization, thus prove unconfirmable. This point should be obvious: The risk of nonpayment under an unconfirmable plan is 100%. As a result, when determining what interest rate is fair and equitable in the context of deciding whether a debtor's proposed plan is reasonably feasible for §362(d)(2)(B) purposes, the court need not consider the debtor's potential failure to satisfy conditions that are necessary for plan confirmation. (Of course, a debtor's lack of evidence that it can timely meet those conditions is relevant to whether the debtor has in prospect a plan that is reasonably confirmable (i.e., feasible), but that is an analytically distinct inquiry.)

The Lenders' suggestion that these considerations or the Order's interest rate finding makes the "Debtor's plan patently unconfirmable . . . requir[ing] reversal" (Appeal Brief, at 54) thus fails for a now familiar reason: the §362(d)(2)(B) standard is whether "a plan has a realistic chance of being confirmed", **not** whether "a plan [is] *per*

*se* confirmable". *Dilworth*, *supra,* at 4. As discussed above, the Order finds based on credible testimony presented by the debtor's witnesses that the debtor will have sufficient funds to make renovations necessary to continue its franchise agreement with Marriott (Order, at 52–53) and further finds that "the court's determination that a 320-basis-point adjustment is needed does not mean that any shortfall in the plan's proposed cramdown rate justifies a conclusion that the debtor lacks 'any realistic prospect of effective reorganization.'" Order, at 51 (quoting *Timbers*, 484 U.S. at 376)). None of this is a candidate for clear error or abuse of discretion.

*Lenders' success on appeal is unlikely.* The Lenders thus show no more than a de minimis likelihood that they will succeed on appeal—i.e., that their appeal will result in a grant of stay relief based on the debtor's failure to confirm its superseded third amended plan. For the reasons discussed above, the issues they raise are unlikely to convince an appellate court that this court abused its discretion in denying the Lenders immediate relief from the automatic stay but entitling Lenders to that relief if the debtor fails to confirm its fourth amended plan at the confirmation hearing scheduled to commence on May 26.

2

*Continuation of the proceedings through plan confirmation or stay relief will not harm Lenders irreparably.* Irreparable harm—"harm that cannot be prevented or fully rectified by the final judgment after trial", *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)—"is the principal prerequisite" for a stay under Bankruptcy Rule 8007; such harm "must be neither remote nor speculative, but actual and imminent." *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 347 (S.D.N.Y. 2007) (quotations omitted); see also *In re Calpine Corp.*, No. 05-60200, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 4, 2008); *Fox v. Bank Mandiri (In re Perry H. Koplik & Sons, Inc.)*, No. 02–B–40648, Adv. No. 05-01136, 2007 WL 781905, at *1 (Bankr. S.D.N.Y. Mar. 13, 2007). Economic harm, including litigation expense, is not irreparable

harm. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." (quoting *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 24 (1974))); see also *Graphic Commc'ns Union, Chi. Paper Handlers' & Electrotypers' Loc. No. 2 v. Chi. Trib. Co.*, 779 F.2d 13, 15 (7th Cir. 1985). "When evaluating irreparable harm, [the court] look[s] to the harm 'that will result to each side if the stay is either granted or denied in error.'" *Heotis v. City of Aurora (In re Heotis)*, Nos. 17 C 886, 17 C 889 & 17 C 893, 2017 WL 4310513, at *5 (N.D. Ill. Sept. 28, 2017) (quoting *A & F Enters., Inc. II*, 742 F.3d at 766).

Lenders face no irreparable harm from continuation of the proceedings in this court. As *Dilworth* well illustrates, the bankruptcy court typically continues to adjudicate plan confirmation (and other matters), even if a creditor has appealed a denial of stay relief.[12] In this case, continuation of confirmation proceedings may inure

---

12. The debtor in *Dilworth* filed his chapter 11 petition on June 10, 2013. Then-Chief Bankruptcy Judge Pepper denied secured creditor Wells Fargo's §362(d)(2) motion for stay relief on February 19, 2014. *In re Dilworth*, Case No. 13-28043, ECF No. 202 (Bankr. E.D. Wis. Feb. 19, 2014). Wells Fargo filed a notice of appeal on March 4, 2014. *Id.*, ECF No. 213. Wells Fargo did not move for a stay pending appeal or for a suspension of the chapter 11 proceedings, and the debtor continued to proceed toward plan confirmation, filing a second amended disclosure statement (for his first amended plan) on April 25, 2014. *Id.*, ECF No. 250. Following an objection by Wells Fargo to the disclosure statement and briefing on absolute-priority-rule and class-gerrymandering issues, the court held a hearing on June 20, 2014, and, after concluding that the gerrymandering issue "might cause an issue for the debtor at the time of confirmation, but [ ] that at [the] time [of the disclosure hearing], the Court did not find the plan unconfirmable on its face," (*id.*, ECF No. 298, at 2), the court approved the second amended disclosure statement and scheduled a preliminary hearing on confirmation for August 20, 2014. *Id.*, ECF Nos. 269 & 298–99. The debtor filed a second amended plan on July 10, 2014, and then on August 19, 2014—on the eve of an August 20 confirmation hearing—the debtor filed a *modified* second amended plan to secure the acceptance of an additional creditor, which reportedly resulted in all classes accepting the plan. See *id.*, ECF Nos. 303 & 331–32. At the August 20 hearing, counsel for a secured creditor reported a settlement of two claim objections and requested adjournment of the confirmation hearing until an objection to a third claim could be resolved between the parties. *Id.*, ECF No. 353, at 1–2. The court adjourned the confirmation hearing to September 30, 2014, at 1:30 p.m. *Id.* On September 30 at 10:03 a.m., the debtor filed a *second modified* second amended plan of reorganization to account for an agreed loan restructuring, about which "the parties had not quite completed negotiations . . . ." *Id.*, ECF No. 367, at 1; see also *Id.*, ECF No. 361. The court heard evidence on the plan's compliance with §1129's confirmation requirements at the September 30 hearing, and, after observing that the remaining objections had been settled, confirmed the plan, subject to the final resolution of the loan-restructuring language and the receipt of a ballot from BMO Harris Bank, N.A., accepting the plan. *Id.*, ECF No. 367, at 2. On October 10, 2014,

to the Lenders' benefit, since the Order entitles them to relief from the stay if the debtor fails to confirm the fourth amended plan. Thus, if the plan proves unconfirmable, the Lenders will secure the relief they seek in a few months. And whatever litigation expense Lenders might incur in connection with confirmation of the plan plainly does not constitute irreparable harm. See *FTC v. Standard Oil Co. of Cal.*, 449 U.S. at 244; *Graphic Commc'ns Union*, 779 F.2d at 15.

Plan confirmation might moot Lenders' appeal, since it would terminate the §362(a) stay as a matter of law. See §§362(c)(1) ("the stay of an act against property of the estate . . . continues until" the property is no longer property of the estate), 362(c)(2) (in a case under chapter 11, the stay of other acts continues until a discharge is granted or denied, or upon dismissal or case closure, whichever occurs first), 1141(b) (unless the chapter 11 plan provides otherwise, "confirmation of a plan vests all property of the estate in the debtor"), & 1141(d)(1)(A) (confirmation of a chapter 11 plan generally discharges the debtor). Some courts reason that potential mootness of an appeal is a "quintessential form of prejudice". See, e.g., *Adelphia*, 361 B.R. at 347–48 (quotation omitted). But courts in this circuit have reasoned either that "an appeal being rendered moot does not itself constitute irreparable harm", *In re 203 N. LaSalle St. P'ship*, 190 B.R. 595, 597–98 (N.D. Ill. 1995), or that the potential mooting of an appeal will sometimes be irreparable harm supportive of a stay pending appeal, "but only if the appellant can show a substantial appellate issue and likelihood of success." *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.)*, 376 B.R. 242, 248–49 (Bankr. N.D. Ill.

---

debtor's counsel filed a declaration stating that the restructuring-language issue was resolved, but the debtor had not yet obtained BMO's acceptance. *Id.*, ECF No. 373.

On October 15, 2014, the District Court affirmed the bankruptcy court's order denying stay relief and returned the record on appeal the following day. *Id.*, ECF No. 378; see also *Dilworth*, 2014 WL 5305904, at *8. Two days later, the debtor filed a declaration confirming that all conditions for the entry of an order confirming the plan had been satisfied. *In re Dilworth*, Case No. 13-28043, ECF No. 383. On October 21, 2014, six days after the District Court's affirmance, the bankruptcy court entered an order confirming the plan. *Id.*, ECF No. 385. No one appealed.

2007) (citing *N. Border Pipeline Co. v. 64.111 Acres of Land*, 125 F. Supp. 2d 299, 301 (N.D. Ill. 2000)). As shown above, the Lenders' likelihood of success on appeal is far less than substantial.

What is more, the Lenders' appeal likely may ***not*** yield the ultimate relief they seek—because, as discussed above, even if Lenders obtain relief from stay, that relief will not impede the debtor's pursuit of plan confirmation at the upcoming confirmation hearing. As a result, any possible mootness of the appeal is not irreparable harm justifying a suspension of proceedings. And, even if confirmation of debtor's fourth amended plan would leave the District Court unable to tailor a remedy in the current appeal, the Lenders will retain the right to seek appellate review of their objections to the terms of the fourth amended plan and the equity auction: They presumably will appeal any future confirmation order, which will be unquestionably final for purposes of appeal. See *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1354–55 (7th Cir. 1990) ("An order confirming the plan of reorganization, however, marks the termination of any distinctive bankruptcy proceeding and is therefore appealable. . . . It is as close to *the* final order as any the bankruptcy judge enters.") (citations omitted). So, the only mooted issues will be ones culled by a confirmation order entered following a full evidentiary record, either because the debtor modified the plan terms or the auction procedures to negate the Lenders' objections or because the court ruled in the Lenders' favor. For example, the debtor has now proposed revised auction procedures that accommodate several of the Lenders' objections, and Marriott has clarified, to the Lenders' apparent satisfaction, its requirements for continuation of the franchise agreement should ownership of the (reorganized) debtor change because newcomers acquire the equity interests at auction. All things considered, the debtor's decision to alter or abandon plan terms or auction procedures in pursuit of plan confirmation advances, rather than impairs, the overall conclusion of the chapter 11

case. This narrowing of the potential appellate issues through the chapter 11 confirmation process and development of a full record is not irreparable harm.

Lenders suggest, however, that they will be harmed by continuation of confirmation proceedings "because they will permanently lose the relief they sought through their motion for relief from stay: a chance to proceed with foreclosure based on Debtor's failure to provide a confirmable plan after well over a year of bankruptcy proceedings." ECF No. 885, at 15. This suggestion repeats their erroneous refrain that the court could not deny immediate stay relief unless it ruled that debtor's third amended plan "was confirmable":

> [I]t was the Debtor's burden to prove it had a reasonable possibility of a successful reorganization within a reasonable time, including whether its . . . Third Amended Plan[ ] was confirmable. *That* is the point at which Lenders contend they were entitled to relief. . . . Lenders do indeed face irreparable harm: the loss of a right to pursue a foreclosure action, which they could have pursued had their motion for relief from the automatic stay been granted.

ECF No. 923, at 7. As explained above, however, stay relief under §362(d)(2) is properly denied when the debtor has a reorganization plan *in process* that has a "realistic chance of being confirmed"; "the bankruptcy judge need not find a plan *per se* confirmable". *Dilworth*, 2014 WL 5305904, at *4.

Moreover, Lenders, who bear the burden of proving irreparable harm, make no effort to prove that such harm follows from a claimed six-month delay (from denial of immediate stay relief to the plan-confirmation hearing) in commencing foreclosure proceedings. See *Winforge, Inc. v. Coachmen Indus., Inc.*, No. 1:06CV0619, 2006 WL 1529566, at *4 (S.D. Ind. May 26, 2006) ("Defendants have presented no argument or evidence to show that they will suffer any appreciable harm by a delay of Coachmen's foreclosure sale of the Property."). They declined the court's offer of an evidentiary hearing on their motion to suspend proceedings. ECF No. 931, at 25–26. And the record

suggests that Lenders can demonstrate no financial harm: Both sides' valuation experts testified that the value of the hotel is expected to increase, as long as operations continue in the ordinary course, and the debtor has made court-ordered adequate protection payments to Computershare.

*The efficient administration of the bankruptcy case is likely to be harmed by a suspension of the proceedings.* The Lenders did not request a suspension of proceedings until January 29, 2026, *six weeks after* they filed their notice of appeal and over two weeks after the debtor filed its fourth amended plan, second amended disclosure statement, and motion to approve equity-sale procedures. Five days after the Lenders filed their request to suspend these proceedings, the court approved the debtor's second amended disclosure statement (no one objected to that course) and ordered the debtor to mail ballots soliciting acceptances or rejections of the plan. ECF No. 892. On February 11 the court approved (again without objection) a stipulation between the debtor and Marriott authorizing the debtor to assume the franchise agreement subject to the conditions stated in the stipulation. ECF No. 908.

The Lenders and White Lodging have objected to plan confirmation, though White Lodging's objection states, "[s]ettlement negotiations between White Lodging and Debtor[] . . . are continuing and White Lodging anticipates an agreement will be finalized shortly." ECF No. 932 at 1 n.1; see also ECF No. 933. Lenders' counsel has reported that the Lenders expect that the court's earlier findings on hotel valuation and the applicable interest rate will be applied in ruling on confirmation of the fourth amended plan. See ECF No. 933, at 3. The United States trustee did not object to confirmation. The debtor has reported that class 8 unsecured creditors voted to accept the plan. ECF No. 941, at 4–5. Thus, the plan meets §1129(a)(10)'s plan-confirmation prerequisite for obtaining confirmation under §1129(b)(1).

As the above summary demonstrates, the proceedings leading to the commencement of the May 26 confirmation hearing on debtor's fourth amended plan of

reorganization are well underway. Suspending those proceedings until completion of the Lenders' appeal is certain to delay a ruling on plan confirmation, which is the centerpiece of this chapter 11 proceeding. *In re Beker Indus. Corp.*, 55 B.R. 945, 950 (Bankr. S.D.N.Y. 1985) ("The purpose of Chapter 11 is to negotiate and confirm a plan."). How long one or more appellate courts will take to complete the Lenders' appeal is anyone's guess—the data suggest an average time from notice of appeal to disposition by the District Court of slightly less than nine months but this average contains many appeals that the District Court dismissed perfunctorily for lack of jurisdiction, failure to pay the filing fee, or failure to prosecute. If one looks only at appeals requiring a decision on the merits, the District Court issues its most prompt rulings in about a year (see *Layng v. Aydt,* No. 22-cv-0096 (E.D. Wis. Dec. 5, 2022) (about eleven months); *Winfield Solutions, LLC v. Ganske,* No. 21-C-134 (E.D. Wis. Mar. 31, 2022) (about fifteen months)), which, given the many other pressing matters to which the District Court must attend and the time required for record preparation and briefing, is impressively diligent, though at times the process takes far longer, especially when the District Court's review is followed by an appeal to the Court of Appeals (see, e.g., *In re Greenpoint Tactical Income Fund LLC,* Case No. 19-29613, ECF No. 951 (Bankr. E.D. Wis.) (notice of appeal filed on February 12, 2021, opinion by the Seventh Circuit affirming the District Court's affirmance of the bankruptcy court's order issued on February 27, 2026, *Ballard Spahr LLP v. Off. Comm. of Equity Sec. Holders (In re Greenpoint Tactical Income Fund LLC),* 168 F.4th 1002 (7th Cir. 2026))). Seventh Circuit statistical data suggests that in 2024 the average time from the filing of a notice of appeal that commences review by the District Court to disposition by the Court of Appeals was slightly over two years, though here too one supposes that the duration of appeals decided on the merits typically exceed the mean. See Report on the Business of the Federal Courts of the Seventh Circuit for the Twelve-Month Period From January 1,

2024, to December 31, 2024, Table 9, available at https://www.ca7.uscourts.gov/pages/ LandingPage.php?page=annual_report (last visited Mar. 31, 2026).

Whether a delay to await resolution of Lenders' appeal is several months or several years, that delay will necessarily impair the efficient consideration of plan confirmation and conclusion of this case. Familiarity with the facts and the record fade as time passes and the participants turn to other matters, requiring time and expense for the parties and the court to reclaim the level of procedural and factual awareness they currently wield. A delay of any significance may require the parties and their experts to devote substantial resources to prepare for confirmation proceedings anew and account for whatever unforeseen financial and economic events occur in the meantime. While that harm is perhaps not irreparable, it weighs strongly against suspending the proceedings because the Lenders demonstrate no likely irreparable harm to offset it.

*The balance of hardships favors continuation of the proceedings.* As explained above, continuing the bankruptcy proceeding through confirmation is unlikely to cause irreparable harm and is likely to advance the just, speedy, and efficient completion of the bankruptcy case. Even if confirmation of the plan holds the possibility of mooting the Lenders' current appeal, they are not at risk of losing appellate review of their principal objections. If the debtor is successful in confirming the fourth amended plan, the Lenders may appeal that final order and seek a stay of the plan's effect to aid in the prosecution of that appeal, which presumably would be consolidated with their current appeal (if it remains pending). At present, weighing the potential effects and possible harms, there is no justification for halting proceedings on plan confirmation and auction-procedure approval to await an appellate ruling.

3

*The public interest does not favor a suspension of confirmation and related proceedings.* Neither party contends that the outcome of Lenders' request to suspend proceedings will have any direct adverse effect on those who are not parties to the debtor's

bankruptcy case. See *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 772 (3d Cir. 2019) ("Courts also evaluate where the public interest lies, the fourth factor, which calls for gauging 'consequences beyond the immediate parties.'" (quoting *In re Revel AC, Inc.*, 802 F.3d 558, 569 (3d Cir. 2015))). One supposes that, on balance, the public interest lies with an outcome consistent with "a primary assumption behind Chapter 11[,] . . . that reorganization preserves value better than liquidation . . . ." *In re A & F Enterprises, Inc. II*, 742 F.3d at 768; see also *id.* at 769 ("Chapter 11 . . . embodies the general Code policy of maximizing the value of the bankruptcy estate. . . . Under certain circumstances a . . . debtor's estate will be worth more if reorganized under Chapter 11 than if liquidated under Chapter 7." (quoting *Toibb v. Radloff*, 501 U.S. 157, 163–64 (1991))). By that measure the public interest plausibly lies with continuing proceedings on plan confirmation rather than stopping all trains to await an unlikely directive issued at an unpredictable future date granting relief from the stay so that the Lenders may initiate foreclosure proceedings under nonbankruptcy law. *In re Quade*, 496 B.R. 520, 530 (Bankr. N.D. Ill. 2013)) ("further delay during an appeal may negatively impact the public interest by extending litigation past a reasonable time"); *In re Taub*, No. 08-44210, 2010 WL 3911360, at *3 (Bankr. E.D.N.Y. Oct. 1, 2010) ("This factor calls for the court to . . . consider and balance the goal of efficient case administration and the right to meaningful review on appeal.").

The Lenders contend that judicial efficiency and "the right to a meaningful review on appeal" favors a suspension of proceedings. ECF No. 885, at 19 (quoting *In re Taub*, 2010 WL 3911360, at *3). They "anticipate the delay occasioned by their pending appeal to be relatively short" and assert that suspension of the proceedings promises to "eliminat[e] the risk of litigation that may ultimately prove futile." *Id.* They premise these conclusions on the notion that their appeal brings to the District Court "a number of Lenders' arguments as to the objectionability of certain plan provisions – provisions

that Debtor then carried forward and included in its Fourth Amended Plan." *Id.* The Lenders offer examples:

> the Court held, *inter alia*, that neither *Castleton Plaza* nor the circumstances of this case require that the auction procedures permit credit bids; that none of the advantages JSM secured to itself in the auction procedures constitute "property" because they are not susceptible to representation on a balance sheet; and that the plan was not rendered unfair despite Lenders' arguments that it (1) permits payment to JSM before Computershare is paid in full; and (2) pays Computershare nearly $60 million on a $45 million claim. Lenders will make those arguments to the District Court, and should the District Court reverse the judgment of this Court, that will necessarily inform this Court's analysis of the Fourth Amended Plan, which, like the Third Amended Plan, does not permit credit bids; secures certain advantages to JSM by virtue of its current ownership interest; permits payment to JSM before Computershare is paid in full; and pays Computershare roughly $60 million on a $45 million claim.

*Id.* at 19–20. The Lenders propose that "as a matter of judicial efficiency," this court should await resolution of the appeal before "undertak[ing] confirmation proceedings". *Id*. at 20.

Even putting aside the uncertain length of the delay and the fact that the District Court is likely to affirm this court's discretionary decision, perhaps without reaching some or all of these issues, the Lenders' proposal must be seen for what it is: an argument that judicial efficiency is furthered by waiting for the District Court to opine on the Lenders' objections to the terms of the *third* amended plan (presented in an appellate Trojan Horse) before holding confirmation hearings on the debtor's *fourth* amended plan. The ***inefficiency*** of that course is among the reasons the Supreme Court held in *Bullard v. Blue Hills Bank* that orders denying plan confirmation with leave to amend *are not final orders* for purposes of appeal: "As [this] case shows, each climb up the appellate ladder and slide down the chute can take more than a year. Avoiding such delays and inefficiencies is precisely the reason for a rule of finality." *Bullard*, 575 U.S. at 504; see also *id*. ("These concerns are heightened if the same rule applies in Chapter 11,

as the parties assume. Chapter 11 debtors, often business entities, are more likely to have the resources to appeal and may do so on narrow issues."). Absent the Lenders' appeal from the Order on relief from the automatic stay, they would have no vehicle to obtain the District Court's review of the confirmation-related issues they press on appeal. Nothing would justify the District Court granting leave to the Lenders to appeal an interlocutory order denying confirmation with leave to amend—a likely outcome in this case had debtor not conceded the need to amend the plan further—because the issues for which they seek appellate oversight will never require review if (i) the debtor fails to confirm the fourth amended plan for any number of other reasons or (ii) the issues drop out or are rendered immaterial by the time the court enters a final order on confirmation. See *Aspen Am. Ins. Co. v. Charmoli*, No. 23-cv-0610, 2023 WL 4562548, at *2 (E.D. Wis. July 17, 2023) ("Interlocutory appeals are a 'disfavored' exception . . . to the 'traditional and basic principle' that limits appellate jurisdiction to 'final decisions.'" (quoting *United States v. MacDonald*, 435 U.S. 850, 853 (1978))); see also *Archdiocese of Milwaukee v. John Does, Claimants A-12 and A-13 (In re Archdiocese of Milwaukee)*, 482 B.R. 792, 797 (E.D. Wis. 2012) ("[A]n interlocutory appeal is appropriate when it involves a controlling question of law over which there is a substantial ground for difference of opinion, and an immediate appeal from the order may materially advance the termination of the litigation. . . . Ultimately, the party seeking an interlocutory appeal must show that 'exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978) (citations omitted))).

What is more, questions containing "issues of fact as well as issues of law", like those for which the Lenders now seek appellate guidance, would not be suitable candidates for interlocutory appeal. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 463 (7th Cir. 2008). As the District Court remarked in ruling that it lacked appellate jurisdiction over denial of plan confirmation in a chapter 13 case,

"[g]iven the 'well-established judicial policy of discouraging interlocutory appeals and avoiding the delay and disruption which results from such piecemeal litigation,' a more appropriate course of action is to await confirmation of the plan and take these issues as a whole after appeal from a final order." *Maier v. Grossman*, No. 12-C-707, 2012 WL 5430994, at *2 (E.D. Wis. Nov. 6, 2012) (quoting *Pullman Const. Indus., Inc. v. Boockford & Co. (In re Pullman Const. Indus., Inc.)*, 143 B.R. 497, 498 (N.D. Ill. 1992)). That statement of well-established judicial policy applies equally to the Lenders' effort to obtain a backdoor review of contested confirmation issues before confirmation has been fully litigated and adjudicated. See *Pleasant Woods Assocs. Ltd. P'ship v. Simmons First Nat'l Bank (In re Pleasant Woods Assocs. Ltd. P'ship)*, 2 F.3d 837, 838 (8th Cir. 1993) ("[O]ur decision in this case [rejecting an appeal of denial of confirmation of chapter 11 plan] avoids time-consuming piecemeal appeals during the confirmation process without depriving parties of effective appellate review.").

Additionally, as emphasized above, appellate courts "review 'judgments,' not explanatory language in lower court opinions." *Nelson v. Welch (In re Repository Techs., Inc.)*, 601 F.3d 710, 718 (7th Cir. 2010) (quoting *In re UAL Corp*, 468 F.3d 444, 449 (7th Cir. 2006)). The functional "judgment" the Lenders appeal is a discretionary ruling denying immediate relief from the automatic stay but entitling them to that relief if the debtor fails to confirm its fourth amended plan. Under these circumstances, the public interest lies in heeding the Fifth Circuit's 60-year-old cautionary statement that appeals typically should not be allowed to bring "the whole bankruptcy proceeding to a dead halt": When a bankruptcy court order that is interlocutory as to the case overall but is final as to a discrete proceeding is appealed, then "(a) the statutory right to appeal . . . of necessity requires that such orders be restricted to those having a definitive operative 'finality,' and (b) the balance of the proceeding should go on unless, on application and showing, a stay is granted . . . ." *Ga. Jewelers, Inc. v. Bulova Watch Co.*, 302 F.2d 362, 364 (5th Cir. 1962). No stay of the proceedings is otherwise warranted, as explained above;

thus, the public interest lies in continuing the bankruptcy case to determine whether the debtor succeeds in confirming its fourth amended plan of reorganization or the debtor fails and the court grants the Lenders relief from the stay. Stated differently, if the public interest inquiry is one of asking what course would most lead the public to have faith in the efficiency of the bankruptcy system, as the Lenders' counsel suggested at her argument in support of suspending the proceedings (ECF No. 942, at 85), the plain answer is to proceed to a hearing on confirmation.

* * *

In sum, the court concludes that the Lenders' likelihood of successfully obtaining relief on appeal is remote; continuation of the confirmation and auction-procedure-approval proceedings is not likely to cause Lenders irreparable harm; and the balance of harms favors continuation of the proceedings, as does the public interest.

III

For the reasons stated above, IT IS ORDERED that the Lenders' request that the court suspend further proceedings in this case pending the resolution of their appeal is denied, and the court will continue all proceedings at least through plan confirmation (unless the court dismisses or converts the case before then) without prejudice to any party seeking a suspension of proceedings should there be an appeal of an order confirming a plan of reorganization or any other future final order.

# # # # #