So Ordered.

Dated: May 8, 2026



G. Michael Halfenger
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Wisconsin & Milwaukee Hotel LLC,　　　　Case No. 24-21743-gmh
　　　　　　　　　　　　　　　　　　　　　　　Chapter 11

　　　　Debtor.

## OPINION AND ORDER APPROVING NEW EQUITY SALE AND RELATED AUCTION PROCEDURES

I

Debtor Wisconsin & Milwaukee Hotel LLC owns a full-service hotel in Milwaukee, Wisconsin. Since the hotel's opening in 2013, the debtor has operated the hotel under a franchise agreement with Marriott International, Inc. (Marriott) and through a management agreement with White Lodging Services Corporation (White Lodging). ECF No. 21, at 2–3; ECF No. 547, at 2; & ECF No. 632, at 1–2. The debtor's fourth amended plan of reorganization continues that operation and, to raise capital "for exit financing," including funding for renovations required to maintain its Marriott franchise, provides that the debtor "will move the Court under Code section 363 . . . to conduct an auction sale of equity to be newly issued" by the reorganized debtor "on the

Effective Date" of the plan. ECF No. 853 at §5.10, p.23.  The amended plan further provides that the debtor's current owner, Jackson Street Management, LLC (JSM), has offered to pay $8 million for the equity in the reorganized debtor.[1]

The plan does not fully pay all creditors, and the debtor's principal creditors (Computershare Trust Company, N.A. (Computershare), and Wisconsin & Milwaukee Hotel Funding LLC (Funding) (collectively, Lenders)) object to its confirmation. Computershare holds a secured claim for about $45 million, and Funding holds an unsecured claim that the plan separately classifies. Neither of the Lenders have accepted the plan. ECF No. 853, §3.10 & ECF No. 941, at 3–4. When unsecured creditors are not paid in full and when at least one class of impaired claims or interests has not accepted the plan, then the plan cannot be confirmed unless the debtor demonstrates that the plan "is fair and equitable" as to each class of impaired claims that has not accepted the plan. 11 U.S.C. § 1129(b)(2).

The debtor expects that JSM will acquire the reorganized debtor's equity interests. Section 1129(b)(2)(B)(ii)'s requirement that the plan be "fair and equitable" requires that a debtor's existing owner can only acquire equity in the reorganized debtor if it pays "new value" that is at least as much as the reorganized debtor's equity interests would fetch in a competitive market.[2]  See *Bank of Am. Nat. Tr. and Sav. Ass'n v. 203 N. LaSalle St. Partn.*, 526 U.S. 434, 453 & n.26 (1999). Thus, to show that the plan is fair and equitable, the debtor must demonstrate that JSM will not be acquiring those equity interests by virtue of its previous ownership of the debtor, but instead by paying at least the competitive market rate for those interests. See *In re Castleton Plaza, LP*, 707 F.3d 821, 824 (7th Cir. 2013) ("An impaired lender who objects to *any* plan that leaves

---

1. JSM owns a 99.99% membership interest in the debtor and is the debtor's managing member. ECF No. 853, at 5. For ease of explication and because it has no bearing on the issues at hand, this opinion ignores the remaining 0.01% and treats JSM as the debtor's sole owner.

2. All statutory references are to the Bankruptcy Code, title 11 of the United States Code, unless otherwise specified.

insiders holding equity is entitled to the benefit of competition. If, as [the debtor] and [its owners] insist, their plan offers creditors the best deal, then they will prevail in the auction."). To satisfy this requirement, the plan terminates the old equity interests and provides for the sale of new equity interests in the reorganized debtor at an auction conducted under §363 in which the winning bidder will acquire ownership of the reorganized debtor.

Section 363(b) authorizes a trustee (and thus a debtor in possession, like Wisconsin & Milwaukee Hotel, that wields the same authority under §1107(a)) to sell property outside the ordinary course of business with court approval after notice and a hearing.[3] §363(b)(1). The debtor's §363 motion seeks approval of the sale of the reorganized debtor's equity interests and approval of procedures to sell those interests. ECF No. 850. The auction procedures must be approved by the court, both because the proposed plan so requires and because the sale of the debtor's equity interests (which must occur before the plan of reorganization becomes effective) is a sale outside the ordinary course of business. See *M & M Holdings, LLC v. Unsecured Creditors Comm. (In re SpecialtyChem Prods. Corp.)*, 372 B.R. 434, 439 (E.D. Wis. 2007) ("[A] bankruptcy sale outside the ordinary course of business . . . [must] be approved by the bankruptcy court." (citing §363(b))).

Approval of a §363(b) sale first requires the debtor to show that a sale of the property "out of the ordinary course of business will aid the debtor's reorganization" and that there is "a good business reason to grant" the motion. *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). As the appraisers' reports submitted in the July 2025 valuation proceeding show, the

---

3. Section 1123(a)(5) provides that a chapter 11 plan may include a "sale of all or any part of the property of the estate" (§1123(a)(5)(D)) and may provide for the "issuance of securities of the debtor" (§1123(a)(5)(J)). In this instance, however, the two avenues converge to the same end—determining that there is a legitimate reorganization rationale for selling ownership interests in the reorganized debtor and ensuring that those interests command top dollar through an auction.

property's highest and best use is to be operated as a luxury hotel. See ECF No. 674-1, at 5 & 112, ECF No. 647-3, at 10, & ECF No. 652-1, at 86. Under the debtor's proposed plan, the reorganized debtor will continue operating the hotel as a Marriott franchisee. To do so the hotel must be renovated to meet Marriott's franchise requirements—renovations the debtor's plan of reorganization funds with proceeds from the equity sale. The record thus shows that the proposed sale benefits the debtor's reorganization effort, even without affording the debtor the benefit of any deference from applying the business judgment rule.[4]

Lenders object to the approval of an equity sale using the procedures the debtor proposes for conducting that sale. The focus of the parties' disagreement is on whether the auction will be fair and open and will yield "the best possible bid" (as the debtor contends) or will unreasonably restrain competition to afford JSM a competitive advantage and ensure that JSM can acquire the interests for less than market value (as the Lenders contend). This opinion's focus is on whether there are auction procedures that will reasonably ensure that the debtor's sale of the proposed new equity interests will generate a sale price that is at least as much as the market will bear for those

---

4. In determining whether there is a business justification for the sale of estate property out of the ordinary course, bankruptcy courts typically apply the business judgment standard. "The business judgment rule is the 'presumption that in making a business decision, the trustee, acting in the stead of the board of directors, will act on an informed basis, in good faith, and in the honest belief that actions to be taken on behalf of the debtor are in the best interest of the debtor, its estate and creditors.' . . . 'Parties opposing the proposed exercise of a [trustee's] business judgment have the burden of rebutting the presumption of validity." *In re Johns*, 667 B.R. 322, 326–27 (Bankr. N.D. Tex. 2025) (first quoting 1 *Collier Int'l Bus. Insolvency Guide* ¶4.05 (2024), then quoting *In re 8 W. 58th St. Hospitality, LLC*, No. 14-11524, 2017 WL 3575856, at *3 (Bankr. S.D.N.Y. Aug. 4, 2017) (citations omitted)).

Lenders contest the application of that standard, arguing that JSM's interest in continuing its ownership of the debtor creates a conflict of interest that deprives the debtor of deference in deciding to auction the equity interests. The decision to sell the new equity interests is somewhat contrary to JSM's self-interest (it clearly would prefer to retain the right to continue as the debtor's owner without facing competition for that right and to avoid having the amount if proposes to pay for continued ownership tested by the market), and on that point, the debtor might be afforded the deference owed under the business judgment rule. But the procedures by which those interests will be sold, discussed below, are another matter, and this opinion scrutinizes both the decision to sell new equity interests and the procedures for their sale without deferring to the debtor's business judgment.

interests, and thus show whether the interests have a fair market value that is greater than JSM's $8 million offer. See *In re Metaldyne Corp.*, 409 B.R. 661, 669 (Bankr. S.D.N.Y. 2009) (noting that the Second Circuit had "cautioned that courts should not follow 'such rigid adherence to the procedures that govern the sale as to elevate them over the substance of a bankruptcy court's principal responsibility, which is to secure for the benefit of creditors the best possible bid.'" (quoting *Consumer News and Business Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 169 (2nd Cir. 1992))).

II

The procedures approved in this opinion are the product of the debtor's proposals and the Lenders' objections to them. The debtor modified several of the proposed bid procedures to address Lenders' contentions that the procedures favor JSM, deter competitive bids, or are otherwise inadequate to ensure that the new equity interests are sold for their fair value. A review of the parties' submissions offers insights into the modified procedures the court will ultimately approve.

A

The debtor filed its new-equity sale motion at the same time it filed its fourth amended plan providing for the sale of those interests as a means of post-confirmation financing. The debtor proposed that the interests would be sold at an auction with JSM serving as the stalking-horse bidder making an $8 million opening bid.[5] ECF No. 850, at 2–4; see also ECF No. 963, at 8–9. The debtor's original auction proposal also stated other procedures, including qualified bidder requirements, auction notice requirements, a requirement that the debtor would engage a professional to promote the sale, a cash

---

5. "A stalking horse is a potential purchaser of a bankruptcy debtor's assets; the debtor uses the stalking horse to set a floor for later competing bids from other potential purchasers to prevent lowball offers." *United Mine Works of America Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1133 n.16 (11th Cir. 2018).

bid requirement, a requirement that the winning bidder must secure Marriott's approval of any ownership change, a cash-deposit requirement under which the deposit would be forfeited by a winning bidder who fails to close the sale, and a provision requiring the court's approval of the sale to the winning bidder. ECF No. 850, at 15–19.

The debtor argued that the court should defer to the debtor's business judgment and should approve the debtor's preferred auction procedures based on that deference. ECF No. 850, at 5–8. Lenders responded that JSM's dual role as the debtor's owner-manager and auction stalking horse defeated any right the debtor might have to decision-making deference.[6] Lenders contended that the court may approve only those sale procedures that are in the best interest of the bankruptcy estate and "'the diverse interests of the debtor, creditors and equity holders, alike.'" ECF No. 901, at 2 (quoting *Lionel Corp.*, 722 F.2d at 1071). Achieving the highest sale price for equity in the reorganized debtor requires procedures that ensure a competitive auction, the Lenders added; so, the court cannot approve auction procedures unless those procedures are calculated to secure the "highest and best offer." *Id.* at 4 (quoting *SpecialtyChem*, 372 B.R. at 441).

More specifically, the Lenders argued that the debtor's proposed procedures

---

6. The Lenders quoted one bankruptcy court as stating that when a sale benefits an insider, the court must apply "heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." ECF No. 901, at 3 (quoting *In re Family Christian, LLC*, 533 B.R. 600, 622, 627 (Bankr. W.D. Mich. 2015)). The heightened scrutiny to which cases like *Family Christian* refer is heightened scrutiny of a proposed sale to an insider after completion of an auction. That is not yet at issue here, since no auction of the new equity has occurred. As a result, whether JSM will prevail at the auction is unknown. The matter currently at issue involves determining whether auction procedures will best serve the interests of the debtor and its creditors by ensuring a competitive auction to determine whether the market value for the equity interests in the reorganized debtor exceeds JSM's $8 million stalking-horse bid. See *Pursuit Parties v. Burtch (In re Pursuit Cap. Mgmt., LLC)*, No. 15-801, 2016 WL 5402735, *4 n.10 (D. Del. Sept. 26, 2016) ("The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there was a sound business purpose for the sale; (2) the proposed sale price was fair; (3) the trustee has provided adequate and reasonable notice; and (4) the buyer has acted in good faith." (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991))). The court has taken account of all of this in approving the modified auction procedures that are attached to this opinion.

favor JSM or are otherwise improper because: (1) the debtor selected JSM as the stalking horse without attempting to recruit other opening bids, even though JSM proposes "an artificially low price" of $8 million; (2) auction participants other than JSM will be required to show an ability to bid more than $12 million; (3) the required cash deposit will deter auction participation because it is subject to forfeiture if Marriott exercises its right to disapprove a winning bidder's new ownership; (4) the debtor, if it is going to administer the auction, should not be authorized to reject any qualified bids; (5) it will chill bidding if auction proceeds that remain after paying all unsecured creditors in full are disbursed to JSM; (6) Computershare should be able to credit bid as a means of increasing any cash bid it might make (while conceding that the cash portion must be sufficient to fund the hotel renovations); (7) the proposed procedures' requirement that a participant must "follow all applicable procedures and requirements in the Marriott Franchise Agreement" is overly vague; and (8) greater clarity is necessary regarding Marriott's approval process. ECF No. 901, at 4–11.

Both the debtor and Marriott responded to Lenders' objections. The debtor amended the bid procedures to (1) reduce the wherewithal requirement to $10.25 million (calculated based on the full renovation costs that Marriott is expected to require from the debtor following a change in ownership of the franchisee); (2) eliminate the deposit forfeiture if the bidder cannot secure Marriott's approval of the ownership change; (3) clarify that the debtor did not intend to reserve a right to reject any bids; and (4) clarify the Marriott-related franchise requirements. ECF No. 934, at 6. Marriott's response observed that the debtor has agreed to assume the franchise agreement, so any party acquiring the debtor's equity will have to ensure that the reorganized debtor adheres to the agreement. ECF No. 930. Marriott's response also provides more guidance about when it might exercise its right under the franchise agreement to disallow continuation of the franchise based on a change in ownership of the franchisee. *Id.* at 4–11.

Following these filings the court held a preliminary hearing on the sale motion. At that hearing, Lenders' counsel reported that Marriott's response "answered as much as possible at this point" the Lenders' "questions . . . about the Marriott approval procedures" and that the Lenders "don't have any further objections . . . specific to what Marriott's approvals require." ECF No. 942, at 17. Lenders then requested an opportunity to reply in writing to the debtor's amended bid procedures, contending that the debtor's amendments to the procedures gave rise to new issues. ECF No. 942, at 19. When the court asked for an overview of the new issues, Lenders' counsel suggested that JSM lacked the means to show the newly proposed uniform $10.25 million financial wherewithal requirement (*id*. at 20), that the debtor's amendment modified the deposit forfeiture provision but did not eliminate it, potentially chilling bidding (*id*. at 25–26), and that the reorganized debtor's assumption of the Marriott franchise "limits or chills bidding" because it "eliminate[s] a potentially large pool of bidders by forcing them into the Marrott brand." *Id*. at 27. The Lenders contended that "the law requires in an equity auction like this, that the Debtor maximize value, and that it achieve top dollar for those equity interests." *Id.* at 28. And, according to Lenders, an auction of debtor's equity interests cannot be shown to achieve "top dollar" by "eliminating a large class of potential bidders who may want to buy this hotel, to rebrand it or run it independently". *Id.* at 30; see also *id.* at 31–32 ("The bottom line is, we have a problem with a procedure that eliminates that potential class of bidders. And we think that because there is this requirement in the law to show that you're maximizing, you're gaining top value".). The Lenders also restated their insistence on credit bidding, relying solely on *Castleton Plaza*, and suggested that the auction might benefit from the use of a professional firm to market it to potential suitors.[7] *Id.* at 32–50.

---

7. At the hearing, the Lenders also suggested "that proposed amendments to the bid procedures are also proposed amendments to the fourth amended plan" because "[t]he bid procedures are incorporated into the plan"; thus, by operation of the court's prior orders, any amendment to the bid

Because Lenders' counsel argued at the hearing that the proposed procedures were inadequate to ensure an open and competitive auction, the court specifically asked whether Lenders sought an evidentiary hearing on the debtor's motion. ECF No. 942, at 52 (Court observed that if Lenders contend the proposed procedures will deter participation in the auction, "it's difficult for me to see how I sort those [issues] out without evidence."). Lenders' counsel responded that they would include any request for an evidentiary hearing in their post-hearing supplemental brief.[8] ECF No. 942, at 52–

procedures requires a showing of good cause. ECF No. 942, at 17; see also *id*. at 19 ("We do believe it is part of the plan. Again, the bid procedures are incorporated, essentially word for word . . . into the plan.").

This argument is unpersuasive. Section 5.10 of the fourth amended plan provides:

a) In order to raise $8 million needed for exit financing, including for renovations, and to provide a cushion to protect against unknown future events which could negatively impact income from operations, the Debtor will move the Court under Code section 363 ("**363 Motion**") to conduct an auction sale of equity to be newly issued on the Effective Date ("**New Equity**"). . . .

b) The Debtor *will file the 363 Motion for approval of* Auction and Equity Sale Bidding Procedures on January 12, 2026, including for approval of the JSM Bid as Stalking Horse Bid, and bidding procedures (the "**Auction and Bidding Procedures**") which shall, among other things, govern the qualification requirements for potential competing bidders, and the submission of competing bids for the purchase of the New Equity. . . . *The principal terms of the JSM Bid and the Auction and Bidding Procedures for which approval will be sought in the 363 Motion* are as follows . . .

ECF No. 853, at 23 (bold italics added). The court construes §5.10 of the plan to provide for an auction governed by procedures that are *separately* approved by the court under §363. The procedures listed in that section are ones the debtor originally proposed for approval in its §363 motion but which may not survive the approval process. Only those procedures provided elsewhere in the plan that are integral to the plan's operation, e.g., the distribution of any net auction proceeds more than the $8 million (ECF No. 853, at 12 (§ 3.7) & 27 (§ 5.10(b)(10)), cannot be changed without modifying the plan.

8. The court emphasized that if the Lenders' suggestion was that the proposed procedures might limit participation in the auction, thus defeating the auction's ability to set a market price, the Lenders had to advise the court whether they sought an evidentiary hearing, since their objection had not done so. Lenders' counsel then assured the court that any desire to submit evidence to support a contention that the procedures are improper would be included in the Lenders' supplemental brief:

THE COURT: . . . And if the Lenders really have some proposals about why the procedures aren't going to [ ]sufficiently yield interest in this auction. But if those things need to be sorted out, it's difficult for me to see how I sort those out without evidence.
[LENDERS' COUNSEL]: To reiterate, Your Honor, we are intending to offer some expert testimony in connection with the bid procedures.

53.

The Lenders' supplemental brief did not request an evidentiary hearing. To the

contrary, it disclaimed any need for evidence and expressly stated, "Lenders no longer

seek an evidentiary hearing on the bid procedures motion." ECF No. 945, at 12

---

THE COURT: **You're going to highlight that or sort of suggest what that's going to be by the time you file this supplemental brief?**
[LENDERS' COUNSEL]: Well, Your Honor, we sort of view this as being tried at the same time as the plan.
THE COURT: So I didn't mean, . . . what the opinions are, with the expert. **I didn't mean all that by March 18. I just meant so that I could understand what the evidentiary issues may be. . . .**
[LENDERS' COUNSEL]: Yeah. I mean, we intend to consult with our expert witness. **We have done a little bit of that already. And to the extent we can highlight those issues for you, where we think that the expert testimony will be important,** *yes, I will do that.*
THE COURT: Right. Because I assume, from the Debtor['s] standpoint, **the Debtor needs to know what those are, or at least needs to know that we're going to have an evidentiary hearing, and probably would like [ ] to know what things the Court thinks we're going to consider at such an evidentiary hearing.** And that's where I don't know if I'm going to be able to sort that out or not. But I assume, Mr. Richman [debtor's counsel], you're going to want to think about [that].
[DEBTOR'S COUNSEL]: I think there has to be a threshold determination by the Court whether there is a triable issue needing an expert witness, as distinct from what the cases say. If we're going to go down that road, we're going to need disclosure of what the witness is going to say in a report and a deposition.
And we're going to have to have a scheduled hearing that gives sufficient time, and then we may have to engage our own expert on the same issue and go down that road to do the same things.
[LENDERS' COUNSEL]: Again, that's where I viewed it as trying it together with the plan made the most sense. Because we already have expert witness disclosure deadlines, and reports, and all of that. So I think we would simply put that in the same report.
[DEBTOR'S COUNSEL]: I don't agree with that, Your Honor. I don't see any reason why this should wait for plan confirmation or be intertwined with it at all. We've already completed the briefing. We've gotten this far. We ought to just finish this, especially if we're going to line up an outside firm in order to assist with marketing the opportunity and have all that ready to go by the time the plan is confirmed, we hope.
THE COURT: Right. I think the -- At least I was contemplating that we would sort this out, that is to say, the bid procedures, auction procedures, before confirmation. I don't know that it's necessarily -- I don't know, as a matter of logic, that it necessarily has to go that way or some other way. . . .  All right. **I guess I'll wait and see what the Lenders file on the 18th.**

ECF No. 942, at 52–55 (emphasis added).

(capitalization altered); *id.* ("Lenders no longer believe that evidence is needed to resolve Lenders' objections to the Amended Bid Procedures."); *id.* at 6 ("*No evidence* is *needed* to determine that JSM should not be granted automatic Qualified Bidder status without having to prove, like all other bidders, that it has a commitment for $10.25 million."); *id*. at 8 n.5 ("Lenders have also objected to the equity sale on the grounds that bidders are compelled by the . . . Plan to adopt the Marriott brand for the hotel. Lenders believe this is a plan objection, and will leave further argument and evidence on this point for the confirmation hearing.").

The Lenders' supplemental brief instead argues that previous events in this case, including previous versions of the debtor's chapter 11 plan, show that the debtor's auction procedures unfairly favor JSM. The Lenders direct the court to previous proposed plan language, language that has now been superseded—beginning with a provision in a former plan amendment that afforded JSM the exclusive right to maintain ownership of the debtor by contributing funds to the reorganized debtor—as a basis for concluding that the auction provisions now under consideration are improper. ECF No. 945, at 1–3. The Lenders' supplemental brief also argues that the debtor's proposed process continues to favor JSM by requiring (1) other bidders to make a greater financial wherewithal showing than JSM and risk a forfeiture of their cash deposit if they fail to close "for any reason other than [the bidder] fails to obtain the approval of Marriott" (*id*. at 7 (quoting ECF No. 934, at 25)) and (2) providing a distribution to JSM of any net sale proceeds that remain after paying the $8 million initial renovation expense and all unsecured creditors in full (with interest).

The Lenders' supplemental brief additionally asks the court to infer that JSM, through its control of the debtor, will control the auction process. The Lenders argue that the auction process must treat all prospective bidders fairly—an undertaking best accomplished by a third-party auction administrator. ECF No. 945, at 3–4. And, in addition to these new grounds for objection, the Lenders' supplemental filing continued

to suggest that the proposed auction is flawed because the debtor selected JSM as the stalking-horse bidder without soliciting other firms to serve in that capacity.[9] *Id*. at 4–7; see also *id*. at 5 n.2. (arguing that the debtor must engage a professional firm to assist in promoting the sale and that "should have occurred before a stalking horse bid was selected.").

Lenders' supplemental brief also continues their insistence that JSM is unfairly favored by the proposed procedures because its $8 million opening bid is deemed

---

9. The Lenders concede that a stalking horse is not required to conduct an auction under §363 but argue that "once Debtor decided to obtain a stalking horse bid, it was obligated to search for alternatives to its owner under the circumstances presented in this case." ECF No. 945, at 4. They contend that the debtor was required "to consult with its primary secured creditor . . . before selecting a stalking horse bidder, and even after selecting one, to give creditors time to object to debtor's choice." *Id.* (citing *In re SpecialtyChem Prods. Corp.*, 372 B.R. at 436–38); see also *Id.* at 4–5 (citing *In re SpecialtyChem Prods. Corp.*, 372 B.R. at 436–37 ("One important issue considered on both days of the hearing was the need for consultation with lenders and creditors regarding selection of a stalking horse bidder.") and *Official Comm. Of Unsecured Creditors v. Bouchard Transp. Co., Inc. (In re Bouchard Transp. Co., Inc.*, 74 F.4th 743, 747 (5th Cir. 2023) (noting that other parties were permitted to object to the selection of a stalking-horse bid within three days of the debtor filing a notice disclosing the selection)). Because the debtor failed to consult them about stalking horse alternatives, the Lenders argue that the debtor's choice of JSM as the stalking horse deserves no deference. ECF No. 945, at 5 (citing *In re Family Christian, LLC*, 533 B.R. at 622 & 627; *In re Flour City Bagels, LLC*, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016); and *In re Innkeepers USA Trust*, 448 B.R. 131, 134 (Bankr. S.D.N.Y. 2011)).

These authorities are factually inapposite and not precedential. See *In re SpecialtyChem Products Corp.*, 372 B.R. at 441 (party not selected as stalking-horse bidder was not entitled to break-up fee due if stalking horse was not winning bidder); *In re Bouchard Transp. Co., Inc.*, 74 F.4th 743 (upholding payment of break-up fee to stalking-horse who was overbid at the auction); *In re Family Christian, LLC*, 533 B.R. at 622 & 627 (decision denying approval of a sale of all assets to an insider finding, after an evidentiary hearing, that the auction process was "flawed" and the debtor had not articulated a sound business justification for selling substantially all its assets to an insider, but allowing the debtor to reopen the auction); *In re Flour City Bagels, LLC*, 557 B.R. at 77–78 (denying after two-day trial, post-auction approval of sale of all assets because debtor had not met burden to show a business reason to grant the motion to sell); *In re Innkeepers USA Trust*, 448 B.R. 131 (Bankr. S.D.N.Y. 2011) (approving debtor's stalking horse and auction procedures for right to sponsor plan of reorganization). To the extent these authorities have any persuasive value, they do not support the Lenders' objections beyond the extent to which the debtor's auction procedures are modified by this opinion and the resulting order. For example, the procedures do not entitle JSM to a break-up fee or any other compensation for serving as the stalking horse. The Lenders presented no evidence to show that (a) auction participation or competition was impaired by the debtor's failure to shop the opportunity to serve as the stalking horse or (b) either that failure or JSM's service as the stalking horse has a demonstrable effect on the competitive nature of the auction.

qualified but "it has not satisfied all the requirements of a Qualified Bidder, and [has] a very unclear 'Financial Wherewithal Requirement' that appears to be lower than that of other bidders." *Id.* at 5–6. Lenders contend that the procedures further favor JSM by imposing a $10.25 million wherewithal requirement on other bidders when JSM has shown only a commitment letter to fund its $8 million bid. *Id.* at 6.

Next, the supplemental brief argues that the revised procedures still contain an unfair deposit forfeiture procedure because, even as revised, a participant forfeits its deposit if it fails to make good on its winning bid "for any reason other than that it failed to obtain the approval of Marriott." *Id.* at 7 (quoting ECF No. 934, at 24–25). "Any reason," say the Lenders, is too broad, since it may include reasons beyond the participant's control other than Marriott's disapproval. *Id.* at 7. "A fairer process," the Lenders suggest, "would make the deposit forfeit*able*, rather than *forfeited*, upon application to the Court, notice to the non-closing bidder, and a hearing." *Id.* at 7–8. The Lenders also find the proposed procedure following a failure to close to be at best confusing as to how the sale then proceeds. *Id*. at 8. And the Lenders argue that the procedures should not require participants to disclose their maximum bid potential, which they construe the proposed procedures to mandate, and repeat their contention that all participants should have to make the same financial wherewithal showings. *Id.* at 8–9. Finally, the supplemental brief restates the Lenders' contention that JSM should receive no proceeds before Computershare is paid, and that Computershare should be allowed to credit bid. *Id.* at 9–12.

The debtor filed a reply to the Lenders' supplemental brief. The reply correctly observes that the Lenders' supplemental brief raises several issues that could have been raised earlier (thus should be deemed forfeited). Beyond this, the debtor correctly responds that JSM's dual role as market participant and debtor's owner has not been shown to have any effect on the competitive nature of the auction. In response to the Lenders' call for an "independent sale counsel" to manage the sale process, the debtor

concedes the point and identifies a candidate, observing that it retained

> the Much Shelist Firm ('MS Firm') to handle all the corporate law aspects of the Auction. . . . The MS Firm has had no need of direction from JSM in its capacity as managing member of the Debtor to do its work in support of the Auction process. The MS Firm has consulted and will continue to consult with Debtor's counsel (who also has not consulted with JSM in its capacity as managing member on these basic corporate and Auction process matters). All Auction-related communications with JSM were conducted in its capacity as the Stalking Horse Bidder, which even the Lenders agree is appropriate. The MS Firm drafted (without JSM involvement) the Amended and Restated Operating Agreement and the Subscription Agreement in the Debtor's Supplement to Fourth Amended Plan [Doc 854], and they will be responsible for drafting the questionnaire for bidder qualification as an "accredited investor," and for negotiating and drafting the NDA, the sale documents, and overseeing other corporate and sale closing matters.

ECF No. 963, at 5 (emphasis omitted). If Much Shelist determines that a potential participant is disqualified, the debtor agrees that person may file an expedited motion requesting the court's review of the disqualification. *Id.* at 7.

The debtor further argues in its supplemental reply that Lenders state no legal or factual basis for requiring any stalking-horse bid much less for shopping that opportunity. *Id.* at 7–9. There's no financial or other benefit to JSM starting the bidding, the debtor argues, because the stalking horse stands to gain no break-up fee or other compensation if it is not the winning bidder. And the amount of the opening bid cannot properly be cast as "too low"—whatever that might mean given the lack of any supporting evidence to explain it—because the opening bid amount is the cost of the initial necessary hotel renovations, not (as far as the record shows) an amount calculated to deter others from bidding. The debtor's supplemental reply again argues that the wherewithal differential is justified by the fact that the winning bidder must secure Marriott's approval, and, if debtor's ownership changes, Marriott may require renovations projected to cost as much as $10.25 million. JSM will commence the bidding

at $8 million because Marriott has agreed to defer some aspects of the total required renovation based on JSM's "unique longtime ownership and relationship with Marriott", an accommodation Marriott might not extend to the reorganized debtor if its ownership changes. *Id.* at 8.

On other points, the debtor suggested consensus with the Lenders, namely:

- The debtor agrees that only an initial wherewithal showing must be made to make an opening bid; wherewithal to make subsequent bids may be shown as the auction progresses. *Id*. at 10-11; see also *id.* at 10 n.6.
- The debtor will promptly engage a professional to market the sale. *Id.* at 12 n.7.
- A deposit will not be forfeited if the winning bidder fails to make the purchase because the debtor defaults or the winning bidder fails to obtain Marriott's approval. *Id*. at 12.
- Bidders are not required to disclose their maximum bid potential. *Id.* at 13–14.

After these supplemental filings, the court advised the parties that it would consider the sale motion further at an April 24 hearing scheduled on a related matter. Before conducting the April 24 hearing, the court raised five matters for consideration:

1. Whether the Much Shelist firm could serve as the auction administrator to address the Lenders' objection that an auction administered by the debtor is inherently unfair when its principal owner, JSM is the stalking-horse bidder?

2. What is the basis for Lenders' contention that JSM's stalking-horse role will limit competition at the auction?

3. Why must bidders other than JSM show an initial ability to pay more than the minimum [over]bid amount of $8.25 million when the winning bidder must secure Marriott's approval of a change in the debtor's ownership?

4. If Much Shelist serves as the auction administrator, is there any reason it cannot oversee and administer the auction's wherewithal requirements,

rather than the debtor's general bankruptcy counsel?

5. Whether the debtor remained committed to engaging a professional to promote the equity sale?

ECF No. 982.

At the April 24 hearing, debtor's counsel confirmed Much Shelist's willingness to serve as the auction administrator, and, while the Lenders maintained their objections, including to JSM's stalking-horse role, Lenders' counsel acknowledged that having Much Shelist serve as the auction administrator is preferable to having the auction administered by the debtor or its general bankruptcy counsel. The debtor also accepted the court's proposal that the financial wherewithal requirement for all potential bidders be modified to require potential bidders to initially show only sufficient wherewithal to make the first bid ($8.25 million), agreeing that further wherewithal showings to support higher bids could be deferred until a need arises. The parties also agreed that the auction administrator would maintain the participants' wherewithal showings in confidence. The debtor again represented that it was prepared to move for approval of the engagement of a professional to promote the auction sale, reporting that it would do so soon after the court enters an order approving the auction procedures. And the Lenders' counsel confirmed that the Lenders rely on the court decisions cited in their submissions (rather than evidence) to support their contention that the debtor's failure to seek other firms to serve as the stalking horse makes the proposed auction unfair or uncompetitive.

B

In deciding whether to approve auction procedures under §363, the court wields "broad discretion and flexibility" to achieve its "'principal responsibility, which is to secure for the benefit of creditors the best possible bid.'" *In re Metaldyne Corp.*, 409 B.R. at 668–69 (quoting *In re Fin. News Network, Inc.*, 980 F.2d at 169). If the court confirms the debtor's fourth amended plan of reorganization, the current record supports approval

of a modified set of auction procedures for the sale of equity interests in the reorganized debtor, with JSM serving as the stalking horse, offering to buy those interests for $8 million. The auction will be administered by Much Shelist with court oversight, and final approval of any sale will be subject to court approval.

The business justification for the equity auction is clear. The debtor under its proposed plan of reorganization seeks to raise $8 million for the initial renovations to the hotel required by Marriott, its franchisor. ECF No. 851, at 2. The testimony of Randall Erkert, the managing member of JSM, the debtor's manager, is that the sale proceeds will allow the debtor to complete the initial renovations necessary for it to continue profitable operations, and "will also be used to provide a cushion against any potential shortfalls in operations . . . ." *Id.* at 2. Erkert's testimony in this regard is consistent with and supported by the report of the Lenders' appraiser that the court received as evidence in July 2025 in connection with determining the hotel's market value. That evidence suggests that the debtor successfully operated the hotel under the Marriott brand both before and after the pandemic. ECF No. 674-1, at 117–20; ECF No. 647-1, at 112–15. The property's history adequately supports the legitimacy of the debtor's business decision to continue operating its property as a luxury hotel under the Marriott brand. And the business justification for the equity sale is supported by the need to renovate the hotel—the debtor's stipulation with Marriott to assume the franchise agreement requires the debtor to renovate as a condition to its continued operations as a Marriott-branded hotel. The record thus establishes that there is a legitimate business reason for the equity sale, even without deferring (at all) to the debtor's business judgment in pursuing that course.

There is also a legitimate business reason for JSM, the debtor's current owner, to serve as the stalking-horse bidder. Again, JSM has owned the debtor for its entire existence and has operated the debtor's hotel as a Marriott franchise profitably for many years, driven to bankruptcy by a pandemic-related inability to secure refinancing in

March 2020 and its subsequent failure to pay the debt owed to Lenders in full when it became due. ECF No. 745, at 50–51. Based on that history alone JSM is a natural candidate to serve as stalking horse in an auction to purchase the new equity of the reorganized debtor. As the debtor's current owner, JSM is familiar with the debtor's finances and is uniquely positioned to evaluate the reorganized debtor's financial prospects and capital needs, including its need for a cash infusion to complete the necessary renovations to continue as a Marriott franchisee.

To confirm the plan of reorganization over the Lenders' objections, however, JSM's potential future ownership must be financially divorced from its current ownership. As discussed above, in order for the plan to be confirmed under §1129(b)(2), JSM must outbid any other interested parties at a competitive auction if it endeavors to acquire ownership of the reorganized debtor.

The debtor has reported that it will apply for approval to retain a professional to market the equity sale and promote it to potentially interested parties. The court expects that this effort would result in a reasonably competitive auction even in the absence of a stalking-horse bidder. There is nothing in the record that persuades the court that the debtor's decision not to have solicited other parties to serve as the stalking horse adversely affects the competitive nature of the planned auction. Nor is the court persuaded by the Lenders' contention that JSM's $8 million initial offer is "artificially low" or somehow limits competition. The $8 million amount has an obvious business justification: it is the amount the debtor expects to need for the initial renovations if the reorganized debtor continues as a Marriott franchisee under JSM ownership. There is no evidence that JSM's $8 million opening bid will deter competition. And it is exceptionally difficult to see *a priori* how an $8 million opening bid that the Lenders label as "too low" could keep away interested parties willing to pay more. The way to find out if $8 million is too low is to hold the auction and see if anyone overbids.

The Lenders' concerns that JSM's dual role as auction participant and debtor

manager could chill competition or interfere with the competitiveness of the auction are more than adequately addressed by having Much Shelist serve as the auction administrator, charged with managing the auction process and implementing the approved auction procedures in the best manner possible to promote rigorous competition for the purchase of the equity interests. Much Shelist is charged with using its independent judgment in its capacity as auction administrator, subject to bankruptcy court oversight. Neither the debtor nor JSM will have any authority to reject bids or control the auction. In the first instance, participants will only need to demonstrate to Much Shelist that they have the financial wherewithal to support an opening overbid of $8.25 million and, later, the wherewithal to bid more if they elect to place a subsequent higher bid. JSM will have to make the same showing if it elects to overbid.

Much Shelist will be required to maintain participants' financial information in confidence, and neither JSM nor the debtor will have a role in determining whether a potential participant has shown adequate wherewithal to bid. Much Shelist may announce additional procedural rules to aid in the administration of the auction, as long as those rules are consistent with the rules established by court order. The court will provide any needed oversight and adjudicate any disputes about the nature of the rules or their application, further preserving Much Shelist's independence in administering the auction. Much Shelist will also oversee the participants' cash deposits, which will be returned to all participants except a winning bidder (or back-up bidder) that fails to purchase the equity interests for reasons other than the debtor's default or Marriott disapproval, and even then, the court will reserve the right to authorize the deposit's return if it determines that the failure to make the purchase resulted from circumstances for which the party cannot justly be held accountable.

JSM's insider status is no showstopper here, contrary to some of the Lenders' suggestions. There is nothing in the Bankruptcy Code that prohibits the sale of the reorganized debtor's equity to an insider. *In re Cypresswood Land Partners, I*, 409 B.R. 396,

436 (Bankr. S.D. Tex. 2009); see *Sugarloaf Indus. & Mktg. Co. v. Quaker City Castings, Inc. (In re Quaker City Castings, Inc.)*, 337 B.R. 729 (B.A.P. 6th Cir. 2005) (unpublished table decision), No. 04–8045, 2005 WL 3078607, at *6 (citing *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998)); see also *In re Andy Frain Svcs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (Considering the issue of whether a purchaser was a purchaser in good faith under §363(m), the court noted: "Wilson's major argument appears to be that it was *per se* bad faith for a court-appointed agent of the debtor to have an interest in the purchase of the debtor. That is not the law. . . . Even if [the agent] were a fiduciary, a sale to him without more would not suffice to show a lack of good faith."). And the modifications to the bidding procedures proposed by the debtor or otherwise ordered by the court address most matters raised by the Lenders as potentially limiting the competitive nature of the auction. The court finds that those procedures are reasonable and "assure that optimal value [will be] realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005).

As noted above, the Lenders further assert that the court should infer that the current auction proposal is unfair or not competitive from the fact that the debtor previously proposed plans that did not expose JSM's acquisition of the reorganized debtor's equity to competition. But, again, under the current circumstances, the proposed equity sale will be promoted by a professional marketing firm, and the auction will be administered by the Much Shelist law firm charged with running the auction to best maximize competition and achieve the highest sale price. Much Shelist's administration of the auction remains subject to court oversight, and the court must approve the final sale. There is no reasonable basis to conclude that JSM can manipulate the auction, the participants, the bidding, or the approval of a final sale.

In reaching these conclusions, the court need not—so does not—resolve the extent to which the debtor's selection of auction procedures is entitled to deference under the business judgment rule or otherwise. Even without deferring to the debtor's

judgment and instead subjecting the auction procedures to heightened scrutiny, the court finds that the bidding procedures approved here are "fair and equitable" and reasonably calculated "to maximize the recovery of value for the benefit of the bankruptcy estate." *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

C

Ultimately, the court approves procedures (again, without affording deference to the debtor) that are generally like those the debtor proposed, but in several instances the court modifies the procedures to address Lenders' objections or to better facilitate a fair and competitive auction. The approved procedures are attached to this opinion as Exhibit A, with several explanatory footnotes describing modifications the court has made to address the Lenders' objections or other considerations. Neither this opinion nor Exhibit A's explanatory footnotes, however, detail each modification or objection the court accepted in whole or in part, or rejected in whole or in a part. Several changes to the procedures debtor originally proposed result from the debtor's subsequent modifications or from modifications that the court deems sufficient to make the procedures reasonably calculated to maximize the sale value of the equity interests and otherwise fair and equitable. In all events, any objection that is not addressed in this opinion (either directly or indirectly in the footnotes to the approved procedures) is rejected as legally unpersuasive or lacking evidentiary support necessary to demonstrate (in the context of the court's approved procedures) that either the approved sale of equity interests does not have a legitimate purpose or that the approved procedures are not reasonably calculated to achieve the highest price in a fair, open, and competitive market and thereby maximize the sale value of the equity interests.

III

The court's modifications to the procedures the debtor originally proposed adequately address all of the Lenders' objections except for the following contentions:

(1) Computershare must be allowed to credit bid and (2) bidding will be chilled unfairly if (a) the debtor is permitted to pay excess auction proceeds to JSM or (b) the reorganized debtor is committed to operating the hotel as a Marriott franchise. These contentions don't warrant further modification to the auction procedures for the reasons that follow.

A

The Lenders object to the requirement that bids must be made in cash. They argue that Computershare should be permitted to submit a bid consisting of cash up to the amount of the cost of the full hotel renovations but after that point "Computershare or its designee [should be allowed] to credit bid over and above its cash bid" up to the amount of its secured claim. ECF No. 901, at 8.

The Bankruptcy Code provides that secured creditors may generally bid the value of their debt when the debtor sells the creditor's collateral: "At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." §363(k). Because the lien must be satisfied from the sale proceeds, the estate is indifferent between a bid of cash equal to the amount of the lien and a credit bid that releases the lien. *Lexington Coal Co., LLC v. Miller, Buckfire, Lewis Ying & Co., LLC (In re HNRC Dissolution Co.)*, 340 B.R. 818, 824–25 (E.D. Ky. 2006) (Section "363(k) treats credit bids as a method of payment—the same as if the secured creditor has paid cash and then immediately reclaimed that cash in payment of the secured debt."). And "credit bidding 'provides a safeguard for secured creditors, by insuring against the undervaluation of their collateral at an asset sale'" because "if the bidding at the sale is less than the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price to as high as the amount of its claim." *In re Weiss Multi-Strategy Advisers LLC*, 665 B.R. 578, 592

(Bankr. S.D.N.Y. 2024) (quoting *In re Aéropostale, Inc.*, 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016)).

None of this applies to the sale of estate property that is ***not*** subject to a lien. Computershare's argument fails on the basic point that although it holds a lien on the hotel and related personal property, it does not hold a lien on the equity interests in the existing debtor or the reorganized debtor. See ECF No. 632, at 5–8; Claim No. 11-1, at 5–6. As a result, neither §363(k) nor any other provision of the Bankruptcy Code entitles Computershare to credit bid at the auction of the ***reorganized debtor's equity interests***. This is true even when the equity interests are in a single-asset entity, directly contrary to the very argument Computershare makes here. As explained in *Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership*:

> [Creditor] argues that an insider sale of a one hundred percent ownership interest in the reorganized debtor (which is a single-asset entity with no on-going business or employees) where the transaction is not subject to market competition or valuation, is tantamount to a sale or transfer of control of the real property. Therefore, it argues, sections 1129(b)(2)(A)(ii) and 363(k) of the Bankruptcy Code mandate that the plan afford [Creditor] the right to credit bid against its secured claim in order for the plan to be deemed fair and equitable under section 1129(b)(2)(A). . . . [Section 1129(b)(2)(A)(ii)] applies only to the "property that is subject to the liens securing [the secured creditor's] claims." The sale of any such collateral must be subject to section 363(k) . . . . **The fatal flaw in [Creditor]'s argument is that the reorganization plan provides for a sale of equity in the limited partnership, not a sale of the collateral**. The bankruptcy court found that the transaction was not a sale of property subject to [Creditor]'s lien, and did not improperly frustrate [Creditor]'s credit bid rights. . . . The court did not err when it held that selling all the equity in a limited partnership does not alter the partnership's identity. Therefore, the credit bid provision does not apply.

248 B.R. 668, 679–80 (D. Mass. 2000) (citations omitted); see also *Bus. Aircraft Leasing, Inc. v. Ultra Energy Res, LLC (In re Addington)*, No. 12-10029, Adv. No. 24-1006, 2025 WL 936686, *3 (Bankr. E.D. Ky. Mar. 26, 2025) ("[Creditor] could not have used a credit bid

to pay the purchase price for an asset that was not subject to its charging lien. [Creditor] could only credit bid on its collateral, which is limited by the Charging Order and statute to the Debtor's distribution rights in Ultra."); *In re Hickey Properties, Ltd.*, 181 B.R. 171, 173 (Bankr. D.Vt. 1995) ("[Creditor]'s argument falters on a fundamental point. Although it holds a security interest in virtually all of Debtor's assets, it has no security interest in Debtor's equity interest. The interest in a partnership is owned by third parties. The Plan calls for termination of the partners' equity interests and sale of those interests at auction to the highest bidder. . . . [Creditor] has a lien on Debtor's assets, not its equity interests. Thus neither §§ 1129(b)(2)(A)(ii) nor 363(k) apply because the property to be sold is not subject to any lien of [Creditor]."); *In re The Free Lance-Star Publishing Co.*, 512 B.R. at 806 (holding that creditor did "not have a right to assert a credit bid on assets that do not secure [its] allowed claim."); see also *In re Weiss Multi-Strategy Advisers*, 665 B.R. at 593 ("In general, '[c]ourts have . . . limited the right to credit bid when the validity of a creditor's lien is in dispute.'" (quoting *Aéropostale*, 555 B.R. at 415)).

On February 9, 2026, after the court reviewed the Lenders' initial objection to the debtor's sale motion, the court entered the following docket order:

> The Lenders do not cite any authority in support of their argument [that they should be permitted to credit bid at the auction of the reorganized debtor's equity interests]. They offer not a single reference to the Code, to an opinion, or even to a secondary source. This is surprising because (a) arguments made without citation to supporting authority are generally deemed not well presented and waived (see, e.g., *Eberhardt v. Walsh*, 122 F.4th 681, 687 n.4 (7th Cir. 2024) (citing *Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023)) and *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006))), and (b) the objection eschews the court's previous suggestion that the Bankruptcy Code may not require credit bidding when an estate is not selling property in which any creditor holds a security interest. See ECF No. 845, at 15-16 (citing 11 U.S.C. secs. 363(k) & 1129(b)(2)(A)(ii)); also citing *id*. at 14-16 (citing *RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), and *In re Castleton Plaza LP*, 707 F.3d 821 (7th Cir. 2013)). What is more, **the 192 words the Lenders devote to this credit-bidding point** – a point they have repeatedly emphasized – **do not explain why reduction of a debt that is not required to be paid at confirmation should be equated with an influx of cash from a cash bid or how the debtor in possession and the court would evaluate the relative value of an all cash bid versus a cash bid that is supplemented by a reduction of a debt that the Code allows to be paid over time.** In sum, the Lenders' argument suggests that the bid procedures must allow bids whose value lies in reducing the reorganization plan's leverage without explaining either the legal basis for that proposition or how the proposition might be practically applied.

ECF No. 906 (emphasis added). The court's order concluded that the court would "deem[ ] the Lenders' credit bidding argument as made in the Lenders' February 6 objection to be not well developed" unless they "supplement[ed] the argument with, at a minimum, citations to supporting legal authorities," by February 17; otherwise, "the court w[ould] rule that the Lenders' argument that the auction procedures must allow credit bidding is waived or forfeited because it is not well presented." *Id.*

The Lenders responded to the court's February 9 docket order by timely filing a supplement that cites *Bank of America National Trust and Savings Association v. 203 North LaSalle St. Partnership*, 526 U.S. 434, 453–54, 456–57 (1999), and *In re 4 C Solutions, Inc.*, 302 B.R. 592, 600 (Bankr. C.D. Ill. 2003), for the proposition that "Lenders' argument that it is unfair to bar credit bidding is an extension of the well-accepted principles that the absolute priority rule is designed to ensure that 'top dollar' or the 'best obtainable' price is to be paid for the equity interests in a reorganized debtor." ECF No. 912, at 1. But those authorities do not at all address the notion that credit bidding is generally limited to sales of collateral in which the secured creditor holds a lien securing its debt. See 2*03 N. LaSalle St. P'ship*, 526 U.S. at 453 & 457 (upholding denial of confirmation of the debtor's plan, which granted old equity an exclusive right to acquire equity in the reorganized debtor, and noting, "old equity may well be in the best position to make a

go of the reorganized enterprise and so may be the party most likely to work out an equity-for-value reorganization" as long as old equity paid "full value".); *In re 4 C Solutions*, 302 B.R. at 599 (applying *203 N. LaSalle* and concluding that §1129(b)(2)(B)(ii) prevented confirmation of a plan affording old equity the exclusive right to buy equity in the reorganized debtor). Lenders did not cite to any other authority. And they said *nothing* at all in response to the court's observation that they had failed to "explain why reduction of a debt that is not required to be paid at confirmation should be equated with an influx of cash from a cash bid or how the debtor in possession and the court would evaluate the relative value of an all cash bid versus a cash bid that is supplemented by a reduction of a debt that the Code allows to be paid over time." ECF No. 906. In their March 18 brief objecting to the debtor's amended bidding procedures, they again argued that they were entitled to credit bid, and while they remained mum about how the court could fairly administer their proposed credit bidding procedure, they contended that the Seventh Circuit's opinion in *Castleton Plaza LP*, 707 F.3d 821, requires this result, stating, "Like this case, *Castleton Plaza* involved what was essentially single asset real estate collateral. . . . As Lenders have advocated, there is little difference between bidding on the equity of a single asset real estate entity and the assets of that entity, and the Seventh Circuit appears to agree." ECF No. 945, at 11 (citation omitted[10]).

 *Castleton Plaza* does not control the question of whether a secured creditor must be allowed to credit bid at an auction for equity interests against which it has no lien. *Castleton Plaza* arose from the appeal of a bankruptcy court's decision to confirm a plan in which an insider had the exclusive right to pay $375 thousand for the debtor's equity,

---

  10. The omitted citation and related parenthetical is "*See, e.g., In re Syed*, 238 B.R. 133, 140 (Bankr. N.D. Ill. 1999) (noting that [Single Asset Real Estate] cases include shopping centers)." ECF No. 945, at 11. *Syed* denies a chapter 13 debtor's Rule 59 motion to reconsider the bankruptcy court's annulment of the automatic stay. *Id*. at 138. The debtor's motion in part contested the court's application of §362(d)(3), which governs relief from the stay of an act against single-asset real estate. *Syed* has nothing whatsoever to do with §363 auctions or credit bidding.

even though an objecting creditor "offered $600,000 for the equity and promised to pay all other creditors 100¢ on the dollar." 707 F.3d at 822. The creditor "asked the bankruptcy judge to condition that plan's acceptance on [the insider] making the highest bid in an open competition. But the bankruptcy judge held that competition is unnecessary and confirmed the plan as proposed." *Id.* "This appeal", the Court of Appeals wrote, "presents the question whether an equity investor can evade the competitive process by arranging for the new value to be contributed by (and the new equity to go to) an 'insider,' as 11 U.S.C. § 101(31) defines that term." *Id.* at 821. The court answered, "no. Competition is essential whenever a plan of reorganization leaves an objecting creditor unpaid yet distributes an equity interest to an insider." *Id.* at 821–22.

In arguing that *Castleton Plaza* affords Computershare the right to credit bid, even though it does not hold a lien on the debtor's equity interests, Lenders rely on two sentences from *Castleton Plaza*'s introduction: "A plan of reorganization that includes a new investment must allow other potential investors to bid. In this competition, creditors can bid the value of their loans." 707 F.2d at 821 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)). This passage is not a **holding** that credit bidding is always required in the competition to acquire debtor equity. Credit bidding was never at issue in *Castleton Plaza*. The creditor offered to meet the insider's cash contribution with more cash, not with a credit bid. See 707 F.3d at 822 (comparing the debtor's plan to sell equity to its owner's spouse for $75 thousand, later increased to $375 thousand and to pay 15% on unsecured claims with the principal secured creditor's offer to pay $600 thousand for the equity with a promise to pay all other creditors in full). Consequently, the introductory statement on which Lenders rely— that "[a] plan of reorganization that includes a new investment must allow other potential investors to bid" and that "[i]n this competition, creditors can bid the value of their loans", 707 F.3d at 821—is dictum, by any measure. It is "unnecessary to the

outcome . . . and therefore perhaps not as fully considered as it would have been if it were essential to the outcome." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988). The statement "was not an integral part of the [ ] opinion—it can be sloughed off without damaging the analytical structure of the opinion . . . ." *Id.* The issue it presents—whether creditors can (at least sometimes) bid the value of their loans when competing to buy debtor equity—"was not grounded in the facts of the case and the judges may therefore have lacked an adequate experiential basis for it . . . ." *Id.* And it "was not presented as an issue, hence was not refined by the fires of adversary presentation." *Id.*; see Brief & Required Short Appendix of Creditor-Appellant EL-SNPR Notes Holdings, LLC at 3–4, *In re Castleton Plaza, LP*, 707 F.3d 821 (7th Cir. 2013) (No. 12-2639), Dkt. No. 13, 2021 U.S. 7th Cir. Briefs LEXIS 1842 [hereinafter Brief of EL-SNPR].[11] The statement, therefore, "was not a fully measured judicial pronouncement,

---

11. Credit bidding was not presented as an issue in the appeal decided by *Castleton Plaza*, 707 F.3d 821. The appellant's brief in that case described the issues as follows:

> 1. Whether the Bankruptcy Court erred as a matter of law when it held that the absolute priority rule, 11 U.S.C. § 1129(b)(2)(B)(ii), is not violated where equity interests of the reorganized Debtor are transferred to an insider of the Debtor without public marketing or auction and where there is a proposed offer for the equity interests far in excess of what the insider has offered to pay.
>
> 2. Whether the Bankruptcy Court erred as a matter of law when it determined that the Debtor's proposed sale of all equity interests of the reorganized Debtor to an insider, Mary Clare Broadbent, of the Debtor without marketing or auction satisfies the heightened scrutiny required of insider sales under 11 U.S.C. § 363(b).
>
> 3. Whether the Bankruptcy Court committed reversible error in finding that the terms proposed in the Plan for modifying the EL-SNPR loan documents were "fair and equitable" under 11 U.S.C. § 1129(b).
>
> 4. Whether the Bankruptcy Court committed reversible error when it found, pursuant to 11 U.S.C. § 1129(a)(11), that the Plan is feasible or not likely to be followed by (a) liquidation of the Debtor or (b) the need for further financial reorganization of the Debtor or any successor to the Debtor.

[ ] it was not likely to be relied on by readers, and indeed [ ] it may not have been part of the decision that resolved the case or controversy on which the court's jurisdiction depended . . . ." *Id.* The statement in *Castleton Plaza*, therefore, is dictum, not a holding; the difference being "that a dictum is not authoritative." *Id.* at 292; see also *In re Cassidy*, 892 F.2d 637, 640–41 (7th Cir. 1990) ("[F]or a ruling to have preclusive effect, it must be necessary to the decision. *United States v. Crawley* . . . defines dicta as that portion of an opinion not entitled to the full weight usually given judicial decisions, including any portion not necessary to the outcome of the case." (citations omitted)).

While a higher court's dicta should not be unthinkingly ignored, see *United States v. Neal*, No. 23-CR-0141, 2024 WL 1794424, at *5 (E.D. Wis. Apr. 25, 2024), dicta can be found wanting of persuasive value, especially when considered in different circumstances. The debtor's plan of reorganization here looks to the proceeds of an equity auction to fund necessary hotel renovations and (if there is an overbid) to pay unsecured creditors, potentially in full. A credit bid by Computershare, which has elected to have its claim treated as fully secured, is likely to be contrary to both of those ends. The Lenders implicitly acknowledge this by proposing that Computershare would first submit a cash bid up to the amount sufficient to fund the renovations but would be allowed to increase its offer by combining the cash component with a credit component.

The Lenders' proposal that it be allowed to overbid the minimum cash bid with credit is seemingly contrary to the terms of the debtor's plan of reorganization, which provides that holders of allowed unsecured claims "shall receive, in addition to the treatment set forth [elsewhere in the plan], [their] pro rata share of any Equity Auction Excess Proceeds up to such amount as will constitute payment of [their] Allowed

---

Brief of EL-SNPR at 3–4, *Castleton Plaza*, 707 F.3d 821 (No. 12-2639). Again, the "proposed offer" to which the brief refers was a cash offer, not a credit bid. The words "credit bid" or "credit bidding" do not appear in the brief.

Unsecured Claim in full . . . ." ECF No. 853, §3.7. "'Equity Auction' means the auction sale of New Equity to be conducted pursuant to the Auction and Bidding Procedures and 363 Motion for at least $8,000,000", and "'Equity Auction Excess Proceeds' means proceeds (net of any marketing expenses) of the Equity Auction that exceed $8 million." *Id.* at §§1.29 & 1.30. Again, $8 million is the opening bid and the projected minimum cost of the initial renovations that the debtor must undertake. Allowing Computershare to credit bid its $45 million fully secured claim on top of the $8 million in cash needed for the initial renovations creates the very real possibility that Computershare could prevail at the auction over cash bids of more than $8 million without the reorganized debtor being able to distribute a dime to unsecured creditors. Computershare's proposed credit bidding thus threatens to deprive unsecured creditors of a benefit provided for in the plan; that fact alone is ample cause to deny Computershare's proposal, even if one presumes the opportunity to credit bid is generally applicable to equity auctions where the creditor does not have a lien on the equity interests—a presumption contrary to every opinion of which the court is aware that addresses that issue. See *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60, n.14 (Bankr. D. Del. 2014) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.").

A thoughtful reflection on the *Castleton Plaza* dictum requires one to consider whether the statement was meant to refer to credit bidding the value of a *loan*, rather than credit bidding the value of a *lien*. See ECF No. 945, at 10–11. The Bankruptcy Code provision at issue in *Castleton Plaza* is the codification of the absolute priority rule in §1129(b)(2)(B)(ii), which provides that "with respect to a class of **unsecured** claims—. . . the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property" unless the plan provides that the unsecured creditor class is paid in full. In

*Castleton Plaza*, the creditor had a "roughly $10 million secured debt" that the plan proposed to write "down to roughly $8.2 million, with the difference treated as unsecured." 707 F.3d at 822. The unsecured portion of the creditor's claim was the subject of §1129(b)(2)(B)(ii)'s protection, not the secured portion, which is the subject of §1129(b)(2)(A). There's no persuasive reason to suppose that *Castleton Plaza*'s dictum that "creditors can bid the value of their loans," is applicable here. 707 F.3d at 821.

*Castleton Plaza* cites the Supreme Court's opinion in *RadLAX* as support for its statement that "creditors can bid the value of their loans." *Id. RadLAX* deals with §1129(b)(2)(A)'s cramdown requirements, which provide, among other things, that if a chapter 11 plan sells property free and clear of a creditor's liens it must do so "subject to §363(k)", that is, allowing a creditor to credit bid its secured claim (i.e., the value of its lien) unless the court orders otherwise. 566 U.S. at 643–49. This suggests that *Castleton Plaza*'s use of "can" is not a mandate that all sales of new equity *must* allow for credit bids, but simply a recognition that credit *may* be bid under appropriate circumstances, i.e., such as those discussed in *RadLAX*, where "the plan provides for the sale of collateral free and clear of the creditor's lien". 566 U.S. at 641. Again, the debtor here proposes to sell equity interests in the reorganized debtor—equity interests in which Computershare has no lien—***not*** the debtor's hotel—in which Computershare has a lien.

Lenders' final argument for applying the *Castleton Plaza* dictum to this case is that the sale of equity in the reorganized debtor should be equated with a sale of the hotel itself, stating, "there is little distinction of significance, in what is essentially a single asset real estate case, between credit bidding on the hotel asset and the equity interests in that asset, when the proposed equity sale incorporates the terms of a confirmed plan by which the buyer will assume all of Debtor's liabilities as modified." ECF No. 912, at 2. But, as noted above, *Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership, supra*, and other courts have rejected this argument because it ignores the fundamental

distinction between sales of assets and sales of equity interests:

> [Creditor]'s argument falters on a fundamental point. Although it holds a security interest in virtually all of Debtor's assets, it has no security interest in Debtor's equity interest. The interest in a partnership is owned by third parties. The Plan calls for termination of the partners' equity interests and sale of those interests at auction to the highest bidder. As Massachusetts Bankruptcy Judge James F. Queenan, Jr., has observed, a sale of equity 'is quite different from an asset sale.'

> > [A]n asset sale will bring about realization by the lender of the value of [its] security interest because a secured creditor is protected [by §§ 1129(b)(2)(A)(ii) and 363(k)] when [its] collateral is sold. This protection is not present in a [sale of the equity interest].... Unlike an asset sale, [sale of the equity interest] leaves the collateral undisturbed, presenting no opportunity for the secured party to obtain the ... value of [its] collateral.

> Queenan, Standards for Valuation of Security Interests in Chapter 11, 92 Com.L.J. 18, 58–59 (1987).

*Hickey Props.*, 181 B.R. at 173. Value in the reorganized debtor's equity may result from the plan's secured-debt repayment terms (which, in opposing plan confirmation, Computershare argues are neither fair nor equitable). If the plan is confirmable, the value of that Congressionally bestowed benefit is best tested by seeing the extent to which it attracts a contribution of new funds, not a retirement of old debt. So, neither *RadLAX*, nor *Castleton Plaza*'s off-hand mention of credit bidding, mandates credit bidding or even provides a persuasive reason to allow it under the present circumstances. On the other hand, allowing credit bidding here would be contrary to the reasoning of *Beal Bank, Business Aircraft Leasing, The Free Lance-Star Publishing Co.,* and *In re Hickey Properties, supra,* and is not supported by a single decision that Lenders have cited or of which the court is aware.

Moreover, Computershare's credit bidding proposal potentially imposes substantial difficulties in administering the equity auction. How, if the proposed credit bidding is allowed, will the auction administrator or the court determine whether, for example, a $10 million all-cash bid is better than a bid by Computershare consisting of $8 million cash and a $2.25 million reduction in its claim secured by debtor's hotel? Given the plan's direction that excess auction proceeds be first used to pay holders of unsecured claims, one might look to the interests of those creditors and conclude that the $10 million in cash is better. But what if Computershare increased its credit bid? At some point Computershare's exchange of its debt for equity would allow the reorganized debtor to borrow funds to pay the unsecured claims in full, but what would require the Computershare-owned reorganized debtor to pay? Would Computershare concede that its credit bid generates "Equity Auction Excess Proceeds" that the reorganized debtor owes to the unsecured creditors under section 3.7 of the plan or, after they are paid in full, to JSM under section 3.13? ECF No. 853, at §§ 3.7 & 3.13. And, if Computershare is entitled to credit bid debt not secured by the equity interests, why shouldn't all the debtor's unsecured creditors be able to credit bid their loans or other debt? As noted above, §1129(b)(2)(B)(ii), the absolute priority provision *Castleton Plaza* invokes, is a fair and equitable requirement applicable to holders of unsecured claims, not secured claims. Principles of equity applicable in bankruptcy generally require holders of secured claims to recover first from their collateral,[12]

---

12. See, e.g., *Meyer v. United States*, 375 U.S. 233, 236–37 (1963) (Marshaling is an "equitable doctrine . . . [that] rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds" and it is "designed to promote fair dealing and justice. Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." (first quoting *Sowell v. Fed. Reserve Bank*, 268 U.S. 449, 456–57 (1925)); see also *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017) ("The Code also sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate. Secured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts. . . . But a bankruptcy court cannot confirm a plan that contains priority-violating distributions over the objection of

another reason to doubt Computershare's entitlement to credit bid for equity interests in which it has no lien to the potential detriment to unsecured creditors who stand to benefit if the cash bidding exceeds $8 million. And even if one could reconcile the reorganization plan's direction that unsecured creditors receive excess bid proceeds with a right to credit bid, allowing credit bids by Computershare, unsecured creditors, or all creditors (since no creditors have a lien on the equity interests) may make it difficult to select a winning bidder—potentially requiring evaluation of the benefits of a reduction in secured debt versus unsecured debt or a comparison of the benefits to other creditors of an unsecured creditor bidding some or all of its pro rata share of the total unsecured debt.[13] In the absence of any authority requiring this course or evidence showing that requiring cash bids will harm competition to buy the equity interest, there is no good reason to accept Computershare's invitation to travel this road so clearly marked with warning signs of future difficult (and therefore costly) questions of administration.

Limiting all bids to cash makes it far easier to administer the auction and avoids the risk that parties prepared to pay more than $8 million in cash will be deterred from bidding at all, as may well be the case if Computershare is entitled to put up its $45

---

an impaired creditor class. §§ 1129(a)(7), (b)(2)."); *In re Multiple Services Industries, Inc.*, 18 B.R. 635 (Bankr. E.D. Wis. 1982) (Clevert, B.J.) (applying marshaling under Wisconsin law in chapter 7 case to require secured lender to collect on its collateral before receiving distribution on its claim against the bankruptcy estate).

13. A credit bid by one of many unsecured creditors only benefits the other unsecured creditors if there are sufficient funds available for paying unsecured claims such that other creditors will receive their pro rata amount of the credit bid. For example, in the absence of other funds to pay unsecured claims, an unsecured creditor holding a claim for $20 where total claims are $100 could not fairly overbid a $10 cash bid with a $20 credit bid, because it would receive property worth at least $10 and other creditors would seemingly receive nothing, losing out on the $8.00 they would have received had the $10 cash bid prevailed. The other creditors benefit only if other payments to a reduced creditor pool make up the difference or the credit-bidding creditor offsets the difference with a partial cash bid. In the example, if the creditor holding a claim for $20 bids $10 cash and $10 of its claim, the other creditors are better off: they receive 90% of the $10 cash ($9); the bidding creditor receives the asset plus 10% of the cash ($1), but has paid $10 cash and forgone the opportunity to receive $2 (had the prior $10 bid prevailed), as well as having reduced its pro rata share of other distributions.

million secured claim as an overbid. Allowing Computershare to credit bid may thus decrease participation in the auction, and, again, Lenders have presented neither evidence nor anecdote to suggest why limiting the auction to cash bids harms competition for the equity interests. This is a sufficient reason to deny Computershare's request to allow credit bidding. See *In re New Energy Corp.*, 739 F.3d 1077, 1078–79 (7th Cir. 2014) ("Yet bankruptcy courts are entitled to require cash bids, rather than complex and hard-to-value bids including leases and options. Cash bids are comparable; the sort of bid Natural Chem wanted to make could not easily have been compared against others.").

The debtor's requirement that all bids for purchasing the equity interests in the reorganized debtor be made in cash is easily justified under these circumstances.

B

1

The Lenders also contend that the proposed auction is unfair and that bidding will be chilled because the debtor's plan "provides that any auction proceeds exceeding the amounts necessary to pay unsecured creditors in full will be paid over to the existing equity holders on account of their pre-existing equity interests." ECF No. 901, at 8. It is "unfair", Lenders say, because they assert that "JSM could acquire New Equity for a purchase price lower than all other bidders. Once the bidding enters such 'excess proceeds' territory, only JSM can bid with abandon because it knows that all of the excess proceeds will be returned to it, whether or not it is the Winning Bidder." *Id.* Lenders contend further that JSM's (old equity's) right to a distribution of excess proceeds after all unsecured creditors are paid in full with interest "chills bidding"—a contention premised solely on a rhetorical question: "Who is to say whether such a provision might deter a bidder from participating in the auction in the first place, seeing the writing on the wall?" ECF No. 945, at 10.

The court cannot say because the Lenders elected to present no evidence to

support this contention. Lenders apparently hypothesize a world in which a party willing to bid more than \$10 million (enough to pay all unsecured claims in full, including WMH Funding's \$2 million claim) to acquire the reorganized debtor's equity would be deterred from bidding further on the presumption that JSM could "bid with abandon" knowing "all excess proceeds will be returned to it". ECF No. 901, at 8. This is not self-evident. Minimally, JSM might lack the means to make an overbid exceeding \$10 million. This record offers no basis for concluding that the plan's distribution of excess sale proceeds will chill bidding or make the auction unfair.[14]

2

Finally, the Lenders have suggested without supporting evidence that the proposed bid procedures may generate a sale for an amount less than what a potential purchaser might pay if it were not required to keep the Marriott brand. ECF No. 942, at 26–31. As mentioned above, the debtor has operated its hotel as a Marriott franchisee since it opened the hotel in 2013. The debtor's reorganization plan is to continue operating the hotel as a Marriott franchise. Acquiring equity in the reorganized debtor is thus to acquire an interest in an entity that is constrained by its plan of reorganization to operate a Marriott franchise.

The Lenders' suggestion that the equity interests might be worth more if the reorganized debtor were not contractually committed to Marriott (again) lacks supporting evidence. More fundamentally, it is in essence a (wholly unsupported) suggestion that the equity interests would be more valuable to some potential purchasers if they were equity interests in a different reorganized debtor—one lacking a plan of reorganization that is committed to operating a Marriott hotel, for example.

---

14. Lenders have emphasized that they do not oppose the debtor's sale motion or the request to approve auction procedures based on an argument that the plan's provision that excess sale proceeds be disbursed to JSM as the debtor's prepetition owner offends §1129; that is an argument they reserve for their objection to plan confirmation. ECF No. 945, at 10.

That's not an objection to auction procedures; that's an objection to the asset being auctioned.

If the Lenders want competition over how the debtor should reorganize as a means of determining the value of the reorganized debtor's equity, then they should have filed a competing plan. The period in which the debtor enjoyed an exclusive right to propose a plan expired before the debtor filed its fourth amended plan of reorganization. Neither the Lenders nor any other creditor has proposed a competing plan. The Lenders' suggestion that the value the debtor's equity interest will command at auction is negatively impacted by the plan's commitment to continuing as a Marriott franchise is unsupported by evidence and otherwise unconvincing.

IV

For the reasons stated above and in Exhibit A to this opinion and order, and contingent on confirmation of the debtor's Fourth Amended Plan of Reorganization (the Plan, ECF No. 853), with capitalized terms not defined here having the definitions stated in that Plan, IT IS ORDERED that:

1. The Equity Auction Procedures (Exhibit A) are incorporated into this order as if stated here in their entirety.

2. Debtor Wisconsin & Milwaukee Hotel LLC's auction sale of New Equity interests in the reorganized debtor pursuant to Section 363(b) of the Bankruptcy Code is approved subject to the terms of this order, including, without limitation, the Equity Auction Procedures in Exhibit A to this order (and as they may be revised or supplemented by subsequent court order), with the terms of this order superseding any conflicting summary of the bidding procedures in the Plan.

3. Debtor must file a motion to employ a professional to market or otherwise promote the Equity Auction as soon as practicable but in all events no later than 14 days after entry of this order.

4. Much Shelist P.C. (MS Firm) is appointed, pursuant to §327(e) of the Bankruptcy Code, as the independent auction administrator (Auction Administrator).

   a. The Auction Administrator is charged with acting in the best interests of the Debtor and the Reorganized Debtor by administering the Equity Auction for the purpose of achieving the best value for the New Equity interests.

   b. The Auction Administrator's charge includes (without limitation) overseeing, administrating, and conducting all aspects of the Equity Auction, which in turn specifically (but without limitation) includes implementing the Equity Auction Procedures and performing all necessary and beneficial steps, such as potentially adopting additional guidelines, policies, or procedures to aid in the efficient and value-maximizing operation of the Equity Auction, making determinations about whether potential bidders meet the wherewithal requirements, and holding potential bidder deposits in trust; all such undertakings must be consisted with and not contrary to the terms of this order, including the Equity Auction Procedures.

   c. In acting as the Auction Administrator, the MS Firm will use its independent judgment; the Auction Administrator may (as it deems best, necessary, or beneficial) solicit, receive, and consider input from the debtor, creditors, potential bidders, and other parties interested in the Equity Auction, but, as Auction Administrator, the MS Firm is charged with independently performing the duties imposed by this order, solely at the ultimate direction and oversight of this Bankruptcy Court.

5. No sale of New Equity interests is final until approved by a subsequent order of this court following a motion to approve the sale.

6. The United States Bankruptcy Court for the Eastern District of Wisconsin (the Bankruptcy Court) maintains exclusive jurisdiction over the enforcement of this order and all matters related to or dependent on it. The Bankruptcy Court is and will remain the sole forum for the adjudication of any issue, dispute,

claim, cause of action, or controversy (any of which is a Matter) that arises in connection with or any way relates to the sale of New Equity interests, the Equity Auction, the Equity Auction Procedures, or the actions of the Auction Administrator, including, but not limited to, any undertaking to become a Qualified Bidder, entering into a non-disclosure agreement, accessing financial information made available to potential bidders, submitting (or potentially forfeiting) a bid deposit, or participating in the bidding (all such participants, along with all Qualified Bidders, and their agents, principals, assigns, successors, and privies, are Participants). All Participants (whether legal entities or individuals) are deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial or right to litigate a Matter in any other venue or forum. All Participants consent to be bound by this order, and all Participants are permanently enjoined from litigating any Matter in any court or forum other than the Bankruptcy Court or courts having appellate jurisdiction over, or that arise as a result of, the Bankruptcy Court's orders.

7. The debtor's motion to approve bidding procedures for the sale of new equity (ECF No. 850) is granted to the extent provided in this order and is otherwise denied.

# # # # #

<u>**EXHIBIT A**</u>

**AUCTION AND EQUITY SALE BIDDING PROCEDURES[1]**

The following procedures (the "**Bidding Procedures**") govern the submission of bids for the auction sale of equity of the Reorganized Debtor to be newly issued on the Effective Date of the Plan ("**New Equity**"). The New Equity will be sold in connection with the chapter 11 bankruptcy case of Wisconsin & Milwaukee Hotel LLC (the "**Debtor**"), Case No. 24-21743-gmh, pending before the United States Bankruptcy Court for the Eastern District of Wisconsin ("**Bankruptcy Court**"). The auction process will be overseen and administered by Much Shelist, P.C. ("**Auction Administrator**") pursuant to the May 8, 2026 order of the Bankruptcy Court approving the auction of the New Equity and related procedures.

1. **Auction and Sale Hearing**. Subject to the approval of the sale by the Bankruptcy Court, the Debtor seeks to sell the New Equity at a live auction pursuant to these procedures.

2. **Stalking Horse Bidder**. Jackson Street Management ("**JSM**"), member of the Debtor, has entered into a subscription agreement ("**New Equity Subscription Agreement**") to purchase the New Equity for $8 million on the Effective Date.

3. **Qualified Bidder Requirements**.

   A. Anyone may submit a competing bid and participate in the auction, provided they first become a qualified bidder ("**Qualified Bidder**"). JSM is deemed to be a Qualified Bidder, because it has already met all Qualification Requirements that are applicable to bidders under these Bid Procedures, subject to its provision of the Cash Deposit (defined below). The opportunity to bid by becoming a Qualified Bidder will be publicized with notices (the "**Public Notice Date**") in the national editions of the *New York Times* and the *Wall Street Journal*, as well as on internet sites that promote and publicize bankruptcy auctions, as soon as is practicable after the date the Court enters an order confirming the Plan. At least one week before the commencement of Plan confirmation hearings (or such other time as mutually agreed upon by the Debtor and Computershare Trust Company, N.A.), the Debtor will also file a motion to engage a professional firm to assist in promoting the Equity Sale and bid opportunities contemplated herein. The bid opportunities may be further marketed and publicized in a manner determined by that professional in the exercise of its business

---

1. Capitalized terms used and not otherwise defined in these Auction and Equity Sale Bidding Procedures have the meanings ascribed to them in the Debtor's Fourth Amended Chapter 11 Plan of Reorganization dated January 12, 2026, ECF No. 853 (the "**Plan**").

judgment. The requirements to become a Qualified Bidder ("**General Qualified Bidder Requirements**") are the following: (i) execution of a non-disclosure agreement to protect the confidentiality of information provided by the Debtor (and Marriott International, Inc. ("**Marriott**"), the Debtor's franchisor) for the purposes of bidder diligence, (ii) a legally binding commitment to assume and ensure that the Reorganized Debtor complies with all the obligations set forth in the confirmed Plan, (iii) a demonstration that the person seeking to bid is an "Accredited Investor" as defined in Regulation D of the Securities Act of 1933, (iv) a demonstration to the satisfaction of the Auction Administrator of the person's financial wherewithal to (X) close on a purchase of the New Equity for a minimum of $8,250,000 million (the Stalking Horse Bid plus the first minimum competing bid increment) ("**Financial Wherewithal Requirement**"), provided, however, that a person who becomes a Qualified Bidder hereunder shall not be permitted to bid an amount that exceeds its Financial Wherewithal Requirement, and (Y) subject to Marriott's approval process, meet any requirements that Marriott may impose, in Marriott's sole discretion, including, without limitation, the requirement of providing an unlimited guaranty of the Debtor's obligations to Marriott ("**Guaranty Requirement**") and the payment of certain fees and costs that Marriott may require; (v) submission of a fully authorized (with evidence of due authorization) and executed New Equity Subscription Agreement, without condition or contingency other than approval of the sale by the Bankruptcy Court, in the amount of at least the $8,250,000 required for a competing bid, and (vi) a cash deposit in the amount of twenty percent (20%) of the bid's proposed purchase price to a non-interest bearing escrow account of the Auction Administrator (the "**Cash Deposit**"). In order to meet the Guaranty Requirement condition of becoming a Qualified Bidder, persons seeking to bid must also provide to the Auction Administrator the identification of the persons (who must not be the Qualified Bidder itself) who shall serve as guarantors to Marriott of all the Debtor's obligations under the prospective franchise agreement, and evidence of their financial ability to perform such guaranty obligations; provided, however, that notwithstanding the foregoing, Marriott's post-auction rights with respect to the Guaranty Requirement, including its process and timeline for reviewing any potential guarantors and its sole discretion to approve or disapprove any potential guarantors, shall not be affected by the Auction Administrator's pre-auction determination that the Guaranty Requirement has been met for Qualified Bidder status. Qualified Bidders, including the Stalking Horse Bidder, must timely demonstrate to the reasonable satisfaction of the Auction Administrator that they have available and committed funds to support any bid they propose to make in excess of $8,250,000 (a process that may be repeated at each successive round of bidding); the Auction Administrator, subject to court oversight, may disqualify a bid by a Qualified Bidder if the Auction Administrator

determines that the bidder has failed to demonstrate its wherewithal to close a sale at a proposed bid amount. The Auction Administrator will maintain in confidence all information relating to bidders' proof of wherewithal and will not disclose that information to the Debtor, other Qualified Bidders, or any other person, unless subsequently ordered by the Bankruptcy Court.[2]

B. **Marriott Approval Process**. Prior to closing on the sale of the New Equity contemplated herein, the Winning Bidder, the Back-up Bidder, or any other Qualified Bidder who prevails at the Auction, as applicable, must finalize and execute all required agreements with Marriott, including, without limitation, an amended franchise agreement or re-licensing franchise agreement, as applicable, a new owner guaranty, a property improvement plan to address any necessary renovations to the Hotel, and any other agreements or actions as may be required by Marriott in its sole discretion for its approval.

4. **Cash Deposits Not Property of the Estate**. All funds delivered in connection with the Equity Auction shall be deposited and held in a segregated account designated as the Equity Auction Proceeds Account, pending the Effective Date, or as otherwise provided herein. Such funds shall not constitute property of the Debtor's estate until they are distributed to the Reorganized Debtor on the Effective Date.

5. **Qualified Bidder Deadline.** There will be a 45-day period from the Public Notice Date for a potential purchaser to become a Qualified Bidder ("**Qualified Bidder Deadline**"), to permit diligence by any such party interested in participating in the Auction. Interested parties who wish to become Qualified Bidders have until the Qualified Bidder Deadline to review the confirmed Plan and other information related to the Debtor, provided they have first satisfied the Qualified Bidder Requirements set forth in Paragraph 3 above. On or prior to the date that public notice is provided, the Debtor, overseen by the Auction Administrator, or the Auction Administrator, with the Debtor's cooperation, will establish a virtual data room which will be populated with historical financial information, and other available information as

---

2. The court modified the Financial Wherewithal Requirement in this paragraph to remove the requirement that bidders other than JSM had to demonstrate their ability to pay $10.25 million, the expected full renovation costs of the Hotel. This modification addresses the Lenders' argument that the Financial Wherewithal Requirement was unfair and chilled bidding because it imposed a significantly higher financial wherewithal requirement on bidders other than JSM.

The court concludes that the differential between JSM's initial $8 million wherewithal requirement and other bidders' initial $8.25 million wherewithal requirement is justified by other bidders' need to initially bid at least $8.25 million, the first increment more than the $8 million stalking-horse bid. Consistent with the incremental approach to showing wherewithal, JSM need not make a wherewithal showing unless its opening bid is overbid and it seeks to raise its bid. The parties will be on equal footing for all subsequent bidding, since the procedures require that they demonstrate to the Auction Administrator's satisfaction that they have the wherewithal to make any subsequent bid. As so modified, the wherewithal requirement bestows no apparent anticompetitive advantage on JSM, nor does it restrain competition to bid more than $8 million for the equity interests.

would customarily be reviewed by a potential purchaser. *Any potential purchaser must enter into a non-disclosure agreement prior to being granted access to such virtual data room.*

6. **Cancellation of Auction**. If at the Qualified Bidder Deadline, there are no Qualified Bidders other than JSM, then the Auction Administrator will cancel the auction, and JSM must close on its acquisition of the New Equity on the Effective Date; provided that JSM must strictly adhere to all applicable provisions of the Marriott Franchise Agreement (as amended and agreed by Marriott) and any other requirements that Marriott may impose, in its sole discretion, prior to closing on its acquisition of the New Equity, and, to the extent the terms of the Marriott Franchise Agreement and the 363 Motion and/or Bidding Procedures conflict, the terms of the Marriott Franchise Agreement control and govern.

7. **Conduct of Auction.** If there are Qualified Bidders other than JSM, then 14 days after the Qualified Bidder Deadline (the "**Auction Date**"), the Auction Administrator will conduct a live auction (in person and via Zoom) of the New Equity at its offices: Much Shelist, P.C., at 191 North Wacker Drive, Suite 1800, Chicago, Illinois, 60606, or at such other reasonable location selected in advance by the Auction Administrator, presuming that all reasonable efforts are made to ensure advance notice to all potential participants of the location of the auction. The first bid of a Qualified Bidder other than JSM must be at least $8,250,000. Thereafter, bids must exceed prior bids by at least $250,000.

8. **Highest and Best Bid**. Bids must be in cash only, and the New Equity will be sold only in its entirety. The highest and best cash bid shall be the bid of a Qualified Bidder that is the highest at the end of the Auction. At the conclusion of the Auction, the Auction Administrator, subject to the Bankruptcy Court's approval, shall determine (i) which bid constitutes the highest or best offer (the "**Winning Bid**"); and (ii) the next highest or best bid (the "**Back-Up Bid**"). The Back-Up Bidder shall remain obligated to close at their last highest bid, and provided that they obtain Marriott's approval as otherwise provided in these Bid Procedures, in the event the Winning Bidder fails to close on the purchase of New Equity.

9. **Effect of Post-Auction Failure to Gain Marriott Approval.** If a Winning Bidder or Back-up Bidder fails to obtain Marriott's post-Auction approval as provided herein, the Auction Administrator will determine based on the bid history and any other considerations it deems relevant, which bidders, if any, should be declared the Winning Bidder and Back-up Bidder or whether the auction must be continued or restarted. The Auction Administrator's determination is subject to court oversight and review, either at the request of an interested party or on the court's own initiative.[3]

---

3. This auction procedure has been modified by the court to address the Lenders' argument that the Debtor's proposed amended bid procedures were unfair and confusing because they provided that, if a

10. **Additional Auction Rules**. The Auction Administrator may announce additional procedural rules for the submission of bids that are reasonable under the circumstances, so long as such rules are not inconsistent with these Bidding Procedures. These rules are subject to review by the Bankruptcy Court, which will resolve any dispute about them or their application filed by an interested party presenting a judiciable controversy.

11. **Consent to Jurisdiction, Retention of Exclusive Jurisdiction, Injunction on Disputing Auction Matters in Any Other Forum**. All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the United States Bankruptcy Court for the Eastern District of Wisconsin and waived any right to a jury trial and any right to litigate any dispute or issue relating in any way to the Bidding Procedures, the Auction, or the construction and enforcement of the New Equity Purchase Agreements in any other venue or forum; additionally, All Qualified Bidders, their agents, principals, assigns, successors, and privies, consent to be bound by the Bankruptcy Court's Auction Procedure Order, which, among other things, enjoins all such persons from litigating any issue or dispute relating in any way to the Bidding Procedures, the Auction, or the construction and enforcement of the New Equity Purchase Agreements in any forum other than the Bankruptcy Court for the Eastern District of Wisconsin.

12. **Sale Approval Hearing**. The Bankruptcy Court will conduct a hearing to approve the New Equity sale, and in the event JSM is not the Winning Bidder, to approve the assumption and agreement by the Winning Bidder to all the obligations under the Plan, as soon after the Auction Date as the Court can reasonably accommodate on its calendar. The Court's approval of any New Equity sale is subject to Marriott's post-auction approval as otherwise provided in these Bid Procedures.

13. **Disposition of Cash Deposits**. Promptly after the Bankruptcy Court's entry of an order approving the sale of the New Equity, the Cash Deposits submitted by all Qualified Bidders (other than the Winning Bidder and the Back-Up Bidder) shall be returned to the respective Qualified Bidders. The Cash Deposit of the Winning Bidder shall be applied to the sale price set forth in the Winning Bidder's New Equity Subscription Agreement. Subject to the negotiation of closing conditions in the sale documents applicable to the Winning Bidder, if the Winning Bidder fails to consummate the purchase of the New Equity for any reason other than (i) the Debtor's Default or (ii) the Winning Bidder failed to obtain the approval of Marriott as provided above, the Cash Deposit of such Winning Bidder shall be forfeited to the Debtor,

---

Winning Bidder or Back-up Bidder failed to close the sale because they failed "to obtain Marriott's post-Auction approval", then "the Auction results [would] be adjusted to the highest amount that was submitted by other bidders (including JSM) before the first bid made by the person who failed to obtain Marriott's approval." ECF No. 934, at 24. Under the revised procedure, the Auction Administrator will use its judgment to determine how to proceed if a Winning Bidder of Back-up Bidder fails to close because they fail to obtain Marriott's approval.

unless, on motion, the Bankruptcy Court determines that the Winning Bidder's failure to consummate the purchase resulted from circumstances for which it cannot justly be held accountable. For these purposes, "**Debtor's Default**" means the Debtor's failure, refusal or inability to close on the sale to the Winning Bidder by or on the Effective Date, provided that the Winning Bidder has complied with all of its obligations under the applicable sale documents and is ready, willing and able to close. Notwithstanding this forfeiture, the Debtor retains the right to seek all additional available damages from any defaulting Winning Bidder. In the event the Winning Bidder does not close on the sale of the New Equity, the Debtor shall sell the New Equity to the Back-Up Bidder pursuant to its New Equity Subscription Agreement, provided that the Back-Up Bidder has obtained Marriott's approval as provided above. The Auction Administrator will retain the Back-Up Bidder's Cash Deposit until the sale to the Winning Bidder closes, and the Back-up Bidder shall remain obligated to close a sale transaction with the Debtor based on the Back-Up Bidder's New Equity Subscription Agreement until the Sale to the Winning Bidder closes. Within seven (7) calendar days of the closing of the sale to the Winning Bidder, the Auction Administrator must return the Deposit to the Back-Up Bidder.[4]

---

[4]. This auction procedure has been modified by the court to address the Lenders' argument that the Debtor's proposed amended bid procedures were unfair because, even as revised, a participant was required to forfeit its deposit if it failed to close on its winning bid "for any reason other than that it failed to obtain the approval of Marriott." ECF No. 945, at 7 (quoting ECF No. 934, at 24–25). The court modified the procedure to provide that a participant facing a forfeiture of the deposit because they failed to close the purchase may file a motion with the court to seek relief from the forfeiture requirement.