UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re:

Wisconsin & Milwaukee Hotel LLC, Case No. 24-21743-gmh
Chapter 11

Debtor.

---

**OPINION**

---

Debtor Wisconsin & Milwaukee Hotel LLC owns the Milwaukee Marriott Downtown, a full-service hotel in Milwaukee, Wisconsin. The debtor moves to confirm its fourth amended chapter 11 plan. Creditors Computershare Trust Company, N.A. (Computershare) and Wisconsin & Milwaukee Hotel Funding LLC (Funding) (collectively, Lenders) voted to reject the plan and object to its confirmation.

I

A

The court held an evidentiary confirmation hearing on May 26–28, 2026. That hearing followed other interstitial rulings that will be briefly discussed and incorporated into this opinion, because the debtor and the Lenders engaged in extensive litigation relating to plan confirmation both before and after the May 2026 hearing.

While an earlier version of the debtor's plan was awaiting a confirmation hearing, Lenders filed a motion for relief from the automatic stay. The court conducted evidentiary hearings on that motion and related confirmation issues in July and August 2025. Based on the evidence presented at those hearings, the court made two findings applicable to plan confirmation, as well as to the Lenders' motion for stay relief. First, the court found that the hotel's fair market value (as of the date on which the parties

agreed applicable) was $26 million. Second, the court found that the five-year Treasury note rate plus 320 basis points, adjusted every five years, is an appropriate discount rate to determine the present value of deferred cash payments to Computershare under §1129(b)(2)(A)(i)(II).[1] See *In re Wis. & Milwaukee Hotel LLC,* 678 B.R. 183, 219 (Bankr. E.D. Wis. 2026). The court issued a December 2025 ruling that denied the Lenders' motion for relief from the automatic stay and afforded the debtor a final opportunity to amend the plan, resulting in the debtor filing the fourth amended plan (which, unless otherwise indicated, is "the plan" to which this opinion refers). *Id.*; ECF Nos. 817 & 853.[2]

The parties elected to proceed to confirmation without relitigating the hotel's value, and the court subsequently ruled that its determination of the discount rate under §1129(b)(2)(A)(i)(II) is law of the case for purposes of the debtor's request that the court confirm the fourth amended plan. *In re Wis. & Milwaukee Hotel LLC*, No. 24-21743, 2026 WL 1968185 (Bankr. E.D. Wis. July 7, 2026). These rulings carry forward to this opinion on confirmation of that plan, which employs the previously adjudicated hotel value and discount rate in its treatment of Computershare's secured claim.

The plan provides that the debtor will continue operating the hotel using the same management firm and under the same brand. White Lodging Services Corporation (White Lodging) has agreed to continue to manage the hotel under a new management agreement that charges a lower fee than before the bankruptcy filing, and the debtor will continue to operate as a franchisee of Marriott International, Inc. (Marriott). ECF No. 988, at 6–7, ECF No. 1019; ECF No. 853, at §§4.13, 5.1 & 7.3(c)–(d).

---

1. All statutory citations are to the Bankruptcy Code, 11 U.S.C. §101 et seq., unless otherwise indicated.

2. The court originally issued the ruling on December 5, 2025. ECF No. 803. On January 5, 2026, it redocked a corrected version to fix two typographical errors. ECF No. 845. The Lenders appealed the order to the district court. The district court affirmed it on September 14, 2026. *Computershare Trust Co. N.A. v. Wis. & Milwaukee Hotel LLC*, No. 25-C-1984, 2026 WL 2690301 (E.D. Wis. Sept. 14, 2026).

Marriott has required the debtor to renovate the hotel as a condition of continuing the franchise agreement. To raise the funds needed for the renovations, the plan provides for an auction of new equity interests in the reorganized debtor and the termination of the existing equity interests. ECF No. 853, at §§3.14 & 5.10. The debtor's principal owner, Jackson Street Management, LLC (JSM), has offered an $8 million initial bid to acquire the new equity interests and is serving as the stalking horse bidder at the auction. ECF No. 853 at §5.10(a). JSM will obtain an $8 million loan from Reiman Family Investment Company, LLC (Reiman) to finance its stalking horse bid.

The plan requires the debtor to obtain court approval of the proposed sale and auction procedures under §363 (the Sale Motion) and for the court to approve the sale following the auction. See ECF No. 853, at §5.10; *id*. at 26–28; ECF No. 850; *In re Wis. & Milwaukee Hotel LLC*, 2026 WL 1278550 (Bankr. E.D. Wis. May 8, 2026). After extensive proceedings on the debtor's proposed sale of the new equity interests and request for approval of auction procedures, the court approved modified auction procedures and appointed an independent administrator to implement those procedures and oversee the sale. *Id*. The approval order declares that "the bidding procedures approved [ ] are 'fair and equitable' and reasonably calculated 'to maximize the recovery of value for the benefit of the bankruptcy estate.'" *Id.* at 11 (quoting *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009)).

At the May 2026 evidentiary confirmation hearing, the debtor presented the testimony of Randall Erkert, the debtor's corporate representative; Michael Hipp, the individual who principally manages Reiman; Deborah Friedland, a hospitality expert; William Pederson, a financial expert; and Daniel Wycklendt, the principal of Funding's manager. ECF Nos. 1012-1, Ex. 25; ECF No. 1012-4, Ex. 28. The Lenders presented the testimony of Cynthia Nelson, a hotel restructuring expert. ECF No. 1006-2, Ex. 131; ECF No. 1037, at 50–55.

The parties filed extensive briefing both before and after the evidentiary hearing. This opinion addresses the Lenders' objections that remain after the rulings summarized above, which are incorporated by reference here to the extent necessary.

B

"The debtor carries the burden of proving that a Chapter 11 plan complies with the statutory requirements for confirmation under §§ 1129(a) & (b)" by "the preponderance of the evidence." *United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994) aff'd, 85 F.3d 1415 (9th Cir. 1996). With respect to the applicable requirements of §1129(a) that this decision does not address in detail (and that are not resolved by the December 5, 2025, May 8, 2026, or July 7, 2026 rulings) the court finds and concludes, after considering the evidence and the record in its entirety, that the debtor has met its burden of demonstrating that the plan complies with those requirements for the reasons stated in the debtor's May 15, 2026 brief in support of confirmation. ECF No. 1008.

II

A

The Lenders contend that the debtor has failed to prove that the plan is "feasible," which is to say that it complies with §1129(a)(11)'s requirement that the debtor, as the plan's proponent, demonstrate that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ." In making this feasibility showing, "[t]he central inquiry is 'whether there is a reasonable probability the provisions of the plan can be performed'" or "whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Lupton Consulting LLC*, 633 B.R. 844, 866 (Bankr. E.D. Wis. 2021) (first quoting *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012), and then quoting *Chase Manhattan Mortg. & Realty Tr. v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir.

1978)). The plan proponent is "not required to show that the plan is guaranteed to succeed. Rather, a reasonable assurance of commercial viability is required." *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 755 (Bankr. N.D. Ill. 2013) (citing *In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 961–62 (7th Cir. 1997) rev'd on other grounds sub nom., *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434 (1999)); see also *In re WR Grace & Co*., 729 F.3d 332, 348 (3d Cir. 2013) ("Success need not be guaranteed, but must be reasonably likely."); *In re Dave's Detailing, Inc.*, No. 13-08077, 2015 WL 4601726, at *9 (Bankr. S.D. Ind. July 30, 2015) ("Feasibility of a plan is established by showing a reasonable assurance of success; a plan does not have to be a guaranty of success.").

In determining whether the plan proponent has shown that the plan promises reasonable viability, the court considers all relevant facts. *Lupton Consulting*, 633 B.R. at 866 ("In assessing feasibility, courts have considered factors including the company's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company."); see also *In re Polytherm Indus., Inc.*, 33 B.R. 823, 831 (W.D. Wis. 1983) ("Feasibility has been defined further in bankruptcy proceedings to require examination of the adequacy of the capital structure; the business's earning power; economic conditions; management's ability; the probability of the present management's continuation; and any other factors related to the successful performance of the plan."). Reduced to basics, the question of whether the debtor has met its burden to prove that the plan is feasible asks whether the evidence shows that it is more likely than not that the debtor will be able to meet the obligations the plan imposes.

For the reasons that follow, the court finds that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor" because through continued operations—made possible in part by an infusion of at least $8 million of new equity to fund franchise-mandated hotel

renovations—the debtor will likely be able to comply with its obligations under the plan. §1129(a)(11).

B

The debtor has operated the hotel since its 2013 opening under a franchise agreement with Marriott and a management agreement with White Lodging. ECF Nos. 21, at 3–5; 547, at 2; & 997, at 2. The hotel is in Milwaukee's downtown business district and within walking distance of the convention center and Lake Michigan. The debtor operated the hotel without any notable financial difficulty until the pandemic disrupted the market in March 2020. ECF No. 21, at 5; see also ECF No. 1038, at 29. Although the Lenders agreed to extended payment terms through March 2024, the debtor sought bankruptcy protection when the extension ended before the debtor could secure new financing. The debtor has maintained profitable operations during the bankruptcy case, paying about $2.8 million in administrative expenses and paying Computershare over $1 million in payments required under the stipulated terms of a cash collateral order. ECF No. 1085, at 1–5; see also ECF No. 998, at 3.

The hotel is well maintained and has enjoyed favorable customer feedback in Marriott's surveys of its performance. ECF No. 1036, at 6–8. Before proposing the current reorganization plan, the debtor reached an agreement with Marriott by which Marriott consented, on the effective date of a confirmed plan and based on certain conditions, to the reorganized debtor's assumption of the franchise agreement, which extends through 2038. ECF No. 849; see also ECF No. 908; ECF No. 1037, at 96. And, before the May 2026 confirmation hearing, White Lodging, the long-time operations manager, agreed to compromise its claims against the debtor and to continue serving as the operations manager at a reduced rate. ECF No. 988, at 6–7; ECF No. 1019; see also ECF No. 1038, at 43–44 & 131–132. These developments and the hotel's overall operational track record support the credible opinions of the debtor's hospitality and financial experts that the debtor will be able to fund the periodic payments required by

the plan from future operating profits and the end-of-plan balloon payment either by refinancing or selling the hotel.

The debtor's experts, Deborah Friedland and William Pederson, projected its future income for the plan term. Ms. Friedland, who has consulted with hotel owners and investors for about 30 years, testified that she started her income projections for the hotel using White Lodging's 2026 operations budget. She made certain adjustments to that budget, used the adjusted budget to make her projections, and then she sent the projections to White Lodging for review. ECF No. 1038, at 110–124. White Lodging's "view", she reported, "was that the projections were reasonable and supportable." ECF No. 1038, at 124.

Mr. Pederson used Ms. Friedland's income projections to model the debtor's ability to fund the required plan payments and the debtor's future renovations and capital expenditures. He also calculated the estimated value of the hotel at the end of the eighteen-year plan period based on Ms. Friedland's projections, employing the same approach used by the debtor's appraiser in his report. ECF No. 1038, at 159. Mr. Pederson's model and testimony show that the debtor's income from hotel operations will likely be sufficient to fund the payments required by the plan.

C

The Lenders contend that the Friedland-Pederson projections are insufficiently "definite" or "credible" to prove by a preponderance of the evidence that the debtor will be able to meet its obligations under the plan. ECF No. 1046, at 7. After considering the experts' competing opinions, I afford the feasibility opinions of Ms. Friedland and Mr. Pederson more weight. Generally, I found their testimony and opinions more credible as to the debtor's future performance and economic outlook.

1

The Lenders and their expert argue that the debtor's projections improperly rely on an assumption that hotel income will grow at a rate of three percent per year during

the 18-year plan period. ECF No. 1046, at 9. The debtor's expert, Ms. Friedland, and both sides' hotel appraisers project a three percent growth rate, contrary to Ms. Nelson's low-income-growth opinion. Though opining that income growth will be lower, Ms. Nelson did not establish that the data on which she bases her contrary opinion is closely aligned with the debtor's hotel or its specific circumstances.[3] ECF No. 1037, at 103-107; see also Ex. Nos. 135 & 137.

Ms. Friedland testified that it was "typical for professionals in the hotel management industry to rely on the consumer price index for a long-term growth rate", as she did in formulating her projections, and that it was "pretty common in the industry to use a CPI [the Consumer Price Index] or price movement of about 3% as an inflation estimate in projections once the property has reached stabilization, or in the projections once stabilization is projected." ECF No. 1038, at 106, 109, & 124–25. She further testified that she believed that both the debtor's and the Lenders' appraisers used three percent when projecting future cash flow. ECF No. 1038, at 106. To determine that the three-percent calculation was accurate, she "looked at CPI data over the last 10 years based on what the Bureau of Labor Statistics publishes" and testified that "for the last 10 years, if you include the – I think it was 2021 and '22, where the impact of the pandemic skewed things, the average CPI was about 3.3%. I[f] we exclude

---

3. Ms. Nelson testified that she reviewed information from Green Street Lodging, which she described as a "major, highly regarded research firm for real estate markets and properties". ECF No. 1037, at 104. Rather than relying on the Consumer Price Index, as did the other experts, she looked to Green Street's "index called commercial property price index or CPPI for lodging properties", which reports data on "institutional quality properties", and reviewed reported data "from December 2003 through March of 2026". *Id*. She testified that this data showed "significant volatility" and that "the increases . . . in the last . . . 10 to 15 years have been less than what the expected growth is of the property of 3 percent per year, except in the 19th year when it's 3.5 percent." *Id*. at 104–05; see also *id*. at 106–07; Exs. 135 & 137. The Green Street Lodging data is based on hotels owned by real estate investment trusts. ECF No. 1037, at 157–61. Ms. Nelson did not identify those hotels, explain whether or to what extent those hotels are comparable to the Milwaukee Marriott, or otherwise convincingly explain why this data provides a sufficient reason to reject a growth projection adopted by three other experts, including the Lenders' appraiser.

those years, the average CPI is about 2.7 and change percent." *Id.* at 106–09; Ex. 30, ECF No. 1017-2. She also looked at the same data set for the last 20 years and concluded that the "estimate of 3% . . . essentially for inflation was reasonable." *Id*. at 107.

Some additional details further justify affording Ms. Friedland's opinion more weight in general. For example, Ms. Friedland considered the impact of the near-term renovations on the hotel's occupancy during the renovation, testifying as follows:

> [I]n this case, we have a planned renovation in year two, so I adjusted my occupancy and ADR [average daily rate] estimates for the soft goods renovation, which is planned for year two. . . . I thought it was reasonable to grow ADR at below inflation between year one and year two, about 1.5%. . . . [T]he soft goods renovation . . . should be completed by March 31 of 2028, [so] I felt that there would be some impact from the renovation in terms of where the property could perform. So I bumped up my occupancy slightly. . . . [T]he case good renovation is planned for year four in the projection period . . . [and] must be completed by December 31 of 2029. So, I again . . . adjusted my ADR and occupancy to reflect that the renovation would be happening in year four. And then assumed that by year five the property would reach stabilization at 71%.

ECF No. 1038, at 108; see *id*. at 136–40.

After considering the testimony of Ms. Friedland and Ms. Nelson, I find that Ms. Friedland's testimony, bolstered by the opinions of the appraisers, provides credible evidence to support the application of the three percent growth rate used in the debtor's projections.

2

The Lenders also challenge the debtor's financial projections on the grounds that they should have included line-item estimates for possible capital expenditures, like future replacement or repair of the roof, HVAC systems, parking areas, and facades, and that they should presume a need to incur additional renovation expenses before the Marriott franchise agreement expires in 2038. ECF No. 1046, at 9–10; see also ECF No. 1037, at 95–97. The debtor's evidence credibly showed that the debtor likely will have

the wherewithal to cover the identified possible capital costs during the plan term, if the need arises. With respect to the specific possible expenses the Lenders identified, Ms. Friedland credibly testified that capital expenses to be potentially incurred before the plan ends will likely not cost more than $1.5 million in the aggregate. ECF No. 1036, at 11–12. The debtor's projected cash flow supports the ability to cover those expenses, because they show that the hotel's operations will generate income that significantly exceeds the reorganized debtor's ordinary operating expenses and its plan payments. After the second year of the plan, net income is projected to exceed plan payments by $2 million or more. ECF No. 1007-21, Ex. 21. And the debtor's projections include anticipated expenses for future renovations as required by Marriott, both under a scenario where JSM is the winning bidder for the reorganized debtor's equity and a scenario where it is not. ECF No. 1038, at 163, 167–70; Exs. 21 & 23. Finally, Ms. Friedland's projections include an estimated expense of 3.5 percent to pay White Lodging's management fee over the plan term, but White Lodging subsequently agreed to a reduced management fee of three percent, which will improve the debtor's net income and undergirds the reliability of Ms. Friedland's projections to the extent challenged as being overly optimistic. ECF No. 1038, at 132.

The Lenders' expert also opined that, with the expiration of the franchise agreement in 2038, "one would expect Marriott to have a discussion with the franchisee about the [required franchise renovation] expenditures prior to any type of renewal of the agreement", resulting in a need for renovation earlier than what is reflected in the plan projections. ECF No. 1037, at 96. Ms. Nelson did not offer an opinion on the expected cost of the additional renovations that she says will be needed before the plan ends. But she conceded on cross-examination that the debtor's projections show cash reserves sufficient to pay for any such renovations. ECF No. 1037, at 153–55.

The Lenders respond by arguing that the court should doubt the debtor's projections of available cash. [4] They argue that the failure to account for the reorganized debtor making distributions to whomever purchases its new equity interests undercuts the projections' reliability, emphasizing testimony that if JSM is the winning bidder at the auction, JSM hopes that those distributions will support its repayment of an $8 million loan from Reiman. But the plan does ***not*** require the debtor to make any distributions to equity. It ***does*** require, however, that the reorganized debtor make payments to the Lenders and other creditors, giving rise to a fiduciary duty to preserve its continuing ability to make those payments before considering distributions to equity. While the reorganized debtor's expected revenues and expenses offer a potential investor the hope of a return on that investment, there is no persuasive reason to infer that the new equity owner will direct the debtor to make distributions that will threaten the success of the plan. To the contrary, Randall Erkert credibly testified that if JSM wins the equity auction, "the requirements on JSM to repay the [Reiman] loan from distributions" will not "affect [his] business judgment as Debtor's manager in determining if distributions should be made[.]" ECF No. 1038, at 94–95. Moreover, because Computershare will continue to hold liens against the hotel that secure the full amount it is owed under the plan, there is no good reason to conclude that the reorganized debtor's owner (whoever that ends up being) will jeopardize its investment by making distributions likely to cause a default on the required plan payments, a reduction in the maintenance of the property, or a subsequent foreclosure of the hotel.

---

4. In their March 2, 2026 objection to confirmation, the Lenders argued that the debtor must demonstrate that it has a means of enforcing Reiman's "hearsay promise" to fund JSM's $8 million bid in the equity auction. ECF No. 933, at 6–7. The Lenders' post-hearing briefs make no mention of this. Even if they maintain the argument, the court is unpersuaded by it. Michael Hipp testified about, among other things, Reiman's "commitment to provide financing to JSM in this bankruptcy proceeding" "[i]n connection with the equity auction". ECF No. 1037, at 8–10 & 18–20. Mr. Hipp's testimony demonstrates that Reiman is committed to loaning the necessary funds to JSM.

The court reaches this conclusion mindful of the fact that JSM has arranged to finance its bid for the reorganized debtor's equity by obtaining a five-year loan from Reiman. Reiman is a separate LLC that is managed by Hexagon Inc. Hexagon, Inc., is the manager of numerous investment LLCs, including Hexagon LLC. Hexagon LLC, through its related entities, has been a minority member of JSM since 2013. ECF No. 1037, at 7-11. And Hexagon-related entities have been partners with JSM's principals for twenty years in connection with investments in other Milwaukee hotels. *Id.* at 11. Reiman concluded after doing due diligence that the debtor's hotel would generate sufficient cash to provide a reasonable cushion against the possibility of an economic downturn and unforeseen capital expenditures and then provide a return that will allow JSM to repay Reiman from hotel operations. Reiman's manager testified, however, that JSM has "a myriad of other business operations and endeavors" that provide resources from which it could repay Reiman if distributions from the debtor are insufficient to cover JSM's payments to Reiman. ECF No. 1037, at 26; see also *id*. at 13–27.

3

The Lenders next argue that there is an unacceptable feasibility risk because the franchise agreement only runs through 2038 and the debtor has not addressed what it will do if Marriott does not agree to renew that agreement. Ms. Friedland credibly testified, however, that Marriott is likely to continue the franchise relationship as long as the hotel continues performing at a high level of customer satisfaction; this is likely, she further opined, because White Lodging, whose management has engendered favorable reviews, is continuing to serve as the hotel's manager. ECF No. 1036, at 7–9.

Ms. Friedland has about three decades of hotel consulting experience and has worked on over a thousand hotel engagements, 25 to 30 percent of which were "Marriott-branded propert[ies]." ECF No. 1036, at 6. She was personally involved in the debtor's negotiations with Marriott with respect to the debtor's assumption of its

franchise agreement, and during those negotiations she helped secure concessions from Marriott, including the extension of the "deadline for which the owner or Debtor can complete" necessary hotel renovations. *Id*. at 6–7. She testified that "Marriott is very receptive to working with ownership groups if the asset or portfolio of the assets that the ownership group owns is well maintained, in compliance with brand standards, and has high guest satisfaction scores." *Id*. at 7. She further testified that the debtor's hotel "scores extremely high" on the metrics that Marriott uses to determine a property's performance, and that the "only metric they didn't score well" on was renovation. *Id*. at 7–8. Once the property is renovated as contemplated under the chapter 11 plan, she expects that metric will increase as well. *Id*. at 8. In her experience, assuming that the hotel will be "well-maintained[ and] in compliance on the guest satisfaction score" it was "fairly inconceivable" that Marriott would not renew the franchise. *Id*. at 8–9. She further testified that, in her experience with Marriott, she had never seen Marriott cancel a franchise agreement. *Id*. at 10. The court finds Ms. Friedland's testimony in this regard credible and deserving of substantial weight.

D

The Lenders further contest the plan's feasibility by contending that the debtor has not proven its ability to make the plan's balloon payment.

1

As noted previously, the court concluded that the five-year Treasury note rate, plus 320 basis points, was the appropriate rate to determine the present value of deferred cash payments to Computershare pursuant to 11 U.S.C. §1129(b)(2)(A)(i)(II). The Friedland-Pederson financial projections predict a balloon payment of approximately $36 million employing a constant rate for the five-year Treasury note throughout the plan term, ignoring the fact that the plan requires that the cramdown rate be adjusted every five years to account for changes in the five-year Treasury note rate. ECF No. 1038, at 160-61 & 173. If the five-year Treasury note rate increases on the

five-, ten-, and fifteen- year anniversaries of the plan's effective date, the required adjustments to the cramdown rate will increase the balloon payment that the debtor must pay Computershare at the end of the plan term (because the debtor's monthly payments to Computershare are fixed). If the adjusted cramdown rate ends up being less than the initial rate, the balloon payment will be less too.

At the May 2026 confirmation hearing, Ms. Nelson criticized the debtor's projections for using the initial cramdown rate to calculate the balloon payment. She opined that five-year Treasury note rates are expected to rise during the plan term, so the projections underestimate the balloon payment. ECF No. 1037, at 76-89; Ex. 140, ECF No. 1006-11; see also ECF No. 1046, at 8–9. She further testified that using the current eighteen-year Treasury rate results in a $10 million increase to the balloon payment, and that forward curve rates suggest that the five-year Treasury rate will increase in subsequent years, resulting in an increase to the balloon payment by as much as $20 million. ECF No. 1037, at 76–88 & 136–49; Exs. 140 & 142.

This criticism of the projections has some force. But Ms. Nelson also acknowledged that there is data suggesting that inflation may decrease over the plan term (ECF No. 1037, at 145–51) and decreases in inflation may be accompanied by reductions in the five-year Treasury rate. Ultimately, Ms. Nelson did not convincingly justify inclusions of her more aggressive predictions about future rate increases for the entire plan, nor did she consider what changes in hotel income might accompany her forecasted inflationary future. Ms. Friedland countered that the relative price insensitivity of consumers of luxury hotel services would allow the debtor in inflationary times to pass on at least some of its increased debt-service expense to consumers by charging higher rates. ECF No. 1038, at 125–127.

In all events, Ms. Nelson's observation that the current eighteen-year Treasury rate can be understood to reflect the market's current expectation about the cramdown base rate over the entire plan term merits consideration. She testified that applying the

eighteen-year rate would increase the projected balloon payment to $46 million, and the debtor's projections support its ability to cover that payment. When the balloon payment comes due, the debtor's projections anticipate that the hotel will have a market value of about $49.5 million and $17.5 million in cash reserves, enabling the reorganized debtor to pay the balloon by using reserved cash and either refinancing or selling the hotel. ECF Nos. 1007-21 & 1007-23, Exs. 21 & 23; ECF No. 1038, at 159–61, 166–67.

2

The Lenders question Mr. Pederson's projected estimate of the hotel's value at the end of the plan term, but that projection is adequately supported by the appraisal evidence presented at the July 2025 hearings. Both the debtor's appraisal expert and the Lenders' appraisal expert opined that the hotel is increasing in value so that at the end of ten years (and well before the expiration of the eighteen-year term) it will be worth more than the balloon payment. See ECF No. 674-1, at 145 (Narrative Appraisal Report of Milwaukee Marriott Downtown dated June 5, 2025 prepared by HVS Consulting & Valuation, a Division of TS Worldwide, LLC, by Tanya J. Pierson, MAI, indicating that in the next ten years, the value of the Hotel is projected to increase to approximately $58.4 million) and ECF No. 652-1, at 122 (Appraisal of the Milwaukee Marriott Downtown dated June 4, 2025 prepared by LW Hospitality Advisors, by Jonathan Jaeger, MAI, ISHC and Christopher Hutsen, indicating that in the next ten years, the value of the Hotel is projected to increase to approximately $47.2 million). While those appraisals were based on ten-year projections, Mr. Pederson's opinion that the hotel will have a value of at least $49.5 million at the end of the eighteen-year plan term is reasonably credible. Exs. 21 & 23; ECF No. 1038, at 159–60, 166–67; see also ECF No. 1038, at 159–60 (Mr. Pederson testified that he arrived at the $49.5 million amount by using the "same approach" that the debtor's appraiser used when appraising the

property in 2025, including by applying a 3.5% growth rate to the last year of the projections.[5] ).

3

The Lenders emphasize the uncertainty inherent in any eighteen-year financial projections. That too is a valid consideration weighing against finding that the plan is feasible, though uncertainty alone does not typically defeat proof of feasibility. See *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ("Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required."). In other circumstances the weight of the uncertainty resulting from the plan's duration (alone or combined with uncertainty about future increases to the cramdown rate) might tip the scales against finding that the plan is feasible. But the overall circumstances here support the likelihood that the hotel can be profitably operated as projected, and thus a finding based on a preponderance of the evidence that the debtor is reasonably likely to be able to perform its obligations under the plan.

The debtor successfully operated the hotel and met its financial obligations from the hotel's opening in 2013 until its pandemic-caused closing in 2020. The debtor had an agreement to refinance the obligation held by Computershare in early March 2020 that failed to close because of the pandemic. The bankruptcy filing was a direct result of the pandemic's unexpected barrier to that refinancing and subsequent reduction in the demand for hotel rooms, the Lenders' refusal to afford the debtor additional accommodations, and the need to renovate the hotel as required by its franchise

---

5. The Lenders' expert challenged the debtor's use of a 3.5% reversionary value for the hotel in the projections. ECF No. 1037, at 90–94. Ultimately, this debate is immaterial. The most the Lenders' expert could say about the difference is that the hotel's "sale value [] would have been a little bit lower and the cash at the end of the plan would have been slightly lower." ECF No. 1037, at 94.

agreement with Marriott. Times have changed, and the debtor's financial outlook has improved. The debtor's monthly operating reports show that since the bankruptcy filing the debtor has operated profitably. As mentioned above, it has made monthly preconfirmation payments to Computershare as required by the agreed terms of the cash collateral order—payments that total more than $1 million—and has paid almost $2.8 million in administrative expenses. The debtor and Marriott have agreed that the debtor will continue operating its hotel under the Marriott franchise through at least 2038, and White Lodging has agreed to continue its long-time management of the hotel. What is more, most of the experts who have testified—two valuation experts, Ms. Friedland and Mr. Pederson—all project that the hotel will continue operating on solid financial footing for at least the next decade, and Ms. Nelson did not suggest otherwise.

The debtor's projections are further supported by Lenders' suggestion that the debtor could pay the balance owed to Computershare in eleven years. While the court finds that suggestion infeasible, it does serve to support the reasonableness of the debtor's projections because it shows that after confirmation, the reorganized debtor likely will have excess operating cash sufficient to cover both unscheduled capital expenses and increases in the balloon payment that might result from increases in the cramdown-rate during the plan term.[6]

---

6. Lenders' suggestion that an eleven-year plan would be feasible is not well considered for two reasons. First, Ms. Nelson's proposed projections left the debtor with only about $239 thousand of available cash in year 8, an amount that would likely be insufficient to continue the hotel's operation during the "dark" winter months when operating expenses regularly exceed revenue by around $400 thousand. ECF No. 1036, at 13–15. Second, the suggested eleven-year repayment would likely leave the reorganized debtor with insufficient funds to make required renovations after year 11. ECF No. 1036, at 15. Notably, this hypothetical repayment proposal was never offered by the Lenders as a competing plan (even though the period in which the debtor enjoyed the exclusive right to offer a plan had expired) nor was it approved by Lenders' management. Ultimately, all it accomplishes is to support the strength of the hotel's revenue potential.

Additionally, the court finds the Lenders' concerns about the debtor's ability to renew an agreement with American Airlines for crew occupancy is inconsequential. Even if American Airlines does not renew the agreement, the reorganized debtor will likely be able to substitute additional room nights

Thus, while the length of the projections and the variability of the cramdown interest rate interject some uncertainty, the plan has a "reasonable assurance of commercial viability". *Buridi v. KMC Real Estate Invs., LLC (In re KMC Real Estate Invs., LLC)*, 531 B.R. 758, 768 (S.D. Ind. 2015) (quoting *203 N. La Salle St. P'ship*, 126 F.3d at 961–62). Considering and weighing all the relevant evidence, especially the hotel's pre- and post-pandemic financial performance and the debtor's evidence of plan feasibility as presented principally through Ms. Friedland and Mr. Pederson, the court finds that the debtor has met its burden to show that confirmation of the plan is not likely to be followed by liquidation or the need for further reorganization.

III

The debtor did not obtain acceptance of its plan by each impaired class, so the debtor seeks over the dissenting classes' rejection of it, as permitted by §1129(b). *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990) ("A plan of reorganization may be confirmed only if each class of impaired creditors votes to accept it. There is one exception to the requirement of approval: 11 U.S.C. § 1129(b)(1)", which provides that a plan that complies with its terms "may be crammed down the throats of objecting creditors."). Section 1129(b)(1) imposes two conditions on confirmation of a plan when one or more classes dissent—(1) the plan cannot discriminate unfairly and (2) it must be fair and equitable with respect to the dissenting classes:

> Notwithstanding section 510(a) of this title [governing subordination], if all of the applicable requirements of subsection (a) of this section other than paragraph (8) [requiring unanimous acceptance of impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, **shall confirm the plan** notwithstanding the requirements of such paragraph **if the plan does not discriminate unfairly, and is fair and**

during the peak season at higher rates, making the agreement's potential loss an inconsequential estimated "2% of total revenue" in the projections. ECF No. 1038, at 144–146.

> **equitable**, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(emphasis added).

The Lenders contend that the debtor has failed to demonstrate that the plan satisfies §1129(b), asserting (a) the plan is not fair and equitable to Class 1 (consisting of Computershare's secured claim) and Class 7 (consisting of Funding's unsecured claim), and (b) the plan discriminates unfairly as to Class 7. (Because these two classes each consist of a single claim this opinion will at times simplify the discussion by referring to Computershare's and Funding's *claims*, rather than classes of claims.) Part III.A addresses the Lenders' arguments that the plan is not fair and equitable with respect to the classes that include Computershare's and Funding's claims. Part III.B addresses their arguments that the plan discriminates unfairly against the class consisting of Funding's claim.

A

1

Section 1129(b)(2) lists requirements for a plan's fair and equitable treatment of classes of claims and interests, segregated by whether the class is composed of secured claims, unsecured claims, or interests. The fair and equitable treatment of secured claims is governed by §1129(b)(2)(A), which requires that the plan satisfy one of three alternative conditions—(i) the reorganized debtor pays the secured creditor in full through deferred payments having the present value of the secured claim and the creditor retains its liens until the payments are completed, (ii) the securing property is sold free and clear of liens at a sale that allows the secured creditor to credit-bid the amount of its claim, after which the liens attach to the sale proceeds, or (iii) the secured creditor is provided its secured claim's "indubitable equivalent".[7]

---

7. Section 1129(b)(2)(A) states:

Computershare exercised its right under §1111(b) to have its claim treated as a secured claim in the full allowed amount of the claim ($45 million). The plan affords Computershare two applicable options: (1) receive deferred payments with a total present value as of the plan's effective date that is at least equal to the $26 million value of its collateral (the hotel) and at least equal to the nominal amount of the claim ($45 million), while retaining its liens on the hotel to secure the payments, or (2) receive $26 million on the plan's effective date paid by the debtor's managing member in exchange for a release of the claim.[8] ECF No. 853, at 10–11. Computershare chose option (1). As a result, the plan must provide for payment of the claim in a manner that satisfies the fair and equitable condition stated in §1129(b)(2)(A)(i)—(I) Computershare "retain[s] the liens . . . to the extent of the allowed amount of such claim" and (II) the plan distributes "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property". There is no dispute that the plan's treatment of

---

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

§1129(b)(2)(A).

8. Computershare's claim is based on three separate loans evidenced by three promissory notes that are secured by three separate mortgage liens on the hotel. ECF No. 997, at 2–4 & 6–8.

Computershare's claim satisfies requirement (I). ECF No. 853, at 10–11 (Fourth Amended Plan, section 3.3, option 1B: "Computershare shall retain [the] liens securing its claim until such time as its secured claim has been paid in full pursuant to the terms of the Plan".); see also ECF No. 933, at 9 (Lenders' objection to confirmation, stating, "The 4th Amended Plan allows Computershare to retain its liens as required . . . .").

But Lenders dispute whether the plan complies with §1129(b)(2)(A)(i)(II)'s requirement that the plan pay Computershare deferred cash payments having a present value at least equal to the value of its liens on the hotel—*i.e.*, its interest in the estate property. As noted above, the appropriate discount (or cramdown) rate was the subject of evidentiary proceedings in 2025, after which the court found that to comply with §1129(b)(2)(A)(i)(II)'s present value requirement, "future payments on Computershare's allowed secured claim must be discounted at a rate equal to the prevailing rate for five-year Treasury notes, as referenced [i.e., adjusted] in the plan, plus 320 basis points." See *Wis. & Milwaukee Hotel*, 678 B.R. at 219; see also *Computershare*, 2026 WL 2690301, at *9–10 (upholding on appeal bankruptcy court's determination of the appropriate cramdown rate for payments due on Computershare's secured debt).

The Lenders did not contest the court's previous cramdown-rate finding in the context of confirmation of the debtor's fourth amended plan. They did contend in the current confirmation context, however, that (1) the cramdown rate cannot, as a matter of law, be subject to adjustment, and (2) if the rate must be fixed, the appropriate reference (or base) rate must be the yield of a Treasury note having the same duration as the plan term. ECF No. 933, at 9–10; see also ECF No. 1041. The court rejected these contentions in its July 7, 2026 opinion and order, which this opinion incorporates as if fully restated here.[9] *Wis. & Milwaukee Hotel*, 2026 WL 1968185, at *11.

---

9. Relying on decisions reasoning that chapter 11 plans must employ a cramdown rate that is constant over the plan term, the Lenders objected before the confirmation hearing that "Debtor cannot show that the 4th Amended Plan provides Computershare with a stream of payments having a present

Aside from the Lenders' challenge to the adjustable cramdown rate, they do not dispute that the plan provides deferred payments to Computershare of at least the present value of its liens on the $26 million hotel as well as total (nominal) payments in an amount that exceeds its allowed claim of about $45 million. The plan's deferred payments thus satisfy §1129(b)(2)(A)(i)(II)'s fair-and-equitable condition as to Computershare's secured claim. Consequently, the plan meets both fair-and-equitable conditions for the treatment of secured clams stated in §1129(b)(2)(A)(i).

b

Section 1129(b)(2)(B) governs the fair-and-equitable treatment of unsecured claims. Codifying the absolute priority rule, §1129(b)(2)(B) requires, as relevant here, that the plan either pay each class of unsecured claims the allowed amount of their claims or pay nothing on account of junior classes or interests.[10] Funding argues that the

---

value of $26 million" because the "evidence will show that the five-year Treasury rate is expected to increase during the life of the plan." ECF No. 933, at 10; ECF No. 1041; see also ECF No. 1046, at 14–15 (incorporating into Lenders' objection to confirmation all of their arguments in their brief in opposition to debtor's motion in limine (ECF No. 1041) that the plan fails to meet §1129(b)(2)(A)(i)(II)'s present value requirement); ECF No. 1064, at 12 (arguing that "[a] Plan that leaves up to $20 million of the balloon payment in flux does not satisfy the requirements of § 1129(b) and the absolute priority rule does not allow payments to equity under these circumstances."). For the reasons explained in the July 7, 2026 decision and order, §1129(b) does not prohibit a plan from adjusting the amount of cramdown interest paid to a secured class based on future changes to the base rate, and the court's determination of that cramdown rate is law of the case. *Wis. & Milwaukee Hotel*, 2026 WL 1968185.

10. Section 1129(b)(2)(B) states:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> . . . .
>
> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . .

§1129(b)(2)(B).

plan's treatment of its Class 7 unsecured claim violates §1129(b)(2)(B).[11] Specifically, Funding asserts that the debtor has not met its burden to show that any success JSM will have at the auction of new equity interests will ***not*** be the result of its prior equity interest (which Funding at times casts as not providing sufficient "new value") because the plan provides JSM "with exclusive opportunities free from competition and without the benefit of market valuation . . . ." ECF No. 933, at 14.

As mentioned above, the fourth amended plan provides for the extinguishing of old equity interests, including JSM's, and the sale of new equity interests in the reorganized debtor. The reorganized debtor will sell those new equity interests at an auction. The debtor filed a motion to approve the auction procedures, and, in May 2026, after affording all interested parties an opportunity to present both argument and evidence, the court approved modified auction procedures. *Wis. & Milwaukee Hotel*, 2026 WL 1278550.[12] The court found that the approved auction process in which JSM will open the bidding at $8 million is reasonably calculated to achieve "[a] truly full [competitive] value transaction" that will "provide the greatest possible addition to the bankruptcy estate". *203 N. LaSalle St. P'ship*, 526 U.S. at 453–54. Consequently, if JSM prevails, it will acquire new equity in the reorganized debtor (presuming court

11. As discussed further in part III.B below, the debtor guaranteed debt owed by JSM to Funding and the parties agreed that the debtor's liability under the guaranty would be nonrecourse and would be secured only by a junior mortgage on the debtor's hotel. Funding's claim is deemed unsecured under §506(a) because Computershare's senior liens leave no equity in the hotel to which Funding's junior lien can attach, but §1111(b)(1)(A) provides that Funding's nonrecourse claim will be allowed as if Funding had recourse against the debtor.

12. At a March 9, 2026 hearing on approval of the proposed auction procedures, the court asked the Lenders (the sole objecting parties) whether they were seeking to present evidence on the alleged auction shortcomings to support their objection to those procedures. ECF No. 942, at 52–55. The Lenders subsequently represented that they did not seek an evidentiary hearing on the propriety of the auction procedures. ECF No. 945, at 12. The order approving the auction procedures adjudicated several sale-related objections to confirmation that the Lenders raised in their initial March 2 confirmation objection. See ECF No. 933, at 13–20 and *Wis. & Milwaukee Hotel*, 2026 WL 1278550. That ruling is incorporated here by reference.

approval of the sale in the manner required by §363) by paying the reorganized debtor at least a fair market price, *not* "on account of" its pre-reorganization interest in the debtor, as prohibited by §1129(b)(2)(B) (and the common law absolute priority rule) if all unsecured claims are not paid in full.[13] See *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1313 (7th Cir. 1995). The plan complies with the fair-and-equitable conditions applicable to unsecured creditor classes stated in §1129(b)(2)(B).

2

Beyond these few disputes about the plan's compliance with §1129(b)(2)'s statutorily prescribed fair-and-equitable conditions, the Lenders principally argue that the plan is not "fair and equitable" to them for reasons ***not*** listed in §1129(b)(2). See, e.g., ECF No. 933, at 12; ECF No. 1046, at 10–14; ECF No. 1064, at 6–12. They argue that even if the plan satisfies the fair-and-equitable conditions listed in §1129(b)(2), that

---

13. The court's conclusion that the auction will yield a price at least equal to the market value of the new equity and the court's subsequent approval of a sale after finding that the process is properly utilized entails that the buyer of the new equity will not acquire it as a result of any prior interest in the debtor. This is enough to show compliance with §1129(b)(2)(B) and the absolute priority rule as it was applied before its codification in §1129(b)(2)(B). For the sake of completeness, however, the court finds and concludes that the outcome is the same if the court applies the historically recognized "new value" *exception* to the absolute priority rule—"that a qualifying new value contribution must be (1) necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably equivalent to the interest retained." *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992) (citing *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121–122 (1939)). The debtor demonstrated that the $8 million minimum auction bid is an amount necessary to remodel the hotel in the manner required by the Marriott franchise agreement, which agreement is necessary to the plan of reorganization. The auction procedures provide that the successful bidder must pay in cash. Although no old equity interest is "retained", the finding that the auction process is "reasonably calculated 'to maximize the recovery of value for the benefit of the bankruptcy estate'" entails that the winning bid will determine the value of equity interests transferred to the winning bidder. *Wis. & Milwaukee Hotel*, 2016 1278550, at 11 (quoting *In re Jon J. Peterson, Inc.*, 411 B.R. at 137). Finally, even if JSM acquires the new equity for the opening $8 million bid, that cash infusion is "up front" under the circumstances of this case. *In re Snyder*, 967 F.2d at 1131. The minimum bid of $8 million is no "token" amount and is "substantial" in the context of making possible the continued operations of the hotel, which, in turn, will fund the plan of reorganization. See *Snyder*, 967 F.2d at 1131 ("The substantiality requirement is derived not from *Los Angeles Lumber*'s third criterion, but from its first—that an infusion of new capital must be necessary to the success of the undertaking."); see also *In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1994) ("Simply put, 'substantiality' requires that the contribution be real and necessary to the successful implementation of a feasible plan.").

§1129(b)(1) authorizes the court to find or conclude the plan is not fair and equitable for reasons not enumerated in §1129(b)(2), asserting: "§ 1129(b)(2) does not provide an exhaustive list of the requirements for fair and equitable treatment; it says 'the condition that a plan be fair and equitable with respect to a class *includes* the following requirements.' (emphasis added). 'Includes' is not a limiting word." ECF No. 933, at 9 (first quoting 11 U.S.C. § 1129(b)(2), then citing 11 U.S.C. §102(3), and then citing *In re Griswold Bldg., LLC*, 420 B.R. 666, 705 (Bankr. E.D. Mich. 2009)); see also ECF No. 1064, at 7.

a

The Lenders' contention that the court may rule that a plan is not "fair and equitable" for purposes of §1129(b)(1) even if it satisfies all of §1129(b)(2)'s fair-and-equitable requirements runs into a high hurdle at the starting line: It is contrary to the Seventh Circuit's construction of §1129(b) in *Kham & Nate's Shoes*. 908 F.2d 1351. *Kham & Nate's Shoes* teaches that as of "the adoption of the [Bankruptcy] Code in 1978", "[t]he definition of 'fair and equitable' is no longer a matter of common law; **§1129(b)(2) defines it expressly**." *Id.* at 1361 (emphasis added); see also *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 642 (2012) ("Section 1129(b)(2)(A) . . . establishes criteria for determining whether a cramdown plan is 'fair and equitable' with respect to secured claims . . . ."); *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 647 (7th Cir. 2011) ("Subsection (b)(2)(A) defines what constitutes 'fair and equitable' treatment in the secured creditor context."), aff'd sub nom., *RadLAX*, 566 U.S. 639; *In re Sparks*, 171 B.R. 860, 865 (Bankr. N.D. Ill. 1994) ("Paragraph (2) of § 1129(b) defines the 'fair and equitable' aspect of the cramdown standard by type of claim or interest; subparagraph (A) sets forth the requirements if the claim is secured . . . . A plan meets

the "fair and equitable" requirement with respect to a secured claim, therefore, if it fulfills clause (i), (ii), or (iii) of § 1129(b)(2)(A).").[14]

The Lenders' arguments and the non-precedential authorities on which they rely read §1129(b)(1)'s "fair and equitable" provision expansively, vesting bankruptcy courts with broad equitable oversight authority with which those courts may deem cramdown plans unconfirmable based on jurist-specific conclusions about plan reasonableness. See ECF No. 933, at 9 (first citing *In re Griswold Bldg.*, 420 B.R. at 705; then citing *Fed. Sav. & Loan Ins. Corp. v. D & F Construction, Inc. (In re D & F Construction Inc.)*, 865 F.2d 673, 675–76 (5th Cir. 1989); and then citing *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 505 (4th Cir. 1992)); ECF No. 1064, at 7 (arguing that "the statute clearly shows that satisfying the test in § 1129(b)(2)([A])(i)(II) is only one necessary element of the 'fair and equitable' standard"); ECF No. 1046, at 13–14 (first citing *In re Consul Restaurant Corp.*, 146 B.R. 979, 989 (Bankr. D. Minn. 1992); then citing *In re TCI 2 Holdings, LLC,* 428 B.R. 117, 163 (Bankr. D. N.J. 2010); and then citing *In re Sherwood Square Assocs.*, 107 B.R. 872, 877 (Bankr. D. Md. 1989)). The Lenders invite the court to follow these authorities and construe §1129(b)(1)'s use of "fair and equitable" to embody—in addition to the specific conditions listed in §1129(b)(2)—a malleable and evolving common-law condition that a plan's treatment of dissenting creditor classes must be reasonable.

Lenders offer no suggestion on how this reading can be reconciled with *Kham & Nate's Shoes'* instruction that "[t]he definition of 'fair and equitable' is no longer a matter of common law; §1129(b)(2) defines ['fair and equitable'] expressly" or its direction that

---

14. In proposing that this court find the plan to be not fair and equitable on grounds unmentioned in §1129(b)(2) the Lenders address none of these authorities, even though this court previously quoted *Kham & Nate's Shoes'* direction that "[t]he definition of 'fair and equitable' is no longer a matter of common law; §1129(b)(2) defines it expressly" in denying the Lenders' motion for relief from the automatic stay. See *Wis. & Milwaukee Hotel*, 678 B.R. at 195 (quoting *Kham & Nate's Shoes*, 908 F.2d at 1361).

under the Bankruptcy Code "bankruptcy judges no longer have equitable powers to modify contracts to achieve 'fair' distributions." 908 F.2d at 1361. The teaching of precedent like *Kham & Nate's Shoes* is that the Bankruptcy Code specifies the extent to which a plan can modify state-law entitlements and "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988). Fidelity to that approach requires reading §1129(b)(1) not to vest courts with standardless discretion to determine which cramdown plans that satisfy §1129(b)(2)'s express fair-and-equitable conditions are nonetheless *not* fair and equitable.

The precedential force of *Kham & Nate's Shoes'* teaching that §1129(b) does not authorize imposition of uncodified common-law-like cramdown conditions and the Lenders' failure to suggest any limiting principle for reading "fair and equitable" more broadly is reason enough for this court to reject their arguments that the plan is not fair and equitable on grounds not codified in §1129(b)(2).

b

i

Still, the premise that §1129(b)(2)'s fair-and-equitable requirement imposes limitations on cramdown plans beyond those limned in that section is not without force. The Code's direction that "includes" is "not limiting" leaves the door open to interpreting "fair and equitable" as carrying unenumerated cramdown limitations.[15]

---

15. This point is not wholly free from doubt, however. While courts and commentators have embraced the construction that §1129(b)(2)'s use of "includes" implies that §1129(b)(1)'s "fair and equitable" requirement imposes conditions beyond those listed in §1129(b)(2), §102 may not bear the required interpretative weight. By comparison, the Third Circuit relied on a similar §102 construction rule to conclude that §1129(b)(2)(A) permitted, as fair and equitable, a plan that sold a creditor's collateral without allowing the creditor to credit bid, contrary to subsection (b)(2)(A)(ii), as long as the plan satisfied subsection (b)(2)(A)(iii)'s indubitable equivalence condition. The Third Circuit's reasoning parallels the §102(3) construction urged by Lenders here:

> The three subsections of § 1129(b)(2)(A) each propose means of satisfying a lender's lien against assets of the bankruptcy estate. . . .

11 U.S.C. §102(3). And often-cited legislative history, potentially relevant to the extent one treats this as a matter of statutory ambiguity, supports the notion that §1129(b)(2)'s list of requirements does not exhaust what constitutes "fair and equitable" under §1129(b)(1). The House and Senate floor managers' statements report,

---

> The Lenders concede, as they must, that § 1129(b)(2)(A) is phrased in the disjunctive. The use of the word "or" in this provision operates to provide alternatives—a debtor may proceed under subsection (i), (ii), *or* (iii), and need not satisfy more than one subsection. This approach is consistent with the definitions provided by the Code. Section 102(5) provides "that 'or' is not exclusive[.]" 11 U.S.C. § 102(5). The statutory note to § 102(5) further explains that "if a party 'may do (a) or (b)', then the party may do either or both. The party is not limited to a mutually exclusive choice between the two alternatives." 11 U.S.C. § 102 hist. n. (West 2004). Thus, any doubt as to whether subsections (i), (ii), and (iii) were meant to be alternative paths to meeting the fair and equitable test of § 1129(b)(2)(A) is resolved by the Bankruptcy Code itself, and courts have followed this uncontroversial mandate.

*In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 305 (3d Cir. 2010), as amended (May 7, 2010) (citation modified); but see *id.* at 324 (Ambro, J., dissenting) ("While the Code states that '"or" is not exclusive' in § 102(5) (and that is true as a general proposition), it is not always the case in practice. Numerous sections of the Bankruptcy Code employ the disjunctive 'or' in a context where the alternative options render the 'or' exclusive." (citing 11 U.S.C. §§365(g)(2)(B)(i)–(ii), 506(d)(1)–(2), 1112(b)(1), 1325(a)(5)(B)–(C), 1325(b)(3)(A)–(C) & 1325(b)(4)(A)(i)-(ii))).

The Seventh Circuit subsequently rejected *Philadelphia Newspapers*' reliance on §102(5)'s non-exclusive "or" construction as failing to appreciate that the Code's general rules of construction may sometimes give way to the statute's structure:

> We disagree with the *Philadelphia Newspapers* majority's conclusion that the use of "or" in Section 1129(b)(2)(A) resolves this issue. While Section 102(5) of the Code indicates that "or" should be understood in the term's non-exclusive sense, several exceptions to this rule have been recognized. Hence, the mere presence of the term "or" is insufficient to resolve this issue.

*River Rd. Hotel Partners,* 651 F.3d at 649 n.5 (citations omitted).

The Supreme Court was similarly unpersuaded that §102(5)'s rule of construction precluded a disjunctive reading of §1129(b)(2)(A). Observing that "[t]he debtor's principal textual argument is that § 1129(b)(2)(A) 'unambiguously provides three distinct options for confirming a Chapter 11 plan over the objection of a secured creditor'", the Court reasoned, without mention of §102(5)'s rule of construction, that the general/specific canon requires the conclusion that a "cramdown plan that provides for the sale of collateral free and clear" of the creditor's lien must comply §1129(b)(2)(A)(ii)'s sale conditions, rather than §1129(b)(2)(A)(iii)'s indubitable equivalence condition. *RadLAX,* 566 U.S. at 647–49. This construction of §1129(b)(2), the Court concluded, was most consistent with the "obligation to interpret the Code clearly and predictably using well established principles of statutory construction." 566 U.S. at 649.

> Although many of the factors interpreting "fair and equitable" are specified in paragraph (2), others, which were explicated in the description of section 1129(b) in the House report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to "fair and equitable" treatment of a dissenting class. For example, a dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims. While that requirement was explicitly included in the House bill, the deletion is intended to be one of style and not one of substance.

124 Cong. Rec. 32,407 (1978) (statement of Rep. Edwards); *id*. at 34,006 (statement of Sen. DeConcini); see also H.R. Rep No. 95-595, at 414 (1977) ("First, under [§1129(b)(1)(A)] the court must be able to find that the consideration given under the plan on account of the secured claim does not exceed the allowed amount of the claim. This condition is not prescribed as a matter of law under section 1129(a), because if the secured claim is compensated in securities of the debtor, a valuation of the business would be necessary to determine the value of the consideration. . . . Once the valuation is performed, it becomes a simple matter to impose the criterion that no claim will be paid more than in full."); Kenneth N. Klee, *Cram Down II*, 64 Am. Bankr. L.J. 229, 230–31 (1990) (noting that "[t]he legislative history of the Bankruptcy Code gives but one example of an uncodified aspect of the fair and equitable rule" and citing to the statements of Rep. Edwards and Sen. DeConcini); Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations,* 44 Stan. L. Rev. 69, 90 (Nov. 1991) ("The scope of these unmentioned yet nonexcluded items was broad. Among the concepts that did not receive explicit statutory expansion, for example, was the fundamental idea that no participant should receive more than its nonbankruptcy entitlement. That other uncodified concepts remained underscores the open texture of the statute.").

The question left unanswered, however, is what fair-and-equitable conditions apply beyond those Congress enumerated? "Fair and equitable" had an established meaning in the reorganization context before Congress included it in §1129(b)(1) of the Bankruptcy Code. Therefore, if §1129(b)(1)'s requirement that a plan be "fair and equitable" to dissenting classes imposes conditions beyond those enumerated in §1129(b)(2), those conditions are best understood by resort to "a longstanding interpretive principle: When a statutory term is '"obviously transplanted from another legal source,"' it '"brings the old soil with it."'" *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (quoting *Hall v. Hall*, 584 U.S. 59, 73 (2018) and citing *Field v. Mans*, 516 U.S. 59, 69–70 (1995)); *see also Hall*, 584 U.S. at 73 ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it". (quoting Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947))); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 223 (2024) ("When Congress enacted the present bankruptcy code in 1978, it did 'not write "on a clean slate."' . . . Recognizing as much, this Court has said that pre-code practice may sometimes inform our interpretation of the code's more 'ambiguous' provisions." (first quoting *Hall v. United States*, 566 U.S. 506, 523 (2012), and then quoting *RadLAX*, 566 U.S. at 649)); *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 278–79 (2024) (referencing section 77B of the Bankruptcy Act of 1898 and its 1938 amendments to conclude that "[t]he historical context and purpose of §1109(b) also supports [the Court's] interpretation [of 'party in interest']."); *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 720–22 (2018) ("Lastly, the statutory history of the phrase 'statement respecting the debtor's financial condition' corroborates our reading of the text. That language can be traced back to a 1926 amendment to the Bankruptcy Act of 1898 . . . . When Congress used the materially same language in [sec.] 523(a)(2), it presumptively was aware of the longstanding judicial interpretation of the phrase and intended for it

to retain its established meaning."); *Dewsnup v. Timm,* 502 U.S. 410, 419 (1992) ("When Congress amends the bankruptcy laws, it does not write 'on a clean slate.'" (quoting *Emil v. Hanley,* 318 U.S. 515, 521 (1943)).

The fair-and-equitable requirement can be traced back to old equity receivership cases and fraudulent conveyance law. See *N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482 (1913); see also Douglas G. Baird & Robert K. Rasmussen, *Boyd's Legacy and Blackstone's Ghost*, 1999 Sup. Ct. Rev. 393, 397–400 (1999); Markell, *Owners, Auctions, and Absolute Priority*, 44 Stan. L. Rev. at 75–87. Congress first employed the term "fair and equitable" in 1934 when it adopted section 77B of the Bankruptcy Act to provide for corporate reorganizations. Baird & Rasmussen, *Boyd's Legacy*, 1999 Sup. Ct. Rev. at 411–12; Markell, *Owners, Auctions, and Absolute Priority*, 44 Stan. L. Rev. at 83. Section 77B(f) stated, "[a]fter hearing such objections as may be made to the [reorganization] plan, the judge shall confirm the plan if satisfied that" among other things, "it is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders and is feasible". Act of June 7, 1934, ch. 424, sec. 77B(f)(1), 48 Stat. 911, 919; see also *203 N. LaSalle St. P'ship*, 526 U.S. at 444; *Kham & Nate's Shoes*, 908 F.3d at 1360. The primary limitation imposed by this provision was the absolute priority rule.[16] *Case*

---

16. As explained by the Supreme Court,

> Both chapters [X and XI] provide for confirmation of the plan or arrangement by the judge 'if satisfied that' it 'is fair and equitable and feasible' and if 'the proposal' of the plan or arrangement 'and its acceptance are in good faith,' §§ 221, 366. 'Fair and equitable,' taken from § 77B and made the condition of confirmation under both Chapter X or Chapter XI[,] are "words of art" having a well understood meaning in reorganizations in equitable receiverships and under § 77B which is incorporated in the structure of both Chapters X and XI. See *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 115 [(1939)]. The phrase signifies that the plan or arrangement must conform to the rule of *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482, which established the principle which we recently applied in the *Los Angeles* case, that in any plan of corporate reorganization unsecured creditors are entitled to priority over stockholders to the full extent of their debts and that any scaling down of the claims of creditors without some fair compensating advantage to them which is prior to the rights of stockholders is inadmissible.

*Sec. & Exch. Comm'n v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 452 (1940); see also *id*. at 448–450.

*v. Los Angeles Lumber Products Co.* held that section 77B(f)'s "fair and equitable" standard required the plan to satisfy the absolute priority rule if the plan was not approved by the affected classes. 308 U.S. at 114–15. The Court stated:

> The words 'fair and equitable' as used in § 77B(f) are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations. Hence, as in case of other terms or phrases used in that section, we adhere to the familiar rule that where words are employed in an act which had at the time a well known meaning in the law, they are used in that sense unless the context requires the contrary.
>
> In equity reorganization law the term 'fair and equitable' included, *inter alia*, the rules of law enunciated by this Court in the familiar cases of . . . *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482; *Kansas City Terminal Ry. Co. v. Central Union Trust Co.*, 271 U.S. 445. These cases dealt with the precedence to be accorded creditors over stockholders in reorganization plans.
>
> . . . .
>
> Throughout the history of equity reorganizations this familiar rule was properly applied in passing on objections made by various classes of creditors that junior interests were improperly permitted to participate in a plan or were too liberally treated therein. In such adjudications the doctrine of *Northern Pacific Ry. Co. v. Boyd*, *supra*, and related cases, was commonly included in the phrase 'fair and equitable' or its equivalent. As we have said, the phrase became a term of art used to indicate that a plan of reorganization fulfilled the necessary standards of fairness. Thus throughout the cases in this earlier chapter of reorganization law, we find the words 'equitable and fair', 'fair and equitable', 'fairly and equitably treated', 'adequate and equitable', 'just, fair, and equitable' and like phrases used to include the 'fixed principle' of the *Boyd* case, its antecedents and its successors. Hence we conclude, as have other courts, that that doctrine is firmly imbedded in § 77B.

*Case*, 308 U.S. at 115–16, 118–19 (footnotes and citations omitted).

In addition to requiring that the plan be "fair and equitable", section 77B required that if an affected creditor class did not accept the plan, the plan of reorganization was required to

> provide **adequate protection** for the realization by them **of the value of their** interests, claims, or **liens**, if the property affected by such interests, claims, or liens is dealt with by the plan, either as provided in the plan (a) by the transfer or sale of such property subject to such interests, claims, or liens, or by the retention of such property by the debtor subject to such interests, claims, or liens, or (b) by the sale free of such interests, claims, liens at not less than a fair upset price and the transfer of such interests, claims, or liens to the proceeds of such sale; or (c) **by appraisal and payment either in cash of the value either of such** interests, claims, or **liens**, or, at the objecting creditors' election, of the securities allotted to such interests, claims or liens under the plan, if any shall be so allotted; or (d) by such **method as will in the opinion of the judge, under and consistent with the circumstances of the particular case, equitably and fairly** provide such protection . . . .

Section 77B(b)(5), 48 Stat. at 914 (emphasis added). Under section 77B(b), therefore, a plan could be confirmed in the absence of acceptance by a secured creditor class if the plan provided those creditors the value of their liens—including by paying the appraised value in cash or by alternative means that the court found "equitably and fairly" provided adequate protection. *Id.* Judge Hand, writing for the Second Circuit in *Metropolitan Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.)*, construed section 77B(b)(5)'s "equitably and fairly" alternative to require that the plan provide "a substitute of the most indubitable equivalence"—the standard Congress codified in §1129(b)(2)(A)(iii)—of payment of the claim or the securing property. 75 F.2d 941, 942 (2d Cir. 1935); see *id*. ("[H]e wishes to get his money or at least his property. We see no reason to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence."). A few years later the Supreme Court construed section 77B's fair-and-equitable provision to require that a plan provide senior creditors the full economic value of their claims before paying junior classes—creditors must receive "full compensatory treatment", i.e., "a value equal to the creditors' claims" determined by a means left to "the informed discretion of the court." *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 529–30 (1941).

In historical context, "fair and equitable" thus appears to include the absolute priority rule and its corollary principles—that full payment of senior claims entails payment of no more than the claim's value as of the plan's effective date—and, as to classes of secured claims, the retention of liens until payment in full is tendered, or the collateral sold, or the indubitable equivalent provided—i.e., the principles Congress codified in §1129(b)(2)(A). See *In re Snyder*, 967 F.2d at 1128 ("The absolute priority rule can be traced at least as far back as the Supreme Court's decision in . . . *Boyd* . . . . The Bankruptcy Code of 1978 codified the absolute priority rule, providing that a plan's treatment of unsecured creditors is 'fair and equitable' if 'the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." (footnote omitted)). There is also precedent and legislative history for understanding §1129(b)(1)'s use of "fair and equitable" to embrace the absolute priority rule's prohibition on a plan paying members of a senior class more than the value of their claims on the effective date because the overpayment deprives junior creditors and interests of compensation that would otherwise be available to them. Congress did not include this condition in §1129(b)(2)(B) or (C), where it codified the absolute priority rule, but this historically supported corollary is mentioned in the legislative history of §1129(b), as noted previously. See 124 Cong. Rec. 32,407 (1978) (statement of Rep. Edwards); *id.* at 34,006 (statement of Sen. DeConcini); see also Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code* ("*Cram Down I*"), 53 Am. Bankr. L. J. 133, 142 (1979). Kenneth Klee, one of the Code's drafters and former associate counsel to the House Judiciary Committee, suggested soon after the Code's enactment that satisfaction of one of §1129(b)(A)'s three conditions is necessary but not sufficient to establish that the plan is fair and equitable as to a dissenting class of secured claims, but the only other condition he identifies is the overpayment principle—that the plan cannot pay a

secured class more than one hundred percent on a present-value basis. Klee, *Cram Down I*, at 142.

c

Lenders do not identify any unenumerated requirement that was part of the established meaning of "fair and equitable" when Congress included that term in §1129(b)(1). Thus, none of their arguments demonstrate that the plan fails to satisfy such a requirement.

i

The Lenders argue that the plan is not fair and equitable because the plan provides that if the auction of new-equity interests yields more proceeds than needed to pay the $8 million renovation expenses and to pay all unsecured claims in full (with post-petition interest), then any additional excess is distributed to holders of the extinguished old equity interests, which distribution would occur before Computershare receives full payment of its claim. ECF No. 853, at 12–14, §§3.7, 3.13 & 3.14. As discussed above, the plan pays Computershare's claim in full, through deferred payments that in total equal the present value of its secured claim (i.e., its liens on the hotel valued at $26 million) and nominally exceed its $45 million claim amount. Consequently, the plan provides that in the event that excess proceeds are received, all claimholders will be paid in full before any holders of the extinguished equity interests will receive payment.

The Lenders contend that this treatment violates the absolute priority rule because none of the potential excess auction funds will be paid to *Computershare*. They argue that the absolute priority rule is offended by the sequencing of the payments—that excess proceeds might be distributed to unsecured creditors and former equity interest holders before Computershare receives its deferred payments on its secured claim. This distribution sequence is not "fair and equitable," they say, because

Computershare must wait to receive full payment of its secured claim, even if excess funds are available earlier.

Lenders' sole support for this contention is the following statement in *Kham & Nate's Shoes*: "Priority is 'absolute' in the sense that every cent of each class comes ahead of the first dollar of any junior class." *Kham & Nate's Shoes*, 908 F.2d at 1359; ECF No. 1064, at 12 (quoting *id.*). But, first, *Kham & Nate's Shoes*, which instructed that "fair and equitable" was codified in §1129(b)(2), cannot be understood to be referring to classes of *secured* creditors. The codification of the absolute priority rule requires that senior classes of *unsecured* claims be paid in full before junior creditor classes or equity interests may be paid (or allowed to retain the debtor's property). Computershare, however, holds no equity interest or unsecured claim (because it exercised its right under §1111(b)(2) to have its claim treated as wholly secured); thus, the codification of the absolute priority rule in §1129(b)(2)(B), which applies "[w]ith respect to a class of unsecured claims", and §1129(b)(2)(C), which applies "[w]ith respect to a class of interests", has no application to Computershare. In context, therefore, *Kham & Nate's Shoes'* statement cannot reasonably be understood to suggest that §1129(b)(1)'s fair-and-equitable condition restricts disbursements to holders of unsecured claims or interests until after holders of *secured* claims receive all deferred payments for which the plan provides.

What is more, because §1129(b)(2)'s codification of the absolute priority rule applies only to dissenting classes of unsecured claims and interests and the plan's excess auction feature provides for the full payment of all unsecured claims (with interest) **before** making any disbursement to the old equity holders, the Lenders' argument presumes an uncodified absolute-priority principle requiring that Computershare, a secured creditor, must receive its deferred payments of its claim in full before the plan makes disbursements to holders of unsecured claims and interests. But an implicit application of the absolute priority rule that would prohibit payments to

unsecured creditor classes before secured creditor classes *receive* all deferred payments allowed under §1129(b)(2)(A) cannot practically be reconciled with §1129(a)(9), which provides that for a plan to be confirmed, it must provide that some classes of priority unsecured claims are paid in full on the plan's effective date and others (such as those comprised of tax claims entitled to priority under §507(a)(8)) are paid no later than five years after the petition date.

Additionally, Lenders read *Kham & Nate's Shoes'* statement of the absolute priority rule's meaning divorced from the rule's historical context. Between *Boyd*'s statement of the absolute priority rule in 1913 and *Case v. Los Angeles Lumber*'s reaffirmation of it in 1939 in the context of section 77B's "fair and equitable" requirement, the principle of relative priority—under which a debtor's capital structure was adjusted based on entitlements to future income and shareholders were allowed to preserve interests in that future income by paying assessments—competed with the absolute priority rule as the proper understanding of the extent to which equity receiverships and then confirmed plans under sections 77 and 77B to the Bankruptcy Act could bind dissenting classes. See Markell, *Owners, Auctions, and Absolute Priority*, 44 Stan. L. Rev. at 82–83; Baird & Rasmussen, *Boyd's Legacy*, 1999 Sup. Ct. Rev. at 401–12; see also James C. Bonbright & Milton M. Bergerman, *Two Rival Theories of Priority Rights of Security Holders in a Corporate Reorganization*, 28 Colum. L. Rev. 127 (1928).[17]

---

17. Bonbright and Bergerman explain relative priority as follows:

> The alternative doctrine of apportionment–the doctrine of relative priorities–would give a very different result. According to this doctrine, all that the first mortgage bondholders are entitled to is an exchange of their old securities for new securities, (a) with an approximately equal income claim (in the form of fixed or contingent charges) and (b) with priority over any new securities issued in exchange for the old junior securities. This latter condition, however, does not apply to new securities issued to the old stockholders or creditors in exchange for a cash assessment, as such securities may be given a priority even over the securities issued in exchange for the old first mortgage bonds. The reason for this exception is that since the new capital will benefit all security holders together, it may properly be given priority over all.

Understood in this context, *Kham & Nate's Shoes*'s statement that the absolute priority rule requires a plan to provide for full payment—"every cent"—of senior classes before providing anything—a "first dollar"—to junior classes does not mean that senior classes must *receive* payment in full before the plan can pay junior classes. 908 F.2d at 1359. *Boyd* itself allowed for deferred payments to senior interests. *Boyd*, 228 U.S. at 508 ("This conclusion does not, as claimed, require the impossible and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock.").

Given all this, it is unsurprising that the Lenders cite no authority, either before or after the enactment of the Bankruptcy Code, holding that the absolute priority rule governs the sequencing of plan distributions. And Collier on Bankruptcy flatly rejects the notion:

> Before examining in detail these treatments, it is important to underscore what compliance with any of the three clauses in section 1129(b)(2)(A) entails: payment in full of the secured claim. **As a result, there can be no fair and equitable argument because of this full payment, even though the secured lender is being paid over time when junior classes, such as unsecured creditors, may be paid sooner.** "It must be remembered that **the absolute priority rule does not require sequential distributions** (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan."

7 Collier on Bankruptcy ¶1129.04[2] (Richard Levin & Henry J. Sommer, eds., 16th ed. 2026) (quoting *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 13 (D. Conn. 2006)); *see also In re Arden Properties, Inc.*, 248 B.R. 164, 174 (Bankr. D. Ariz. 2000) ("[E]ven if the concept of § 1129(b)(2)(B) were somehow applied to secured claims, it still would not require *payment* before a junior class could receive anything; it merely

---

28 Colum. L. Rev. at 131.

means that senior classes must be fully provided for in order for junior classes to receive anything.”).[18] The plan’s provisions governing the distribution of excess auction proceeds thus does not offend §1129(b)’s explicit or implicit fair-and-equitable conditions (even presuming the subsection imposes implicit conditions).

---

18. The Lenders ultimately appear to concede the point that §1129(b)(1)’s fair-and-equitable requirement does not require a plan to provide that payments to senior creditors will be completed before the plan makes distributions to unsecured creditors or interest holders, stating in their reply brief, “Lenders do not argue that the Code requires payment of non-insider [secured] claims in full before any payment can be made to insiders, but rather that good faith and fairness require that distributions to non-insider creditors be prioritized over the interests of insiders and equity holders.” ECF No. 1064, at 10. The bankruptcy decisions they cite to support this conclusion all address §1129(a)’s good-faith requirement, rather §1129(b)(1)’s fair-and-equitable requirement. See *In re Lupton Consulting LLC*, 633 B.R. at 872 (“Considering all of these aspects, the Court cannot conclude that the plan was filed in good faith as the law understands that term, and as members of the public would perceive it.”); *In re Microcurrent Research and Educ., LLC*, 626 B.R. 455, 456 (Bankr. M.D. Fla. 2021) (After determining that the debtor had failed to disclose unencumbered funds in its liquidation analysis, the court concluded, “[b]ased on the Debtor’s failure to dedicate the Unencumbered Funds to pay unsecured creditors or to otherwise explain why those funds are absolutely needed as an operating reserve, the Court is concerned that the Debtor fails to appreciate the import of 11 U.S.C. § 1129(a)(3).”); *In re GAC Storage Lansing, LLC*, 485 B.R. 174, 200–01 (Bankr. N.D. Ill. 2013) (“Mr. Schwartz elected to condition his $250,000 new equity contribution upon the entry of a non-consensual Guarantors Injunction. In doing so, Schwartz effectively foreclosed the opportunity for third-party investors to provide a larger new equity contribution which could have been used to satisfy the Bank’s claim. In light of these circumstances, the Court concludes that the Debtor’s Amended Plan was not proposed in good faith.”); *In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 461–62 (Bankr. N.D. Fla. 2011) (“The Debtor’s Plan has not been proposed in good faith as is required by 11 U.S.C. § 1129(a)(3), because it is not intended for the benefit of the Debtor or its creditors. . . . Essentially, the Plan is designed to utilize bankruptcy law to re-arrange the priorities of the existing three secured creditors in order to benefit the Debtor’s insiders/guarantors. This is the opposite of the intended purpose for Chapter 11 relief and is not good faith.”); *In re Rusty Jones, Inc.*, 110 B.R. 362, 375 (Bankr. N.D. Ill. 1990) (“[T]he Plan serves to an unacceptable extent as a vehicle for the personal profit of ‘investors’ who purchased the Debtor for $1.00 and since sought to operate it in bankruptcy for their personal benefit and contrary to the interests of creditors. . . . [T]he present Plan has not been proposed in good faith and does not meet the requirement of 11 U.S.C. §1129(a)(3).”). The plan’s compliance with §1129(a)(3)’s good-faith requirement is addressed in part IV, below.

Additionally, the Lenders have argued that JSM’s potential receipt of excess auction payments could chill bidding at the auction, thus impairing competition. ECF Nos. 933, at 20–21; 1046, at 10–11. But the May 8, 2026 opinion approving the new equity sale and auction procedures found no basis in the record to conclude that the terms of the plan would adversely affect the competitive nature of the auction. *Wis. & Milwaukee Hotel*, 2026 WL 1278550, at 17; see *id*. at 17 n.14. No evidence or argument presented since then changes that finding and conclusion.

The Lenders' ultimate contention about the plan not being fair and equitable is that it imposes an unreasonable risk on Computershare by paying its claim through eighteen years of monthly payments that total $27 million and an estimated $36 million balloon payment in year 18 to complete payment of the cramdown interest.[19] The

19. The Lenders argued that the plan "dramatically increased the allowed [Class 1–Computershare] Claim to more than $61 million". ECF No. 933, at 11. But, unlike their earlier arguments in support of relief from the §362(a) stay (see, e.g., ECF No. 760, at 20–21), Lenders do not appear to contend that the plan is *overpaying* Computershare (and thus is not fair and equitable to junior creditors who would suffer from the diversion of funds to an allegedly favored secured creditor). For clarity's sake, the plan's payment of total payments of about $61 million over the term of the plan provides Computershare with deferred payments that have a value as of the plan's effective date equal to Computershare's $26 million secured claim and at least equal to its $45 million allowed claim. Consequently, the plan does not pay Computershare more than it is entitled under §1129(b)(2)(A)(i)(II) or an amount that would have been understood to be not "fair and equitable" under pre-Bankruptcy Code reorganization law. All this was explained earlier, but bears repeating here for the sake of completeness (with updated figures as used in the fourth amended plan):

> While the plan says that Computershare "shall have a secured claim" in an amount exceeding $[61] million, the plan does not pay Computershare more than it is fairly and equitably entitled to by operation of §1129(b)(2)(A)(i)(II) as payment on its allowed $45 million claim secured by $26 million of estate property (at least if the plan's discount rate is correct, a matter discussed at length [and adjudicated later in the opinion]).
>
> . . . .
>
> To ensure that the plan's deferred payments equal the present value of the collateral, therefore, those payments must be sufficiently great that when discounted by the appropriate rate . . . their value on the plan's effective date equals the amount of the allowed secured claim. . . . The plan projects that when one discounts those payments at an annual rate of 6.[9]%, they have a total value as of the plan's effective date that is at least equal to $26 million and will pay Computershare the remainder of its §1111(b) claim (the portion of the allowed claim that exceeds the value of the collateral). Because the Bankruptcy Code provides that paying holders of secured claims the present value of their lien—that is, providing "payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property"—is fair and equitable, the plan cannot be said to violate the absolute priority rule as to unsecured creditors by making those payments. See *Kham & Nate's Shoes No. 2, Inc.*, 908 F.2d at 1361. Payment of interest on deferred payments to meet §1129(b)(2)(A)(i)(II)'s present-value requirement is neither unfair [n]or inequitable to unsecured creditors for purposes of §1129(b). *Id.*

*Wis. & Milwaukee Hotel*, 678 B.R. at 198–199; see also ECF No. 853, at 10. Or, as Klee explained, "It is not so much that interest per se is required [to satisfy §1129(b)(2)(A)(i)(II)'s present-value test]. It would suffice if the principal payments exceeded the principal amount of the secured debt to a sufficient extent that the

Lenders contend that even if the plan satisfies §1129(b)(2)(A)(i)'s requirements, the court should still find that the plan is not fair and equitable as to Computershare because the plan's eighteen-year payment term and large balloon payment "impose an unreasonable risk of its failure on the secured creditor." ECF No. 933 at 12. As discussed in detail above, however, this contention that the court may conclude that a plan is not fair and equitable even though it satisfies §1129(b)(2)(A)'s enumerated requirements is in tension with the Supreme Court's and Seventh Circuit's reading of the section's text, which suggest that §1129(b)(2) describes the "criteria" for deciding whether a plan's treatment is "fair and equitable," as required by §1129(b)(1). See *RadLAX,* 566 U.S. at 642; *Kham & Nate's Shoes,* 908 F.2d at 1361. And, as also explained above, Lenders' arguments that the plan's treatment of Computershare is not fair and equitable lack textual or historical purchase.

In addition, the risk that a cramdown plan will not make required distributions is accounted for in §1129(b)(2)(A)(i)(II)'s fair-and-equitable condition that the plan's deferred distributions equal the present value of the secured claim as of the plan's effective date. As explained previously, "[t]he discount (or cramdown) rate must reflect 'the non-eliminable risk of default, inflation, and the opportunity costs associated with the inability of the creditor to use the money right away, whether for investment or any other profitable purpose." *Wis. & Milwaukee Hotel*, 678 B.R. at 201 (quoting Matthew Wiener, *Cramdown Interest Rates in the Commercial Credit Context: Arguments for the Two-Step Approach in Chapter 11*, 74 N.Y.U. Ann. Surv. Am. L. 223, 231 (2018), and citing *In re Oil Spill by Amoco Cadiz Off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1332–35 (7th Cir. 1992)). The cramdown rate is determined using the "formula approach"

---

effective interest being paid equal[]ed the discount rate." Klee, *Cram Down I,* at 157 n.153. The plan does not overpay Computershare's claim: it pays deferred payments the total value of which on the plan's effective date is equal to the value of Computershare's secured claim, i.e., its liens on the estate's interest in the hotel.

adopted by *Till v. SCS Credit Corp.*'s plurality opinion. 541 U.S. 465 (2004). That analysis consists of two steps: "Step one: Select an appropriate base or reference interest rate. Step two: **adjust that rate to account for the risk that the debtor will default on its obligation to make the required deferred payments**." *Wisconsin & Milwaukee Hotel*, 678 B.R. at 201 (emphasis added) (citing *Till*, 541 U.S. at 478–79). Thus, §1129(b)(2)(A)(i)(II)'s present-value requirement accounts for the risk of plan default by requiring the payment of interest at an increased rate until the risk adjustment is so great that it defeats a finding that the plan is feasible, at which point it is not confirmable under §1129(a)(11).[20]

As discussed above, the debtor has proven that the plan is feasible. Given the plan's feasibility, the court earlier determined that the Lenders' evidence proved the need for a 320-basis point adjustment from the base rate. The Lenders did not seek to revisit the court's cramdown rate ruling as an evidentiary matter—did not seek to prove that the fourth amended plan required a different risk adjustment than the third amended plan—instead arguing only that §1129(b)(2) did not allow use of a variable cramdown rate as a matter of law. Because §1129(b)(2)(A)(i)(II)'s present-value condition accounts for the default risk, there is no textual or structural justification for

20. At the 2025 evidentiary hearings on the appropriate cramdown rate the Lenders' expert considered the risk of plan default in proposing a higher risk adjustment, expressly taking into account the length of the debtor's financial projections, the uncertainty surrounding the extension of the franchise agreement, and the debtor's need to fund required property improvements. See *Wis. & Milwaukee Hotel*, 678 B.R. at 212, 215–16. By the confirmation trial in 2026 those risks had lessened. The debtor reached an agreement with Marriott to continue its franchise rights before the debtor filed its fourth amended plan and the debtor demonstrated at the confirmation hearing that proceeds of the court-approved equity auction and future operations would allow it to pay for necessary renovations. The Lenders' expert further opined in 2025 that the debtor's decision to use as the base rate the five-year Treasury rate adjusted every five years to account for rate changes "was risk-minimizing for purposes of calculating the appropriate interest rate". *Wis. & Milwaukee Hotel*, 2026 WL 1968185, at *3 (quoting ECF No. 787, at 9–10); see also 678 B.R. at 217 ("About the risk of default based on the plan's length, Ms. Nelson testified that after the debtor amended the plan to base the cramdown rate on the five-year Treasury note rate, to be reset every five years, she concluded that an adjustment of 61 basis points *downward* was warranted.").

ruling that a feasible plan that satisfies §1129(b)(2)(A)(i) nevertheless should be declared not fair and equitable on the grounds that there is too great a chance that the reorganized debtor will default on plan payments. Again, the Lenders cite no pre-Code authority in support of this extra-textual understanding of "fair and equitable."

iii

The court is aware, however, that numerous nonprecedential opinions and academic articles read "fair and equitable" in §1129(b)(2) to authorize a bankruptcy court to deny confirmation of a cramdown plan that is feasible and satisfies §1129(b)(2)(A)'s fair-and-equitable conditions, if the court concludes that the plan is unreasonable or unduly risky. See, e.g., *D & F Const.*, 865 F.2d at 675 ("Assuming without deciding that the requirements set forth in § 1129(b)(2) are literally met, the debtor's plan is neither fair nor equitable."); Jack Friedman, *What Courts Do to Secured Creditors in Chapter 11 Cram Down*, 14 Cardozo L. Rev. 1495, 1543 (Apr. 1993) ("The fair and equitable standard as it applies to secured claims requires not only that the plan satisfy, at a minimum, one of the explicit requirements of clauses (i), (ii), or (iii) of section 1129(b)(2)(A), but also requires that the absolute priority rule be satisfied and that the plan should not impose an unreasonable risk of the plan's failure on the secured creditor.");[21] H. Miles Cohn, *Single Asset Chapter 11 Cases*, 26 Tulsa L.J. 523, 537 (Summer, 1991) ("No test or formula can guide the bankruptcy judge in determining

21. Friedman asserts, "Based on an analysis of over fifty years of case law, this author has discerned the following second requirement: Fair and equitable as it applies to secured claims requires not only the satisfaction of one of the explicit requirements of clauses (i), (ii), or (iii), but also that the technical fulfillment of these three clauses should not impose an unreasonable risk of the plan's failure on the secured creditor." Friedman, supra, at 1506–07. But, aside from describing case outcomes, the article cites no decision predating the Bankruptcy Code that supports reading §1129(b)(1)'s "fair and equitable" provision to impose a reasonableness condition on the treatment of dissenting secured classes beyond that codified in §1129(b)(2)(A). Following the course of many bankruptcy court decisions, Friedman seems simply to presume without textual or historical support that §1129(b)(1)'s use of "fair and equitable" authorizes bankruptcy judges to gauge the risk of plan default— even if the plan complies with §§1129(a)(11) and 1129(b)(2)—and decide whether the plan imposes on the secured creditor a risk of failure that the judge finds unreasonable.

whether the creditor has been sufficiently compensated for the risk it must assume. Like feasibility, this determination is a judgment call: the court must weigh the risks imposed on the creditor against the benefits paid to the creditor in determining whether the plan is 'fair and equitable' as to the secured creditor.").

Many decisions simply declare that a plan's treatment is not "fair and equitable"—apparently applying an I-know-it-when-I-see-it approach—whereas others have announced amorphous alternative formulations and multi-factor tests. See, e.g., *In re Edgewater Motel, Inc.*, 85 B.R. 989, 998 (Bankr. E.D. Tenn. 1988) ("The court accordingly finds, irrespective of the statutory definition of 'fair and equitable,' that the debtor's Plan, in its treatment of the claim of Union Planters, is not 'fair and equitable.'"); *In re Manion*, 127 B.R. 887, 890 (Bankr. N.D. Fla. 1991) ("Section 1129(b) requires that the dissenting claimant receive full payment over a *reasonable* period of time." (citing *In re Hollanger*, 15 B.R. 35, 47 (Bankr. W.D. La. 1981)); see also *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr. W.D. Tenn. 1991) ("[I]t seems appropriate to consider the following [ten] factors in evaluating whether this plan provides fair and equitable treatment to Leader's oversecured claim".); *In re Spanish Lake Assocs.*, 92 B.R. 875, 878–79 (Bankr. E.D. Mo. 1988); see also Friedman, supra at 1506 n.50 (collecting authorities).

The Ninth Circuit, for example, has directed bankruptcy courts to apply a ten-factor, non-exclusive test when considering whether a plan's negative amortization of deferred payments is fair and equitable:

> We hold that the fairness of a reorganization plan that includes negative amortization should be determined on a case-by-case basis. *In re Apple Tree Partners* contains a list of some of the factors that are relevant to this determination:
>
> 1. Does the plan offer a market rate of interest and present value of the deferred payments;
> 2. Is the amount and length of the proposed deferral reasonable;
> 3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;
5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;
6. Are the risks unduly shifted to the creditor;
7. Are the risks borne by one secured creditor or class of secured creditors;
8. Does the plan preclude the secured creditor's foreclosure;
9. Did the original loan terms provide for negative amortization; and
10. Are there adequate safeguards to protect the secured creditor against plan failure[?]

*Great W. Bank v. Sierra Woods Group*, 953 F.2d 1174, 1177–78 (9th Cir. 1992) (quoting *Apple Tree Partners,* 131 B.R. at 398). This is little better than standardless discretion: five of the ten factors themselves contain undefined value considerations—"reasonable", "satisfactory", "sufficiently", "unduly", and "adequate"—and one of the factors, number 4, is either redundant of §1129(a)(11)'s feasibility requirement or requires an ad hoc super-feasibility determination. Multi-factor approaches of this type have long been disfavored in this circuit. See, e.g., *United States v. Mayfield*, 771 F.3d 417, 435 (7th Cir. 2014) (en banc) ("Multifactor tests are common in our law but they can be cryptic when unattached to a substantive legal standard, as this one is. Knowing what factors to look *at* is useless unless one knows what to look *for*."); *Marrs v. Motorola, Inc.*, 577 F.3d 783, 788 (7th Cir. 2009) ("That sounds like a balancing test in which unweighted factors mysteriously are weighed. Such a test is not conducive to providing guidance to courts or plan administrators."); *Menard, Inc. v. IRS*, 560 F.3d 620, 622–23 (7th Cir. 2009) ("Multifactor tests with no weight assigned to any factor are bad enough from the standpoint of providing an objective basis for a judicial decision, multifactor tests when none of the factors is concrete are worse". (first citing *Farmer v. Haas*, 990 F.2d 319, 321 (7th Cir. 1993), then citing *Prussner v. United States*, 896 F.2d 218, 224 (7th Cir. 1990) (en

banc); then citing *Palmer v. Chicago*, 806 F.2d 1316, 1318 (7th Cir. 1986); and then citing *United States v. Borer*, 412 F.3d 987, 992 (8th Cir. 2005)).

In all events, if one treats §1129(b)(1)'s fair-and-equitable provision as open-ended and requiring application of a reasonableness standard, then the circumstances here present facts on both sides of the equation. The evidence supports the Lenders' contention that the eighteen-year term is longer than would be available for conventional hotel financing. The debtor defends the reasonableness of the plan's eighteen-year term as reinstating the loans' original maturity date, which the debtor argues is about eighteen years from the debtor's filing of its bankruptcy petition. The Lenders disagree and argue that the loans originally matured according to their terms before the bankruptcy case was filed.

Based on the court's review of the relevant loan documents, the original maturity date of the loans is January 1, 2042. The loan agreement that governs the parties' transaction as originally issued and as subsequently amended provides, "If not sooner paid, each Note, together with all accrued and unpaid interest thereon, shall be due and payable in full on the Maturity Date applicable to such Note." ECF No. 638-8, at 7; see also ECF No. 638-11, at 3. Each of the promissory notes the debtor executed has as a defined "Maturity Date" of January 1, 2042. See ECF Nos. 638-1, 638-2, 638-3, and 997, at 2–3. In addition, the Lenders and the debtor stipulated to facts in advance of confirmation, including that "The stated maturity date for each Note is January 1, 2042." ECF No. 997, at 3.

The Lenders respond that the loans' 2042 maturity date should be disregarded because, in fact, the loans' repayment in full had already been triggered by a mandatory tender of the bonds when the Indenture trustee lacked sufficient funds to purchase them. The Loan Agreement (as amended) states as follows:

> [I]n the event of a mandatory tender under Section 4.9 of the Indenture with respect to the Bonds, if there are insufficient monies in the Bond Purchase

> Account (as defined in the Indenture) on the Mandatory Tender Date (as defined in the Indenture) to purchase the Bonds, **the Borrower shall be required to prepay the Loan on the later of the Mandatory Tender Date or December 31, 2020 in an amount equal to such shortfall.**

ECF No. 638-10, at 5 (emphasis added). As a result of this occurrence, say the Lenders, the loans had come due (after an agreed extension), and thus had "matured" in March 2024. But this confuses the original Maturity Date, as defined in the promissory notes and loan agreement, with a prepayment date that resulted from a conditional triggering event. As the Third Circuit has explained, contractually defined maturity dates are to be construed in accordance with their terms:

> The Noteholders also argue that certain provisions of the 2024 Notes "refer to maturity arising 'on acceleration' or 'otherwise[,]'" so maturity here must mean the day they are scheduled to mature in 2024. We disagree. The referenced sections of the 2024 Notes do not use the word "maturity" but the defined term "Stated Maturity," which means "the fixed date [here, October 15, 2024] on which the payment of principal . . . is due[.]" That is different from maturity, which occurs whenever a debt obligation "become[s] due." *Mature*, Black's Law Dictionary (12th ed. 2024). And, when interpreting contracts, we read defined and undefined terms as having distinct meanings.

*Wells Fargo Bank, N.A. v. The Hertz Corp. (In re Hertz Corp.)*, 120 F.4th 1181, 1192 (3d Cir. 2024) (record citations omitted). Again, the loans at issue here included a defined Maturity Date of January 1, 2042; thus, the loans had a 30-year term that lends support to the plan's repayment term.[22]

---

22. The Lenders state in their reply brief,

> To be clear, Lenders do not merely contend that the parties 'intended' the loans to have a duration of six years, but that *the loan documents clearly provide* an initial duration of only six years. Debtor stipulated to the key facts on this, *see* ECF #997, ¶¶ 12-13; the loan documents admitted into evidence at trial verify them, *see* Lenders' Ex. 104, at 5 (definition of 'Conversion Date'), §§ 4.9, 4.11; Ex. 108, § 2.7; Ex. 126, §§ 1(a), 15 . . . .

ECF No. 1064, at 2–3 (italics in original). None of the loan documents the Lenders cite—or that are in evidence—so provide.

That leaves the Lenders' contention that the plan is not fair and equitable because it pays Computershare $1.5 million a year, requiring a $36 million balloon to ensure Computershare receives the present value of its secured claim—the $26 million value of the hotel plus eighteen years of cramdown interest. The plan's annual payments to Computershare are less than the annual interest payments, thus, amounting to negative amortization. Several bankruptcy courts conducting ad hoc reasonableness determinations or applying the type of multi-factor balancing test described above have concluded that such treatment is not fair and equitable, unless the secured party enjoys a substantial equity cushion or the original obligation provided for negative amortization, neither of which have been shown to apply here. See, e.g., *Apple Tree Partners*, 131 B.R. at 395–406. In the Lenders' view the debtor has designed the plan to minimize payments to Computershare to ensure that the reorganized debtor will have sufficient net income to make distributions to its owner—whomever acquires its equity at the post-confirmation auction—which the Lenders presume will be JSM. As discussed above, JSM intends to borrow its $8 million opening bid from Reiman, and

---

As demonstrated above, the evidence shows that the loan documents provide a January 1, 2042, Maturity Date. Section 2.2 of the loan agreement provides, "If not sooner paid, each Note," defined as the promissory notes made payable to the order of Lender secured by the mortgages executed by the Borrower (i.e., the debtor), "shall be due and payable in full on the Maturity Date applicable to such Note." ECF No. 638-8, at 7; see *id*. at 5 (defining "Maturity Date" as "January 1, 2042").

Exhibit 104, cited to by the Lenders in the passage above, is the Indenture. Its definition of "Conversion Date" does not alter the Maturity Date on the notes; instead, it governs "the end of the Lockout Period and the date on which the interest rate on the Bonds is converted from the Fixed Rate to the Variable Rate . . . all as provided in Section 4.2(b) of this Indenture." ECF No. 638-4, at 10. Section 4.9 of the Indenture, cited by the Lenders, governs the mandatory tender of the bonds for purchase, and section 4.11, also cited, provides for the bond purchase account, as referenced above. Section 2.7 of the loan agreement (exhibit 108) provides for conditional "prepayment," as discussed in the text above. Exhibit 126, also cited by the Lenders, is a note executed by JSM (*not the debtor*) in January 2022 and has no effect on the maturity date in the debtor's loan agreement. ECF No. 638-26. Paragraphs 12 and 13 of the stipulated facts, asserted by the Lenders to be "the key facts" on this issue, ECF No. 1064, at 2, address the mandatory tender of the bonds under the Indenture and the resulting conditional acceleration of the loans "in the amount of any shortfall in the Bond Purchase Account," none of which, again, alters the Maturity Date, i.e., January 1, 2042. ECF No. 997, at 5.

the Lenders assert that the plan overly defers payment to Computershare to facilitate distributions to JSM, which, in turn, will enable JSM to repay Reiman.

As mentioned in discussing the plan's feasibility, the Lenders' expert opined that the reorganized debtor's expected operations would yield sufficient funds to pay Computershare's $26 million secured claim in 11 years by making monthly payments of $197 thousand, or about $2.36 million per year, plus a final balloon payment of about $21.8 million. But considering seasonal variations in the hotel's revenue, the expert's proposal almost certainly would leave the debtor at substantial risk of needing further reorganization or liquidation before the end of the proposed eleven-year payment period. And, although this alternative deferred payment scheme presumes that the reorganized debtor will secure the $8 million cash infusion needed to make the renovations required by the franchise agreement, the expert offered no reason to find that anyone would acquire the equity for that amount under the expert's scenario that results in a 57% increase in monthly payments to Computershare (as well as a $21.8 million balloon payment due in eleven years and Computershare's retention of liens against the hotel to secure its $45 million debt). While the evidence shows that Reiman is committed to lending JSM the funds needed to make an opening bid of $8 million under the plan's proposed restructuring of the obligation to Computershare, there is no evidentiary basis from which to conclude that Reiman would loan JSM the funds to purchase equity in the reorganized debtor under the terms the Lenders' expert posits, especially since those terms would likely result in default and foreclosure or additional restructuring of the debtor. Perhaps JSM would take the risk of buying the new equity interests under those circumstances and perhaps it would have sufficient wherewithal to support the required $8 million loan, but there's no evidence of that, nor is there an evidentiary basis for presuming that under those circumstances someone else would come forward to acquire the reorganized debtor's equity for at least $8 million. All things considered, there is no reason to believe that JSM or any other party would

invest the necessary $8 million to allow the reorganized debtor to continue operations; as a result, the expert's proposed restructuring of the Computershare obligation would be infeasible at square one. Presuming that this was the best counter the Lenders could plausibly propose—a repayment period that itself extends beyond the 5-10 years their expert opined would be available outside of bankruptcy with periodic payments that would only marginally exceed the accruing interest—the infeasibility of that proposal hardly supports the Lenders' contention that the debtor's plan defers greater payments to Computershare *only* to allow distributions to whomever acquires the reorganized debtor's equity at auction, rather than to ensure the plan's feasibility.[23]

Under these circumstances, one supposes that reasonable jurists might differ on whether the plan's treatment of Computershare's claim *unduly* shifts a risk of default to Computershare or is generally unreasonable. As this opinion illustrates, if one construes "fair and equitable" in §1129(b)(1) to require that inquiry, then it becomes essentially unprincipled, bounded by little more than individual jurists' value judgments informed by the reported decisions of other jurists employing *their* value judgments. This is the very common-law methodology that *Kham & Nate Shoes* declared displaced by §1129(b)(2) and is inconsistent with the Bankruptcy Code's general shift from broad-reaching equitable authority to statutorily prescribed principles. 908 F.2d at 1361. The better reading of §1129(b)(1)'s "fair and equitable" condition, as discussed above, is that it imposes the conditions stated in §1129(b)(2) supplemented only by any additional limitations that were well-established components of that term of art ("fundamental" in the language of the House and Senate Reports) when Congress passed the Bankruptcy

23. As an aside, the Lenders' contention that the plan's failure to distribute any of the $8 million to creditors makes it not fair and equitable is specious. ECF No. 1064, at 8. The $8 million minimum bid on the reorganized debtor's equity offering was set as the amount needed to fund necessary renovations to comply with franchise requirements and enable the continued operation of the hotel under the Marriott flag. Those continued operations fund the plan's required payments to creditors, and the plan commits no amount of the equity sale proceeds *or* future income to distributions to the successful acquirer of the new equity, whether that acquirer is JSM or some other party.

Code in 1978. 124 Cong. Rec. 32,407 (1978) (statement of Rep. Edwards); *id*. at 34,006 (statement of Sen. DeConcini).

None of the decisions on which the Lenders rely identifies any pre-Code use of "fair and equitable" that would support their contention that this term of art authorizes the bankruptcy court to engage in reasonableness determinations. The debtor has shown the plan satisfies §1129(b)(1)'s fair-and-equitable requirement because it complies with the conditions of §1129(b)(2) and does not offend any identified pre-Code use of "fair and equitable."

iv

What is more, the plan offers Computershare a payment option that would have been confirmable under the pre-Code reorganization statutes, thus, "fair and equitable" as that term was used before 1978. The plan's treatment of the class consisting of Computershare's claim presents three options, and Computershare chose the second option—retention of its liens and deferred payment of its claim—after making its §1111(b) election. The third option, however, which Computershare did not choose, provides that JSM or its designee would purchase the bonds or the loans for $26 million on the plan's effective date, the Lenders would release their claims against the debtor, and the purchaser would acquire Computershare's claim. ECF No. 853, at 11. This option is fair and equitable under the pre-Code usage of that term of art.

As discussed above, §77B of the Bankruptcy Act allowed courts to bind dissenting creditors to the terms of a confirmed plan if a court found that the plan's treatment was "fair and equitable" under the terms of that statute and the court found that the plan complied with other conditions, including the provisions of section 77B(b) relating to the treatment of nonconsenting secured classes. Act of June 7, 1934, ch. 424, sec. 77B(f)(1)–(2), 48 Stat. 911, 919. Section 77B(b)(5) provided, for relevant purposes, that if a class of secured creditors did not accept the plan, then the plan had to "provide adequate protection for the realization by [the secured creditors] of the value of their

interests, claims, or liens, if the property affected by such interests, claims or liens is dealt with by the plan . . . ." *Id*. at §77B(b)(5), 48 Stat. 911, 913–14. Section 77B(b)(5) listed four separate ways in which the debtor could provide the creditor with adequate protection, including "**by appraisal and payment either in** cash of the value either **of such** interests, claims, or **liens** or, at the objecting creditors' election, of the securities allotted to such interests, claims, or liens under the plan, if any shall be so allotted". *Id*. (emphasis added); see also *Murel Holding*, 75 F.2d at 942 (explaining that §77B requires as to non-accepting classes that the plan pay "adequate protection" in one of four ways, including that the "value of the liens may be appraised and paid"). When the 1938 Chandler Act divided reorganizations into three chapters, chapter X (governing corporate reorganizations) retained the "fair and equitable" requirement. Act of June 22, 1938, ch. 575, sec. 174, 52 Stat. 840, 891. In so doing, the statute required plans to provide dissenting secured creditors with "adequate protection for the realization by them of the value of their claims against the property dealt with by the plan and affected by such claims", including "by appraisal and payment in cash of the value of such claims". Act of June 22, 1938, ch. 575, sec. 216(7), 52 Stat. 840, 896. Thus, payment of the full appraised value of the collateral was the fair-and-equitable touchstone for treatment of dissenting secured creditors before Congress incorporated "fair and equitable" into §1129(b)(1).

The plan's option to pay Computershare $26 million on the plan's effective date would satisfy the treatment of secured claims imposed by pre-Code usage of "fair and equitable." Computershare's refusal of that option, electing to receive deferred payments and the retention of its liens in the full value of its claim, entails that it views the deferred-payment option as more valuable than a treatment that was understood to be fair-and-equitable before 1978. Thus, whatever one might reason "fair and equitable" in §1129(b)(1) carries forward from past usage, it appears that in Computershare's own view, the plan's treatment of its claim is at least equal economically to "fair and

equitable" treatment as understood before enactment of the Bankruptcy Code. In the absence of the plan being shown to offend a historically mandated fair-and-equitable condition, Computershare's decision to forgo a treatment that would have been historically deemed fair and equitable is sufficient to find that the treatment it elected is "fair and equitable" under §1129(b)(1), apart from the conditions Congress enumerated in §1129(b)(2).

B

The plan creates three separate classes for allowed nonpriority unsecured claims. Class 7 is comprised of Funding's nonrecourse guaranty claim, and the plan proposes to pay that class a ten percent dividend totaling about $211,341 over 18 years with monthly payments of about $978. ECF No. 853, at 13. Class 8 consists of unsecured claims largely held by active vendors, and the plan proposes to pay that class a fifty percent dividend, totaling approximately $283 thousand, pro rata over 2.5 years in quarterly payments of $28,350 beginning immediately following the plan's effective date. ECF No. 853, at 14. Class 9 contains unsecured claims held by JSM and Wave Renovations LLC (Wave); the plan similarly proposes to pay that class a fifty percent dividend, totaling about $431,583, pro rata over 2.5 years of quarterly payments of $43,158, with payments beginning after completion of payments to Class 8.[24] *Id*. The Lenders contend that the plan does not comply with §1129(b)(1) as to Funding because the plan unfairly discriminates against Class 7 (Funding's §1111(b) unsecured guaranty

24. If JSM does not prevail at the auction of new equity interests, the plan provides for the debtor's rejection of a consulting and asset management agreement with JS Asset Management, LLC, an entity related to JSM. ECF No. 853, at 16–17. JS Asset Management's resulting rejection claim "shall be treated as a Class 9 Unsecured Claim, and it shall be treated in the same manner as other Class 9 Claims". *Id.* at 17. The plan will pay a greater amount to Class 9 claims if JS Asset Management's agreement is rejected. But this nuance makes no difference, and the remainder of the discussion ignores it.

claim) in favor of Class 9 (the unsecured loan claims held by insiders JSM and Wave).[25] ECF No. 933, at 7–8; ECF No. 1046, at 1–7; ECF No. 1064, at 1–6.

1

Section 1129(b)(1) states that a cramdown plan must "not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The Bankruptcy Code neither defines "discriminate unfairly" nor provides examples of what that phrase includes. Collier observes about this unfair discrimination requirement that "the rationale for its inclusion is, at best, obscure". 7 Collier on Bankruptcy ¶1129.03[3] (Richard Levin & Henry J. Sommer, eds., 16th ed. 2026). Collier points out, however, that given other chapter 11 requirements, "[a]ll that is at issue", with §1129(b)(1)'s not-discriminate-unfairly condition, "is the 'unfair' division of the reorganization surplus, that amount of value in excess of liquidation value", because "[b]efore reaching any issues of unfair discrimination . . . . the court will have found that classification of the dissenting class is proper, and the dissenting class will receive at least its liquidation preference." *Id.* (citing §1129(a)(1) (requiring the plan to comply "with all applicable provisions" of Title 11), (a)(7) (requiring that impaired

25. Funding initially argued that the plan also unfairly discriminated against Class 7 (containing its claim) in favor of Class 8 (the unsecured vendor claims). See ECF No. 933, at 8. After the May 2026 evidentiary hearing, however, Funding did not press that argument further, suggesting that after considering the evidence, Funding elected to forego any challenge to the fairness of the plan's differing treatment of Class 7 and Class 8. See ECF No. 1046 & 1064. To the extent that Funding has not abandoned that argument, the court finds and concludes that the plan's treatment of Class 7 (Funding's §1111(b) claim) and that of Class 8 (the vendor class of allowed unsecured claims) is not unfair discrimination within the meaning of §1129(b)(1) for the reasons that follow in connection with the claim of unfair discrimination in favor of Class 9. In addition, based on Randall Erkert's testimony and the record considered as a whole, the evidence showed that the vendor class consists of creditors with whom the reorganized debtor will benefit from maintaining ongoing business relationships, including Town Bank, which is a long-standing customer of the hotel's banquette facilities, as well as a creditor. ECF No. 1038, at 33. The debtor's desire to maintain these relationships further justifies paying the vendor class a fifty percent dividend over 2.5 years while paying less on Funding's unsecured claim that arises solely out of the debtor's guaranty of Funding's loan to JSM, enforceable only by foreclosure of an underwater lien on the hotel. Funding did not do regular business with the debtor and has no ongoing relationship with the debtor, the continuation of which will aid the debtor's reorganization. Lenders' post-hearing briefs do not contest any of this. See ECF Nos. 1046, at 3–6; 1064, at 1–6.

classes receive on account of their claim an amount that is not less than what they would receive if the debtor were liquidated under chapter 7) & (a)(10) (requiring at least one impaired class of non-insiders to accept the plan). Funding does not dispute the separate classification of its §1111(b) unsecured claim or that it would be entitled to nothing if the debtor were liquidated, as will be discussed further below.[26]

Like the history of the fair-and-equitable requirement discussed above, the history of the prohibition on unfair discrimination predates twentieth century bankruptcy statutes. Out of equity receivership cases arose the principle that "reorganization plans . . . were fair only if they offered equal participation to all similarly situated creditors and shareholders." Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11 ("A New Perspective")*, 72 Am. Bankr. L.J. 227, 230 (1998). The requirement that a plan "not discriminate unfairly" was included in §77B(f)(1) of the Bankruptcy Act. For the most part, however, the phrase was removed in the 1938 Chandler Act, which instead imposed a requirement that plans be "fair and equitable, and feasible", apparently because "a prohibition against any unfair

26. Section 1122(a) provides that only claims that are "substantially similar" may be placed in the same class. §1122(a) ("a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."). Claims are not substantially similar, and "may be classified separately if 'significant disparities exists between the legal rights of the [claimholders] which render the two claims not substantially similar.'" *In re Wabash Valley Power Ass'n*, 72 F.3d at 1321 (quoting *Woodbrook*, 19 F.3d at 318)). Seventh Circuit precedent instructs that "[a] debtor in bankruptcy has considerable discretion to classify claims and interests in a chapter 11 reorganization plan." *In re Wabash Valley Power Ass'n*, 72 F.3d at 1321 (citing *Woodbrook*, 19 F.3d 312). For the reasons discussed below, Funding's unsecured guaranty claim results from the operation of §1111(b)(1)(A) and is not substantially similar to the other unsecured claims. See *Woodbrook*, 19 F.3d at 318 ("a general unsecured claim exists in all chapters of the Code, while a § 1111(b) claim exists only as long as the case remains in Chapter 11 and, once converted to a Chapter 7 case, recovery is limited to its collateral."). And, as also discussed further below, Funding's guaranty claim is for payment of JSM's debt to Funding; so, unlike all other unsecured claims, Funding enjoys a right to collect the obligation from JSM, the primary obligor, as well as from the debtor, which also makes the claim not substantially similar for classification purposes. See *Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC)*, 465 B.R. 525, 541 (B.A.P. 9th Cir. 2012), aff'd, 578 Fed. Appx. 644 (9th Cir. 2014) ("Here, we have an undersecured creditor who has a third-party source of recovery for its deficiency claim, the guarantors, whom it has already sued. . . . This is clearly a 'special circumstance' that does not apply to any other unsecured claimants and accords Wells Fargo a different status.").

discrimination" was "[i]mplicit" in the phrase "fair and equitable" and "therefore unnecessary." *Id.* at 232 (quoting S. Rep. No. 75-1916, at 35-36 (1938)); see also *id.* at 232 n.28 (noting that "Senate Report No. 1916 accompanied H.R. 8046, which was the bill ultimately enacted"). Chapters VIII and IX, covering railroads and municipalities, retained unfair discrimination provisions. *Id.* at 233; see also Act of March 3, 1933, ch. 204, §77(g)(1), 47 Stat. 1467, 1479; Act of May 24, 1934, ch. 345, §80(e)(1), 48 Stat. 798, 801. And courts applying this provision concluded that a plan violates the prohibition of unfair discrimination if "one creditor [is] obtaining some special favor or inducement not accorded the others . . .", particularly if the favor or inducement is not disclosed. *Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*, 311 U.S. 138, 147 (1940) (citing, among other cases, *In re M. & H. Gordon*, 245 F. 905, 906 (S.D.N.Y. 1917), where the court rejected the debtor's payment of a creditor's expenses to induce it to vote in favor of the plan because it resulted in payment in excess of the twenty-five percent proposed to be paid to the creditor in the plan.); see also *Kaufman Cnty. Levee Imp. Dist. No. 4 v. Mitchell*, 116 F.2d 959, 960 (5th Cir. 1941) (Plan providing for the improvement of lands owned by seventy-three percent of the participating unsecured creditors was "unfair and discriminatory" because "[i]t [was] inconceivable that anyone would have . . . been willing to take 8 cents on the dollar for the bonds, but for the prospective increase in value of their lands.").

Beyond this, historic usage offers little meaningful guidance for applying §1129(b)(1)'s requirement that the plan "not discriminate unfairly" against dissenting classes. And the legislative history surrounding its inclusion in the Bankruptcy Code is largely unhelpful (see Markell, *A New Perspective*, supra, at 236–39[27]), though one of the

---

27. Markell sums up the legislative history relating to the Code's inclusion of a prohibition on unfair discrimination in §1129(b)(1) as follows:

> All of this inquiry leads back to the floor comments indicating that the [unfair discrimination] requirement was reinserted after a forty year hiatus for "clarity." These comments are consistent with the notion that Congress intended nothing novel, and that

Code's drafters suggested that the role of "not discriminate unfairly" was limited to circumstances involving subordinated debentures. Klee, *Cram Down I,* supra at 141 ("The requirement is intended to be complementary to the fair and equitable test and to permit the court to evaluate the complex relationship inherent in the relative priority of classes caused by partial subordination." (footnotes omitted)).

Courts in this circuit have not limited §1129(b)(1)'s unfair discrimination provision to subordination. But the courts have also not settled on a uniform approach for deciding whether a plan's discriminatory treatment is unfair. See, e.g., *In re Multiut Corp.*, 449 B.R. 323, 351 (Bankr. N.D. Ill. 2011); *In re Dave's Detailing, Inc.*, 2015 WL 4601726, at *14 (collecting cases). Notably, the Seventh Circuit, in the context of deciding whether a chapter 13 plan offended §1322(b)(1)'s requirement that a plan "may not discriminate unfairly against any class" of designated unsecured claims, concluded about unfair discrimination "that this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law, which in this case is Chapter 13 of the Bankruptcy Code; and to uphold his determination unless it is unreasonable (an abuse of discretion)." *In re Crawford*, 324 F.3d 539, 541–42 (7th Cir. 2003). Seventh Circuit cases addressing unfair discrimination in the context of chapter 11 plans implicitly take a similar approach, affirming lower courts' findings on unfair discrimination if not clearly erroneous. See *203 N. LaSalle St. P'ship*, 126 F.3d at 969

> the search for the proper limits of the rule ought to canvass the past. Yet, given the other additions to the Code, it seems odd that clarity was needed. *Avon Park*'s concern with undisclosed compensation seemed to be met by the expanded definition of "insider" and the inclusion of § 1129(a)(4) and (5) relating to the disclosure and approval of insider compensation. Section 510(a) specifically codified recognition of subordination agreements.
>
> Thus, courts interpreting the unfair discrimination prohibition in the context of Chapter 11 cases faced a difficult task.

Markell, *A New Perspective*, supra, at 238–39 (footnotes omitted).

(ruling that the bankruptcy court's "explanation adequately explains the difference in treatment between the two classes of unsecured claims, and the bankruptcy court did not clearly err in refusing to find this discrimination unfair.").

This opinion follows that lead. It considers whether under the circumstances presented there is an adequate explanation for the plan affording Class 7 less favorable treatment than Class 9 and whether the difference in treatment is unfair.

2

A brief explanation of the claims that make up Class 7 and Class 9 is necessary to understand whether the plan's differing treatment of those classes constitutes unfair discrimination. Class 9 is made up of the unsecured claims of JSM and Wave. JSM and Wave "loaned money to the [d]ebtor during and after the pandemic for operating capital". ECF No. 1038, at 50. Those loans give rise to JSM's and Wave's allowed Class 9 claims to which neither the Lenders nor anyone else has objected.

Funding's Class 7 claim is based on the debtor's guaranty of a loan that Funding extended to *JSM*, the funds from which JSM put "into the Debtor's operations", as was the intent in obtaining the loan. ECF No. 1038, at 50–51. The guaranty makes the debtor jointly liable with JSM for payment of the note, and the guaranty is secured by a junior mortgage in the hotel. The debtor's guaranty of JSM's debt to Funding was not an isolated agreement; instead, it was one of a series of related agreements, including a note JSM made to pay Funding the $2.1 million it borrowed, all executed on January 3, 2022. Ex. Nos. 127–29, ECF Nos. 638-27, 638-28 & 638-29. On the same date, the debtor, Funding, and JSM, executed a Covenant Agreement in which they agreed that Funding's "recourse against [the debtor] with respect to the Guaranty shall be limited to enforcement of the Real Estate Mortgage . . . from [the debtor] to [Funding]." ECF No. 638-29, at 7.

Also, on January 3, 2022, two other agreements were executed that align the guaranty and the loan Funding made to JSM with the debtor's loan and senior

mortgage held by Computershare, as indenture trustee. The debtor signed a third amended loan agreement with the original lender and bond issuer, Wisconsin Housing and Economic Development Authority, and Computershare entered into a third supplemental indenture with Wisconsin Housing and Economic Development Authority.[28] ECF Nos. 638-7 & 638-11, Exs. 107 & 111; see also ECF No. 997. These agreements amend the loan and indenture that originally financed the hotel (called, in these documents, the "Project"). ECF No. 638-29, at 1. Funding, as "sole Bondholder", consented to both agreements. ECF Nos. 638-7 & 638-11, Exs. 107 & 111.

These documents show that any collection of the JSM loan from the debtor's nonrecourse guaranty would take a backseat to the principal loan and senior mortgage held by Computershare as indenture trustee. The Covenant Agreement provides that "to induce the Purchaser [Funding] to restructure certain terms of the Bonds and the Note" the debtor, JSM, and Funding agreed to be bound by the Covenant Agreement's terms. ECF No. 638-29, at 1, Ex. 129. Under the terms of the Covenant Agreement, the debtor and JSM agreed to "[m]andatory [p]repayment" terms: the debtor is required to repay the Project loans "upon repayment in full of the [JSM] Note" and "JSM will repay the Note upon repayment, redemption or purchase of the Bonds (other than a sale of Bonds initiated by the Purchaser [Funding])." *Id*. at 3, §2.03. Section 2.12 of the Covenant Agreement modifies the loan agreement governing the debtor's Project-loan obligations and ties JSM's performance on its January 2022 note to the debtor's obligation to Computershare on the Project-loan by providing that an "event of default"

---

28. The resulting third amended loan agreement authorizes the debtor to grant Funding the junior mortgage to give effect to the debtor's nonrecourse guaranty of the JSM note and conditions the third amended loan agreement's effect on, among other things, "effectiveness of the Covenant Agreement" and the "effectiveness of th[e] Third Supplemental Indenture related to the Bonds dated [January 3, 2022]." ECF No. 638-11, at 5, Ex. 11. The third supplemental indenture recognizes the outstanding principal balances on the bonds "[a]s of January 3, 2022 . . . taking into account payments required to be made on or about the date hereof pursuant to the Covenant Agreement". ECF No. 638-7, at 2.

by either JSM on its note or by the debtor on its obligation to Computershare (either under the loans or the indenture) constitutes an event of default under both the Project-loan obligation and the JSM note: "An Event of Default shall constitute an 'event of default' under the [debtor's] Loan Agreement and the [JSM] Note". *Id*. at 7, §4.02.

The Covenant Agreement limits Funding's ability to enforce the debtor's guaranty to its foreclosure of a mortgage on the hotel that is junior to the mortgages held by Funding's agent, Computershare, to secure the debtor's principal indebtedness. Thus, Funding's right to collect payment due on the JSM note from the debtor is limited by design to funds available from foreclosure of the hotel *after* Computershare is paid on its mortgages securing almost $45 million of total principal bond balances (after capitalization of accrued interest), as stated in the third supplemental indenture executed at the same time as the guaranty. ECF No. 638-7, at 2.

The nature of Funding's claim is thus legally and practically distinct from the unsecured claims that compose Class 8 (the vendor claims) and Class 9 (the JSM and Wave loan claims). Funding's guaranty claim is collectable only from the hotel and only if the hotel's value exceeds the $45 million Computershare claim secured by the senior mortgages. Computershare acts at Funding's direction for purposes of the senior indebtedness. Thus, as a practical matter, in the context of the overall January 2022 transaction, the debtor's nonrecourse guaranty operates to ensure that if the debtor were to sell or refinance the hotel, the debtor (and derivatively JSM as its principal owner) would realize no gain before Funding obtained repayment of the JSM note.

Funding's nonrecourse claim to collect from the hotel is valueless outside of bankruptcy and would receive nothing if the debtor were liquidated under chapter 7. Funding's allowed unsecured claim results solely from the operation of §1111(b)(1)(A), which states (subject to inapplicable exceptions), "A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim,

whether or not such holder has such recourse". See also *In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 601 (7th Cir. 2013) ("Regardless of whether the claim is secured by any value in the collateral, §1111(b)(1)(A) treats the nonrecourse [claim] as if [the claim] had recourse against [the debtor]."). But, as the Seventh Circuit has recognized, "[s]ignificant disparities do exist between the legal rights of the holder of a § 1111(b) claim and the holder of a general unsecured claim which render the two claims not substantially similar and which preclude the two from being classified together under § 1122(a)." *Woodbrook*, 19 F.3d at 318. "These disparities in rights stem from the most obvious difference between the two claims: a general unsecured claim exists in all chapters of the Code, while a § 1111(b) claim exists only as long as the case remains in Chapter 11 and, once converted to a Chapter 7 case, recovery is limited to its collateral." *Id*. (citing 11 U.S.C. §§103(f) & 502(b)(1)).

Courts and commentators have suggested that, at least in some circumstances, a plan may fairly provide holders of nonrecourse claims inferior treatment to holders of recourse claims because doing so "do[es] not unsettle prebankruptcy legal expectations":

> This could be the case, for example, if there is nonrecourse debt. Outside of Chapter 11 (in Chapter 7 or under state law), the value of a deficiency claim on a nonrecourse secured claim is zero. In Chapter 11, however, it has value. Different treatment of such deficiency claims has thus been approved since no nonbankruptcy expectations are hindered; indeed, any recognition will increase recovery.

Markell, *A New Perspective*, supra, at 257–58 (footnotes omitted) (citing, among other authorities, *203 N. LaSalle St. P'ship*, 126 F.3d at 969 and *Woodbrook*, 19 F.3d at 317–20); see also *In re Aztec Co.*, 107 B.R. 585, 592 (Bankr. M.D. Tenn. 1989) ("the existence of 'natural' and 'unnatural' recourse claimants is one factor to be considered in the unfair discrimination calculus; it is not outcome determinative."); *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 488 (Bankr. S.D. Ohio 1994) ("Accordingly, the Court finds that the

Plan's proposed treatment of Peoples nonrecourse deficiency claim does not discriminate unfairly against that claim. There are practical and legal differences between Peoples' nonrecourse deficiency claim and the general unsecured claims of trade creditors or security deposit holders. These differences support the later payment proposed for Peoples' nonrecourse deficiency claim under the Plan."); Denise R. Polivy, *Unfair Discrimination in Chapter 11: A Comprehensive Compilation of Current Case Law*, 72 Am. Bankr. L.J. 191, 209–10 (1998).

The plan's payment of Funding's §1111(b)-recourse guaranty claim by providing Class 7 with a lesser dividend over a longer period than the payment of Class 9 claims preserves the parties' prebankruptcy expectations. While the debtor's nonrecourse guaranty ensured that the debtor could not profit from a sale of the hotel without repaying the amount Funding loaned to JSM, the junior status of the nonrecourse-guaranty's lien required Funding to first expect repayment of the loan by JSM, the borrower. Even though the debtor guaranteed repayment, thus affording Funding an unconditional right to seek payment from the debtor's property by enforcing the mortgage,[29] the nonrecourse nature of the guaranty effectively ties Funding's exercise of its foreclosure rights to Computershare's exercise of the foreclosure rights under the senior mortgages. There's no evidence suggesting that the junior mortgage has been in the money at any time since it was granted as part of the January 2022 transactions; if anything, one might infer from the appraisal evidence that the hotel's value in 2022 was

---

29. "Unlike a guaranty of collection, a guaranty of payment does not condition liability upon the creditor exhausting remedies against the debtor. A creditor is under no obligation to first seek collection from the principal debtor or any other guarantor under a guaranty of payment." *Park Bank v. Westburg*, 832 N.W.2d 539, 551 (Wis. 2013) (citations omitted); see also *Bank of Sun Prairie v. Opstein*, 273 N.W.2d 279, 282–83 (Wis. 1979) ("With a guaranty of payment, a creditor is '"not under any legal obligation to first enforce collection from the maker or any other guarantor, or to first resort to securities given by the principal debtor . . . . Under [a] guaranty of payment, and not merely of collection, plaintiff was entitled to immediate recovery from the sureties, and his right to immediate recovery from them could not be postponed for their benefit until after efforts to recover[] by foreclosure or otherwise were exhausted."'" (quoting *First Wis. Nat. Bank of Oshkosh v. Kramer*, 246 N.W.2d 536, 538-39 (Wis. 1976) (second brackets added)).

almost certainly less than the $45 million identified as the total indebtedness in the third supplemental indenture, leaving no equity to which the junior mortgage could attach. As a result, there would be no point to Funding foreclosing on its junior mortgage unless Computershare was foreclosing on the senior mortgages and, as common sense suggests and the testimony showed, Computershare would not likely take that course unless Funding desired it. ECF No. 1037, at 46–48. In all events, at the time of the January 2022 transactions, Funding could not have reasonably expected to recover its loan to JSM from the debtor's property unless the debtor sold or refinanced the hotel for an amount that exceeded the $45 million then owed to Computershare.

The plan's treatment of Funding's claim thus makes Funding better off than it was outside of bankruptcy and better off than it would be in a chapter 7 case, since the plan pays Funding ten percent through monthly payments coextensive with the payments to Computershare. And, unlike the other unsecured claims, including the Class 9 claims, Funding has an alternative source from which to collect, namely, JSM, the entity that borrowed the funds and made the promise to pay that the debtor guaranteed. The plan in no way limits Funding's ability to seek payment from JSM, just as Funding would have expected to do outside of bankruptcy given that Funding agreed to make the debtor's guaranty a nonrecourse obligation rendering it a worthless collection vehicle unless the hotel's foreclosure value proved in excess of the $45 million debt secured by Computershare's senior mortgages.

Funding protests, however, that the plan discriminates unfairly because the disparity between the plan's ten percent payment over 18 years to Class 7 and fifty percent payment after five years to Class 9 excessively favors the insiders who hold those claims. ECF No. 1046, at 1 (citing *Woodbrook*, 19 F.3d at 321 (given full payment on insider unsecured claims, payment of five percent on §1111(b) unsecured deficiency claim "was the 'three dollar bill.'")). But, again, the plan indisputably pays Funding more than Funding could reasonably have expected to recover from the debtor either

under nonbankruptcy law (by exercising its rights under the January 2022 transactions, including its nonrecourse-guaranty) or in a chapter 7 liquidation. Under other circumstances the court might find the disparity in treatment between a class comprised of a creditor's §1111(b) "artificial" unsecured claim and a class of insiders with "natural" unsecured claims too great to be fair for purposes of §1129(b)(1); here, however, any additional plan distribution to Funding would allow Funding to collect from the reorganized debtor's operations in a way that it could not have expected to recover—*was not entitled to recover*—from the debtor outside of bankruptcy.[30]

What is more, any increase in payments to Funding directly reduces JSM's obligation to repay the $2.1 million it borrowed from Funding, a reduction that could have no economic benefit to the debtor or its bankruptcy estate. The only economic benefit of such an increase is to *JSM.* And, if increasing plan payments to Funding would have resulted in the reduction of payments to the Class 8 unsecured creditor class, that increase to Class 7 might have risked the vendors not continuing to do business with the reorganized debtor. For these reasons, Funding's claim is sufficiently

30. Some courts have reasoned that if "treatment of substantially similar claims is grossly disparate, it is very difficult for the plan proponent to show fair discrimination." *In re Deming Hosp., LLC*, No. 11-12-13377, 2013 WL 1397458, at *5 (Bankr. D.N.M. Apr. 5, 2013) (citations and quotations omitted); see also *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D. N.J. 2000) ("Courts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment (50% or more) to similarly situated creditors."); *In re Tucson Self–Storage, Inc.*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (court denied confirmation of a plan that proposed to pay trade creditors 100% and the deficiency claim 10%); *In re Aztec Co.*, 107 B.R. at 591 (plan discriminated unfairly by paying a class with an insider claim in full while paying noninsider claims a de minimus amount); *In re Barney & Carey Co.*, 170 B.R. 17, 19 (Bankr. D. Mass. 1994) (denying confirmation where deficiency claim was to be paid 100%, while general unsecured claims were to receive 15%). The plan's 10-50% split in distributions may reflect an effort to navigate these opinions. Here, however, the plan pays the same 50% percentage dividend to all "natural" unsecured creditors. The plan's payment of a lesser dividend to Funding's "artificial" §1111(b) unsecured recourse claim is not unfair discrimination because the claim carried distinct expectations outside of bankruptcy and is a legal construct of chapter 11. Moreover, paying Funding's claim on par with other unsecured creditors would benefit JSM by directing the reorganized debtor's funds from future operations to reduce its loan obligation to Funding, even though Funding could not have achieved that outcome in either a chapter 7 case or a foreclosure case because its right to that relief is limited to enforcing its underwater mortgage.

distinct both legally and factually from the claims that compose Class 9, and the plan's treatment does not discriminate unfairly.

IV

Section 1129(a)(3) requires the plan's proponent to demonstrate that the "plan has been proposed in good faith and not by any means forbidden by law." The Bankruptcy Code does not define "good faith." But "the term is generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1982)). In determining whether the plan proponent has made this showing, "the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code. The plan 'must be "viewed in light of the totality of the circumstances surrounding confection" of the plan [and] . . . [t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals.'" *Id.* at 425 (quoting *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984), which in turn was quoting *Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983)).

The Lenders' arguments contesting the good-faith nature of the proposed plan depend on a misconception of the good-faith inquiry, asking the court to parse the plan's terms and decide whether the debtor has shown that the plan embodies "a 'fundamental fairness in dealing with one's creditors.'" ECF No. 1046, at 15 (quoting *Madison Hotel*, 749 F.2d at 425). In proposing this uncharted equitable inquiry, the Lenders rely on *Madison Hotel*'s drive-by observation that "Similarly, in the context of a Chapter 13 reorganization, this court has interpreted the identical 'good faith' language contained in 11 U.S.C. §1325(a)(3) to require the bankruptcy court to review the proposed plan for accuracy and 'a fundamental fairness in dealing with one's

creditors.'"[31] 749 F.2d at 425 (quoting *In re Rimgale*, 669 F.2d at 432–33). But *Madison Hotel*'s passing reference to a "fundamental fairness" requirement (adopted for determining whether individual chapter 13 debtors propose a debt-adjustment plan in good faith under §1325(a)(3)) is an insufficient basis for finding statutory authorization to deem a chapter 11 reorganization plan that otherwise complies with the chapter's requirements not to be proposed in good faith under §1129(a)(3).

The Seventh Circuit has more recently instructed that "[t]o be in good faith a plan of reorganization must have a true purpose and fact-based hope of either 'preserving [a] going concern' or 'maximizing property available to satisfy creditors.'"

---

31. The source of *Madison Hotel*'s "fundamental fairness" language is *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426, 432–33 (7th Cir. 1982), which, in turn, was quoting *In re Beaver,* 2 B.R. 337, 340 (Bankr. S.D. Cal. 1980)). *Rimgale*, in the context of asking whether a chapter 13 plan paid too little to the debtor's tort victim, construed §1325(a)(3)'s good-faith provision as authorizing an inquiry into whether the plan works an "abuse of the provisions, purposes, or spirit of [the Chapter] in the proposal . . . ." 669 F.2d at 431 (quoting *Tenney v. Terry (In re Terry)*, 630 F.2d 634, 635 (8th Cir. 1980)). *Beaver*, the source of *Rimgale*'s "fundamental fairness" language, divined this concept from "Congressional intent" and chapter 13's "basic purposes" in eliminating a majority-acceptance requirement in chapter 13:

> This Court believes that a plan cannot be considered to have been filed in good faith unless it forwards the basic purposes of Chapter 13. As this Court understands Congressional intent in this regard, **a proper Chapter 13 plan must be a meaningful attempt to come to terms with creditors**. In this context **the requirement of good faith** is one meaning more than just simple honesty. Instead, it **requires a fundamental fairness in dealing with one's creditors.** Without such a requirement, Chapter 13 would be open to any number of potential abuses. Under the Act creditors were protected from mistreatment by the necessity of the plan receiving the acceptances of a majority of the unsecured creditors affected by the plan. See Bankruptcy Act § 652(1). That requirement has been eliminated under the Code. *House Report*, at p. 123. Instead Congress has now placed on the Courts the responsibility to insure that fair dealing is accomplished in Chapter 13 proceedings. They achieved this in the comprehensive requisites stated in Section 1325(a), and in particular, in the requirement of a specific finding of good faith before a plan can be confirmed.

*In re Beaver*, 2 B.R. at 340. Even if one could reconcile all this with the Supreme Court's admonition that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code," *Ahlers*, 485 U.S. at 206, the Code's structure does not reasonably allow "fundamental fairness" to limit modifications of creditors' rights that chapter 11 otherwise authorizes. Nor is there good reason to suppose that this amorphous notion of "fundamental fairness," which is not stated in the Code, is a component of "good faith" as used in §1129(a)(3).

*In re S. Beach Securities, Inc.*, 606 F.3d 366, 376 (7th Cir. 2010) (quoting *203 North LaSalle P'ship*, 526 U.S. at 453, and citing *Madison Hotel*, 749 F.2d at 425). The debtor's plan has a true purpose of restructuring the debtor's financial obligations to allow it to continue operating the Milwaukee Marriott hotel, thus preserving the debtor as a going concern. And, aside from the Lenders, the plan received strong support from the debtor's creditors. White Lodging, which had filed a proof of claim for over $1.5 million, agreed to compromise its claim and continue to do business with the reorganized debtor under the terms of an amended management agreement.[32] ECF Nos. 988 & 1019. Creditors in Class 8, comprised of impaired general unsecured claims, voted unanimously to accept the plan. ECF No. 941. This support and the conclusion that debtor's fourth amended plan "achieve[s] a result consistent with the objectives and purposes of the Bankruptcy Code" support a finding that the debtor proposed the plan in good faith. *In re Andreuccetti*, 975 F.2d 413, 420 (7th Cir. 1992) (quoting *Madison Hotel*, 749 F.2d at 425).

Ultimately, the Lenders alone opposed plan confirmation. They contend that the plan prioritizes JSM's interests over that of other creditors. But, even though the debtor no longer enjoyed the exclusive right to file and confirm a plan, the Lenders chose not to present creditors with an alternative. They complain that the plan intolerably modifies their rights; however, as shown above, the debtor has demonstrated that its plan complies with the requirements of §1129, including that its modifications of the Lenders' rights are authorized by the Bankruptcy Code. As the Seventh Circuit observed, "[i]t is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?" *In re James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992). So too a cramdown plan that complies with the other confirmation requirements of §1129 should not be found in bad faith simply because a creditor

32. White Lodging also filed a contingent claim for over $21 million based on the possible termination of its management agreement. It agreed to withdraw that claim as part of the compromise. See ECF No. 988 & 1019; Claim No. 16.

contends that a purely hypothetical plan of reorganization would have treated it more fairly.

In all events, considering the particular facts and circumstances presented in this case, the court finds and concludes that the debtor's plan will achieve a result consistent with the Bankruptcy Code, was proposed in good faith, and satisfies the requirement imposed by §1129(a)(3).

V

For the reasons stated in the Opinion, the court will confirm the debtor's fourth amended chapter 11 plan. The court will enter a separate order to that effect.

October 9, 2026

G. Michael Halfenger
United States Bankruptcy Judge