UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | Chapter 11 |
| WISCONSIN & MILWAUKEE HOTEL, LLC, | Case No. 24-21743 |
| Debtor. | Honorable G. Michael Halfenger |

# LENDERS' MOTION TO STAY CONFIRMATION ORDER PENDING APPEAL

Computershare Trust Company, N.A. (solely in its capacity as indenture trustee, taking direction from the bondholder, "Computershare") and Wisconsin & Milwaukee Hotel Funding LLC ("Funding," and together with Computershare, "Lenders"), hereby move pursuant to Federal Rule of Bankruptcy Procedure 8007 to stay the October 9, 2026 Order Confirming the Debtor's Fourth Amended Plan of Reorganization, pending resolution of their appeal of that order.[1] In support of this motion, Lenders represent the following.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

2. The Court retains jurisdiction to decide this Motion, notwithstanding Lenders' appeal. *See* Fed. R. Bankr. P. 8007(a)(1)(A), (D) (requiring party seeking stay of order or suspension of proceedings to move first in Bankruptcy Court).

[1] Lenders have, contemporaneously with this Motion, moved for an order shortening the notice period therefor and dispensing with a hearing.

## FACTUAL BACKGROUND

3. Debtor Wisconsin & Milwaukee Hotel LLC ("Debtor") filed a voluntary Chapter 11 petition on April 9, 2024.

4. Lenders filed proofs of claim in this case totaling more than $50 million. Their claims are more fully explained, and backed by supporting documentation, in Proof of Claim Numbers 11 and 12, filed with the Court on June 20, 2024.

5. Debtor received two extensions of its exclusive period to file a plan (*see* ECF Nos. 217, 357) before filing its first plan with the Court on February 7, 2025. (ECF No. 392.) It amended that plan on April 4, 2025, filing a clean copy on April 10 (ECF No. 504), then amended its plan again at the Court's direction on June 27, 2025 (ECF No. 621).

6. After more than a year of bankruptcy proceedings, Lenders filed a motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) on June 5, 2025. (ECF No. 577.)

7. Debtor filed its Third Amended Plan on August 4. (ECF No. 710.)

8. Trial on Lenders' motion for relief from the stay was held on August 6, 11, and 14, 2025. At the conclusion of the trial, Debtor informed the Court it intended to submit a fifth plan. (*See* Aug. 14, 2025 Tr. 149: 6-7 "[T]he plan will have to be amended to fix some of the glitches."), 155:6-156:14, ECF No. 746.)

9. On December 5, 2025, the Court entered an Opinion & Order modifying the stay to terminate upon the entry of an order denying confirmation of all plans of reorganization filed or last amended no later than December 31, 2025 and Lenders' filing of a request for termination of the stay, but otherwise denying Lenders' motion in its entirety. (ECF Nos. 803, 845.)

10. Lenders timely appealed from the Opinion & Order on December 17, 2025. (ECF Nos. 824, 846.)

11. On January 29, 2026, Lenders moved to stay further proceedings in this case pending the resolution of their appeal. (ECF No. 885.) Argument was heard on that motion on March 9, 2026 (*see* ECF No. 937), and the Court denied it on April 2, 2026 (ECF No. 957). Lenders then moved in the District Court to suspend further proceedings pending the District Court's resolution of their appeal.

12. On May 8, 2026, this Court entered an order approving the Debtor's proposed bid procedures. (ECF No. 992.) The order directed certain modifications to address some of Lenders' objections, but the Court also rejected certain of Lenders' objections to the bid procedures, including their arguments related to credit bidding and the distribution of auction overage to existing equity holders.

13. The Court held an evidentiary hearing on confirmation of the Debtor's Fourth Amended Plan on May 26, 2026, through May 28, 2026. (*See* ECF No. 1035.)

14. On September 14, 2026, the U.S. District Court for the Eastern District of Wisconsin affirmed the Bankruptcy Court's decision denying the motion for relief from the automatic stay. It denied as moot the still-pending motion to suspend proceedings.

15. On October 9, 2026, the Court issued an Opinion rejecting Lenders' arguments against the confirmability of the Fourth Amended Plan (ECF No. 1104) and entered an accompanying order confirming it. (ECF No. 1105.) That order was amended at the request of Debtor on October 22, 2026. (ECF No. 1113.)

16. Lenders filed a timely notice of appeal on October 23, 2026. (ECF No. 1114.)

17. On October 24, 2026, this Court entered an order raising the possibility of certification of the appeal to the United States Court of Appeals for the Seventh Circuit. (ECF No. 1117.) The Court directed the parties to provide their positions on certification on or before

November 4, 2026, and both parties filed their own positional statements accordingly. (ECF No. 1122, 1123.)

18. Lenders timely filed their Designation of Items to be Included in the Record on Appeal and Statement of Issues to Be Presented on November 6, 2026. (ECF No. 1124.)

## RELIEF REQUESTED

19. By this Motion, Lenders respectfully request that the Court stay its order confirming Debtor's Fourth Amended Plan (the "Plan"), pursuant to Federal Rule of Bankruptcy Procedure 8007(a).

20. Debtor has now initiated the procedures that will lead to the equity auction. As matters currently stand, Lenders believe that public notice of the equity sale has been given, potential bidders have signed non-disclosure agreements, access to a data room has been provided, and opening bids are due on or before December 14, 2026.

21. As discussed herein, proceeding with the equity auction will present serious risks of irreparable harm. Should this Court ultimately deny the Motion, Lenders have the right to seek a stay from the appellate court. *See* Fed. R. Bankr. P. 8007(b). But in the meantime, the equity auction will, presumably, proceed according to the proposed timeline.

22. Lenders recognize that this Court has indicated it has limited capacity from now until November 23, 2026. (ECF No. 1117.) Lenders therefore respectfully request, as set forth in the contemporaneously-filed motion to shorten the notice period and dispense with a hearing, that the Court expedite its consideration of this Motion to avoid the potential irreparable harm to Lenders' appellate rights as the equity auction procedures are implemented and, should this Court deny the Motion, to allow Lenders the opportunity to move for stay relief in the appellate court.

<u>**ARGUMENT**</u>

23. A party appealing an order of the bankruptcy court may move the court to issue a stay of its order during the pendency of the appeal to protect the rights of all parties in interest. Fed. R. Bankr. P. 8007(a).

24. A stay pending appeal is an exercise of judicial discretion and depends on the circumstances of the particular case. *See Nken v. Holder*, 556 U.S. 418, 433 (2009). When deciding whether to issue a stay under Bankruptcy Rule 8007, courts consider factors similar to those required in the preliminary injunction context, with the goal of "minimiz[ing] the costs of error." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). Specifically, the Court must consider "the moving party's likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other." *Id.*; *see also In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015); *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir. 1997).

25. The stay analysis takes the form of a "sliding scale" approach: "the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters.*, 742 F.3d at 766 (citations omitted); *see also Revel AC*, 802 F.3d at 569; *Forty-Eight Insulations*, 115 F.3d at 1301.

26. Here, Lenders respectfully submit that the circumstances here favor a stay and accordingly request that such a stay be granted.

**I. Likelihood of Success on the Merits**

27. "As a threshold matter, the applicant for a stay pending appeal must first show *some* likelihood of success on the merits." *In re Quade*, 496 B.R. 520, 526 (Bankr. N.D. Ill. 2013). "Once the threshold burden is met, . . . the applicant is required to make a stronger showing of the likelihood of success on the merits than the mere possibility of success that is

required in a preliminary injunction context." *Id.* "While this probability of success, laying somewhere along a continuum of likeliness, requires a substantial showing, it also calls for something less than a demonstration that the applicant will probably win on appeal." *Id.*; *see also In re Drs. Hosp. of Hyde Park, Inc.*, 376 B.R. 242, 246 (Bankr. N.D. Ill. 2007) ("Likelihood of success is not certainty of success; neither is it a mere possibility."); *Wilcox v. Stroup*, 358 B.R. 835, 838 (D.S.C. 2006) ("[T]o justify the granting of a stay, the movant need not always establish a high or mathematical probability of success on the merits.").

28. Applying the foregoing standards, Lenders respectfully submit that they have a strong likelihood of success on the merits of their arguments on appeal and that the first stay factor weighs in their favor.

29. Lenders will argue that the Court erred in approving the auction procedures on two separate grounds.

a. First, Lenders will argue that providing that all overages past a certain point will be paid over to existing equity holders due to their pre-existing equity interests renders the auction unfair and will chill bidding. As Lenders argued in their objections, under the procedures as approved, all excess proceeds after a certain threshold will return to pre-existing equity (i.e., JSM). Thus, past a certain point, JSM can bid with impunity, knowing that those additional monies from the auction will return to them, while other bidders enjoy no such assurances and must make their bids knowing that overage will go to JSM as pre-existing equity. Lenders disagree with the Court's conclusion that "[t]his is not self-evident" (ECF No. 992, at 36), and will argue that no additional

evidence is necessary to conclude that the *procedures themselves* are unfair simply because they permit such an outcome.

b. Second, Lenders will argue that the Court should have permitted credit bidding based on the principle that the absolute priority rule is designed to ensure an auction of equity in a reorganized debtor will obtain the highest possible price, as well as pursuant to *In re Castleton Plaza, LP*, 707 F.3d 821 (7th Cir. 2013) ["*Castleton Plaza I*"], Lenders respectfully submit that the Court erred in stating that "[c]redit bidding was never at issue in *Castleton Plaza*" (ECF No. 992, at 27), as demonstrated by subsequent proceedings in that case, where : (1) the bankruptcy court explained that *Castleton Plaza I* "directed the Court 'to open the proposed plan of reorganization to competitive bidding' and credit-bidding," Order at 6, *In re Castleton Plaza, LP*, No. 11-1444-BHL-11 (Bankr. S.D. Ind. Feb. 11, 2014), ECF No. 460 (quoting *Castleton Plaza I*, 707 F.3d at 824);[2] (2) the bankruptcy court rejected the debtor's subsequently submitted plan because it did not provide for competitive bidding or credit-bidding at the auction for equity in the reorganized debtor and dismissed the case; and (3) the Seventh Circuit affirmed those holdings, stating that "[t]he bankruptcy court properly implemented this court's decision." *In re Castleton Plaza, LP*, 561 F. App'x 561, 562 (7th Cir. 2014).

[2] Notably, the debtor filed a Petition for Writ of Certiorari, confirming that it shared the bankruptcy court's understanding of the Seventh Circuit's holding and stating that "[t]he Seventh Circuit nonetheless held that EL-SNPR and any other creditor (secured or unsecured) are entitled to credit-bid their entire claim at an auction of the unencumbered equity." *Castleton Plaza, LP v. EL-SNPR Notes Holdings, LLC*, No. 12-1422, 2013 WL 2452794, at *27.

30. Lenders will also argue that the Plan unfairly discriminates against them by providing Class 9 Insiders Jackson Street Management and Wave Renovations a 50% dividend over two and a half years after Class 8 creditors receive their distributions, while proposing to pay Wisconsin & Milwaukee Hotel Funding LLC, one of the Lenders, a mere 10% of its unsecured claim over eighteen years. Binding Seventh Circuit case law provides that plans that unfairly discriminate among unsecured creditors cannot be confirmed. *In re Woodbrook Assocs.*, 19 F.3d 312, 321 (7th Cir. 1994). This is discrimination: though Debtor claims that it treats existing equity holders less favorably than other creditors, it recognizes, as it must, that Funding is an exception. It is also unfair on its face: there is no reason for Debtor to pay insiders 50% over a short period of time while paying Funding just 10% over nearly two decades. The Court recognized that the eighteen-year term "is longer than would be available for conventional hotel financing." (ECF No. 1104, at 46.) And any argument that the eighteen-year period is established by the bond documents (1) does not change the discriminatory aspects of the plan, and (2) is incorrect, given that the loan documents verify, and Debtor itself has repeatedly acknowledged, that payments *actually came due* on March 31, 2024, following Lenders' numerous good-faith extensions of the original payment due date. (*See* ECF No. 638-4, Ex. 104, § 4.9; ECF No. 638-5, Ex. 105, §§ 2(a), 2(b); ECF No. 638-8, Ex. 108, § 2.7; ECF No. 638-9, Ex. 109, § 2(d); ECF No. 997, ¶¶ 12-13.)

31. Lenders will further argue that the Plan is not fair and equitable, as 11 U.S.C. § 1129(b)(2) requires.

a. As discussed at length in Lenders' prior briefing, literal compliance with the articulated standards in that subsection is not sufficient to demonstrate that a plan is fair and equitable, as those standards are not exhaustive. *See* 11 U.S.C.

§ 1129(b)(2) ("[T]he condition that a plan be fair and equitable with respect to a class *includes* the following requirements…" (emphasis added)); 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). Though this Court rejected that argument, it recognized in its October 9, 2026 Opinion that Lenders' position was "not without force." (ECF No. 1104, at 27.)

b. The Plan provides significantly better treatment to insiders than Funding on their unsecured claims; provides surplus auction proceeds to JSM, while Computershare is required to wait eighteen years for full payment; and allows for the payment of significant dividends to JSM, while Computershare must wait for a balloon payment that is speculative at best, thus requiring Computershare to bear the risks of the Plan's failure. As the Court recognized, "numerous nonprecedential opinions and academic articles read 'fair and equitable' in §1129(b)(2) to authorize a bankruptcy court to deny confirmation of a cramdown plan that is feasible and satisfies §1129(b)(2)(A)'s fair-and-equitable conditions, if the court concludes that the plan is unreasonable or unduly risky." (ECF No. 1104, at 43.) The Court further stated that "reasonable jurists might differ on whether the plan's treatment of Computershare's claim *unduly* shifts a risk of default to Computershare or is generally unreasonable." (*Id.* at 50.) *See also In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 940-42 (Bankr. S.D. Fla. 1992); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 708 (Bankr. S.D.N.Y. 1993); *In re Consul Rest. Corp.*, 146 B.R. 979, 989 (Bankr. D. Minn. 1992). Lenders submit that the weight of authority supports their position that in fact, the Plan's treatment

of Computershare is neither fair nor equitable under these circumstances—particularly given that the evidence showed that Debtor *could* have proposed a feasible plan that placed creditors' interests ahead of JSM's interests (May 27, 2026 Tr. 119:23-132:13, ECF No. 1037; May 26, 2026 Tr. 76:16-21, ECF No. 1038 (Erkert testifying that JSM could satisfy its debt to Reiman without assistance from Debtor)), and that, as Debtor admitted, it did not consider a single alternative payment stream to Computershare. (May 26, 2026 Tr. 92:4-93:10, ECF No. 1038.)

c. Moreover, Lenders will argue that the Plan is not "fair and equitable" in allowing for overage from the equity auction to be paid to existing equity holders, as described above.

32. Lenders will argue that the Plan violates the absolute priority rule because it pays Computershare $15 million more than the amount of its claim, in order to manipulate the present value calculation required by section 1129(b)(2)(A)(i)(II), while paying Funding only 10% of its claim. That is, the Plan reserves an extra $15 million to Computershare (instead of to the unsecured creditors) so that it can satisfy the requirements of section 1129(b)(2)(A)(i)(II), because Debtor wanted to provide Computershare with such low monthly payments over such a long period of time so that it can make distributions to its new owner. (May 26, 2026 Tr. 32:1-18, 69:10-17, 83:19-85:2, 90:3-6, ECF No. 1038; May 27, 2026 Tr. 20:4-11, 20:21-21:7, ECF No. 1037.)

33. Lenders will further argue that the Plan was not proposed in good faith, because, *inter alia*, it does not exhibit a "fundamental fairness in dealing with [Debtor's] creditors." *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (citation omitted). The low monthly

payments to Computershare, coupled with the massive and speculative balloon payment at the conclusion of the eighteen-year term, is designed to allow for insider payments to JSM so that it can pay its lender an 8% return over five years, as opposed to paying creditors like Computershare. JSM *could* have satisfied its obligations to its lender without taking dividends from Debtor. It chose not to. It did not even prepare any models of alternative payment streams to Computershare. (May 26, 2026 Tr. 92:4-93:10, ECF No. 1038.) This is not good faith. Lenders respectfully disagree with the Court's conclusion that the law as set forth in *Madison Hotel Associates* does not provide a basis for denying plan confirmation and further submit that, for all the reasons discussed above, the Plan does not in fact achieve "a result consistent with the objectives and purposes of the Bankruptcy Code." (ECF No. 1104, at 67 (quoting *In re Andreuccetti*, 975 F.2d 413, 420 (7th Cir. 1992)).

## II. Irreparable Harm

34. Second, a party seeking a stay must demonstrate irreparable injury. To constitute irreparable injury, the harm asserted must rise above the level of speculation, and it must be something more than monetary harm. *In re Quade*, 496 B.R. at 528.

35. Lenders face irreparable harm if a stay is not entered and proceedings are not suspended. "Irreparable harm is an injury that cannot be redressed by a legal or equitable remedy following a trial." *In re Tribune Co.*, 477 B.R. 465, 476 (Bankr. D. Del. 2012); *see also Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied").

36. In the absence of an order staying confirmation, Lenders will presumably continue to implement the Plan, including holding the proposed equity auction, preliminary

proceedings for which have already begun. As reorganization proceeds, that implementation risks undermining Lenders' ability to appeal from the confirmation order.

37. While many Circuit Courts of Appeals refer to this doctrine as "equitable mootness," the Seventh Circuit has in some cases rejected that nomenclature—though not the doctrine itself. Instead, "[i]n common with other courts of appeals, [it has] recognized that a plan of reorganization, once implemented, should be disturbed only for compelling reasons." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). It is "an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties." *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994). "An appellate court may properly refuse to decide the merits of a challenge to a bankruptcy or receivership plan where unwinding the plan (even if legally justifiable) would be difficult and inequitable in light of the complexity of the transactions and the reliance interests involved." *Duff v. Cent. Sleep Diagnostics, LLC*, 801 F.3d 833, 840 (7th Cir. 2015).

38. Allowing implementation of the Plan during the pendency of the appeal of the confirmation order, including by allowing the equity auction to proceed, will create a risk that the District Court and/or the Seventh Circuit will ultimately refuse to alter that plan, even should Lenders ultimately prove to be correct on the merits of their arguments. Lenders will thus lose the right to meaningful appellate review of the confirmation order, as well as their opportunity to proceed with foreclosure.

## III. No Substantial Injury to Other Parties

39. Staying the confirmation order will not cause substantial injury to Debtor or other parties to this proceeding.

40. A stay will merely preserve the *status quo* pending appellate review. *See In re Skinner*, 202 B.R. 867, 869 (W.D. Va. 1996) ("The case law signals a preference in favor of

maintaining the status quo.”). If Debtor is successful on appeal, then it may proceed to implement its Plan; if Lenders are successful, then the automatic stay will terminate upon submission of a doomsday order request. Either way, following the conclusion of appeal proceedings, this proceeding will come to a close; there is no danger that, as Debtor has previously argued, a delay will cause the Plan to fail or require further litigation on confirmation.

41. Lenders do not believe any significant additional expenses will be occasioned by a stay. Thus, no substantial harm will come to the Debtor from delaying Plan implementation while the appellate court determines whether confirmation was proper.

42. Debtor has already been relieved from the obligation to make any further cash collateral payments. (*See* ECF No. 1002.) Thus, this cannot serve as a continued source of harm, either.

43. Lenders are not aware of any substantial harm that third parties will suffer as a result of the requested stay, which, again, will result in the mere postponement of the implementation of the Plan while the appellate court determines whether the Plan should have been confirmed in the first instance. There has been virtually zero participation from Debtor’s other creditors in this matter thus far, and there is no reason of which Lenders are aware that a stay will affect those other creditors while the appeal is decided.

44. In sum, while Lenders will suffer substantial and irreparable harm in the event that Debtor is allowed to proceed to implement the Plan, in the form of the potential loss of meaningful appellate review of the confirmation order, neither Debtor nor third parties will suffer any substantial injury should the equity auction be delayed until Lenders’ appeal is concluded. Accordingly, the balance of harms favors granting Lenders’ requested relief.

## IV. Public Interest Considerations

45. Public policy concerns strongly support Lenders' request for a suspension of proceedings. "This factor calls for the court to weigh the public interest in the matter, and to consider and balance the goal of efficient case administration and the right to a meaningful review on appeal." *In re Taub*, No. 08-44210, 2010 WL 3911360, at *3 (Bankr. E.D.N.Y. Oct. 1, 2010); *see also In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 349-50 (Bankr. S.D.N.Y. 2007).

46. A stay will ensure Lenders the "right to a meaningful review on appeal," *In re Taub*, 2010 WL 3911360, at *3, which serves the public interest.

47. A stay will also prevent the possible need to unwind any transactions that take place in furtherance of the implementation of the Plan. Should the appellate court hold that the Plan was not confirmable, it will become necessary to undo whatever plan transactions have taken place, affecting not only the parties to this proceeding but any third parties who may have been involved in those transactions.

48. Furthermore, a stay will help to ensure that the auction achieves top dollar by providing potential bidders with certainty. As this Court has previously recognized with reference to the prior appeal of the denial of stay relief, a pending appeal injects an inherent uncertainty into the proceedings. (ECF No. 935 ("Won't any appeal effectively delay implementation of the proposed plan by making uncertain the value of the equity to be auctioned?").) With the confirmability of the Plan at issue on appeal, pressing forward with the auction now renders the finality of the Plan uncertain and may lessen the value placed on the equity to be auctioned or disincentivize bidding altogether.

49. Accordingly, because a suspension of further proceedings will preserve the right to meaningful appellate review, serve the aim of judicial efficiency, and help to effectuate the

purposes underlying the Bankruptcy Code, the public interest favors the Court granting a suspension of proceedings pending the resolution of Lenders' appeal.

**V. Bond**

50. Lenders should not be required to post a bond as a condition of granting their requested stay pending appeal.

51. Federal Rule of Bankruptcy Procedure 8007(c) permits, but does not require, the Court to condition relief on filing a bond or other security with the Court. *In re Sphere Holding Corp.*, 162 B.R. 639, 644 (E.D.N.Y. 1994) ("The posting of a bond, therefore, is discretionary."); *see* Fed. R. Bankr. P. 8007(c).

52. The purpose of imposing a bond is "to protect the adverse party from potential losses resulting from the stay." *In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426, 430 (D. Del. 1992). If no substantial harm will come to the opposing party, the Court need not condition the stay on a posting of the bond. *See, e.g.*, *id.*; *In re Finova Grp., Inc.*, Bankruptcy No. 01-698-PJW, Civil Action No. 07-480-JJF, 2007 WL 3238764, at *2 (D. Del. Oct. 31, 2007).

53. The suspension of proceedings that Lenders seek will do nothing more than maintain the status quo and the rights of the parties until after an appeal is decided. Thus, no real harm will be suffered by the parties by virtue of a stay. *See In re Sphere Holding Corp.*, 162 B.R. at 644-45 (bond not required as a condition to enjoin creditors from collection pending appeal when there was no evidence that the creditor's collateral was diminishing in value and little damage would occur). Therefore, a bond is unnecessary.

## NOTICE

54. Lenders will provide notice of this Motion to Debtor, counsel to Debtor, the US Trustee, Debtor's 20 largest unsecured creditors, and all parties that have filed a notice of

appearance and request for service of papers pursuant to Bankruptcy Rule 2002. Considering the nature of the relief requested herein, Lenders submit that no other or further notice is necessary.

## NO PRIOR REQUEST

55. No prior request for the relief sought herein has been made.

## CONCLUSION

For all of the reasons set forth herein, the Court should grant the Motion and stay its order confirming the Plan in this case pending the resolution of Lenders' appeal.

DATE: November 12, 2026

COMPUTERSHARE TRUST COMPANY, N.A.
WISCONSIN & MILWAUKEE HOTEL FUNDING LLC

BY: *<u>/s/ Frank W. DiCastri</u>*

Frank W. DiCastri
Sara C. McNamara
Monica A. Mark
REINHART BOERNER VAN DEUREN s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202-3186
414-298-1000
fdicastri@reinhartlaw.com
smcnamara@reinhartlaw.com
mmark@reinhartlaw.com